IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| MATTHEW REYNOLDS | : |
| Plaintiff, | : Civil Action No. 5:21-cv-01208-JFL |
| v. | : |
| WILLERT MFG. CO., LLC | : |
| Defendant. | : |

**STATEMENT OF UNDISPUTED MATERIAL FACTS IN SUPPORT OF DEFENDANT WILLERT MANUFACTURING COMPANY'S MOTION FOR <u>SUMMARY JUDGMENT</u>**

Defendant Willert Manufacturing Company submits the following Statement of Undisputed Material Facts in support of its Motion for Summary Judgment in this matter:

**A. <u>Plaintiff worked for Willert as a Maintenance Manager for two weeks.</u>**

1. From October 16, 2020 through November 5, 2020, Plaintiff worked for Willert as the Maintenance Manager of its Douglassville, PA facility. <u>See</u> Ex. A, Compl. at 15; Ex. B, Offer Letter.

2. On October 15, 2020, Willert sent correspondence to Plaintiff offering him the position of Maintenance Manager at Willert's Douglassville, PA facility (the "Offer Letter"). <u>See</u> Ex. B; Ex. C, Pl.'s Dep. at 162:10 – 163:21.

3. Plaintiff read and signed the Offer Letter. <u>See</u> Ex. C at 169:9-20.

4. Plaintiff worked at Willert's Douglassville, PA facility. <u>See</u> Ex. C at 158:18-24.

5. When he took the job at Willert, Plaintiff understood that Willert was "making two or three products there at the time," such as Ty-D-Bowl <u>See</u> Ex. C at 154:8 – 155:2.

6. Making those products involved the mixing of chemicals. <u>See</u> Ex. C at 155:3 – 15.

7. As the Maintenance Manager at Willert, Plaintiff's job responsibilities included "[s]afety, making sure my employees left the same way they came in. And equipment up time, ensuring that my employees supported production and keep the place running." See Ex. C at 171:23 – 172:4.

8. Plaintiff's job responsibilities included overseeing the repairs and installations and upkeep of various machines and power equipment associated with al parts of the production of liquid film manufacturing. See Ex. C at 172:16 – 173:2.

9. Plaintiff's job responsibilities included designing maintenance procedures, tracking budgets and expenses and performing inspections on different machines and equipment to find problems and make repairs or replace as needed. See Ex. C at 173:3-15.

10. Plaintiff's job responsibilities included communicating directly with the production manager and general manager to coordinate maintenance and repair work in process areas. See Ex. C at 174:21 – 175:2.

11. Plaintiff's job responsibilities included assisting the planning and implementing plant improvements and expansions. See Ex. C at 175:24 – 176:4.

12. Plaintiff's job responsibilities included maintaining, updating, operating training manuals for the maintenance department. See Ex. C at 176:11-15.

13. Plaintiff's job responsibilities included ensuring that all maintenance technicians were trained on the most updated version of the operating procedures. See Ex. C at 176:16-23.

14. Plaintiff's job responsibilities included reviewing the operation of plant equipment and systems constantly to minimize unplanned downtime, anticipate and solve problems in a timely manner and to identify opportunities for improvement. See Ex. C at 177:8-14.

15. Plaintiff's job responsibilities included making sure that maintenance and repair of the maintenance shop equipment happened. See Ex. C at 177:15 – 178:2.

16. Plaintiff's job responsibilities included ensuring that maintenance technicians are equipment trained, equipped and motivated so that the maintenance program could be accomplished in a safe, timely and cost-effective manner. See Ex. C at 179:5-11.

17. Plaintiff's job responsibilities included communicating regularly with all maintenance technicians both individually and as a group to ensure good two-way communication concerning maintenance issues. See Ex. C at 179:12-18.

18. Plaintiff's job responsibilities included initiating and carrying out projects that improve efficiency and/or reduce operating costs. See Ex. C at 180:2-6.

19. Plaintiff's job responsibilities included maintaining safety, health and environment policies and procedures. See Ex. C at 180:14-18.

20. Plaintiff's job responsibilities included ensuring that city, county and state and federal regulations relating to the maintenance department were met at all times. See Ex. C at 180:19-24.

21. Plaintiff's job responsibilities included initiating, implementing, and managing the plant maintenance program with an emphasis on planning, scheduling and preventative predictive maintenance. See Ex. C at 181:8-13.

22. Plaintiff was responsible for supervising maintenance technicians on all shifts. See Ex. C at 181:20 – 182:7.

23. Plaintiff wore personal protective equipment at Willert, including steel toe boots, safety glasses, and ear plugs. See Ex. C at 184:19 – 185:2.

24. The type of machinery at Willert while Plaintiff worked there included injection molding machines, filling machines, and bulk storage tanks to hold water and chemical mixtures. See Ex. C at 185:10-17.

25. The storage tanks were part of the equipment that the maintenance team was tasked with maintaining and repairing when necessary. See Ex. C at 186:18-21.

