**In the Matter Of:**

REYNOLDS V WILLERT

5:21-cv-01208-JFL

---

# MATTHEW REYNOLDS

*August 26, 2021*

---



800.211.DEPO (3376)
*EsquireSolutions.com*

1          IN THE UNITED STATES DISTRICT COURT

2        FOR THE EASTERN DISTRICT OF PENNSYLVANIA

3                       -  -  -

4    MATTHEW REYNOLDS,          :
                  Plaintiff,    :
5                               :
     -vs.-                      :
6                               :
     WILLERT MFG. CO., LLC,     :
7              Defendant.       : No. 5:21-cv-01208-JFL

8                       -  -  -

9            Thursday, August 26, 2021

10                      -  -  -

11              Videoconferenced deposition of

12   MATTHEW REYNOLDS, taken pursuant to notice, was

13   held virtually in the State of Arizona,

14   commencing at 9:59 a.m., on the above date,

15   before Jared Carey, a Professional Reporter and

16   Notary Public in and for the Commonwealth of

17   Pennsylvania.

18                      -  -  -

19           ESQUIRE DEPOSITION SERVICES
                 1835 Market Street
20                   Suite 555
            Philadelphia, Pennsylvania 19103
21                 (215) 988-9191

22

23

24



1        APPEARANCES:

2    LAW OFFICE OF STEVEN T. AUERBACH
     BY: STEVEN T. AUERBACH, ESQUIRE
3    822 Montgomery Avenue, Suite 210
     Narberth, Pennsylvania 19072
4    215.964.4410
     Attorney for the Plaintiff
5    (Appearing via Zoom)

6

7    KAUFMAN, DOLOWICH & VOLUCK, LLP
     BY: EILEEN MONAGHAN FICARO, ESQUIRE
8    1600 JFK Boulevard, Suite 1030
     Philadelphia, Pennsylvania 19103
9    215.501.7002
     Attorney for the Defendant
10   (Appearing via Zoom)

11

12

13

14

15

16

17

18

19

20

21

22

23

24



```
 1                  I   N   D   E   X

 2    WITNESS                            PAGE

 3    MATTHEW REYNOLDS

 4    BY:  MS. FICARO                    5

 5

 6

 7               E   X   H   I   B   I   T   S

 8    MARKED            DESCRIPTION        PAGE

 9    Exhibit 1   Medical marijuana card   126

10    Exhibit 2   Dispensary Information   131

11    Exhibit 3   Email                    145

12    Exhibit 4   Offer letter             162

13    Exhibit 5   Benefit package          170

14    Exhibit 6   Job description          172

15    Exhibit 7   List                     199

16    Exhibit 8   Drug screen              208

17    Exhibit 9   Photographs              238

18

19

20

21

22

23

24
```



```
 1            DEPOSITION SUPPORT INDEX

 2

 3  Direction to Witness Not to Answer

 4  Page Line          Page Line          Page Line

 5  None

 6

 7

 8  Request for Production of Documents

 9  Page Line          Page Line          Page Line

10  None

11

12

13  Stipulations

14  Page Line          Page Line          Page Line

15  None

16

17

18  Question Marked

19  Page Line          Page Line          Page Line

20  None

21

22

23

24
```



```
 1                    -  -  -
 2              MATTHEW REYNOLDS, having been
 3  duly sworn, was examined and testified as
 4  follows:
 5                    -  -  -
 6                  EXAMINATION
 7                    -  -  -
 8  BY MS. FICARO
 9        Q.     Good morning, Mr. Reynolds.  My
10  name is Eileen Ficaro.  I am an attorney at
11  Kaufman, Dolowich & Voluck.  And I represent the
12  Defendant Willert Manufacturing Company in this
13  matter.  I am here today to take your
14  deposition.  Have you ever had your deposition
15  taken before?
16        A.     No.
17        Q.     Have you ever testified in court
18  before?
19        A.     No.
20        Q.     I will begin with a few
21  instructions for you.  As you can see there is a
22  court reporter here who is on the Zoom video
23  with us.  And he is going to be taking down
24  everything that both you and I say during this
```



1  deposition.

2          As a result will you please make

3  sure that you give verbal responses to the

4  questions that I ask you?

5          A.    Yes.

6          Q.    Because he is going to be taking

7  everything down that we both say it is important

8  that we don't speak over one another during the

9  deposition.  So will you please wait until I

10 finish my questions before you provide your

11 answers?

12         A.    Certainly.

13         Q.    If I ask you a question and you

14 answer it I will assume that you understood the

15 question.  If at any time I ask you a question

16 and you don't understand what I'm asking, please

17 ask me to rephrase.  Okay?

18         A.    Yes.

19         Q.    I am here today not to have you

20 guess to answers to my questions.  But if you

21 are able to estimate or approximate the answers

22 to my questions would you please do so?

23         A.    Yes.

24         Q.    Did you take any medication



1   before your deposition today?

2        A.    No.

3        Q.    Is there anything today that

4   would affect your ability to understand my

5   questions and answer them truthfully?

6        A.    No.

7        Q.    Where are you presently

8   physically located?

9        A.    In my hotel room in Phoenix,

10   Arizona.

11        Q.    Is anyone else in the hotel room

12   in Arizona with you?

13        A.    No.

14        Q.    If anyone comes into your hotel

15   room during the course of this deposition will

16   you please let us know?

17        A.    Yes.

18        Q.    Why are you in Phoenix, Arizona?

19        A.    My current job has me out here

20   for training.

21        Q.    Did you review any documents

22   today in preparation for your deposition?

23        A.    Not today, no.

24        Q.    Did you review any documents at



1  all at any time in preparation for your

2  deposition?

3         A.    Yes.

4         Q.    What documents did you review in

5  preparation for your deposition?

6         A.    Going to get the title wrong.

7  But the Defendant's Response.  There were some

8  documents that I put together with facts and

9  information so just to refresh my memory.

10        Q.    Were those all documents that

11  have already been produced to us in this matter?

12  And by us I mean to Willert.

13        A.    Yes.  I believe so, yes.

14        Q.    Do you recall specifically what

15  any of those documents were?

16        A.    These were -- I don't know if

17  Steve would know exactly how they are presented

18  to you.  But I created them as PowerPoints.

19  There was like a Defendant's Response to

20  Interrogatories.  Sorry.

21        Q.    Were they then documents that you

22  then produced in response to questions that for

23  which you were asked for information in this

24  litigation?



```
 1            A.      Yes.   These were responses to
 2   questions from the defense.
 3            Q.      Other than your attorney did you
 4   speak to anyone else in preparation for your
 5   deposition?
 6            A.      No.
 7            Q.      Other than your attorney have you
 8   spoken to anyone else at any time prior to your
 9   deposition in preparation for your deposition?
10            A.      No.
11            Q.      Could you please state and spell
12   your full name for the record.
13            A.      Matthew David Reynolds.
14   M-A-T-T-H-E-W, D-A-V-I-D, R-E-Y-N-O-L-D-S.
15            Q.      Do you currently go by any other
16   names?
17            A.      Not legally.
18            Q.      Do you have nicknames?
19            A.      People call me Matt.
20            Q.      Have you ever gone by any other
21   names other than Matthew David Reynolds or being
22   referred to as Matt?
23            A.      No.
24            Q.      What is your date of birth?
```



```
 1          A.      April 7, 1979.
 2          Q.      What is your Social Security
 3  Number?
 4          A.      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.
 5          Q.      Are you currently married?
 6          A.      Yes.
 7          Q.      Who are you married to?
 8          A.      My wife.
 9          Q.      What is her name?
10          A.      Okay.  Megan Ellen Reynolds.
11          Q.      How long have you and
12  Mrs. Reynolds been married?
13          A.      Since 2007.  So I will say 14
14  years.
15          Q.      Were you married at the time that
16  you worked for Willert Manufacturing Company?
17          A.      Yes.
18          Q.      Where do you currently live?
19          A.      In Ephrata, Pennsylvania.
20          Q.      What is your address?
21          A.      1586 Division Highway, Ephrata,
22  PA.  Zip code is 17522.
23          Q.      How long have you lived there?
24          A.      Since 2016.  So five years in
```



 1  October.

 2          Q.     Does anyone else live at that

 3  address with you?

 4          A.     Yes.

 5          Q.     Who else lives there with you?

 6          A.     Our two sons.

 7          Q.     What are their names?  Let the

 8  record reflect Mr. Reynolds' video has gone out.

 9          A.     I am back.  Sorry.  I had a

10  pop-up.  My two sons live with us.

11          Q.     What are their names?

12          A.     So Logan Robert Reynolds and

13  Isaac Aaron Reynolds.

14          Q.     How old is Logan?

15          A.     He is 19.

16          Q.     How old is Isaac?

17          A.     He is 12.

18          Q.     At the time that you worked for

19  Willert how old was Logan?

20          A.     18.

21          Q.     At the time you worked for

22  Willert how old was Isaac?

23          A.     11.

24          Q.     Have you ever been a party to any



```
 1   other lawsuits?
 2           A.      No.
 3           Q.      Have you ever sued an employer
 4   before?
 5           A.      No.
 6           Q.      Have you ever sued any former
 7   employers of yours before other than Willert?
 8           A.      No.
 9           Q.      Have you ever been arrested?
10           A.      No.
11           Q.      Have you ever been convicted of
12   any crimes?
13           A.      No.
14           Q.      Have you ever served in the
15   military?
16           A.      No.
17           Q.      What is the highest educational
18   degree that you hold?
19           A.      Bachelor's of science.
20           Q.      When did you earn your bachelor's
21   of science?
22           A.      2000.
23           Q.      Where did you earn it from?
24           A.      ITT Technical Institute.
```



1          Q.     Where is that located?

2          A.     That was in Norfolk, Virginia.

3          Q.     Did you graduate?  Did you have a

4   major when you graduated?

5          A.     Yes.

6          Q.     What was your major?

7          A.     Automated manufacturing

8   technology.

9          Q.     What is automated manufacturing

10  technology?

11         A.     It was a technical overview of

12  the manufacturing process.  So courses in

13  hydraulics, pneumatics, controls.  It was not a

14  specific engineering degree like a electrical or

15  mechanical.

16         Q.     When you referred to controls

17  what are you referring to?

18         A.     The digital signals that

19  coordinate equipment in a manufacturing process

20  like the computer program that makes equipment

21  run.

22         Q.     Are those controls/signals

23  typically electronically powered?

24         A.     Yes.



```
 1          Q.     Did you have a minor in college
 2   at all?
 3          A.     Yes.   It was electronics
 4   engineering.
 5          Q.     Were those two separate minors or
 6   was that one minor?   Electronics engineering?
 7          A.     That was one.
 8          Q.     What is electronics engineering?
 9          A.     So that's low voltage, small,
10   like 12 to 24 volts DC.   It is a study of the
11   tiny components that go into devices, resistors,
12   capacitors, chips.
13          Q.     How are those components
14   typically powered?
15          A.     By low voltage DC, a 24-volt or
16   12-a volt power supply.
17          Q.     Have you taken or -- have you
18   engaged in any advanced learning since you left
19   ITT Technical Institute?
20          A.     Not like counting -- I don't know
21   if I understand the question.
22          Q.     Sure.  Did you attempt to obtain
23   any advanced degree after you left college?
24          A.     I did apply for a master's degree
```



```
 1  program.
 2          Q.      In what?
 3          A.      That was an MBA business
 4  administration.
 5          Q.      Were you accepted into that
 6  program?
 7          A.      Unfortunately I was not.
 8          Q.      Do you know why you were not
 9  accepted in that program?
10          A.      Yes.  Accreditation.  There were
11  different accrediting bodies.  So the university
12  I was applying to didn't recognize the
13  accreditation for the degrees that I held.
14          Q.      What university did you apply to
15  for the master's degree program?
16          A.      I'm sorry.  I don't remember at
17  this time.
18          Q.      Did you ever apply for any other
19  advanced degree programs?
20          A.      No.
21          Q.      Have you taken any continuing
22  education courses since you left ITT Technical
23  Institute?
24          A.      No.
```



```
1          Q.      Have you earned any
2   certifications in anything since you left ITT
3   Technical?
4          A.      The only thing I believe that
5   would fall under that -- well, let me make sure
6   I understand the question.  So would
7   employer-sponsored training count for that?
8          Q.      So I will ask about that as well.
9          A.      Okay.
10         Q.      For now have you earned any
11  industry certifications at all?
12         A.      I understand.  No.
13         Q.      You mentioned employer-sponsored
14  trainings.  Since you left college what types of
15  employer-sponsored trainings have you undergone?
16         A.      A front line supervisor boot camp
17  and a 40-hour arc flash electrical safety
18  program.
19         Q.      Where did you undergo the front
20  line supervisor boot camp?
21         A.      Harley-Davidson Motor Company in
22  York, Pennsylvania.
23         Q.      What types of things did you
24  learn or were you taught during that boot camp?
```



```
 1          A.     It was behavioral coaching mostly
 2   geared towards navigating the intricate
 3   relationship between the management and the
 4   union in that environment.
 5          Q.     Were there any other topics that
 6   were covered during the front line supervisor
 7   boot camp?
 8          A.     Coaching.  There is an emphasis
 9   on character.  And I can't speak further to
10   details on that.  It's been a while.
11          Q.     Do you receive any written course
12   materials as part of that frontline supervisor
13   boot camp?
14          A.     I believe so.
15          Q.     Do you still have a copy of those
16   written course materials?
17          A.     I'm not certain.  If I do it's in
18   a box in the garage somewhere.
19          Q.     You mentioned that one of the
20   topics covered during that boot camp was
21   coaching.  What type of coaching was covered
22   during that boot camp?
23          A.     It would be behavioral correction
24   from a supervisor.  I was a supervisor.  So
```



1  behavioral correction conversations between a

2  supervisor and a employee and navigating those

3  conversations in such a way to get buy-in, to

4  get the employees to understand where the

5  company was coming from and take deeper

6  ownership of the direction that was being given

7  to them rather than just a command-and-conquer,

8  you will do this sort of thing.  It's like seek

9  first to understand and be understood.

10        Q.      When did you participate in that

11  front line supervisor boot camp?

12        A.      This is going be an estimate.

13  2006.

14        Q.      Where was that boot camp held?

15        A.      Off site at a leased or rented

16  conference room in York, Pennsylvania.

17        Q.      Did Harley-Davidson run that boot

18  camp or was it a third party who ran that boot

19  camp?

20        A.      It was a third party.

21        Q.      What was the name of the third

22  party that ran that boot camp?

23        A.      I don't know and I don't know

24  that I ever did.



```
 1              Q.      You also mentioned you
 2    participated in a 40-hour arc flash safety
 3    course, did you refer to it as?
 4              A.      Yes.
 5              Q.      Is that the proper title of the
 6    course that you believe you underwent?
 7              A.      Yes.
 8              Q.      Where did you undergo that
 9    course?
10              A.      That was on site at
11    Harley-Davidson.
12              Q.      When did you undergo that?
13              A.      2005.
14              Q.      What topics were covered during
15    that course?
16              A.      Electrical safety and the NFPA
17    70E electrical safety code.
18              Q.      Were you taught anything about
19    lock out, tag out procedures during that course?
20              A.      Yes.
21              Q.      Do you recall what you were
22    taught about lock out, tag out procedures during
23    that course?
24              A.      I would say lock, tag, verify.
```



1  And I also want to say that I was not an

2  authorized user of lock out, tag out in that

3  case.  It was a awareness for me so I could

4  enforce the policies.

5       Q.    When you say you were not a

6  authorized user for lock out, tag out, what do

7  you mean by that?

8       A.    It was a union environment.  And

9  as a supervisor I was not authorized to touch

10  any equipment.  I was nonunion.  So I was

11  strictly forbidden to partake in any physical

12  work.

13       Q.    You mentioned that you taught a

14  course of supervising.  What did you learn

15  during that course about supervising lock out,

16  tag out procedures?

17       A.    The proper procedures for

18  tradesmen to follow to ensure safety during

19  performance of maintenance tasks.

20       Q.    As a supervisor then at that time

21  then what were your responsibilities with regard

22  to lock out, tag out procedures?

23       A.    Observing the work and ensuring

24  that the rules or the procedures were followed.

1          Q.     If you saw that procedures were
2    not being followed would it be your
3    responsibility to correct the procedures to
4    ensure they were?
5          A.     Do you mean correct as far as
6    coaching or instructing the employee?
7          Q.     Yes.  Was it your responsibility
8    to instruct the employee in terms of how to do
9    it correctly if you observe them doing it
10   incorrectly?
11         A.     Yes.
12         Q.     What else did you learn during
13   that course?
14         A.     It was a overview of electrical
15   safety which includes personal protective
16   equipment.
17         Q.     What did you learn about personal
18   protective equipment during that?
19         A.     That there was different
20   categories of work and different in regards to
21   electrical work.  And so each category requires
22   a different level of personal protective
23   equipment and different levels of safe work
24   practices to ensure the area is isolated, that



1  bystanders are restricted from accessing the

2  work area so they don't become exposed to a

3  safety issue.

4          Q.     Was there any discussion about

5  different voltages?

6          A.     Yes.

7          Q.     What did you learn about

8  electrical voltages during that course?

9          A.     That relates to the categories.

10 So voltages relate to I think it's called like a

11 incident level.  There is a calculation based on

12 the voltage inside of a cabinet which mandates

13 the level of personal protective equipment.  I

14 can't quote those off the top of my head.

15         Q.     Were you taught that any -- that

16 there were any voltages that were safe enough

17 for you to work with without personal protective

18 equipment?

19         A.     I don't recall.

20         Q.     Do you recall being taught that

21 any level of voltage can potentially be

22 dangerous?

23         A.     Yes.

24         Q.     Is there anything else that you



```
 1   recall about what you were taught concerning

 2   electrical voltages during that course?

 3          A.     No.

 4          Q.     Did you receive any certificate

 5   of completion upon completion of the arc flash

 6   safety course?

 7          A.     Yes.

 8          Q.     Do you still have a copy of that

 9   certificate?

10          A.     I don't believe so.  I'm not sure

11   on that.

12          Q.     What is an arc flash?

13          A.     That's in general terms when

14   something bad happens in a electrical cabinet.

15   It can look like a bomb going off depending on

16   the incident level.

17          Q.     Can arc flashes occur in

18   electrical cabinets containing any level of

19   voltage?

20          A.     Not any level, no.

21          Q.     How about voltages of a hundred

22   volts?

23          A.     I'm uncertain honestly.

24          Q.     Did you have in terms of your
```



1  course work at ITT Technical, what type of

2  courses related to electrical work did you take

3  there?

4          A.      In terms of electrical work there

5  was a safety awareness training which was not a

6  course.  It was like a one-day classroom

7  session.  The degree I received there was

8  focused on electronics, which is low level

9  signal voltages.  When you say electrical work I

10 consider that to be like tradesmen-level

11 electrical service.

12         Q.      Did you ever take any

13 tradesmen-level courses while at ITT Technical?

14         A.      No.

15         Q.      Have you taken any

16 tradesmen-level electric courses at any time

17 since you left ITT Technical?

18         A.      No.

19         Q.      Other than the two

20 employer-sponsored programs that you already

21 testified to, are there any other training

22 courses that you have completed since you left

23 ITT Technical?

24         A.      I did one arc flash refresher



```
 1   training.  It was a four-hour course.
 2          Q.     When did you take the arc flash
 3   refresher training?
 4          A.     2018.
 5          Q.     Where did you take the ark flash
 6   refresher training?
 7          A.     It was in Harrisburg.
 8          Q.     Who were you working for at the
 9   time you took the arc flash refresher training?
10          A.     That was Fleur De Lait.
11          Q.     How do you spell that?
12          A.     F-L-E-U-R.  Then D-E, L-A-I-T.
13          Q.     Where is Fleur De Lait located?
14          A.     New Holland, Pennsylvania.
15          Q.     Did Fleur De Lait sponsor or host
16   the arc flash refresher training course that you
17   took?
18          A.     No.
19          Q.     Who did?
20          A.     That was a free course offered by
21   a vendor that Fleur De Lait had a working
22   relationship with.
23          Q.     What was the name of that vendor?
24          A.     I'm not sure.  I can offer an
```



```
 1  estimate.
 2          Q.      Okay.  What is your estimate?
 3          A.      I believe it was Schaedler Yesco.
 4          Q.      How do you spell that?
 5          A.      S-C-H-A-E-D-L-E-R.  And then
 6  Y-E-S-C-O.
 7          Q.      What did you learn during the arc
 8  flash refresher training course?
 9          A.      It was a reinforcement of the
10  personal protective equipment required.  And it
11  gave updates to the NFPA electrical safety code.
12  I learned that that code is a very dynamic -- it
13  goes through a lot of revisions.
14          Q.      What did you learn about that
15  code during the refresher course?
16          A.      I learned that -- I learned that
17  some of the practices around electrical work as
18  far as recommended practices had been modified
19  or changed.
20          Q.      How had they been modified or
21  changed?
22          A.      They were in my opinion it was
23  more work friendly.  Meaning the 2005 code was
24  very strict.  It required numerous steps to be
```



1  taken.  And so I learned that over time it

2  appeared that the governing body determined that

3  there can be some changes made to make that a

4  more -- more conducive to the real world

5  honestly.

6       Q.    When you refer to the practices

7  that these modifications were being made, to

8  what types of practices were you referring to?

9       A.    I only want to speak to what I'm

10  certain about.  And I believe that was the

11  boundaries and physical barriers.

12       Q.    Boundaries and physical barriers

13  around what?

14       A.    So the original code required

15  like temporary fencing to be placed around a

16  work area.  And that was for, if I remember

17  correctly, that was for any hot work job where

18  electricity was live in the cabinet.  And if I

19  remember correctly, the standard changed to

20  where some basic troubleshooting can be done

21  without those barriers.

22       Q.    When you refer to basic

23  troubleshooting what are you referring to?

24       A.    Trying to diagnosis machine



 1  issues through electrical -- I don't want to try

 2  to define the word with the word.  But through a

 3  electrical troubleshooting process.

 4        Q.     Would those involve situations

 5  where for example a machine's motor stopped

 6  working?  When you refer to basic

 7  troubleshooting then would that be a situation

 8  where you would be referring to that type of a

 9  situation?

10        A.     Sure.  Yes.

11        Q.     When you refer to a hot work job

12  what are you referring to?

13        A.     Any time that lock out, tag out

14  cannot be followed due to some kind of

15  requirement within the task to enter that

16  electrical enclosure with a live voltage being

17  fed into it.

18        Q.     Why were you learning about those

19  topic areas at that time?

20        A.     The same reasons that I had at

21  Harley-Davidson.  I was supervising a

22  maintenance crew and awareness for me so that I

23  could ensure the safety of the workers.

24        Q.     Before October 2020 had you ever



```
 1   undergone any OSHA training?

 2           A.      Yes.

 3           Q.      When?

 4           A.      I will say 2008.

 5           Q.      Where did you undergo that

 6   training?

 7           A.      Harley-Davidson.

 8           Q.      What type of OSHA training did

 9   you undergo at that time?

10           A.      That was called Hazwopper.

11           Q.      What topics were covered during

12   the OSHA training?

13           A.      Waste clean-up, spill clean-up in

14   a industrial environment primarily.

15           Q.      Were there any other topics that

16   were covered?

17           A.      I don't recall.

18           Q.      Did the waste clean-up and spill

19   clean-up that you learned during that training

20   program, did that involve chemical clean-ups?

21           A.      It could.

22           Q.      When you refer to industrial

23   environments, are those situations in which you

24   may be dealing with equipment that is
```



```
 1  electronically powered?

 2          A.      No.  Typically not.

 3          Q.      In the type of industrial

 4  environment that you were learning about in your

 5  OSHA training course taken in 2008, how was the

 6  machinery in those types of situations

 7  considered to be powered?

 8          A.      In -- I feel like I can't give a

 9  all-encompassing statement.  But in general

10  these were spills not coming from power

11  equipment.  It would be other situations where

12  chemicals being transported or otherwise

13  handled.

14          Q.      Did you ever undergo any OSHA

15  training other than the courses in 2008 that you

16  just mentioned?

17          A.      Yes.

18          Q.      When else did you undergo OSHA

19  training?

20          A.      I don't remember the exact year.

21  But I can estimate it was 2003 or 2004.

22          Q.      Where did you undergo that

23  training?

24          A.      Harley-Davidson.
```



```
 1            Q.      What type of OSHA training did
 2   you undergo at that time?
 3            A.      Confined space.
 4            Q.      When you are referring to
 5   confined space, what are you referring to?
 6            A.      Those are -- the confined space
 7   is a restricted area with only one mode of
 8   egress that can be potentially hazardous, going
 9   into a tank, for example.
10            Q.      What type of tank?
11            A.      Any type of tank that is not
12   constructed with the intention of human
13   occupation.
14            Q.      Would that involve potentially
15   tanks that hold chemicals?
16            A.      Yes.
17            Q.      Do you recall anything specific
18   about what you learned regarding confined spaces
19   during that training?
20            A.      Yes.
21            Q.      What do you recall having
22   learned?
23            A.      Supervisory practices required to
24   follow the procedures in regards to a safe
```



```
 1  confined space entry.
 2         Q.    What did you learn about what
 3  needed to be done in order for those practices
 4  to be safe with regard to confined spaces?
 5         A.    That there would be no exceptions
 6  in that environment at Harley to practices.
 7         Q.    Does that mean at Harley-Davidson
 8  you were required to always follow safe
 9  practices with regard to confined spaces?
10         A.    Yes.  And, again, I was not
11  personally entering confined spaces.  This was
12  my part was a supervisory role making sure that
13  the employees were following those safe work
14  practices.
15         Q.    Is there any other OSHA training
16  that you had undergone?
17         A.    I don't recall.
18         Q.    Is there any documentation of
19  your completion of the OSHA courses that you
20  testified to today?
21         A.    I don't believe I have any of
22  those in my possession at this time.
23         Q.    When did you last have them in
24  your possession?
```



```
 1          A.      Probably -- this is an estimate.
 2   2013.
 3          Q.      How did they come to leave your
 4   possession?
 5          A.      My family moved a couple times
 6   and things get shuffled in a move.
 7          Q.      Other than what you testified to
 8   so far, are there any other training courses
 9   that you have completed since you graduated from
10   ITT Technical?
11          A.      I took a data analytics course.
12   I don't feel that relates to this specific
13   conversation much.
14          Q.      When did you take the data
15   analytics course?
16          A.      Estimating 2018.
17          Q.      Where did you take the data
18   analytic course?
19          A.      Online.
20          Q.      Why did you take a data analytics
21   course?
22          A.      I was interested in the topic.
23          Q.      What type of data was being
24   analyzed during that course?
```



```
 1          A.     There was no company-specific
 2  data.  It was for training on how to use Excel
 3  to improve your ability to navigate large
 4  quantities of data.
 5          Q.     Any other courses that you
 6  completed since leaving ITT Technical?
 7          A.     I don't recall any others.
 8          Q.     Have you ever attended any
 9  college or university other than ITT Technical?
10          A.     No.
11          Q.     When did you graduate from high
12  school?
13          A.     1997.
14          Q.     Did you go straight from high
15  school to ITT Technical?
16          A.     Yes.
17          Q.     Where did you go to high school?
18          A.     Northern York County School
19  District in Dillsburg, Pennsylvania.
20          Q.     Did you go to York High School or
21  was it called Northern Work?
22          A.     Northern York.  That was the
23  formal name.
24          Q.     After you graduated from ITT what
```


ESQUIRE
DEPOSITION SOLUTIONS

1 | did you do?

2 |         A.     I immediately -- I had been

3 | offered a job at United Parcel Service.

4 |         Q.     What job did you hold at United

5 | Parcel Service?

6 |         A.     It was a plant engineering role.

7 |         Q.     What was your specific role with

8 | regard to plant engineering at UPS?

9 |         A.     The oversight of what they called

10 | extended centers, satellite hubs to the main

11 | hubs within their system -- hubs being

12 | buildings.

13 |         Q.     Before I ask a question about

14 | that, when I refer to UPS I mean United Parcel

15 | Service.  Is that okay?  Do you understand what

16 | I'm saying when I refer to it as UPS?

17 |         A.     Yes.  They actually changed their

18 | name to UPS.  That's accurate.

19 |         Q.     What did you do at UPS with

20 | regard to oversight of the extended centers?

21 |         A.     Vendor and contractor management

22 | primarily.  Also capital project development,

23 | environmental compliance, and facility asset

24 | protection.



```
 1            Q.      What did vendor and contractor
 2    management entail?
 3            A.      Preventative -- scheduling,
 4    vendor and contractor activities and scheduling,
 5    coordinating, ensuring payment for those
 6    activities.
 7            Q.      What do you mean when you say
 8    scheduling vendor and contractor meetings, were
 9    you bringing vendors to the company?
10            A.      They were service providers to
11    the company.
12            Q.      Were these then vendors the
13    company would use to do various things for UPS?
14            A.      They were performing on site
15    tasks.
16            Q.      Were they performing on site
17    maintenance tasks or other types of tasks?
18            A.      Correct.  Like breakdown response
19    as well as preventative maintenance.
20            Q.      Breakdown response with regard to
21    what?
22            A.      Any of the -- anything that was
23    not a package car or a box on the UPS property.
24            Q.      Was there any machinery that was
```



1  used on the UPS property?

