**IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| MATTHEW REYNOLDS | : |
| Plaintiff, | : Civil Action No. 5:21-cv-01208-JFL |
| v. | : |
| WILLERT MFG. CO., LLC | : |
| Defendant. | : |

**DEFENDANT WILLERT MANUFACTURING COMPANY, LLC'S
BRIEF IN OPPOSITION TO PLAINTIFF'S MOTION FOR
<u>PARTIAL SUMMARY JUDGMENT</u>**

Respectfully submitted this 20th day of September, 2021,

**KAUFMAN DOLOWICH & VOLUCK, LLP**

By: <u>/s/ Eileen Monaghan Ficaro</u>
Gregory S. Hyman, Esquire
Eileen Monaghan Ficaro, Esquire
*Attorneys for Defendant,*
*Willert Manufacturing Company, LLC*

Page(s)

Cases

Anderson v. Liberty Lobby, Inc.,
   477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) ................................................................ 4
Berckley Invest. Group, Ltd. v. Colkitt,
   259 F.2d 135 (3d Cir. 2001) ..................................................................................................... 10
Celotex Corp. v. Catrett,
   477 U.S. 317 (1986) .................................................................................................................. 4
Chladni v. Univ. of Phoenix, Inc.,
   2016 WL 6600045 (E.D. Pa. Nov. 7, 2016) ............................................................................. 4
Clark County Sch. Dist. v. Breeden,
   532 U.S. 268, 121 S.Ct. 1508, 149 L.Ed.2d 509 (2001) ........................................................... 6
In re Beyer,
   631 Pa. 612, 115 A.3d 835 (Pa. 2015) .............................................................................. 10, 11
Lawrence v. City of Phila.,
   527 F.3d 299 (3d Cir. 2008) ................................................................................................... 10
Marcellus Shale Coal v. Dep't of Envtl. Prot. of Pa.,
   193 A.3d 447 (Pa. Commw. Ct. 2018) ................................................................................... 10
Marino v. Indus. Crating Co.,
   358 F.3d 241 (3d Cir. 2004) ..................................................................................................... 4
Orvosh v. Program of Grp., Ins. For Salaried Emps. of Volkswagen of Am., Inc.,
   222 F.3d 123 (3d Cir. 2000) ..................................................................................................... 4
Palmiter v. Commonwealth Health Systems,
   2021 PA Super 159 (Aug. 10, 2021) ........................................................................................ 5
Power v. Lockheed Martin Corp.,
   419 F. Supp. 3d 878 (E.D. Pa. 2020) ................................................................................... 6, 7
Robert W. Mauthe, M.D., P.C. v. MCMC LLC,
   387 F.Supp.3d 551 (E.D. Pa. 2019) .......................................................................................... 4
Sugarhouse HSP Gaming, L.P. v. Pennsylvania Gaming Control Board,
   640 Pa. 169, 162 A.3d 353 (Pa. 2017) ................................................................................... 10
Warfield v. SEPTA,
   460 F. App'x 127 (3d Cir. 2012) .............................................................................................. 6
Watson v. Pennsylvania, Dept's of Revenue,
   854 F. App'x 440 (3d Cir. 2021) .............................................................................................. 6

Rules

Fed. R. Civ. P. 56(c) ........................................................................................................................ 4

Other Authorities

1 Summ. Pa. Jur.2d Torts § 12:77 (2d ed.) ...................................................................................... 6

Defendant Willert Manufacturing Company, LLC ("Willert"), by and through its counsel, Kaufman Dolowich & Voluck, LLP, hereby files this Brief in opposition to Plaintiff's Motion for Partial Summary Judgment.

