**IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| MATTHEW REYNOLDS | : | |
| | : | |
| Plaintiff, | : | Civil Action No. 5:21-cv-01208-JFL |
| | : | |
| v. | : | |
| | : | |
| WILLERT MFG. CO., LLC | : | |
| | : | |
| Defendant. | : | |

**DEFENDANT WILLERT MANUFACTURING COMPANY'S RESPONSE TO PLAINTIFF'S STATEMENT OF UNDISPUTED MATERIAL FACTS AND COUNTER-STATEMENT OF MATERIAL FACTS IN OPPOSITION TO PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT**

Defendant Willert Manufacturing Company ("Willert") responds to Plaintiff's Statement of Undisputed Material Facts and submits the following Counter-Statement of Material Facts in opposition to Plaintiff's Motion for Partial Summary Judgment as follows:

1. Admitted in part and denied in part. It is admitted only that Plaintiff alleges that he was a medical marijuana patient at all times relevant to this action.

2. Denied. See Pl.'s Mot. for Partial Summ. J. at Ex. 2.

3. This allegation refers to a document, the terms of which speak for itself. Willert denies all mischaracterizations or misstatements of the document.

4. Denied. Willert currently lacks knowledge or information sufficient to admit or deny this allegation, which is therefore denied.

5. Denied. See Pl.'s Mot. for Partial Summ. J. at Ex. 2.

6. Admitted in part and denied in part. It is admitted only that on October 15, 2020, Willert offered Plaintiff the position of Maintenance Manager. See Pl.'s Mot. for Summ. J. at Ex.

6. It is denied that Willert described the position as "overtime-exempt" in the October 15, 2020 offer letter (the "Offer Letter") it sent to Plaintiff. See id.

7. Admitted in part and denied in part. It is admitted Plaintiff held the role of Maintenance Manager at Willert from October 16, 2020 through November 15, 2020. It is denied that Willert described the position as "overtime-exempt Maintenance Manager." See id.

8. Admitted in part and denied in part. It is admitted only that Plaintiff was not placed on a performance improvement plan during the approximately two-week period of time he worked for Willert. It is denied that Willert "is without evidence that, during this period, it gave Plaintiff negative performance reviews or evaluations, reprimands, or coachings to remediated performance deficiencies." Plaintiff's supervisor at Willert, Jack Bonsky, testified at his deposition in this matter about his coaching of Plaintiff and discussion with Plaintiff regarding Plaintiff's performance deficiencies. See Ex. A, Bonsky Dep. at 15:2 – 17:7 and 67:16 – 74:23. Mr. Bonsky explained that Plaintiff's subordinates were not pleased with his job performance. See Ex. A at 16:17-24. Their major complaint was that they never knew where Plaintiff was. Id. Plaintiff would work late and would work different hours. Id. Plaintiff "just never communicated with his team and they didn't like that." Id. As a result, Mr. Bonsky provided Plaintiff an oral warning that "he had to let his people know where he is because that was their complaint." Id. at 67:16-22. Mr. Bonsky also coached Plaintiff about the fact that he arrived at work late and missed entire days of work in the two weeks that he worked for Willert. See id. at 70:3 – 74:16. Mr. Bonsky further testified to discussing the following incident with Plaintiff:

> Q. Other than the instance in which you told him you got to let your people know where you are, did you ever have any other conversations with him that might have been perceived as a performance deficiency?
>
> A. Yes.

Q. What was that?

A. He – we do a – he came onto the shop floor – this is during COVID and masking – and he was on the shop floor with a leather mask, which I don't care about, but it had nose holes in it so it wouldn't – with the nose holes it wasn't doing what face masks were supposed to do, so I asked him to put on a proper one. First thing he says, well – well, they don't work anyway, because they aren't N95 masks then – you know, 30 second later he says, well, I'll change it.

See Ex. A at 69:4-21.

Mr. Bonsky described Plaintiff's ability as a maintenance manager as "below average."

See Ex. A at 70:3-15. He testified as follows:

Q. Overall, how would you describe his abilities as a maintenance manager?

A. Below average.

Q. On what basis do you say that?

A. I guess I can give you an example. I was with Bryan Willert on our line 13, and there's a discussion about something electrical. I don't recall exactly what it was, but Bryan and I later talked, and it's like Matt doesn't really seem to understand. It's something he should have understood. Again, I don't even recall what the electrical thing was and, of course, his attendance wasn't good.