26. Plaintiff estimates that the bulk storage tanks were ten to fifteen feet high and six feet wide. See Ex. C at 185:18 – 186:1.

27. The storage tanks were electronically powered by 3 phase 480 volts of electricity. See Ex. C at 196:5-11.

28. A mixer was located on top of the storage tanks and a pump was located on the bottom. See Ex. C at 197:8-12.

29. If a mixer or pump broke, it was ultimately Plaintiff's responsibility as the Maintenance Manager to ensure that they were repaired. See Ex. C at 197:13 – 198:13.

30. During Plaintiff's time at Willert, the control system on one of the bulk storage tanks broke and required repair. See Ex. C at 187:10 – 190:5.

31. It was ultimately Plaintiff's responsibility to make sure that the storage tank was repaired and working again. See Ex. C at 190:2-5.

32. Plaintiff oversaw the maintenance and repair of fillers and air compressors at Willert. See Ex. C at 193:7-20; 197:2-7; 198:14-18.

33. Plaintiff described the fillers as "a long sequence of machines kind of lined up together," measuring approximately fifty to seventy-five feet long and approximately three or four feet high. Plaintiff's job responsibilities included enforcing proper "lock out, tag out" procedures. See Ex. C at 199:9-19.

34. The fillers injected liquid chemicals into bottles. See Ex. C at 195:4-18.

35. The fillers were electronically powered by "likely a 480 distribution into the main panel. And then it could be stepped down from there. Some equipment needs smaller voltages. So it's distributed from the local panel at the machine." See Ex. C at 196:12-21.

36. The air compressors were powered by 480 volts of electricity. See Ex. C at 196:22 – 197:1.

37. Plaintiff acknowledged at his deposition that 480 volts of electricity can injure and even kill someone. See Ex. C at 197:2-7.

38. Plaintiff's job responsibilities included enforcing proper "lock out, tag out" procedures. See Ex. C at 191:3-15.

39. Plaintiff explained at his deposition that if an electronically-powered machine required repair, the person performing repairs would need to "lock out" the machine before making the repairs. See Ex. C at 192:13-18.

40. The person performing those repairs would need to report to Plaintiff. See Ex. C at 192:13-22.

41. Further, Plaintiff himself performed work on machinery while he worked for Willert. See Ex. C. at 200:17 – 201:3.

42. Specifically, Plaintiff reports that he expedited parts for a machine he referred to as the "bottle scrambler." See Ex. C. at 200:17 – 201:3.

43. The "bottle scrambler" was powered by "probably 480, 3 phase" volts of electricity. See Ex. C. at 201:12-15.

44. In order to determine what parts needed to be ordered, Plaintiff removed the motor from the "bottle scrambler." See Ex. C. at 201:16 – 202:2.

B.  **Plaintiff Used Medical Marijuana.**

45. Before he began working for Willert, Plaintiff was allegedly diagnosed with severe anxiety disorder.  See Ex. A at 17.

46. Plaintiff further alleges that he was prescribed a course of medical marijuana treatment to manage the systems of his anxiety.  See Ex. A at 18.

47. Between July 2020 and May 2021, Plaintiff used medical marijuana five to seven times per week.  See Ex. C at 138:5-17.

48. During the two weeks that he worked at Willert, Plaintiff used medical marijuana approximately twice per week.  See Ex. C at 215:21-24.

49. He used medical marijuana if there was a particularly crazy day at work.  See Ex. C at 216:1-4.

50. Plaintiff experienced some "existential anxiety" during the two weeks he worked at Willert.  See Ex. C at 9-12.

51. On those occasions when he experienced "existential anxiety," Plaintiff used medical marijuana.  See Ex. C at 216:9-17.

52. On each occasion that he used medical marijuana, Plaintiff used "approximately one to five milligrams of THC with a ratio of 10 to 15 milligrams of CBD."  See Ex. C at 138:18 – 139:1.

53. Plaintiff typically used medical marijuana in the evening, around 5:00 p.m. or 6:00 p.m.  See Ex. C at 140:7-15.

54. Plaintiff does not know how long the medical marijuana he used stayed in his system after he used it.  See Ex. C at 140:3-6.

55.     When Plaintiff used medical marijuana, he used it in the form of tinctures or extracts.  See Ex. C at 135:13-22.

56.     Plaintiff testified that after he used medical marijuana, it did not emit a scent.  See Ex. C at 141:16-18.

### C. **Plaintiff Failed His Pre-Employment Drug Screen.**

57.     Plaintiff's offer of employment with Willert was contingent upon successful completion of a pre-employment drug test.  See Ex. B.

58.     Plaintiff understood that he needed to successfully complete the pre-employment drug test in order to work at Willert.  See Ex. C at 169:21 – 170:1.

59.     Plaintiff was originally scheduled to undergo the pre-employment drug screen on October 27, 2020, but missed his original appointment because he claimed that it was a busy day at work.  See Ex. C at 144:20 – 148:13.