2        A.     Yes.

3        Q.     Would the breakdown work for

4  which you were bringing in vendors pertain to

5  breakdown work for that machinery?

6        A.     Yes.

7        Q.     When you say breakdown work, what

8  are you referring to?

9        A.     Any equipment situation that

10  would interrupt their ability to process

11  packages or otherwise perform the work, mainly

12  focused on packages.

13        Q.     What type of equipment then did

14  they have in the facility to handle that?

15        A.     Conveyors, overhead doors, dock

16  locks.

17        Q.     Was your role at UPS to simply

18  bring the vendors in who would work on the

19  machinery?

20        A.     Correct.

21        Q.     Did you have to watch them do the

22  work on the machinery?

23        A.     It was not required, no.

24        Q.     Did you watch them do the work on



```
 1   the machinery?
 2           A.      Occasionally.  But not always.
 3   Just the logistics of it.
 4           Q.      Was it your responsibility there
 5   at UPS to ensure the vendor completed the job on
 6   the machinery at issue?
 7           A.      Do you mean like a physical
 8   verification?
 9           Q.      Yes.
10           A.      In that case, no.
11           Q.      Was there another type of
12   verification that you had to perform to ensure
13   those vendors performed their job correctly on
14   the machinery?
15           A.      Yes.
16           Q.      What type of verification did you
17   do to make sure that that occurred?
18           A.      Communication primarily with the
19   UPS staff on site.
20           Q.      Were you located on site at UPS
21   while you worked there?
22           A.      I was at a UPS facility.  I was
23   responsible, again just to clarify, I was
24   responsible for extended centers.  So I had nine
```



```
 1  facilities outside of that one that I was
 2  coordinating processes for.
 3         Q.    Would you travel from facility to
 4  facility?
 5         A.    At times, yes.
 6         Q.    When you were not traveling from
 7  facility to facility where was your office
 8  located?
 9         A.    At the main hub in Roanoke,
10  Virginia.
11         Q.    Was there machinery located at
12  the main hub for which you needed to bring in
13  vendors?
14         A.    Yes.  As a secondary, I was the
15  backup for that facility.
16         Q.    When you say backup, what do you
17  mean?
18         A.    There was a plant engineer that
19  had the ownership and responsibility for that
20  entire facility.  But if they were on vacation
21  or otherwise unavailable I was expected to step
22  in to handle any unexpected situations that came
23  up.
24         Q.    Would that involve repairing any
```



1  machinery that broke?

2        A.      Me personally, no.

3        Q.      Would it involve ensuring that

4  machinery that broke was repaired?

5        A.      Yes.  Not necessarily through

6  physical verification.  But I had to know what

7  was going on.

8        Q.      In terms of your work with regard

9  to capital projects at UPS, what do you do?

10        A.      Developed scope of work,

11  developed the cost estimates and proposed that

12  project package up through the chain of command.

13  I apologize.  May I go to the restroom quick?

14        Q.      Sure.

15             (Discussion held off the record.)

16  BY MS. FICARO

17        Q.      Mr. Reynolds, what type of

18  capital projects did you deal with at UPS?

19        A.      They refer to it as facility

20  asset protection.

21        Q.      What type of projects were those

22  then?

23        A.      Facility repairs, paving,

24  overhead door replacements, conveyor

ESQUIRE
DEPOSITION SOLUTIONS

```
 1   modifications.
 2          Q.      What was your job title at UPS?
 3          A.      Plant engineering supervisor.
 4          Q.      What did you earn at UPS?
 5          A.      Annual salary?
 6          Q.      Yes.
 7          A.      Entry base level was $42,000 a
 8   year.
 9          Q.      Did you earn bonuses while you
10   worked there?
11          A.      No.
12          Q.      How long did you work for UPS?
13          A.      Three years.
14          Q.      Was that then from
15   approximately 2000 until 2003?
16          A.      Correct.
17          Q.      Why did you leave UPS?
18          A.      Actually I wanted to get back
19   home.
20          Q.      Was home York, PA?
21          A.      Yes.  And I had accepted a job
22   offer at Harley-Davidson.
23          Q.      Were you asked to leave UPS?
24          A.      No.
```



```
 1          Q.      Where is Harley-Davidson located?

 2          A.      York, Pennsylvania.

 3          Q.      When you began working for

 4  Harley-Davidson what was your job title there?

 5          A.      Maintenance supervisor II.

 6          Q.      Did your job title ever change

 7  during time you worked at Harley-Davidson?

 8          A.      No.

 9          Q.      As the maintenance supervisor II

10  what were your job responsibilities?

11          A.      Supervising and coordinating

12  equipment repairs, managing people.

13          Q.      What type of equipment -- for

14  what type of equipment were you supervising and

15  coordinating repairs?

16          A.      Manufacturing equipment related

17  to the fabrication and assembly of

18  Harley-Davidson motorcycles.

19          Q.      What type of equipment was that?

20          A.      Hydraulic presses, metal

21  fabrication, chrome plating, paint shop, weld

22  shop, waste treatment plant, facilities and

23  grounds, housekeeping, environmental, hazardous

24  waste clean-up, robotics, the assembly line and
```



```
 1  then general facilities and grounds.
 2          Q.    As the maintenance supervisor II
 3  did you supervise and coordinate equipment
 4  maintenance and repairs with regard to all of
 5  the equipment at Harley-Davidson during the time
 6  that you worked there?
 7          A.    No.  Not all.
 8          Q.    So then the equipment that you
 9  supervised and coordinated repair and
10  maintenance of was just the equipment that you
11  previously testified to?
12          A.    Well, I feel like I should strike
13  that prior response when I say "all."  There
14  were times when I was responsible for the
15  supervision of all the maintenance employees on
16  shift for the entire grounds, although that was
17  not my primary job responsibility.  There were
18  times when I was indeed responsible for all
19  activities on site.
20          Q.    When you say you were responsible
21  for all of them, what did you do then with
22  regard to those maintenance workers?
23          A.    What did I do?  I would walk,
24  talk, direct, work, clarify questions.  And then
```



```
 1   there was a mix of planned project work that I
 2   would be directing as well as breakdown of
 3   maintenance and response, production support as
 4   well.
 5           Q.      Did you physically oversee any
 6   work that individuals, maintenance employees,
 7   performed there?
 8           A.      Overseeing, yes.
 9           Q.      Does that mean you were
10   physically present when you would perform work
11   on the equipment?
12           A.      Not a hundred percent of the
13   work.  But, yes, I was present for various
14   activities.
15           Q.      How was the equipment at
16   Harley-Davidson during the time you worked there
17   powered?
18           A.      Electricity, pneumatics for
19   compressed air, steam, and I believe natural gas
20   or propane, some kind of combustible.
21           Q.      Did you have to wear personal
22   protective equipment when you worked at
23   Harley-Davidson?
24           A.      Yes.
```



```
 1            Q.      What type of personal protective
 2     equipment did you have to wear?
 3            A.      Steel-toed boots, safety glasses,
 4     ear plugs.
 5            Q.      Anything else?
 6            A.      No.
 7            Q.      With regard to the equipment that
 8     was electronically powered did you ever interact
 9     with the electrical panels associated with that
10     equipment?
11            A.      Personally like as far as me
12     interacting with those personally?
13            Q.      Yes.
14            A.      No.
15            Q.      Did you ever have to inspect the
16     electrical panels?
17            A.      Do you mean internally like with
18     the panels open or just like physically where
19     they are placed?
20            Q.      I will say both ways.  Physically
21     where they were placed did you have to inspect
22     the electrical panels?
23            A.      Yes.
24            Q.      Were you ever present when any of
```



1  electrical panels were open?

2          A.      Yes.

3          Q.      For what purposes would you be

4  present when an electrical panel was open?

5          A.      Primarily that would be to

6  understand what was going on during the

7  troubleshooting process.  So I would be outside

8  of the restricted boundary.  But I had to speak

9  to the work in progress.

10                 So if there was a job going on

11  during shift change the more information I had

12  the better because then I could communicate to

13  the incoming shift supervisor so they would know

14  what is going on.  So I was there to talk to

15  employees and ask them questions, just make sure

16  that I had as complete of a story as possible to

17  share with other management.

18          Q.      In terms of supervising and

19  overseeing the maintenance workers who were

20  working at Harley-Davidson while you worked

21  there, did that involve ensuring their safety?

22          A.      Yes.

23          Q.      How long did you work at

24  Harley-Davidson?



```
 1              A.      2003 to 2009.  So six years.
 2              Q.      When you left Harley-Davidson
 3   what were you earning there?
 4              A.      My last W-2 was $93,000 I
 5   believe.
 6              Q.      Did you have an opportunity to
 7   earn bonuses while you were there?
 8              A.      No.
 9              Q.      Was that because you were not
10   eligible for bonuses while you were there?  Or
11   because there was no opportunity for you to even
12   try to earn a bonus there?
13              A.      There was no bonus structure, at
14   least not for the role which I held.
15              Q.      Why did you leave Harley-Davidson
16   in 2009?
17              A.      I accepted a offer at Fleur De
18   Lait.
19              Q.      Were you asked to leave
20   Harley-Davidson?
21              A.      No.
22              Q.      Did you ever receive any poor
23   performance reviews at Harley-Davidson while you
24   worked there?
```



```
 1            A.     No.
 2            Q.     Did you ever receive any written
 3   reprimands for work that you performed at
 4   Harley-Davidson?
 5            A.     No.
 6            Q.     Were you ever the subject of any
 7   disciplinary action while you worked at
 8   Harley-Davidson?
 9            A.     No.
10            Q.     Did you apply for the job at
11   Fleur De Lait or were you recruited to go work
12   there?
13            A.     A recruiter located me.
14            Q.     What type of company is Fleur De
15   Lait?
16            A.     They are food production.  They
17   make cream cheese.
18            Q.     What was your job title at Fleur
19   De Lait?
20            A.     I had two.  Initially it was
21   maintenance engineer.  And let's see.  Three or
22   four years later I was promoted to maintenance
23   manager.
24            Q.     As the maintenance engineer what
```



1   were your job responsibilities?

2           A.      Supervising the spare parts crib

3   attendant, supervising vendors and outside

4   contractor activity, supervising the ammonia

5   refrigeration system activities, and supervising

6   the waste water treatment plant operator and

7   those operations as well as backup support for

8   the primary maintenance supervisor when he was

9   otherwise unavailable.

10          Q.      Where is Fleur De Lait located?

11          A.      New Holland, Pennsylvania.

12          Q.      Did you visit one facility or

13  does it have multiple facilities?

14          A.      There were four buildings

15  associated with the company in that locale.

16          Q.      Were those four buildings all

17  located on the same property?

18          A.      No.

19          Q.      How far apart from each other

20  were those buildings located?

21          A.      Approximately an eighth of a

22  mile.

23          Q.      Did you work primarily in one

24  building or out of all the buildings?



```
 1              A.      Primarily out of the one
 2   building.
 3              Q.      Did you ever -- was there any
 4   machinery located in the building that you
 5   worked out of?
 6              A.      Yes.
 7              Q.      What type of machinery?
 8              A.      So milk and cream processing
 9   equipment as well as food packaging equipment
10   and then cooling and refrigeration.
11              Q.      What type of machines were
12   involved in the milk and cream processing?
13              A.      Silos, tanks, homogenizers,
14   separators, pumps, valves.
15              Q.      Was there a mixing of chemicals
16   that occurred in the facility where you were
17   located in order to process the milk and cream?
18              A.      No.
19              Q.      What did you actually do to
20   oversee -- rather to supervise the maintenance
21   of that machinery there?
22              A.      That was similar to
23   Harley-Davidson.  I was involved in coordinating
24   spare parts, though.  So if there is a breakdown
```



1    and we didn't have a spare part I might run down

2    to Lancaster and get it.  But otherwise it was

3    primarily communication, coordination, people

4    management, you know, walking the floor and

5    being available, you know.

6              A customer service aspect with

7    the operators.  My motto as maintenance became

8    "we are here to help."  So just being out there

9    and talking to the operators and understanding

10   what their issues were so that I could

11   communicate that with the maintenance employees.

12       Q.     If there was a issue with regard

13   to a piece of machinery at Fleur De Lait would

14   you be the first person who was called to

15   troubleshoot that issue?

16       A.     No.

17       Q.     Who would be the first person

18   called to troubleshoot that issue?

19       A.     They had a paging system.  So it

20   would be a general page to maintenance which

21   meant any of the available hourly maintenance

22   staff which were on site at the time.

23       Q.     Were you ever called to

24   troubleshoot issues with machinery at Fleur De



 1   Lait?

 2            A.      Yes.

 3            Q.      Were you often called to

 4   troubleshoot machinery issues at Fleur De Lait?

 5            A.      No.

 6            Q.      About how often were you called

 7   to troubleshoot issues with machinery at Fleur

 8   De Lait?

 9            A.      Maybe monthly.

10            Q.      On those occasions what would you

11   have to do?

12            A.      Usually I was called when

13   somebody was responding.  So it was rare, if

14   not -- I don't want to say never.  But it was

15   rare that I was actually troubleshooting.  But I

16   was called to the site of the problem.  The

17   problem would be explained to me.  If I

18   understood it well enough that I could direct

19   the hourly employee or help them coach them

20   through a corrective action I would do that.

21                   And then, you know, usually there

22   was a reason why no other maintenance folks were

23   available.  So I would be then following up to

24   go find a maintenance employee to try to get



```
 1  them out there to get things taken care of.  I

 2  can't carry tools, for example.  I had a cup of

 3  coffee and a pen -- well, not a cup of coffee on

 4  the production floor, but clipboard, pen,

 5  flashlight.

 6          Q.      And in terms of the coaching of

 7  individuals through corrective actions, were you

 8  personally present with those employees when you

 9  would be coaching them?

10          A.      Yes.

11          Q.      Did those corrective actions ever

12  involve issues concerning electrical panels

13  associated with the equipment there?

14          A.      No.

15          Q.      What would happen when there was

16  an issue with the powering of the machines

17  there?

18          A.      We had a journeyman electrician

19  on site.  And he was the first point of contact

20  for those issues.  We also had a automation and

21  controls technician which is a very similar role

22  that was also primary point of contact.

23          Q.      Did you oversee the work,

24  supervise the work, the journeyman electrical
```

1  individual would perform on site?

2        A.    Yes.

3        Q.    Would you be physically present

4  when you were overseeing that work?

5        A.    At times.  Not 100 percent of the

6  time.

7        Q.    Was ensuring that the journeyman

8  electrical individual on site properly

9  troubleshot that issue, did that fall under your

10 umbrella of supervisory responsibility at Fleur

11 De Lait?

12        A.    In terms of -- a clarification

13 question.  Do you mean in terms of following

14 electrical safe work practices or the actual

15 troubleshooting steps?

16        Q.    I'm referring to actual

17 troubleshooting steps.

18        A.    Generally, no.  The closest I

19 would come to actually troubleshooting would be

20 listening to his assessment of the situation.  I

21 would be a sounding board for that guy.  He

22 would talk through what he had seen so far.  And

23 I might ask questions or sometimes when you say

24 something out loud you hear yourself say the



1  answer.  So I was a sounding board for him

2  during the troubleshooting process was my role

3  in that primarily.

4        Q.      In your role as a maintenance

5  engineer at Fleur De Lait, was it your

6  responsibility to ensure that issues with the

7  machinery were troubleshot?

8        A.      Primarily, no.

9        Q.      Was it part of your

10  responsibilities?

11       A.      At times when the primary

12  maintenance supervisor was unavailable.

13       Q.      When you became maintenance

14  manager at Fleur De Lait, what were your job

15  responsibilities as a maintenance manager?

16       A.      That included all the job

17  responsibilities I had as a maintenance engineer

18  with the additional responsibility of I was

19  responsible for the budget.  So the money that

20  was being spent and accounting for that,

21  developing budget forecasts, developing capital

22  project proposals up to $50,000, maintain a

23  relationship with our sister company next door

24  in part of the same building.



1        Q.      As the maintenance manager was it

2    your responsibility at Fleur De Lait to ensure

3    that all of the machinery there was properly

4    maintained and repaired when necessary?

5        A.      Yes.  Well, let me clarify.  Do

6    you mean like a hundred percent inspection or

7    verification of all jobs?  Or just the ownership

8    and responsibility for work being performed

9    correctly and people understanding procedures,

10   being trained in those procedures and following

11   those procedures?

12       Q.      You tell me, Mr. Reynolds.  As

13   the maintenance manager there, was it your

14   responsibility to ensure that the machinery

15   there was properly maintained?

16       A.      In terms of policy, yes.  In

17   terms of a hundred percent inspection of every

18   job, no.  But it was a food plant and extensive

19   regulation comes along with that.  So there is

20   personal liability and ownership of ensuring

21   that rules are followed and a number of other

22   regulating bodies.  So ultimately that

23   responsibility fell to my position.

24       Q.      Just so I'm clear then when you



```
 1  say in terms of policy, yes, what do you mean by
 2  that?
 3          A.      So for example there is a tool
 4  reconciliation policy that when a employee would
 5  go work on a machine there was a verification
 6  process to make sure that those tools were
 7  extracted from the machine before returning it
 8  to production.  And so there would be scheduled
 9  audits of our paperwork to see if employees were
10  following that.  And if it was discovered that
11  those policies were not being followed I was
12  responsible to train or coach or if it would
13  extend to disciplinary action then whatever
14  remediation was required that the responsibility
15  for making those corrective actions fell to me.
16          Q.      How long did you hold the
17  position of maintenance manager at Fleur De
18  Lait?
19          A.      2013 to 2019.  So that was six
20  years.
21          Q.      Why did you leave Fleur De Lait?
22          A.      I found a -- I was offered a job
23  at a company called Grosfillex which I would
24  have to spell for you if you are interested.
```



```
 1          Q.     When you left Fleur De Lait what
 2   were you earning?
 3          A.     I believe my last W-2 there was
 4   $92,750 plus or minus.
 5          Q.     Did you earn any bonuses while
 6   you were at Fleur De Lait?
 7          A.     Yes.
 8          Q.     Did you earn a bonus every year
 9   that you worked at Fleur De Lait?
10          A.     Yes.
11          Q.     When you last left Fleur De Lait
12   what was the last bonus amount that you had
13   received?
14          A.     I believe this is an estimate.
15   But I believe it was a 12 percent bonus on my
16   annual salary.
17          Q.     How about the year before you
18   left Fleur De Lait, was it also 12 percent
19   bonus?
20          A.     I can't remember exactly.  But
21   every year it was within I would say 11 to
22   13 percent.
23          Q.     Were there certain requirements
24   that you had to meet in order to earn that
```



```
 1  bonus?
 2         A.     Yes.
 3         Q.     Do you recall what those
 4  requirements were the last year that you worked
 5  for Fleur De Lait?
 6         A.     Safety, quality, maintenance
 7  performance, budget performance, and capital
 8  project completion and process improvements and
 9  waste treatment plant compliance.
10         Q.     Were there certain things that
11  needed to be met with regard to each of those
12  categories in order for you to earn the bonus?
13         A.     Yes.
14         Q.     Did you achieve those goals in
15  your last three years that you worked at Fleur
16  De Lait?
17         A.     I achieved a high percentage of
18  those goals.  I didn't hit a hundred percent on
19  all of the metics.
20         Q.     Were you ever the subject to any
21  disciplinary action at Fleur De Lait?
22         A.     No.
23         Q.     Did you ever receive any written
24  reprimands while you worked for Fleur De Lait?
```



```
 1          A.     No.
 2          Q.     Did you ever receive any negative
 3  performance evaluations while you worked at
 4  Fleur De Lait?
 5          A.     No.
 6          Q.     Did you receive written job
 7  performance evaluations while you worked at
 8  Fleur De Lait?
 9          A.     Written job evaluations?  There
10  was a annual performance review process.
11          Q.     Did you receive annual written
12  performance reviews?
13          A.     So not in the sense that they
14  were written by somebody else.
15          Q.     Did you have to perform complete
16  self-evaluations each year at Fleur De Lait?
17          A.     Yes.
18          Q.     Did you receive anything in
19  writing back from anyone at Fleur De Lait about
20  your performance evaluations each year?
21          A.     Yes.  There was a feedback loop.
22          Q.     Do you have copies of written
23  performance evaluations that you received while
24  working at Fleur De Lait?
```



```
 1            A.      I'm not sure.
 2            Q.      Did you at any time have copies
 3   of written performance evaluations that you
 4   received at Fleur De Lait?
 5            A.      I don't believe I got a hundred
 6   percent of them.
 7            Q.      Do you still possess copies of
 8   any of the written performance evaluations that
 9   you received while working at Fleur De Lait?
10            A.      I don't believe so.
11            Q.      Do you recall when you last
12   possessed copies of any written performance
13   evaluations you received while working at Fleur
14   De Lait?
15            A.      2019 when I still worked there.
16            Q.      After you left there did you get
17   rid of the written performance evaluations?
18            A.      I don't believe I took them with
19   me.  I don't believe I took them with me.
20            Q.      Do you have a copy your personnel
21   file from Fleur De Lait?
22            A.      No.
23            Q.      Why did you leave Fleur De Lait?
24            A.      I accepted a role at Grosfillex.
```



1          Q.      Were you interviewing for jobs at
2    that time?
3          A.      Yes.
4          Q.      Why?
5          A.      Work/life balance.
6          Q.      Were you looking for a better
7    work/life balance than what you felt you had at
8    Fleur De Lait?
9          A.      Correct.
10         Q.      What was your criticism of the
11   work/life balance at Fleur De Lait?
12         A.      There were 24/7 phone support
13   that resulted in numerous wake-up calls in the
14   middle of the night a few times a week, two or
15   three in the morning, as well as being called in
16   Christmas night, Easter morning -- interrupts to
17   family life.
18         Q.      Did you use a recruiter to find
19   your next job?
20         A.      Yes.
21         Q.      What recruiter did you use?
22         A.      I don't remember honestly.
23         Q.      Do you recall the name of the
24   company that recruiter may have been affiliated



1   with, if any?

2          A.     No.  Oh, the recruiter's name was

3   Tamara.  I don't remember her last name.  And I

4   don't remember the company.  But I remember her

5   name was Tamara.

6          Q.     Do you have copies of any written

7   communications between you and Tamara during

8   that time?

9          A.     That's unknown.

10          Q.     When you communicated with her in

11   writing, was it via email or hard copies?

12          A.     Email.

13          Q.     What email account did you use to

14   communicate with her?

15          A.     That was a Gmail account.

16          Q.     What is that email address?

17          A.     Soundmindservices@gmail.com.

18          Q.     Was that the Gmail account you

19   used or that she was using?

20          A.     That was mine.

21          Q.     What is Sound Mind Services?

22          A.     Just a name I made up back in the

23   early 2000s.

24          Q.     So you mentioned then the name of



1  the company that you worked with after Fleur De

2  Lait.  Would you mind saying it again and

3  spelling it for us, please?

4          A.      Sure.  It was Grosfillex.

5  G-R-O-S-F-I-L-L-E-X.

6          Q.      What is Grosfillex?

7          A.      They are a privately owned French

8  company that manufactures commercial plastic

9  furniture.

10         Q.      Where is Grosfillex located?

11         A.      Robesonia.  There is two plants.

12  There is one in Robesonia and there is one in

13  Lebanon, Pennsylvania.

14         Q.      Which facility did you work at?

15         A.      Both.  My office was located in

16  Robesonia.

17         Q.      When you began working at

18  Grosfillex what was your job title?

19         A.      Maintenance manager.

20         Q.      As the maintenance manager what

21  were your job responsibilities?

22         A.      Supervising maintenance staff,

23  hiring.  I never fired anybody.  But that would

24  have fallen under my responsibility.  Coaching,



1  coordinating maintenance work as well as project

2  work.

3         Q.     In terms of coordinating

4  maintenance work, what did that entail in terms

5  of your job responsibilities?

6         A.     Setting priorities for the

7  maintenance employees, communicating and

8  coordinating amongst the management staff and

9  the production staff so that everybody was on

10  the same page as far as what was happening when

11  equipment would be returned to service and when

12  equipment needed to be made available for

13  service.

14         Q.     In terms of supervising the

15  maintenance staff, what did your job

16  responsibilities entail?

17         A.     Communication, providing

18  direction, coaching, purchasing as far as spare

19  parts or tools, setting priorities again.

20  Occasionally I would drive somewhere for spare

21  parts if there was a crisis breakdown and we

22  needed some parts.

23         Q.     What types of things would you

24  provide correction and coaching to the employees



1  at Grosfillex?

2       A.    So coaching, housekeeping in the

3  maintenance shop, trying to improve overall

4  appearance, directions as far as again setting

5  priorities to make sure the most important tasks

6  got done quickly.

7       Q.    What did you actually do to set

8  priorities?

9       A.    I would be -- I used emails,

10 phone calls, personal interaction.  I posted

11 work schedules, those things.

12      Q.    Was there any machinery located

13 at the facilities where you worked for

14 Grosfillex?

15      A.    Yes.

16      Q.    What types of machinery?

17      A.    At Robesonia it was injection

18 molding and in Lebanon it was a paint line,

19 automated paint conveyor line.

20      Q.    How big were the injection

21 molding machines?

22      A.    In general terms roughly the size

23 of a school bus.  They were 1,200 ton and 1,800

24 ton.  That is the pressure they provided, not



1    how much they weighed individually.

2          Q.    How was the injection molding

3    machine powered?

4          A.    Electricity.

5          Q.    Were any chemicals placed into

6    the injection molding machine?

7          A.    No.

8          Q.    At Grosfillex did they mix or

9    process any chemicals?

10          A.    The paint shop would have had

11   thinners for clean-up.  Does that fit your

12   question?

13          Q.    Were those thinners chemicals?

14          A.    Yes.

15          Q.    Were those thinners mixed and

16   processed at Grosfillex?

17          A.    No.  They were not mixed.

18          Q.    As part of your job

19   responsibilities as the maintenance manager at

20   Grosfillex, did you oversee and supervise the

21   maintenance and repair of injection molding

22   machinery?

23          A.    Yes.

24          Q.    What types of tasks did you



1  perform to supervise and oversee the maintenance

2  of the injection molding machines?

3          A.     My tasks were coordination,

4  communication, follow-up, setting priorities,

5  ensuring proper staffing is available, ensuring

6  that proper spare parts were available,

7  coordinating outside vendor support if specific

8  technical resources were required.  I believe

9  those are the -- yeah.  I will stop there.

10         Q.     What role did you play with

11  regard to the repair of the injection molding

12  machines?

13         A.     Coordinator or manager.

14         Q.     By coordinator what specific

15  things would you do?

16         A.     Again, that would be coordinating

17  outside vendor support for -- like there was a

18  summer shutdown.  They shut down the plant for

19  two months.  And there were I think it was like

20  five or six hundred individual tasks that were

21  associated with that shutdown.  So coordinating

22  those tasks, recording completion and

23  communicating the status across the plant and

24  organizing staffing to help complete those



```
 1   tasks.
 2          Q.      Would you mind telling me again
 3   what they made at Grosfillex?
 4          A.      Sure.   If you go to a Hilton and
 5   they have a and chaise lounge with a matching
 6   table and chair next to it that is the product
 7   they are making.   And similar products, like
 8   outdoor seating that if you go to Sea Isle City
 9   a number of those restaurants there right in the
10   center of town have Grosfillex furniture.
11          Q.      Did you ever have to physically
12   inspect the injection molding machines?
13          A.      Yes.
14          Q.      Did that ever involve inspection
15   of the electrical panels associated with those
16   machines?
17          A.      No.
18          Q.      What would happen when there was
19   an issue with the powering of the machine?
20          A.      We had a maintenance employee who
21   was a trained electrician.   So he was the
22   primary first responder for that kind of issue.
23          Q.      Does that maintenance employee
24   report to you?
```


ESQUIRE
DEPOSITION SOLUTIONS

```
 1          A.      Yes.
 2          Q.      Did you ever have to troubleshoot
 3   any issues with the injection molding machine?
 4          A.      No.
 5          Q.      Were there ever any issues with
 6   the injection molding machines while you worked
 7   at Grosfillex?
 8          A.      Yes.
 9          Q.      Were those issues troubleshot
10   with regard to those machines?
11          A.      Yes.
12          Q.      Who performed the troubleshooting
13   of those machines while you worked there?
14          A.      The maintenance technicians.
15          Q.      Who did the maintenance
16   technicians report to at Grosfillex?
17          A.      Myself.
18          Q.      How long did you work at
19   Grosfillex?
20          A.      Just under one year.
21          Q.      What date did you stop working at
22   Grosfillex?
23          A.      March 27, 2020.
24          Q.      Why did you stop working there at
```



1   that time?

2          A.     It was deemed a nonessential

3   business.  And so the entire operation shut down

4   and I was laid off at that time.

5          Q.     Was anyone else laid off at the

6   same time you were laid off?