I. **INTRODUCTION**

Plaintiff asserts one cause of action against Willert – wrongful termination in violation of the Pennsylvania Medical Marijuana Act ("MMA"), 35 P.S. §§ 10231.101 – 10231.2110. Specifically, Plaintiff alleges that Willert terminated him because he was a medical marijuana patient. However, no one from Willert knew that Plaintiff was a medical marijuana patient before the decision to terminate Plaintiff was made or communicated to Plaintiff, and Plaintiff admits that he did not first tell anyone from Willert that he was a medical marijuana patient until *after* Willert communicated to him that he was terminated. Considering that Willert had no knowledge of Plaintiff's alleged status as a patient certified to use medical marijuana before it terminated him, Plaintiff cannot establish that Willert terminated or retaliated against him on the basis of his alleged status as an individual certified to use medical marijuana in violation of the MMA.

Additionally, even if Plaintiff could establish that Willert terminated him based on his status as an individual certified to use medical marijuana, Plaintiff cannot establish that it was the *sole* reason for Plaintiff's termination, which is fatal to Plaintiff's MMA claim. Rather, Plaintiff's termination was also motivated by the job performance issues Plaintiff exhibited in the two weeks he worked for Willert.

Finally, Willert's termination of Plaintiff did not violate the MMA because the prohibitions set forth in Section 10231.510 of the MMA apply since Plaintiff operated or was in physical control of "chemicals which require a permit issued by the Federal Government or a state government or any agency of the Federal Government or a state government," as well as "high-voltage electricity"

in his role as Willert's Maintenance Manager. Plaintiff's Motion for Partial Summary Judgment should, therefore, be denied.

**I.      COUNTER-STATEMENT OF FACTS**

Willert incorporates by reference its Response to Plaintiff's Statement of Undisputed Material Facts and Counter-Statement of Material Facts in Opposition to Plaintiff's Motion for Partial Summary Judgment.

**II.     STATEMENT OF QUESTIONS INVOLVED**

**1.**     Should Plaintiff's Motion for Partial Summary Judgment be denied since Plaintiff cannot establish that Willert terminated Plaintiff on the basis of his alleged status as an individual certified to use medical marijuana?

*Suggested Answer:    Yes.*

**2.**     Should Plaintiff's Motion for Partial Summary Judgment be denied since Plaintiff cannot establish that Willert terminated Plaintiff *solely* on the basis of his status as an individual certified to use medical marijuana?

*Suggested Answer:    Yes.*

**3.**     Should Plaintiff's Motion for Partial Summary Judgment be denied since Plaintiff operated or was in physical control of "chemicals which require a permit issued by the Federal Government or a state government or any agency of the Federal Government or a state government," as well as "high-voltage electricity" in his role as Willert's Maintenance Manager?

*Suggested Answer:    Yes.*

**III.    ARGUMENT**

    **A.      Standard of Review**

"Summary judgment is only appropriate when 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law.'" Orvosh v. Program of Grp., Ins. For Salaried Emps. of Volkswagen of Am., Inc., 222 F.3d 123, 129 (3d Cir. 2000) (quoting Fed. R. Civ. P. 56(c)).  "An issue of fact is 'genuine' if 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" Robert W. Mauthe, M.D., P.C. v. MCMC LLC, 387 F.Supp.3d 551, 559 (E.D. Pa. 2019) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)).  "A fact is 'material' if it 'might affect the outcome of the suit under the governing law.'" Mauthe, 387 F.Supp.3d at 559 (quoting Anderson, 477 U.S. at 248).

"In considering a motion for summary judgment, a district court may not make credibility determinations or engage in any weighing of the evidence; instead, the non-moving party's evidence 'is to be believed and all justifiable inferences are to be drawn in his favor.'" Marino v. Indus. Crating Co., 358 F.3d 241, 247 (3d Cir. 2004) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)).  "The party moving for summary judgment bears the burden of showing the absence of a genuine issue as to any material fact." Chladni v. Univ. of Phoenix, Inc., No. 5:15-CV-4453, 2016 WL 6600045, at *2 (E.D. Pa. Nov. 7, 2016) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986)).  Plaintiff falls far short of that burden here.