See Ex. B, Bonsky Dep. at 70:3-15.

9. Admitted. By way of further response, Plaintiff's job responsibilities also included the tasks identified in Willert's Counter-Statement of Material Facts, which is incorporated herein by reference.

10. Denied. Mr. Bonsky testified at his deposition as follows:

Q. When you say maintaining and repairing machines, you're referring to overseeing his subordinates repair them?

A. That and he – he would – would work on machines himself, as well, either with his subordinates or alone.

Q. What machines would he work on?

> A. What I remember – I remember – I can't recall specifically, but he used to carry a little – like a fanny pack kind of thing, but not really – I think it was on his belt, but he used to carry tools with him and gloves, and I know he got his hands dirty. I just can't recall exactly what he's worked on.
>
> Q. Did you ever see him working on machines?
>
> A. I probably did. I can't think of a specific instance.

See Ex. A, Bonsky Dep. at 62:9 – 63:2. By way of further response, Plaintiff admitted at his deposition in this matter that while working for Willert, Plaintiff removed the motor from a piece of machinery referred to as the "bottle scrambler." See Ex. B, Pl.'s Dep. at 201:16 – 202:2.

11. Denied. See Pl.'s Mot. for Partial Summ. J. at Ex. 2.

12. Admitted in part and denied in part. It is admitted only

13. Admitted.

14. Admitted.

15. Admitted in part and denied in part. It is admitted only that Willert does not use equipment at or in excess of 115,000 volts. It is denied that all electrical equipment with voltage in excess of 601 volts was maintained by non-Willert employees. Willert incorporates by reference Paragraphs 8-23 and 35-54 of its Counter-Statement of Material Facts.

16. Denied. Willert incorporates by reference the facts set forth in its Counter-Statement of Undisputed Material Facts.

17. Denied. Willert incorporates by reference the facts set forth in its Counter-Statement of Undisputed Material Facts.

18. Denied. By way of further response, Mr. Bonsky testified at his deposition that Plaintiff would have been expected to work at heights. See Ex. A at 63:12-14.

19. Denied. Plaintiff's deposition testimony in this matter creates a question as to whether Plaintiff ever used medical marijuana within eight (8) hours of a shift or during working

hours.  Specifically, although he testified at his deposition in this matter that he "typically" used medical marijuana "in the evening," he admitted that he does not know how long medical marijuana stayed in his system after he used it.  See Ex. B at 140:3-15.  Further, Plaintiff could not state when he last used medical marijuana before he took the drug screen for his employment with Willert.  See Ex. B at 144:1-14.  He likely used medical marijuana "within 36 hours prior" and it is "possible" that he used medical marijuana the night before the drug screen.  See id.

20. Admitted.

21. Denied.  Plaintiff's drug screen was originally scheduled for October 27, 2020.  See Ex. B at 144:15 – 148:23.  However, Plaintiff missed the October 27, 2020 appointment because he "was having so much fun" at work.  See id.  As a result, Plaintiff ultimately underwent the drug screen on October 28, 2020.  See Ex. B at 144:15-19.

22. Admitted in part and denied in part.  It is admitted only that the drugs Plaintiff was tested for included "D-THC-Marijuana Metabolite 50/15."  See Pl.'s Mot. for Summ. J. at Ex. 9.  It is denied that this means that Plaintiff did not have a blood content of more than 10 nanograms of active THC per milliliter of blood in serum on October 28, 2020, or at any relevant time.  Indeed, Plaintiff admitted at his deposition that he does not know how long medical marijuana stayed in his system after he used it.  See Ex. B at 140:3-15.

23. Denied.  The pertinent portion of the Drug Screen Results Letter reads: "D-THC-Marijuana Metabolite 50/15 – Positive."  See Pl.'s Mot. for Summ. J. at Ex. 9.

24. Admitted in part and denied in part.  It is admitted only that the results of the Drug Screen were relayed to Willert on or after November 3, 2020.  It is admitted that the Drug Screen is the "sole source of knowledge that Plaintiff had any amount of THC in his system."  See Pl.'s Mot. for Summ. J. at Ex. 2, at 10.