60.     Before missing his original appointment, Plaintiff did not inform anyone from Willert that he would not be at the appointment.  See Ex. C at 148:14-23.

61.     On October 28, 2020, Plaintiff underwent the pre-employment drug screen for Willert.  See Ex. C at 144:15-19.

62.     Plaintiff ultimately tested positive for "D-THC-marijuana metabolite 50/15."  See Ex. C at 216:18 – 217:6; Ex. D, Drug Screen Results Letter.

63.     Plaintiff did not use medical marijuana on the date of his pre-employment drug screen.  See Ex. C at 144:1-4.

64.     Plaintiff could not state when he last used medical marijuana before the pre-employment drug screen.  See Ex. C at 144:5-14.

65. Plaintiff "likely" used medical marijuana within thirty-six hours prior to the pre-employment drug screen, and it is "possible" that Plaintiff used medical marijuana the night before the pre-employment drug screen.  See Ex. C at 144:5-14.

66. Plaintiff learned about his drug test results because the medical review officer ("MRO") called him.  See Ex. C at 209:5-10.

67. The MRO told Plaintiff that he tested positive for THC and sought Plaintiff's comments about that.  See Ex. C at 209:11-23.

68. Plaintiff testified at his deposition in this matter that he told the MRO that he was a medical marijuana patient.  See Ex. C at 209:5 – 210:5.

69. Plaintiff testified at his deposition in this matter that he also told the person who performed the drug screen that he was a medical marijuana patient.  See Ex. C at 212:13-23.

**D. No one from Willert knew that Plaintiff was a medical marijuana patient before he was terminated.**

70. Plaintiff did not tell Bryan Willert during his initial interview that he was a medical marijuana patient.  See Ex. C at 157:13-16.

71. Before he began working at Willert, Plaintiff attended an in-person meeting with Mr. Willert and Jack Bonsky, the Plant Manager at Willert's Douglassville location.  See Ex. C at 157:21 – 158:12.

72. Plaintiff did not mention that he was a medical marijuana patient to Mr. Willert or Mr. Bonsky during the in-person meeting.  See Ex. C at 160:2-5.

73. The Offer Letter Plaintiff read and signed provided that "[t]his offer is contingent upon successful completion of a pre-employment drug test."  See Ex. B.

74. When Plaintiff received the Offer Letter, he did not tell anyone from Willert that he was a medical marijuana patient.  See Ex. C. at 170:2-5.

75.     Plaintiff does not know if the person who performed his drug screen told anyone from Willert that he was a medical marijuana patient.  See Ex. C at 213:4-8.

76.     Plaintiff does not believe that the MRO told anyone from Willert that he was a medical marijuana patient.  See Ex. C at 213:18-22.

77.     Plaintiff did not tell anyone from Willert that he was a medical marijuana patient at any time before his pre-employment drug screen.  See Ex. C at 213:23 – 214:3.

### E. Willert only learned that Plaintiff was a medical marijuana patient after it terminated him.

78.     On November 5, 2020, Plaintiff was terminated.  See Ex. C at 218:3-4.

79.     Mr. Bonsky called Plaintiff, told him that "this is not going to be a pleasant call," and then read the contents of a termination letter which Plaintiff later received from Willert.  See Ex. C at 218:5-22.

80.     After Mr. Bonsky read Plaintiff the termination letter, Plaintiff told him that he was a medical marijuana patient.  See Ex. C at 218:23 – 219:4.

81.     Plaintiff also told Mr. Bonsky that he had a medical marijuana card, but did not show it to anyone.  See Ex. C at 128:6-15.

82.     Before Mr. Bonsky read the termination letter to Plaintiff, Plaintiff had not ever told Mr. Bonsky that he was a medical marijuana patient.  See Ex. C at 219:15-19.

83.     Before Mr. Bonsky read the termination letter to Plaintiff, Plaintiff never told Mr. Willert that he was a medical marijuana patient.  See Ex. C at 219:20-24.

84.     Before Mr. Bonsky read the termination letter to Plaintiff, no one from Willert knew that Plaintiff was a medical marijuana patient.  See Ex. C at 220:1-4.

85.     At the time that Plaintiff underwent the drug screen on October 28, 2020, he still had anxiety.  See Ex. C at 221:14-17.

86. At the time that Plaintiff underwent the drug screen on October 28, 2020, he had not discussed or consulted with a doctor about stopping the use of medical marijuana. See Ex. C at 221:9-13.

87. Plaintiff continued to use medical marijuana until May 2021. See Ex. C at 87:7-13.

Respectfully submitted this 7th day of September 2021.

**KAUFMAN DOLOWICH & VOLUCK, LLP**

By: /s/Eileen Monaghan Ficaro
Gregory S. Hyman, Esquire
Eileen Monaghan Ficaro, Esquire
Four Penn Center
1600 John F. Kennedy Blvd., Suite 1030
Philadelphia, PA 19103
(215) 501-7024 (phone)
(215) 405-2973 (fax)