7          A.     Yes.

8          Q.     Did the manufacturing facilities

9   associated with Grosfillex then close?

10          A.     Yes.

11          Q.     Have they reopened at all since

12   March 7, 2020?

13          A.     I believe so.  Although I have

14   not been there to confirm that.

15          Q.     Do you have any sense as to when

16   they may have reopened?

17          A.     For that last question I am

18   guessing.  And you said not to guess.  I should

19   say I don't know if they reopened honestly.

20          Q.     Have you ever reached out to them

21   since you left to see if you can return to work

22   there?

23          A.     No.

24          Q.     Did anyone from Grosfillex



1    contact you after you left to see if you were

2    interested in returning to work there?

3            A.      No.

4            Q.      When you left Grosfillex what

5    were you earning?

6            A.      $84,700 a year plus or minus.

7            Q.      Did you ever earn a bonus while

8    you worked for Grosfillex?

9            A.      No.

10           Q.      Was there a bonus structure in

11   place while you worked for Grosfillex?

12           A.      Yes.

13           Q.      Were you eligible to earn any

14   bonuses during time you worked for Grosfillex?

15           A.      No.

16           Q.      Why were you not eligible to earn

17   any bonuses during the time you worked for

18   Grosfillex?

19           A.      The timing around the calendar

20   year and my employment start and end dates in

21   relation to that.

22           Q.      Were you ever the subject of any

23   disciplinary action at Grosfillex?

24           A.      No.



```
 1           Q.      Did you ever receive any negative
 2  performance reviews?
 3           A.      No.
 4           Q.      Were you ever criticized with
 5  regard to the work that you performed at
 6  Grosfillex?
 7           A.      I'm not aware of any criticism.
 8           Q.      Are you aware of anything close
 9  to criticism?
10           A.      I received feedback about
11  priorities.  But I wouldn't classify it as
12  criticism.  It was a conversation between
13  manager and supervisor.
14           Q.      What type of feedback did you
15  receive about priorities there?
16           A.      It was a verbal feedback.
17           Q.      What was the content of the
18  feedback?
19           A.      From what I remember I was told
20  to focus on some written priority task lists.
21           Q.      Why were you told to focus on
22  those written priority task lists?
23           A.      Because I had been focusing a
24  fair amount of time on training, coaching and
```



1  development of employees.  And I was redirected

2  to focus more on some specific tasks.

3          Q.      At the time that you received the

4  verbal feedback were those tasks that they

5  believe you should have been completing there

6  already?

7          A.      Yes.

8          Q.      Did you ever receive any verbal

9  feedback regarding the work that you performed

10  at Harley-Davidson?

11          A.      I don't remember.

12          Q.      Do you ever receive any verbal

13  feedback about the work that you performed at

14  Fleur De Lait?

15          A.      Yes.

16          Q.      What type of verbal feedback did

17  you receive at Fleur De Lait?

18          A.      It was positive.

19          Q.      Did you ever receive any negative

20  verbal feedback regarding your work performance

21  at Fleur De Lait?

22          A.      No.

23          Q.      Who provided you with the verbal

24  feedback at Fleur De Lait?



```
 1          A.     The plant manager.
 2          Q.     Who was the person who provided
 3   you with the verbal feedback at Grosfillex?
 4          A.     The director of operations which
 5   is equivalent to plant manager.
 6          Q.     What was that person's name?
 7          A.     Gene Hracho.
 8          Q.     Is that Gene -- is Gene male or
 9   female?
10          A.     Male.
11          Q.     Do you know how to spell Gene's
12   name?
13          A.     G-E-N-E, H-R-A-C-H-O.
14          Q.     Have you had any communications
15   with Gene Hracho since you left Grosfillex?
16          A.     I recall one communication.
17          Q.     When did that one communication
18   with Mr. Hracho occur?
19          A.     Shortly after the layoff.
20          Q.     What did you and Mr. Hracho
21   discuss at that time?
22          A.     I don't remember specifically.  I
23   recall it being kind of a check-in from him to
24   me.
```



```
1          Q.     What was he checking in on?
2          A.     I don't want to guess.  But I did
3    have a medical procedure done like the day of
4    the layoff.  And I am estimating that he was
5    checking in to see how that went.
6          Q.     What medical procedure did you
7    have done on the day of the layoff?
8          A.     I can answer that.  Isn't it like
9    HIPAA protected.  I can answer I suppose.
10                MR. AUERBACH:  Go ahead and
11       answer it, please.
12                THE WITNESS:  It was a
13       colonoscopy.
14   BY MS. FICARO
15         Q.     Have you had any other
16   communications with Mr. Hracho since you left
17   Grosfillex?
18         A.     I don't believe so.
19         Q.     Have you spoken to anyone else
20   from Grosfillex since you left there?
21         A.     No.
22         Q.     From the time you left Grosfillex
23   until the time you began working for Willert did
24   you hold any other jobs?
```



1        A.      No.

2        Q.      Did you apply for any other jobs

3  during that time?

4        A.      Yes.

5        Q.      How many other jobs did you apply

6  for?

7        A.      I would -- this would be an

8  estimate.  Around ten.  I was on Indeed all the

9  time.  Ten to twenty.  That's an educated guess.

10        Q.      Did you receive any other job

11  offers during that time?

12        A.      No.

13        Q.      Did you use a recruiter during

14  that time between when you worked for Grosfillex

15  and when you worked for Willert to look for

16  jobs?

17        A.      Yes.

18        Q.      What recruiter did you use at

19  that time?

20        A.      Executive Avail-a-Search was one

21  of them.

22        Q.      How do you spell Availa?

23        A.      So it was A-V-A-I-L-A Search.

24        Q.      Where is that company located?



```
 1          A.      Lancaster.
 2          Q.      Was there a specific individual
 3  for whom you worked with there?
 4          A.      Primarily it was Mark Whiteman or
 5  Whiteman.
 6          Q.      Are you currently employed?
 7          A.      Yes.
 8          Q.      Where are you currently employed?
 9          A.      Georgia Pacific.
10          Q.      Is there a specific facility for
11  Georgia Pacific out of which you work?
12          A.      There are multiple facilities.
13  So not one specific facility.
14          Q.      Do you travel from facility to
15  facility for Georgia Pacific?
16          A.      Yes.
17          Q.      How much time do you typically
18  spend in each facility when you travel there?
19          A.      At this time one to three weeks.
20          Q.      During the times when you are not
21  traveling from facility to facility is there a
22  specific Georgia Pacific facility at which you
23  maintain an office?
24          A.      Not yet.
```



1          Q.     Do you expect that there will be
2    soon?
3          A.     Yes.
4          Q.     Where do you expect that you will
5    soon be working out of for Georgia Pacific?
6          A.     Jonestown, Pennsylvania.
7          Q.     Johnstown or Jonestown?
8          A.     Jonestown.  Zip 17038.
9          Q.     When did you expect that you will
10   be maintaining an office at that location?
11         A.     Mid October 2021.
12         Q.     Why do you expect to be
13   maintaining a office at that location then?
14         A.     That's when the location is
15   opening.
16         Q.     When did you begin working for
17   Georgia Pacific?
18         A.     June 28, 2021.
19         Q.     How did you come to get the job
20   at Georgia Pacific?
21         A.     It was a recruiter.
22         Q.     Which recruiter did you use?
23         A.     I can't remember his name.
24         Q.     Do you recall the company with



```
 1   which he was affiliated?
 2          A.      Not at this time.
 3          Q.      What is your job title at Georgia
 4   Pacific?
 5          A.      Reliability supervisor.
 6          Q.      As a reliability supervisor what
 7   are your job responsibilities?
 8          A.      Developing the preventative
 9   maintenance program, developing the critical
10   spare parts.  It will entail and it does entail
11   the supervision and coordination of maintenance
12   staff and work safety compliance.
13          Q.      Since you've been working for
14   Georgia Pacific have you received any negative
15   performance reviews?
16          A.      No.
17          Q.      Since you have been working at
18   Georgia Pacific have you received any feedback
19   regarding the work you performed so far?
20          A.      Yes.
21          Q.      What type of feedback have you
22   received?
23          A.      Positive verbal feedback.
24          Q.      Who provided that positive verbal
```



```
 1   feedback to you?
 2           A.      My direct supervisor.
 3           Q.      What is the name of your direct
 4   supervisor?
 5           A.      Ty Vaughn.
 6           Q.      What specific feedback were you
 7   provided?
 8           A.      Appreciation for my willingness
 9   to jump in and take over responsibilities,
10   coordinating some breakdowns and ensuring that
11   some priority work was accomplished.
12           Q.      What do you earn at Georgia
13   Pacific?
14           A.      Annual salary is $98,000 a year.
15           Q.      Is there a bonus structure there?
16           A.      There is a bonus structure, yes.
17           Q.      Are you eligible to earn a bonus
18   there?
19           A.      The bonuses here at Georgia
20   Pacific are sort of -- opportunistic rather than
21   like the typical annual bonus structure.  So if
22   I provide a notable performance gain or
23   something I can be eligible for that.  Yes.
24   What was the question again?
```



```
 1              Q.    I will just follow up by asking
 2    are there concrete metrics that you need to meet
 3    in order to obtain a bonus at Georgia Pacific?
 4              A.    No.  Not that I'm aware of.
 5              Q.    Are the bonuses discretionary?
 6              A.    Yes.
 7              Q.    If you were to receive a bonus do
 8    you have any idea how much that bonus could be?
 9              A.    No.  I would be guessing.
10              Q.    Did the bonus structure set forth
11    potential bonus amounts that can be earned?
12              A.    I have not seen any in writing,
13    nor have I been communicated any verbally.
14              Q.    Did you receive an offer letter
15    before you began working at Georgia Pacific?
16              A.    Yes.
17              Q.    Do you have a copy of that offer
18    letter?
19              A.    Yes.
20              Q.    Did you sign an employment
21    agreement before you began working at Georgia
22    Pacific?
23              A.    I believe so.
24              MS. FICARO:  Steve, can you
```



```
 1        please provide copies of that offer letter
 2        and employment agreement to us?
 3                   MR. AUERBACH:  Send me a letter.
 4        But I do believe I sent that to you.  It
 5        would have been an email titled
 6        "mitigation."  And I got it within a day or
 7        two, meaning I sent it to you within a day
 8        or two that I received it, as you
 9        previously requested any mitigation
10        efforts.  So search your inbox.  Send me a
11        letter and I will look into anything.
12                   THE WITNESS:  Eileen, just a
13        point of clarity:  The employment agreement
14        like -- at Fleur De Lait there was a
15        contract that I signed.  Do you mean
16        something like that?  Or just like terms of
17        employment?
18  BY MS. FICARO
19        Q.    So if there any contract you
20  signed at Fleur De Lait -- let me -- was there a
21  contract that you signed before you began
22  working at Fleur De Lait?
23        A.    I thought we were talking about
24  Georgia Pacific?
```



```
 1          Q.    I was.  But you mentioned Fleur
 2   De Lait I think when you commented on that.
 3          A.    Yes.  I was using that as a frame
 4   of reference because I'm familiar with a
 5   contract in that term.  So Fleur De Lait had a
 6   contract which Georgia Pacific does not.  And I
 7   was trying to clarify if you meant like an
 8   agreement at that level like a contract level or
 9   just the employee website where you check boxes.
10   Sorry.  It's nebulous.
11          Q.    Do you have any plans to leave
12   Georgia Pacific any time soon?
13          A.    No.
14          Q.    Has anyone at Georgia Pacific
15   asked you to leave since you begun working
16   there?
17          A.    No.
18          Q.    Did you take a preemployment drug
19   screen at Georgia Pacific?
20          A.    Yes.
21          Q.    Did you receive any written
22   records back regarding those drug screen
23   results?
24                MR. AUERBACH:  What employer?
```



```
 1  BY MS. FICARO
 2           Q.      Georgia Pacific.
 3           A.      Just clarification:  Do you mean
 4  like the actual record from the drug test lab?
 5           Q.      Well, first I will ask about the
 6  record from the drug test lab.  Was there a
 7  record you received from the drug test lab
 8  regarding the test you took for Georgia Pacific?
 9           A.      No.
10           Q.      Did you receive any documentation
11  from Georgia or anyone else about the drug
12  screen results from your test at Georgia
13  Pacific?
14           A.      I don't think so.
15           Q.      Is it possible that you did?
16           A.      If I did it was simply a pass in
17  an email.  I passed the drug test.  I got hired.
18           Q.      Did the drug screen that you took
19  for Georgia Pacific, did it screen for THC?
20           A.      Yes.
21           Q.      Do you know if those drug screen
22  results showed a positive result for THC?
23           A.      Do I know if they tested
24  positive?  Do I know if they test -- I don't
```



1  know how to answer that.  Do I know if they

2  tested positive?  I know that they did not test

3  positive for THC.

4          Q.      How do you know that?

5          A.      I took three preemployment drug

6  tests on my own which indicated a pass.  And I

7  also received a offer letter from them.  They

8  have a very clear drug policy.  So if I had

9  tested positive for THC there would have been at

10  a minimum a conversation about that because they

11  do have a clause in regards to medical marijuana

12  but that conversation didn't happen because I

13  tested negative.

14          Q.      Why did you take three drug

15  screens on your own before you began working at

16  Georgia Pacific?

17          A.      I wanted to be sure.

18          Q.      Why three?

19          A.      No specific reason.  I mean, they

20  were cheap Dollar Tree drug tests.  So I didn't

21  know how reliable they were.  So I tried three.

22  Seemed like a good number.

23          Q.      Before you took those tests was

24  there concern on your part that they might be

```
 1  positive?
 2          A.     Yes.
 3          Q.     Why were you concerned they could
 4  be positive?
 5          A.     I was uncertain how long it takes
 6  THC to clear your system once you stop using it.
 7          Q.     Have you stopped using medical
 8  marijuana?
 9          A.     Yes.
10          Q.     When did you stop using medical
11  marijuana?
12          A.     I estimate sometime in May
13  of 2021.
14          Q.     Why did you stop using medical
15  marijuana?
16          A.     Why did I stop?  I decided to
17  stop.
18                 MS. FICARO:  Can we go off the
19      record?
20                 (A recess was taken from 12:13
21  p.m. to 12:46 p.m.)
22  BY MS. FICARO
23          Q.     Mr. Reynolds, we are back on the
24  record now.  And you had just indicated to me
```



```
 1    that you took some ibuprofen, that your head

 2    hurts, and that you are feeling off.  Is that

 3    accurate?

 4           A.     Yes.

 5           Q.     Do you feel as though you can

 6    proceed with this deposition?

 7           A.     Yes.

 8           Q.     Are you concerned about doing

 9    that?

10           A.     No.  We can proceed.

11           Q.     Does the fact that you are

12    feeling off and that your head hurts, does that

13    affect your ability to understand my questions

14    and answer them accurately?

15           A.     No.  I don't believe so.

16                  MS. FICARO:  Steve, do you have

17        any objection to us continuing with the

18        deposition?

19                  MR. AUERBACH:  No.  I don't.

20        But, Matt, I need to instruct you that if

21        that changes at any moment, specifically if

22        you feel that you don't understand what is

23        going on, you can't concentrate, you have

24        an obligation to let us know.  You got
```



```
 1      that?
 2                   THE WITNESS:  Yes.
 3   BY MS. FICARO
 4        Q.     We are not trying to torture you
 5   here, Mr. Reynolds.  And for everyone involved
 6   is interested in the transcript being accurate.
 7   And we would not want to proceed if you
 8   indicated there was something going on with you
 9   physically or mentally that would impact your
10   deposition testimony in any way.
11        A.     Okay.  I will let you know.
12        Q.     If it gets worse or anything
13   please let me know.  You can ask for a break at
14   any time.  And you can interject at any time if
15   you feel as though you are concerned that you
16   cannot continue with the deposition.
17        A.     Okay.
18        Q.     If that's the case we will figure
19   something else out.
20        A.     Yes.  If I hit the wall I will
21   let you know.
22        Q.     Great.
23               When we left off here we were
24   discussing about your new job with Georgia
```



1  Pacific.  I believe you testified that you came

2  to find out about that job via a recruiter; is

3  that correct?

4          A.     Yes.

5          Q.     Did you have to submit an

6  application to work at Georgia Pacific?

7          A.     Yes.

8          Q.     When did you submit the

9  application to work at Georgia Pacific?

10         A.     Sometime the week prior to

11 June 28, maybe two weeks prior.

12         Q.     Did you have any interviews with

13 anyone at Georgia Pacific?

14         A.     Yes.

15         Q.     Who did you interview with there?

16         A.     It was Monica Stopsinski.  I'm

17 not sure I can spell that last name properly.

18 And Terrence Rice, Cliff Brignola and Ty Vaughn.

19 There was also like a prescreen from the

20 recruiter.  But that was not with Georgia

21 Pacific specifically.

22         Q.     When did you do the prescreen

23 with the recruiter?

24         A.     It moved pretty quick.  Maybe two



```
 1  weeks prior to the 28th.  Around June 14th, the
 2  10th through the 14th.
 3          Q.      What does the prescreen entail?
 4          A.      Explanation of the job, the
 5  scenario, circumstances, gauging my interest
 6  level and just kind of validating that my
 7  background would be a potentially good fit.
 8          Q.      When did your interviews with
 9  Georgia Pacific occur?
10          A.      In between the 14th and the 28th.
11  I can't recite exact dates.
12          Q.      That is the 14th through the 28th
13  of June?
14          A.      Yes.  June 14, 2021.
15          Q.      Mr. Reynolds, you've already
16  mentioned today stopping using medical
17  marijuana.  You indicated you stopped in
18  May 2021; is that correct?
19          A.      Yes.
20          Q.      When did you begin using medical
21  marijuana?
22                  MR. AUERBACH:  One second.  If
23      you are asking in terms -- first off,
24      objection.  If you are asking about
```



1        marijuana in general Mr. Reynolds will

2        assert a Fifth Amendment right and rights

3        under Rule 403 and 608.

4                   If you are asking about medical

5        marijuana he may answer.  Otherwise based

6        on the assertion of privilege I am

7        directing him not to answer.

8                   MS. FICARO:  Would that be with

9        regard to any and all questions regarding

10       recreational, nonmedical marijuana use?

11                  MR. AUERBACH:  Anything before

12       July 2020.

13                  MS. FICARO:  Anything before

14       July 2020.  So just to be clear here then

15       Mr. Reynolds is asserting a Fifth Amendment

16       privilege with regard to any questions

17       regarding his use of recreational marijuana

18       before July 2020; is that correct?

19                  MR. AUERBACH:  Yes.

20   BY MS. FICARO

21         Q.     So to get back to my question:

22   When did you begin using medical marijuana?

23         A.     Sometime after --

24                  MR. AUERBACH:  Did you say



```
 1        marijuana or medical marijuana?
 2                    MS. FICARO:  I said medical
 3        marijuana.
 4   BY MS. FICARO
 5        Q.    When did you begin using medical
 6   marijuana?
 7        A.    After I received the patient card
 8   from the State of Pennsylvania which I believe
 9   the date on the card was July 6, 2020.  So after
10   that time I was able to go to a dispensary and
11   obtain medical marijuana.
12        Q.    Were you ever prescribed medical
13   marijuana?
14        A.    There was a doctor's
15   recommendation for a course of medical
16   marijuana.  I believe that's the proper
17   terminology for that.
18        Q.    What doctor recommended a course
19   of medical marijuana?
20        A.    And her name is -- and I think it
21   was with Green Health Docs.  I can't remember
22   the last name.  Something like Tavoli.  I'm
23   butchering that.  It's not a hundred percent
24   accurate.
```



```
 1            Q.     I will refer to her as Andrea
 2  only because you are unsure of her last, not to
 3  not show a lack of disrespect.
 4            A.     Sure.
 5            Q.     So I will call her Dr. Andrea.  I
 6  will clarify.  Is she a medical doctor?
 7            A.     Yes.
 8            Q.     And with which practice was
 9  Dr. Andrea affiliated?
10            A.     I believe it was Green Health
11  Doctors was the name of it.  I found it through
12  the Pennsylvania state list of approved
13  practitioners.
14            Q.     When did you first see
15  Dr. Andrea?
16            A.     I believe it was either May or
17  June of 2020.  I forget exactly how long the
18  approval process took after I saw her until the
19  card was issued.  But just based on the date on
20  the card it was within six weeks or so prior to
21  that.
22            Q.     So that would put it when?  June
23  did you say 2020?
24            A.     Yes.  Like May or June 2020.
```



```
 1          Q.     How did you find Dr. Andrea?
 2          A.     On the Pennsylvania state medical
 3   marijuana page list of approved practitioners.
 4   And I found her name on there.
 5          Q.     How many times have you treated
 6   with Dr. Andrea?
 7          A.     One time with her.  But you meet
 8   with or consulted with...
 9          Q.     She is a doctor, correct?
10          A.     Yes.
11          Q.     Did she ever provide you with any
12   medical treatment?
13          A.     I'm not playing dumb.  But I'm
14   not a hundred percent clear on the definition of
15   medical treatment.
16          Q.     Why did you go to see Dr. Andrea?
17          A.     Oh, extreme anxiety.
18          Q.     So did you go to Dr. Andrea with
19   the hope that she would be able to help to treat
20   you for your extreme anxiety?
21          A.     Yes.
22          Q.     Did she perform any type of
23   evaluation of you when you saw her?
24          A.     Yes.
```



```
 1          Q.     What type of evaluation did she
 2   perform?
 3          A.     I don't know a medical term.  But
 4   there were a series of questions, you know,
 5   whether that be like a psychiatric evaluation or
 6   something similar, a series of questions.
 7          Q.     Did she diagnose you with
 8   anything during that meeting with her?
 9          A.     Anxiety.
10          Q.     Did she diagnose you with
11   anything else?
12          A.     No.  I don't believe so.
13          Q.     Did you discuss with her
14   potential treatment options for your anxiety?
15          A.     Yes.
16          Q.     What treatment options did you
17   discuss?
18          A.     I discussed treatments that were
19   not working at the time.  And I was inquisitive
20   about medical marijuana being a potential
21   treatment.
22          Q.     Did you go to Dr. Andrea hoping
23   that you would get a prescription for medical
24   marijuana?
```



1        A.      Yes.

2        Q.      Why were you interested in

3  medical marijuana at that time?

4        A.      So I had just seen a family

5  member get involuntarily committed to a

6  psychiatric ward because they tried a brand new

7  prescription pill, a pharmaceutical.  And I had

8  tried some pharmaceuticals in the past after

9  seeing just how bad the negative side effects of

10  psychiatry can be.  I really didn't want to try

11  something new.  I decided maybe a organic,

12  plant-based option would be a better thing for

13  me.  That's really what drove that.

14        Q.      So for now I am not interested in

15  the person's name.  But in terms of family

16  relationship to you how is that person related

17  to you?

18        A.      Sibling.  So I figured the DNA is

19  pretty close.  I don't want to gamble with my

20  future like that.  I never want to be in that

21  position.

22        Q.      Other than the sibling have any

23  of your other family members experienced mental

24  health issues?



```
 1          A.     I don't know.  I don't know
 2   diagnoses.  I believe my dad has seen a doctor
 3   for mental health something.  I don't know
 4   details.
 5          Q.     Are you aware whether your dad
 6   has any mental health diagnoses?
 7          A.     I'm not aware.
 8          Q.     Was it upsetting to you that your
 9   sibling was involuntarily committed?
10          A.     Yes.  Deeply.
11          Q.     At the time that you went to see
12   Dr. Andrea were you currently at that time
13   treating with any other mental health care
14   professionals?
15          A.     Sorry.  Can you still hear me?
16          Q.     Can you hear us?
17          A.     Yes.  Another call came in for a
18   second.  So at the time I saw Dr. Andrea had
19   I...
20          Q.     Were you treating with another
21   doctor at that time?
22          A.     Yes.
23          Q.     Who were you treating with when
24   you went to see Dr. Andrea?
```



```
 1          A.     Dr. Maria Fernando.
 2          Q.     Where is Dr. Maria Fernando
 3  located?
 4          A.     Lancaster, Pennsylvania.
 5          Q.     Is she affiliated with a
 6  particular entity or practice?
 7          A.     I'm not sure.  I believe she is
 8  an independent practice but not certain.
 9          Q.     What is her address?
10          A.     I think it's 230 Shippen Street
11  or maybe West Shippen Street in Lancaster.
12  That's an estimate but pretty close.
13          Q.     Are you still treating with
14  Dr. Fernando now?
15          A.     No.
16          Q.     When did you stop treating with
17  Dr. Fernando?
18          A.     Sometime in 2020.  Sometime after
19  I got laid off.  Just money got tight.
20          Q.     Was there any reason you stopped
21  treating with her other than money getting
22  tight?
23          A.     Treatment didn't seem to be
24  effective for the anxiety I was experiencing.
```



1   So I made the decision to stop with them.

2          Q.     Which treatment are you referring

3   to?

4          A.     She had me on some pharmaceutical

5   prescriptions.

6          Q.     With what prescription did she

7   have you on?

8          A.     Lamictal and Abilify.

9          Q.     From what periods of time to what

10  period of time did you take Lamictal and

11  Abilify?

12         A.     I believe I started in 2015

13  through that period in 2020 there.

14         Q.     You mentioned that you were

15  treating with Dr. Fernando when you went to see

16  Dr. Andrea.  Did Dr. Fernando refer you to

17  Dr. Andrea?

18         A.     No.

19         Q.     Did you ever discuss potential

20  medical marijuana usage with Dr. Fernando?

21         A.     I don't believe so.

22         Q.     Did you ever discuss or notify

23  Dr. Fernando that you were using medical

24  marijuana after you began using medical



```
 1  marijuana?
 2          A.      I don't recall.
 3          Q.      Between June 2020 and when you
 4  stopped seeing Dr. Fernando how many times did
 5  you see Dr. Fernando?
 6          A.      I'm not certain.  I don't
 7  remember.
 8          Q.      Are you able to estimate or
 9  approximate in terms of it being for example
10  more than five times or less than five times?
11          A.      It was less than five.  I was
12  thinking maybe one or two.
13          Q.      Have you seen Dr. Andrea at any
14  time other than when you saw her on the occasion
15  in June 2020?
16          A.      No.
17          Q.      When you spoke to Dr. Andrea did
18  she discuss any pharmaceutical options for the
19  treatment of your anxiety at that time?
20          A.      No.
21          Q.      Was medical marijuana the only
22  thing she recommended for you?
23          A.      Yes.
24          Q.      Did she provide a prescription
```



```
1   for you?
2          A.     I don't -- I don't think that is
3   how the system works.
4                  MR. AUERBACH:  Off the record.
5                  (Discussion held off the record.)
6                  THE WITNESS:  So to answer the
7       question there is no prescription due to
8       the way the system is currently structured.
9   BY MS. FICARO
10         Q.     Dr. Andrea explained to you how
11  she was recommending that you use the medical
12  marijuana?
13         A.     I believe so.  Yes.
14         Q.     What did she tell you in terms of
15  her recommendations with regard to your use of
16  medical marijuana?
17         A.     The most medicinal benefit comes
18  from oral administration, like tinctures, as
19  well as a what they call an entourage effect
20  when you combine ratios of CBD with THC, like
21  particularly a 10 to 1, 10 parts CBD to one part
22  THC.
23         Q.     Did she tell you how often she
24  recommended you use medical marijuana?
```



```
 1          A.      As needed.
 2          Q.      Did she explain to you which
 3   circumstances might be constitute needing to use
 4   medical marijuana?
 5          A.      I don't believe so.
 6          Q.      Do you recall anything else about
 7   your discussion with Dr. Andrea during your one
 8   visit with her in June 2020?
 9          A.      Yes.
10          Q.      What else do you recall?
11          A.      I asked how this worked in
12   regards to drug tests for employment.  Because I
13   was looking at this as triage.  I was anxious.
14   I had never been laid off before.  So she told
15   me at that time there was privacy protection in
16   the law.  So I thought then I was good to go as
17   far as applying for jobs and stuff.
18          Q.      Did she explain what she meant
19   when she said there was privacy and protection
20   under the law?
21          A.      No.  That's what she said.
22          Q.      Did she offer you any instruction
23   about anything that you should do with regard to
24   preemployment drug screens if you were taking
```



```
 1  medical marijuana?
 2          A.     No.  Not that I recall.
 3          Q.     Did she tell you that you should
 4  tell the drug screeners or potential employers
 5  that you were using medical marijuana?
 6          A.     No.  Not that I recall.
 7          Q.     Have you seen Dr. Andrea at any
 8  time at all since June 2020?
 9          A.     No.
10          Q.     Did Dr. Andrea administer any
11  tests to you on the occasion that you saw her?
12          A.     Just oral interviews.  But no
13  blood tests or you know...
14          Q.     Did she administer any other
15  diagnostic tests to you on the occasion that you
16  saw her?
17          A.     No.
18          Q.     You mentioned that you learned
19  about her because you read about her on what?
20          A.     I found her name through the
21  Pennsylvania State Department of Health Medical
22  Marijuana office through the list of approved
23  practitioners.
24          Q.     Has any other mental health care
```



1  provider ever recommended that you consider
2  using medical marijuana?
3          A.      When I got recertified, it was
4  the annual recertification, so there was a
5  follow-up visit with a different doctor who saw
6  fit to extend the patient certification.
7          Q.      Which doctor was that?
8          A.      His name was John.  I'm horrible
9  with names.  I apologize.  I will have to say
10 Dr. John with the same practice, Green Health.
11         Q.      When did you see Dr. John from
12 Green Health?
13         A.      I guess that would have been
14 July 2020.  In the time to recertify.  2021.
15 Sorry.  This year.
16         Q.      Have you ever seen Dr. John on
17 any occasions other than what you saw him in
18 July 2021?
19         A.      No.
20         Q.      Did Dr. John perform any
21 evaluation of you when you saw him in July 2021?
22         A.      An oral series of questions which
23 I would generically refer to as like a
24 psychiatric evaluation.