> **B. Plaintiff's Motion for Partial Summary Judgment Should Be Denied because Plaintiff Cannot Establish that Willert Terminated, Discriminated, or Otherwise Retaliated Against Plaintiff Solely on the Basis of Plaintiff's Status as an <u>Individual Certified to Use Medical Marijuana.</u>**
>
>> **1.** *Willert Did Not Base Its Decision to Terminate Plaintiff on His Alleged Status as an Individual Certified to Use Medical Marijuana.*

Section 2103(b)(1) of the MMA provides that

> [n]o employer may discharge, threaten, refuse to hire or otherwise discriminate or retaliate against any employee regarding an employee's compensation, terms, conditions, location or privileges solely on the basis of such employee's status as an individual who is certified to use medical marijuana.

35 P.S. § 10231.2103(b)(1).

The Superior Court of Pennsylvania only just recently acknowledged an employee's private right of action under the MMA. In Palmiter v. Commonwealth Health Systems, the Superior Court of Pennsylvania held that an employee could maintain a private right of action for alleged discrimination in violation of the MMA. See Palmiter v. Commonwealth Health Systems, 2021 PA Super 159 (Aug. 10, 2021).

Neither the Palmiter Court nor any other court in Pennsylvania has set forth the elements a plaintiff must establish to prove an MMA case. See Palmiter, 2021 PA Super 159. The plain language of Section 2103(b)(1) of the MMA, however, suggests that there must be a causal connection between an alleged adverse employment action and the plaintiff's status as an individual who is certified to use medical marijuana. Such connection is lacking here.

Plaintiff argues that Willert discriminated against him in violation of the MMA when it terminated him. (See Ex. A, Pl.'s Compl. at 23-26.) However, no one from Willert knew that Plaintiff was a medical marijuana patient before the decision to terminate Plaintiff was made. (See Def.'s Counter-Statement of Undisputed Material Facts ("Def.'s Counter-Stmt.") at 84.) Plaintiff was advised in the letter sent to him by Willert offering him the Maintenance Manager position that his employment with Willert was contingent upon his successful completion of a drug screen. (See Def.'s Counter-Stmt. at 78-79.) Yet, Plaintiff did not tell anyone from Willert that he was a medical marijuana patient until *after* he was terminated. (See id. at 81 and 91-98.)

5

Since no one from Willert knew that Plaintiff was a medical marijuana patient before he was terminated, Willert's termination of Plaintiff could not have been based on Plaintiff's alleged status as an individual certified to use medical marijuana. Plaintiff's admission that no one from Willert knew that he was a medical marijuana patient before he was terminated renders him incapable of establishing the causation element of his MMA claim. See Watson v. Pennsylvania, Dept's of Revenue, 854 F. App'x 440, 443 (3d Cir. 2021) ("Without *any* evidence of the decisionmaker's knowledge of [the plaintiff's] protected conduct, [the plaintiff] cannot establish a causal connection between the protected activity and his termination."); Warfield v. SEPTA, 460 F. App'x 127, 132 (3d Cir. 2012) ("Knowledge of an employee's protected conduct is an essential element of establishing a causal connection.") (citing Clark County Sch. Dist. v. Breeden, 532 U.S. 268, 273, 121 S.Ct. 1508, 149 L.Ed.2d 509 (2001)); 1 Summ. Pa. Jur.2d Torts § 12:77 (2d ed.) ("An employee cannot establish a causal connection between the employee's protected activity and the employer's adverse employment action, as element for *prima facie* case of retaliation in violation of the [PHRA] without some evidence that the individuals responsible for the adverse action knew of the employee's protected conduct at the time they acted.") (citing Power v. Lockheed Martin Corp., 419 F. Supp. 3d 878, 898 (E.D. Pa. 2020)). Because Plaintiff cannot establish this essential element of an MMA claim, Plaintiff's Motion for Partial Summary Judgment should be denied.