25. Denied. Mr. Bonsky did not inform Plaintiff that "he was being fired because of the presence of marijuana in his system." Rather, Mr. Bonsky read a copy of the termination letter attached as Exhibit 8 to Plaintiff's Motion for Partial Summary Judgment ("Termination Letter"). See Ex. A, Bonsky Dep. at 79:11-80:5.

26. The Termination Letter is a document, the terms of which speak for itself. Willert denies all mischaracterizations or misstatements of the Termination Letter. See Pl.'s Mot. for Summ. J. at Ex. 8. By way of further response, Mr. Bonsky coached and/or discussed with Plaintiff his performance issues related to lack of communication with his team, his attendance issues, and the fact that he wore an inappropriate face mask to work. See Ex. A at 67:16-22, 69:4-21, and 70:3 – 74:16.

27. The Termination Letter is a document, the terms of which speak for itself. Willert denies all mischaracterizations or misstatements of the Termination Letter. See Pl.'s Mot. for Summ. J. at Ex. 8.

28. Denied. It is denied that Plaintiff "asked Mr. Bonsky to reconsider this decision because he was a medical marijuana patient." By way of further response, after Mr. Bonsky read the Termination Letter to Plaintiff, Plaintiff informed Mr. Bonsky for the first time that he had a medical marijuana card. See Ex. A at 79:11 – 80:24.

29. Denied. Willert incorporates by reference its Counter-Statement of Material Facts.

30. Denied as a conclusion of law to which no response is required.

31. Denied. Willert did not acquire the Douglassville Facility until 2019. See Ex. C, Gillette Dep. at 43:5-14. Willert's Human Resources Manager, Tammy Gillette, testified at her deposition in this matter that although updating Willert's policies was her "major goal" for 2019,

"[o]nce COVID happened, everything changed" for her and her attention shifted to ensuring that she kept the Willert employees safe and protecting them from COVID. See Ex. C at 43:15 – 44:18.

32. Denied. Willert incorporates by reference the facts set forth in its Counter-Statement of Material Facts.

33. Denied. Willert incorporates by reference the facts set forth in its Counter-Statement of Material Facts.

34. Denied. Willert incorporates by reference the facts set forth in its Counter-Statement of Material Facts.

35. Denied. Willert incorporates by reference the facts set forth in its Counter-Statement of Material Facts.

**COUNTER-STATEMENT OF MATERIAL FACTS**

Defendant Willert Manufacturing Company submits the following Counter-Statement of Undisputed Material Facts in opposition to Plaintiff's Motion for Partial Summary Judgment in this matter:

**A. Plaintiff worked for Willert as a Maintenance Manager for two weeks.**

1. From October 16, 2020 through November 5, 2020, Plaintiff worked for Willert as the Maintenance Manager of its Douglassville, PA facility. See Ex. D, Compl. at 15; Ex. B, Offer Letter.

2. On October 15, 2020, Willert sent correspondence to Plaintiff offering him the position of Maintenance Manager at Willert's Douglassville, PA facility (the "Offer Letter"). See Ex. B, Pl.'s Dep. at 162:10 – 163:21.

3. Plaintiff read and signed the Offer Letter. See Ex. B at 169:9-20.

4. Plaintiff worked at Willert's Douglassville, PA facility. See Ex. B at 158:18-24.

5. When he took the job at Willert, Plaintiff understood that Willert was "making two or three products there at the time," such as Ty-D-Bowl See Ex. B at 154:8 – 155:2.

6. Making those products involved the mixing of chemicals. See Ex. B at 155:3 – 15.

7. The Maintenance Manager "is in charge of the facility. . . . taking care of the office plumbing and all that kind of stuff, responsible for the machines, of maintaining them, repairing them, leading the installation of new equipment, ordering things that are required for the plant to maintain it, making sure we have critical spare parts." See Ex. A at 61:20 – 62:22.

8. As the Maintenance Manager at Willert, Plaintiff's job responsibilities included "[s]afety, making sure my employees left the same way they came in. And equipment up time, ensuring that my employees supported production and keep the place running." See Ex. B at 171:23 – 172:4.