1          Q.      Did he give you a diagnosis?

2          A.      Anxiety.  I should say yes.

3          Q.      Are you currently taking any

4    pharmaceutical for purpose of your anxiety?

5          A.      Yes.

6          Q.      What do you currently take for

7    your anxiety?

8          A.      Lamictal.

9          Q.      Who prescribed the Lamictal to

10   you?

11         A.      That is one of the doctors at LG

12   Health.  One moment.  I will get it here.  Dr.

13   Zimmerman is one of the doctors I see.  There is

14   a number of doctors at the practice I go to at

15   Lincoln LG Health.  It is part of Lancaster

16   General Health Network.  And Dr. Zimmerman is

17   one of those I have seen recently.

18         Q.      When did you first treat with

19   anyone at Lancaster General Health?

20         A.      I think it was November 2020.

21         Q.      When in November 2020?

22         A.      Few days after I was terminated

23   from Willert in the single digits there, 7th,

24   8th, 9th, like that.



1      Q.     Before that date had you ever
2  treated with anyone at LG Health?
3      A.     No.  I don't believe so.
4      Q.     Did anyone refer you to LG Health
5  or recommend that you go to LG Health?
6      A.     My wife, if that counts.  If you
7  are looking for a professional then no.
8      Q.     When did you first contact your
9  attorney Mr. Auerbach?
10     A.     I believe it was maybe February
11 or March of 2021.
12     Q.     How did you come to find
13 Mr. Auerbach?
14     A.     I was referred to him.
15     Q.     Who referred you to him?
16     A.     Another attorney whose name --
17     Q.     I was going to ask the name.
18     A.     I don't recall.
19     Q.     Is there a reason why in
20 November 2020 you went to LG Health as opposed
21 to going to Dr. Fernando after you were
22 terminated from Willert?
23     A.     Yes.
24     Q.     What is the reason for that?



1          A.      The initial symptoms I had were
2   unlike anything I had ever experienced before in
3   my life.  So I didn't initially think it was any
4   kind of mental health thing.  I thought it was
5   having some kind of systemic -- something else.
6   I didn't know what to call it.  But it didn't
7   feel like a mental health thing.  It felt like
8   something was seriously wrong.
9          Q.      What type of symptoms were you
10  experiencing?
11          A.      It was centered mostly in my
12  core.  And it felt like everything was shutting
13  down.  It felt like I was dying inside.  I don't
14  mean that dramatically or emotionality.  It felt
15  like my core systems were shutting down.  It was
16  alarming.  It was stark.  It was notable.
17                  I just would fall asleep in the
18  middle of the day or just get sucked into bed.
19  It was very heavy.  It was -- I am sorry.  Yeah.
20  It was like a tangible, physical manifestation,
21  which I had not really experienced before with
22  what I wouldn't call anxiety or anything like
23  that.  So I went to LG Health to start with a
24  general practitioner to see where they would



1  send me from there.

2          Q.      Are you okay to continue?  Do you

3  want to take a break?

4          A.      No.  I'm good.  It's just in the

5  moment sometimes it is going be a lot to think

6  about.  But I'm okay.

7          Q.      When you went to LG Health then,

8  who did you first see there?

9          A.      That was Dr. Zimmerman.  I think

10  her first name is Taryn.  But anyway it's

11  Dr. Zimmerman.

12          Q.      Let's take a step back for a

13  minute here.  When were you first diagnosed with

14  anxiety?

15          A.      First diagnosed was way back in

16  when I worked at Harley-Davidson in 2008 maybe.

17  Give or take.

18          Q.      At that time did anything happen

19  to bring on the anxiety?

20          A.      I believe it was just the stress

21  of the job.  That was a very demanding

22  situation.

23          Q.      In 2008 who first diagnosed you

24  with anxiety?



```
 1          A.     I believe that Dr. Czulada.  He
 2   practices in Dover, Pennsylvania.  I forget the
 3   name of the practice.
 4          Q.     How many times did you treat with
 5   Dr. Czulada?
 6          A.     Two or three.  Not real long.
 7          Q.     Did Dr. Czulada prescribe any
 8   medication for you?
 9          A.     Yes.
10          Q.     What medication did -- male or
11   female?
12          A.     A male.
13          Q.     What type of medication did he
14   prescribe for you?
15          A.     It was a general antidepressant.
16   Either Prozac or Wellbutrin.  One of those.
17          Q.     Did Dr. Czulada diagnose you with
18   anything else other than anxiety at that time?
19          A.     Not that I recall.
20          Q.     Did you continue to take the
21   general antidepressant after the two or three
22   times that you saw Dr. Czulada?
23          A.     No.
24          Q.     When did you last see
```



1  Dr. Czulada?

2          A.      The latest 2009.

3          Q.      From 2008 to 2009 were you using

4  the general antidepressant that Dr. Czulada

5  prescribed?

6          A.      If I recall I don't know if I

7  refilled it.  It was only a matter of months

8  that I took that prescription.

9          Q.      After you last saw Dr. Czulada,

10 did you feel like your anxiety had subsided or

11 gone away?

12         A.      It was manageable.  So I guess

13 subsided, not gone away, but subsided.  Sure.

14         Q.      Did there come a point in time

15 after you saw Dr. Czulada you began treating

16 with another mental health care provider?

17         A.      Definitely Dr. Fernando.

18         Q.      When did you first treat with

19 Dr. Fernando?

20         A.      I believe that was 2015.

21         Q.      Between 2009 and 2015 did you

22 receive any mental health treatment?

23         A.      Not that I recall.

24         Q.      In 2015 why did you go see



1  Dr. Fernando?

2          A.      General anxiety.

3          Q.      Was there anything happening in

4  your life at that time to cause the general

5  anxiety?

6          A.      Again, it was mostly work related

7  stress.  Maintenance is typically kind of

8  demanding, lots of emergencies, professional

9  fire fighting in a sense.

10         Q.      Was there anything else that you

11 believe caused you to experience general anxiety

12 in 2015?

13         A.      No.

14         Q.      In 2015 when you saw Dr. Fernando

15 did she diagnose you with anything?

16         A.      Yes.

17         Q.      What did she diagnose you with?

18         A.      Anxiety.  And it was like

19 atypical depression or -- it's not like a

20 depression where you are depressed all the time.

21 It kind of comes and goes.  It is like seasonal

22 effective disorder or let's just say depression

23 I guess.

24         Q.      What type of treatment did she



 1   provide you for your general anxiety and

 2   depression?

 3          A.      Psychiatric medication,

 4   prescriptions, pharmaceuticals.

 5          Q.      What did she prescribe for you?

 6          A.      That was Lamictal and Abilify.

 7   She added Wellbutrin as needed.  Kind of

 8   seasonally.

 9          Q.      How long did you take the

10   Lamictal and Abilify?

11          A.      Five years.

12          Q.      So would that be from

13   approximately 2015 through 2020?

14          A.      Correct.

15          Q.      Why did you stop taking Lamictal

16   and Abilify?

17          A.      They didn't seem to be doing

18   anything that I can tell.

19          Q.      For how long a period of time did

20   you feel like they didn't seem to be doing

21   anything?

22          A.      To be honest I was never really

23   satisfied overall with what they did.  But I was

24   at least functional and going to work.  So I



1   just kept up with the course she prescribed.

2          Q.      Did you ever explain to her that

3   you felt that you were not satisfied with what

4   they did at any time?

5          A.      Yes.  I can't give you dates.

6   But periodically we would discuss it.

7          Q.      Did you ever try a different drug

8   other than Lamictal and Abilify during that

9   five-year period of time?

10          A.      I don't think so.

11          Q.      Did you ever discuss with

12   Dr. Fernando using a different pharmaceutical?

13          A.      No.

14          Q.      Is there a reason why you never

15   asked her about that despite feeling like you

16   were not satisfied with the Lamictal and the

17   Abilify?

18          A.      In general I personally really

19   don't like prescription pharmaceutical

20   psychiatric drugs to begin with.  And I really

21   honestly just didn't want to experiment with

22   myself based on the research I had done on

23   different options when you read about the

24   potential side effects and stuff.  It just --



1  the best thing that can happen is weight gain,

2  you get fat, it goes downhill from there.

3          And so I just was not really --

4  to me -- it was not worth the risk of, well,

5  experiment with some stuff with the potential,

6  you know, cost of who knows what.  So I just

7  dealt with it.  And like I said, I was

8  functional and I was doing things.  It kept

9  going.

10      Q.    Did Dr. Fernando ever discuss

11  medical marijuana with you?

12      A.    No.

13      Q.    Did you ever ask Dr. Fernando

14  about medical marijuana?

15      A.    No.  I don't think so.

16      Q.    Between 2015 and June 2020 did

17  you treat with any mental health professionals

18  other than Dr. Fernando?

19      A.    Does that include the therapist,

20  like just conversation?

21      Q.    So were you seeing a therapist

22  between 2015 and 2020?

23      A.    For some period of time in there,

24  yes.  But no other physician or doctor.



```
 1          Q.      Is Dr. Fernando a psychiatrist?
 2          A.      Yes.
 3          Q.      Between 2015 and 2020 what
 4   therapists were you seeing?
 5          A.      It was only a short period of
 6   time but Dr. Heidi Ramsbottom.
 7          Q.      Is Dr. Ramsbottom affiliated with
 8   a particular practice or entity?
 9          A.      Not that I'm ware of.  Her
10   practice has a name.  But I believe it is hers.
11   I don't think she is part of a network or
12   doctors, if that is what you mean.
13          Q.      How do you spell Ramsbottom?
14          A.      R-A-M-S-B-O-T-T-O-M, I believe.
15          Q.      Where is Dr. Ramsbottom located?
16          A.      Reading, PA.
17          Q.      How many times -- when did you
18   first see Dr. Ramsbottom?
19          A.      I believe it was 2015.
20          Q.      When did you last see
21   Dr. Ramsbottom?
22          A.      2015 or 2016.
23          Q.      How many times did you see
24   Dr. Ramsbottom between 2015 and the last time
```



```
 1  you saw her?
 2          A.      Approximately five.
 3          Q.      You mentioned that she is -- you
 4  refer to as a doctor.  What type of doctor is
 5  she?
 6          A.      I honestly don't know.
 7          Q.      Is she an MD?
 8          A.      I don't think so.  But I'm not
 9  certain.
10          Q.      How come you stopped seeing
11  Dr. Ramsbottom?
12          A.      $150 an hour.  Money was tight.
13          Q.      Any other reason you stopped
14  seeing Dr. Ramsbottom?
15          A.      No.
16          Q.      Between 2015 and 2020 have you
17  seen any other therapists -- actually let me
18  restate that question.
19                  Between 2015 and June 2020 have
20  you seen any other therapists other than
21  Dr. Ramsbottom?
22          A.      June '20.  No.  I don't think so.
23          Q.      Is there a reason why you have
24  not seen any other therapists during that time?
```



```
 1            A.     I was generally doing pretty
 2   good.  So I didn't feel the need to actively
 3   reach out for help.  And the expense -- just
 4   expensive.
 5            Q.     Other than Dr. Ramsbottom and
 6   Dr. Fernando, did you treat with any other
 7   mental health care providers between 2015 and
 8   June 2020?
 9            A.     No.
10            Q.     Have you at any time ever
11   undergone any inpatient mental health care
12   treatment anywhere?
13            A.     No.
14            Q.     At any time have you been
15   hospitalized for any mental health care reasons?
16            A.     No.
17            Q.     In terms of then your treatment
18   with LG Health you mentioned you saw
19   Dr. Zimmerman.  Are you sill treating with LG
20   Health?
21            A.     Yes.
22            Q.     Are you treating with
23   Dr. Zimmerman at LG Health?
24            A.     No.  It's -- I remember his name.
```



1   It's Dr. Musyt.

2         Q.    Are you still treating with

3   Dr. Musyt at LG Health?

4         A.    Yes.

5         Q.    Between November 2020 and today

6   how many times have you seen Dr. Musyt?

7         A.    Approximately -- it was not

8   Dr. Musyt every time.  But with LG Health there

9   was approximately five or six visits.  Or it's

10  COVID year so it's been virtual appointments

11  sometimes as well.  Yes.  I will say about five

12  or six.

13        Q.    Do you have an appointment

14  scheduled to see Dr. Musyt any time in the near

15  future?

16        A.    No.  Not yet.

17        Q.    Is there a set schedule with

18  regard to your appointments with Dr. Musyt or do

19  you make those appointments on a as-needed

20  basis?

21        A.    Currently as needed.

22        Q.    Are you currently taking any

23  pharmaceutical for purpose of your mental

24  health?



```
 1          A.    I think we covered that.  But,
 2  yes.
 3          Q.    What are you currently taking?
 4          A.    Lamictal.
 5          Q.    Did you take any Lamictal today?
 6          A.    No.
 7          Q.    How often do you take the
 8  Lamictal?
 9          A.    One a day.
10          Q.    When is the last time you took
11  Lamictal?
12          A.    Last night.
13          Q.    Who prescribed that Lamictal to
14  you?
15          A.     It was LG Health.  And I believe
16  it was Dr. Musyt.  Dr. Musyt at LG Health.
17          Q.    Does your wife work outside of
18  the home?
19          A.    Not full-time, no.
20          Q.    Has your wife worked outside of
21  the home at any time between 2019 and the
22  present?
23          A.    No.
24          Q.    Does she work outside of the home
```



```
 1  part-time?
 2          A.      Yes.
 3          Q.      What does she do?
 4          A.      She is a state-licensed massage
 5  therapist.
 6          Q.      Where does you she work?
 7          A.      That's the thing.  She doesn't
 8  work at a place.  She just practices.  So it's
 9  just one here, one there.  Kind of pocket money
10  for her.  With COVID massage therapy went away.
11  So really in 2020 that was effectively zero.
12  And that just stopped.
13          Q.      Did you file tax returns in 2020?
14          A.      Yes.  I filed an extension.
15  That's a long story.
16          Q.      Have you to date filed a tax
17  return for 2020?
18          A.      No.
19          Q.      Do you and your wife file tax
20  returns jointly?
21          A.      Yes.
22          Q.      After Dr. Andrea recommended
23  medical marijuana for you, what did you do?
24          A.      I did a lot of research about
```



1  different kinds of strains because there is

2  thousands of different strains of medical

3  marijuana.  And I shopped around at the

4  different dispensaries to see what they had.

5  And then I went to a dispensary and selected --

6  actually they have a person there who explains

7  the process and explains some of the products to

8  you.  And they are not prescribing but they can

9  advise you towards different things.  I talked

10  to them.  And then I selected products there at

11  one of the dispensaries.

12         Q.     Before speaking to the

13  dispensary, did you obtain a medical marijuana

14  license in Pennsylvania?

15         A.     Oh, yes.  I got a patient card or

16  patient certification.

17         Q.     What did you do to get that

18  patient certification?

19         A.     I followed the process.  There

20  was a process on the Department of Health

21  website.

22         Q.     What did that process entail?

23         A.     So I believe the first part is

24  you apply on the state website.  You pay a fee.


ESQUIRE
DEPOSITION SOLUTIONS

1   And then once you have an account and a website

2   then you see a authorized physician who may or

3   may not make a determination and a

4   recommendation.  And they go to the system to

5   certify and answer some questions.  And once

6   that is done I think that's the whole process.

7   And then you are approved and you get a card in

8   the mail.

9          Q.    Did you have anything in writing

10  from Dr. Andrea?

11         A.    I don't think so.

12         Q.    When you talked about going

13  online were you referring to the medical

14  marijuana registry?

15         A.    Going online and regards to what?

16         Q.    The initial step before speaking

17  to a physician?

18         A.    Yes.  Yes.  The Pennsylvania

19  Department of Health Office of Medical

20  Marijuana.

21         Q.    Did you create a profile in this

22  medical marijuana registry?

23         A.    Yes.  I have to sign up for a

24  patient profile.



1          Q.      When did you create your profile

2    in the medical marijuana registry?

3          A.      I believe it was May 2020.

4          Q.      What led you to create a profile

5    in the medical marijuana registry at that time?

6          A.      Overwhelming anxiety of the

7    situation with my being laid off from COVID and

8    the pharmaceuticals just were not working at

9    all.  So it was a last-ditch effort.

10         Q.      At that time was it the Lamictal

11   and the Abilify that you were taking when you

12   refer to pharmaceuticals?

13         A.      Yes.

14         Q.      Dr. Andrea then was the physician

15   whom you contacted after that; is that correct?

16         A.      Yes.

17         Q.      After you met with Dr. Andrea and

18   she provided you with this recommendation, did

19   you have to do anything to complete your

20   application for the medical marijuana ID card?

21         A.      I can't remember.  If I did it

22   was very easy.  I can't remember.

23         Q.      You mentioned that you went

24   through the recertification process, correct,



1   for a medical marijuana license?

2          A.     Correct.

3          Q.     You also mentioned that you

4   stopped using medical marijuana in May 2021,

5   correct?

6          A.     Yes.

7          Q.     Why did you go through the

8   recertification process if you stopped using

9   medical marijuana?

10         A.     Well, honestly I just -- I was

11  not sure I wanted to make sure I was still part

12  of the program and, you know, covered as a

13  patient.  Because I have not really come to

14  closure with the ramifications and the outfall

15  of being a patient.  And so just covering all my

16  bases.

17         Q.     In May 2020 when you stopped

18  using medical marijuana, were you experiencing

19  any symptoms or side effects of the use of it

20  that you did not enjoy?

21         A.     You meant May 2021?

22         Q.     May 2021.  Let me re-ask.

23                When you stopped using medical

24  marijuana in May 2021, were you experiencing any



```
 1  symptoms or side effects that led you to stop

 2  using medical marijuana?

 3          A.      No.

 4          Q.      Is the reason you stopped because

 5  of the comment you just made about the

 6  ramifications of you using medical marijuana

 7  still being unclear?

 8          A.      Primarily.

 9          Q.      Have you received a new medical

10  marijuana license card for the State of

11  Pennsylvania?

12          A.      Yes.

13          Q.      When did you receive that new

14  card?

15          A.      Fairly recently.  I can't

16  remember exactly.  I went through the process.

17  I think it was last month or so.

18                  (Exhibit 1 was marked for

19      identification.)

20  BY MS. FICARO

21          Q.      I am going to share my screen

22  with you for a moment.  I am showing you a copy

23  of a document that I would ask be marked

24  Reynolds 1.
```



```
 1                    Mr. Reynolds, I will represent to
 2    you this is a document that we received from
 3    your attorney in this matter.  There is written
 4    words at the top of it that reads, No. 15, The
 5    MMM card presented at the preemployment drug
 6    screen.
 7                    And then there is a picture of
 8    what appears to be a medical marijuana
 9    identification card.  Do you recognize this
10    document?
11            A.      Yes.
12            Q.      Do you recognize the card?
13            A.      Yes.
14            Q.      Is that your medical marijuana
15    identification card that you had for the period
16    of time from July 6, 2020 through July 6 2021?
17            A.      Yes.
18            Q.      Did you carry that card with you
19    at all times after you received it?
20            A.      Oh, yes.  Right next to my
21    driver's license.
22            Q.      Did you carry that card with you
23    even when you may not have had medical marijuana
24    on your person?
```



1          A.     Yes.

2          Q.     On the date of your termination

3    did you have your medical marijuana

4    identification card with you?

5          A.     Yes.

6          Q.     On the date of your termination

7    from Willert, did you show your medical

8    marijuana identification card to anyone?

9          A.     No.

10         Q.     On the date of your termination

11   from Willert, did you offer to show your medical

12   marijuana identification card to anyone?

13         A.     It was over the phone.  So I

14   couldn't physically show them.  But I told them

15   over the phone that I had the patient card.

16         Q.     In order to complete your profile

17   on the medical marijuana registry, did you

18   complete that profile entirely online?

19         A.     Yes.

20         Q.     Do you have written documentation

21   for what information you provided or any

22   documents that you had to submit in order to

23   create that profile?

24         A.     I don't think so.  I'm not



1  aware of -- I can't remember what I had to

2  submit.  But I don't think I have written

3  documentation.

4         Q.    If you logged into the medical

5  marijuana registry right now would you be able

6  to access your profile?

7         A.    Yes.

8         Q.    Are you able to print out a copy

9  of your profile?

10         A.    Probably.  If it's on your screen

11  you can print it.

12         Q.    In preparing and completing your

13  profile in the medical marijuana registry did

14  you have to submit any documents?

15         A.    I don't think so.  I don't

16  remember submitting anything.

17         Q.    Did you receive any hard copy

18  documents back from the Pennsylvania Department

19  of Health or any other entity after you had

20  completed your medical marijuana registry

21  profile?

22         A.    I believe so.  I know I got the

23  card and I believe there was a letter as well.

24  I will need a two-minute restroom break at some



```
 1   point here.
 2           Q.     Sure.  I'm fine if we take it
 3   right now.
 4                  (Discussion held off the record.)
 5   BY MS. FICARO
 6           Q.     Mr. Reynolds, when you stopped
 7   using medical marijuana in May of 2021, did you
 8   do that in consultation with a doctor?
 9           A.     No.
10           Q.     Did you discuss with any of your
11   doctors the fact that you were going to stop
12   using medical marijuana?
13           A.     Yes.  I did tell them.
14           Q.     Who did you tell?
15           A.     One of the doctors at LG Health,
16   Musyt or Zimmerman.
17           Q.     Did you seek their advice as
18   whether you should or you should not cease using
19   medical marijuana?
20           A.     No.
21           Q.     Did any of them tell you you
22   should continue using medical marijuana?
23           A.     No.
24           Q.     You mentioned earlier that you
```



```
 1   had checked out some dispensaries when were

 2   originally applying for your medical marijuana

 3   card.  And I want to share my screen for a

 4   moment again.

 5          A.    Sure.

 6                (Exhibit 2 was marked for

 7      identification.)

 8   BY MS. FICARO

 9          Q.    Mr. Reynolds, I am showing you

10   copy of a document that I will ask be marked

11   Reynolds 2.  This is another document that was

12   produced by your attorney in this action.  At

13   the top it reads, No. 4 Dispensary Information.

14                And it appears to list three

15   different entities:  Herbology Dispensary, Cure

16   Pennsylvania, Apothecarium Dispensary.  Do you

17   recognize those names on this document?

18          A.    Yes.

19          Q.    Who prepared this document?

20          A.    The date was provided by myself.

21          Q.    Did you prepare the actual

22   document?

23          A.    It looks very similar.  I can't

24   testify if that's the exact one or if it was
```



```
 1   copy pasted.  But that is the exact information
 2   I provided.
 3          Q.     What are these companies listed
 4   on here?
 5          A.     Those are state-licensed medical
 6   marijuana dispensaries.
 7          Q.     Do you purchase medical marijuana
 8   from those dispensaries?
 9          A.     I did, yes.
10          Q.     So under each of those entities
11   there is dates of purchase that appear to be
12   listed.
13          A.     Yes.
14          Q.     Herbology Dispensary it lists
15   November 16, 2020, December 18, 2020, August 21,
16   2020.  Are those dates on which you purchased
17   medical marijuana from that dispensary?
18          A.     Yes.
19          Q.     How did you purchase the medical
20   marijuana from the dispensary?
21          A.     I went to the dispensary and made
22   selections and a cash purchase.
23          Q.     Do you have receipts from those
24   purchases?
```



```
1              A.      I'm uncertain.

2              Q.      Do you have any of the receipts?

3              A.      I don't know.  That was a

4      dreadfully disorganized time in my life.

5              Q.      Do you have -- are you able to

6      look and see if you have copies of the receipts

7      after this deposition?

8              A.      Not immediately.  I'm in Phoenix

9      now.  I can testify to those dates specifically.

10     I know those are accurate.  But I don't know if

11     I can provide receipts or not.

12             Q.      What causes you to specifically

13     remember those dates?

14             A.      Google maps.  I have a Android

15     phone and it tracks everywhere you go.  So I had

16     to go to my timeline and find the days I went to

17     the dispensaries.  It is the only times I ever

18     go to those places.

19             Q.      Is it possible that you have

20     copies of those receipts?

21             A.      It's possible I have some copies.

22             Q.      I see here that there are dates

23     of March 4, 2021 and February 11, 2021 listed

24     under Cure Pennsylvania.  Are those dates in
```



1    which you purchased medical marijuana from Cure

2    Pennsylvania?

3           A.    Yes.

4           Q.    And then I see here under the

5    Apothecary Dispensary there is dates listed

6    January 29, 2021, October 1, 2020, August 3,

7    2020 and July 21, 2021.  Are those dates in

8    which you purchased medical marijuana from that

9    dispensary?

10          A.    That last date you said was 2021?

11   That was...

12          Q.    So July 21, 2020.

13          A.    So, yes, those are dates

14   purchased from that dispensary.

15          Q.    Is there reason why you used

16   three different dispensaries?

17          A.    Yes.

18          Q.    What is the reason?

19          A.    Product selection.  It varies

20   dramatically.  It's very inconsistent what they

21   have available.

22          Q.    Have you purchased medical

23   marijuana from anywhere other than those three

24   dispensaries since you received your license,



1   your medical marijuana card?

2          A.    No.

3          Q.    Have you purchased marijuana from

4   anywhere else since -- I am not referring to

5   medical marijuana exclusively -- I'm referring

6   generally to marijuana.  Have you purchased

7   marijuana from anywhere else since July 21,

8   2020?

9          A.    No.

10         Q.    Have you been provided marijuana

11  from anywhere else since July 21, 2020?

12         A.    No.

13         Q.    When you use medical marijuana in

14  what form do you use it?

15         A.    Preferable oral tinctures like

16  drops.  If those were not available then

17  extracts, which are like essential oils.

18         Q.    Have you used medical marijuana

19  in any other form since you obtained your

20  license?

21         A.    No.  Those were the forms I used

22  it.

23         Q.    Have you smoked medical marijuana

24  at all since July 21, 2020?



```
1           A.      No.
2           Q.      Have you used marijuana
3    recreationally at all since July 2020?
4           A.      No.
5               MS. FICARO:  Steve, as a point to
6       raise here, the fact that he has answered a
7       question about recreational marijuana with
8       regard to any time arguably waives any
9       privilege that could be asserted with
10      regard to questions about recreational
11      marijuana in general.
12              MR. AUERBACH:  It is your call
13      (inaudible) filing a protective order or
14      motion in limine.
15              MS. FICARO:  Are you going to
16      continue to instruct him not to answer
17      those questions?
18              MR. AUERBACH:  The objection was
19      specifically anything before July 2020.  If
20      you want to ask him anything on or after
21      that date be my guest.
22              MS. FICARO:  What I'm saying is
23      the fact that he has testified to
24      recreational marijuana use after July 2020
```



1  waives the privilege with regard to
2  questions about recreational marijuana in
3  general.
4          MR. AUERBACH:  And I am saying it
5  doesn't.
6          MS. FICARO:  So are you
7  instructing the witness then not to answer
8  any questions still about recreational
9  marijuana use before July 2020?
10         MR. AUERBACH:  Yes.
11         MS. FICARO:  We will address that
12  with the Court then.
13         MR. AUERBACH:  Please.  What
14  basis do you have to waive the Fifth
15  Amendment privilege?
16         MS. FICARO:  Sorry?  Say that
17  again.  You cut out.
18         MR. AUERBACH:  What basis you
19  have you challenge a Fifth Amendment
20  privilege?
21         MS. FICARO:  He just waived the
22  privilege by answering a question about
23  recreational marijuana use at any time.
24         MR. AUERBACH:  Continue.



```
 1                    MS. FICARO:  So your position is
 2        the same?
 3                    MR. AUERBACH:  A hundred percent.
 4   BY MS. FICARO
 5         Q.     Since July 2020, Mr. Reynolds,
 6   how many times have you used medical marijuana?
 7         A.     I can't quantify that
 8   specifically.
 9         Q.     Can you estimate or approximate
10   for me how many times a week between July 2020
11   and May 2021 you used medical marijuana?
12         A.     Used?  You said used, correct?
13         Q.     Is there anything else you do
14   with the marijuana?
15         A.     No.  I'm just asking, just
16   clarifying.  I would say five to seven times a
17   week.
18         Q.     On those five to seven times a
19   week between July 2020 and May 2021 that you
20   would use medical marijuana, how much medical
21   marijuana did you use on each occasion?
22         A.     I say approximately because it's
23   hard to quantify.  But approximately one to five
24   milligrams of THC with a ratio of 10 to 15
```



1  milligrams of CBD.