>  **2.   *Plaintiff's Poor Job Performance Contributed to Willert's Decision to Terminate Him and Not to Revoke the Termination After Learning that Plaintiff Used Medical Marijuana.***

Even if Willert's decision to terminate Plaintiff was based on his status as an individual certified to use medical marijuana (which it was not as set forth above), Plaintiff's MMA claim

6

would still fail because the decision would not have been *solely* based on his status as an individual certified to use medical marijuana.

In the first and only two weeks he worked at Willert, Plaintiff already had attendance problems. (See Def.'s Counter-Stmt. at 57-64.) Plaintiff arrived to work late and missed entire days. (See id. at 58.) Willert's Human Resources Manager explained that Plaintiff's attendance problems were particularly troubling because "[w]hen you are having attendance issues within your first month, those are red – that's a huge red flag." (See id. at 65.)

Plaintiff's subordinates complained that they never knew where Plaintiff was and that Plaintiff never communicated with his team. (See Willert's Opposition to Plaintiff's Statement of Undisputed Material Facts ("Opp'n to Pl.'s Statement) at 8.) Indeed, Mr. Bonsky gave Plaintiff an oral warning due to his lack of communication, explaining that "he had to let his people know where he is because that was their complaint." (See id.)

Willert also questioned the level of Plaintiff's electrical knowledge. Mr. Bonsky testified as follows:

> Q. Overall, how would you describe his abilities as a maintenance manager?
>
> A. Below average.
>
> Q. On what basis do you say that?
>
> A. I guess I can give you an example. I was with Bryan Willert on our line 13, and there's a discussion about something electrical. I don't recall exactly what it was, but Bryan and I later talked, and it's like Matt doesn't really seem to understand. It's something he should have understood. Again, I don't even recall what the electrical thing was and, of course, his attendance wasn't good.

(See Opp'n to Pl's Statement at 8.)

Finally, Willert questioned Plaintiff's conduct with regard to masking during COVID. Specifically, Plaintiff worked on the shop floor with a leather mask with nose holes in it. (See Opp'n to Pl.'s Statement at 8). When Mr. Bonsky asked Plaintiff to wear a proper face mask, Plaintiff initially respond that "they don't work anyway, because they aren't N95 masks." (See id.) Plaintiff then later agreed to change his face mask. (See id.)

Both Jack Bonsky and Tammy Gillette explained during their depositions in this matter that these performance issues contributed to Plaintiff's termination. (See Def.'s Counter-Stmt. at 65.) When asked if there was anything stopping Ms. Gillette from revoking Plaintiff's termination after he disclosed that he was a medical marijuana patient following his termination, Ms. Gillette testified as follows:

> Q. Was there anything stopping you from revoking the termination?
>
> A. No, because that was not – that's what brought everything to a head, but that was not the only item of consideration that led to the termination.
>
> Q. What other items led to the termination?
>
> A. Well, from my understanding – actually, what I knew was there had been some attendance issues with Mr. Reynolds, either arriving late or not arriving at all, taking items home with him that he was not supposed to take with him and there was an item that – I don't know the specific circumstances – but he either took something home or had something that was going to be needed at the plant and he didn't drop it off until after the shift was over and, you know, he said he wouldn't be there. He acknowledged that he whatever it was that was needed and said he would drop it off sometime and it wasn't dropped off until later. Those are the issues that I was made aware of. I know that Mr. Bonsky and Mr. Willert actually had other conversations about other issues that I don't – I don't know the specifics of those and so I'm not going to speak to those.

(See Def's Counter-Stmt. at 65.)

When pressed about whether Willert would have terminated Plaintiff on November 5, 2020 had he not failed his drug screen, Ms. Gillette reiterated that Plaintiff's performance issues would have ultimately led to his termination, explaining as follows:

> Q. Had he not failed the drug test, would you have fired him November 5, 2020?
>
> A. I don't know. The reason I say that is because you put in there – in your question November 5th, and I know that there were issues. Would a termination have happened on November 5th, would it have happened November 6th, the next week – I'm not sure, but I do know that because of the issues, it would have led to termination.