9. Plaintiff's job responsibilities included overseeing the repairs and installations and upkeep of various machines and power equipment associated with al parts of the production of liquid film manufacturing. See Ex. B at 172:16 – 173:2.

10. Plaintiff's job responsibilities included designing maintenance procedures, tracking budgets and expenses and performing inspections on different machines and equipment to find problems and make repairs or replace as needed. See Ex. B at 173:3-15.

11. Plaintiff's job responsibilities included communicating directly with the production manager and general manager to coordinate maintenance and repair work in process areas. See Ex. B at 174:21 – 175:2.

12. Plaintiff's job responsibilities included assisting the planning and implementing plant improvements and expansions. See Ex. B at 175:24 – 176:4.

13. Plaintiff's job responsibilities included maintaining, updating, operating training manuals for the maintenance department. See Ex. B at 176:11-15.

14. Plaintiff's job responsibilities included ensuring that all maintenance technicians were trained on the most updated version of the operating procedures. See Ex. B at 176:16-23.

15. Plaintiff's job responsibilities included reviewing the operation of plant equipment and systems constantly to minimize unplanned downtime, anticipate and solve problems in a timely manner and to identify opportunities for improvement. See Ex. B at 177:8-14.

16. Plaintiff's job responsibilities included making sure that maintenance and repair of the maintenance shop equipment happened. See Ex. B at 177:15 – 178:2.

17. Plaintiff's job responsibilities included ensuring that maintenance technicians are equipment trained, equipped and motivated so that the maintenance program could be accomplished in a safe, timely and cost-effective manner. See Ex. B at 179:5-11.

18. Plaintiff's job responsibilities included communicating regularly with all maintenance technicians both individually and as a group to ensure good two-way communication concerning maintenance issues. See Ex. B at 179:12-18.

19. Plaintiff's job responsibilities included initiating and carrying out projects that improve efficiency and/or reduce operating costs. See Ex. B at 180:2-6.

20. Plaintiff's job responsibilities included maintaining safety, health and environment policies and procedures. See Ex. B at 180:14-18.

21. Plaintiff's job responsibilities included ensuring that city, county and state and federal regulations relating to the maintenance department were met at all times. See Ex. B at 180:19-24.

22. Plaintiff's job responsibilities included initiating, implementing, and managing the plant maintenance program with an emphasis on planning, scheduling and preventative predictive maintenance. See Ex. B at 181:8-13.

23. Plaintiff was responsible for supervising maintenance technicians on all shifts. See Ex. B at 181:20 – 182:7.

24. Plaintiff wore personal protective equipment at Willert, including steel toe boots, safety glasses, and ear plugs. See Ex. B at 184:19 – 185:2.

25. Willert has chemicals at the Douglassville Facility that require registration with the state. See Ex. A at 82:13 – 83:3; Ex. E, O'Donel Report at p. 2[1] and p. 10[2].

26. Willert also has chemicals at the Douglassville Facility that required permit from the Federal Government or an agency thereof. See Ex. F, Willert Decl.

27. Specifically, at the Douglassville Facility, Willert manufactures several household products. See Ex. F at ¶ 3.

28. The manufacture of some of those products involves the use of "Specific Specially Denatured Alcohol/Rum Conditions." See Ex. F at ¶ 4.

29. "Specific Specially Denatured Alcohol/Rum Conditions" was present at the Douglassville Facility and used during the time Plaintiff worked for Willert. See Ex. F at ¶ 6.

30. Willert is required to have an "Industrial Alcohol User Permit" issued by the United States Department of the Treasury Alcohol and Tobacco Tax and Trade Bureau for the "Specific Specially Denatured Alochol/Rum Conditions." See Ex. F at ¶ 5.

---

[1] "The facility also stores and processes listed chemicals (ie corrosion hazards) as well as hazardous wastes." Ex. E.
[2] "The facility contains chemicals some listed (EPA List of Lists), some hazardous, all requiring workplace safety by alert employees using good judgement [sic]." Ex. E.

31. Willert had an "Industrial Alcohol User Permit" for the "Specific Specially Denatured Alcohol/Rum Conditions" during the time that Plaintiff worked for Willert. See Ex. F at ¶ 7.