2       Q.    How do you know how much was in

3  each dose of medical marijuana?

4       A.    When it comes in the tincture

5  form in a liquid bottle it says on the box one

6  dropper full contains a certain amount.  So in

7  those cases I can -- that is what I'm use as my

8  basis to estimate those dosages.

9       Q.    Do you still have copies of the

10  boxes in which the medical marijuana you

11  purchased came?

12       A.    No.  I cleaned everything out and

13  threw it all away.

14       Q.    When did you throw it all away?

15       A.    Sometime around May.

16       Q.    Was that May 2021?

17       A.    Yes.

18       Q.    Why did you throw it away at that

19  time?

20       A.    I was cleaning up just doing

21  housekeeping, cleaning up.

22       Q.    Between July '20 and the

23  preemployment drug screen you took for Willert,

24  did you undergo any other drug screens during



1    that time?

2          A.    No.

3          Q.    When you used the medical

4    marijuana do you know how long it stays in your

5    system after you use it?

6          A.    No.  I don't know.

7          Q.    Between July 2020 and May 2021

8    when you were using medical marijuana five to

9    seven times per week, was there a set schedule

10   on which you used the medical marijuana?

11         A.    Typically in the evening.

12         Q.    What time in the evening

13   typically would you take it?

14         A.    Around 5:00 or 6:00 p.m. or

15   something like that.

16         Q.    Between July 2020 and May 2021

17   when you stopped using medical marijuana, did

18   you take the medical marijuana in any form other

19   than tinctures or extracts?

20         A.    No.

21         Q.    Is there a difference between

22   marijuana used for medical purposes versus

23   marijuana used recreationally?

24         A.    Well, I know the state requires a



1  whole list of quality and safety checks in order

2  for a product to be sold in a legal dispensary.

3  And so I know that about the medical marijuana.

4      Q.    Do you have any other information

5  that indicates the chemical composition between

6  medical marijuana and marijuana used for

7  recreational purposes is different?

8      A.    I don't know.

9      Q.    When you used medical marijuana

10  via tinctures, does it create an odor?

11      A.    No, not really.

12      Q.    When you use medical marijuana,

13  the extracts, does it create an odor?

14      A.    The extract itself definitely has

15  a scent to it.

16      Q.    After you used medical marijuana

17  do you emit a scent?

18      A.    No.

19      Q.    When you use medical marijuana do

20  you experience red eyes?

21      A.    Sometimes.

22      Q.    When you use medical marijuana do

23  use experience poor muscle coordination?

24      A.    No.



```
 1          Q.     When you use medical marijuana do
 2   you experience delayed reaction times?
 3          A.     No.
 4          Q.     When you use medical marijuana do
 5   you experience an increased appetite?
 6          A.     No.
 7          Q.     When you use medical marijuana do
 8   you experience sudden shifts in your mood?
 9          A.     Well, that's kind of the point of
10   the medicine is to go from anxious to feeling
11   okay.  Or does mood mean something else other
12   than anxiety?  Sorry.  Maybe I need more
13   clarification.
14          Q.     Is it fair to say then when you
15   use medical marijuana that there is a sudden
16   shift in your mood from feeling anxious to
17   feeling okay?
18          A.     Oh, yes.  It's effective.
19          Q.     When use medical marijuana do you
20   feel like you are under the influence?
21          A.     No.
22          Q.     Do you feel high?
23          A.     No.
24          Q.     When you use medical marijuana
```



1  does it affect your coordination?

2          A.      No.

3          Q.      When you use medical marijuana do

4  you experience dizziness?

5          A.      No.

6          Q.      When you use medical marijuana do

7  you ever feel like your perception is distorted?

8          A.      My visual -- what I am seeing?

9          Q.      Yes.

10         A.      No.

11         Q.      When you use medical marijuana do

12 you ever feel like you experience impaired

13 cognition?

14         A.      No.  I mean, lets me ask for a

15 point of clarity on that.  Does like feeling

16 sleepy or tired count for cognition?

17         Q.      When you use medical marijuana do

18 you feel sleepy or tired?

19         A.      Sometimes.

20         Q.      Do you know if medical marijuana

21 shows up differently on a drug test than

22 recreational marijuana might?

23         A.      I can't scientifically answer

24 that.  I would be guessing.



```
 1            Q.     On the day you took drug screen
 2  for Willert did you use medical marijuana that
 3  day?
 4            A.     No.
 5            Q.     When did you last use medical
 6  marijuana before you took the drug screen for
 7  Willert?
 8            A.     I can't answer with a hundred
 9  percent certainty but likely within 36 hours
10  prior.
11            Q.     Is it possible you used medical
12  marijuana the night before you took the drug
13  screen from Willert?
14            A.     Possible.
15            Q.     My understanding is that you took
16  the drug screen for Willert on October 28, 2020;
17  is that accurate?
18            A.     That sounds correct.  I believe
19  so.
20            Q.     Were you actually scheduled to
21  originally take the drug screen the day before
22  on October 27, 2020?
23            A.     I don't remember.  It's possible.
24  There was a lot unplanned breakdowns and stuff
```



1   going on.  So I don't remember that.  You are

2   asking so I am assuming that is coming from

3   somewhere.

4                   (Exhibit 3 was marked for

5       identification.)

6   BY MS. FICARO

7       Q.    I will share my screen with you.

8   I am showing you a copy of a document that I

9   will ask be marked as Reynolds 3.  I will scroll

10  down so you can see the whole document.  I will

11  tell you Willert produced this in discovery in

12  this matter.

13                  If you look at the bottom of both

14  pages first you will see there is Bates labels

15  at the bottom, Willert 0044 and Willert 0045.

16  Do you see those numbers there?

17      A.    Yes.

18      Q.    I will scroll all way to the

19  bottom because it's an email chain.

20      A.    Okay.

21      Q.    So you will see here at the

22  bottom the name David Furno.  Who is David

23  Furno?

24      A.    He was one of the salaried people



1  there at Willert.  It was quality, safety,

2  environmental I believe were his

3  responsibilities.

4          Q.     I will scroll up a little bit

5  here at the top of this email.  It appears as

6  though it was sent on Monday, October 26, 2020

7  from email address DFurno@Willert.com.  Do you

8  see that there?

9          A.     Yes.

10          Q.     Was that Mr. Furno's email

11  address at Willert?

12          A.     Yes.

13          Q.     It says, Gentlemen, I have you

14  scheduled for new employee drug screens,

15  occupational health and rehabilitation services

16  at Care Plex, 81 Robinson Street, Pottstown.

17  That's for another individual.  And there is

18  another individual's name.  And the last name

19  here is Matthew Reynolds.  Tuesday, October 27th

20  at 2:00 p.m.  Do you see that there?

21          A.     Yes.

22          Q.     Does that refresh your

23  recollection as to the fact you were supposed to

24  go for that drug screen on October 27?



```
 1          A.    I'm seeing it and reading it.  I
 2  forgot the facts.  So I agree because I'm seeing
 3  it there.  I don't remember the circumstances
 4  back then.
 5          Q.    Do you have any reason to
 6  disagree or refute the fact you were originally
 7  scheduled to take that test on October 27?
 8          A.    No.  I don't think they made that
 9  up.
10          Q.    Scrolling up little bit higher
11  here there is an email from you dated
12  October 27, 2020 at 3:21 p.m.  The subject is
13  Re: new employee drug screens, to Dave Furno.
14  And it reads, I missed my appointment today.
15  Was having so much fun I couldn't quit.
16                Do you see that there?
17          A.    Yes.
18          Q.    And MReynolds@Willert.com, was
19  that your email address at Willert?
20          A.    I had another call coming in
21  quick.
22          Q.    Is that your email address at
23  Willert?
24          A.    Yes.
```



```
1          Q.     Does that refresh your
2    recollection as to whether you missed that drug
3    test on October 27?
4          A.     That is certainly something that
5    I wrote.
6          Q.     Why did you miss the drug test
7    appointment on October 27, 2020?
8          A.     It was a really busy day at work.
9    And when I say was having so much fun, I enjoyed
10   my job.  And there was breakdowns, high priority
11   issues that I was attending to.  And that was my
12   way of saying that I needed to keep the business
13   running.  And so we needed to reschedule it.
14         Q.     In the middle of that crazy day
15   was there any reason why you didn't contact
16   Mr. Furno before the 2:00 p.m. appointment and
17   say I'm not going to be able to make it today,
18   I'm slammed at work?
19         A.     I might have just lost track of
20   time.  I can't remember the specifics breakdown
21   situation or what I was doing that day.  I
22   couldn't tell what you line broke or anything.
23   I will just say I lost track of time.
24         Q.     Mr. Reynolds, how did you come to
```



1  find out about the job at Willert?

2        A.     I believe a recruiter.  Hang

3  tight a second.  I will put my phone on, Do not

4  disturb.  It might turn my video off for a

5  second.

6        Q.     Sure.  Jumping back for a moment

7  here, does your wife use medical marijuana?

8        A.     No.

9        Q.     Does your wife use marijuana

10  recreationally?

11        A.     No.  Wait.  Hang on a second.

12  The last time I said no to a recreational

13  question it got me in trouble.  So am I allowed

14  to answer that?

15              MR. AUERBACH:  Are you allowed to

16        answer that?  I don't think we have a basis

17        to assert privilege.  I think you have to.

18              THE WITNESS:  No.  She doesn't

19        use any kind of marijuana.

20  BY MS. FICARO

21        Q.     Did she use any kind of marijuana

22  in October or November 2020?

23        A.     No.

24        Q.     What is your older son's name?



```
 1          A.     Logan.

 2          Q.     In October 2020 and November 2020

 3   was he living in the same house as you?

 4          A.     Yes.

 5          Q.     Does Logan use marijuana?

 6          A.     No.

 7          Q.     Just to be specific:  Does he use

 8   medical marijuana?

 9          A.     No.

10          Q.     Does he use recreational

11   marijuana?

12          A.     No.

13          Q.     In October 2020 and November 2020

14   did Logan use marijuana recreationally?

15          A.     No.

16          Q.     In October 2020 and November 2020

17   did Logan use medical marijuana?

18          A.     No.

19          Q.     In October 2020 and November 2020

20   was Isaac living in the same house as you?

21          A.     Yes.

22          Q.     In October 2020 and November 2020

23   did Isaac use medical marijuana?

24          A.     No.
```



```
1          Q.      In October 2020 and November 2020
2   did Isaac use marijuana recreationally?
3          A.      No.
4          Q.      In October 2020 and November 2020
5   was anyone else living in the same house as you
6   except for your -- other than your wife and your
7   two sons?
8          A.      No.
9          Q.      So jumping back then you were
10  mentioning a recruiter here.  So a recruiter led
11  you to Willert.  Do you recall the name of the
12  recruiter?
13         A.      I think it was Mike or Matt.  I
14  will not swear to it.  So maybe I should say I
15  don't know.
16         Q.      Was there a company with which
17  that recruiter was affiliated?
18         A.      Yes.  I believe so.  I can't
19  provide the name.
20         Q.      Do you recall where that company
21  was located?
22         A.      No.
23         Q.      How did you get contact with that
24  recruiter?
```



```
1          A.     We had been working together for
2   sometime through 2020.   I believe he found me.
3   I had my resume posted all over the internet.
4   So I believe he contacted me and presented a
5   number of employment opportunities which I tried
6   for.
7          Q.     Did you have to complete a
8   application in order to get the job at Willert?
9          A.     No.
10         Q.     Did you submit any documentation
11  in order to get the job at Willert?
12         A.     Not that I remember.   I don't
13  believe so.
14         Q.     Did you have any interviews with
15  anyone at Willert before you began working at
16  Willert?
17         A.     Yes.
18         Q.     How many interviews did you have?
19         A.     So there are two instances.   I
20  will say two.
21         Q.     Two instances, did you say?   Or
22  two interviews?
23         A.     There is one that was definitely
24  an interview and there was an in-person meeting
```



1  there.  But that was not really structured as an

2  interview at all.  But it was prior to

3  employment.  So that is why I say instances.

4          Q.      With regard to the interview when

5  did that take place?

6          A.      Maybe like the Thursday before.

7  So it would have been like maybe the 18th, 19th

8  or -- no, no.  Sorry.  I am doing math here.

9  Lets say at the 8th or 9th of October, the week

10 before I started I started like Friday the 16th.

11 And I think it was the week prior.

12         Q.      Did that interview occur in

13 person?

14         A.      No.

15         Q.      Was it conducted telephonically?

16         A.      Does that include a Zoom?

17         Q.      No.  That is different.  Did it

18 occur via video conference?

19         A.      Yes.

20         Q.      Who interviewed you from Willert?

21         A.      Bryan Willert.

22         Q.      Did anyone else besides you and

23 Bryan Willert participate in that interview?

24         A.      No.



1        Q.      What did you and Bryan Willert

2   discuss during that interview?

3        A.      My background, job history, the

4   general processes they were doing there at the

5   plant, kind of the timeline of what they were

6   doing.  Just basically expectations of what he

7   is looking for in a manager.

8        Q.      What did Mr. Willert explain to

9   you about the processes, the general processes

10  of the plant?

11       A.      Well, I understood that they are

12  making two or three products there at the time.

13  But that they were going to be rapidly

14  expanding, adding new equipment, bringing in new

15  lines.  So that all sounded pretty exiting.

16       Q.      What products were they making

17  there at the plant at the time you interviewed

18  there?

19       A.      Ty-D-Bowl.  Which is a upside

20  down bottle you can put in the back of a commode

21  to make blue water.  Some air refreshers and

22  like a gel air freshener.  It comes in short

23  container.  Then a spray bottle air freshener or

24  cleaner.  But something that comes in a



1   Windex-style bottle with a trigger on it.  Those

2   are the main lines.

3          Q.     In to order make those products

4   did it involve the mixing of chemicals?

5          A.     Yes.  They had mix tanks there.

6          Q.     What types of chemicals were

7   being mixed there at the plant when you

8   interviewed there and when you began to work

9   there?

10         A.     I don't know.  I know some of

11  those products are 99 percent water.  Just FYI

12  when you are paying $7 for a thing of cleaner

13  it's a lot of water.  I don't know what the

14  actual chemicals were.  Some fragrances and

15  maybe surfactants or something.

16         Q.     What else did Bryan Willert

17  explain to you about what they were looking for

18  in a manager?

19         A.     One thing he specifically said

20  that stood out I was used to being on call at

21  the cheese place at Fleur De Lait.  And I only

22  lived six miles from that plant.  And I was

23  explaining to him that I wouldn't be as

24  available for Willert because I lived 40 minutes



```
 1   away for on-call situations and after hours and

 2   stuff.  And I remember him saying, well, I am

 3   not looking for you to be doing work.  I'm

 4   looking for you to be coordinating the efforts

 5   of people doing the work.  He outlined it that

 6   that is not your job.  You are the guy

 7   coordinating the people doing that.

 8           Q.     Did he explain what he meant when

 9   he said by coordinating those efforts?

10           A.     No.  He didn't expound on that

11   too much as far as I recall.  I understood what

12   he meant.  Or I think I did.

13           Q.     Did you ask him to explain what

14   he meant by coordinating those efforts?

15           A.     No.

16           Q.     Did he explain to you anything

17   else about the responsibilities of a maintenance

18   manager at the facility?

19           A.     I don't remember.

20           Q.     Did he show you anything in

21   writing about the job responsibilities of a the

22   maintenance manager at Willert?

23           A.     No.

24           Q.     Do you recall anything else that
```



1  you and he discussed during that interview?

2          A.     The only other thing coming to

3  mind is just he told me some of his background,

4  his professional or personal background.  But

5  that was not really relevant to this.  That is

6  all I remember talking about otherwise.

7          Q.     During that interview did you

8  have red eyes?

9          A.     I don't know.

10          Q.     Did you use any medical marijuana

11  before the interview?

12          A.     No.

13          Q.     Did you mention to Mr. Willert

14  that you were a medical marijuana patient during

15  the interview?

16          A.     No.

17          Q.     Was there any discussion about

18  preemployment drug screen during that initial

19  interview?

20          A.     No.

21          Q.     You mentioned there was as an

22  in-person meeting.  When did the in-person

23  meeting prior to your employment occur?

24          A.     Wednesday.  I think Wednesday,



1  October 14th two days before I started.

2      Q.    So that's October 14, 2020?

3      A.    Yes.  I believe so.  I want to

4  check a calendar before I bet a paycheck on it.

5  But yes.

6      Q.    Who participated in that

7  in-person meeting?

8      A.    Bryan Willert and Jack Bonsky.

9      Q.    Who is Jack Bonsky?

10     A.    He was the brand new plant

11  manager who just accepted his role five minutes

12  before I walked in the door.

13     Q.    Where did the in-person meeting

14  occur?

15     A.    Throughout the plant.  We walked

16  the operation and looked over the facility.  So

17  we went for a walk.

18     Q.    When you refer to the plant are

19  you referring to Willert's Douglassville

20  location?

21     A.    Yes.

22     Q.    Is that the location where you

23  worked at for Willert?

24     A.    Yes.



```
 1          Q.      Did you ever see Bryan Willert at
 2    the Douglassville location other than the time
 3    of your in-person meeting with him?
 4          A.      Yes.  At least once.  He came
 5    back maybe a week or so later.
 6          Q.      What was discussed during that
 7    October 14, 2020 in-person meeting?
 8          A.      He explained the processes and
 9    explained that he was looking for people that he
10    could trust to take care of the operation so he
11    wouldn't have to be there.  And he asked me if I
12    thought I could do it.  And I said yes.  We
13    shook hands on it and that was it.
14          Q.      And, again, what was discussed
15    regarding the processes?
16          A.      It was just a tour of the plant
17    to see the kinds of equipment that were there to
18    see if I was comfortable maintaining that
19    equipment and different manufacturing
20    facilities.  A wide variety of different stuff.
21    And my background lent itself to what they were
22    doing there.  And I felt very confident I could
23    perform the role.  Just kind of a process check.
24    Do you think you can do this?  Was his question
```



1  to me.

2          Q.      During the in-person meeting did

3  you mention to Mr. Willert and Mr. Bonsky you

4  were a medical marijuana patient?

5          A.      No.

6          Q.      During the time of the in-person

7  meeting did you have red eyes at all?

8          A.      I don't know.

9          Q.      Did you take any medical

10  marijuana before the in-person meeting?

11          A.      No.

12          Q.      When was the last time you took

13  medical marijuana before the in-person meeting?

14          A.      I can't tell you.  I don't know.

15          Q.      Did Mr. Willert or Mr. Bonsky

16  make comments to you during the in-person

17  meeting about medical marijuana?

18          A.      No.

19          Q.      Did Mr. Willert or Mr. Bonsky

20  make any comments to you during the in-person

21  meeting regarding marijuana?

22          A.      No.

23          Q.      Did Mr. Willert make comments to

24  you regarding medical marijuana during the first



1   interview that you had with him?

2          A.     No.

3          Q.     Did Mr. Willert make any comments

4   to you about marijuana in general during the

5   first interview that you had with him?

6          A.     No.

7          Q.     Other than what you already

8   testified to, can you recall anything else that

9   was discussed during that in-person meeting that

10  you mentioned?

11         A.     General introduction between me

12  and Jack Bonsky.  We talked about having fun a

13  lot.  Jack was a high-energy guy.  He was

14  excited to be there.  And so was I.  And it was

15  really unique in that sense.  It was like having

16  fun was the kind of part of the objective and

17  that really stood out.  It was part of what made

18  that job special at the time.

19         Q.     What was it about that job that

20  seemed like it would be fun to you?

21         A.     The people.  I mean, there is not

22  necessarily anything fun about a building or

23  machinery.  But it's the attitude and the

24  atmosphere that the people and the leadership



1  put in place.  And that was kind of the MO from

2  Bryan and Jack was like, hey, we are going to do

3  this and we are going to have a good time doing

4  it.

5          Q.    After the in-person meeting were

6  you offered a position at Willert?

7          A.    Yes.

8          Q.    What position were you offered?

9          A.    Maintenance manager.

10         Q.    Did you receive an offer letter

11  from Willert?

12         A.    I think a few days after I

13  started there was there was an offer letter.

14  But I had already been working a few days.

15         Q.    What was the first day that you

16  began working at Willert?

17         A.    Friday, October 15th or 16th,

18  2020.

19               (Exhibit 4 was marked for

20      identification.)

21  BY MS. FICARO

22         Q.    I will share my screen with you.

23  I am showing you a copy of a document I will ask

24  be marked Reynolds 4.  There are Bates numbers



1   at the bottom of each page of the two-page

2   document, Willert 0001 and Willert 00002.  Do

3   you see those Bates labels?

4          A.     Yes.

5          Q.     Scrolling back to the top here it

6   appears to be a letter on Willert Manufacturing

7   Company's letterhead.  Do you see that top

8   there?

9          A.     Yes.

10         Q.     It is dated October 15, 2020.  Do

11  you see that there?

12         A.     Yes.

13         Q.     Do you recognize this document?

14         A.     Yes.

15         Q.     What is this document?

16         A.     This it would be a offer letter,

17  yes.

18         Q.     Is that the offer letter you

19  received for the position of maintenance manager

20  at Willert?

21         A.     Yes.

22         Q.     Take a look at that there.  There

23  are bullet points after the first paragraph.

24  And the first one reads, Full-time\part-time.



```
 1   And it says, Full-time salary exempt employee.
 2   Am I reading that correctly?
 3          A.     Yes.
 4          Q.     The next one says, Pay rate.
 5   $3,269.24 per biweekly pay period.  Is that what
 6   you earned per biweekly pay period while you
 7   worked for Willert?
 8          A.     Yes.
 9          Q.     The next sentence there says,
10   Upon completion of project goals defined by the
11   plant manager you will receive a bonus of
12   $15,000.  Do you see that there?
13          A.     Yes.
14          Q.     What were the project goals that
15   needed to be completed in order for you to
16   receive that bonus?
17          A.     That entire list had not been
18   defined in the time that I was there.  There
19   were a couple of opportunities highlighted.  But
20   it was not established in writing, nor was the
21   entire list defined.
22          Q.     When you say there were a couple
23   opportunities that were highlighted, what do you
24   mean by that?
```



1          A.     I remember Bryan Willert and I
2    was walking through.  And there was a specific
3    piece of equipment that had broke down very
4    frequently in a short amount of time.  And he
5    said, hey, remember that bonus thing we talked
6    about, and he pointed to that thing to get on it
7    and see what you could do.
8                 So it was -- to me that was,
9    okay, I fix this thing, make it not break
10   anymore.  And that will contribute to a bonus
11   there.
12         Q.     Did he ever mention anything else
13   to you about any type of tasks that might
14   constitute project goals entitling you to a
15   bonus?
16         A.     We had talked about line
17   performance and what they call OEE or Equipment
18   Effectiveness, Equipment efficiency, how well
19   the plant runs.  But it was very high-level
20   conversation.  It was -- we were talking in
21   generalities up front.  The maintenance of the
22   equipment has an impact on how well it runs.
23   And, you know, it was understood and agreed
24   between us that if there was a measurable



```
 1   improvement in the way things were running after

 2   I had been there a while that would be

 3   considered a part of a bonus opportunity.

 4           Q.      Did he ever write that down for

 5   you?

 6           A.      No.

 7           Q.      When you got the offer letter did

 8   you see to him, What are those project goals

 9   that I need to accomplish in order to receive

10   this bonus?

11           A.      No.

12           Q.      Do you see the next sentence

13   there says, Future bonuses are determined and

14   paid at the discretion of management?

15           A.      Yes.

16           Q.      The next bullet point indicates

17   hours, minimum of 40 hours per week.

18           A.      Correct.

19           Q.      Did you work 40 hours per week

20   during the time that you worked at Willert?

21           A.      I believe it was 59 hours and 60

22   hours.

23           Q.      How were you tracking those

24   hours?
```



```
 1           A.      Again Google timeline.  You go in

 2   and you see when you arrive and depart a place.

 3   So I went through and tallied up the hours for

 4   each day that I was there and put it in a Excel

 5   spreadsheet and totaled it.

 6           Q.      Do you have that Excel

 7   spreadsheet?

 8           A.      I believe it has been submitted

 9   as part of the documents somewhere.  Or at least

10   the total hours were.

11           Q.      Why did you prepare that Excel

12   spreadsheet?

13           A.      Because I felt that it showed I

14   was going above and beyond the minimum.  It said

15   all I had to work was 40 hours a week and I was

16   there for 150 percent of that.

17           Q.      Did you call out of work on any

18   days during the limited time you worked at

19   Willert?

20           A.      The day -- yes.  One day.

21           Q.      How many times did you call out

22   during the two-week period you worked there?

23           A.      One day.

24           Q.      Did you take any half days during
```



1    the period of time you worked there?

2         A.    No.  I don't believe so.

3         Q.    Was there a set time by which you

4    were expected to arrive at work?

5         A.    No.

6         Q.    Did you have set hours there for

7    work?

8         A.    No.

9         Q.    Here it says that your start date

10   is October 19, 2020.  Do you believe you began

11   before the start date listed in your offer

12   letter?

13        A.    Yes.

14        Q.    You believe it was October 15th

15   or 16th that you began working at Willert?

16        A.    Yes.  We met Wednesday.  Jack

17   started Thursday.  And I started Friday.

18        Q.    So in terms then of the next

19   bullet point, Benefits, it says, See salaried

20   employee benefit packet attached.  And then it

21   says, As a deviation from our standard salaried

22   employee benefit package you will receive four

23   weeks paid vacation per year.  Do you see that?

24        A.    Yes.



```
 1          Q.     Was it your understanding that
 2  you would receive that vacation time per year?
 3          A.     Yes.
 4          Q.     The offer letter reads, This
 5  offer is contingent upon successful completion
 6  of a pre-employment drug test.  Do you see that
 7  there?
 8          A.     Yes.
 9          Q.     Did you read that offer letter
10  when you received it?
11          A.     Yes.
12          Q.     Did you have to sign the offer
13  letter?
14          A.     I believe so.
15          Q.     Scrolling down on the document
16  here to the second page there is a signature
17  line that says, I, Matt Reynolds, accept the
18  offer as presented above.  And there is
19  signature there.  Is that your signature?
20          A.     Yes.
21          Q.     So scrolling up then again was it
22  your understanding that you had to successfully
23  complete a preemployment drug test in order to
24  work at Willert?
```



```
 1          A.     Yes.

 2          Q.     When you received that offer

 3   letter and read it did you say to anyone at

 4   Willert, I am a medical marijuana patient?

 5          A.     No.

 6                 (Exhibit 5 was marked for

 7      identification.)

 8   BY MS. FICARO

 9          Q.     I will stop sharing the screen

10   and pull up another document.  I will share my

11   screen again.  I will show you another document.

12   I will ask that be marked as Reynolds 5.  Take a

13   look at that document.  I am scrolling down to

14   the bottom of this three-page document are Bates

15   labels.  And if you see Willert 00005, Willert

16   0006, Willert 0007.  Do you see that?

17          A.     Yes.

18          Q.     At the top, scrolling back up to

19   the top, title on the document is Willert Home

20   Products, Inc. Salaried Full-time Employee

21   Benefit Package.

22                 Do you recognize this document?

23          A.     Yes.  I believe I have seen that.

24          Q.     Was this document presented to
```



1  you as a benefit package at the time that you

2  were offered employment at Willert?

3          A.     I believe so.

4          Q.     Do you believe that this package

5  accurately represents the benefits being offered

6  to you in order to work at Willert?

7          A.     Yes.  Clearly I can't read the

8  whole thing now.  But looking at the bullet

9  points, the bold underlined things, that all

10 looks...

11         Q.     Would you like to read the whole

12 thing before you answer that?

13         A.     No.  Just scroll down.  Keep

14 going.  There this page 1, okay.  Keep going.

15 Okay.  Bereavement.  Okay.  Jury duty.  I

16 believe -- yes.  I believe I was presented this.

17         Q.     And do you believe that the

18 benefits set forth in this package were the

19 benefits being offered to you for the purpose of

20 your employment at Willert?

21         A.     Yes.  I believe so.

22         Q.     I will stop sharing.

23                As the maintenance manager at

24 Willert, what were your job responsibilities?



1          A.     Safety, making sure my employees

2    left the same way they came in.   And equipment

3    up time, ensuring that my employees supported

4    production and keep the place running.

5                    (Exhibit 6 was marked for

6          identification.)

7    BY MS. FICARO

8          Q.     I will share my screen with you

9    again.   Mr. Reynolds, I pulled up another

10   document that I will ask be marked as Reynolds

11   6.   Scrolling down that document there are Bates

12   labels at the bottom of the document here.   The

13   first page is 000109 and then you have 110.   And

14   then it goes to 000111.   Do you see that?

15         A.     Yes.

16         Q.     This is a job description for the

17   maintenance manager position there.   The summary

18   says, Maintenance managers oversee the repairs

19   and installations and upkeep of various machines

20   and power equipment associated with all parts of

21   the production of liquid film manufacturing.