(See Def.'s Counter-Stmt. at 65.)

The plain language of the MMA makes clear that in order to prevail on his MMA claim, Plaintiff must establish that his status as an individual certified to use medical marijuana was the *sole* reason for his termination. See 35 P.S. § 10231.2103(b)(1). Plaintiff cannot do so here. As a result, Plaintiff's MMA claim fails and his Motion for Partial Summary Judgment should be denied.

### C. Plaintiff's MMA Claim Fails Because the Prohibitions Set Forth in Section 10231.510 of the MMA Apply.

The MMA provides, in pertinent part:

> The following prohibitions shall apply:
>
> (1) A patient may not operate or be in physical control of any of the following while under the influence with a blood content of more than 10 nanograms of active tetrahydrocannabis per milliliter of blood in serum:
>
> > (i) Chemicals which require a permit issued by the Federal Government or a state government or an agency of the Federal Government or a state government.
> >
> > (ii) High-voltage electricity or any other public utility.

35 P.S. § 10231.510.

The MMA does not define key terms in the above-referenced provision.  Specifically, the MMA fails to define "operate," "control," or "high-voltage electricity."  Plaintiff argues in his Motion that "in interpreting a statute, 'it is permissible to use a dictionary to determine a term's plain meaning."  See Doc. No. 27 at p. 21 (citing Berckley Invest. Group, Ltd. v. Colkitt, 259 F.2d 135, 142-43 n.7 (3d Cir. 2001); Lawrence v. City of Phila., 527 F.3d 299, 317 (3d Cir. 2008)).  Plaintiff further argues that "Pennsylvania courts have held that in determining the common and approved usage or meaning of undefined statutory terms, courts may turn to standard dictionary definitions."  See Doc. No. 27 at pp. 22-23 (citing Marcellus Shale Coal v. Dep't of Envtl. Prot. of Pa., 193 A.3d 447, 472 (Pa. Commw. Ct. 2018) (citing Sugarhouse HSP Gaming, L.P. v. Pennsylvania Gaming Control Board, 640 Pa. 169, 162 A.3d 353, 376 (Pa. 2017) and In re Beyer, 631 Pa. 612, 115 A.3d 835, 839 (Pa. 2015)).

The "dictionary definition" of each of those terms[1], as set forth by Merriam-Webster, is as follows:

- "operate":  "to perform a function: exert power or influence."  *Operate*, Merriam-Webster, https://www.merriam-webster.com/dictionary/operate, accessed 20 Sep. 2021.

- "control":  "to have power over (something)."  *Control,* Merriam-Webster https://www.merriam-webster.com/dictionary/control, accessed 20 Sep. 2021.

- "high-voltage":  "marked by great energy: electric, dynamic."  *High-voltage*, Merriam-Webster, https://www.merriam-webster.com/dictionary/control, accessed 20 Sep. 2021.

Application of the above definitions to Plaintiff's job duties at Willert compels the conclusion that Section 10231.510 applies here.

---

[1]   For the term "control," the below-stated definition is the second definition for "control" listed by Merriam-Webster, rather than the first, as the first definition refers to control over people or animals, as opposed to things.