32. The type of machinery at Willert while Plaintiff worked there included injection molding machines, filling machines, and bulk storage tanks to hold water and chemical mixtures. See Ex. B at 185:10-17.

33. The storage tanks were part of the equipment that the maintenance team was tasked with maintaining and repairing when necessary. See Ex. B at 186:18-21.

34. Plaintiff estimates that the bulk storage tanks were ten to fifteen feet high and six feet wide. See Ex. B at 185:18 – 186:1.

35. The storage tanks were electronically powered by 3 phase 480 volts of electricity. See Ex. B at 196:5-11.

36. A mixer was located on top of the storage tanks and a pump was located on the bottom. See Ex. B at 197:8-12.

37. If a mixer or pump broke, it was ultimately Plaintiff's responsibility as the Maintenance Manager to ensure that they were repaired. See Ex. B at 197:13 – 198:13.

38. During Plaintiff's time at Willert, the control system on one of the bulk storage tanks broke and required repair. See Ex. B at 187:10 – 190:5.

39. It was ultimately Plaintiff's responsibility to make sure that the storage tank was repaired and working again. See Ex. B at 190:2-5.

40. Plaintiff oversaw the maintenance and repair of fillers and air compressors at Willert. See Ex. B at 193:7-20; 197:2-7; 198:14-18.

41. Plaintiff described the fillers as "a long sequence of machines kind of lined up together," measuring approximately fifty to seventy-five feet long and approximately three or four feet high. Plaintiff's job responsibilities included enforcing proper "lock out, tag out" procedures. See Ex. B at 199:9-19.

42. The fillers injected liquid chemicals into bottles. See Ex. B at 195:4-18.

43. The fillers were electronically powered by "likely a 480 distribution into the main panel. And then it could be stepped down from there. Some equipment needs smaller voltages. So it's distributed from the local panel at the machine." See Ex. B at 196:12-21.

44. The air compressors were powered by 480 volts of electricity. See Ex. B at 196:22 – 197:1.

45. Plaintiff acknowledged at his deposition that 480 volts of electricity can injure and even kill someone. See Ex. B at 197:2-7.

46. According Willert's expert engineer, Brian O'Donel, P.E., "[t]he Willert Manufacturing facility did contain high voltage switchgear (13,200 Volts) as well as 480 Volt service of high amperage that would cause a fatality, and which could certainly be characterized as 'marked by great energy'." See Ex. E, O'Donel Report at pp. 8-9.

47. Mr. O'Donel further opines that Plaintiff "could have been exposed to these electrical hazards as part of employment at Willert Manufacturing." See Ex. E at pp. 8-9.

48. Plaintiff's job responsibilities included enforcing proper "lock out, tag out" procedures. See Ex. B at 191:3-15.

49. Plaintiff explained at his deposition that if an electronically-powered machine required repair, the person performing repairs would need to "lock out" the machine before making the repairs. See Ex. B at 192:13-18.

50. The person performing those repairs would need to report to Plaintiff. See Ex. B at 192:13-22.

51. Further, Plaintiff himself performed work on machinery while he worked for Willert. See Ex. B at 200:17 – 201:3.

52. Specifically, Plaintiff reports that he expedited parts for a machine he referred to as the "bottle scrambler." See Ex. B at 200:17 – 201:3.

53. The "bottle scrambler" was powered by "probably 480, 3 phase" volts of electricity. See Ex. B at 201:12-15.

54. In order to determine what parts needed to be ordered, Plaintiff removed the motor from the "bottle scrambler." See Ex. B at 201:16 – 202:2.

55. Mr. O'Donel opines that "[t]he Willert Manufacturing Maintenance Manager would be responsible for the maintenance of the plant equipment and processes across 3 shifts, which could expose him and others to numerous recognized hazards including but not limited to high voltage, electrical energy capable of electrocution, EPA listed chemicals being processed on the machines he would be tasked to service and maintain, associated chemical wastes, thermal hazards and machine hazards." See Ex. E at p. 11.

56. Further, as the Maintenance Manager, Plaintiff "would have been in control of many or all of these recognized hazards." See Ex. E at p. 12.