22                    Do you agree that those were part

23   of your job responsibilities as maintenance

24   manager at Willert?



1           A.      Yes, that was part of my
2   responsibility.
3           Q.      Then says the main duties include
4   designing maintenance procedures, tracking
5   budgets and expenses and performing inspections
6   on different machines and equipment to find
7   problems and make repairs or replace as needed.
8                   Were those part of your job
9   responsibilities as well?
10          A.      To be honest I believe those were
11  implied.  I don't think we ever spoke to them in
12  each of those bullet points in detail.  But just
13  in my professional experience I would assume
14  that those things would be part of my
15  responsibility.
16          Q.      So when you say they were
17  implied, what you mean is that it was your
18  understanding that that would be included within
19  your job responsibilities at Willert?
20          A.      Yes.  My understanding or my
21  assumptions would have led me to believe that
22  that stuff would be falling under my
23  responsibility, yes.
24          Q.      Then it talks about essential



1  duties and responsibilities include the

2  following:  And other duties may be assigned.

3  So in addition to what we already discussed here

4  I will read run this list.  And if you are able

5  to provide me with a yes or no as to your

6  understanding as to whether your job

7  responsibilities included these items please do

8  so.

9         A.     Can I just say during my

10 employment there I was never presented with this

11 document.  So I as we go through these things

12 this is solely based on my personal

13 understanding of what it means to be a

14 maintenance manager.  I want to say that.

15        Q.     That's fine.

16        A.     Okay.

17        Q.     I understand that.  I'm asking

18 you if this was your understanding that these

19 were part of your responsibilities.

20        A.     Okay.

21        Q.     So is it your understanding that

22 part of your responsibilities included

23 communicating directly with the production

24 manager and general manager to coordinate



1    maintenance and repair work in process areas?

2              A.      Yes.

3              Q.      Is it your understanding that

4    part of your responsibilities included

5    communicating directly with QA laboratory to

6    ensure effective participation by the

7    maintenance technicians in the implementation of

8    QA policies and procedures?

9              A.      Sure.  I guess to the extent that

10   maintenance would overlap with -- quality

11   assurance typically doesn't have a lot to do

12   with maintenance.  But if there were procedures

13   that applied to maintenance then, yes.

14   Certainly, yes.

15             Q.      Is you understanding that your

16   job responsibilities included implementing

17   programs or procedures required to ensure plant

18   cleanliness?

19             A.      No.  Honestly I don't think so.

20   The maintenance technicians were mostly focused

21   on production equipment.  I didn't have any

22   janitorial housekeeping staff.  So, no, I will

23   say no for that one.

24             Q.      Is it your understanding that



1  your responsibilities included assisting the

2  planning and implementing plant improvements and

3  expansions?

4          A.    Yes.

5          Q.    Is it your understanding that

6  your job responsibilities included conducting

7  employee performance reviews based on job

8  descriptions to determine competency, knowledge

9  and contribution of the maintenance technicians?

10          A.    Yes.

11          Q.    Is it your understanding that

12  your job responsibilities included maintaining,

13  updating, operating training manuals for the

14  maintenance department?

15          A.    Yes.

16          Q.    Is it your understanding that

17  your job responsibilities included ensuring that

18  all maintenance technicians were trained on the

19  most updated version of the operating

20  procedures?

21          A.    I was not aware what any

22  operating procedures were yet.  But certainly

23  that would fall under my responsibility, yes.

24          Q.    Is it your understanding that



1   your job responsibilities included monitoring

2   operation of plant equipment and systems?

3           A.     I don't know exactly what they

4   mean there.  Honestly I guess I'm not sure

5   exactly what that means.  But I mean in general

6   awareness of the operation of what is going on

7   in the plant, plant equipment systems, sure.

8           Q.     Is it your understanding that

9   your job responsibilities included reviewing the

10  operation of plant equipment and systems

11  constantly to minimize unplanned downtime,

12  anticipate and solve problems in a timely manner

13  and to identify opportunities for improvement?

14          A.     Yes.

15          Q.     Is it your understanding that

16  your job responsibilities include maintaining

17  and repairing maintenance shop equipment?

18          A.     I was not personally maintaining

19  or repairing shop equipment, nor would I have

20  thought it would be part of the job.  I mean

21  making sure that happens, yes.  But me?  No.

22          Q.     So you were then responsible for

23  making sure that maintenance and repair and of

24  the maintenance shop equipment happened?



```
 1              A.     Yes.   But I don't know how to fix
 2    a lathe or a welder.   You know so...
 3              Q.     To expedite this a bit there are
 4    several other tasks that are listed as the
 5    responsibilities here.   If you wouldn't mind
 6    taking a moment reading those and letting me
 7    know of any of the other additional tasks listed
 8    under these responsibilities if you do not agree
 9    that they were encompassed in your job
10    responsibilities.
11              A.     Okay.
12              Q.     Actually strike that.   Off the
13    record.
14                     (Discussion held off the record.)
15    BY MS. FICARO
16              Q.     Is it your understanding that
17    your job responsibilities included establishing
18    and maintaining a computerized maintenance
19    management system for tracking work orders,
20    spare parts and maintenance history of plant
21    equipment?
22              A.     Yes.
23              Q.     Is it your understanding that
24    your job responsibilities included providing
```



1   reports and analyzing data and making

2   recommendations for improving plant operations

3   and solving maintenance-related problems?

4          A.    Yes.

5          Q.    Is it your understanding that

6   your job responsibilities included ensuring that

7   maintenance technicians are adequately trained,

8   equipped and motivated so that the maintenance

9   program can be accomplished in a safe, timely

10  and cost-effective manner?

11         A.    Yes.

12         Q.    Is it your understanding that

13  your responsibilities included communicating

14  regularly with all maintenance technicians both

15  individually and as a group to ensure good

16  two-way communication concerning maintenance

17  issues?

18         A.    Yes.

19         Q.    Is it your understanding that

20  your job responsibilities consisted of assisting

21  with -- strike that.

22             Is it your understanding that

23  your job responsibilities included assisting

24  with hiring of maintenance personnel?



```
 1              A.     Yes.

 2              Q.     Is it your understanding that

 3   your job responsibilities included initiating

 4   and carrying out projects that improve

 5   efficiency and/or reduce operating costs?

 6              A.     Yes.

 7              Q.     Is it your understanding that

 8   your job responsibilities included tracking,

 9   analyzing and improving key maintenance

10   parameters such as asset utilization,

11   maintenance cost, PM compliance and schedule

12   compliance?

13              A.     Yes.

14              Q.     Is it your understanding that

15   your job responsibilities included maintaining

16   safety, health and environment policies and

17   procedures?

18              A.     Yes.

19              Q.     Is it your understanding that

20   your job responsibilities included ensuring that

21   city, county and state and federal regulations

22   relating to the maintenance department were met

23   at all times?

24              A.     Yes.
```



```
 1             Q.      Is that your understanding that
 2   your job responsibilities included directing,
 3   maintaining and enforcing the safety program for
 4   the maintenance department and reviewing safety
 5   records to uphold standards of maximum safety
 6   for all maintenance technicians?
 7             A.      Yes.
 8             Q.      Is it your understanding that
 9   your job responsibilities included initiating,
10   implementing and managing the plant maintenance
11   program with an emphasis on planning, scheduling
12   and preventative predictive maintenance?
13             A.      Yes.
14             Q.      Is it your understanding that
15   your job responsibilities included monitoring
16   the use and inventories of spare parts,
17   maintenance supplies and equipment and
18   initiating reordering when necessary?
19             A.      Yes.
20             Q.      The next section lists
21   supervisory responsibilities.  And it
22   indicates -- it reads, Supervises maintenance
23   technician on all shifts.  Is it your
24   understanding that your job responsibilities
```



1  included supervising maintenance technicians on

2  all shifts?

3          A.      In regards to my staff worked on

4  all shifts.  And, yes, I made myself available

5  across all three shifts.  Clearly was not there

6  all three shifts.  I have to sleep sometime.

7  But yes.

8          Q.      Scrolling further down the

9  document there is a section called, Reasoning

10  ability.  And it indicates that the ability to

11  solve practical problems and deal with a variety

12  of concrete variable situations where only

13  limited standardization exists, the ability to

14  interpret a variety of instructions, furnish a

15  written a oral diagram or scheduled form.

16          Do you agree that you needed the

17  ability to do those things in order to perform

18  your job as a maintenance manager?

19          A.      Yes.

20          Q.      There is a physical demands

21  section here.  It says, The physical demands

22  described are representative of those that must

23  be met by an employee to successfully perform

24  the essential functions of this job.  Reasonable



1  accommodations may be made to enable individuals

2  with disabilities to perform these essential

3  functions.  While performing the duties of this

4  job the employees are regularly required to use

5  hands to finger handle or feel and talk or hear.

6              Employee required to stand and

7  walk.  Employee must regularly lift and/or move

8  up to 10 pounds and occasionally lift and remove

9  up to 25 pounds.  Specific vision abilities

10  required by this job include close vision,

11  distance vision and ability to adjust focus.

12              Is it your understanding that

13  those were physical requirements of the

14  maintenance manager position?

15       A.    Yes.

16       Q.    I will stop sharing.  Gentlemen,

17  can we take quick five-minute break?

18              (Discussion held off the record.)

19  BY MS. FICARO

20       Q.    Mr. Reynolds, did you receive any

21  training when you started working at Willert?

22       A.    No.  Not that I recall.

23       Q.    Did you spend any time with Jack

24  Bonsky or anyone else at Willert, walking



```
 1   through the plant, having them describe to you
 2   what happens, the processes of the plant, et
 3   cetera?
 4          A.     I spent time with Jack Bonsky
 5   walking through the plant in terms of a daily
 6   walk-through.  But he was just as new as me so
 7   we were learning together.
 8          Q.     When you did your daily
 9   walk-throughs what types of topics did you
10   discuss or things did you address during the
11   daily walk-throughs?
12          A.     They were like customer service
13   visits from the management to the employees like
14   as if the employees were customers.  So checking
15   in with the line leads, the leaders on the floor
16   to see what needs they had, if there were any
17   issues, anything that the maintenance manager or
18   the plant manager can address.
19          Q.     Did you wear personal protective
20   equipment at Willert?
21          A.     Steel toes, safety -- yes.
22          Q.     Did you wear any -- what type of
23   personal protective equipment did you wear at
24   Willert?
```



```
 1          A.      Steel toes and safety glasses and
 2   I believe ear plugs were required as well.
 3          Q.      Why did you wear that personal
 4   protective equipment?
 5          A.      The ear plugs were for the one
 6   area was noisy.  So the decibel rating required
 7   it.  And steel toes were required for the plant.
 8   It's good practice in any manufacturing
 9   environment to have steel toes on.
10          Q.      At the time you worked at Willert
11   what type of machinery did they have there?
12          A.      They had some injection molding
13   machines which make the plastic bottles that
14   they were also filling.  And they had filling
15   machines to fill those bottles.  And the tanks
16   we talked about.  The bulk storage tanks that
17   held the water and chemical mixtures.
18          Q.      How big were the bulk storage
19   tanks?
20          A.      They were probably like 15,000
21   pound tanks like the size of --
22          Q.      How tall were they?  Sorry.  Like
23   the side of what?
24          A.      Like a 15-passenger van.  A 10-
```



1  or 15-foot high, maybe six-foot across.

2        Q.    Were there any storage tanks that

3  were 20 feet high?

4        A.    I don't think so.  I'm guessing

5  at 10 to 15-foot.  I don't think any were

6  20-foot.

7        Q.    What were those storage tanks

8  used for?

9        A.    There was a -- they fed the

10 filler process.  So that held the ingredients

11 that were going into the bottles and containers.

12       Q.    What type of ingredients were

13 being held in those storage tanks?

14       A.    I don't know.  I didn't -- I was

15 not involved with the product mix or -- that

16 just was not part of my area.  So I don't know

17 what they were put in that stuff.

18       Q.    Were the storage tanks part of

19 the equipment that the maintenance team was to

20 maintain and repair when necessary?

21       A.    Yes.

22       Q.    Do you know what type of

23 chemicals were stored in any of those storage

24 tanks?



```
1            A.      No.   They would have been drained

2   out for any maintenance.   Can't maintain

3   anything that is full of chemicals.   But I don't

4   know what any of those chemicals were.

5            Q.      Were any of those storage

6   tanks -- was any maintenance necessary with

7   regard to any of those storage tanks during the

8   time you worked at Willert?

9            A.      Yes.

10           Q.      Do you recall any specific

11  maintenance that was performed on any storage

12  tanks while you were at Willert?

13           A.      Yes.

14           Q.      What maintenance was performed on

15  any storage tanks while you were at Willert?

16           A.      The control system for one of

17  those tanks stopped working.   So I brought in a

18  outside vendor that supported that kind of

19  equipment.   And they repaired that and got it

20  working again.

21           Q.      When you say control system, what

22  are you referring to?

23           A.      The digital -- it's a PLC

24  controller.   So it is a signal-level voltage
```



1   which is a real low level, like a 4 to 20

2   milliamp or a 12 vote DC signal that

3   coordinates -- like turns the pumps on, turns

4   the mixer on.  So I forgot if they couldn't pump

5   out of the thing or couldn't mix.  But one or

6   the other.  There is not much that a tank does

7   other than get mixed or pumped.  That guy came

8   in and got it working again.

9          Q.    How did you know the control

10  system on the storage tank was not working?

11         A.    I think essentially the button

12  did not work.

13         Q.    I mean, how did you know?  Did

14  you have to go look at it?

15         A.    No.  It was -- no.

16         Q.    So how did you know that that was

17  not working?

18         A.    I think one of the maintenance

19  technicians did a brief triage on it to see if

20  he could figure it out.  Couldn't get there.

21  And so I brought in outside help to expedite the

22  process.

23         Q.    Did you go and inspect it before

24  you brought in the outside help?



1          A.     No.   There is not really much to

2    inspect with that.

3          Q.     How did you know what outside

4    help to bring in?

5          A.     Just experience I guess.   What

6    you are supposed to know as a maintenance

7    manager is what to do when things break.

8          Q.     Did you go near the storage tank

9    at all when it was not working?

10         A.     I went to the area to the

11   employee.   I was in the general area.

12         Q.     How far away from the storage

13   tank were you when you did that?

14         A.     I don't know.   10 feet, something

15   like that.

16         Q.     Were there chemicals being stored

17   in the storage tank?

18         A.     I don't know what was in there at

19   that time.

20         Q.     Could it have been chemicals?

21         A.     It could have been, yes.

22         Q.     You said you were about 10 to

23   15 feet away from the storage tank when it had

24   to be repaired?



1          A.      Yes.

2          Q.      Was it ultimately your

3    responsibility to make sure that that storage

4    tank was repaired and working again?

5          A.      Yes.

6          Q.      In terms of the control system

7    that you mentioned on that storage tank, how was

8    that control system powered?

9          A.      I think those have a 120-volt

10   single phase power supply going to them.  Like a

11   household voltage level.

12         Q.      You said 120-volt?

13         A.      I think so.

14         Q.      Can 120-volts be dangerous to

15   you?

16         A.      Potentially.

17         Q.      Can it seriously injure you if

18   you came into contact with something that was

19   live and 120-volts?

20         A.      It's possible, not typical.  But

21   it's possible.

22         Q.      In terms of your time at Willert

23   was there ever an occasion on which you and

24   Mr. Bonsky had worked together to repair a



1   drive?

2          A.      Not that I recall, no.

3          Q.      Did you ever have to employ lock

4   out, tag out procedures while you were at

5   Willert?

6          A.      No.

7          Q.      Would implementing lock out, tag

8   out procedures be part of your job

9   responsibilities as a maintenance manager?

10          A.      Like enforcing them?  Or

11   personally locking something out?

12          Q.      Let's talk about enforcing them.

13   Would that be part of your job responsibilities?

14          A.      Yes.  Ensuring that people follow

15   the practices and procedures, yes.

16          Q.      Did you yourself ever have to

17   lock out any equipment at Willert?

18          A.      No.

19          Q.      If you had stayed there and

20   worked longer would it have been possible that

21   you would have needed to lock out equipment at

22   Willert?

23          A.      No.  I don't believe so.

24          Q.      Under what circumstances would



1  somebody need to lock out equipment?

2          A.      If they are working in a

3  situation where there is any unsecured energy

4  you got to bring the equipment to a zero energy

5  state.  That can be gravity, compressed air,

6  steam.  I don't think they had steam there.  But

7  so any time you are changing the equipment

8  conditions, taking something apart, taking off

9  guards and going into something, before do you

10  that you have to lock it out and tag it out.  So

11  that involves disassembling something, taking it

12  out of the original factory condition.

13          Q.      If a machine was electronically

14  powered broke and needed to be repaired, would

15  it need to be locked out before repairs were

16  made on the machine?

17          A.      Typically by the person

18  performing the repair typically.

19          Q.      And typically the person

20  performing the repairs would need to report to

21  you, correct?

22          A.      Yes.

23          Q.      Other than the storage

24  containers, what other type of machinery was at



1  Willert during the time that you worked there?

2          A.      Fillers.  So equipment that put

3  liquids into bottles or gels into containers.

4  Air compressors and some vacuum pumps and

5  injection molding machines which are plastic

6  machines.

7          Q.      Did you oversee the maintenance

8  of the fillers at Willert?

9          A.      Yes.

10          Q.      Did you oversee the maintenance

11  of air compressors Al Willert?

12          A.      Yes.

13          Q.      Did you oversee the repair of

14  fillers at Willert?

15          A.      Yes.

16          Q.      Did you oversee the repair of air

17  compressors at Willert?

18          A.      I don't think any broke while I

19  was there.  But I was working on a replacement

20  for one.  Yes, yes.

21          Q.      What replacement of an air

22  compressor did you work on at Willert?

23          A.      There was one that was out of

24  service that I was trying to see if we can get



1  an outside company to retrofit a piece to it

2  rather than replace the whole thing.  So try to

3  make it a 5 to $10,000 fix rather than a $50,000

4  replacement.

5        Q.     Did you have to inspect the

6  machinery at all in order to figure out who to

7  bring in to do that?

8        A.     A visual walk-around.  I didn't

9  have to take any guards off or anything.  It was

10 just getting the serial number and model number

11 off of it and taking some pictures.

12       Q.     When you did the visual

13 walk-around how close to the air compressor did

14 you walk around?

15       A.     I mean, close enough to -- 1 to 2

16 feet away from the air compressor, close enough

17 to take pictures.  All the guarding was in

18 place.

19       Q.     Was that air compressor

20 ultimately repaired while you were there?

21       A.     No.  I was still in the process

22 of getting quotes for it.

23       Q.     If it had been repaired while you

24 were there, was it your understanding as a



1  maintenance manager it would have been your

2  responsibility to ensure that it was repaired?

3         A.     Yes.

4         Q.     In terms of the fillers that you

5  mentioned, what type of materials did the

6  fillers literally inject into the bottles?

7         A.     They were liquids.

8         Q.     Were they chemicals?

9         A.     Ultimately these were like

10  consumer household chemicals.  So stuff that you

11  can buy at the Dollar Tree or wherever.  So it's

12  chemicals, yes.  It is going to consumer

13  households.  It is not going to -- you don't

14  want to drink it.  But other than that the risk

15  factor is pretty low.

16         Q.     But they were chemicals?

17         A.     Sure.  It was not sugar.  You

18  know?  Some kind of chemical.

19         Q.     During the time that you worked

20  at Willert, were you familiar with the

21  electrical voltages that you might interact with

22  there?

23         A.     Yes.

24         Q.     What voltage of --



```
 1          A.     Wait.  That I personally
 2 interacted with?  I should rephrase that answer.
 3 I was not personally interacting with any
 4 voltages.  So I think I misheard that I guess.
 5          Q.     I believe you mentioned that the
 6 storage tanks were electrically powered.  What
 7 voltage of electricity, if you know, powered
 8 those storage tanks?
 9          A.     There is a mixer on top and a
10 pump underneath.  And those were likely to be 3
11 phase 480.
12          Q.     How about the fillers, were they
13 electronically powered?
14          A.     Yes, they were.
15          Q.     Do you know what voltage of
16 electricity powered those fillers?
17          A.     They were likely a 480
18 distribution into the main panel.  And then it
19 can be stepped down from there.  Some equipment
20 needs smaller voltages.  So it's distributed
21 from the local panel at the machine.
22          Q.     How about the air compressor,
23 what voltage of electricity powered the air
24 compressors?
```



```
 1            A.      Those are 480.
 2            Q.      Can 480 volts of electricity
 3  injure someone?
 4            A.      Yes.
 5            Q.      Can 480 volts of electricity kill
 6  someone?
 7            A.      Yes.
 8            Q.      You mentioned, for example, there
 9  was I believe it was over the storage tank you
10  indicated there was a mixer on top and a pump on
11  the bottom; is that correct?
12            A.      Yes.
13            Q.      So theoretically if a mixer broke
14  on top of the storage mixer, would the repair of
15  that mixer fall under your duties as maintenance
16  manager at Willert?
17            A.      It would fall under my
18  responsibilities, not my personal duty.  If
19  duty -- does duty mean that I'm doing it?  Or
20  does duty mean my department?
21            Q.      Are you ultimately as the
22  maintenance manager responsible for ensuring
23  that, for example, a broken mixer on top of the
24  storage tank would be repaired?
```



```
 1          A.     Responsible for getting it
 2  repaired, yes.
 3          Q.     How about the pump on the bottom
 4  of the storage tank, if a pump was broken on the
 5  bottom of one of those storage tanks would it be
 6  your responsibility as the maintenance manager
 7  to ensure that the pump was repaired?
 8          A.     Yes.
 9          Q.     Would it be your responsibility
10  as the maintenance manager to ensure that the
11  mixer on top and the pump on the bottom are
12  properly maintained?
13          A.     Yes.
14          Q.     How about with regard to the
15  fillers, your job as a maintenance manager
16  responsibilities included ensuring the
17  maintenance and repair of the fillers, correct?
18          A.     Yes.
19          Q.     Did your job responsibilities as
20  maintenance manager also include ensuring the
21  maintenance and repair of air compressors?
22          A.     Yes.
23          Q.     How big were the air compressors?
24          A.     Those are typically measured in
```



1  horsepower of the motor.  And I believe they

2  were I think 50-horsepower and a 75-horsepower.

3        Q.     Are you able to tell me in terms

4  of how high those air compressors were how tall

5  or high they were?

6        A.     They were like the size of a

7  Volkswagen Beetle, the old '70s ones.  So like 8

8  feet by 4 feet by 4 feet, something like that.

9        Q.     How about the filler, how big

10 were the fillers?

11       A.     They are a long sequence of

12 machines kind of lined up together.  So those

13 are -- the overall line, they were probably like

14 50 to 75 feet long.  But they are low and fairly

15 skinny.  Maybe 3 or 4 feet off the ground.  They

16 are stationed so that operators can stand there

17 and pull bottles off lines.  4 feet high, you

18 know, 4 or 5 feet wide depending on where it is

19 on the filler.

20              (Exhibit 7 was marked for

21       identification.)

22 BY MS. FICARO

23       Q.     Let me pull up a document

24 quickly.  I will share my screen again with you.



1  With the document that I will ask please be

2  marked as Reynolds 7.  And I will scroll so you

3  can see the whole document here.  It is a

4  one-page document.  And I will represent to you

5  it's a document produced by your attorney in

6  this matter.  And at the top it says, No. 3,

7  performance.  Do you see that there?

8          A.     Yes.

9          Q.     Do you recognize that document?

10         A.     Yes.

11         Q.     Who created this document?

12         A.     I believe I provided the data on

13  there.

14         Q.     Did you literally type the

15  document or did somebody else do that?

16         A.     That looked like the one I typed.

17         Q.     What is this list?  What is this

18  list supposed to be describing?

19         A.     These were accomplishments or

20  things that I had gotten done while I was there

21  during my tenure at Willert.

22         Q.     So the first thing is 10/19/20.

23  Expedited parts for surprise one-day turnaround

24  on a machine expected by staff to be down days



1  or weeks.  What machine was that?

2          A.      They called it the bottle

3  scrambler.

4          Q.      What was the bottle scrambler?

5          A.      It was they would dump a bunch --

6  hundreds of bottle into this thing.  And it

7  would spin them around and send them out in a

8  single file line.

9          Q.      How big was that machine?

10         A.      Let's say 8-foot wide by 8-foot

11  long by 10-foot high, something like that.

12         Q.      How was that machine powered?

13         A.      It was probably 480, 3 phase.

14         Q.      Electricity?

15         A.      Yes.

16         Q.      What did you have to do in order

17  to expedite the parts?

18         A.      My part was sourcing the motor,

19  finding it.  I got it through motion so making

20  phone calls, ordering.

21         Q.      Did you look at the motor so you

22  knew what parts to be ordered?

23         A.      Yes.  I would have taken it off

24  the machine.  It was pretty small, like the size



1  of a foot-long sub.  So I was able to look at it
2  and get the part numbers off it.
3         Q.    How about safety issues
4  identified or addressed?  See first request for
5  Production of Documents -- sorry.
6               It says, See First Request for
7  Production -- FRP.  Then it is bullet points
8  trip hazard, unsecured gas bottles were blocking
9  fire extinguisher, bench grinder gap, machine
10  guarding issue, Ty-D-Bowl line.  Explain what
11  this means to me and what each of things are.
12         A.    So the bench grind gap and the
13  blocked fire extinguisher and unsecured gas
14  cylinder, those are all OSHA violations.  And in
15  my experience OSHA has a minimum charge of
16  $6,000 per violation.  So I identified those and
17  either had somebody correct them or corrected
18  them myself.  And the bottles -- it is simple
19  tasks.  But OSHA doesn't care.  A violation is a
20  violation.
21               The hose that was -- they had a
22  garden hose just laying on the floor across in
23  front of a emergency exit doorway.  So I had a
24  guy make up a plate to cover that and secure



1  that.  So a threshold instead of a loose hose on

2  the ground blocking a exit.

3          Q.     Where is the hose?

4          A.     Oh, trip hazard.  That is what

5  that is.  That trip hazard was a garden hose.

6          Q.     What was the machine guarding

7  issue Ty-D-Bowl line?

8          A.     So I had dug through some old

9  safety committee notes.  And I found a concern

10  that was brought up an operator six months prior

11  and it had never been addressed.  And I went out

12  and talked to the operator.  And she had a valid

13  safety concern where there was no guard on this

14  line.  There was pinch points all over the

15  place.  Anybody can have walked up and reached

16  in there and suffered a amputation.  There was

17  no guarding which is required by OSHA.  So I got

18  that on the priority list.  And it was something

19  that was actively being addressed when I parted

20  ways with Willert.

21          Q.     What type of machine was it that

22  there was a guarding issue for?

23          A.     That was filler that put the blue

24  stuff in the Ty-D-Bowl bottles.



1        Q.      How did you realize that there
2   was a guarding issue?
3        A.      Finding the documentation, the
4   employee concern.
5        Q.      How did you notice there was a
6   lack of guard there in the first place?  Did you
7   see it and did it appear as though a guard was
8   missing?
9        A.      I had not noticed that specific
10  area yet myself personally.  So my part in it
11  was being thorough and digging through the
12  six-month old documentation and reading up on
13  safety committee notes.  And then once I found
14  that that somebody else identified it I had to
15  go out and ask her where it was at.  And she
16  showed me.
17       Q.      Then did you look at it?
18       A.      Yes.
19       Q.      Did you have to climb on anything
20  or how close did you have to get to it?
21       A.      No.  It was readily apparent once
22  it was pointed out.  Didn't have to do anything
23  remarkable to see it.
24       Q.      Was there a specific shift that



1   you worked at Willert?

2          A.     No.

3          Q.     How many shifts were there at

4   Willert?

5          A.     Three.

6          Q.     Was there a typical shift that

7   you were more often there during than others?

8          A.     I made it a point to try to be

9   available to all three shifts.  But the bulk of

10  my hours were during day shift.  I think 7:00 to

11  3:00 there.

12         Q.     Further down in this list it

13  says, Production support provided on second

14  shift as needed.  Underneath that its says,

15  Initiated the upgrade of an obsolete AC/DC

16  rectifier inverter to a modern drive unit.

17                What machinery were you dealing

18  with in that instance?

19         A.     That was one of the plastic

20  injection molding machines.

21         Q.     And what did you have to do in

22  order in initiate the upgrade of that machine?

23         A.     Contact a outside vendor with the

24  skills and experience to be able to perform that



 1  task.

 2          Q.      Halfway down the page it says,

 3  Hand delivered same mix tank spare part.   Time

 4  2:18, 11/4/20.  Which was a sick day caused by

 5  panic attack which onset after a November 3,

 6  2020 phone conversation with medical review

 7  officer in regards to drug test results.

 8                  Do you see that there?

 9          A.      Yes.

10          Q.      Why did you have a panic attack

11  after reading -- or with regard to the drug test

12  results?