1. *As Maintenance Manager, Plaintiff Operated or Was in Physical Control of Chemicals that Required "a permit issued by the Federal Government or a state government or an agency of the Federal Government or a state government."*

Contrary to Plaintiff's arguments, the record in this matter is clear that Willert had chemicals at the Douglassville Facility that required a permit issued by the Federal Government or a state government or an agency of the Federal Government or a state government during the time that Plaintiff worked there. Plaintiff testified at his deposition in this matter that he understood when he took the job at Willert, that Willert was "making two or three products there [at the Douglassville Facility] at a time" and that making those products involved the mixing of chemicals. (See Def.'s Counter-Stmt. at 5-6.) Mr. Bonsky explained at his deposition in this matter that Willert had chemicals at its facility that required registration with the state. (See id. at 25.) Willert's engineering expert, Bryan O'Donel, P.E., also explained in his expert report that the Douglassville Facility "contains chemicals some listed (EPA List of Lists), some hazardous, all requiring workplaces safety by alert employees using good judgment [sic]." (See id.)

Additionally, in the Declaration submitted by Bryan Willert in opposition to this Motion, Mr. Willert attests to the fact that "Specific Specially Denatured Alcohol/Rum Conditions" was present at the Douglassville Facility and used during the time that Plaintiff worked for Willert. (See Def.'s Counter-Stmt. at 29.) Willert is required to have an "Industrial Alcohol User Permit" issued by the United States Department of the Treasury Alcohol and Tobacco Tax and Trade Bureau for the "Specific Specially Denatured Alcohol/Rum Conditions," which Willert had during the time that Plaintiff worked for Willert (See id. at 30-31.) Accordingly, Plaintiff's claim that Willert has no evidence that it had chemicals that required permits is directly contradicted by the record, which establishes just the opposite.

11

Moreover, as the Maintenance Manager, Plaintiff performed functions and exerted power and influence over these chemicals. As the Maintenance Manager, Plaintiff was responsible for supervising maintenance technicians on all shifts. (See Def.'s Counter-Stmt. at 23.) Plaintiff was responsible for overseeing the maintenance and repair of various machines and power equipment associated with all parts of production of liquid film manufacturing. (See Def.'s Counter-Stmt. at 7-9.) This included, inter *alia*, bulk storage tanks measuring ten to fifteen feet high and six feet wide, which held chemical mixtures. (See id. at 32-34.) Indeed, during the short time that Plaintiff worked for Willert, the control system on one of the bulk storage tanks broke and required repair, and it was ultimately Plaintiff's responsibility to make sure that the storage tank was repaired and working again. (See id. at 37-39.)

Mr. O'Donel opines, in pertinent part, that "[t]he Willert Manufacturing Maintenance Manager would be responsible for the maintenance of the plant equipment and processes across 3 shifts, which could expose him and others to numerous recognized hazards including but not limited to . . . EPA listed chemicals being processed on the machines he would be tasked to service and maintain" and "associated chemical wastes." (See Def.'s Counter-Stmt. at 55.) Further, as Maintenance Manager, Plaintiff "would have been in control of many or all of these recognized hazards." (See id. at 55.)

In other words, Plaintiff operated or was in physical control of chemicals that required a permit with a Federal or state government or an agency of the Federal government or a state government while he worked as the Maintenance Manager for Willert. Willert's termination of Plaintiff could not, therefore, have violated the MMA and Plaintiff's Motion should be denied.

### 2. *As Maintenance Manager, Plaintiff Operated or Was in Physical Control of "High-Voltage Electricity."*

In his role as Maintenance Manager, Plaintiff also operated or was in control of "high-voltage electricity." Plaintiff explained during his deposition that most of the machinery for which he was responsible for maintenance and repair was electrically-powered. (See Def.'s Counter-Stmt. at 32, 35, 43, 44.) For example, according to Plaintiff, the storage tanks were powered by 3 phase 480 volts of electricity, the fillers were electronically powered by "likely a 480 distribution into the main panel," and the air compressors were powered by 480 volts of electricity. (See id. at 35, 43, and 44.)

Plaintiff oversaw the maintenance and repair of fillers and air compressors at Willert. (See Def.'s Counter-Stmt. at 40.) It was also ultimately Plaintiff's responsibility to make sure that the storage tanks were repaired and working. (See id. at 38-39.) If an electrically-powered machine required repair, the person performing repairs would need to "lock out" the machine before making the repairs. (See id. at 49.) The person performing those repairs would need to report to Plaintiff and it was Plaintiff's responsibility to enforce proper "lock out, tag out" procedures. (See id. at 48 and 50.)