**B. Plaintiff Had Job Performance Issues at Willert.**

57. During the two weeks that Plaintiff worked at Willert, he had attendance issues. See Ex. A at 70:22 – 74:11; Ex. C at 60:12 – 63:10.

58. Plaintiff arrived to work late and missed entire days. See Ex. A at 70:22 – 71:11.

59. Plaintiff's subordinates also complained that they never knew where he was and that Plaintiff never communicated with his team. See Ex. A at 16:17-24.

60. Mr. Bonsky described Plaintiff's abilities as a maintenance manager as "below average." See Ex. A at 70:3-5.

61. By way of example, Mr. Bonsky recalls a discussion concerning something electrical associated with line 13 at the Douglassville Facility during which Plaintiff did not seem understand the issue. See Ex. A at 70:3-15.

62. During the time of COVID and masking, Plaintiff also worked on the shop floor with a leather mask with nose holes in it. See Ex. A at 69:4-21.

63. When Mr. Bonsky asked Plaintiff to wear a proper face mask, Plaintiff initially responded "they don't work anyway, because they aren't N95 masks." See id.

64. Plaintiff then later agreed to change his face mask. See id.

65. Plaintiff's job performance issues contributed to his termination. See Ex. C at 60:12 – 63:10; Ex. B at 87:1-8.

**C. Plaintiff Used Medical Marijuana.**

66. Before he began working for Willert, Plaintiff was allegedly diagnosed with severe anxiety disorder. See Ex. D at 17.

67. Plaintiff further alleges that he was prescribed a course of medical marijuana treatment to manage the systems of his anxiety. See Ex. D at 18.

68. Between July 2020 and May 2021, Plaintiff used medical marijuana five to seven times per week. See Ex. B at 138:5-17.

69. During the two weeks that he worked at Willert, Plaintiff used medical marijuana approximately twice per week. See Ex. B at 215:21-24.

70. He used medical marijuana if there was a particularly crazy day at work. See Ex. B at 216:1-4.

71. Plaintiff experienced some "existential anxiety" during the two weeks he worked at Willert. See Ex. B at 9-12.

72. On those occasions when he experienced "existential anxiety," Plaintiff used medical marijuana. See Ex. B at 216:9-17.

73. On each occasion that he used medical marijuana, Plaintiff used "approximately one to five milligrams of THC with a ratio of 10 to 15 milligrams of CBD." See Ex. B at 138:18 – 139:1.

74. Plaintiff typically used medical marijuana in the evening, around 5:00 p.m. or 6:00 p.m. See Ex. B at 140:7-15.

75. Plaintiff does not know how long the medical marijuana he used stayed in his system after he used it. See Ex. B at 140:3-6.

76. When Plaintiff used medical marijuana, he used it in the form of tinctures or extracts. See Ex. B at 135:13-22.

77. Plaintiff testified that after he used medical marijuana, it did not emit a scent. See Ex. B at 141:16-18.

**D. Plaintiff Failed His Pre-Employment Drug Screen.**

78. Plaintiff's offer of employment with Willert was contingent upon successful completion of a pre-employment drug test. See Ex. B.

79. Plaintiff understood that he needed to successfully complete the pre-employment drug test in order to work at Willert. See Ex. B at 169:21 – 170:1.

80. Plaintiff was originally scheduled to undergo the pre-employment drug screen on October 27, 2020, but missed his original appointment because he claimed that it was a busy day at work. See Ex. B at 144:20 – 148:13.

81. Before missing his original appointment, Plaintiff did not inform anyone from Willert that he would not be at the appointment. See Ex. B at 148:14-23.

82. On October 28, 2020, Plaintiff underwent the pre-employment drug screen for Willert. See Ex. B at 144:15-19.

83. Plaintiff ultimately tested positive for "D-THC-marijuana metabolite 50/15." See Ex. B at 216:18 – 217:6; Ex. G, Drug Screen Results Letter.

84. Plaintiff did not use medical marijuana on the date of his pre-employment drug screen. See Ex. B at 144:1-4.

85. Plaintiff could not state when he last used medical marijuana before the pre-employment drug screen. See Ex. B at 144:5-14.