13          A.      Well, that changed my whole

14  worldview.  Up to that point I had been living

15  under the assumption that I had privacy and

16  protection in this.  So just like if you are

17  prescribed a painkiller or Adderall and you

18  disclose that to a medical review officer they

19  report a past to the company and you have

20  privacy.  The company has no idea you are on

21  prescriptions.  So that is what I thought was

22  going to happen with this.  And when he told me

23  it was a fail I immediately knew I was going to

24  get fired.  And it is like everything started



```
 1  caving in.  That is what I called in sick the
 2  next day.
 3              But I had the part in my car.  I
 4  had gotten fixed the day before.  And I knew
 5  they needed it.  So I drug myself out of bed on
 6  the 4th which was the only day I called in.
 7  That was the only day I called in sick.  But I
 8  got myself out of bed and I drove up there and I
 9  dropped that part off because I knew they needed
10  it.  So I took it in.
11          Q.    Was there a typical time of day
12  that Jack Bonsky would arrive at work usually?
13          A.    Yes.  He was clockwork.  I think
14  he there between 6:30 and 7:00 every day.
15          Q.    Did they expect you to be there
16  around that same time?
17          A.    No.  At least that's what had
18  been communicated to me by Jack.  He was my
19  direct supervisor.
20          Q.    So this list then, what we are
21  looking at on this document, these are all tasks
22  that you performed while you worked at Willert?
23          A.    Performed, coordinated, got done.
24  Sure, yes.
```



```
 1              (Exhibit 8 was marked for

 2       identification.)

 3 BY MS. FICARO

 4       Q.     I will show you another document

 5 quickly.  Mr. Reynolds, you mentioned your drug

 6 screen.  That's come up a few times during this

 7 deposition.  I will show you a document now and

 8 ask that it be marked as Reynolds 8.  I will

 9 show you that.  I will scroll done here.  There

10 is a Bates Willert 0046.  Do you see that there?

11       A.     Yes.

12       Q.     At the time top it says,

13 Occupational Health Pottstown Hospital, Tower

14 Health.  And then it says, Drug screen results

15 letter.  So it was to Dave Furno, Ed Kinnet,

16 Willert Manufacturing Company.  Then it has your

17 name here, Matthew D. Reynolds.  Do you see that

18 there?

19       A.     Yes.

20       Q.     Then it's had your patient ID.

21 And the collection date and time of October 28,

22 2020.  Have you ever seen this document before?

23       A.     Yes.

24       Q.     When did you first see that
```



1  document?

2          A.      That is a good question.  I

3  believe that was provided to me was my

4  termination letter.  But I'm not sure.

5          Q.      The document that we just looked

6  at it says that you learned about the drug test

7  results on November 3, 2020.  How did you learn

8  about those results?

9          A.      The medical review officer called

10  me.

11          Q.      What did the medical review

12  officer tell you when he called you?

13          A.      He indicated that I tested

14  positive for THC and was looking for my comments

15  on that.

16          Q.      What did he ask you?

17          A.      I don't remember his specific

18  question.  But he was looking for my feedback

19  about it.

20          Q.      Did he explain what he meant when

21  he said he was looking for your feedback or why

22  he wanted your feedback?

23          A.      I don't remember.

24          Q.      What did you tell him during that



1  call?

2       A.    I told him I was a medical

3  marijuana patient and I had a card for that.

4  And that that was the reason for the results on

5  the test.

6       Q.    Before that time had you ever

7  spoken to the medical review officer before?

8       A.    Not the medical review officer.

9  They are not present at the drug test.

10      Q.    So let me try this again.  Then I

11 will share the screen.  Are you able to see the

12 document again?

13      A.    Yes.

14      Q.    So that call on November 3rd from

15 the medical review officer was the first time

16 you spoke to the medical review officer; is that

17 correct?

18      A.    Yes.

19      Q.    When you told him you were a

20 medical marijuana patient, what did the medical

21 review officer say?

22      A.    To paraphrase.  But it was

23 essentially we don't really care.  We go by the

24 federal law.  We will report a fail.



1        Q.      Did he explain anything further
2  about what he meant by that?
3        A.      Not that I remember.  And I
4  certainly -- I don't want to say protested.  But
5  I can't think of another word.  I said I thought
6  I had protection of privacy with this.  I
7  have -- I'm a patient.  And he was not budging
8  on his position.
9        Q.      Before you spoke to the medical
10  review officer, was there a different person who
11  actually performed the collection from you?
12        A.      Yes.
13        Q.      Who was that person?
14        A.      I don't remember.  I don't recall
15  her name.  But it was one of the RNs or service
16  provider there at Pottstown, whatever that's
17  called.
18        Q.      On these drug screen results it
19  identifies the collector at Michelle Bradley,
20  RT.  Does that refresh your recollection as to
21  who may have collected it from you?
22        A.      Yes.  That's sounds right.
23        Q.      Where did you actually have the
24  drug screen taken?



1        A.      It was I think the address on the
2   letter is the right place.  I just Googled up
3   the address and went there.  So whatever I was
4   directed to go to.
5        Q.      At the top it says, Occupational
6   Health Pottstown Hospital.  Tower Health.  81
7   Robinson Street, Pottstown, PA.  Do you believe
8   that is where you had the test done?
9        A.      It was not a hospital.  It was
10  one of those clinics.  So I don't know if the
11  header means that clinic was part of the
12  network.  I didn't go to a hospital.
13       Q.      Did you tell the person who
14  performed your drug screen that you were a
15  medical marijuana patient?
16       A.      Yes.  I got out my card.  Said,
17  hey, this is probably going to show up.  Do you
18  guys need to know this?
19       Q.      What did that person say to you
20  when you told her that?
21       A.      She said, oh, no, no problem.
22  Just if you have any questions I will give you a
23  call.  Okay?
24       Q.      Did you know whether it was noted



1  anywhere by the person who collected it whether

2  or not you were a medical marijuana patient?

3          A.    I don't know.

4          Q.    Do you know if the person who

5  performed that collection ever told anyone from

6  Willert that you were a medical marijuana

7  patient?

8          A.    I don't know.

9          Q.    On the form here it identifies a

10 gentleman Joseph Albert, DO.  Do you recognize

11 that name?

12         A.    I don't recognize it just because

13 I am bad with names.  But I wouldn't disagree

14 either.

15         Q.    Disagree meaning that that was

16 the medical review officer who contacted you?

17         A.    It is likely the right name.

18         Q.    Do you know if Dr. Albert told

19 anyone from Willert that you had communicated to

20 him you are a medical marijuana patient?

21         A.    I can't say with certainty that

22 he did.  I don't believe he did.

23         Q.    Did you at any time before you

24 took the drug screen, the preemployment drug



```
 1  screen, did you at any time tell anyone from
 2  Willert you were a medical marijuana patient?
 3          A.      No.
 4          Q.      Before you took the preemployment
 5  drug screen did you ever use medical marijuana
 6  during work hours?
 7          A.      No.
 8          Q.      During the time you worked at
 9  Willert what type of day did you typically use
10  medical marijuana?
11          A.      What type of day?
12          Q.      Let me rephrase.  During the time
13  you worked a Willert typically what time of day
14  did you use medical marijuana?
15              MR. AUERBACH:  Objection, asked
16          and answered.  I believe you said
17          5 o'clock.
18  BY MS. FICARO
19          Q.      I am just clarifying whether that
20  pertained to the time that he worked at Willert
21  as well?
22          A.      Your screen is still up there.
23          Q.      Sorry.
24          A.      Yeah.  5:00.
```



```
 1          Q.     Can you see the drug screen
 2   results?
 3          A.     No.  I'm looking at all of you
 4   right now.
 5          Q.     During the period of time that
 6   you worked at Willert, and I believe you
 7   previously testified that typically you take
 8   medical marijuana about 5:00 or 6:00 at night;
 9   is that correct?
10          A.     Yes.
11          Q.     And during the time you worked at
12   Willert you were using medical marijuana five to
13   seven days per week, correct?
14          A.     So I will say no.  The five to
15   seven was more during the time of unemployment
16   when anxiety was through the roof.  Once I had a
17   job life started to normalize a little bit.  So
18   it was -- I didn't need it as much.  Maybe two
19   days a week if it was a really wild day at work
20   or something.
21          Q.     During the time that you worked
22   at Willert then you estimate that you used
23   medical marijuana approximately twice a week?
24          A.     Yes.
```



1          Q.     And you mentioned that you used
2    it if there was a particularly crazy day at
3    work?
4          A.     Sure.
5          Q.     Would there be any other things
6    that would prompt you to use medical marijuana?
7          A.     I can't think of any specific
8    examples existential of anxiety.
9          Q.     Did you experience any
10   existential anxiety during the period of time
11   that you worked at Willert?
12         A.     Some.
13         Q.     On those occasions when you did,
14   did you use medical marijuana?
15         A.     If it is after work hours.  So
16   you asked me a yes or no or question.  I'm
17   rambling.  Sorry.  So yes.
18         Q.     Take a look at the drug screen
19   results letter again.  If you look at the bolded
20   part of the letter midway down it says
21   D-THC-marijuana metabolite 50\15-positive.  Do
22   you see that there?
23         A.     Yes.
24         Q.     Is it your understanding that



```
 1  that indicates that those drug screen results
 2  indicates that those drug screen results
 3  indicated that you tested positive for
 4  D-THC-marijuana metabolite 50\15?
 5         A.    Yes.  I can't tell you what all
 6  that means, but yes.
 7         Q.    I will stop that share here.
 8  What happened then after you got the drug screen
 9  results?
10         A.    So you mean the call with the
11  medical review officer?
12         Q.    Yes.
13         A.    When I heard results from him?
14         Q.    Yes.
15         A.    I was at work.  So I finished the
16  day at work.  But inside my world was starting
17  to crumble.  It was bad.
18         Q.    At that time when you heard about
19  the results, did you tell Mr. Willert,
20  Mr. Bonsky or anyone else at Willert that you
21  were a medical marijuana patient?
22         A.    No.  Not at that time.
23         Q.    It's my understanding that you
24  were eventually terminated from your employment
```



1    at Willert; is that correct?

2              A.      Yes.

3              Q.      On what day were you terminated?

4              A.      November 5.

5              Q.      How did you find out that you

6    were being terminated?

7              A.      Phone call.

8              Q.      Who was the phone call with?

9              A.      Ed Kennet and Jack Bonsky.

10             Q.      Who is Ed Kennet?

11             A.      He was another salaried

12   individual.  I think he was like the accounting

13   guy slash IT guy, plant controller.

14             Q.      What did they tell you during

15   that call?

16             A.      Jack did the talking.  Ed was

17   just there as a witness.  Typically on

18   termination you have a witness.  So Jack said,

19   hey, Matt, this is not going to be a pleasant

20   call.  And then he read contents of a

21   termination letter which I later received from

22   them.

23             Q.      Did he say anything else to you

24   other than reading the termination letter to



1  you?

2           A.     Yeah.  I told him I didn't

3  understand why that was happening because I had

4  a card, a patient card.  I was a medical

5  marijuana patient.  And he kind of shifted

6  gears.  He was like, oh, you have a medical

7  card.  I said yeah.  Oh, okay.  Well, hang

8  tight.  Take the day off and I will get back to

9  you.

10          So for a short period of time I

11 thought maybe things would be all right.  Then I

12 got voice mail from him because my phone died.

13 And I missed the call.  But I got a voice mail

14 saying, yes, indeed you are terminated.

15          Q.     Before Mr. Bonsky read that

16 termination letter to you, did you ever tell

17 Mr. Bonsky that you were a medical marijuana

18 patient?

19          A.     No.

20          Q.     Before Mr. Bonsky read the

21 termination letter to you, did you ever tell

22 Mr. Willert that were a medical marijuana

23 patient?

24          A.     No.



```
1           Q.     Before the termination letter was
2    read to you, did anyone from Willert know that
3    you were a medical marijuana patient?
4           A.     No.
5           Q.     After the termination letter was
6    read to you, did you offer to show Mr. Bonsky
7    your medical marijuana license?
8           A.     I told him I had one.  But I
9    guess I didn't specifically spell it out to show
10   him because I was not there in person.
11          Q.     Did you ever offer or agree to
12   show anyone from Willert your medical marijuana
13   license?
14          A.     I would have agreed to had they
15   asked.  But, no, I didn't offer to show it to
16   anybody there.
17          Q.     On October 28, 2020 at the time
18   you took the drug careen, did you have any
19   intention at that time of stopping using medical
20   marijuana -- strike that.
21                 At the time of your October 28,
22   2020 drug screen did you intend to stop using
23   medical marijuana?
24          A.     Yes.
```



1          Q.     When did you plan to stop using
2    medical marijuana?
3          A.     Pretty much immediately.  It was
4    kind of a triage to get me through unemployment.
5          Q.     Did you tell anyone at Willert
6    that you were not going use medical marijuana
7    anymore?
8          A.     Via voice mail, yes.
9          Q.     At the time that you took that
10   drug screen on October 28, 2020, had you
11   discussed or consulted with a doctor about
12   stopping use of medical marijuana?
13         A.     No.
14         Q.     At the time that you took that
15   drug screen on October 28, 2020 did you still
16   have anxiety?
17         A.     Yes.
18         Q.     Has anyone since October 28, 2020
19   told you that your anxiety is cured or done?
20   Can you hear us?
21                Have you told anyone since
22   October 28, 2020 that your ankle -- had any
23   doctor since October 28, 2020 told you that your
24   anxiety is cured or finished?



```
 1            A.    No.  Improved, yes.  I have
 2   gotten feedback it improved but not ever cured.
 3            Q.    After you were terminated from
 4   Willert, did you undergo any mental health
 5   treatment programs other than treatment that you
 6   already testified to?
 7            A.    Yes.
 8            Q.    What program did you undergo?
 9            A.    Sought therapy at Sheppard Pratt
10   down in Baltimore.
11            Q.    In order to do that did you have
12   to stay overnight there?
13            A.    No.
14            Q.    What did that program entail?
15            A.    Three months of therapy.
16            Q.    What type of therapy did you
17   undergo?
18            A.    I don't know the name for it.
19   But counseling, I guess.
20            Q.    How did you come to participate
21   in that program at Sheppard Pratt?
22            A.    I found it online.
23            Q.    Is there a reason why you were
24   looking online for a program at that time?
```



```
1           A.      Looking for help.  I was in a bad
2   way.  Just looking for help.
3           Q.      Were you eventually discharged
4   from that program?
5           A.      Yes.  I completed the last
6   session here a week or two ago.
7           Q.      At the time of your discharge
8   were you told that you did not need to return to
9   any additional therapy?
10          A.      Correct.  Yes.
11          Q.      Did you continue to participate
12  in that program even after you began your new
13  job at Georgia Pacific?
14          A.      Yes.
15          Q.      Why?
16          A.      Once I start something I will
17  finish it.  There was a couple sessions left.
18  And I already scheduled it so I finished them.
19          Q.      After you left Willert did you
20  try to find new employment?
21          A.      Yes.
22          Q.      What did you do to find new
23  employment?
24          A.      Answered phones when recruiters
```



```
 1  called me.  And I applied for a couple jobs but

 2  it was mostly talking to a recruiter.

 3          Q.      How many recruiters did you speak

 4  to?

 5          A.      Three or four.

 6          Q.      Did you speak to any of the

 7  recruiters who helped you get any of your

 8  previous jobs?

 9          A.      Yes.  I did.

10          Q.      Did you communicate with those

11  recruiters in writing at all?

12          A.      Most likely.

13          Q.      When you communicated with them

14  in writing was that done via email?

15          A.      Email and text.

16          Q.      Do you have copies of any of your

17  text messages that you exchanged with

18  recruiters?

19          A.      I have not looked.  It depends on

20  retention policy on my phone.  I don't know.

21          Q.      I would ask if you do to take

22  steps now to preserve those text messages.  Do

23  you have copies of any items you exchanged with

24  recruiters?
```



1          A.      Likely.

2          Q.      I will ask you provide a copy of

3  those emails to your attorney as we will be

4  requesting those.

5                  MR. AUERBACH:  Send a letter.

6  BY MS. FICARO

7          Q.      How many jobs did you say you

8  applied for after you left Willert?

9          A.      I don't know.  At least four for

10 sure.  I don't want to overstate it.  But I

11 don't want to understate it either.

12         Q.      When you applied for those jobs

13 did you submit applications?

14         A.      For some of them.  But not all of

15 them.

16         Q.      When you submitted the

17 applications did you submit hard copies of

18 applications or did you submit them

19 electronically?

20         A.      All electronic, if I remember.

21         Q.      Do you have any records or

22 documentation of any of those applications that

23 you submitted electronically?

24         A.      It's unlikely.  It's unlikely.



1          Q.     Did you use any online platform
2    such as Indeed to apply for jobs?
3          A.     Yes.
4          Q.     Do you still have a active Indeed
5    account?
6          A.     I have the account.  I think I
7    suspended the profile so I would stop getting
8    calls from recruiters.
9          Q.     Did you use any other online
10   platforms other than Indeed to apply for jobs
11   after you left Willert.
12         A.     I have a Career Builder account
13   as well.
14         Q.     Did you use your Career Builder
15   account to apply for jobs after you were
16   terminated from Willert?
17         A.     I don't remember if I found any
18   that I applied to or not.  I don't recall.
19         Q.     Did you have any interviews with
20   any potential employers other than Georgia
21   Pacific between the time of your termination
22   from Willert and when you began working for
23   Georgia Pacific?
24         A.     Yes.



```
 1          Q.      How many interviews did you have?
 2          A.      I remember three.
 3          Q.      Which companies did you have
 4  interviews?
 5          A.      Johnson & Johnson, LCBC, Kunzler.
 6          Q.      Were you offered jobs at any of
 7  those companies?
 8          A.      No.
 9          Q.      Do you know why you were not
10  offered jobs at any of those companies?
11          A.      No.
12          Q.      Did you receive any job offers
13  from the time you were terminated from Willert
14  until the time you began working for Georgia
15  Pacific?
16          A.      No.
17          Q.      Do you have a Facebook account?
18          A.      No.
19          Q.      Do you have a Twitter handle?
20          A.      No.
21          Q.      Do you engage in any type of
22  social media?
23          A.      No.
24          Q.      Do you have a Linkedin account?
```



```
 1              A.      Oh, yeah.  I guess, yes.
 2              Q.      Under what name is your Linkedin
 3   account listed?
 4              A.      Matthew Reynolds.  I'm not sure
 5   what the link is.  Everyone gets a specific
 6   link.  I don't know what the forward slash is.
 7   But I am Matthew Reynolds.
 8              Q.      Did you ever post any comments
 9   about this lawsuit or the allegations involved
10   in this lawsuit on Linkedin?
11              A.      No.
12              Q.      During the time that you worked
13   at Willert how many people did you supervise?
14              A.      Three, I believe.
15              Q.      Did those three people constitute
16   other than you the entire maintenance team
17   there?
18              A.      Yes.
19              Q.      Did you coach those three people
20   on your maintenance team similar to how you
21   testified earlier that you coached other
22   employees at your prior jobs?
23              A.      One employee for sure and there
24   was a teaching opportunity.
```



```
 1          Q.      What did you do to coach that
 2   employee?
 3          A.      We looked at a line diagram
 4   together.  And I explained to him -- it was an
 5   electrical print.  And I was explaining on the
 6   print like how an SCR works, which takes up AC
 7   wave form and turns into a DC wave form.  So he
 8   had not learned much about electricity before or
 9   electronic controls.  So I was sharing with him
10   what I knew about what we were looking at on
11   that piece of paper.
12          Q.      During the time that you worked
13   at Willert did you ever have to oversee any of
14   the individuals you supervised perform repairs
15   on any of the machinery?
16          A.      Yes.
17          Q.      When you did that what
18   specifically did you do in order to oversee them
19   and their work?
20          A.      Just make myself available.  I
21   don't like to hide in the office.  So just being
22   in proximity or going back and forth between job
23   sites, checking in with them, seeing if they
24   need anything, anything I can do to coordinate
```



1   to help get the job done quicker.

2          Q.      Would this involve you talking to

3   them or going near them while they were actually

4   performing work on the machinery?

5          A.      Yes.  Correction.  There were

6   four employees.  I just remember the fourth guy.

7          Q.      Off the record.

8                  (Discussion held off the record.)

9   BY MS. FICARO

10         Q.      Mr. Reynolds, you previously

11  testified to an incident which a sibling of

12  yours was committed to a mental health

13  institute.  When did that occur?

14         A.      February 2020.

15         Q.      Did you receive unemployment

16  benefits after you left Willert?

17         A.      Yes.

18         Q.      For how long did you receive

19  unemployment benefits?

20         A.      Up until I got the job at Georgia

21  Pacific.

22         Q.      Was there any period of time from

23  the time that you terminated from Willert until

24  you began working at Georgia Pacific that you



1  were not receiving unemployment benefits?

2         A.     Yes.

3         Q.     How long and when?

4         A.     Whenever the feds and state got

5  it messed up.  There was couple of -- I think

6  one was in January or February.

7         Q.     How long a period of time did

8  that last?

9         A.     I think four weeks.

10         Q.     Were you ultimately then provided

11  those benefits that you were not paid during

12  that time?

13         A.     I don't remember.  I don't think

14  I got it all back.

15         Q.     In this case there has been a

16  claim that sustained damages that consist of

17  back pay, of pay that you would have earned had

18  you continued to work at Willert from the time

19  that you were terminated until the time that you

20  began working at Georgia Pacific.  Are there any

21  other economic damages that you believe that you

22  sustained as a result of the conduct that you

23  allege on the part of Willert?

24         A.     Maxed out my credit card, cashed



```
 1  out some retirement early which will have tax
 2  implications and long-term capital returns will
 3  impact my savings.  I have a number of bills in
 4  collections still trying to get caught up with.
 5          Q.    Are there any other economic
 6  damages that you are arguing you sustained in
 7  this action?
 8          A.    I don't think so.
 9          Q.    What noneconomic damages do you
10  allege you sustained as a result of the conduct
11  you attribute to Willert?
12          A.    Hard to quantify the emotional
13  physical effects on me, my wife and the kids.
14  My son has not said it but I can clearly tell I
15  lost the respect of my older son.  My wife and I
16  both gained about 20 pounds after this thing
17  blew up.  I was not myself.  And I messed up
18  relationships with some of the most important
19  people in my life because I was so scattered.
20              And I was seeing doctors after
21  doctor there for a while.  I was trying to
22  figure out what was wrong with me.  I thought I
23  had like -- I ended up getting blood work done
24  too.  Blood tests were showing that something
```



1    was up but it ended up an endocrinologist said I

2    think you are okay physically.  Talked to me

3    about panic attacks, like how a panic attack

4    feels like?  You are dying.  It was -- I don't

5    know how you quantify all that stuff.  But there

6    is messes that -- I don't know how I will

7    restore the relationship with my son.  It's

8    really if I get one syllable a day out of him it

9    is good.  He doesn't even say hi to me.

10          Q.     How was the relationship with

11   your son before you were terminated from

12   Willert?

13          A.     We at least go out in the garage

14   and work out together, talk about his job.  It

15   was good.  He really is a good kid, a great

16   young man.  I give him advice about things and

17   he would listened to me.  And we would play

18   video games together.  I would try to show

19   interest in whatever he is into to relate.  It

20   was good.

21          Q.     Is there anyone else whose

22   relationship you believe with whom your

23   relationship has been affected since you were

24   terminated from Willert?



```
 1          A.     It really made things
 2  uncomfortable with my mom, my dad, and my sister
 3  and brother-in-law.  I lied to all them for
 4  months.  I didn't want to ruin Christmas.  Hey,
 5  guys.  I got fired.  I just sat on it.  I kept
 6  it all in.  And I had to put on the hat.  Gosh.
 7  Sorry.  Sorry.
 8              I just had to put on a happy face
 9  and just make up stories about work, how things
10  were going.  And I would just take stories from
11  those first three weeks and expound on them like
12  I knew what was going on.  I didn't want my
13  loved ones to have to deal with the pain that I
14  was dealing with.  Like, you know, in a hard
15  time you need your loved ones to be there for
16  you.  And they know now.  But it made things --
17  on one hand they kind of understand but on the
18  other hand I was lying to their face.  It was
19  like, Matt, come on.  There is a trust thing.
20  You know?
21          Q.     So they are upset with you that
22  you lied to them about losing your job?
23          A.     Yeah.  It's made things awkward.
24          Q.     After you were laid off from
```



1  Grosfillex did you tell your parents and your

2  sister and brother-in-law you were laid off from

3  there?

4          A.      Yes.  Because it was COVID

5  related.  They restructures the company.  Part

6  of the world of pandemic.  Yeah.

7          Q.      Were your parents and sister and

8  brother-in-law aware you were a medical

9  marijuana patient before you were terminated

10  from Willert?

11          A.      No.  Absolutely not.  Still

12  don't.

13          Q.      So you have not shared with them

14  you are a medical marijuana patient?

15          A.      No.  I really like to keep my

16  medical stuff private.  But here we are.

17          Q.      Is there anything in your life

18  that you believe you can't do now that you could

19  do before your termination from Willert?

20          A.      I am back to work.  For a while I

21  didn't know I can do that.  I have not been able

22  to do any of the things that I enjoy.  I have

23  always been a project guy.  I build guitars or I

24  build gas bikes or I am always doing something.



1  I have a whole garage of tools and woodwork

2  supplies.  But I have not been able to do

3  anything out there.

4                    My bedroom looks like I was test

5  driving the horder lifestyle for months.  It

6  still does.  I have not been able to clean up,

7  basic housekeeping.  Like pay pills.  Like I

8  stopped paying bills for while.  I didn't

9  realize I stopped.  My anxiety -- I stopped.

10 And I'm getting better at that.  I am getting

11 better.  You got to pay bills.

12         Q.    Why did you stop paying bills?

13         A.     It was not a conscious decision.

14 I just -- I just like went into la-la land in my

15 head.  I didn't know that I was not taking care

16 of things.

17         Q.    Did you tell your wife that you

18 were not paying the bills?

19         A.     At some point.  And I was paying

20 the core ones.  I made the mortgage payment.

21 Then when I get the shutoff note from the

22 internet, oh, I guess I should pay that.  You

23 get the phone call.  Like it was like I had to

24 be prompted to do each thing.  The electric



1   company only lets you go so long and then they

2   call you.  Like, oh, yeah, sure.  I will pay

3   that.  Sorry.

4            Q.     When did you stop paying the

5   bills?

6            A.     November, December.  I stopped

7   paying the health insurance.  We got kicked off

8   the Obamacare plan because I stopped paying the

9   friggin health insurance premium.

10           Q.     And the reason why you did that

11  is just because in your words you were off in

12  la-la land at that point?

13           A.     Yes.  I just couldn't handle

14  realty.  Yeah.  I was lost.

15           Q.     I will share my screen with you

16  one more second.  I will jump back for a moment

17  during the time you were at Willert.  And I

18  marked a series of photographs as exhibits.  I

19  will go through them just to show you the Bates.

20                  But if you can see up at the top

21  right-hand corner of this screen -- and actually

22  let me rotate the view so you are seeing them

23  the right way.  It will be the bottom.  The

24  bottom of the screen then, the right-hand corner



1  again, we have Bates labels.  And it begins with

2  Bates Willert 0085.  And it goes down

3  continuously through Willert 00104.  Do you see

4  that there?

5          A.    Yes.

6          Q.    Take a look at the first picture.

7  Is this equipment that you recognized that was

8  located at Willert during your time there?

9          A.    I am not contesting it's there.

10  I can't recall where that stuff is at.

11          Q.    Do you see looking at the two

12  boxes there that have orange stickers on them

13  that say 480 volts, are those electrical panels?

14          A.    Yes.  They are safety disconnect

15  switches.

16          Q.    Does the 480-volts suggest the

17  voltage associated with that?

18          A.    Yes.

19              (Exhibit 9 was marked for

20      identification.)

21  BY MS. FICARO

22          Q.    How about the next picture,

23  looking at Willert 0086.  And I will ask this

24  whole set of photographs be marked as Exhibit 9.



1  Do you recognize that?

2          A.      Yes.

3          Q.      What is that?

4          A.      That's one of the control panels.

5  I think that was outside of what they called the

6  mix room by the fillers.

7          Q.      What housed -- what was located

8  at the mix room?

9          A.      They had some tanks in there,

10  some mix tanks.  They are like badge tanks that

11  make up a smaller batches for the fillers.

12          Q.      Did that mix room -- is that

13  where mixing of chemicals occurred there at

14  Willert?

15          A.      Yes.  That was one of the

16  locations.

17          Q.      How about this next picture here,

18  Willert 087.  Do you recognize that?

19          A.      Trying to place it just based on

20  the surroundings there.  I know what it is.

21          Q.      What is it?

22          A.      That's the control panel in the

23  distribution cabinet.  So that would have either

24  relays, motor control starters, PLC stuff.  You



1   can see all the conduit at the top.  So it's

2   eight or ten pieces of equipment being

3   controlled out of that thing.  And the knobs and

4   selector switches would be on bypass or on off

5   switches.  The operator would use them.  The red

6   knob on the left is the emergency stop.  If

7   anything goes wrong anyone can walk up and slap

8   that.

9          Q.     Did your role as maintenance

10  manager at Willert involve overseeing the

11  maintenance and repair of this cabinet we are

12  looking at in this photograph?