Plaintiff admitted at his deposition in this matter that 480 volts of electricity can injure and even kill someone. (See id. at 45.) Mr. O'Donel also opines in his expert report that "[t]he Willert Manufacturing facility did contain high voltage switchgear (13,200 Volts) as well as 480 Volt service of high amperage that would cause a fatality, and which could certainly be characterized as 'marked by great energy.'" (See id. at 46.) Further, Plaintiff could have been exposed to these electrical hazards as part of his employment at Willert and, as the Maintenance Manager, "would have been in control of many or all of these recognized hazards." (See id. at 47 and 55-56.)

Plaintiff also operated or was in physical control of high-voltage electricity at Willert, further cementing the applicability of Section 10231.510 under the facts of record here. For this

additional reason, Willert did not violate the MMA when it terminated Plaintiff and Plaintiff's Motion for Partial Summary Judgment should be denied.

### 3. *Plaintiff's Argument that Section 10231.510 Is Not Triggered By Plaintiff's Positive Drug Screen Result Fails.*

Plaintiff seeks to have this Court ignore the hazards associated with the safety-sensitive position Plaintiff held at Willert by arguing that the drug screen Plaintiff failed does not establish the requisite level of *active* THC to trigger Section 10231.510. However, Plaintiff's drug screen results do not mean that Plaintiff did not have active THC in his system during the time that he worked at Willert or that he would not have active THC in his system during working hours if he continued to work at Willert.

Plaintiff testified in this matter that he used medical marijuana approximately twice per week during the time that he worked for Willert. (See Def.'s Counter-Stmt. at 69.) He used medical marijuana if there was a particularly crazy day at work. (See id. at 70.) He also used medical marijuana when he experienced "existential anxiety," and admitted that he experienced some "existential anxiety" while he worked at Willert. (See id. at 71-72.) On each occasion that he used medical marijuana, Plaintiff used "approximately one to five milligrams of THC with a ratio of 10 to 15 milligrams of CBD." (See id. at 73.) Although Plaintiff testified that he typically used medical marijuana in the evening, around 5:00 p.m. or 6:00 p.m., he admitted that he does not know how long the medical marijuana he used stayed in his system after he used it. (See id. at 74-75.) Plaintiff also could not state when he last used marijuana before the drug screen at issue. (See id. at 85.) Plaintiff "likely" used medical marijuana within thirty-six hours prior to the pre-employment drug screen, and it is "possible" that Plaintiff used medical marijuana the night before the drug screen. (See id. at 86.)

At the time of the drug screen, Plaintiff still had anxiety and had not discussed or consulted with a doctor about stopping the use of medical marijuana. (See id. at 106-107.)  Plaintiff then continued to use medical marijuana until May 2021.  (See id. at 108.)

The above-stated facts do not foreclose the possibility that Plaintiff had 10 nanograms of active THC in his system during the time that he worked at Willert or that he might have had 10 nanograms of active THC in his system during any relevant time if he continued to work for Willert.  In short, the drug screen results, alone, are insufficient to preclude Willert from asserting and establishing the prohibitions of Section 10231.510 as a defense to Plaintiff's MMA claim

## IV.   CONCLUSION

For the reasons set forth above, Plaintiff is not entitled to partial summary judgment in this matter and Plaintiff's Motion for Partial Summary Judgment should be denied.

Respectfully submitted this 20th day of September, 2021,

**KAUFMAN DOLOWICH & VOLUCK, LLP**

By:   */s/ Eileen Monaghan Ficaro*
Gregory S. Hyman, Esquire
Eileen Monaghan Ficaro, Esquire
*Attorneys for Defendant,*
*Willert Manufacturing Company, LLC*