86. Plaintiff "likely" used medical marijuana within thirty-six hours prior to the pre-employment drug screen, and it is "possible" that Plaintiff used medical marijuana the night before the pre-employment drug screen. See Ex. B at 144:5-14.

87. Plaintiff learned about his drug test results because the medical review officer ("MRO") called him. See Ex. B at 209:5-10.

88. The MRO told Plaintiff that he tested positive for THC and sought Plaintiff's comments about that. See Ex. B at 209:11-23.

89. Plaintiff testified at his deposition in this matter that he told the MRO that he was a medical marijuana patient. See Ex. B at 209:5 – 210:5.

90. Plaintiff testified at his deposition in this matter that he also told the person who performed the drug screen that he was a medical marijuana patient. See Ex. B at 212:13-23.

### E. No one from Willert knew that Plaintiff was a medical marijuana patient before he was terminated.

91. Plaintiff did not tell Bryan Willert during his initial interview that he was a medical marijuana patient. See Ex. B at 157:13-16.

92. Before he began working at Willert, Plaintiff attended an in-person meeting with Mr. Willert and Jack Bonsky, the Plant Manager at Willert's Douglassville location. See Ex. B at 157:21 – 158:12.

93. Plaintiff did not mention that he was a medical marijuana patient to Mr. Willert or Mr. Bonsky during the in-person meeting. See Ex. B at 160:2-5.

94. The Offer Letter Plaintiff read and signed provided that "[t]his offer is contingent upon successful completion of a pre-employment drug test." See Ex. B.

95. When Plaintiff received the Offer Letter, he did not tell anyone from Willert that he was a medical marijuana patient. See Ex. B at 170:2-5.

96. Plaintiff does not know if the person who performed his drug screen told anyone from Willert that he was a medical marijuana patient. See Ex. B at 213:4-8.

97. Plaintiff does not believe that the MRO told anyone from Willert that he was a medical marijuana patient. See Ex. B at 213:18-22.

98. Plaintiff did not tell anyone from Willert that he was a medical marijuana patient at any time before his pre-employment drug screen. See Ex. B at 213:23 – 214:3.

### F. Willert only learned that Plaintiff was a medical marijuana patient after it terminated him.

99. On November 5, 2020, Plaintiff was terminated. See Ex. B at 218:3-4.

100. Mr. Bonsky called Plaintiff, told him that "this is not going to be a pleasant call," and then read the contents of a termination letter which Plaintiff later received from Willert. See Ex. B at 218:5-22.

101. After Mr. Bonsky read Plaintiff the termination letter, Plaintiff told him that he was a medical marijuana patient. See Ex. B at 218:23 – 219:4.

102. Plaintiff also told Mr. Bonsky that he had a medical marijuana card, but did not show it to anyone. See Ex. B at 128:6-15.

103. Before Mr. Bonsky read the termination letter to Plaintiff, Plaintiff had not ever told Mr. Bonsky that he was a medical marijuana patient. See Ex. B at 219:15-19.

104. Before Mr. Bonsky read the termination letter to Plaintiff, Plaintiff never told Mr. Willert that he was a medical marijuana patient. See Ex. B at 219:20-24.

105. Before Mr. Bonsky read the termination letter to Plaintiff, no one from Willert knew that Plaintiff was a medical marijuana patient. See Ex. B at 220:1-4.

106. At the time that Plaintiff underwent the drug screen on October 28, 2020, he still had anxiety. See Ex. B at 221:14-17.

107. At the time that Plaintiff underwent the drug screen on October 28, 2020, he had not discussed or consulted with a doctor about stopping the use of medical marijuana. See Ex. B at 221:9-13.

108. Plaintiff continued to use medical marijuana until May 2021. See Ex. B at 87:7-13.

Respectfully submitted this 20th day of September 2021,

**KAUFMAN DOLOWICH & VOLUCK, LLP**

By: <u>*/s/Eileen Monaghan Ficaro*</u>
Gregory S. Hyman, Esquire
Eileen Monaghan Ficaro, Esquire
Four Penn Center
1600 John F. Kennedy Blvd., Suite 1030
Philadelphia, PA 19103
(215) 501-7024 (phone)
(215) 405-2973 (fax)