13         A.     This certainly could have.  I

14  don't remember like anything specifically of

15  that one while I was there.  But it is part of

16  the equipment of the building.  So it fell under

17  my responsibility.

18         Q.     How about this next picture which

19  is marked Willert 088, what is that we are

20  looking at there?

21         A.     Honor Guard?  Production area --

22  I can only guess that might be controlling

23  exhaust fans.  But I'm not sure on that.

24         Q.     Did your role as maintenance



1  manager involve overseeing and supervising the

2  maintenance and repair of this cabinet we are

3  looking at in Willert 0088?

4        A.    Yes.

5        Q.    We are now looking at Willert

6  0089.  The Bates on this document actually --

7  let me rotate the photograph.  If you look at

8  that document what we are looking at there?

9        A.    I think that is a lighting panel.

10 So that would control -- those are breakers, a

11 breaker panel, that controls lighting throughout

12 the plant.  Those are on the right there is --

13 there is a start and stop stations.  I'm not

14 sure what they controlled.

15       Q.    And the 480-volt sticker there,

16 does that indicate there are 480 volts of

17 electricity associated with that?

18       A.    Yes.  The supply going into that

19 would be a 480 supply.

20       Q.    Did your role as a maintenance

21 supervisor at Willert involve overseeing and

22 supervising maintenance and repair of this

23 cabinet that we see in Willert 0089?

24       A.    Yes.



```
 1            Q.      Take a look now at Willert 0090.
 2    What are we looking at there?
 3            A.      I believe that's a fork truck
 4    battery charger.
 5            Q.      Would your work as maintenance
 6    manager at Willert involve overseeing and
 7    supervising maintenance and repair of that in
 8    this photograph?
 9            A.      In the sense of coordinating
10    outside contracting, yes.
11            Q.      The 480-volt sticker, does that
12    indicate the electricity associated with that
13    battery?
14            A.      Yes.
15            Q.      Looking at Willert 0091.  And
16    what am I looking at in that picture?
17            A.      The transformer.  You see the
18    480, 208, 120 at the top.  That takes a 480-volt
19    input voltage.  And then it steps down.  There
20    is tabs in there that different supply voltages
21    can be ran from that source.
22            Q.      Did your role as maintenance
23    manager at Willert involve overseeing and
24    supervising maintenance and repair of this shown
```



1   in this photograph here?

2           A.      Yes.

3                   MS. FICARO:   Steve, also as an

4       aside, these documents I am showing you

5       have been marked confidential.   I will just

6       ask that this portion of the transcript

7       with regard to the photographs be marked as

8       confidential as well.

9   BY MS. FICARO

10          Q.      Take look at Willert 092.   What

11  am I looking at in that picture?

12          A.      That is a control cabinet.   I

13  don't know what equipment that's running.   But

14  that is similar to other control cabinet that we

15  saw earlier.   Multiple pieces of equipment would

16  be run out of that.

17          Q.      The stickers on there say 480

18  volts.   Does that mean there is 480 volts of

19  electricity associated with this cabinet here?

20          A.      Yes.

21          Q.      As maintenance manager at Willert

22  did your job responsibilities include overseeing

23  and supervising the maintenance and repair of

24  this cabinet in Willert 0092?



```
 1          A.     Yes.
 2                 MR. AUERBACH:  Can you read back
 3      the question?
 4                 (The reporter read back the
 5      record as requested.)
 6  BY MS. FICARO
 7          Q.     Take a look at Willert 094.  What
 8  is this that we are looking in this photograph?
 9          A.     I think that is the panel in the
10  mix tank room.  It used to be the Kiwi plant
11  when it made shoe polish.  That is a left over
12  label.  Anyway I think that this is in this mix
13  tank room where the big tanks were.  So that 480
14  runs various pieces of equipment.
15          Q.     And there are 480-volt stickers
16  on there.  Does that mean there are 480 volts of
17  electricity associated with that?
18          A.     Yes.
19          Q.     As maintenance manager at Willert
20  did your job responsibilities include overseeing
21  and supervising the maintenance and repair of
22  this cabinet in Willert 93?
23          A.     Yes.
24          Q.     How about Willert 094, I will
```



1  rotate that photograph.  What is that we are

2  looking at in Willert 0094?

3          A.    Another control panel.  The thing

4  on side there is a lunchbox -- is a safety

5  disconnect.

6          Q.    And there is 480 volts of

7  electricity associated with that?

8          A.    Yes.

9          Q.    Did your job responsibilities as

10  the maintenance manager at Willert involve

11  overseeing and supervising maintenance and

12  repair of this machinery in here in Willert 094?

13          A.    Yes.

14          Q.    Willert 0095, what is that?

15          A.    Good question.  Looks like a

16  refrigerator.  But it's not.  That might be the

17  welder in the maintenance shop.  But I can't

18  tell.

19          Q.    How about Willert 0096, what is

20  in that photograph?

21          A.    I think that is another fork

22  truck battery charger.

23          Q.    Is 480 volts of electricity

24  associated with that?



```
 1              A.      Yes.
 2              Q.      Did your job responsibilities as
 3  maintenance manager involve overseeing
 4  maintenance and repair of this charger in
 5  Willert 0096?
 6              A.      Yes.
 7              Q.      Willert 0097, I will rotate that
 8  picture.  What is that in that picture?
 9              A.      I think that's the main switch
10  gear, the main on/off switch for the whole
11  plant.
12              Q.      Are you able to tell how many
13  volts of electricity are associated with that?
14              A.      I am just looking at the picture
15  there I don't see any identification.
16              Q.      Did your job responsibilities as
17  maintenance manager include overseeing and
18  supervising maintenance and repair of what we
19  see in Willert 097?
20              A.      Yes.
21              Q.      Looking at Willert 099.  What is
22  that in Willert 099?
23              A.      That's a breaker panel.
24              Q.      And there are different places
```



1    where I see 480, 480, 480V, 480V.  Does that

2    designate the electricity voltage associated

3    with that breaker panel?

4            A.     Yes.

5            Q.     Did your job as a maintenance

6    manager at Willert involve overseeing and

7    supervising maintenance and repair of this

8    breaker?

9            A.     Yes.

10           Q.     In Willert 0099?

11           A.     Yes.

12           Q.     Looking at Willert 0101 what is

13   that that we see in that picture?

14           A.     I can only read off the label

15   there, a closed switch.  That's a -- I think

16   that is one of the main circuit breakers for the

17   plastic room.

18           Q.     On the switch does it indicate

19   there is 600 volts of electricity associated

20   with that?

21           A.     I think that's the rating.  Like

22   the upper end of the rating.  But below that it

23   says 3 phase 480.  I think the actual operating

24   voltage is 480.  But it is rated for 600.



1         Q.      Did your role as maintenance
2    manager at Willert involve overseeing and
3    supervising maintenance and repair of this
4    switch depicted in Willert 01101?
5         A.      Yes.
6         Q.      Looking at Willert 0104.  What is
7    it that we are looking at in that picture?
8         A.      (inaudible) the scribbling on
9    that is a metameter transformer.  But I have to
10   go with that.  I don't recognize it otherwise.
11        Q.      Do you recognize having ever seen
12   it Willert?
13        A.      I can't remember that one
14   specifically.  I don't know where that's at.
15        Q.      I will scroll up and then just
16   ask with regard to Willert 0103 what are we
17   looking at in that picture?
18        A.      That's control cabinet.
19        Q.      There are stickers on here for
20   480 volts.  Does that mean there is 480 volts of
21   electricity associated with that control panel?
22        A.      Yes.
23        Q.      Does your job as maintenance
24   manager at Willert involve overseeing and



1   supervising maintenance and repair of this

2   control panel?

3          A.     Yes.

4          Q.     I am sorry?

5          A.     Yes.

6          Q.     Let me ask the question again so

7   the record is clear.  Did your role as

8   maintenance manager at Willert involve

9   overseeing and supervising maintenance and

10  repair of the cabinet depicted in Willert 01103?

11         A.     Yes.

12         Q.     I will stop that share.  Off the

13  record one moment.

14                (Discussion held off the record.)

15  BY MS. FICARO

16         Q.     We asked earlier with regard to

17  other jobs and I just don't recall whether I

18  asked with regard to Willert.  With regard to

19  lock out, tag out procedures at Willert, as

20  maintenance manager was it your responsibility

21  to ensure that those individuals on your

22  maintenance team whom you were supervising

23  properly employed lock out, tag out procedures

24  when necessary?



```
1              A.    Yes.  Definitely.

2                    MS. FICARO:  Those are all the

3        questions that I have for you.

4                    (Witness excused.)

5                    (Deposition concluded at 5:03

6   p.m.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24
```



1

2              C E R T I F I C A T I O N

3

4

5              I, JARED CAREY, Court Reporter,

6   certify that the foregoing is a true and

7   accurate transcript of the foregoing deposition,

8   that the witness was first sworn by me at the

9   time, place and on the date herein before set

10  forth.

11              I further certify that I am neither

12  attorney nor counsel for, not related to nor

13  employed by any of the parties to the action in

14  which this deposition was taken; further, that I

15  am not a relative or employee of any attorney or

16  counsel employed in this case, nor am I

17  financially interested in this action.

18  

19

20

21  _____

    Jared Carey
22  Court Reporter
    and Notary Public
23  Date: August 31, 2021

24

ESQUIRE
DEPOSITION SOLUTIONS































































































































































































15.) The MM card presented at the pre-employment drug screen:



EXHIBIT

1

- #4 dispensary information
- Herbology Dispensary 815 Cumberland St Lebanon PA 17402
  - Dates of purchase: 11/16/2020, 12/18/2020, 08/21/2020
- Cure Pennsylvania 1866 Fruitville Pike Lancaster PA 17601
  - 03/04/2021 02/11/2021
- Apothacarium Dispensary Lancaster 2405 Covered Bridge Dr #125 PA 17602
  - 01/29/2021, 10/01/2020, 08/03/2020, 07/21/2020

**EXHIBIT**

**2**

**From:**     Jack Bonsky <jbonsky@willert.com>
**Sent:**     Friday, March 19, 2021 7:22 AM
**To:**       Daniel O'Toole; Bryan Willert; Tammy Gillette
**Subject:**  Fwd: new employee drug screens

**CAUTION:**   **EXTERNAL EMAIL**

**attorney-client privileged**
**attorney work product**—requested by legal counsel.

---------- Forwarded message ---------
From: **Dave Furno** <dfurno@willert.com>
Date: Fri, Mar 19, 2021 at 8:14 AM
Subject: Fwd: new employee drug screens
To: Jack Bonsky <jbonsky@willert.com>

**David Furno**
**Quality Manager**
**Willert Manufacturing Company, LLC.**
**610-385-9500 ext 277**
**cell 732-939-5582**

---------- Forwarded message ---------
From: **Matthew Reynolds** <mreynolds@willert.com>
Date: Tue, Oct 27, 2020 at 3:21 PM
Subject: Re: new employee drug screens
To: Dave Furno <dfurno@willert.com>

I missed my appointment today. Was having so much fun, I just couldn't
quit.

On Mon, Oct 26, 2020 at 9:13 AM Dave Furno <dfurno@willert.com> wrote:
 Gentlemen,
 I have you scheduled for new employee drug screens.

 Occupational Health and Rehabilitation Services at CarePlex
 81 Robinson St, Pottstown, PA 19464

 Shaun McLaughlin
 MOnday 10/26 at 12:00 pm

EXHIBIT

3

1

**Willert0044**

Jack Bonsky
Tuesday 10/27 at 1:00pm

Mathew Reynolds
Tuesday 10/27 at 2:00 pm

Please be sure to have your ID and mask when you arrive.  We can easily change these appointments to suit your schedule.

Thanks,
Dave

**David Furno**
**Quality Manager**
**Willert Manufacturing Company, LLC.**
**610-385-9500 ext 277**
**cell 732-939-5582**


--
Jack Bonsky
Plant Manager
Willert Home Products
447 Old Swede Road
Douglassville, PA 19518
610-385-9500  extension 369

2

**Willert0045**


**WILLERT** MFG Co., LLC

447 Old Swede Rd, Douglassville, PA 19518

Phone: 610-385-9500
Fax: 610-385-9322

October 15, 2020

Mr. Matt Reynolds

Dear Mr. Reynolds,

I want to thank you for your time to interview with Willert Manufacturing Company. I am pleased to offer you the position of Maintenance Manager with the following package:

- **Full-time/Part-time**: Full-time Salary Exempt Employee

- **Pay Rate** - $3,269.24 per biweekly pay period. Upon completion of project goals defined by the Plant Manager, you will receive a bonus of $15,000. Future bonuses are determined and paid at the discretion of management.

- **Hours:** Minimum of 40 hours per week.

- **State Date:** October 19, 2020

- **Benefits:** See salaried employee benefit package attached. As a deviation from our standard Salaried Employee Benefit Package, you will receive four (4) weeks paid vacation per year.

This offer is contingent upon successful completion of a pre-employment drug test. All such testing will be conducted in accordance with applicable federal, state, and local laws. Please contact Ed Kennet to get the necessary paperwork you will need, should you accept this offer.

Upon the Immigration Reform and Control Act (IRCA), our company is required to verify the identity and work authorization of all newly hired employees. Therefore, you will be required to complete the I-9 form upon hire. Within three business days of beginning employment, you will need to supply acceptable documentation (as noted on the I-9 form) of your identity and work authorization. Willert Home Products, Inc. is an equal opportunity employer.

**Our company adheres to a policy of employment-at-will which allows either party to terminate the employment relationship at any time, for any reason, with or without cause.**

If you accept this position, please sign on the next page and return by Monday, October 19, 2020. You may email it to me at tgillette@willert.com or fax it to (314) 772-3238.

I look forward to working with you in this position. If you have any questions or would like additional clarification, please let us know.

Sincerely,

*Tammy Gillette*

Tammy Gillette
HR Manager

EXHIBIT

**4**

1 of 2

**Willert0001**

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

**ACKNOWLEDGEMENT**

I, Matt Reynolds, accept the offer as presented above.

_____          10/16/2020
        Signature                              Date

2 of 2

**Willert0002**

# Willert Home Products, Inc.
# Salaried Full-Time Employee Benefit Package

## Holidays

The following days are considered paid holidays:

| | |
|---|---|
| New Year's Day | Veterans Day |
| Good Friday | Thanksgiving Day |
| Memorial Day | Day after Thanksgiving |
| Fourth of July | Christmas Eve |
| Labor Day | Christmas Day |

## Vacation

The following paid vacations are provided:

| Years of Service | Vacation |
|---|---|
| Upon hire | 2 weeks |
| After 5 years | 3 weeks |
| After 15 years | 4 weeks |

Vacations must be taken within the year following the date upon which the employee becomes eligible for the vacation.

In the event an employee who has one or more years of service is terminated, the employee shall receive, on a pro-rated basis, any vacation he or she has earned since his or her last anniversary date.

In the event an employee who has one or more years of service is absent due to a bona fide illness according to FMLA standards during part of the qualifying year, he or she shall receive vacation pro-rated on the basis of hours worked.

## Sick Pay

Sick days are not limited for salaried employees. However, excessive use or abuse of sick days may be reflected in an employee's performance evaluation or be basis for termination of employment.

## Basic Life Insurance

On the first of the month coincident with or after sixty (60) days of continuous active employment, life insurance in the amount of $20,000.00 is provided at no cost to the employee, subject to the terms of the applicable policy.

## Medical Insurance

After sixty (60) days of service, medical insurance is offered to the employee and his or her family for a fee. See the "Medical Insurance Election Form" for current rates.

## 125 Flexible Spending Account

After sixty (60) days of service, the employee may contribute pre-tax dollars to a flexible spending account to cover medical and dependent care costs according to IRS regulations.

Page 1 of 3

EXHIBIT

5

Willert0005

### 401(k) Plan

A 401(k) plan is provided allowing the employee to contribute up to 75% of his or her pre-tax earnings to a qualified plan subject to certain limitations. An employee may also may catch-up contributions if the employee is eligible per IRS regulations. The Company may contribute a match to any participating employee's account on your behalf. Currently, the Company matches 50% of your 401K contribution up to 4% of your bi-weekly compensation. See the "Summary Plan Description" for details.

### Short-Term Disability

First of the month coinciding with or next following sixty (60) days of continuous active employment, the Company provides short-term disability insurance under a Group Accident and Sickness Weekly Benefit Indemnity Plan. The benefits for non-occupational accidents and sickness qualifying under the plan shall be:

| Consecutive calendar days | Benefit Paid |
|---|---|
| Days 1 to 3 | 0% if illness, 100% if accident |
| Days 4 to 30 | 100% of salary |
| Days 31 to 60 | 75% of salary |
| Days 61 to 90 | 60% of pay |

### Long-Term Disability

First of the month coinciding with or next following sixty (60) days of continuous active employment, long-term disability insurance is provided under a group plan – see policy for full details. Employees making in excess of $45,000 are eligible to purchase additional long-term disability insurance under individual policies. If the employee purchases one of these additional policies, the Company will pay a portion of these additional costs while the employee is employed by the Company.

### Optional Life Insurance/Annuity Program

After sixty (60) days of service, an employee may purchase an additional life insurance policy and annuity policy through the specified carrier. This policy is written individually for the employee. The Company will match the employee's contributions to such policies up to $60.00 in premiums per month.

### Bereavement

In case of death of an employee's mother, father, brother, sister, mother-in-law, father-in-law, grandparent, husband, wife, child, stepchild (adopted or living in the employee's home), or grandchild, the employee shall be granted a leave of absence with pay for up to three (3) consecutive workdays for time missed because of the death and attendance at the funeral. In case of death of an employee's stepmother, stepfather, brother-in-law, sister-in-law, son-in-law, or daughter-in-law, the employee shall be granted a leave of one (1) day leave of absence with one (1) day's pay. Employees who are eligible to receive one (1) day of paid leave under this provision are eligible to receive an additional one (1) day of unpaid leave. The employee will be compensated for eight (8) hours straight time pay, providing the days of leave shall fall on regularly scheduled workdays of the employee. Bereavement pay shall not be paid for days when the employee is not scheduled to work.

Page **2** of **3**

**Willert0006**

## Jury Duty

Employees shall be compensated at their regular straight time rate of pay for all hours during regular working hours served by them as jurors when summoned for jury service. Any sums paid by the court to the employee for such jury services shall be deducted from their regular rate of pay; provided that in no case shall the period of such compensation exceed ten (10) working days per calendar year unless on Grand Jury. Proof of government payment must be furnished prior to the Company paying such compensation.

## Military Leave

Employees who are on temporary military assignment will be compensated at their regular rate of pay less the sum paid by military government. Proof of government payment must be furnished prior to the Company paying such compensation.

**Willert0007**



## JOB DESCRIPTION

Location: Douglassville

| | |
|---|---|
| **TITLE:** | Maintenance Manager |
| **REPORTS TO:** | Plant Manager |
| **DEPARTMENT:** | Maintenance |
| **DATE:** | January, 2021 |
| **FLSA STATUS:** | Non-Exempt (_) Hourly (_) / Salaried (X) Exempt (X) |

### SUMMARY

Maintenance Managers oversee the repairs, installations and upkeep of various machines, and power equipment associated with all parts of the production of liquid fill manufacturing. The main duties include designing maintenance procedures, tracking budgets and expenses, and performing inspections on different machines and equipment to find problems and make repairs or replace as needed.

### ESSENTIAL DUTIES AND RESPONSIBILITIES include the following. Other duties may be assigned.

- Communicates directly with the Production Manager and General Manager to coordinate maintenance and repair work in process areas.
- Communicates directly with QA laboratory to ensure effective participation by the maintenance technicians in the implementation of QA policies and procedures.
- Implements programs and procedures required to ensure plant cleanliness.
- Assists with planning and implementing plant improvements and expansions.
- Conducts employee performance reviews based on job descriptions to determine competency, knowledge, and contribution of the maintenance technicians.
- Maintains and updates operating and training manuals for the maintenance department.
- Ensures that all maintenance technicians are trained on the most updated version of the operating procedures.
- Monitor's operation of plant equipment and systems.
- Reviews the operation of plant equipment and systems constantly, to minimize unplanned downtime, anticipate solve problems in a timely manner, and to identify opportunities for improvement.
- Maintains and repairs maintenance shop equipment.
- Establishes and maintains a computerized maintenance management system (CMMS) for tracking work orders, spare parts, and maintenance history of plant equipment.

**EXHIBIT**

**6**

000109

- Prepares reports, analyzes data, and makes recommendations for improving plant operations and solving maintenance-related problems.
- Ensures that maintenance technicians are adequately trained, equipped, and motivated so that the maintenance program can be accomplished in a safe, timely, and cost-effective manner.
- Communicates regularly with all maintenance technicians, both individually and as a group, to ensure good two-way communication concerning maintenance issues.
- Assists with hiring of maintenance personnel.
- Initiates and carries out projects that improve efficiency and/or reduce operating costs.
- Tracks, analyzes, and improves key maintenance parameters such as asset utilization, maintenance cost, PM compliance, schedule compliance, etc.
- Maintains safety, health, and environmental policies and procedures.
- Ensures city, county, state, and federal regulations relating to the maintenance department are met at all times.
- Directs, maintains, and enforces the safety program for the maintenance department; reviews safety records to uphold standards of maximum safety for all maintenance technicians.
- Initiates, implements, and manages the plant maintenance program with an emphasis on planning/scheduling and preventive/predictive maintenance.
- Monitors the use and inventories of spare parts, maintenance supplies, and equipment and initiates reordering when necessary.

## SUPERVISORY RESPONSIBILITIES
Supervises Maintenance technicians on all shifts.

## QUALIFICATIONS
To perform this job successfully, an individual must be able to perform each essential duty satisfactorily. The requirements listed below are representative of the knowledge, skill, and/or ability required. Reasonable accommodations may be made to enable individuals with disabilities to perform the essential functions.

- Bachelor's Degree in engineering, administration, or facility management.
- Minimum experience of 5 years in a supervisory role.
- Working knowledge of electrical and mechanical systems.
- Familiarity in drafting and understanding blueprints and schematics.
- Effective communication and people management skills.
- Comfortable working in a fast-paced environment.

## COMPUTER SKILLS
- Must have experience with Excel, MS word.
- MS Office proficiency
- Good telephone and email communication skills.

**LANGUAGE SKILLS**

Ability to read and interpret documents such as safety rules, operating and maintenance instructions, and procedure manuals.  Ability to write routine reports and correspondence.  Ability to speak effectively before groups of employees.

**REASONING ABILITY**

Ability to solve practical problems and deal with a variety of concrete variables in situations where only limited standardization exists. Ability to interpret a variety of instructions furnished in written, oral, diagram, or schedule form.

**PHYSICAL DEMANDS**

The physical demands described here are representative of those that must be met by an employee to successfully perform the essential functions of this job. Reasonable accommodations may be made to enable individuals with disabilities to perform the essential functions.

While performing the duties of this job, the employee is regularly required to use hands to finger, handle, or feel and talk or hear.  The employee required to stand and walk.  The employee must regularly lift and/or move up to 10 pounds and occasionally lift and/or move up to 25 pounds.  Specific vision abilities required by this job include close vision, distance vision, and ability to adjust focus.

**WORK ENVIRONMENT**

The work environment characteristics described here are representative of those an employee encounters while performing the essential functions of this job. Reasonable accommodations may be made to enable individuals with disabilities to perform the essential functions.

The noise level in the work environment is usually moderate.

# 3. performance

- 10/19/2020 Expedited parts for surprise 1 day turn around on a machine expected by staff to be down days or weeks.

- Safety issues identified or addressed (see First Request for Production - FRP)
  - Trip hazard
  - unsecured gas bottles which were blocking a fire extinguisher.
  - Bench grinder gap
  - Machine guarding issue Ty-D-Bowl line

- Week 2 Equipment performance improvement: Introduced new automation vendor who eliminated a 5 year issue on bottle line resulting in less downtime and reduced operator hassle.

- 10/27/2020 Voluntarily started early @time 0453 to meet and network with the team on 3rd shift.

- 10/30/2020 Worked late (till time 20:37 on a Friday) to facilitate the swap of a hydraulic pump on Uniloy #1.  This down machine issue was jeopardizing the production schedule. The quick repair eliminated the scheduling concern

  - 12/0/2020 – **POST TERMINATION:** the Plaintiff communicated with John Kulp via text that the hydraulic pump for above Uniloy #1 was on site from repair delivery driver with BDS Company contacted the Plaintiff upon arrival at Willert with rep.

- Facilitated re-initiation of an out of service labeler to provide a work around for a dysfunctional piece of "new" equipment on bottle line.

- Production support provided on 2nd shift as needed (Plaintiff demonstrated schedule flexibility)

- Initiated the upgrade of an obsolete AC – DC Rectifier Inverter to a modern drive unit

- Assisted with coordination of repair of waste pit piping

- 11/03/2020 - Hand delivered a mix tank pipe to Access Mechanical "after hours" for emergency repair.

- Hand delivered same mix tank spare part @time 20:18  on 11/04/2020 – which was a sick day caused by panic attack which onset after a 11/03/2020 phone conversation with Medical Review Officer in regards to drug test results.

- Early identification of a vacuum pump failure mode – although not addressed during the tenure of the Plaintiff due to subsequent termination.

- Began process of integration and provided a 33 point training schedule for a production employee, to transition into a hybrid maintenance / production role.  Training schedule document was on Plaintiff's desk at Willert, but never Training schedule document was returned to Plaintiff with other personal belongings from The Office via Fed-Ex on 11/06/2020.

- 10/26/2020 Facilitated emergency repair of Programable Logic Controller (PLC) for mix tanks.

- **Located** 6 month old Safety Committee minutes and located an unaddressed and valid employee concern about lack of machine guarding on Ty-D-Bowl line capper.  This guarding issue was then turned into a project to be immediately **termination**

- 10/16/2020 - Initiated evaluation process of out of service Sullair compressor for feasibility of $5k - $10k  repair vs $50k – $75k replacement. Followed up with vendor and Ed Kennett from Willert ON 11/11/2020 **POST TERMINA**

- 12/10/2020 POST TERMINATION – Coordinated delivery of hydraulic drive when BDS company delivery driver contacted Plaintiff for delivery instructions, location, and contact person.  Plaintiff contacted John Kulp of Willert to cor

- Plaintiff maintained open communication with supervisor – such as communication of varying start times or current location & status via text message on 10/19/2020, 10/30/2020, 11/02/2020, 11/04/2020.

- 10/26/2020 Plaintiff authorized facility safety and appearance improvement with employee parking lot lighting upgrades with minimal incremental expense over a mandatory repair of 1 light pole that was inoperable.

- Fitment issue encountered with upgrade of main 400 amp electrical breaker for new equipment install. Coordinated Plan B to complete the job withing the deliverable time frame for no additional cost to the overall project.

- Improved safety (authorized lighting improvement) at parts storage area.

- 11/06/2020 POST TERMINATION: Plaintiff communicated Jack Bonsky's contact information to a vendor(3B) to ensure a seamless transition for in progress work.  Plaintiff also provided T-shirt sizes for the maintenance crew, becat

- Bottle de-scrambler / sorter for Ty-D-Bowl line – Root Cause Analysis was in progress. This machine experienced 2 motor failures in the 2 weeks that the Plaintiff was employed at Willert. At time of termination, Plaintiff was working application.

**EXHIBIT**

**7**

Occupational Health-Pottstown Hospital Tower Hlth
81 Robinson Street
Pottstown, PA 19464
Phone: 610-326-2300
Fax: 610-970-5889

## Drug Screen Results Letter

To:     Dave Furno/Ed Kennet
        Willert Manufacturing CO, LLC
        447 Old Swede Road
        Douglassville, PA 19518-1239

|  |  |
|---|---|
| Name: | Matthew D. Reynolds |
| Patient ID: | 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 |
| Collection Date & Time: | 10/28/2020 |
| Specimen ID #: | Z40177937 |
| Drug Test Profile: | 5 Rapid DS |
| Drugs Tested For: | Creatinine, Urinary  > = 20 |
|  | D-Amphetamines 1000/500 |
|  | D-Cocaine 300/150 |
|  | D-Opiates 2000/2000 DOT |
|  | D-PCP-Phencyclidine 25/25 |
|  | **D-THC-Marijuana Metabolite 50/15**  -  **Positive** |
| Collection Site & Phone: | Occupational Health-Pottstown Hospital |
|  | 81 Robinson Street |
|  | Pottstown, PA 19464 |
|  | 610-326-2300 |
| Collector: | Michelle Bradley, RT |
| Laboratory: | Medtox Laboratories |
|  | 402 W County Rd D |
|  | Saint Paul, MN 55112 |
| Test Reason: | Pre-employment |
| Result: | Positive |
| MRO Verified On: | 11/03/2020 |
| Date CCF Received: | 10/28/2020 |

**EXHIBIT**

**8**

Printed:  11/03/2020    1:07:42PM

Joseph Albert, DO
Medical Review Officer

11/3/20
Date of Review and Verification

**Willert0046**



**EXHIBIT**

**9**































