# EXHIBIT B

**Page 1**

1     IN THE UNITED STATES DISTRICT COURT
2     FOR THE EASTERN DISTRICT OF PENNSYLVANIA
3                     - - -
4   MATTHEW REYNOLDS,        :
              Plaintiff,     :
5                            :
    -vs.-                    :
6                            :
    WILLERT MFG. CO., LLC,   :
7           Defendant.    : No. 5:21-cv-01208-JFL
8                     - - -
9           Thursday, August 26, 2021
10                    - - -
11          Videoconferenced deposition of
12  MATTHEW REYNOLDS, taken pursuant to notice, was
13  held virtually in the State of Arizona,
14  commencing at 9:59 a.m., on the above date,
15  before Jared Carey, a Professional Reporter and
16  Notary Public in and for the Commonwealth of
17  Pennsylvania.
18                    - - -
19          ESQUIRE DEPOSITION SERVICES
                1835 Market Street
20                  Suite 555
            Philadelphia, Pennsylvania 19103
21              (215) 988-9191
22
23
24

**Page 2**

1     APPEARANCES:
2   LAW OFFICE OF STEVEN T. AUERBACH
    BY: STEVEN T. AUERBACH, ESQUIRE
3   822 Montgomery Avenue, Suite 210
    Narberth, Pennsylvania 19072
4   215.964.4410
    Attorney for the Plaintiff
5   (Appearing via Zoom)
6
7   KAUFMAN, DOLOWICH & VOLUCK, LLP
    BY: EILEEN MONAGHAN FICARO, ESQUIRE
8   1600 JFK Boulevard, Suite 1030
    Philadelphia, Pennsylvania 19103
9   215.501.7002
    Attorney for the Defendant
10  (Appearing via Zoom)
11
12
13
14
15
16
17
18
19
20
21
22
23
24

**Page 3**

1               I N D E X
2   WITNESS                                    PAGE
3   MATTHEW REYNOLDS
4   BY:  MS. FICARO                              5
5
6
7           E X H I B I T S
8   MARKED          DESCRIPTION               PAGE
9   Exhibit 1   Medical marijuana card         126
10  Exhibit 2   Dispensary Information         131
11  Exhibit 3   Email                          145
12  Exhibit 4   Offer letter                   162
13  Exhibit 5   Benefit package                170
14  Exhibit 6   Job description                172
15  Exhibit 7   List                           199
16  Exhibit 8   Drug screen                    208
17  Exhibit 9   Photographs                    238
18
19
20
21
22
23
24

**Page 4**

1           DEPOSITION SUPPORT INDEX
2
3   Direction to Witness Not to Answer
4   Page Line        Page Line        Page Line
5   None
6
7
8   Request for Production of Documents
9   Page Line        Page Line        Page Line
10  None
11
12
13  Stipulations
14  Page Line     Page Line        Page Line
15  None
16
17
18  Question Marked
19  Page Line        Page Line        Page Line
20  None
21
22
23
24



Page 5

1                - - -
2                MATTHEW REYNOLDS, having been
3 duly sworn, was examined and testified as
4 follows:
5                - - -
6                EXAMINATION
7                - - -
8 BY MS. FICARO
9        Q.    Good morning, Mr. Reynolds.  My
10 name is Eileen Ficaro.  I am an attorney at
11 Kaufman, Dolowich & Voluck.  And I represent the
12 Defendant Willert Manufacturing Company in this
13 matter.  I am here today to take your
14 deposition.  Have you ever had your deposition
15 taken before?
16       A.    No.
17       Q.    Have you ever testified in court
18 before?
19       A.    No.
20       Q.    I will begin with a few
21 instructions for you.  As you can see there is a
22 court reporter here who is on the Zoom video
23 with us.  And he is going to be taking down
24 everything that both you and I say during this

Page 6

1 deposition.
2                As a result will you please make
3 sure that you give verbal responses to the
4 questions that I ask you?
5        A.    Yes.
6        Q.    Because he is going to be taking
7 everything down that we both say it is important
8 that we don't speak over one another during the
9 deposition.  So will you please wait until I
10 finish my questions before you provide your
11 answers?
12       A.    Certainly.
13       Q.    If I ask you a question and you
14 answer it I will assume that you understood the
15 question.  If at any time I ask you a question
16 and you don't understand what I'm asking, please
17 ask me to rephrase.  Okay?
18       A.    Yes.
19       Q.    I am here today not to have you
20 guess to answers to my questions.  But if you
21 are able to estimate or approximate the answers
22 to my questions would you please do so?
23       A.    Yes.
24       Q.    Did you take any medication

Page 7

1 before your deposition today?
2        A.    No.
3        Q.    Is there anything today that
4 would affect your ability to understand my
5 questions and answer them truthfully?
6        A.    No.
7        Q.    Where are you presently
8 physically located?
9        A.    In my hotel room in Phoenix,
10 Arizona.
11       Q.    Is anyone else in the hotel room
12 in Arizona with you?
13       A.    No.
14       Q.    If anyone comes into your hotel
15 room during the course of this deposition will
16 you please let us know?
17       A.    Yes.
18       Q.    Why are you in Phoenix, Arizona?
19       A.    My current job has me out here
20 for training.
21       Q.    Did you review any documents
22 today in preparation for your deposition?
23       A.    Not today, no.
24       Q.    Did you review any documents at

Page 8

1 all at any time in preparation for your
2 deposition?
3        A.    Yes.
4        Q.    What documents did you review in
5 preparation for your deposition?
6        A.    Going to get the title wrong.
7 But the Defendant's Response.  There were some
8 documents that I put together with facts and
9 information so just to refresh my memory.
10       Q.    Were those all documents that
11 have already been produced to us in this matter?
12 And by us I mean to Willert.
13       A.    Yes.  I believe so, yes.
14       Q.    Do you recall specifically what
15 any of those documents were?
16       A.    These were -- I don't know if
17 Steve would know exactly how they are presented
18 to you.  But I created them as PowerPoints.
19 There was like a Defendant's Response to
20 Interrogatories.  Sorry.
21       Q.    Were they then documents that you
22 then produced in response to questions that for
23 which you were asked for information in this
24 litigation?



MATTHEW REYNOLDS
REYNOLDS V WILLERT

August 26, 2021
9–12

Page 9

1    A.    Yes.  These were responses to
2 questions from the defense.
3    Q.    Other than your attorney did you
4 speak to anyone else in preparation for your
5 deposition?
6    A.    No.
7    Q.    Other than your attorney have you
8 spoken to anyone else at any time prior to your
9 deposition in preparation for your deposition?
10    A.    No.
11    Q.    Could you please state and spell
12 your full name for the record.
13    A.    Matthew David Reynolds.
14 M-A-T-T-H-E-W, D-A-V-I-D, R-E-Y-N-O-L-D-S.
15    Q.    Do you currently go by any other
16 names?
17    A.    Not legally.
18    Q.    Do you have nicknames?
19    A.    People call me Matt.
20    Q.    Have you ever gone by any other
21 names other than Matthew David Reynolds or being
22 referred to as Matt?
23    A.    No.
24    Q.    What is your date of birth?

Page 10

1    A.    April 7, 1979.
2    Q.    What is your Social Security
3 Number?
4    A.    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.
5    Q.    Are you currently married?
6    A.    Yes.
7    Q.    Who are you married to?
8    A.    My wife.
9    Q.    What is her name?
10    A.    Okay.  Megan Ellen Reynolds.
11    Q.    How long have you and
12 Mrs. Reynolds been married?
13    A.    Since 2007.  So I will say 14
14 years.
15    Q.    Were you married at the time that
16 you worked for Willert Manufacturing Company?
17    A.    Yes.
18    Q.    Where do you currently live?
19    A.    In Ephrata, Pennsylvania.
20    Q.    What is your address?
21    A.    1586 Division Highway, Ephrata,
22 PA.  Zip code is 17522.
23    Q.    How long have you lived there?
24    A.    Since 2016.  So five years in

Page 11

1 October.
2    Q.    Does anyone else live at that
3 address with you?
4    A.    Yes.
5    Q.    Who else lives there with you?
6    A.    Our two sons.
7    Q.    What are their names?  Let the
8 record reflect Mr. Reynolds' video has gone out.
9    A.    I am back.  Sorry.  I had a
10 pop-up.  My two sons live with us.
11    Q.    What are their names?
12    A.    So Logan Robert Reynolds and
13 Isaac Aaron Reynolds.
14    Q.    How old is Logan?
15    A.    He is 19.
16    Q.    How old is Isaac?
17    A.    He is 12.
18    Q.    At the time that you worked for
19 Willert how old was Logan?
20    A.    18.
21    Q.    At the time you worked for
22 Willert how old was Isaac?
23    A.    11.
24    Q.    Have you ever been a party to any

Page 12

1 other lawsuits?
2    A.    No.
3    Q.    Have you ever sued an employer
4 before?
5    A.    No.
6    Q.    Have you ever sued any former
7 employers of yours before other than Willert?
8    A.    No.
9    Q.    Have you ever been arrested?
10    A.    No.
11    Q.    Have you ever been convicted of
12 any crimes?
13    A.    No.
14    Q.    Have you ever served in the
15 military?
16    A.    No.
17    Q.    What is the highest educational
18 degree that you hold?
19    A.    Bachelor's of science.
20    Q.    When did you earn your bachelor's
21 of science?
22    A.    2000.
23    Q.    Where did you earn it from?
24    A.    ITT Technical Institute.

MATTHEW REYNOLDS
REYNOLDS V WILLERT

August 26, 2021
13–16

Page 13

1    Q.    Where is that located?
2    A.    That was in Norfolk, Virginia.
3    Q.    Did you graduate?  Did you have a
4 major when you graduated?
5    A.    Yes.
6    Q.    What was your major?
7    A.    Automated manufacturing
8 technology.
9    Q.    What is automated manufacturing
10 technology?
11    A.    It was a technical overview of
12 the manufacturing process.  So courses in
13 hydraulics, pneumatics, controls.  It was not a
14 specific engineering degree like a electrical or
15 mechanical.
16    Q.    When you referred to controls
17 what are you referring to?
18    A.    The digital signals that
19 coordinate equipment in a manufacturing process
20 like the computer program that makes equipment
21 run.
22    Q.    Are those controls/signals
23 typically electronically powered?
24    A.    Yes.

Page 14

1    Q.    Did you have a minor in college
2 at all?
3    A.    Yes.  It was electronics
4 engineering.
5    Q.    Were those two separate minors or
6 was that one minor?  Electronics engineering?
7    A.    That was one.
8    Q.    What is electronics engineering?
9    A.    So that's low voltage, small,
10 like 12 to 24 volts DC.  It is a study of the
11 tiny components that go into devices, resistors,
12 capacitors, chips.
13    Q.    How are those components
14 typically powered?
15    A.    By low voltage DC, a 24-volt or
16 12-a volt power supply.
17    Q.    Have you taken or -- have you
18 engaged in any advanced learning since you left
19 ITT Technical Institute?
20    A.    Not like counting -- I don't know
21 if I understand the question.
22    Q.    Sure.  Did you attempt to obtain
23 any advanced degree after you left college?
24    A.    I did apply for a master's degree

Page 15

1 program.
2    Q.    In what?
3    A.    That was an MBA business
4 administration.
5    Q.    Were you accepted into that
6 program?
7    A.    Unfortunately I was not.
8    Q.    Do you know why you were not
9 accepted in that program?
10    A.    Yes.  Accreditation.  There were
11 different accrediting bodies.  So the university
12 I was applying to didn't recognize the
13 accreditation for the degrees that I held.
14    Q.    What university did you apply to
15 for the master's degree program?
16    A.    I'm sorry.  I don't remember at
17 this time.
18    Q.    Did you ever apply for any other
19 advanced degree programs?
20    A.    No.
21    Q.    Have you taken any continuing
22 education courses since you left ITT Technical
23 Institute?
24    A.    No.

Page 16

1    Q.    Have you earned any
2 certifications in anything since you left ITT
3 Technical?
4    A.    The only thing I believe that
5 would fall under that -- well, let me make sure
6 I understand the question.  So would
7 employer-sponsored training count for that?
8    Q.    So I will ask about that as well.
9    A.    Okay.
10    Q.    For now have you earned any
11 industry certifications at all?
12    A.    I understand.  No.
13    Q.    You mentioned employer-sponsored
14 trainings.  Since you left college what types of
15 employer-sponsored trainings have you undergone?
16    A.    A front line supervisor boot camp
17 and a 40-hour arc flash electrical safety
18 program.
19    Q.    Where did you undergo the front
20 line supervisor boot camp?
21    A.    Harley-Davidson Motor Company in
22 York, Pennsylvania.
23    Q.    What types of things did you
24 learn or were you taught during that boot camp?



MATTHEW REYNOLDS
REYNOLDS V WILLERT

August 26, 2021
17–20

1    A.    It was behavioral coaching mostly
2  geared towards navigating the intricate
3  relationship between the management and the
4  union in that environment.
5    Q.    Were there any other topics that
6  were covered during the front line supervisor
7  boot camp?
8    A.    Coaching.  There is an emphasis
9  on character.  And I can't speak further to
10  details on that.  It's been a while.
11    Q.    Do you receive any written course
12  materials as part of that frontline supervisor
13  boot camp?
14    A.    I believe so.
15    Q.    Do you still have a copy of those
16  written course materials?
17    A.    I'm not certain.  If I do it's in
18  a box in the garage somewhere.
19    Q.    You mentioned that one of the
20  topics covered during that boot camp was
21  coaching.  What type of coaching was covered
22  during that boot camp?
23    A.    It would be behavioral correction
24  from a supervisor.  I was a supervisor.  So

1  behavioral correction conversations between a
2  supervisor and a employee and navigating those
3  conversations in such a way to get buy-in, to
4  get the employees to understand where the
5  company was coming from and take deeper
6  ownership of the direction that was being given
7  to them rather than just a command-and-conquer,
8  you will do this sort of thing.  It's like seek
9  first to understand and be understood.
10    Q.    When did you participate in that
11  front line supervisor boot camp?
12    A.    This is going be an estimate.
13  2006.
14    Q.    Where was that boot camp held?
15    A.    Off site at a leased or rented
16  conference room in York, Pennsylvania.
17    Q.    Did Harley-Davidson run that boot
18  camp or was it a third party who ran that boot
19  camp?
20    A.    It was a third party.
21    Q.    What was the name of the third
22  party that ran that boot camp?
23    A.    I don't know and I don't know
24  that I ever did.

1    Q.    You also mentioned you
2  participated in a 40-hour arc flash safety
3  course, did you refer to it as?
4    A.    Yes.
5    Q.    Is that the proper title of the
6  course that you believe you underwent?
7    A.    Yes.
8    Q.    Where did you undergo that
9  course?
10    A.    That was on site at
11  Harley-Davidson.
12    Q.    When did you undergo that?
13    A.    2005.
14    Q.    What topics were covered during
15  that course?
16    A.    Electrical safety and the NFPA
17  70E electrical safety code.
18    Q.    Were you taught anything about
19  lock out, tag out procedures during that course?
20    A.    Yes.
21    Q.    Do you recall what you were
22  taught about lock out, tag out procedures during
23  that course?
24    A.    I would say lock, tag, verify.

1  And I also want to say that I was not an
2  authorized user of lock out, tag out in that
3  case.  It was a awareness for me so I could
4  enforce the policies.
5    Q.    When you say you were not a
6  authorized user for lock out, tag out, what do
7  you mean by that?
8    A.    It was a union environment.  And
9  as a supervisor I was not authorized to touch
10  any equipment.  I was nonunion.  So I was
11  strictly forbidden to partake in any physical
12  work.
13    Q.    You mentioned that you taught a
14  course of supervising.  What did you learn
15  during that course about supervising lock out,
16  tag out procedures?
17    A.    The proper procedures for
18  tradesmen to follow to ensure safety during
19  performance of maintenance tasks.
20    Q.    As a supervisor then at that time
21  then what were your responsibilities with regard
22  to lock out, tag out procedures?
23    A.    Observing the work and ensuring
24  that the rules or the procedures were followed.



MATTHEW REYNOLDS
REYNOLDS V WILLERT

August 26, 2021
21–24

Page 21

1    Q.    If you saw that procedures were
2 not being followed would it be your
3 responsibility to correct the procedures to
4 ensure they were?
5    A.    Do you mean correct as far as
6 coaching or instructing the employee?
7    Q.    Yes.  Was it your responsibility
8 to instruct the employee in terms of how to do
9 it correctly if you observe them doing it
10 incorrectly?
11    A.    Yes.
12    Q.    What else did you learn during
13 that course?
14    A.    It was a overview of electrical
15 safety which includes personal protective
16 equipment.
17    Q.    What did you learn about personal
18 protective equipment during that?
19    A.    That there was different
20 categories of work and different in regards to
21 electrical work.  And so each category requires
22 a different level of personal protective
23 equipment and different levels of safe work
24 practices to ensure the area is isolated, that

Page 22

1 bystanders are restricted from accessing the
2 work area so they don't become exposed to a
3 safety issue.
4    Q.    Was there any discussion about
5 different voltages?
6    A.    Yes.
7    Q.    What did you learn about
8 electrical voltages during that course?
9    A.    That relates to the categories.
10 So voltages relate to I think it's called like a
11 incident level.  There is a calculation based on
12 the voltage inside of a cabinet which mandates
13 the level of personal protective equipment.  I
14 can't quote those off the top of my head.
15    Q.    Were you taught that any -- that
16 there were any voltages that were safe enough
17 for you to work with without personal protective
18 equipment?
19    A.    I don't recall.
20    Q.    Do you recall being taught that
21 any level of voltage can potentially be
22 dangerous?
23    A.    Yes.
24    Q.    Is there anything else that you

Page 23

1 recall about what you were taught concerning
2 electrical voltages during that course?
3    A.    No.
4    Q.    Did you receive any certificate
5 of completion upon completion of the arc flash
6 safety course?
7    A.    Yes.
8    Q.    Do you still have a copy of that
9 certificate?
10    A.    I don't believe so.  I'm not sure
11 on that.
12    Q.    What is an arc flash?
13    A.    That's in general terms when
14 something bad happens in a electrical cabinet.
15 It can look like a bomb going off depending on
16 the incident level.
17    Q.    Can arc flashes occur in
18 electrical cabinets containing any level of
19 voltage?
20    A.    Not any level, no.
21    Q.    How about voltages of a hundred
22 volts?
23    A.    I'm uncertain honestly.
24    Q.    Did you have in terms of your

Page 24

1 course work at ITT Technical, what type of
2 courses related to electrical work did you take
3 there?
4    A.    In terms of electrical work there
5 was a safety awareness training which was not a
6 course.  It was like a one-day classroom
7 session.  The degree I received there was
8 focused on electronics, which is low level
9 signal voltages.  When you say electrical work I
10 consider that to be like tradesmen-level
11 electrical service.
12    Q.    Did you ever take any
13 tradesmen-level courses while at ITT Technical?
14    A.    No.
15    Q.    Have you taken any
16 tradesmen-level electric courses at any time
17 since you left ITT Technical?
18    A.    No.
19    Q.    Other than the two
20 employer-sponsored programs that you already
21 testified to, are there any other training
22 courses that you have completed since you left
23 ITT Technical?
24    A.    I did one arc flash refresher



MATTHEW REYNOLDS
REYNOLDS V WILLERT

August 26, 2021
25–28

Page 25

1 training.  It was a four-hour course.
2     Q.     When did you take the arc flash
3 refresher training?
4     A.     2018.
5     Q.     Where did you take the ark flash
6 refresher training?
7     A.     It was in Harrisburg.
8     Q.     Who were you working for at the
9 time you took the arc flash refresher training?
10     A.     That was Fleur De Lait.
11     Q.     How do you spell that?
12     A.     F-L-E-U-R.  Then D-E, L-A-I-T.
13     Q.     Where is Fleur De Lait located?
14     A.     New Holland, Pennsylvania.
15     Q.     Did Fleur De Lait sponsor or host
16 the arc flash refresher training course that you
17 took?
18     A.     No.
19     Q.     Who did?
20     A.     That was a free course offered by
21 a vendor that Fleur De Lait had a working
22 relationship with.
23     Q.     What was the name of that vendor?
24     A.     I'm not sure.  I can offer an

Page 26

1 estimate.
2     Q.     Okay.  What is your estimate?
3     A.     I believe it was Schaedler Yesco.
4     Q.     How do you spell that?
5     A.     S-C-H-A-E-D-L-E-R.  And then
6 Y-E-S-C-O.
7     Q.     What did you learn during the arc
8 flash refresher training course?
9     A.     It was a reinforcement of the
10 personal protective equipment required.  And it
11 gave updates to the NFPA electrical safety code.
12 I learned that that code is a very dynamic -- it
13 goes through a lot of revisions.
14     Q.     What did you learn about that
15 code during the refresher course?
16     A.     I learned that -- I learned that
17 some of the practices around electrical work as
18 far as recommended practices had been modified
19 or changed.
20     Q.     How had they been modified or
21 changed?
22     A.     They were in my opinion it was
23 more work friendly.  Meaning the 2005 code was
24 very strict.  It required numerous steps to be

Page 27

1 taken.  And so I learned that over time it
2 appeared that the governing body determined that
3 there can be some changes made to make that a
4 more -- more conducive to the real world
5 honestly.
6     Q.     When you refer to the practices
7 that these modifications were being made, to
8 what types of practices were you referring to?
9     A.     I only want to speak to what I'm
10 certain about.  And I believe that was the
11 boundaries and physical barriers.
12     Q.     Boundaries and physical barriers
13 around what?
14     A.     So the original code required
15 like temporary fencing to be placed around a
16 work area.  And that was for, if I remember
17 correctly, that was for any hot work job where
18 electricity was live in the cabinet.  And if I
19 remember correctly, the standard changed to
20 where some basic troubleshooting can be done
21 without those barriers.
22     Q.     When you refer to basic
23 troubleshooting what are you referring to?
24     A.     Trying to diagnosis machine

Page 28

1 issues through electrical -- I don't want to try
2 to define the word with the word.  But through a
3 electrical troubleshooting process.
4     Q.     Would those involve situations
5 where for example a machine's motor stopped
6 working?  When you refer to basic
7 troubleshooting then would that be a situation
8 where you would be referring to that type of a
9 situation?
10     A.     Sure.  Yes.
11     Q.     When you refer to a hot work job
12 what are you referring to?
13     A.     Any time that lock out, tag out
14 cannot be followed due to some kind of
15 requirement within the task to enter that
16 electrical enclosure with a live voltage being
17 fed into it.
18     Q.     Why were you learning about those
19 topic areas at that time?
20     A.     The same reasons that I had at
21 Harley-Davidson.  I was supervising a
22 maintenance crew and awareness for me so that I
23 could ensure the safety of the workers.
24     Q.     Before October 2020 had you ever



MATTHEW REYNOLDS                                    August 26, 2021
REYNOLDS V WILLERT                                            29–32

Page 29

1 undergone any OSHA training?
2      A.    Yes.
3      Q.    When?
4      A.    I will say 2008.
5      Q.    Where did you undergo that
6 training?
7      A.    Harley-Davidson.
8      Q.    What type of OSHA training did
9 you undergo at that time?
10     A.    That was called Hazwopper.
11     Q.    What topics were covered during
12 the OSHA training?
13     A.    Waste clean-up, spill clean-up in
14 a industrial environment primarily.
15     Q.    Were there any other topics that
16 were covered?
17     A.    I don't recall.
18     Q.    Did the waste clean-up and spill
19 clean-up that you learned during that training
20 program, did that involve chemical clean-ups?
21     A.    It could.
22     Q.    When you refer to industrial
23 environments, are those situations in which you
24 may be dealing with equipment that is

Page 30

1 electronically powered?
2      A.    No.  Typically not.
3      Q.    In the type of industrial
4 environment that you were learning about in your
5 OSHA training course taken in 2008, how was the
6 machinery in those types of situations
7 considered to be powered?
8      A.    In -- I feel like I can't give a
9 all-encompassing statement.  But in general
10 these were spills not coming from power
11 equipment.  It would be other situations where
12 chemicals being transported or otherwise
13 handled.
14     Q.    Did you ever undergo any OSHA
15 training other than the courses in 2008 that you
16 just mentioned?
17     A.    Yes.
18     Q.    When else did you undergo OSHA
19 training?
20     A.    I don't remember the exact year.
21 But I can estimate it was 2003 or 2004.
22     Q.    Where did you undergo that
23 training?
24     A.    Harley-Davidson.

Page 31

1      Q.    What type of OSHA training did
2 you undergo at that time?
3      A.    Confined space.
4      Q.    When you are referring to
5 confined space, what are you referring to?
6      A.    Those are -- the confined space
7 is a restricted area with only one mode of
8 egress that can be potentially hazardous, going
9 into a tank, for example.
10     Q.    What type of tank?
11     A.    Any type of tank that is not
12 constructed with the intention of human
13 occupation.
14     Q.    Would that involve potentially
15 tanks that hold chemicals?
16     A.    Yes.
17     Q.    Do you recall anything specific
18 about what you learned regarding confined spaces
19 during that training?
20     A.    Yes.
21     Q.    What do you recall having
22 learned?
23     A.    Supervisory practices required to
24 follow the procedures in regards to a safe

Page 32

1 confined space entry.
2      Q.    What did you learn about what
3 needed to be done in order for those practices
4 to be safe with regard to confined spaces?
5      A.    That there would be no exceptions
6 in that environment at Harley to practices.
7      Q.    Does that mean at Harley-Davidson
8 you were required to always follow safe
9 practices with regard to confined spaces?
10     A.    Yes.  And, again, I was not
11 personally entering confined spaces.  This was
12 my part was a supervisory role making sure that
13 the employees were following those safe work
14 practices.
15     Q.    Is there any other OSHA training
16 that you had undergone?
17     A.    I don't recall.
18     Q.    Is there any documentation of
19 your completion of the OSHA courses that you
20 testified to today?
21     A.    I don't believe I have any of
22 those in my possession at this time.
23     Q.    When did you last have them in
24 your possession?



MATTHEW REYNOLDS
REYNOLDS V WILLERT

August 26, 2021
33–36

Page 33

1    A.    Probably -- this is an estimate.
2 2013.
3    Q.    How did they come to leave your
4 possession?
5    A.    My family moved a couple times
6 and things get shuffled in a move.
7    Q.    Other than what you testified to
8 so far, are there any other training courses
9 that you have completed since you graduated from
10 ITT Technical?
11    A.    I took a data analytics course.
12 I don't feel that relates to this specific
13 conversation much.
14    Q.    When did you take the data
15 analytics course?
16    A.    Estimating 2018.
17    Q.    Where did you take the data
18 analytic course?
19    A.    Online.
20    Q.    Why did you take a data analytics
21 course?
22    A.    I was interested in the topic.
23    Q.    What type of data was being
24 analyzed during that course?

Page 34

1    A.    There was no company-specific
2 data.  It was for training on how to use Excel
3 to improve your ability to navigate large
4 quantities of data.
5    Q.    Any other courses that you
6 completed since leaving ITT Technical?
7    A.    I don't recall any others.
8    Q.    Have you ever attended any
9 college or university other than ITT Technical?
10    A.    No.
11    Q.    When did you graduate from high
12 school?
13    A.    1997.
14    Q.    Did you go straight from high
15 school to ITT Technical?
16    A.    Yes.
17    Q.    Where did you go to high school?
18    A.    Northern York County School
19 District in Dillsburg, Pennsylvania.
20    Q.    Did you go to York High School or
21 was it called Northern Work?
22    A.    Northern York.  That was the
23 formal name.
24    Q.    After you graduated from ITT what

Page 35

1 did you do?
2    A.    I immediately -- I had been
3 offered a job at United Parcel Service.
4    Q.    What job did you hold at United
5 Parcel Service?
6    A.    It was a plant engineering role.
7    Q.    What was your specific role with
8 regard to plant engineering at UPS?
9    A.    The oversight of what they called
10 extended centers, satellite hubs to the main
11 hubs within their system -- hubs being
12 buildings.
13    Q.    Before I ask a question about
14 that, when I refer to UPS I mean United Parcel
15 Service.  Is that okay?  Do you understand what
16 I'm saying when I refer to it as UPS?
17    A.    Yes.  They actually changed their
18 name to UPS.  That's accurate.
19    Q.    What did you do at UPS with
20 regard to oversight of the extended centers?
21    A.    Vendor and contractor management
22 primarily.  Also capital project development,
23 environmental compliance, and facility asset
24 protection.

Page 36

1    Q.    What did vendor and contractor
2 management entail?
3    A.    Preventative -- scheduling,
4 vendor and contractor activities and scheduling,
5 coordinating, ensuring payment for those
6 activities.
7    Q.    What do you mean when you say
8 scheduling vendor and contractor meetings, were
9 you bringing vendors to the company?
10    A.    They were service providers to
11 the company.
12    Q.    Were these then vendors the
13 company would use to do various things for UPS?
14    A.    They were performing on site
15 tasks.
16    Q.    Were they performing on site
17 maintenance tasks or other types of tasks?
18    A.    Correct.  Like breakdown response
19 as well as preventative maintenance.
20    Q.    Breakdown response with regard to
21 what?
22    A.    Any of the -- anything that was
23 not a package car or a box on the UPS property.
24    Q.    Was there any machinery that was



MATTHEW REYNOLDS
REYNOLDS V WILLERT

August 26, 2021
37—40

Page 37

1 used on the UPS property?
2     A.    Yes.
3     Q.    Would the breakdown work for
4 which you were bringing in vendors pertain to
5 breakdown work for that machinery?
6     A.    Yes.
7     Q.    When you say breakdown work, what
8 are you referring to?
9     A.    Any equipment situation that
10 would interrupt their ability to process
11 packages or otherwise perform the work, mainly
12 focused on packages.
13     Q.    What type of equipment then did
14 they have in the facility to handle that?
15     A.    Conveyors, overhead doors, dock
16 locks.
17     Q.    Was your role at UPS to simply
18 bring the vendors in who would work on the
19 machinery?
20     A.    Correct.
21     Q.    Did you have to watch them do the
22 work on the machinery?
23     A.    It was not required, no.
24     Q.    Did you watch them do the work on

Page 38

1 the machinery?
2     A.    Occasionally.  But not always.
3 Just the logistics of it.
4     Q.    Was it your responsibility there
5 at UPS to ensure the vendor completed the job on
6 the machinery at issue?
7     A.    Do you mean like a physical
8 verification?
9     Q.    Yes.
10     A.    In that case, no.
11     Q.    Was there another type of
12 verification that you had to perform to ensure
13 those vendors performed their job correctly on
14 the machinery?
15     A.    Yes.
16     Q.    What type of verification did you
17 do to make sure that that occurred?
18     A.    Communication primarily with the
19 UPS staff on site.
20     Q.    Were you located on site at UPS
21 while you worked there?
22     A.    I was at a UPS facility.  I was
23 responsible, again just to clarify, I was
24 responsible for extended centers.  So I had nine

Page 39

1 facilities outside of that one that I was
2 coordinating processes for.
3     Q.    Would you travel from facility to
4 facility?
5     A.    At times, yes.
6     Q.    When you were not traveling from
7 facility to facility where was your office
8 located?
9     A.    At the main hub in Roanoke,
10 Virginia.
11     Q.    Was there machinery located at
12 the main hub for which you needed to bring in
13 vendors?
14     A.    Yes.  As a secondary, I was the
15 backup for that facility.
16     Q.    When you say backup, what do you
17 mean?
18     A.    There was a plant engineer that
19 had the ownership and responsibility for that
20 entire facility.  But if they were on vacation
21 or otherwise unavailable I was expected to step
22 in to handle any unexpected situations that came
23 up.
24     Q.    Would that involve repairing any

Page 40

1 machinery that broke?
2     A.    Me personally, no.
3     Q.    Would it involve ensuring that
4 machinery that broke was repaired?
5     A.    Yes.  Not necessarily through
6 physical verification.  But I had to know what
7 was going on.
8     Q.    In terms of your work with regard
9 to capital projects at UPS, what do you do?
10     A.    Developed scope of work,
11 developed the cost estimates and proposed that
12 project package up through the chain of command.
13 I apologize.  May I go to the restroom quick?
14     Q.    Sure.
15         (Discussion held off the record.)
16 BY MS. FICARO
17     Q.    Mr. Reynolds, what type of
18 capital projects did you deal with at UPS?
19     A.    They refer to it as facility
20 asset protection.
21     Q.    What type of projects were those
22 then?
23     A.    Facility repairs, paving,
24 overhead door replacements, conveyor



Page 41

1 modifications.
2     Q.     What was your job title at UPS?
3     A.     Plant engineering supervisor.
4     Q.     What did you earn at UPS?
5     A.     Annual salary?
6     Q.     Yes.
7     A.     Entry base level was $42,000 a
8 year.
9     Q.     Did you earn bonuses while you
10 worked there?
11     A.     No.
12     Q.     How long did you work for UPS?
13     A.     Three years.
14     Q.     Was that then from
15 approximately 2000 until 2003?
16     A.     Correct.
17     Q.     Why did you leave UPS?
18     A.     Actually I wanted to get back
19 home.
20     Q.     Was home York, PA?
21     A.     Yes.  And I had accepted a job
22 offer at Harley-Davidson.
23     Q.     Were you asked to leave UPS?
24     A.     No.

Page 42

1     Q.     Where is Harley-Davidson located?
2     A.     York, Pennsylvania.
3     Q.     When you began working for
4 Harley-Davidson what was your job title there?
5     A.     Maintenance supervisor II.
6     Q.     Did your job title ever change
7 during time you worked at Harley-Davidson?
8     A.     No.
9     Q.     As the maintenance supervisor II
10 what were your job responsibilities?
11     A.     Supervising and coordinating
12 equipment repairs, managing people.
13     Q.     What type of equipment -- for
14 what type of equipment were you supervising and
15 coordinating repairs?
16     A.     Manufacturing equipment related
17 to the fabrication and assembly of
18 Harley-Davidson motorcycles.
19     Q.     What type of equipment was that?
20     A.     Hydraulic presses, metal
21 fabrication, chrome plating, paint shop, weld
22 shop, waste treatment plant, facilities and
23 grounds, housekeeping, environmental, hazardous
24 waste clean-up, robotics, the assembly line and

Page 43

1 then general facilities and grounds.
2     Q.     As the maintenance supervisor II
3 did you supervise and coordinate equipment
4 maintenance and repairs with regard to all of
5 the equipment at Harley-Davidson during the time
6 that you worked there?
7     A.     No.  Not all.
8     Q.     So then the equipment that you
9 supervised and coordinated repair and
10 maintenance of was just the equipment that you
11 previously testified to?
12     A.     Well, I feel like I should strike
13 that prior response when I say "all."  There
14 were times when I was responsible for the
15 supervision of all the maintenance employees on
16 shift for the entire grounds, although that was
17 not my primary job responsibility.  There were
18 times when I was indeed responsible for all
19 activities on site.
20     Q.     When you say you were responsible
21 for all of them, what did you do then with
22 regard to those maintenance workers?
23     A.     What did I do?  I would walk,
24 talk, direct, work, clarify questions.  And then

Page 44

1 there was a mix of planned project work that I
2 would be directing as well as breakdown of
3 maintenance and response, production support as
4 well.
5     Q.     Did you physically oversee any
6 work that individuals, maintenance employees,
7 performed there?
8     A.     Overseeing, yes.
9     Q.     Does that mean you were
10 physically present when you would perform work
11 on the equipment?
12     A.     Not a hundred percent of the
13 work.  But, yes, I was present for various
14 activities.
15     Q.     How was the equipment at
16 Harley-Davidson during the time you worked there
17 powered?
18     A.     Electricity, pneumatics for
19 compressed air, steam, and I believe natural gas
20 or propane, some kind of combustible.
21     Q.     Did you have to wear personal
22 protective equipment when you worked at
23 Harley-Davidson?
24     A.     Yes.



MATTHEW REYNOLDS
REYNOLDS V WILLERT

August 26, 2021
45–48

Page 45

1      Q.     What type of personal protective
2   equipment did you have to wear?
3      A.     Steel-toed boots, safety glasses,
4   ear plugs.
5      Q.     Anything else?
6      A.     No.
7      Q.     With regard to the equipment that
8   was electronically powered did you ever interact
9   with the electrical panels associated with that
10  equipment?
11     A.     Personally like as far as me
12  interacting with those personally?
13     Q.     Yes.
14     A.     No.
15     Q.     Did you ever have to inspect the
16  electrical panels?
17     A.     Do you mean internally like with
18  the panels open or just like physically where
19  they are placed?
20     Q.     I will say both ways.  Physically
21  where they were placed did you have to inspect
22  the electrical panels?
23     A.     Yes.
24     Q.     Were you ever present when any of

Page 46

1   electrical panels were open?
2      A.     Yes.
3      Q.     For what purposes would you be
4   present when an electrical panel was open?
5      A.     Primarily that would be to
6   understand what was going on during the
7   troubleshooting process.  So I would be outside
8   of the restricted boundary.  But I had to speak
9   to the work in progress.
10        So if there was a job going on
11  during shift change the more information I had
12  the better because then I could communicate to
13  the incoming shift supervisor so they would know
14  what is going on.  So I was there to talk to
15  employees and ask them questions, just make sure
16  that I had as complete of a story as possible to
17  share with other management.
18     Q.     In terms of supervising and
19  overseeing the maintenance workers who were
20  working at Harley-Davidson while you worked
21  there, did that involve ensuring their safety?
22     A.     Yes.
23     Q.     How long did you work at
24  Harley-Davidson?

Page 47

1      A.     2003 to 2009.  So six years.
2      Q.     When you left Harley-Davidson
3   what were you earning there?
4      A.     My last W-2 was $93,000 I
5   believe.
6      Q.     Did you have an opportunity to
7   earn bonuses while you were there?
8      A.     No.
9      Q.     Was that because you were not
10  eligible for bonuses while you were there?  Or
11  because there was no opportunity for you to even
12  try to earn a bonus there?
13     A.     There was no bonus structure, at
14  least not for the role which I held.
15     Q.     Why did you leave Harley-Davidson
16  in 2009?
17     A.     I accepted a offer at Fleur De
18  Lait.
19     Q.     Were you asked to leave
20  Harley-Davidson?
21     A.     No.
22     Q.     Did you ever receive any poor
23  performance reviews at Harley-Davidson while you
24  worked there?

Page 48

1      A.     No.
2      Q.     Did you ever receive any written
3   reprimands for work that you performed at
4   Harley-Davidson?
5      A.     No.
6      Q.     Were you ever the subject of any
7   disciplinary action while you worked at
8   Harley-Davidson?
9      A.     No.
10     Q.     Did you apply for the job at
11  Fleur De Lait or were you recruited to go work
12  there?
13     A.     A recruiter located me.
14     Q.     What type of company is Fleur De
15  Lait?
16     A.     They are food production.  They
17  make cream cheese.
18     Q.     What was your job title at Fleur
19  De Lait?
20     A.     I had two.  Initially it was
21  maintenance engineer.  And let's see.  Three or
22  four years later I was promoted to maintenance
23  manager.
24     Q.     As the maintenance engineer what



MATTHEW REYNOLDS
REYNOLDS V WILLERT

August 26, 2021
49–52

Page 49

1 were your job responsibilities?
2        A.      Supervising the spare parts crib
3 attendant, supervising vendors and outside
4 contractor activity, supervising the ammonia
5 refrigeration system activities, and supervising
6 the waste water treatment plant operator and
7 those operations as well as backup support for
8 the primary maintenance supervisor when he was
9 otherwise unavailable.
10      Q.      Where is Fleur De Lait located?
11      A.      New Holland, Pennsylvania.
12      Q.      Did you visit one facility or
13 does it have multiple facilities?
14      A.      There were four buildings
15 associated with the company in that locale.
16      Q.      Were those four buildings all
17 located on the same property?
18      A.      No.
19      Q.      How far apart from each other
20 were those buildings located?
21      A.      Approximately an eighth of a
22 mile.
23      Q.      Did you work primarily in one
24 building or out of all the buildings?

Page 50

1        A.      Primarily out of the one
2 building.
3        Q.      Did you ever -- was there any
4 machinery located in the building that you
5 worked out of?
6        A.      Yes.
7        Q.      What type of machinery?
8        A.      So milk and cream processing
9 equipment as well as food packaging equipment
10 and then cooling and refrigeration.
11      Q.      What type of machines were
12 involved in the milk and cream processing?
13      A.      Silos, tanks, homogenizers,
14 separators, pumps, valves.
15      Q.      Was there a mixing of chemicals
16 that occurred in the facility where you were
17 located in order to process the milk and cream?
18      A.      No.
19      Q.      What did you actually do to
20 oversee -- rather to supervise the maintenance
21 of that machinery there?
22      A.      That was similar to
23 Harley-Davidson.  I was involved in coordinating
24 spare parts, though.  So if there is a breakdown

Page 51

1 and we didn't have a spare part I might run down
2 to Lancaster and get it.  But otherwise it was
3 primarily communication, coordination, people
4 management, you know, walking the floor and
5 being available, you know.
6        A customer service aspect with
7 the operators.  My motto as maintenance became
8 "we are here to help."  So just being out there
9 and talking to the operators and understanding
10 what their issues were so that I could
11 communicate that with the maintenance employees.
12      Q.      If there was a issue with regard
13 to a piece of machinery at Fleur De Lait would
14 you be the first person who was called to
15 troubleshoot that issue?
16      A.      No.
17      Q.      Who would be the first person
18 called to troubleshoot that issue?
19      A.      They had a paging system.  So it
20 would be a general page to maintenance which
21 meant any of the available hourly maintenance
22 staff which were on site at the time.
23      Q.      Were you ever called to
24 troubleshoot issues with machinery at Fleur De

Page 52

1 Lait?
2        A.      Yes.
3        Q.      Were you often called to
4 troubleshoot machinery issues at Fleur De Lait?
5        A.      No.
6        Q.      About how often were you called
7 to troubleshoot issues with machinery at Fleur
8 De Lait?
9        A.      Maybe monthly.
10      Q.      On those occasions what would you
11 have to do?
12      A.      Usually I was called when
13 somebody was responding.  So it was rare, if
14 not -- I don't want to say never.  But it was
15 rare that I was actually troubleshooting.  But I
16 was called to the site of the problem.  The
17 problem would be explained to me.  If I
18 understood it well enough that I could direct
19 the hourly employee or help them coach them
20 through a corrective action I would do that.
21      And then, you know, usually there
22 was a reason why no other maintenance folks were
23 available.  So I would be then following up to
24 go find a maintenance employee to try to get



MATTHEW REYNOLDS
REYNOLDS V WILLERT

August 26, 2021
53–56

Page 53

1 them out there to get things taken care of. I
2 can't carry tools, for example. I had a cup of
3 coffee and a pen -- well, not a cup of coffee on
4 the production floor, but clipboard, pen,
5 flashlight.
6       Q.      And in terms of the coaching of
7 individuals through corrective actions, were you
8 personally present with those employees when you
9 would be coaching them?
10      A.      Yes.
11      Q.      Did those corrective actions ever
12 involve issues concerning electrical panels
13 associated with the equipment there?
14      A.      No.
15      Q.      What would happen when there was
16 an issue with the powering of the machines
17 there?
18      A.      We had a journeyman electrician
19 on site. And he was the first point of contact
20 for those issues. We also had a automation and
21 controls technician which is a very similar role
22 that was also primary point of contact.
23      Q.      Did you oversee the work,
24 supervise the work, the journeyman electrical

Page 54

1 individual would perform on site?
2       A.      Yes.
3       Q.      Would you be physically present
4 when you were overseeing that work?
5       A.      At times. Not 100 percent of the
6 time.
7       Q.      Was ensuring that the journeyman
8 electrical individual on site properly
9 troubleshot that issue, did that fall under your
10 umbrella of supervisory responsibility at Fleur
11 De Lait?
12      A.      In terms of -- a clarification
13 question. Do you mean in terms of following
14 electrical safe work practices or the actual
15 troubleshooting steps?
16      Q.      I'm referring to actual
17 troubleshooting steps.
18      A.      Generally, no. The closest I
19 would come to actually troubleshooting would be
20 listening to his assessment of the situation. I
21 would be a sounding board for that guy. He
22 would talk through what he had seen so far. And
23 I might ask questions or sometimes when you say
24 something out loud you hear yourself say the

Page 55

1 answer. So I was a sounding board for him
2 during the troubleshooting process was my role
3 in that primarily.
4       Q.      In your role as a maintenance
5 engineer at Fleur De Lait, was it your
6 responsibility to ensure that issues with the
7 machinery were troubleshot?
8       A.      Primarily, no.
9       Q.      Was it part of your
10 responsibilities?
11      A.      At times when the primary
12 maintenance supervisor was unavailable.
13      Q.      When you became maintenance
14 manager at Fleur De Lait, what were your job
15 responsibilities as a maintenance manager?
16      A.      That included all the job
17 responsibilities I had as a maintenance engineer
18 with the additional responsibility of I was
19 responsible for the budget. So the money that
20 was being spent and accounting for that,
21 developing budget forecasts, developing capital
22 project proposals up to $50,000, maintain a
23 relationship with our sister company next door
24 in part of the same building.

Page 56

1       Q.      As the maintenance manager was it
2 your responsibility at Fleur De Lait to ensure
3 that all of the machinery there was properly
4 maintained and repaired when necessary?
5       A.      Yes. Well, let me clarify. Do
6 you mean like a hundred percent inspection or
7 verification of all jobs? Or just the ownership
8 and responsibility for work being performed
9 correctly and people understanding procedures,
10 being trained in those procedures and following
11 those procedures?
12      Q.      You tell me, Mr. Reynolds. As
13 the maintenance manager there, was it your
14 responsibility to ensure that the machinery
15 there was properly maintained?
16      A.      In terms of policy, yes. In
17 terms of a hundred percent inspection of every
18 job, no. But it was a food plant and extensive
19 regulation comes along with that. So there is
20 personal liability and ownership of ensuring
21 that rules are followed and a number of other
22 regulating bodies. So ultimately that
23 responsibility fell to my position.
24      Q.      Just so I'm clear then when you



MATTHEW REYNOLDS
REYNOLDS V WILLERT

August 26, 2021
57–60

Page 57

1 say in terms of policy, yes, what do you mean by
2 that?
3      A.    So for example there is a tool
4 reconciliation policy that when a employee would
5 go work on a machine there was a verification
6 process to make sure that those tools were
7 extracted from the machine before returning it
8 to production.  And so there would be scheduled
9 audits of our paperwork to see if employees were
10 following that.  And if it was discovered that
11 those policies were not being followed I was
12 responsible to train or coach or if it would
13 extend to disciplinary action then whatever
14 remediation was required that the responsibility
15 for making those corrective actions fell to me.
16      Q.    How long did you hold the
17 position of maintenance manager at Fleur De
18 Lait?
19      A.    2013 to 2019.  So that was six
20 years.
21      Q.    Why did you leave Fleur De Lait?
22      A.    I found a -- I was offered a job
23 at a company called Grosfillex which I would
24 have to spell for you if you are interested.

Page 58

1      Q.    When you left Fleur De Lait what
2 were you earning?
3      A.    I believe my last W-2 there was
4 $92,750 plus or minus.
5      Q.    Did you earn any bonuses while
6 you were at Fleur De Lait?
7      A.    Yes.
8      Q.    Did you earn a bonus every year
9 that you worked at Fleur De Lait?
10      A.    Yes.
11      Q.    When you last left Fleur De Lait
12 what was the last bonus amount that you had
13 received?
14      A.    I believe this is an estimate.
15 But I believe it was a 12 percent bonus on my
16 annual salary.
17      Q.    How about the year before you
18 left Fleur De Lait, was it also 12 percent
19 bonus?
20      A.    I can't remember exactly.  But
21 every year it was within I would say 11 to
22 13 percent.
23      Q.    Were there certain requirements
24 that you had to meet in order to earn that

Page 59

1 bonus?
2      A.    Yes.
3      Q.    Do you recall what those
4 requirements were the last year that you worked
5 for Fleur De Lait?
6      A.    Safety, quality, maintenance
7 performance, budget performance, and capital
8 project completion and process improvements and
9 waste treatment plant compliance.
10      Q.    Were there certain things that
11 needed to be met with regard to each of those
12 categories in order for you to earn the bonus?
13      A.    Yes.
14      Q.    Did you achieve those goals in
15 your last three years that you worked at Fleur
16 De Lait?
17      A.    I achieved a high percentage of
18 those goals.  I didn't hit a hundred percent on
19 all of the metics.
20      Q.    Were you ever the subject to any
21 disciplinary action at Fleur De Lait?
22      A.    No.
23      Q.    Did you ever receive any written
24 reprimands while you worked for Fleur De Lait?

Page 60

1      A.    No.
2      Q.    Did you ever receive any negative
3 performance evaluations while you worked at
4 Fleur De Lait?
5      A.    No.
6      Q.    Did you receive written job
7 performance evaluations while you worked at
8 Fleur De Lait?
9      A.    Written job evaluations?  There
10 was a annual performance review process.
11      Q.    Did you receive annual written
12 performance reviews?
13      A.    So not in the sense that they
14 were written by somebody else.
15      Q.    Did you have to perform complete
16 self-evaluations each year at Fleur De Lait?
17      A.    Yes.
18      Q.    Did you receive anything in
19 writing back from anyone at Fleur De Lait about
20 your performance evaluations each year?
21      A.    Yes.  There was a feedback loop.
22      Q.    Do you have copies of written
23 performance evaluations that you received while
24 working at Fleur De Lait?



MATTHEW REYNOLDS
REYNOLDS V WILLERT

August 26, 2021
61–64

Page 61

1    A.    I'm not sure.
2    Q.    Did you at any time have copies
3  of written performance evaluations that you
4  received at Fleur De Lait?
5    A.    I don't believe I got a hundred
6  percent of them.
7    Q.    Do you still possess copies of
8  any of the written performance evaluations that
9  you received while working at Fleur De Lait?
10   A.    I don't believe so.
11   Q.    Do you recall when you last
12  possessed copies of any written performance
13  evaluations you received while working at Fleur
14  De Lait?
15   A.    2019 when I still worked there.
16   Q.    After you left there did you get
17  rid of the written performance evaluations?
18   A.    I don't believe I took them with
19  me. I don't believe I took them with me.
20   Q.    Do you have a copy your personnel
21  file from Fleur De Lait?
22   A.    No.
23   Q.    Why did you leave Fleur De Lait?
24   A.    I accepted a role at Grosfillex.

Page 62

1    Q.    Were you interviewing for jobs at
2  that time?
3    A.    Yes.
4    Q.    Why?
5    A.    Work/life balance.
6    Q.    Were you looking for a better
7  work/life balance than what you felt you had at
8  Fleur De Lait?
9    A.    Correct.
10   Q.    What was your criticism of the
11  work/life balance at Fleur De Lait?
12   A.    There were 24/7 phone support
13  that resulted in numerous wake-up calls in the
14  middle of the night a few times a week, two or
15  three in the morning, as well as being called in
16  Christmas night, Easter morning -- interrupts to
17  family life.
18   Q.    Did you use a recruiter to find
19  your next job?
20   A.    Yes.
21   Q.    What recruiter did you use?
22   A.    I don't remember honestly.
23   Q.    Do you recall the name of the
24  company that recruiter may have been affiliated

Page 63

1  with, if any?
2    A.    No. Oh, the recruiter's name was
3  Tamara. I don't remember her last name. And I
4  don't remember the company. But I remember her
5  name was Tamara.
6    Q.    Do you have copies of any written
7  communications between you and Tamara during
8  that time?
9    A.    That's unknown.
10   Q.    When you communicated with her in
11  writing, was it via email or hard copies?
12   A.    Email.
13   Q.    What email account did you use to
14  communicate with her?
15   A.    That was a Gmail account.
16   Q.    What is that email address?
17   A.    Soundmindservices@gmail.com.
18   Q.    Was that the Gmail account you
19  used or that she was using?
20   A.    That was mine.
21   Q.    What is Sound Mind Services?
22   A.    Just a name I made up back in the
23  early 2000s.
24   Q.    So you mentioned then the name of

Page 64

1  the company that you worked with after Fleur De
2  Lait. Would you mind saying it again and
3  spelling it for us, please?
4    A.    Sure. It was Grosfillex.
5  G-R-O-S-F-I-L-L-E-X.
6    Q.    What is Grosfillex?
7    A.    They are a privately owned French
8  company that manufactures commercial plastic
9  furniture.
10   Q.    Where is Grosfillex located?
11   A.    Robesonia. There is two plants.
12  There is one in Robesonia and there is one in
13  Lebanon, Pennsylvania.
14   Q.    Which facility did you work at?
15   A.    Both. My office was located in
16  Robesonia.
17   Q.    When you began working at
18  Grosfillex what was your job title?
19   A.    Maintenance manager.
20   Q.    As the maintenance manager what
21  were your job responsibilities?
22   A.    Supervising maintenance staff,
23  hiring. I never fired anybody. But that would
24  have fallen under my responsibility. Coaching,



Page 65
1 coordinating maintenance work as well as project
2 work.
3      Q.     In terms of coordinating
4 maintenance work, what did that entail in terms
5 of your job responsibilities?
6      A.     Setting priorities for the
7 maintenance employees, communicating and
8 coordinating amongst the management staff and
9 the production staff so that everybody was on
10 the same page as far as what was happening when
11 equipment would be returned to service and when
12 equipment needed to be made available for
13 service.
14      Q.     In terms of supervising the
15 maintenance staff, what did your job
16 responsibilities entail?
17      A.     Communication, providing
18 direction, coaching, purchasing as far as spare
19 parts or tools, setting priorities again.
20 Occasionally I would drive somewhere for spare
21 parts if there was a crisis breakdown and we
22 needed some parts.
23      Q.     What types of things would you
24 provide correction and coaching to the employees

Page 66
1 at Grosfillex?
2      A.     So coaching, housekeeping in the
3 maintenance shop, trying to improve overall
4 appearance, directions as far as again setting
5 priorities to make sure the most important tasks
6 got done quickly.
7      Q.     What did you actually do to set
8 priorities?
9      A.     I would be -- I used emails,
10 phone calls, personal interaction.  I posted
11 work schedules, those things.
12      Q.     Was there any machinery located
13 at the facilities where you worked for
14 Grosfillex?
15      A.     Yes.
16      Q.     What types of machinery?
17      A.     At Robesonia it was injection
18 molding and in Lebanon it was a paint line,
19 automated paint conveyor line.
20      Q.     How big were the injection
21 molding machines?
22      A.     In general terms roughly the size
23 of a school bus.  They were 1,200 ton and 1,800
24 ton.  That is the pressure they provided, not

Page 67
1 how much they weighed individually.
2      Q.     How was the injection molding
3 machine powered?
4      A.     Electricity.
5      Q.     Were any chemicals placed into
6 the injection molding machine?
7      A.     No.
8      Q.     At Grosfillex did they mix or
9 process any chemicals?
10      A.     The paint shop would have had
11 thinners for clean-up.  Does that fit your
12 question?
13      Q.     Were those thinners chemicals?
14      A.     Yes.
15      Q.     Were those thinners mixed and
16 processed at Grosfillex?
17      A.     No.  They were not mixed.
18      Q.     As part of your job
19 responsibilities as the maintenance manager at
20 Grosfillex, did you oversee and supervise the
21 maintenance and repair of injection molding
22 machinery?
23      A.     Yes.
24      Q.     What types of tasks did you

Page 68
1 perform to supervise and oversee the maintenance
2 of the injection molding machines?
3      A.     My tasks were coordination,
4 communication, follow-up, setting priorities,
5 ensuring proper staffing is available, ensuring
6 that proper spare parts were available,
7 coordinating outside vendor support if specific
8 technical resources were required.  I believe
9 those are the -- yeah.  I will stop there.
10      Q.     What role did you play with
11 regard to the repair of the injection molding
12 machines?
13      A.     Coordinator or manager.
14      Q.     By coordinator what specific
15 things would you do?
16      A.     Again, that would be coordinating
17 outside vendor support for -- there was a
18 summer shutdown.  They shut down the plant for
19 two months.  And there were I think it was like
20 five or six hundred individual tasks that were
21 associated with that shutdown.  So coordinating
22 those tasks, recording completion and
23 communicating the status across the plant and
24 organizing staffing to help complete those



MATTHEW REYNOLDS
REYNOLDS V WILLERT

August 26, 2021
69–72

Page 69

1 tasks.

2      Q.      Would you mind telling me again
3 what they made at Grosfillex?

4      A.      Sure.  If you go to a Hilton and
5 they have a and chaise lounge with a matching
6 table and chair next to it that is the product
7 they are making.  And similar products, like
8 outdoor seating that if you go to Sea Isle City
9 a number of those restaurants there right in the
10 center of town have Grosfillex furniture.

11      Q.      Did you ever have to physically
12 inspect the injection molding machines?

13      A.      Yes.

14      Q.      Did that ever involve inspection
15 of the electrical panels associated with those
16 machines?

17      A.      No.

18      Q.      What would happen when there was
19 an issue with the powering of the machine?

20      A.      We had a maintenance employee who
21 was a trained electrician.  So he was the
22 primary first responder for that kind of issue.

23      Q.      Does that maintenance employee
24 report to you?

Page 70

1      A.      Yes.

2      Q.      Did you ever have to troubleshoot
3 any issues with the injection molding machine?

4      A.      No.

5      Q.      Were there ever any issues with
6 the injection molding machines while you worked
7 at Grosfillex?

8      A.      Yes.

9      Q.      Were those issues troubleshot
10 with regard to those machines?

11      A.      Yes.

12      Q.      Who performed the troubleshooting
13 of those machines while you worked there?

14      A.      The maintenance technicians.

15      Q.      Who did the maintenance
16 technicians report to at Grosfillex?

17      A.      Myself.

18      Q.      How long did you work at
19 Grosfillex?

20      A.      Just under one year.

21      Q.      What date did you stop working at
22 Grosfillex?

23      A.      March 27, 2020.

24      Q.      Why did you stop working there at

Page 71

1 that time?

2      A.      It was deemed a nonessential
3 business.  And so the entire operation shut down
4 and I was laid off at that time.

5      Q.      Was anyone else laid off at the
6 same time you were laid off?

7      A.      Yes.

8      Q.      Did the manufacturing facilities
9 associated with Grosfillex then close?

10      A.      Yes.

11      Q.      Have they reopened at all since
12 March 7, 2020?

13      A.      I believe so.  Although I have
14 not been there to confirm that.

15      Q.      Do you have any sense as to when
16 they may have reopened?

17      A.      For that last question I am
18 guessing.  And you said not to guess.  I should
19 say I don't know if they reopened honestly.

20      Q.      Have you ever reached out to them
21 since you left to see if you can return to work
22 there?

23      A.      No.

24      Q.      Did anyone from Grosfillex

Page 72

1 contact you after you left to see if you were
2 interested in returning to work there?

3      A.      No.

4      Q.      When you left Grosfillex what
5 were you earning?

6      A.      $84,700 a year plus or minus.

7      Q.      Did you ever earn a bonus while
8 you worked for Grosfillex?

9      A.      No.

10      Q.      Was there a bonus structure in
11 place while you worked for Grosfillex?

12      A.      Yes.

13      Q.      Were you eligible to earn any
14 bonuses during time you worked for Grosfillex?

15      A.      No.

16      Q.      Why were you not eligible to earn
17 any bonuses during the time you worked for
18 Grosfillex?

19      A.      The timing around the calendar
20 year and my employment start and end dates in
21 relation to that.

22      Q.      Were you ever the subject of any
23 disciplinary action at Grosfillex?

24      A.      No.



MATTHEW REYNOLDS
REYNOLDS V WILLERT

August 26, 2021

73–76

Page 73

1      Q.      Did you ever receive any negative
2  performance reviews?
3      A.      No.
4      Q.      Were you ever criticized with
5  regard to the work that you performed at
6  Grosfillex?
7      A.      I'm not aware of any criticism.
8      Q.      Are you aware of anything close
9  to criticism?
10     A.      I received feedback about
11 priorities.  But I wouldn't classify it as
12 criticism.  It was a conversation between
13 manager and supervisor.
14     Q.      What type of feedback did you
15 receive about priorities there?
16     A.      It was a verbal feedback.
17     Q.      What was the content of the
18 feedback?
19     A.      From what I remember I was told
20 to focus on some written priority task lists.
21     Q.      Why were you told to focus on
22 those written priority task lists?
23     A.      Because I had been focusing a
24 fair amount of time on training, coaching and

Page 74

1  development of employees.  And I was redirected
2  to focus more on some specific tasks.
3      Q.      At the time that you received the
4  verbal feedback were those tasks that they
5  believe you should have been completing there
6  already?
7      A.      Yes.
8      Q.      Did you ever receive any verbal
9  feedback regarding the work that you performed
10 at Harley-Davidson?
11     A.      I don't remember.
12     Q.      Do you ever receive any verbal
13 feedback about the work that you performed at
14 Fleur De Lait?
15     A.      Yes.
16     Q.      What type of verbal feedback did
17 you receive at Fleur De Lait?
18     A.      It was positive.
19     Q.      Did you ever receive any negative
20 verbal feedback regarding your work performance
21 at Fleur De Lait?
22     A.      No.
23     Q.      Who provided you with the verbal
24 feedback at Fleur De Lait?

Page 75

1      A.      The plant manager.
2      Q.      Who was the person who provided
3  you with the verbal feedback at Grosfillex?
4      A.      The director of operations which
5  is equivalent to plant manager.
6      Q.      What was that person's name?
7      A.      Gene Hracho.
8      Q.      Is that Gene -- is Gene male or
9  female?
10     A.      Male.
11     Q.      Do you know how to spell Gene's
12 name?
13     A.      G-E-N-E, H-R-A-C-H-O.
14     Q.      Have you had any communications
15 with Gene Hracho since you left Grosfillex?
16     A.      I recall one communication.
17     Q.      When did that one communication
18 with Mr. Hracho occur?
19     A.      Shortly after the layoff.
20     Q.      What did you and Mr. Hracho
21 discuss at that time?
22     A.      I don't remember specifically.  I
23 recall it being kind of a check-in from him to
24 me.

Page 76

1      Q.      What was he checking in on?
2      A.      I don't want to guess.  But I did
3  have a medical procedure done like the day of
4  the layoff.  And I am estimating that he was
5  checking in to see how that went.
6      Q.      What medical procedure did you
7  have done on the day of the layoff?
8      A.      I can answer that.  Isn't it like
9  HIPAA protected.  I can answer I suppose.
10         MR. AUERBACH:  Go ahead and
11    answer it, please.
12         THE WITNESS:  It was a
13    colonoscopy.
14 BY MS. FICARO
15     Q.      Have you had any other
16 communications with Mr. Hracho since you left
17 Grosfillex?
18     A.      I don't believe so.
19     Q.      Have you spoken to anyone else
20 from Grosfillex since you left there?
21     A.      No.
22     Q.      From the time you left Grosfillex
23 until the time you began working for Willert did
24 you hold any other jobs?



MATTHEW REYNOLDS
REYNOLDS V WILLERT

August 26, 2021
77—80

Page 77

1    A.    No.
2    Q.    Did you apply for any other jobs
3 during that time?
4    A.    Yes.
5    Q.    How many other jobs did you apply
6 for?
7    A.    I would -- this would be an
8 estimate.  Around ten.  I was on Indeed all the
9 time.  Ten to twenty.  That's an educated guess.
10    Q.    Did you receive any other job
11 offers during that time?
12    A.    No.
13    Q.    Did you use a recruiter during
14 that time between when you worked for Grosfillex
15 and when you worked for Willert to look for
16 jobs?
17    A.    Yes.
18    Q.    What recruiter did you use at
19 that time?
20    A.    Executive Avail-a-Search was one
21 of them.
22    Q.    How do you spell Availa?
23    A.    So it was A-V-A-I-L-A Search.
24    Q.    Where is that company located?

Page 78

1    A.    Lancaster.
2    Q.    Was there a specific individual
3 for whom you worked with there?
4    A.    Primarily it was Mark Whiteman or
5 Whiteman.
6    Q.    Are you currently employed?
7    A.    Yes.
8    Q.    Where are you currently employed?
9    A.    Georgia Pacific.
10    Q.    Is there a specific facility for
11 Georgia Pacific out of which you work?
12    A.    There are multiple facilities.
13 So not one specific facility.
14    Q.    Do you travel from facility to
15 facility for Georgia Pacific?
16    A.    Yes.
17    Q.    How much time do you typically
18 spend in each facility when you travel there?
19    A.    At this time one to three weeks.
20    Q.    During the times when you are not
21 traveling from facility to facility is there a
22 specific Georgia Pacific facility at which you
23 maintain an office?
24    A.    Not yet.

Page 79

1    Q.    Do you expect that there will be
2 soon?
3    A.    Yes.
4    Q.    Where do you expect that you will
5 soon be working out of for Georgia Pacific?
6    A.    Jonestown, Pennsylvania.
7    Q.    Johnstown or Jonestown?
8    A.    Jonestown.  Zip 17038.
9    Q.    When did you expect that you will
10 be maintaining an office at that location?
11    A.    Mid October 2021.
12    Q.    Why do you expect to be
13 maintaining a office at that location then?
14    A.    That's when the location is
15 opening.
16    Q.    When did you begin working for
17 Georgia Pacific?
18    A.    June 28, 2021.
19    Q.    How did you come to get the job
20 at Georgia Pacific?
21    A.    It was a recruiter.
22    Q.    Which recruiter did you use?
23    A.    I can't remember his name.
24    Q.    Do you recall the company with

Page 80

1 which he was affiliated?
2    A.    Not at this time.
3    Q.    What is your job title at Georgia
4 Pacific?
5    A.    Reliability supervisor.
6    Q.    As a reliability supervisor what
7 are your job responsibilities?
8    A.    Developing the preventative
9 maintenance program, developing the critical
10 spare parts.  It will entail and it does entail
11 the supervision and coordination of maintenance
12 staff and work safety compliance.
13    Q.    Since you've been working for
14 Georgia Pacific have you received any negative
15 performance reviews?
16    A.    No.
17    Q.    Since you have been working at
18 Georgia Pacific have you received any feedback
19 regarding the work you performed so far?
20    A.    Yes.
21    Q.    What type of feedback have you
22 received?
23    A.    Positive verbal feedback.
24    Q.    Who provided that positive verbal



MATTHEW REYNOLDS
REYNOLDS V WILLERT

August 26, 2021
81–84

Page 81

1 feedback to you?
2      A.    My direct supervisor.
3      Q.    What is the name of your direct
4 supervisor?
5      A.    Ty Vaughn.
6      Q.    What specific feedback were you
7 provided?
8      A.    Appreciation for my willingness
9 to jump in and take over responsibilities,
10 coordinating some breakdowns and ensuring that
11 some priority work was accomplished.
12      Q.    What do you earn at Georgia
13 Pacific?
14      A.    Annual salary is $98,000 a year.
15      Q.    Is there a bonus structure there?
16      A.    There is a bonus structure, yes.
17      Q.    Are you eligible to earn a bonus
18 there?
19      A.    The bonuses here at Georgia
20 Pacific are sort of -- opportunistic rather than
21 like the typical annual bonus structure.  So if
22 I provide a notable performance gain or
23 something I can be eligible for that.  Yes.
24 What was the question again?

Page 82

1      Q.    I will just follow up by asking
2 are there concrete metrics that you need to meet
3 in order to obtain a bonus at Georgia Pacific?
4      A.    No.  Not that I'm aware of.
5      Q.    Are the bonuses discretionary?
6      A.    Yes.
7      Q.    If you were to receive a bonus do
8 you have any idea how much that bonus could be?
9      A.    No.  I would be guessing.
10      Q.    Did the bonus structure set forth
11 potential bonus amounts that can be earned?
12      A.    I have not seen any in writing,
13 nor have I been communicated any verbally.
14      Q.    Did you receive an offer letter
15 before you began working at Georgia Pacific?
16      A.    Yes.
17      Q.    Do you have a copy of that offer
18 letter?
19      A.    Yes.
20      Q.    Did you sign an employment
21 agreement before you began working at Georgia
22 Pacific?
23      A.    I believe so.
24      MS. FICARO:  Steve, can you

Page 83

1 please provide copies of that offer letter
2 and employment agreement to us?
3      MR. AUERBACH:  Send me a letter.
4 But I do believe I sent that to you.  It
5 would have been an email titled
6 "mitigation."  And I got it within a day or
7 two, meaning I sent it to you within a day
8 or two that I received it, as you
9 previously requested any mitigation
10 efforts.  So search your inbox.  Send me a
11 letter and I will look into anything.
12      THE WITNESS:  Eileen, just a
13 point of clarity:  The employment agreement
14 like -- at Fleur De Lait there was a
15 contract that I signed.  Do you mean
16 something like that?  Or just like terms of
17 employment?
18 BY MS. FICARO
19      Q.    So if there any contract you
20 signed at Fleur De Lait -- let me -- was there a
21 contract that you signed before you began
22 working at Fleur De Lait?
23      A.    I thought we were talking about
24 Georgia Pacific?

Page 84

1      Q.    I was.  But you mentioned Fleur
2 De Lait I think when you commented on that.
3      A.    Yes.  I was using that as a frame
4 of reference because I'm familiar with a
5 contract in that term.  So Fleur De Lait had a
6 contract which Georgia Pacific does not.  And I
7 was trying to clarify if you meant like an
8 agreement at that level like a contract level or
9 just the employee website where you check boxes.
10 Sorry.  It's nebulous.
11      Q.    Do you have any plans to leave
12 Georgia Pacific any time soon?
13      A.    No.
14      Q.    Has anyone at Georgia Pacific
15 asked you to leave since you begun working
16 there?
17      A.    No.
18      Q.    Did you take a preemployment drug
19 screen at Georgia Pacific?
20      A.    Yes.
21      Q.    Did you receive any written
22 records back regarding those drug screen
23 results?
24      MR. AUERBACH:  What employer?



MATTHEW REYNOLDS
REYNOLDS V WILLERT

August 26, 2021
85–88

Page 85

1  BY MS. FICARO
2      Q.    Georgia Pacific.
3      A.    Just clarification:  Do you mean
4  like the actual record from the drug test lab?
5      Q.    Well, first I will ask about the
6  record from the drug test lab.  Was there a
7  record you received from the drug test lab
8  regarding the test you took for Georgia Pacific?
9      A.    No.
10      Q.    Did you receive any documentation
11  from Georgia or anyone else about the drug
12  screen results from your test at Georgia
13  Pacific?
14      A.    I don't think so.
15      Q.    Is it possible that you did?
16      A.    If I did it was simply a pass in
17  an email.  I passed the drug test.  I got hired.
18      Q.    Did the drug screen that you took
19  for Georgia Pacific, did it screen for THC?
20      A.    Yes.
21      Q.    Do you know if those drug screen
22  results showed a positive result for THC?
23      A.    Do I know if they tested
24  positive?  Do I know if they test -- I don't

Page 86

1  know how to answer that.  Do I know if they
2  tested positive?  I know that they did not test
3  positive for THC.
4      Q.    How do you know that?
5      A.    I took three preemployment drug
6  tests on my own which indicated a pass.  And I
7  also received a offer letter from them.  They
8  have a very clear drug policy.  So if I had
9  tested positive for THC there would have been at
10  a minimum a conversation about that because they
11  do have a clause in regards to medical marijuana
12  but that conversation didn't happen because I
13  tested negative.
14      Q.    Why did you take three drug
15  screens on your own before you began working at
16  Georgia Pacific?
17      A.    I wanted to be sure.
18      Q.    Why three?
19      A.    No specific reason.  I mean, they
20  were cheap Dollar Tree drug tests.  So I didn't
21  know how reliable they were.  So I tried three.
22  Seemed like a good number.
23      Q.    Before you took those tests was
24  there concern on your part that they might be

Page 87

1  positive?
2      A.    Yes.
3      Q.    Why were you concerned they could
4  be positive?
5      A.    I was uncertain how long it takes
6  THC to clear your system once you stop using it.
7      Q.    Have you stopped using medical
8  marijuana?
9      A.    Yes.
10      Q.    When did you stop using medical
11  marijuana?
12      A.    I estimate sometime in May
13  of 2021.
14      Q.    Why did you stop using medical
15  marijuana?
16      A.    Why did I stop?  I decided to
17  stop.
18          MS. FICARO:  Can we go off the
19      record?
20          (A recess was taken from 12:13
21  p.m. to 12:46 p.m.)
22  BY MS. FICARO
23      Q.    Mr. Reynolds, we are back on the
24  record now.  And you had just indicated to me

Page 88

1  that you took some ibuprofen, that your head
2  hurts, and that you are feeling off.  Is that
3  accurate?
4      A.    Yes.
5      Q.    Do you feel as though you can
6  proceed with this deposition?
7      A.    Yes.
8      Q.    Are you concerned about doing
9  that?
10      A.    No.  We can proceed.
11      Q.    Does the fact that you are
12  feeling off and that your head hurts, does that
13  affect your ability to understand my questions
14  and answer them accurately?
15      A.    No.  I don't believe so.
16          MS. FICARO:  Steve, do you have
17      any objection to us continuing with the
18      deposition?
19          MR. AUERBACH:  No.  I don't.
20      But, Matt, I need to instruct you that if
21      that changes at any moment, specifically if
22      you feel that you don't understand what is
23      going on, you can't concentrate, you have
24      an obligation to let us know.  You got



MATTHEW REYNOLDS
REYNOLDS V WILLERT

August 26, 2021
89—92

Page 89

1 that?
2          THE WITNESS:  Yes.
3 BY MS. FICARO
4     Q.    We are not trying to torture you
5 here, Mr. Reynolds.  And for everyone involved
6 is interested in the transcript being accurate.
7 And we would not want to proceed if you
8 indicated there was something going on with you
9 physically or mentally that would impact your
10 deposition testimony in any way.
11     A.    Okay.  I will let you know.
12     Q.    If it gets worse or anything
13 please let me know.  You can ask for a break at
14 any time.  And you can interject at any time if
15 you feel as though you are concerned that you
16 cannot continue with the deposition.
17     A.    Okay.
18     Q.    If that's the case we will figure
19 something else out.
20     A.    Yes.  If I hit the wall I will
21 let you know.
22     Q.    Great.
23          When we left off here we were
24 discussing about your new job with Georgia

Page 90

1 Pacific.  I believe you testified that you came
2 to find out about that job via a recruiter; is
3 that correct?
4     A.    Yes.
5     Q.    Did you have to submit an
6 application to work at Georgia Pacific?
7     A.    Yes.
8     Q.    When did you submit the
9 application to work at Georgia Pacific?
10    A.    Sometime the week prior to
11 June 28, maybe two weeks prior.
12    Q.    Did you have any interviews with
13 anyone at Georgia Pacific?
14    A.    Yes.
15    Q.    Who did you interview with there?
16    A.    It was Monica Stopsinski.  I'm
17 not sure I can spell that last name properly.
18 And Terrence Rice, Cliff Brignola and Ty Vaughn.
19 There was also like a prescreen from the
20 recruiter.  But that was not with Georgia
21 Pacific specifically.
22    Q.    When did you do the prescreen
23 with the recruiter?
24    A.    It moved pretty quick.  Maybe two

Page 91

1 weeks prior to the 28th.  Around June 14th, the
2 10th through the 14th.
3     Q.    What does the prescreen entail?
4     A.    Explanation of the job, the
5 scenario, circumstances, gauging my interest
6 level and just kind of validating that my
7 background would be a potentially good fit.
8     Q.    When did your interviews with
9 Georgia Pacific occur?
10    A.    In between the 14th and the 28th.
11 I can't recite exact dates.
12    Q.    That is the 14th through the 28th
13 of June?
14    A.    Yes.  June 14, 2021.
15    Q.    Mr. Reynolds, you've already
16 mentioned today stopping using medical
17 marijuana.  You indicated you stopped in
18 May 2021; is that correct?
19    A.    Yes.
20    Q.    When did you begin using medical
21 marijuana?
22         MR. AUERBACH:  One second.  If
23    you are asking in terms -- first off,
24    objection.  If you are asking about

Page 92

1    marijuana in general Mr. Reynolds will
2    assert a Fifth Amendment right and rights
3    under Rule 403 and 608.
4         If you are asking about medical
5    marijuana he may answer.  Otherwise based
6    on the assertion of privilege I am
7    directing him not to answer.
8         MS. FICARO:  Would that be with
9    regard to any and all questions regarding
10   recreational, nonmedical marijuana use?
11        MR. AUERBACH:  Anything before
12   July 2020.
13        MS. FICARO:  Anything before
14   July 2020.  So just to be clear here then
15   Mr. Reynolds is asserting a Fifth Amendment
16   privilege with regard to any questions
17   regarding his use of recreational marijuana
18   before July 2020; is that correct?
19        MR. AUERBACH:  Yes.
20 BY MS. FICARO
21    Q.    So to get back to my question:
22 When did you begin using medical marijuana?
23    A.    Sometime after --
24        MR. AUERBACH:  Did you say

MATTHEW REYNOLDS
REYNOLDS V WILLERT

August 26, 2021
93—96

Page 93

1    marijuana or medical marijuana?
2         MS. FICARO:  I said medical
3    marijuana.
4  BY MS. FICARO
5         Q.    When did you begin using medical
6  marijuana?
7         A.    After I received the patient card
8  from the State of Pennsylvania which I believe
9  the date on the card was July 6, 2020.  So after
10  that time I was able to go to a dispensary and
11  obtain medical marijuana.
12        Q.    Were you ever prescribed medical
13  marijuana?
14        A.    There was a doctor's
15  recommendation for a course of medical
16  marijuana.  I believe that's the proper
17  terminology for that.
18        Q.    What doctor recommended a course
19  of medical marijuana?
20        A.    And her name is -- and I think it
21  was with Green Health Docs.  I can't remember
22  the last name.  Something like Tavoli.  I'm
23  butchering that.  It's not a hundred percent
24  accurate.

Page 95

1         Q.    How did you find Dr. Andrea?
2         A.    On the Pennsylvania state medical
3  marijuana page list of approved practitioners.
4  And I found her name on there.
5         Q.    How many times have you treated
6  with Dr. Andrea?
7         A.    One time with her.  But you meet
8  with or consulted with...
9         Q.    She is a doctor, correct?
10        A.    Yes.
11        Q.    Did she ever provide you with any
12  medical treatment?
13        A.    I'm not playing dumb.  But I'm
14  not a hundred percent clear on the definition of
15  medical treatment.
16        Q.    Why did you go to see Dr. Andrea?
17        A.    Oh, extreme anxiety.
18        Q.    So did you go to Dr. Andrea with
19  the hope that she would be able to help to treat
20  you for your extreme anxiety?
21        A.    Yes.
22        Q.    Did she perform any type of
23  evaluation of you when you saw her?
24        A.    Yes.

Page 94

1         Q.    I will refer to her as Andrea
2  only because you are unsure of her last, not to
3  not show a lack of disrespect.
4         A.    Sure.
5         Q.    So I will call her Dr. Andrea.  I
6  will clarify.  Is she a medical doctor?
7         A.    Yes.
8         Q.    And with which practice was
9  Dr. Andrea affiliated?
10        A.    I believe it was Green Health
11  Doctors was the name of it.  I found it through
12  the Pennsylvania state list of approved
13  practitioners.
14        Q.    When did you first see
15  Dr. Andrea?
16        A.    I believe it was either May or
17  June of 2020.  I forget exactly how long the
18  approval process took after I saw her until the
19  card was issued.  But just based on the date on
20  the card it was within six weeks or so prior to
21  that.
22        Q.    So that would put it when?  June
23  did you say 2020?
24        A.    Yes.  Like May or June 2020.

Page 96

1         Q.    What type of evaluation did she
2  perform?
3         A.    I don't know a medical term.  But
4  there were a series of questions, you know,
5  whether that be like a psychiatric evaluation or
6  something similar, a series of questions.
7         Q.    Did she diagnose you with
8  anything during that meeting with her?
9         A.    Anxiety.
10        Q.    Did she diagnose you with
11  anything else?
12        A.    No.  I don't believe so.
13        Q.    Did you discuss with her
14  potential treatment options for your anxiety?
15        A.    Yes.
16        Q.    What treatment options did you
17  discuss?
18        A.    I discussed treatments that were
19  not working at the time.  And I was inquisitive
20  about medical marijuana being a potential
21  treatment.
22        Q.    Did you go to Dr. Andrea hoping
23  that you would get a prescription for medical
24  marijuana?



MATTHEW REYNOLDS
REYNOLDS V WILLERT

August 26, 2021
97–100

Page 97

1     A.    Yes.
2     Q.    Why were you interested in
3  medical marijuana at that time?
4     A.    So I had just seen a family
5  member get involuntarily committed to a
6  psychiatric ward because they tried a brand new
7  prescription pill, a pharmaceutical.  And I had
8  tried some pharmaceuticals in the past after
9  seeing just how bad the negative side effects of
10 psychiatry can be.  I really didn't want to try
11 something new.  I decided maybe a organic,
12 plant-based option would be a better thing for
13 me.  That's really what drove that.
14     Q.    So for now I am not interested in
15 the person's name.  But in terms of family
16 relationship to you how is that person related
17 to you?
18     A.    Sibling.  So I figured the DNA is
19 pretty close.  I don't want to gamble with my
20 future like that.  I never want to be in that
21 position.
22     Q.    Other than the sibling have any
23 of your other family members experienced mental
24 health issues?

Page 98

1     A.    I don't know.  I don't know
2  diagnoses.  I believe my dad has seen a doctor
3  for mental health something.  I don't know
4  details.
5     Q.    Are you aware whether your dad
6  has any mental health diagnoses?
7     A.    I'm not aware.
8     Q.    Was it upsetting to you that your
9  sibling was involuntarily committed?
10     A.    Yes.  Deeply.
11     Q.    At the time that you went to see
12 Dr. Andrea were you currently at that time
13 treating with any other mental health care
14 professionals?
15     A.    Sorry.  Can you still hear me?
16     Q.    Can you hear us?
17     A.    Yes.  Another call came in for a
18 second.  So at the time I saw Dr. Andrea had
19 I...
20     Q.    Were you treating with another
21 doctor at that time?
22     A.    Yes.
23     Q.    Who were you treating with when
24 you went to see Dr. Andrea?

Page 99

1     A.    Dr. Maria Fernando.
2     Q.    Where is Dr. Maria Fernando
3  located?
4     A.    Lancaster, Pennsylvania.
5     Q.    Is she affiliated with a
6  particular entity or practice?
7     A.    I'm not sure.  I believe she is
8  an independent practice but not certain.
9     Q.    What is her address?
10     A.    I think it's 230 Shippen Street
11 or maybe West Shippen Street in Lancaster.
12 That's an estimate but pretty close.
13     Q.    Are you still treating with
14 Dr. Fernando now?
15     A.    No.
16     Q.    When did you stop treating with
17 Dr. Fernando?
18     A.    Sometime in 2020.  Sometime after
19 I got laid off.  Just money got tight.
20     Q.    Was there any reason you stopped
21 treating with her other than money getting
22 tight?
23     A.    Treatment didn't seem to be
24 effective for the anxiety I was experiencing.

Page 100

1  So I made the decision to stop with them.
2     Q.    Which treatment are you referring
3  to?
4     A.    She had me on some pharmaceutical
5  prescriptions.
6     Q.    With what prescription did she
7  have you on?
8     A.    Lamictal and Abilify.
9     Q.    From what periods of time to what
10 period of time did you take Lamictal and
11 Abilify?
12     A.    I believe I started in 2015
13 through that period in 2020 there.
14     Q.    You mentioned that you were
15 treating with Dr. Fernando when you went to see
16 Dr. Andrea.  Did Dr. Fernando refer you to
17 Dr. Andrea?
18     A.    No.
19     Q.    Did you ever discuss potential
20 medical marijuana usage with Dr. Fernando?
21     A.    I don't believe so.
22     Q.    Did you ever discuss or notify
23 Dr. Fernando that you were using medical
24 marijuana after you began using medical



MATTHEW REYNOLDS
REYNOLDS V WILLERT

August 26, 2021
101—104

Page 101

1 marijuana?

2     A.    I don't recall.

3     Q.    Between June 2020 and when you
4 stopped seeing Dr. Fernando how many times did
5 you see Dr. Fernando?

6     A.    I'm not certain.  I don't
7 remember.

8     Q.    Are you able to estimate or
9 approximate in terms of it being for example
10 more than five times or less than five times?

11     A.    It was less than five.  I was
12 thinking maybe one or two.

13     Q.    Have you seen Dr. Andrea at any
14 time other than when you saw her on the occasion
15 in June 2020?

16     A.    No.

17     Q.    When you spoke to Dr. Andrea did
18 she discuss any pharmaceutical options for the
19 treatment of your anxiety at that time?

20     A.    No.

21     Q.    Was medical marijuana the only
22 thing she recommended for you?

23     A.    Yes.

24     Q.    Did she provide a prescription

Page 102

1 for you?

2     A.    I don't -- I don't think that is
3 how the system works.

4           MR. AUERBACH:  Off the record.

5           (Discussion held off the record.)

6           THE WITNESS:  So to answer the
7     question there is no prescription due to
8     the way the system is currently structured.

9 BY MS. FICARO

10     Q.    Dr. Andrea explained to you how
11 she was recommending that you use the medical
12 marijuana?

13     A.    I believe so.  Yes.

14     Q.    What did she tell you in terms of
15 her recommendations with regard to your use of
16 medical marijuana?

17     A.    The most medicinal benefit comes
18 from oral administration, like tinctures, as
19 well as a what they call an entourage effect
20 when you combine ratios of CBD with THC, like
21 particularly a 10 to 1, 10 parts CBD to one part
22 THC.

23     Q.    Did she tell you how often she
24 recommended you use medical marijuana?

Page 103

1     A.    As needed.

2     Q.    Did she explain to you which
3 circumstances might be constitute needing to use
4 medical marijuana?

5     A.    I don't believe so.

6     Q.    Do you recall anything else about
7 your discussion with Dr. Andrea during your one
8 visit with her in June 2020?

9     A.    Yes.

10     Q.    What else do you recall?

11     A.    I asked how this worked in
12 regards to drug tests for employment.  Because I
13 was looking at this as triage.  I was anxious.
14 I had never been laid off before.  So she told
15 me at that time there was privacy protection in
16 the law.  So I thought then I was good to go as
17 far as applying for jobs and stuff.

18     Q.    Did she explain what she meant
19 when she said there was privacy and protection
20 under the law?

21     A.    No.  That's what she said.

22     Q.    Did she offer you any instruction
23 about anything that you should do with regard to
24 preemployment drug screens if you were taking

Page 104

1 medical marijuana?

2     A.    No.  Not that I recall.

3     Q.    Did she tell you that you should
4 tell the drug screeners or potential employers
5 that you were using medical marijuana?

6     A.    No.  Not that I recall.

7     Q.    Have you seen Dr. Andrea at any
8 time at all since June 2020?

9     A.    No.

10     Q.    Did Dr. Andrea administer any
11 tests to you on the occasion that you saw her?

12     A.    Just oral interviews.  But no
13 blood tests or you know...

14     Q.    Did she administer any other
15 diagnostic tests to you on the occasion that you
16 saw her?

17     A.    No.

18     Q.    You mentioned that you learned
19 about her because you read about her on what?

20     A.    I found her name through the
21 Pennsylvania State Department of Health Medical
22 Marijuana office through the list of approved
23 practitioners.

24     Q.    Has any other mental health care



MATTHEW REYNOLDS
REYNOLDS V WILLERT

August 26, 2021
105–108

Page 105

1 provider ever recommended that you consider
2 using medical marijuana?
3       A.    When I got recertified, it was
4 the annual recertification, so there was a
5 follow-up visit with a different doctor who saw
6 fit to extend the patient certification.
7       Q.    Which doctor was that?
8       A.    His name was John.  I'm horrible
9 with names.  I apologize.  I will have to say
10 Dr. John with the same practice, Green Health.
11       Q.    When did you see Dr. John from
12 Green Health?
13       A.    I guess that would have been
14 July 2020.  In the time to recertify.  2021.
15 Sorry.  This year.
16       Q.    Have you ever seen Dr. John on
17 any occasions other than what you saw him in
18 July 2021?
19       A.    No.
20       Q.    Did Dr. John perform any
21 evaluation of you when you saw him in July 2021?
22       A.    An oral series of questions which
23 I would generically refer to as like a
24 psychiatric evaluation.

Page 106

1       Q.    Did he give you a diagnosis?
2       A.    Anxiety.  I should say yes.
3       Q.    Are you currently taking any
4 pharmaceutical for purpose of your anxiety?
5       A.    Yes.
6       Q.    What do you currently take for
7 your anxiety?
8       A.    Lamictal.
9       Q.    Who prescribed the Lamictal to
10 you?
11       A.    That is one of the doctors at LG
12 Health.  One moment.  I will get it here.  Dr.
13 Zimmerman is one of the doctors I see.  There is
14 a number of doctors at the practice I go to at
15 Lincoln LG Health.  It is part of Lancaster
16 General Health Network.  And Dr. Zimmerman is
17 one of those I have seen recently.
18       Q.    When did you first treat with
19 anyone at Lancaster General Health?
20       A.    I think it was November 2020.
21       Q.    When in November 2020?
22       A.    Few days after I was terminated
23 from Willert in the single digits there, 7th,
24 8th, 9th, like that.

Page 107

1       Q.    Before that date had you ever
2 treated with anyone at LG Health?
3       A.    No.  I don't believe so.
4       Q.    Did anyone refer you to LG Health
5 or recommend that you go to LG Health?
6       A.    My wife, if that counts.  If you
7 are looking for a professional then no.
8       Q.    When did you first contact your
9 attorney Mr. Auerbach?
10       A.    I believe it was maybe February
11 or March of 2021.
12       Q.    How did you come to find
13 Mr. Auerbach?
14       A.    I was referred to him.
15       Q.    Who referred you to him?
16       A.    Another attorney whose name --
17       A.    I was going to ask the name.
18       A.    I don't recall.
19       Q.    Is there a reason why in
20 November 2020 you went to LG Health as opposed
21 to going to Dr. Fernando after you were
22 terminated from Willert?
23       A.    Yes.
24       Q.    What is the reason for that?

Page 108

1       A.    The initial symptoms I had were
2 unlike anything I had ever experienced before in
3 my life.  So I didn't initially think it was any
4 kind of mental health thing.  I thought it was
5 having some kind of systemic -- something else.
6 I didn't know what to call it.  But it didn't
7 feel like a mental health thing.  It felt like
8 something was seriously wrong.
9       Q.    What type of symptoms were you
10 experiencing?
11       A.    It was centered mostly in my
12 core.  And it felt like everything was shutting
13 down.  It felt like I was dying inside.  I don't
14 mean that dramatically or emotionality.  It felt
15 like my core systems were shutting down.  It was
16 alarming.  It was stark.  It was notable.
17             I just would fall asleep in the
18 middle of the day or just get sucked into bed.
19 It was very heavy.  It was -- I am sorry.  Yeah.
20 It was like a tangible, physical manifestation,
21 which I had not really experienced before with
22 what I wouldn't call anxiety or anything like
23 that.  So I went to LG Health to start with a
24 general practitioner to see where they would

Page 109
1 send me from there.
2      Q.    Are you okay to continue?  Do you
3 want to take a break?
4      A.    No.  I'm good.  It's just in the
5 moment sometimes it is going be a lot to think
6 about.  But I'm okay.
7      Q.    When you went to LG Health then,
8 who did you first see there?
9      A.    That was Dr. Zimmerman.  I think
10 her first name is Taryn.  But anyway it's
11 Dr. Zimmerman.
12      Q.    Let's take a step back for a
13 minute here.  When were you first diagnosed with
14 anxiety?
15      A.    First diagnosed was way back in
16 when I worked at Harley-Davidson in 2008 maybe.
17 Give or take.
18      Q.    At that time did anything happen
19 to bring on the anxiety?
20      A.    I believe it was just the stress
21 of the job.  That was a very demanding
22 situation.
23      Q.    In 2008 who first diagnosed you
24 with anxiety?

Page 110
1      A.    I believe that Dr. Czulada.  He
2 practices in Dover, Pennsylvania.  I forget the
3 name of the practice.
4      Q.    How many times did you treat with
5 Dr. Czulada?
6      A.    Two or three.  Not real long.
7      Q.    Did Dr. Czulada prescribe any
8 medication for you?
9      A.    Yes.
10      Q.    What medication did -- male or
11 female?
12      A.    A male.
13      Q.    What type of medication did he
14 prescribe for you?
15      A.    It was a general antidepressant.
16 Either Prozac or Wellbutrin.  One of those.
17      Q.    Did Dr. Czulada diagnose you with
18 anything else other than anxiety at that time?
19      A.    Not that I recall.
20      Q.    Did you continue to take the
21 general antidepressant after the two or three
22 times that you saw Dr. Czulada?
23      A.    No.
24      Q.    When did you last see

Page 111
1 Dr. Czulada?
2      A.    The latest 2009.
3      Q.    From 2008 to 2009 were you using
4 the general antidepressant that Dr. Czulada
5 prescribed?
6      A.    If I recall I don't know if I
7 refilled it.  It was only a matter of months
8 that I took that prescription.
9      Q.    After you last saw Dr. Czulada,
10 did you feel like your anxiety had subsided or
11 gone away?
12      A.    It was manageable.  So I guess
13 subsided, not gone away, but subsided.  Sure.
14      Q.    Did there come a point in time
15 after you saw Dr. Czulada you began treating
16 with another mental health care provider?
17      A.    Definitely Dr. Fernando.
18      Q.    When did you first treat with
19 Dr. Fernando?
20      A.    I believe that was 2015.
21      Q.    Between 2009 and 2015 did you
22 receive any mental health treatment?
23      A.    Not that I recall.
24      Q.    In 2015 why did you go see

Page 112
1 Dr. Fernando?
2      A.    General anxiety.
3      Q.    Was there anything happening in
4 your life at that time to cause the general
5 anxiety?
6      A.    Again, it was mostly work related
7 stress.  Maintenance is typically kind of
8 demanding, lots of emergencies, professional
9 fire fighting in a sense.
10      Q.    Was there anything else that you
11 believe caused you to experience general anxiety
12 in 2015?
13      A.    No.
14      Q.    In 2015 when you saw Dr. Fernando
15 did she diagnose you with anything?
16      A.    Yes.
17      Q.    What did she diagnose you with?
18      A.    Anxiety.  And it was like
19 atypical depression or -- it's not like a
20 depression where you are depressed all the time.
21 It kind of comes and goes.  It is like seasonal
22 effective disorder or let's just say depression
23 I guess.
24      Q.    What type of treatment did she



MATTHEW REYNOLDS
REYNOLDS V WILLERT

August 26, 2021
113–116

Page 113

1 provide you for your general anxiety and
2 depression?
3      A.    Psychiatric medication,
4 prescriptions, pharmaceuticals.
5      Q.    What did she prescribe for you?
6      A.    That was Lamictal and Abilify.
7 She added Wellbutrin as needed.  Kind of
8 seasonally.
9      Q.    How long did you take the
10 Lamictal and Abilify?
11     A.    Five years.
12     Q.    So would that be from
13 approximately 2015 through 2020?
14     A.    Correct.
15     Q.    Why did you stop taking Lamictal
16 and Abilify?
17     A.    They didn't seem to be doing
18 anything that I can tell.
19     Q.    For how long a period of time did
20 you feel like they didn't seem to be doing
21 anything?
22     A.    To be honest I was never really
23 satisfied overall with what they did.  But I was
24 at least functional and going to work.  So I

Page 114

1 just kept up with the course she prescribed.
2      Q.    Did you ever explain to her that
3 you felt that you were not satisfied with what
4 they did at any time?
5      A.    Yes.  I can't give you dates.
6 But periodically we would discuss it.
7      Q.    Did you ever try a different drug
8 other than Lamictal and Abilify during that
9 five-year period of time?
10     A.    I don't think so.
11     Q.    Did you ever discuss with
12 Dr. Fernando using a different pharmaceutical?
13     A.    No.
14     Q.    Is there a reason why you never
15 asked her about that despite feeling like you
16 were not satisfied with the Lamictal and the
17 Abilify?
18     A.    In general I personally really
19 don't like prescription pharmaceutical
20 psychiatric drugs to begin with.  And I really
21 honestly just didn't want to experiment with
22 myself based on the research I had done on
23 different options when you read about the
24 potential side effects and stuff.  It just --

Page 115

1 the best thing that can happen is weight gain,
2 you get fat, it goes downhill from there.
3          And so I just was not really --
4 to me -- it was not worth the risk of, well,
5 experiment with some stuff with the potential,
6 you know, cost of who knows what.  So I just
7 dealt with it.  And like I said, I was
8 functional and I was doing things.  It kept
9 going.
10     Q.    Did Dr. Fernando ever discuss
11 medical marijuana with you?
12     A.    No.
13     Q.    Did you ever ask Dr. Fernando
14 about medical marijuana?
15     A.    No.  I don't think so.
16     Q.    Between 2015 and June 2020 did
17 you treat with any mental health professionals
18 other than Dr. Fernando?
19     A.    Does that include the therapist,
20 like just conversation?
21     Q.    So were you seeing a therapist
22 between 2015 and 2020?
23     A.    For some period of time in there,
24 yes.  But no other physician or doctor.

Page 116

1      Q.    Is Dr. Fernando a psychiatrist?
2      A.    Yes.
3      Q.    Between 2015 and 2020 what
4 therapists were you seeing?
5      A.    It was only a short period of
6 time but Dr. Heidi Ramsbottom.
7      Q.    Is Dr. Ramsbottom affiliated with
8 a particular practice or entity?
9      A.    Not that I'm ware of.  Her
10 practice has a name.  But I believe it is hers.
11 I don't think she is part of a network or
12 doctors, if that is what you mean.
13     Q.    How do you spell Ramsbottom?
14     A.    R-A-M-S-B-O-T-T-O-M, I believe.
15     Q.    Where is Dr. Ramsbottom located?
16     A.    Reading, PA.
17     Q.    How many times -- when did you
18 first see Dr. Ramsbottom?
19     A.    I believe it was 2015.
20     Q.    When did you last see
21 Dr. Ramsbottom?
22     A.    2015 or 2016.
23     Q.    How many times did you see
24 Dr. Ramsbottom between 2015 and the last time



MATTHEW REYNOLDS
REYNOLDS V WILLERT

August 26, 2021
117–120

Page 117

1 you saw her?
2      A.      Approximately five.
3      Q.      You mentioned that she is -- you
4 refer to as a doctor.  What type of doctor is
5 she?
6      A.      I honestly don't know.
7      Q.      Is she an MD?
8      A.      I don't think so.  But I'm not
9 certain.
10      Q.      How come you stopped seeing
11 Dr. Ramsbottom?
12      A.      $150 an hour.  Money was tight.
13      Q.      Any other reason you stopped
14 seeing Dr. Ramsbottom?
15      A.      No.
16      Q.      Between 2015 and 2020 have you
17 seen any other therapists -- actually let me
18 restate that question.
19            Between 2015 and June 2020 have
20 you seen any other therapists other than
21 Dr. Ramsbottom?
22      A.      June '20.  No.  I don't think so.
23      Q.      Is there a reason why you have
24 not seen any other therapists during that time?

Page 118

1      A.      I was generally doing pretty
2 good.  So I didn't feel the need to actively
3 reach out for help.  And the expense -- just
4 expensive.
5      Q.      Other than Dr. Ramsbottom and
6 Dr. Fernando, did you treat with any other
7 mental health care providers between 2015 and
8 June 2020?
9      A.      No.
10      Q.      Have you at any time ever
11 undergone any inpatient mental health care
12 treatment anywhere?
13      A.      No.
14      Q.      At any time have you been
15 hospitalized for any mental health care reasons?
16      A.      No.
17      Q.      In terms of then your treatment
18 with LG Health you mentioned you saw
19 Dr. Zimmerman.  Are you sill treating with LG
20 Health?
21      A.      Yes.
22      Q.      Are you treating with
23 Dr. Zimmerman at LG Health?
24      A.      No.  It's -- I remember his name.

Page 119

1 It's Dr. Musyt.
2      Q.      Are you still treating with
3 Dr. Musyt at LG Health?
4      A.      Yes.
5      Q.      Between November 2020 and today
6 how many times have you seen Dr. Musyt?
7      A.      Approximately -- it was not
8 Dr. Musyt every time.  But with LG Health there
9 was approximately five or six visits.  Or it's
10 COVID year so it's been virtual appointments
11 sometimes as well.  Yes.  I will say about five
12 or six.
13      Q.      Do you have an appointment
14 scheduled to see Dr. Musyt any time in the near
15 future?
16      A.      No.  Not yet.
17      Q.      Is there a set schedule with
18 regard to your appointments with Dr. Musyt or do
19 you make those appointments on a as-needed
20 basis?
21      A.      Currently as needed.
22      Q.      Are you currently taking any
23 pharmaceutical for purpose of your mental
24 health?

Page 120

1      A.      I think we covered that.  But,
2 yes.
3      Q.      What are you currently taking?
4      A.      Lamictal.
5      Q.      Did you take any Lamictal today?
6      A.      No.
7      Q.      How often do you take the
8 Lamictal?
9      A.      One a day.
10      Q.      When is the last time you took
11 Lamictal?
12      A.      Last night.
13      Q.      Who prescribed that Lamictal to
14 you?
15      A.      It was LG Health.  And I believe
16 it was Dr. Musyt.  Dr. Musyt at LG Health.
17      Q.      Does your wife work outside of
18 the home?
19      A.      Not full-time, no.
20      Q.      Has your wife worked outside of
21 the home at any time between 2019 and the
22 present?
23      A.      No.
24      Q.      Does she work outside of the home



MATTHEW REYNOLDS
REYNOLDS V WILLERT

August 26, 2021
121–124

Page 121

1  part-time?
2      A.     Yes.
3      Q.     What does she do?
4      A.     She is a state-licensed massage
5  therapist.
6      Q.     Where does you she work?
7      A.     That's the thing.  She doesn't
8  work at a place.  She just practices.  So it's
9  just one here, one there.  Kind of pocket money
10 for her.  With COVID massage therapy went away.
11 So really in 2020 that was effectively zero.
12 And that just stopped.
13     Q.     Did you file tax returns in 2020?
14     A.     Yes.  I filed an extension.
15 That's a long story.
16     Q.     Have you to date filed a tax
17 return for 2020?
18     A.     No.
19     Q.     Do you and your wife file tax
20 returns jointly?
21     A.     Yes.
22     Q.     After Dr. Andrea recommended
23 medical marijuana for you, what did you do?
24     A.     I did a lot of research about

Page 122

1  different kinds of strains because there is
2  thousands of different strains of medical
3  marijuana.  And I shopped around at the
4  different dispensaries to see what they had.
5  And then I went to a dispensary and selected --
6  actually they have a person there who explains
7  the process and explains some of the products to
8  you.  And they are not prescribing but they can
9  advise you towards different things.  I talked
10 to them.  And then I selected products there at
11 one of the dispensaries.
12     Q.     Before speaking to the
13 dispensary, did you obtain a medical marijuana
14 license in Pennsylvania?
15     A.     Oh, yes.  I got a patient card or
16 patient certification.
17     Q.     What did you do to get that
18 patient certification?
19     A.     I followed the process.  There
20 was a process on the Department of Health
21 website.
22     Q.     What did that process entail?
23     A.     So I believe the first part is
24 you apply on the state website.  You pay a fee.

Page 123

1  And then once you have an account and a website
2  then you see a authorized physician who may or
3  may not make a determination and a
4  recommendation.  And they go to the system to
5  certify and answer some questions.  And once
6  that is done I think that's the whole process.
7  And then you are approved and you get a card in
8  the mail.
9      Q.     Did you have anything in writing
10 from Dr. Andrea?
11     A.     I don't think so.
12     Q.     When you talked about going
13 online were you referring to the medical
14 marijuana registry?
15     A.     Going online and regards to what?
16     Q.     The initial step before speaking
17 to a physician?
18     A.     Yes.  Yes.  The Pennsylvania
19 Department of Health Office of Medical
20 Marijuana.
21     Q.     Did you create a profile in this
22 medical marijuana registry?
23     A.     Yes.  I have to sign up for a
24 patient profile.

Page 124

1      Q.     When did you create your profile
2  in the medical marijuana registry?
3      A.     I believe it was May 2020.
4      Q.     What led you to create a profile
5  in the medical marijuana registry at that time?
6      A.     Overwhelming anxiety of the
7  situation with my being laid off from COVID and
8  the pharmaceuticals just were not working at
9  all.  So it was a last-ditch effort.
10     Q.     At that time was it the Lamictal
11 and the Abilify that you were taking when you
12 refer to pharmaceuticals?
13     A.     Yes.
14     Q.     Dr. Andrea then was the physician
15 whom you contacted after that; is that correct?
16     A.     Yes.
17     Q.     After you met with Dr. Andrea and
18 she provided you with this recommendation, did
19 you have to do anything to complete your
20 application for the medical marijuana ID card?
21     A.     I can't remember.  If I did it
22 was very easy.  I can't remember.
23     Q.     You mentioned that you went
24 through the recertification process, correct,



MATTHEW REYNOLDS
REYNOLDS V WILLERT

August 26, 2021
125–128

Page 125

1  for a medical marijuana license?
2      A.    Correct.
3      Q.    You also mentioned that you
4  stopped using medical marijuana in May 2021,
5  correct?
6      A.    Yes.
7      Q.    Why did you go through the
8  recertification process if you stopped using
9  medical marijuana?
10      A.    Well, honestly I just -- I was
11  not sure I wanted to make sure I was still part
12  of the program and, you know, covered as a
13  patient.  Because I have not really come to
14  closure with the ramifications and the outfall
15  of being a patient.  And so just covering all my
16  bases.
17      Q.    In May 2020 when you stopped
18  using medical marijuana, were you experiencing
19  any symptoms or side effects of the use of it
20  that you did not enjoy?
21      A.    You meant May 2021?
22      Q.    May 2021.  Let me re-ask.
23          When you stopped using medical
24  marijuana in May 2021, were you experiencing any

Page 126

1  symptoms or side effects that led you to stop
2  using medical marijuana?
3      A.    No.
4      Q.    Is the reason you stopped because
5  of the comment you just made about the
6  ramifications of you using medical marijuana
7  still being unclear?
8      A.    Primarily.
9      Q.    Have you received a new medical
10  marijuana license card for the State of
11  Pennsylvania?
12      A.    Yes.
13      Q.    When did you receive that new
14  card?
15      A.    Fairly recently.  I can't
16  remember exactly.  I went through the process.
17  I think it was last month or so.
18          (Exhibit 1 was marked for
19      identification.)
20  BY MS. FICARO
21      Q.    I am going to share my screen
22  with you for a moment.  I am showing you a copy
23  of a document that I would ask be marked
24  Reynolds 1.

Page 127

1          Mr. Reynolds, I will represent to
2  you this is a document that we received from
3  your attorney in this matter.  There is written
4  words at the top of it that reads, No. 15, The
5  MMM card presented at the preemployment drug
6  screen.
7          And then there is a picture of
8  what appears to be a medical marijuana
9  identification card.  Do you recognize this
10  document?
11      A.    Yes.
12      Q.    Do you recognize the card?
13      A.    Yes.
14      Q.    Is that your medical marijuana
15  identification card that you had for the period
16  of time from July 6, 2020 through July 6 2021?
17      A.    Yes.
18      Q.    Did you carry that card with you
19  at all times after you received it?
20      A.    Oh, yes.  Right next to my
21  driver's license.
22      Q.    Did you carry that card with you
23  even when you may not have had medical marijuana
24  on your person?

Page 128

1      A.    Yes.
2      Q.    On the date of your termination
3  did you have your medical marijuana
4  identification card with you?
5      A.    Yes.
6      Q.    On the date of your termination
7  from Willert, did you show your medical
8  marijuana identification card to anyone?
9      A.    No.
10      Q.    On the date of your termination
11  from Willert, did you offer to show your medical
12  marijuana identification card to anyone?
13      A.    It was over the phone.  So I
14  couldn't physically show them.  But I told them
15  over the phone that I had the patient card.
16      Q.    In order to complete your profile
17  on the medical marijuana registry, did you
18  complete that profile entirely online?
19      A.    Yes.
20      Q.    Do you have written documentation
21  for what information you provided or any
22  documents that you had to submit in order to
23  create that profile?
24      A.    I don't think so.  I'm not



MATTHEW REYNOLDS
REYNOLDS V WILLERT

August 26, 2021
129–132

Page 129

1 aware of -- I can't remember what I had to
2 submit. But I don't think I have written
3 documentation.
4      Q.    If you logged into the medical
5 marijuana registry right now would you be able
6 to access your profile?
7      A.    Yes.
8      Q.    Are you able to print out a copy
9 of your profile?
10     A.    Probably. If it's on your screen
11 you can print it.
12     Q.    In preparing and completing your
13 profile in the medical marijuana registry did
14 you have to submit any documents?
15     A.    I don't think so. I don't
16 remember submitting anything.
17     Q.    Did you receive any hard copy
18 documents back from the Pennsylvania Department
19 of Health or any other entity after you had
20 completed your medical marijuana registry
21 profile?
22     A.    I believe so. I know I got the
23 card and I believe there was a letter as well.
24 I will need a two-minute restroom break at some

Page 130

1 point here.
2      Q.    Sure. I'm fine if we take it
3 right now.
4           (Discussion held off the record.)
5 BY MS. FICARO
6      Q.    Mr. Reynolds, when you stopped
7 using medical marijuana in May of 2021, did you
8 do that in consultation with a doctor?
9      A.    No.
10     Q.    Did you discuss with any of your
11 doctors the fact that you were going to stop
12 using medical marijuana?
13     A.    Yes. I did tell them.
14     Q.    Who did you tell?
15     A.    One of the doctors at LG Health,
16 Musyt or Zimmerman.
17     Q.    Did you seek their advice as
18 whether you should or you should not cease using
19 medical marijuana?
20     A.    No.
21     Q.    Did any of them tell you you
22 should continue using medical marijuana?
23     A.    No.
24     Q.    You mentioned earlier that you

Page 131

1 had checked out some dispensaries when were
2 originally applying for your medical marijuana
3 card. And I want to share my screen for a
4 moment again.
5      A.    Sure.
6           (Exhibit 2 was marked for
7      identification.)
8 BY MS. FICARO
9      Q.    Mr. Reynolds, I am showing you
10 copy of a document that I will ask be marked
11 Reynolds 2. This is another document that was
12 produced by your attorney in this action. At
13 the top it reads, No. 4 Dispensary Information.
14           And it appears to list three
15 different entities: Herbology Dispensary, Cure
16 Pennsylvania, Apothecarium Dispensary. Do you
17 recognize those names on this document?
18     A.    Yes.
19     Q.    Who prepared this document?
20     A.    The date was provided by myself.
21     Q.    Did you prepare the actual
22 document?
23     A.    It looks very similar. I can't
24 testify if that's the exact one or if it was

Page 132

1 copy pasted. But that is the exact information
2 I provided.
3      Q.    What are these companies listed
4 on here?
5      A.    Those are state-licensed medical
6 marijuana dispensaries.
7      Q.    Do you purchase medical marijuana
8 from those dispensaries?
9      A.    I did, yes.
10     Q.    So under each of those entities
11 there is dates of purchase that appear to be
12 listed.
13     A.    Yes.
14     Q.    Herbology Dispensary it lists
15 November 16, 2020, December 18, 2020, August 21,
16 2020. Are those dates on which you purchased
17 medical marijuana from that dispensary?
18     A.    Yes.
19     Q.    How did you purchase the medical
20 marijuana from the dispensary?
21     A.    I went to the dispensary and made
22 selections and a cash purchase.
23     Q.    Do you have receipts from those
24 purchases?



MATTHEW REYNOLDS
REYNOLDS V WILLERT

August 26, 2021
133–136

Page 133

1      A.    I'm uncertain.
2      Q.    Do you have any of the receipts?
3      A.    I don't know.  That was a
4   dreadfully disorganized time in my life.
5      Q.    Do you have -- are you able to
6   look and see if you have copies of the receipts
7   after this deposition?
8      A.    Not immediately.  I'm in Phoenix
9   now.  I can testify to those dates specifically.
10  I know those are accurate.  But I don't know if
11  I can provide receipts or not.
12     Q.    What causes you to specifically
13  remember those dates?
14     A.    Google maps.  I have a Android
15  phone and it tracks everywhere you go.  So I had
16  to go to my timeline and find the days I went to
17  the dispensaries.  It is the only times I ever
18  go to those places.
19     Q.    Is it possible that you have
20  copies of those receipts?
21     A.    It's possible I have some copies.
22     Q.    I see here that there are dates
23  of March 4, 2021 and February 11, 2021 listed
24  under Cure Pennsylvania.  Are those dates in

Page 134

1   which you purchased medical marijuana from Cure
2   Pennsylvania?
3      A.    Yes.
4      Q.    And then I see here under the
5   Apothecary Dispensary there is dates listed
6   January 29, 2021, October 1, 2020, August 3,
7   2020 and July 21, 2021.  Are those dates in
8   which you purchased medical marijuana from that
9   dispensary?
10     A.    That last date you said was 2021?
11  That was...
12     Q.    So July 21, 2020.
13     A.    So, yes, those are dates
14  purchased from that dispensary.
15     Q.    Is there reason why you used
16  three different dispensaries?
17     A.    Yes.
18     Q.    What is the reason?
19     A.    Product selection.  It varies
20  dramatically.  It's very inconsistent what they
21  have available.
22     Q.    Have you purchased medical
23  marijuana from anywhere other than those three
24  dispensaries since you received your license,

Page 135

1   your medical marijuana card?
2      A.    No.
3      Q.    Have you purchased marijuana from
4   anywhere else since -- I am not referring to
5   medical marijuana exclusively -- I'm referring
6   generally to marijuana.  Have you purchased
7   marijuana from anywhere else since July 21,
8   2020?
9      A.    No.
10     Q.    Have you been provided marijuana
11  from anywhere else since July 21, 2020?
12     A.    No.
13     Q.    When you use medical marijuana in
14  what form do you use it?
15     A.    Preferable oral tinctures like
16  drops.  If those were not available then
17  extracts, which are like essential oils.
18     Q.    Have you used medical marijuana
19  in any other form since you obtained your
20  license?
21     A.    No.  Those were the forms I used
22  it.
23     Q.    Have you smoked medical marijuana
24  at all since July 21, 2020?

Page 136

1      A.    No.
2      Q.    Have you used marijuana
3   recreationally at all since July 2020?
4      A.    No.
5           MS. FICARO:  Steve, as a point to
6   raise here, the fact that he has answered a
7   question about recreational marijuana with
8   regard to any time arguably waives any
9   privilege that could be asserted with
10  regard to questions about recreational
11  marijuana in general.
12          MR. AUERBACH:  It is your call
13  (inaudible) filing a protective order or
14  motion in limine.
15          MS. FICARO:  Are you going to
16  continue to instruct him not to answer
17  those questions?
18          MR. AUERBACH:  The objection was
19  specifically anything before July 2020.  If
20  you want to ask him anything on or after
21  that date be my guest.
22          MS. FICARO:  What I'm saying is
23  the fact that he has testified to
24  recreational marijuana use after July 2020



MATTHEW REYNOLDS
REYNOLDS V WILLERT

August 26, 2021
137–140

Page 137

1  waives the privilege with regard to
2  questions about recreational marijuana in
3  general.
4       MR. AUERBACH:  And I am saying it
5  doesn't.
6       MS. FICARO:  So are you
7  instructing the witness then not to answer
8  any questions still about recreational
9  marijuana use before July 2020?
10      MR. AUERBACH:  Yes.
11      MS. FICARO:  We will address that
12  with the Court then.
13      MR. AUERBACH:  Please.  What
14  basis do you have to waive the Fifth
15  Amendment privilege?
16      MS. FICARO:  Sorry?  Say that
17  again.  You cut out.
18      MR. AUERBACH:  What basis you
19  have you challenge a Fifth Amendment
20  privilege?
21      MS. FICARO:  He just waived the
22  privilege by answering a question about
23  recreational marijuana use at any time.
24      MR. AUERBACH:  Continue.

Page 138

1       MS. FICARO:  So your position is
2    the same?
3       MR. AUERBACH:  A hundred percent.
4  BY MS. FICARO
5    Q.   Since July 2020, Mr. Reynolds,
6  how many times have you used medical marijuana?
7    A.   I can't quantify that
8  specifically.
9    Q.   Can you estimate or approximate
10  for me how many times a week between July 2020
11  and May 2021 you used medical marijuana?
12    A.   Used?  You said used, correct?
13    Q.   Is there anything else you do
14  with the marijuana?
15    A.   No.  I'm just asking, just
16  clarifying.  I would say five to seven times a
17  week.
18    Q.   On those five to seven times a
19  week between July 2020 and May 2021 that you
20  would use medical marijuana, how much medical
21  marijuana did you use on each occasion?
22    A.   I say approximately because it's
23  hard to quantify.  But approximately one to five
24  milligrams of THC with a ratio of 10 to 15

Page 139

1  milligrams of CBD.
2    Q.   How do you know how much was in
3  each dose of medical marijuana?
4    A.   When it comes in the tincture
5  form in a liquid bottle it says on the box one
6  dropper full contains a certain amount.  So in
7  those cases I can -- that is what I'm use as my
8  basis to estimate those dosages.
9    Q.   Do you still have copies of the
10  boxes in which the medical marijuana you
11  purchased came?
12    A.   No.  I cleaned everything out and
13  threw it all away.
14    Q.   When did you throw it all away?
15    A.   Sometime around May.
16    Q.   Was that May 2021?
17    A.   Yes.
18    Q.   Why did you throw it away at that
19  time?
20    A.   I was cleaning up just doing
21  housekeeping, cleaning up.
22    Q.   Between July '20 and the
23  preemployment drug screen you took for Willert,
24  did you undergo any other drug screens during

Page 140

1  that time?
2    A.   No.
3    Q.   When you used the medical
4  marijuana do you know how long it stays in your
5  system after you use it?
6    A.   No.  I don't know.
7    Q.   Between July 2020 and May 2021
8  when you were using medical marijuana five to
9  seven times per week, was there a set schedule
10  on which you used the medical marijuana?
11    A.   Typically in the evening.
12    Q.   What time in the evening
13  typically would you take it?
14    A.   Around 5:00 or 6:00 p.m. or
15  something like that.
16    Q.   Between July 2020 and May 2021
17  when you stopped using medical marijuana, did
18  you take the medical marijuana in any form other
19  than tinctures or extracts?
20    A.   No.
21    Q.   Is there a difference between
22  marijuana used for medical purposes versus
23  marijuana used recreationally?
24    A.   Well, I know the state requires a



MATTHEW REYNOLDS
REYNOLDS V WILLERT

August 26, 2021
141–144

Page 141

1 whole list of quality and safety checks in order
2 for a product to be sold in a legal dispensary.
3 And so I know that about the medical marijuana.
4     Q.    Do you have any other information
5 that indicates the chemical composition between
6 medical marijuana and marijuana used for
7 recreational purposes is different?
8     A.    I don't know.
9     Q.    When you used medical marijuana
10 via tinctures, does it create an odor?
11     A.    No, not really.
12     Q.    When you use medical marijuana,
13 the extracts, does it create an odor?
14     A.    The extract itself definitely has
15 a scent to it.
16     Q.    After you used medical marijuana
17 do you emit a scent?
18     A.    No.
19     Q.    When you use medical marijuana do
20 you experience red eyes?
21     A.    Sometimes.
22     Q.    When you use medical marijuana do
23 use experience poor muscle coordination?
24     A.    No.

Page 142

1     Q.    When you use medical marijuana do
2 you experience delayed reaction times?
3     A.    No.
4     Q.    When you use medical marijuana do
5 you experience an increased appetite?
6     A.    No.
7     Q.    When you use medical marijuana do
8 you experience sudden shifts in your mood?
9     A.    Well, that's kind of the point of
10 the medicine is to go from anxious to feeling
11 okay.  Or does mood mean something else other
12 than anxiety?  Sorry.  Maybe I need more
13 clarification.
14     Q.    Is it fair to say then when you
15 use medical marijuana that there is a sudden
16 shift in your mood from feeling anxious to
17 feeling okay?
18     A.    Oh, yes.  It's effective.
19     Q.    When use medical marijuana do you
20 feel like you are under the influence?
21     A.    No.
22     Q.    Do you feel high?
23     A.    No.
24     Q.    When you use medical marijuana

Page 143

1 does it affect your coordination?
2     A.    No.
3     Q.    When you use medical marijuana do
4 you experience dizziness?
5     A.    No.
6     Q.    When you use medical marijuana do
7 you ever feel like your perception is distorted?
8     A.    My visual -- what I am seeing?
9     Q.    Yes.
10     A.    No.
11     Q.    When you use medical marijuana do
12 you ever feel like you experience impaired
13 cognition?
14     A.    No.  I mean, lets me ask for a
15 point of clarity on that.  Does like feeling
16 sleepy or tired count for cognition?
17     Q.    When you use medical marijuana do
18 you feel sleepy or tired?
19     A.    Sometimes.
20     Q.    Do you know if medical marijuana
21 shows up differently on a drug test than
22 recreational marijuana might?
23     A.    I can't scientifically answer
24 that.  I would be guessing.

Page 144

1     Q.    On the day you took drug screen
2 for Willert did you use medical marijuana that
3 day?
4     A.    No.
5     Q.    When did you last use medical
6 marijuana before you took the drug screen for
7 Willert?
8     A.    I can't answer with a hundred
9 percent certainty but likely within 36 hours
10 prior.
11     Q.    Is it possible you used medical
12 marijuana the night before you took the drug
13 screen from Willert?
14     A.    Possible.
15     Q.    My understanding is that you took
16 the drug screen for Willert on October 28, 2020;
17 is that accurate?
18     A.    That sounds correct.  I believe
19 so.
20     Q.    Were you actually scheduled to
21 originally take the drug screen the day before
22 on October 27, 2020?
23     A.    I don't remember.  It's possible.
24 There was a lot unplanned breakdowns and stuff



MATTHEW REYNOLDS
REYNOLDS V WILLERT

August 26, 2021
145–148

Page 145

1  going on.  So I don't remember that.  You are
2  asking so I am assuming that is coming from
3  somewhere.
4          (Exhibit 3 was marked for
5      identification.)
6  BY MS. FICARO
7      Q.    I will share my screen with you.
8  I am showing you a copy of a document that I
9  will ask be marked as Reynolds 3.  I will scroll
10 down so you can see the whole document.  I will
11 tell you Willert produced this in discovery in
12 this matter.
13          If you look at the bottom of both
14 pages first you will see there is Bates labels
15 at the bottom, Willert 0044 and Willert 0045.
16 Do you see those numbers there?
17     A.    Yes.
18     Q.    I will scroll all way to the
19 bottom because it's an email chain.
20     A.    Okay.
21     Q.    So you will see here at the
22 bottom the name David Furno.  Who is David
23 Furno?
24     A.    He was one of the salaried people

Page 146

1  there at Willert.  It was quality, safety,
2  environmental I believe were his
3  responsibilities.
4      Q.    I will scroll up a little bit
5  here at the top of this email.  It appears as
6  though it was sent on Monday, October 26, 2020
7  from email address DFurno@Willert.com.  Do you
8  see that there?
9      A.    Yes.
10     Q.    Was that Mr. Furno's email
11 address at Willert?
12     A.    Yes.
13     Q.    It says, Gentlemen, I have you
14 scheduled for new employee drug screens,
15 occupational health and rehabilitation services
16 at Care Plex, 81 Robinson Street, Pottstown.
17 That's for another individual.  And there is
18 another individual's name.  And the last name
19 here is Matthew Reynolds.  Tuesday, October 27th
20 at 2:00 p.m.  Do you see that there?
21     A.    Yes.
22     Q.    Does that refresh your
23 recollection as to the fact you were supposed to
24 go for that drug screen on October 27?

Page 147

1      A.    I'm seeing it and reading it.  I
2  forgot the facts.  So I agree because I'm seeing
3  it there.  I don't remember the circumstances
4  back then.
5      Q.    Do you have any reason to
6  disagree or refute the fact you were originally
7  scheduled to take that test on October 27?
8      A.    No.  I don't think they made that
9  up.
10     Q.    Scrolling up little bit higher
11 here there is an email from you dated
12 October 27, 2020 at 3:21 p.m.  The subject is
13 Re: new employee drug screens, to Dave Furno.
14 And it reads, I missed my appointment today.
15 Was having so much fun I couldn't quit.
16         Do you see that there?
17     A.    Yes.
18     Q.    And MReynolds@Willert.com, was
19 that your email address at Willert?
20     A.    I had another call coming in
21 quick.
22     Q.    Is that your email address at
23 Willert?
24     A.    Yes.

Page 148

1      Q.    Does that refresh your
2  recollection as to whether you missed that drug
3  test on October 27?
4      A.    That is certainly something that
5  I wrote.
6      Q.    Why did you miss the drug test
7  appointment on October 27, 2020?
8      A.    It was a really busy day at work.
9  And when I say was having so much fun, I enjoyed
10 my job.  And there was breakdowns, high priority
11 issues that I was attending to.  And that was my
12 way of saying that I needed to keep the business
13 running.  And so we needed to reschedule it.
14     Q.    In the middle of that crazy day
15 was there any reason why you didn't contact
16 Mr. Furno before the 2:00 p.m. appointment and
17 say I'm not going to be able to make it today,
18 I'm slammed at work?
19     A.    I might have just lost track of
20 time.  I can't remember the specifics breakdown
21 situation or what I was doing that day.  I
22 couldn't tell what you line broke or anything.
23 I will just say I lost track of time.
24     Q.    Mr. Reynolds, how did you come to



MATTHEW REYNOLDS
REYNOLDS V WILLERT

August 26, 2021
149–152

Page 149

1 find out about the job at Willert?
2      A.    I believe a recruiter.  Hang
3 tight a second.  I will put my phone on, Do not
4 disturb.  It might turn my video off for a
5 second.
6      Q.    Sure.  Jumping back for a moment
7 here, does your wife use medical marijuana?
8      A.    No.
9      Q.    Does your wife use marijuana
10 recreationally?
11      A.    No.  Wait.  Hang on a second.
12 The last time I said no to a recreational
13 question it got me in trouble.  So am I allowed
14 to answer that?
15           MR. AUERBACH:  Are you allowed to
16      answer that?  I don't think we have a basis
17      to assert privilege.  I think you have to.
18           THE WITNESS:  No.  She doesn't
19      use any kind of marijuana.
20 BY MS. FICARO
21      Q.    Did she use any kind of marijuana
22 in October or November 2020?
23      A.    No.
24      Q.    What is your older son's name?

Page 150

1      A.    Logan.
2      Q.    In October 2020 and November 2020
3 was he living in the same house as you?
4      A.    Yes.
5      Q.    Does Logan use marijuana?
6      A.    No.
7      Q.    Just to be specific:  Does he use
8 medical marijuana?
9      A.    No.
10      Q.    Does he use recreational
11 marijuana?
12      A.    No.
13      Q.    In October 2020 and November 2020
14 did Logan use marijuana recreationally?
15      A.    No.
16      Q.    In October 2020 and November 2020
17 did Logan use medical marijuana?
18      A.    No.
19      Q.    In October 2020 and November 2020
20 was Isaac living in the same house as you?
21      A.    Yes.
22      Q.    In October 2020 and November 2020
23 did Isaac use medical marijuana?
24      A.    No.

Page 151

1      Q.    In October 2020 and November 2020
2 did Isaac use marijuana recreationally?
3      A.    No.
4      Q.    In October 2020 and November 2020
5 was anyone else living in the same house as you
6 except for your -- other than your wife and your
7 two sons?
8      A.    No.
9      Q.    So jumping back then you were
10 mentioning a recruiter here.  So a recruiter led
11 you to Willert.  Do you recall the name of the
12 recruiter?
13      A.    I think it was Mike or Matt.  I
14 will not swear to it.  So maybe I should say I
15 don't know.
16      Q.    Was there a company with which
17 that recruiter was affiliated?
18      A.    Yes.  I believe so.  I can't
19 provide the name.
20      Q.    Do you recall where that company
21 was located?
22      A.    No.
23      Q.    How did you get contact with that
24 recruiter?

Page 152

1      A.    We had been working together for
2 sometime through 2020.  I believe he found me.
3 I had my resume posted all over the internet.
4 So I believe he contacted me and presented a
5 number of employment opportunities which I tried
6 for.
7      Q.    Did you have to complete a
8 application in order to get the job at Willert?
9      A.    No.
10      Q.    Did you submit any documentation
11 in order to get the job at Willert?
12      A.    Not that I remember.  I don't
13 believe so.
14      Q.    Did you have any interviews with
15 anyone at Willert before you began working at
16 Willert?
17      A.    Yes.
18      Q.    How many interviews did you have?
19      A.    So there are two instances.  I
20 will say two.
21      Q.    Two instances, did you say?  Or
22 two interviews?
23      A.    There is one that was definitely
24 an interview and there was an in-person meeting



MATTHEW REYNOLDS
REYNOLDS V WILLERT

August 26, 2021
153–156

Page 153

1 there.  But that was not really structured as an
2 interview at all.  But it was prior to
3 employment.  So that is why I say instances.
4       Q.     With regard to the interview when
5 did that take place?
6       A.     Maybe like the Thursday before.
7 So it would have been like maybe the 18th, 19th
8 or -- no, no.  Sorry.  I am doing math here.
9 Lets say at the 8th or 9th of October, the week
10 before I started I started like Friday the 16th.
11 And I think it was the week prior.
12       Q.     Did that interview occur in
13 person?
14       A.     No.
15       Q.     Was it conducted telephonically?
16       A.     Does that include a Zoom?
17       Q.     No.  That is different.  Did it
18 occur via video conference?
19       A.     Yes.
20       Q.     Who interviewed you from Willert?
21       A.     Bryan Willert.
22       Q.     Did anyone else besides you and
23 Bryan Willert participate in that interview?
24       A.     No.

Page 154

1       Q.     What did you and Bryan Willert
2 discuss during that interview?
3       A.     My background, job history, the
4 general processes they were doing there at the
5 plant, kind of the timeline of what they were
6 doing.  Just basically expectations of what he
7 is looking for in a manager.
8       Q.     What did Mr. Willert explain to
9 you about the processes, the general processes
10 of the plant?
11       A.     Well, I understood that they are
12 making two or three products there at the time.
13 But that they were going to be rapidly
14 expanding, adding new equipment, bringing in new
15 lines.  So that all sounded pretty exiting.
16       Q.     What products were they making
17 there at the plant at the time you interviewed
18 there?
19       A.     Ty-D-Bowl.  Which is a upside
20 down bottle you can put in the back of a commode
21 to make blue water.  Some air refreshers and
22 like a gel air freshener.  It comes in short
23 container.  Then a spray bottle air freshener or
24 cleaner.  But something that comes in a

Page 155

1 Windex-style bottle with a trigger on it.  Those
2 are the main lines.
3       Q.     In to order make those products
4 did it involve the mixing of chemicals?
5       A.     Yes.  They had mix tanks there.
6       Q.     What types of chemicals were
7 being mixed there at the plant when you
8 interviewed there and when you began to work
9 there?
10       A.     I don't know.  I know some of
11 those products are 99 percent water.  Just FYI
12 when you are paying $7 for a thing of cleaner
13 it's a lot of water.  I don't know what the
14 actual chemicals were.  Some fragrances and
15 maybe surfactants or something.
16       Q.     What else did Bryan Willert
17 explain to you about what they were looking for
18 in a manager?
19       A.     One thing he specifically said
20 that stood out I was used to being on call at
21 the cheese place at Fleur De Lait.  And I only
22 lived six miles from that plant.  And I was
23 explaining to him that I wouldn't be as
24 available for Willert because I lived 40 minutes

Page 156

1 away for on-call situations and after hours and
2 stuff.  And I remember him saying, well, I am
3 not looking for you to be doing work.  I'm
4 looking for you to be coordinating the efforts
5 of people doing the work.  He outlined it that
6 that is not your job.  You are the guy
7 coordinating the people doing that.
8       Q.     Did he explain what he meant when
9 he said by coordinating those efforts?
10       A.     No.  He didn't expound on that
11 too much as far as I recall.  I understood what
12 he meant.  Or I think I did.
13       Q.     Did you ask him to explain what
14 he meant by coordinating those efforts?
15       A.     No.
16       Q.     Did he explain to you anything
17 else about the responsibilities of a maintenance
18 manager at the facility?
19       A.     I don't remember.
20       Q.     Did he show you anything in
21 writing about the job responsibilities of a the
22 maintenance manager at Willert?
23       A.     No.
24       Q.     Do you recall anything else that



MATTHEW REYNOLDS
REYNOLDS V WILLERT

August 26, 2021
157–160

Page 157

1  you and he discussed during that interview?
2      A.    The only other thing coming to
3  mind is just he told me some of his background,
4  his professional or personal background.  But
5  that was not really relevant to this.  That is
6  all I remember talking about otherwise.
7      Q.    During that interview did you
8  have red eyes?
9      A.    I don't know.
10      Q.    Did you use any medical marijuana
11  before the interview?
12      A.    No.
13      Q.    Did you mention to Mr. Willert
14  that you were a medical marijuana patient during
15  the interview?
16      A.    No.
17      Q.    Was there any discussion about
18  preemployment drug screen during that initial
19  interview?
20      A.    No.
21      Q.    You mentioned there was as an
22  in-person meeting.  When did the in-person
23  meeting prior to your employment occur?
24      A.    Wednesday.  I think Wednesday,

Page 158

1  October 14th two days before I started.
2      Q.    So that's October 14, 2020?
3      A.    Yes.  I believe so.  I want to
4  check a calendar before I bet a paycheck on it.
5  But yes.
6      Q.    Who participated in that
7  in-person meeting?
8      A.    Bryan Willert and Jack Bonsky.
9      Q.    Who is Jack Bonsky?
10      A.    He was the brand new plant
11  manager who just accepted his role five minutes
12  before I walked in the door.
13      Q.    Where did the in-person meeting
14  occur?
15      A.    Throughout the plant.  We walked
16  the operation and looked over the facility.  So
17  we went for a walk.
18      Q.    When you refer to the plant are
19  you referring to Willert's Douglassville
20  location?
21      A.    Yes.
22      Q.    Is that the location where you
23  worked at for Willert?
24      A.    Yes.

Page 159

1      Q.    Did you ever see Bryan Willert at
2  the Douglassville location other than the time
3  of your in-person meeting with him?
4      A.    Yes.  At least once.  He came
5  back maybe a week or so later.
6      Q.    What was discussed during that
7  October 14, 2020 in-person meeting?
8      A.    He explained the processes and
9  explained that he was looking for people that he
10  could trust to take care of the operation so he
11  wouldn't have to be there.  And he asked me if I
12  thought I could do it.  And I said yes.  We
13  shook hands on it and that was it.
14      Q.    And, again, what was discussed
15  regarding the processes?
16      A.    It was just a tour of the plant
17  to see the kinds of equipment that were there to
18  see if I was comfortable maintaining that
19  equipment and different manufacturing
20  facilities.  A wide variety of different stuff.
21  And my background lent itself to what they were
22  doing there.  And I felt very confident I could
23  perform the role.  Just kind of a process check.
24  Do you think you can do this?  Was his question

Page 160

1  to me.
2      Q.    During the in-person meeting did
3  you mention to Mr. Willert and Mr. Bonsky you
4  were a medical marijuana patient?
5      A.    No.
6      Q.    During the time of the in-person
7  meeting did you have red eyes at all?
8      A.    I don't know.
9      Q.    Did you take any medical
10  marijuana before the in-person meeting?
11      A.    No.
12      Q.    When was the last time you took
13  medical marijuana before the in-person meeting?
14      A.    I can't tell you.  I don't know.
15      Q.    Did Mr. Willert or Mr. Bonsky
16  make comments to you during the in-person
17  meeting about medical marijuana?
18      A.    No.
19      Q.    Did Mr. Willert or Mr. Bonsky
20  make any comments to you during the in-person
21  meeting regarding marijuana?
22      A.    No.
23      Q.    Did Mr. Willert make comments to
24  you regarding medical marijuana during the first



Page 161

1 interview that you had with him?
2     A.    No.
3         Q.    Did Mr. Willert make any comments
4 to you about marijuana in general during the
5 first interview that you had with him?
6     A.    No.
7         Q.    Other than what you already
8 testified to, can you recall anything else that
9 was discussed during that in-person meeting that
10 you mentioned?
11     A.    General introduction between me
12 and Jack Bonsky.  We talked about having fun a
13 lot.  Jack was a high-energy guy.  He was
14 excited to be there.  And so was I.  And it was
15 really unique in that sense.  It was like having
16 fun was the kind of part of the objective and
17 that really stood out.  It was part of what made
18 that job special at the time.
19         Q.    What was it about that job that
20 seemed like it would be fun to you?
21     A.    The people.  I mean, there is not
22 necessarily anything fun about a building or
23 machinery.  But it's the attitude and the
24 atmosphere that the people and the leadership

Page 162

1 put in place.  And that was kind of the MO from
2 Bryan and Jack was like, hey, we are going to do
3 this and we are going to have a good time doing
4 it.
5         Q.    After the in-person meeting were
6 you offered a position at Willert?
7     A.    Yes.
8         Q.    What position were you offered?
9     A.    Maintenance manager.
10         Q.    Did you receive an offer letter
11 from Willert?
12     A.    I think a few days after I
13 started there was there was an offer letter.
14 But I had already been working a few days.
15         Q.    What was the first day that you
16 began working at Willert?
17     A.    Friday, October 15th or 16th,
18 2020.
19         (Exhibit 4 was marked for
20     identification.)
21 BY MS. FICARO
22         Q.    I will share my screen with you.
23 I am showing you a copy of a document I will ask
24 be marked Reynolds 4.  There are Bates numbers

Page 163

1 at the bottom of each page of the two-page
2 document, Willert 0001 and Willert 00002.  Do
3 you see those Bates labels?
4     A.    Yes.
5         Q.    Scrolling back to the top here it
6 appears to be a letter on Willert Manufacturing
7 Company's letterhead.  Do you see that top
8 there?
9     A.    Yes.
10         Q.    It is dated October 15, 2020.  Do
11 you see that there?
12     A.    Yes.
13         Q.    Do you recognize this document?
14     A.    Yes.
15         Q.    What is this document?
16     A.    This it would be a offer letter,
17 yes.
18         Q.    Is that the offer letter you
19 received for the position of maintenance manager
20 at Willert?
21     A.    Yes.
22         Q.    Take a look at that there.  There
23 are bullet points after the first paragraph.
24 And the first one reads, Full-time\part-time.

Page 164

1 And it says, Full-time salary exempt employee.
2 Am I reading that correctly?
3     A.    Yes.
4         Q.    The next one says, Pay rate.
5 $3,269.24 per biweekly pay period.  Is that what
6 you earned per biweekly pay period while you
7 worked for Willert?
8     A.    Yes.
9         Q.    The next sentence there says,
10 Upon completion of project goals defined by the
11 plant manager you will receive a bonus of
12 $15,000.  Do you see that there?
13     A.    Yes.
14         Q.    What were the project goals that
15 needed to be completed in order for you to
16 receive that bonus?
17     A.    That entire list had not been
18 defined in the time that I was there.  There
19 were a couple of opportunities highlighted.  But
20 it was not established in writing, nor was the
21 entire list defined.
22         When you say there were a couple
23 opportunities that were highlighted, what do you
24 mean by that?



MATTHEW REYNOLDS
REYNOLDS V WILLERT

August 26, 2021
165–168

Page 165

1    A.    I remember Bryan Willert and I
2  was walking through.  And there was a specific
3  piece of equipment that had broke down very
4  frequently in a short amount of time.  And he
5  said, hey, remember that bonus thing we talked
6  about, and he pointed to that thing to get on it
7  and see what you could do.
8         So it was -- to me that was,
9  okay, I fix this thing, make it not break
10  anymore.  And that will contribute to a bonus
11  there.
12    Q.    Did he ever mention anything else
13  to you about any type of tasks that might
14  constitute project goals entitling you to a
15  bonus?
16    A.    We had talked about line
17  performance and what they call OEE or Equipment
18  Effectiveness, Equipment efficiency, how well
19  the plant runs.  But it was very high-level
20  conversation.  It was -- we were talking in
21  generalities up front.  The maintenance of the
22  equipment has an impact on how well it runs.
23  And, you know, it was understood and agreed
24  between us that if there was a measurable

Page 166

1  improvement in the way things were running after
2  I had been there a while that would be
3  considered a part of a bonus opportunity.
4    Q.    Did he ever write that down for
5  you?
6    A.    No.
7    Q.    When you got the offer letter did
8  you see to him, What are those project goals
9  that I need to accomplish in order to receive
10  this bonus?
11    A.    No.
12    Q.    Do you see the next sentence
13  there says, Future bonuses are determined and
14  paid at the discretion of management?
15    A.    Yes.
16    Q.    The next bullet point indicates
17  hours, minimum of 40 hours per week.
18    A.    Correct.
19    Q.    Did you work 40 hours per week
20  during the time that you worked at Willert?
21    A.    I believe it was 59 hours and 60
22  hours.
23    Q.    How were you tracking those
24  hours?

Page 167

1    A.    Again Google timeline.  You go in
2  and you see when you arrive and depart a place.
3  So I went through and tallied up the hours for
4  each day that I was there and put it in a Excel
5  spreadsheet and totaled it.
6    Q.    Do you have that Excel
7  spreadsheet?
8    A.    I believe it has been submitted
9  as part of the documents somewhere.  Or at least
10  the total hours were.
11    Q.    Why did you prepare that Excel
12  spreadsheet?
13    A.    Because I felt that it showed I
14  was going above and beyond the minimum.  It said
15  all I had to work was 40 hours a week and I was
16  there for 150 percent of that.
17    Q.    Did you call out of work on any
18  days during the limited time you worked at
19  Willert?
20    A.    The day -- yes.  One day.
21    Q.    How many times did you call out
22  during the two-week period you worked there?
23    A.    One day.
24    Q.    Did you take any half days during

Page 168

1  the period of time you worked there?
2    A.    No.  I don't believe so.
3    Q.    Was there a set time by which you
4  were expected to arrive at work?
5    A.    No.
6    Q.    Did you have set hours there for
7  work?
8    A.    No.
9    Q.    Here it says that your start date
10  is October 19, 2020.  Do you believe you began
11  before the start date listed in your offer
12  letter?
13    A.    Yes.
14    Q.    You believe it was October 15th
15  or 16th that you began working at Willert?
16    A.    Yes.  We met Wednesday.  Jack
17  started Thursday.  And I started Friday.
18         So in terms then of the next
19  bullet point, Benefits, it says, See salaried
20  employee benefit packet attached.  And then it
21  says, As a deviation from our standard salaried
22  employee benefit package you will receive four
23  weeks paid vacation per year.  Do you see that?
24    A.    Yes.



MATTHEW REYNOLDS
REYNOLDS V WILLERT

August 26, 2021
169–172

Page 169

1    Q.    Was it your understanding that
2 you would receive that vacation time per year?
3    A.    Yes.
4    Q.    The offer letter reads, This
5 offer is contingent upon successful completion
6 of a pre-employment drug test.  Do you see that
7 there?
8    A.    Yes.
9    Q.    Did you read that offer letter
10 when you received it?
11    A.    Yes.
12    Q.    Did you have to sign the offer
13 letter?
14    A.    I believe so.
15    Q.    Scrolling down on the document
16 here to the second page there is a signature
17 line that says, I, Matt Reynolds, accept the
18 offer as presented above.  And there is
19 signature there.  Is that your signature?
20    A.    Yes.
21    Q.    So scrolling up then again was it
22 your understanding that you had to successfully
23 complete a preemployment drug test in order to
24 work at Willert?

Page 170

1    A.    Yes.
2    Q.    When you received that offer
3 letter and read it did you say to anyone at
4 Willert, I am a medical marijuana patient?
5    A.    No.
6         (Exhibit 5 was marked for
7    identification.)
8 BY MS. FICARO
9    Q.    I will stop sharing the screen
10 and pull up another document.  I will share my
11 screen again.  I will show you another document.
12 I will ask that be marked as Reynolds 5.  Take a
13 look at that document.  I am scrolling down to
14 the bottom of this three-page document are Bates
15 labels.  And if you see Willert 00005, Willert
16 0006, Willert 0007.  Do you see that?
17    A.    Yes.
18    Q.    At the top, scrolling back up to
19 the top, title on the document is Willert Home
20 Products, Inc. Salaried Full-time Employee
21 Benefit Package.
22         Do you recognize this document?
23    A.    Yes.  I believe I have seen that.
24    Q.    Was this document presented to

Page 171

1 you as a benefit package at the time that you
2 were offered employment at Willert?
3    A.    I believe so.
4    Q.    Do you believe that this package
5 accurately represents the benefits being offered
6 to you in order to work at Willert?
7    A.    Yes.  Clearly I can't read the
8 whole thing now.  But looking at the bullet
9 points, the bold underlined things, that all
10 looks...
11    Q.    Would you like to read the whole
12 thing before you answer that?
13    A.    No.  Just scroll down.  Keep
14 going.  There this page 1, okay.  Keep going.
15 Okay.  Bereavement.  Okay.  Jury duty.  I
16 believe -- yes.  I believe I was presented this.
17    Q.    And do you believe that the
18 benefits set forth in this package were the
19 benefits being offered to you for the purpose of
20 your employment at Willert?
21    A.    Yes.  I believe so.
22    Q.    I will stop sharing.
23         As the maintenance manager at
24 Willert, what were your job responsibilities?

Page 172

1    A.    Safety, making sure my employees
2 left the same way they came in.  And equipment
3 up time, ensuring that my employees supported
4 production and keep the place running.
5         (Exhibit 6 was marked for
6    identification.)
7 BY MS. FICARO
8    Q.    I will share my screen with you
9 again.  Mr. Reynolds, I pulled up another
10 document that I will ask be marked as Reynolds
11 6.  Scrolling down that document there are Bates
12 labels at the bottom of the document here.  The
13 first page is 000109 and then you have 110.  And
14 then it goes to 000111.  Do you see that?
15    A.    Yes.
16    Q.    This is a job description for the
17 maintenance manager position there.  The summary
18 says, Maintenance managers oversee the repairs
19 and installations and upkeep of various machines
20 and power equipment associated with all parts of
21 the production of liquid film manufacturing.
22         Do you agree that those were part
23 of your job responsibilities as maintenance
24 manager at Willert?



MATTHEW REYNOLDS
REYNOLDS V WILLERT

August 26, 2021
173–176

Page 173

1   A.   Yes, that was part of my
2 responsibility.
3   Q.   Then says the main duties include
4 designing maintenance procedures, tracking
5 budgets and expenses and performing inspections
6 on different machines and equipment to find
7 problems and make repairs or replace as needed.
8        Were those part of your job
9 responsibilities as well?
10  A.   To be honest I believe those were
11 implied.  I don't think we ever spoke to them in
12 each of those bullet points in detail.  But just
13 in my professional experience I would assume
14 that those things would be part of my
15 responsibility.
16  Q.   So when you say they were
17 implied, what you mean is that it was your
18 understanding that that would be included within
19 your job responsibilities at Willert?
20  A.   Yes.  My understanding or my
21 assumptions would have led me to believe that
22 that stuff would be falling under my
23 responsibility, yes.
24  Q.   Then it talks about essential

Page 174

1 duties and responsibilities include the
2 following:  And other duties may be assigned.
3 So in addition to what we already discussed here
4 I will read run this list.  And if you are able
5 to provide me with a yes or no as to your
6 understanding as to whether your job
7 responsibilities included these items please do
8 so.
9   A.   Can I just say during my
10 employment there I was never presented with this
11 document.  So I as we go through these things
12 this is solely based on my personal
13 understanding of what it means to be a
14 maintenance manager.  I want to say that.
15  Q.   That's fine.
16  A.   Okay.
17  Q.   I understand that.  I'm asking
18 you if this was your understanding that these
19 were part of your responsibilities.
20  A.   Okay.
21  Q.   So is it your understanding that
22 part of your responsibilities included
23 communicating directly with the production
24 manager and general manager to coordinate

Page 175

1 maintenance and repair work in process areas?
2   A.   Yes.
3   Q.   Is it your understanding that
4 part of your responsibilities included
5 communicating directly with QA laboratory to
6 ensure effective participation by the
7 maintenance technicians in the implementation of
8 QA policies and procedures?
9   A.   Sure.  I guess to the extent that
10 maintenance would overlap with -- quality
11 assurance typically doesn't have a lot to do
12 with maintenance.  But if there were procedures
13 that applied to maintenance then, yes.
14 Certainly, yes.
15  Q.   Is you understanding that your
16 job responsibilities included implementing
17 programs or procedures required to ensure plant
18 cleanliness?
19  A.   No.  Honestly I don't think so.
20 The maintenance technicians were mostly focused
21 on production equipment.  I didn't have any
22 janitorial housekeeping staff.  So, no, I will
23 say no for that one.
24  Q.   Is it your understanding that

Page 176

1 your responsibilities included assisting the
2 planning and implementing plant improvements and
3 expansions?
4   A.   Yes.
5   Q.   Is it your understanding that
6 your job responsibilities included conducting
7 employee performance reviews based on job
8 descriptions to determine competency, knowledge
9 and contribution of the maintenance technicians?
10  A.   Yes.
11  Q.   Is it your understanding that
12 your job responsibilities included maintaining,
13 updating, operating training manuals for the
14 maintenance department?
15  A.   Yes.
16  Q.   Is it your understanding that
17 your job responsibilities included ensuring that
18 all maintenance technicians were trained on the
19 most updated version of the operating
20 procedures?
21  A.   I was not aware what any
22 operating procedures were yet.  But certainly
23 that would fall under my responsibility, yes.
24  Q.   Is it your understanding that



MATTHEW REYNOLDS
REYNOLDS V WILLERT

August 26, 2021
177–180

Page 177

1 your job responsibilities included monitoring
2 operation of plant equipment and systems?
3      A.   I don't know exactly what they
4 mean there.  Honestly I guess I'm not sure
5 exactly what that means.  But I mean in general
6 awareness of the operation of what is going on
7 in the plant, plant equipment systems, sure.
8      Q.   Is it your understanding that
9 your job responsibilities included reviewing the
10 operation of plant equipment and systems
11 constantly to minimize unplanned downtime,
12 anticipate and solve problems in a timely manner
13 and to identify opportunities for improvement?
14      A.   Yes.
15      Q.   Is it your understanding that
16 your job responsibilities include maintaining
17 and repairing maintenance shop equipment?
18      A.   I was not personally maintaining
19 or repairing shop equipment, nor would I have
20 thought it would be part of the job.  I mean
21 making sure that happens, yes.  But me?  No.
22      Q.   So you were then responsible for
23 making sure that maintenance and repair and of
24 the maintenance shop equipment happened?

Page 178

1      A.   Yes.  But I don't know how to fix
2 a lathe or a welder.  You know so...
3      Q.   To expedite this a bit there are
4 several other tasks that are listed as the
5 responsibilities here.  If you wouldn't mind
6 taking a moment reading those and letting me
7 know of any of the other additional tasks listed
8 under these responsibilities if you do not agree
9 that they were encompassed in your job
10 responsibilities.
11      A.   Okay.
12      Q.   Actually strike that.  Off the
13 record.
14           (Discussion held off the record.)
15 BY MS. FICARO
16      Q.   Is it your understanding that
17 your job responsibilities included establishing
18 and maintaining a computerized maintenance
19 management system for tracking work orders,
20 spare parts and maintenance history of plant
21 equipment?
22      A.   Yes.
23      Q.   Is it your understanding that
24 your job responsibilities included providing

Page 179

1 reports and analyzing data and making
2 recommendations for improving plant operations
3 and solving maintenance-related problems?
4      A.   Yes.
5      Q.   Is it your understanding that
6 your job responsibilities included ensuring that
7 maintenance technicians are adequately trained,
8 equipped and motivated so that the maintenance
9 program can be accomplished in a safe, timely
10 and cost-effective manner?
11      A.   Yes.
12      Q.   Is it your understanding that
13 your responsibilities included communicating
14 regularly with all maintenance technicians both
15 individually and as a group to ensure good
16 two-way communication concerning maintenance
17 issues?
18      A.   Yes.
19      Q.   Is it your understanding that
20 your job responsibilities consisted of assisting
21 with -- strike that.
22           Is it your understanding that
23 your job responsibilities included assisting
24 with hiring of maintenance personnel?

Page 180

1      A.   Yes.
2      Q.   Is it your understanding that
3 your job responsibilities included initiating
4 and carrying out projects that improve
5 efficiency and/or reduce operating costs?
6      A.   Yes.
7      Q.   Is it your understanding that
8 your job responsibilities included tracking,
9 analyzing and improving key maintenance
10 parameters such as asset utilization,
11 maintenance cost, PM compliance and schedule
12 compliance?
13      A.   Yes.
14      Q.   Is it your understanding that
15 your job responsibilities included maintaining
16 safety, health and environment policies and
17 procedures?
18      A.   Yes.
19      Q.   Is it your understanding that
20 your job responsibilities included ensuring that
21 city, county and state and federal regulations
22 relating to the maintenance department were met
23 at all times?
24      A.   Yes.



Page 181

1      Q.    Is that your understanding that
2  your job responsibilities included directing,
3  maintaining and enforcing the safety program for
4  the maintenance department and reviewing safety
5  records to uphold standards of maximum safety
6  for all maintenance technicians?
7      A.    Yes.
8      Q.    Is it your understanding that
9  your job responsibilities included initiating,
10  implementing and managing the plant maintenance
11  program with an emphasis on planning, scheduling
12  and preventative predictive maintenance?
13      A.    Yes.
14      Q.    Is it your understanding that
15  your job responsibilities included monitoring
16  the use and inventories of spare parts,
17  maintenance supplies and equipment and
18  initiating reordering when necessary?
19      A.    Yes.
20      Q.    The next section lists
21  supervisory responsibilities.  And it
22  indicates -- it reads, Supervises maintenance
23  technician on all shifts.  Is it your
24  understanding that your job responsibilities

Page 182

1  included supervising maintenance technicians on
2  all shifts?
3      A.    In regards to my staff worked on
4  all shifts.  And, yes, I made myself available
5  across all three shifts.  Clearly was not there
6  all three shifts.  I have to sleep sometime.
7  But yes.
8      Q.    Scrolling further down the
9  document there is a section called, Reasoning
10  ability.  And it indicates that the ability to
11  solve practical problems and deal with a variety
12  of concrete variable situations where only
13  limited standardization exists, the ability to
14  interpret a variety of instructions, furnish a
15  written a oral diagram or scheduled form.
16          Do you agree that you needed the
17  ability to do those things in order to perform
18  your job as a maintenance manager?
19      A.    Yes.
20      Q.    There is a physical demands
21  section here.  It says, The physical demands
22  described are representative of those that must
23  be met by an employee to successfully perform
24  the essential functions of this job.  Reasonable

Page 183

1  accommodations may be made to enable individuals
2  with disabilities to perform these essential
3  functions.  While performing the duties of this
4  job the employees are regularly required to use
5  hands to finger handle or feel and talk or hear.
6          Employee required to stand and
7  walk.  Employee must regularly lift and/or move
8  up to 10 pounds and occasionally lift and remove
9  up to 25 pounds.  Specific vision abilities
10  required by this job include close vision,
11  distance vision and ability to adjust focus.
12          Is it your understanding that
13  those were physical requirements of the
14  maintenance manager position?
15      A.    Yes.
16      Q.    I will stop sharing.  Gentlemen,
17  can we take quick five-minute break?
18          (Discussion held off the record.)
19  BY MS. FICARO
20      Q.    Mr. Reynolds, did you receive any
21  training when you started working at Willert?
22      A.    No.  Not that I recall.
23      Q.    Did you spend any time with Jack
24  Bonsky or anyone else at Willert, walking

Page 184

1  through the plant, having them describe to you
2  what happens, the processes of the plant, et
3  cetera?
4      A.    I spent time with Jack Bonsky
5  walking through the plant in terms of a daily
6  walk-through.  But he was just as new as me so
7  we were learning together.
8      Q.    When you did your daily
9  walk-throughs what types of topics did you
10  discuss or things did you address during the
11  daily walk-throughs?
12      A.    They were like customer service
13  visits from the management to the employees like
14  as if the employees were customers.  So checking
15  in with the line leads, the leaders on the floor
16  to see what needs they had, if there were any
17  issues, anything that the maintenance manager or
18  the plant manager can address.
19      Q.    Did you wear personal protective
20  equipment at Willert?
21      A.    Steel toes, safety -- yes.
22      Q.    Did you wear any -- what type of
23  personal protective equipment did you wear at
24  Willert?



Page 185

1    A.    Steel toes and safety glasses and
2 I believe ear plugs were required as well.
3    Q.    Why did you wear that personal
4 protective equipment?
5    A.    The ear plugs were for the one
6 area was noisy.  So the decibel rating required
7 it.  And steel toes were required for the plant.
8 It's good practice in any manufacturing
9 environment to have steel toes on.
10    Q.    At the time you worked at Willert
11 what type of machinery did they have there?
12    A.    They had some injection molding
13 machines which make the plastic bottles that
14 they were also filling.  And they had filling
15 machines to fill those bottles.  And the tanks
16 we talked about.  The bulk storage tanks that
17 held the water and chemical mixtures.
18    Q.    How big were the bulk storage
19 tanks?
20    A.    They were probably like 15,000
21 pound tanks like the size of --
22    Q.    How tall were they?  Sorry.  Like
23 the side of what?
24    A.    Like a 15-passenger van.  A 10-

Page 186

1 or 15-foot high, maybe six-foot across.
2    Q.    Were there any storage tanks that
3 were 20 feet high?
4    A.    I don't think so.  I'm guessing
5 at 10 to 15-foot.  I don't think any were
6 20-foot.
7    Q.    What were those storage tanks
8 used for?
9    A.    There was a -- they fed the
10 filler process.  So that held the ingredients
11 that were going into the bottles and containers.
12    Q.    What type of ingredients were
13 being held in those storage tanks?
14    A.    I don't know.  I didn't -- I was
15 not involved with the product mix or -- that
16 just was not part of my area.  So I don't know
17 what they were put in that stuff.
18    Q.    Were the storage tanks part of
19 the equipment that the maintenance team was to
20 maintain and repair when necessary?
21    A.    Yes.
22    Q.    Do you know what type of
23 chemicals were stored in any of those storage
24 tanks?

Page 187

1    A.    No.  They would have been drained
2 out for any maintenance.  Can't maintain
3 anything that is full of chemicals.  But I don't
4 know what any of those chemicals were.
5    Q.    Were any of those storage
6 tanks -- was any maintenance necessary with
7 regard to any of those storage tanks during the
8 time you worked at Willert?
9    A.    Yes.
10    Q.    Do you recall any specific
11 maintenance that was performed on any storage
12 tanks while you were at Willert?
13    A.    Yes.
14    Q.    What maintenance was performed on
15 any storage tanks while you were at Willert?
16    A.    The control system for one of
17 those tanks stopped working.  So I brought in a
18 outside vendor that supported that kind of
19 equipment.  And they repaired that and got it
20 working again.
21    Q.    When you say control system, what
22 are you referring to?
23    A.    The digital -- it's a PLC
24 controller.  So it is a signal-level voltage

Page 188

1 which is a real low level, like a 4 to 20
2 milliamp or a 12 vote DC signal that
3 coordinates -- like turns the pumps on, turns
4 the mixer on.  So I forgot if they couldn't pump
5 out of the thing or couldn't mix.  But one or
6 the other.  There is not much that a tank does
7 other than get mixed or pumped.  That guy came
8 in and got it working again.
9    Q.    How did you know the control
10 system on the storage tank was not working?
11    A.    I think essentially the button
12 did not work.
13    Q.    I mean, how did you know?  Did
14 you have to go look at it?
15    A.    No.  It was -- no.
16    Q.    So how did you know that that was
17 not working?
18    A.    I think one of the maintenance
19 technicians did a brief triage on it to see if
20 he could figure it out.  Couldn't get there.
21 And so I brought in outside help to expedite the
22 process.
23    Q.    Did you go and inspect it before
24 you brought in the outside help?



MATTHEW REYNOLDS
REYNOLDS V WILLERT

August 26, 2021
189—192

Page 189

1    A.    No.  There is not really much to
2 inspect with that.
3    Q.    How did you know what outside
4 help to bring in?
5    A.    Just experience I guess.  What
6 you are supposed to know as a maintenance
7 manager is what to do when things break.
8    Q.    Did you go near the storage tank
9 at all when it was not working?
10   A.    I went to the area to the
11 employee.  I was in the general area.
12   Q.    How far away from the storage
13 tank were you when you did that?
14   A.    I don't know.  10 feet, something
15 like that.
16   Q.    Were there chemicals being stored
17 in the storage tank?
18   A.    I don't know what was in there at
19 that time.
20   Q.    Could it have been chemicals?
21   A.    It could have been, yes.
22   Q.    You said you were about 10 to
23 15 feet away from the storage tank when it had
24 to be repaired?

Page 190

1    A.    Yes.
2    Q.    Was it ultimately your
3 responsibility to make sure that that storage
4 tank was repaired and working again?
5    A.    Yes.
6    Q.    In terms of the control system
7 that you mentioned on that storage tank, how was
8 that control system powered?
9    A.    I think those have a 120-volt
10 single phase power supply going to them.  Like a
11 household voltage level.
12   Q.    You said 120-volt?
13   A.    I think so.
14   Q.    Can 120-volts be dangerous to
15 you?
16   A.    Potentially.
17   Q.    Can it seriously injure you if
18 you came into contact with something that was
19 live and 120-volts?
20   A.    It's possible, not typical.  But
21 it's possible.
22   Q.    In terms of your time at Willert
23 was there ever an occasion on which you and
24 Mr. Bonsky had worked together to repair a

Page 191

1 drive?
2    A.    Not that I recall, no.
3    Q.    Did you ever have to employ lock
4 out, tag out procedures while you were at
5 Willert?
6    A.    No.
7    Q.    Would implementing lock out, tag
8 out procedures be part of your job
9 responsibilities as a maintenance manager?
10   A.    Like enforcing them?  Or
11 personally locking something out?
12   Q.    Let's talk about enforcing them.
13 Would that be part of your job responsibilities?
14   A.    Yes.  Ensuring that people follow
15 the practices and procedures, yes.
16   Q.    Did you yourself ever have to
17 lock out any equipment at Willert?
18   A.    No.
19   Q.    If you had stayed there and
20 worked longer would it have been possible that
21 you would have needed to lock out equipment at
22 Willert?
23   A.    No.  I don't believe so.
24   Q.    Under what circumstances would

Page 192

1 somebody need to lock out equipment?
2    A.    If they are working in a
3 situation where there is any unsecured energy
4 you got to bring the equipment to a zero energy
5 state.  That can be gravity, compressed air,
6 steam.  I don't think they had steam there.  But
7 so any time you are changing the equipment
8 conditions, taking something apart, taking off
9 guards and going into something, before do you
10 that you have to lock it and tag it out.  So
11 that involves disassembling something, taking it
12 out of the original factory condition.
13   Q.    If a machine was electronically
14 powered broke and needed to be repaired, would
15 it need to be locked out before repairs were
16 made on the machine?
17   A.    Typically by the person
18 performing the repair typically.
19   Q.    And typically the person
20 performing the repairs would need to report to
21 you, correct?
22   A.    Yes.
23   Q.    Other than the storage
24 containers, what other type of machinery was at



MATTHEW REYNOLDS
REYNOLDS V WILLERT

August 26, 2021
193—196

Page 193

1  Willert during the time that you worked there?
2      A.    Fillers.  So equipment that put
3  liquids into bottles or gels into containers.
4  Air compressors and some vacuum pumps and
5  injection molding machines which are plastic
6  machines.
7      Q.    Did you oversee the maintenance
8  of the fillers at Willert?
9      A.    Yes.
10      Q.    Did you oversee the maintenance
11  of air compressors Al Willert?
12      A.    Yes.
13      Q.    Did you oversee the repair of
14  fillers at Willert?
15      A.    Yes.
16      Q.    Did you oversee the repair of air
17  compressors at Willert?
18      A.    I don't think any broke while I
19  was there.  But I was working on a replacement
20  for one.  Yes, yes.
21      Q.    What replacement of an air
22  compressor did you work on at Willert?
23      A.    There was one that was out of
24  service that I was trying to see if we can get

Page 194

1  an outside company to retrofit a piece to it
2  rather than replace the whole thing.  So try to
3  make it a 5 to $10,000 fix rather than a $50,000
4  replacement.
5      Q.    Did you have to inspect the
6  machinery at all in order to figure out who to
7  bring in to do that?
8      A.    A visual walk-around.  I didn't
9  have to take any guards off or anything.  It was
10  just getting the serial number and model number
11  off of it and taking some pictures.
12      Q.    When you did the visual
13  walk-around how close to the air compressor did
14  you walk around?
15      A.    I mean, close enough to -- 1 to 2
16  feet away from the air compressor, close enough
17  to take pictures.  All the guarding was in
18  place.
19      Q.    Was that air compressor
20  ultimately repaired while you were there?
21      A.    No.  I was still in the process
22  of getting quotes for it.
23      Q.    If it had been repaired while you
24  were there, was it your understanding as a

Page 195

1  maintenance manager it would have been your
2  responsibility to ensure that it was repaired?
3      A.    Yes.
4      Q.    In terms of the fillers that you
5  mentioned, what type of materials did the
6  fillers literally inject into the bottles?
7      A.    They were liquids.
8      Q.    Were they chemicals?
9      A.    Ultimately these were like
10  consumer household chemicals.  So stuff that you
11  can buy at the Dollar Tree or wherever.  So it's
12  chemicals, yes.  It is going to consumer
13  households.  It is not going to -- you don't
14  want to drink it.  But other than that the risk
15  factor is pretty low.
16      Q.    But they were chemicals?
17      A.    Sure.  It was not sugar.  You
18  know?  Some kind of chemical.
19      Q.    During the time that you worked
20  at Willert, were you familiar with the
21  electrical voltages that you might interact with
22  there?
23      A.    Yes.
24      Q.    What voltage of --

Page 196

1      A.    Wait.  That I personally
2  interacted with?  I should rephrase that answer.
3  I was not personally interacting with any
4  voltages.  So I think I misheard that I guess.
5      Q.    I believe you mentioned that the
6  storage tanks were electrically powered.  What
7  voltage of electricity, if you know, powered
8  those storage tanks?
9      A.    There is a mixer on top and a
10  pump underneath.  And those were likely to be 3
11  phase 480.
12      Q.    How about the fillers, were they
13  electronically powered?
14      A.    Yes, they were.
15      Q.    Do you know what voltage of
16  electricity powered those fillers?
17      A.    They were likely a 480
18  distribution into the main panel.  And then it
19  can be stepped down from there.  Some equipment
20  needs smaller voltages.  So it's distributed
21  from the local panel at the machine.
22      Q.    How about the air compressor,
23  what voltage of electricity powered the air
24  compressors?



Page 197

1     A.     Those are 480.
2     Q.     Can 480 volts of electricity
3  injure someone?
4     A.     Yes.
5     Q.     Can 480 volts of electricity kill
6  someone?
7     A.     Yes.
8     Q.     You mentioned, for example, there
9  was I believe it was over the storage tank you
10  indicated there was a mixer on top and a pump on
11  the bottom; is that correct?
12     A.     Yes.
13     Q.     So theoretically if a mixer broke
14  on top of the storage mixer, would the repair of
15  that mixer fall under your duties as maintenance
16  manager at Willert?
17     A.     It would fall under my
18  responsibilities, not my personal duty.  If
19  duty -- does duty mean that I'm doing it?  Or
20  does duty mean my department?
21     Q.     Are you ultimately as the
22  maintenance manager responsible for ensuring
23  that, for example, a broken mixer on top of the
24  storage tank would be repaired?

Page 198

1     A.     Responsible for getting it
2  repaired, yes.
3     Q.     How about the pump on the bottom
4  of the storage tank, if a pump was broken on the
5  bottom of one of those storage tanks would it be
6  your responsibility as the maintenance manager
7  to ensure that the pump was repaired?
8     A.     Yes.
9     Q.     Would it be your responsibility
10  as the maintenance manager to ensure that the
11  mixer on top and the pump on the bottom are
12  properly maintained?
13     A.     Yes.
14     Q.     How about with regard to the
15  fillers, your job as a maintenance manager
16  responsibilities included ensuring the
17  maintenance and repair of the fillers, correct?
18     A.     Yes.
19     Q.     Did your job responsibilities as
20  maintenance manager also include ensuring the
21  maintenance and repair of air compressors?
22     A.     Yes.
23     Q.     How big were the air compressors?
24     A.     Those are typically measured in

Page 199

1  horsepower of the motor.  And I believe they
2  were I think 50-horsepower and a 75-horsepower.
3     Q.     Are you able to tell me in terms
4  of how high those air compressors were how tall
5  or high they were?
6     A.     They were like the size of a
7  Volkswagen Beetle, the old '70s ones.  So like 8
8  feet by 4 feet by 4 feet, something like that.
9     Q.     How about the filler, how big
10  were the fillers?
11     A.     They are a long sequence of
12  machines kind of lined up together.  So those
13  are -- the overall line, they were probably like
14  50 to 75 feet long.  But they are low and fairly
15  skinny.  Maybe 3 or 4 feet off the ground.  They
16  are stationed so that operators can stand there
17  and pull bottles off lines.  4 feet high, you
18  know, 4 or 5 feet wide depending on where it is
19  on the filler.
20     (Exhibit 7 was marked for
21     identification.)
22  BY MS. FICARO
23     Q.     Let me pull up a document
24  quickly.  I will share my screen again with you.

Page 200

1  With the document that I will ask please be
2  marked as Reynolds 7.  And I will scroll so you
3  can see the whole document here.  It is a
4  one-page document.  And I will represent to you
5  it's a document produced by your attorney in
6  this matter.  And at the top it says, No. 3,
7  performance.  Do you see that there?
8     A.     Yes.
9     Q.     Do you recognize that document?
10     A.     Yes.
11     Q.     Who created this document?
12     A.     I believe I provided the data on
13  there.
14     Q.     Did you literally type the
15  document or did somebody else do that?
16     A.     That looked like the one I typed.
17     Q.     What is this list?  What is this
18  list supposed to be describing?
19     A.     These were accomplishments or
20  things that I had gotten done while I was there
21  during my tenure at Willert.
22     Q.     So the first thing is 10/19/20.
23  Expedited parts for surprise one-day turnaround
24  on a machine expected by staff to be down days



Page 201

1  or weeks.  What machine was that?
2      A.     They called it the bottle
3  scrambler.
4      Q.     What was the bottle scrambler?
5      A.     It was they would dump a bunch --
6  hundreds of bottle into this thing.  And it
7  would spin them around and send them out in a
8  single file line.
9      Q.     How big was that machine?
10     A.     Let's say 8-foot wide by 8-foot
11  long by 10-foot high, something like that.
12     Q.     How was that machine powered?
13     A.     It was probably 480, 3 phase.
14     Q.     Electricity?
15     A.     Yes.
16     Q.     What did you have to do in order
17  to expedite the parts?
18     A.     My part was sourcing the motor,
19  finding it.  I got it through motion so making
20  phone calls, ordering.
21     Q.     Did you look at the motor so you
22  knew what parts to be ordered?
23     A.     Yes.  I would have taken it off
24  the machine.  It was pretty small, like the size

Page 202

1  of a foot-long sub.  So I was able to look at it
2  and get the part numbers off it.
3      Q.     How about safety issues
4  identified or addressed?  See first request for
5  Production of Documents -- sorry.
6              It says, See First Request for
7  Production -- FRP.  Then it is bullet points
8  trip hazard, unsecured gas bottles were blocking
9  fire extinguisher, bench grinder gap, machine
10  guarding issue, Ty-D-Bowl line.  Explain what
11  this means to me and what each of things are.
12     A.     So the bench grind gap and the
13  blocked fire extinguisher and unsecured gas
14  cylinder, those are all OSHA violations.  And in
15  my experience OSHA has a minimum charge of
16  $6,000 per violation.  So I identified those and
17  either had somebody correct them or corrected
18  them myself.  And the bottles -- it is simple
19  tasks.  But OSHA doesn't care.  A violation is a
20  violation.
21              The hose that was -- they had a
22  garden hose just laying on the floor across in
23  front of a emergency exit doorway.  So I had a
24  guy make up a plate to cover that and secure

Page 203

1  that.  So a threshold instead of a loose hose on
2  the ground blocking a exit.
3      Q.     Where is the hose?
4      A.     Oh, trip hazard.  That is what
5  that is.  That trip hazard was a garden hose.
6      Q.     What was the machine guarding
7  issue Ty-D-Bowl line?
8      A.     So I had dug through some old
9  safety committee notes.  And I found a concern
10  that was brought up an operator six months prior
11  and it had never been addressed.  And I went out
12  and talked to the operator.  And she had a valid
13  safety concern where there was no guard on this
14  line.  There was pinch points all over the
15  place.  Anybody can have walked up and reached
16  in there and suffered a amputation.  There was
17  no guarding which is required by OSHA.  So I got
18  that on the priority list.  And it was something
19  that was actively being addressed when I parted
20  ways with Willert.
21     Q.     What type of machine was it that
22  there was a guarding issue for?
23     A.     That was filler that put the blue
24  stuff in the Ty-D-Bowl bottles.

Page 204

1      Q.     How did you realize that there
2  was a guarding issue?
3      A.     Finding the documentation, the
4  employee concern.
5      Q.     How did you notice there was a
6  lack of guard there in the first place?  Did you
7  see it and did it appear as though a guard was
8  missing?
9      A.     I had not noticed that specific
10  area yet myself personally.  So my part in it
11  was being thorough and digging through the
12  six-month old documentation and reading up on
13  safety committee notes.  And then once I found
14  that that somebody else identified it I had to
15  go out and ask her where it was at.  And she
16  showed me.
17     Q.     Then did you look at it?
18     A.     Yes.
19     Q.     Did you have to climb on anything
20  or how close did you have to get to it?
21     A.     No.  It was readily apparent once
22  it was pointed out.  Didn't have to do anything
23  remarkable to see it.
24     Q.     Was there a specific shift that



Page 205

1  you worked at Willert?
2      A.    No.
3      Q.    How many shifts were there at
4  Willert?
5      A.    Three.
6      Q.    Was there a typical shift that
7  you were more often there during than others?
8      A.    I made it a point to try to be
9  available to all three shifts.  But the bulk of
10  my hours were during day shift.  I think 7:00 to
11  3:00 there.
12      Q.    Further down in this list it
13  says, Production support provided on second
14  shift as needed.  Underneath that its says,
15  Initiated the upgrade of an obsolete AC/DC
16  rectifier inverter to a modern drive unit.
17          What machinery were you dealing
18  with in that instance?
19      A.    That was one of the plastic
20  injection molding machines.
21      Q.    And what did you have to do in
22  order in initiate the upgrade of that machine?
23      A.    Contact a outside vendor with the
24  skills and experience to be able to perform that

Page 206

1  task.
2      Q.    Halfway down the page it says,
3  Hand delivered same mix tank spare part.  Time
4  2:18, 11/4/20.  Which was a sick day caused by
5  panic attack which onset after a November 3,
6  2020 phone conversation with medical review
7  officer in regards to drug test results.
8          Do you see that there?
9      A.    Yes.
10      Q.    Why did you have a panic attack
11  after reading -- or with regard to the drug test
12  results?
13      A.    Well, that changed my whole
14  worldview.  Up to that point I had been living
15  under the assumption that I had privacy and
16  protection in this.  So just like if you are
17  prescribed a painkiller or Adderall and you
18  disclose that to a medical review officer they
19  report a past to the company and you have
20  privacy.  The company has no idea you are on
21  prescriptions.  So that is what I thought was
22  going to happen with this.  And when he told me
23  it was a fail I immediately knew I was going to
24  get fired.  And it is like everything started

Page 207

1  caving in.  That is what I called in sick the
2  next day.
3          But I had the part in my car.  I
4  had gotten fixed the day before.  And I knew
5  they needed it.  So I drug myself out of bed on
6  the 4th which was the only day I called in.
7  That was the only day I called in sick.  But I
8  got myself out of bed and I drove up there and I
9  dropped that part off because I knew they needed
10  it.  So I took it in.
11      Q.    Was there a typical time of day
12  that Jack Bonsky would arrive at work usually?
13      A.    Yes.  He was clockwork.  I think
14  he there between 6:30 and 7:00 every day.
15      Q.    Did they expect you to be there
16  around that same time?
17      A.    No.  At least that's what had
18  been communicated to me by Jack.  He was my
19  direct supervisor.
20      Q.    So this list then, what we are
21  looking at on this document, these are all tasks
22  that you performed while you worked at Willert?
23      A.    Performed, coordinated, got done.
24  Sure, yes.

Page 208

1          (Exhibit 8 was marked for
2      identification.)
3  BY MS. FICARO
4      Q.    I will show you another document
5  quickly.  Mr. Reynolds, you mentioned your drug
6  screen.  That's come up a few times during this
7  deposition.  I will show you a document now and
8  ask that it be marked as Reynolds 8.  I will
9  show you that.  I will scroll done here.  There
10  is a Bates Willert 0046.  Do you see that there?
11      A.    Yes.
12      Q.    At the time top it says,
13  Occupational Health Pottstown Hospital, Tower
14  Health.  And then it says, Drug screen results
15  letter.  So it was to Dave Furno, Ed Kinnet,
16  Willert Manufacturing Company.  Then it has your
17  name here, Matthew D. Reynolds.  Do you see that
18  there?
19      A.    Yes.
20      Q.    Then it's had your patient ID.
21  And the collection date and time of October 28,
22  2020.  Have you ever seen this document before?
23      A.    Yes.
24      Q.    When did you first see that



MATTHEW REYNOLDS
REYNOLDS V WILLERT

August 26, 2021
209–212

Page 209

1  document?
2      A.     That is a good question.  I
3  believe that was provided to me was my
4  termination letter.  But I'm not sure.
5      Q.     The document that we just looked
6  at it says that you learned about the drug test
7  results on November 3, 2020.  How did you learn
8  about those results?
9      A.     The medical review officer called
10  me.
11      Q.     What did the medical review
12  officer tell you when he called you?
13      A.     He indicated that I tested
14  positive for THC and was looking for my comments
15  on that.
16      Q.     What did he ask you?
17      A.     I don't remember his specific
18  question.  But he was looking for my feedback
19  about it.
20      Q.     Did he explain what he meant when
21  he said he was looking for your feedback or why
22  he wanted your feedback?
23      A.     I don't remember.
24      Q.     What did you tell him during that

Page 210

1  call?
2      A.     I told him I was a medical
3  marijuana patient and I had a card for that.
4  And that that was the reason for the results on
5  the test.
6      Q.     Before that time had you ever
7  spoken to the medical review officer before?
8      A.     Not the medical review officer.
9  They are not present at the drug test.
10      Q.     So let me try this again.  Then I
11  will share the screen.  Are you able to see the
12  document again?
13      A.     Yes.
14      Q.     So that call on November 3rd from
15  the medical review officer was the first time
16  you spoke to the medical review officer; is that
17  correct?
18      A.     Yes.
19      Q.     When you told him you were a
20  medical marijuana patient, what did the medical
21  review officer say?
22      A.     To paraphrase.  But it was
23  essentially we don't really care.  We go by the
24  federal law.  We will report a fail.

Page 211

1      Q.     Did he explain anything further
2  about what he meant by that?
3      A.     Not that I remember.  And I
4  certainly -- I don't want to say protested.  But
5  I can't think of another word.  I said I thought
6  I had protection of privacy with this.  I
7  have -- I'm a patient.  And he was not budging
8  on his position.
9      Q.     Before you spoke to the medical
10  review officer, was there a different person who
11  actually performed the collection from you?
12      A.     Yes.
13      Q.     Who was that person?
14      A.     I don't remember.  I don't recall
15  her name.  But it was one of the RNs or service
16  provider there at Pottstown, whatever that's
17  called.
18      Q.     On these drug screen results it
19  identifies the collector at Michelle Bradley,
20  RT.  Does that refresh your recollection as to
21  who may have collected it from you?
22      A.     Yes.  That's sounds right.
23      Q.     Where did you actually have the
24  drug screen taken?

Page 212

1      A.     It was I think the address on the
2  letter is the right place.  I just Googled up
3  the address and went there.  So whatever I was
4  directed to go to.
5      Q.     At the top it says, Occupational
6  Health Pottstown Hospital.  Tower Health.  81
7  Robinson Street, Pottstown, PA.  Do you believe
8  that is where you had the test done?
9      A.     It was not a hospital.  It was
10  one of those clinics.  So I don't know if the
11  header means that clinic was part of the
12  network.  I didn't go to a hospital.
13      Q.     Did you tell the person who
14  performed your drug screen that you were a
15  medical marijuana patient?
16      A.     Yes.  I got out my card.  Said,
17  hey, this is probably going to show up.  Do you
18  guys need to know this?
19      Q.     What did that person say to you
20  when you told her that?
21      A.     She said, oh, no, no problem.
22  Just if you have any questions I will give you a
23  call.  Okay?
24      Q.     Did you know whether it was noted



MATTHEW REYNOLDS
REYNOLDS V WILLERT

August 26, 2021
213—216

Page 213

1  anywhere by the person who collected it whether
2  or not you were a medical marijuana patient?
3      A.   I don't know.
4      Q.   Do you know if the person who
5  performed that collection ever told anyone from
6  Willert that you were a medical marijuana
7  patient?
8      A.   I don't know.
9      Q.   On the form here it identifies a
10 gentleman Joseph Albert, DO.  Do you recognize
11 that name?
12     A.   I don't recognize it just because
13 I am bad with names.  But I wouldn't disagree
14 either.
15     Q.   Disagree meaning that that was
16 the medical review officer who contacted you?
17     A.   It is likely the right name.
18     Q.   Do you know if Dr. Albert told
19 anyone from Willert that you had communicated to
20 him you are a medical marijuana patient?
21     A.   I can't say with certainty that
22 he did.  I don't believe he did.
23     Q.   Did you at any time before you
24 took the drug screen, the preemployment drug

Page 214

1  screen, did you at any time tell anyone from
2  Willert you were a medical marijuana patient?
3      A.   No.
4      Q.   Before you took the preemployment
5  drug screen did you ever use medical marijuana
6  during work hours?
7      A.   No.
8      Q.   During the time you worked at
9  Willert what type of day did you typically use
10 medical marijuana?
11     A.   What type of day?
12     Q.   Let me rephrase.  During the time
13 you worked a Willert typically what time of day
14 did you use medical marijuana?
15         MR. AUERBACH:  Objection, asked
16     and answered.  I believe you said
17     5 o'clock.
18 BY MS. FICARO
19     Q.   I am just clarifying whether that
20 pertained to the time that he worked at Willert
21 as well?
22     A.   Your screen is still up there.
23     Q.   Sorry.
24     A.   Yeah.  5:00.

Page 215

1      Q.   Can you see the drug screen
2  results?
3      A.   No.  I'm looking at all of you
4  right now.
5      Q.   During the period of time that
6  you worked at Willert, and I believe you
7  previously testified that typically you take
8  medical marijuana about 5:00 or 6:00 at night;
9  is that correct?
10     A.   Yes.
11     Q.   And during the time you worked at
12 Willert you were using medical marijuana five to
13 seven days per week, correct?
14     A.   So I will say no.  The five to
15 seven was more during the time of unemployment
16 when anxiety was through the roof.  Once I had a
17 job life started to normalize a little bit.  So
18 it was -- I didn't need it as much.  Maybe two
19 days a week if it was a really wild day at work
20 or something.
21     Q.   During the time that you worked
22 at Willert then you estimate that you used
23 medical marijuana approximately twice a week?
24     A.   Yes.

Page 216

1      Q.   And you mentioned that you used
2  it if there was a particularly crazy day at
3  work?
4      A.   Sure.
5      Q.   Would there be any other things
6  that would prompt you to use medical marijuana?
7      A.   I can't think of any specific
8  examples existential of anxiety.
9      Q.   Did you experience any
10 existential anxiety during the period of time
11 that you worked at Willert?
12     A.   Some.
13     Q.   On those occasions when you did,
14 did you use medical marijuana?
15     A.   If it is after work hours.  So
16 you asked me a yes or no or question.  I'm
17 rambling.  Sorry.  So yes.
18     Q.   Take a look at the drug screen
19 results letter again.  If you look at the bolded
20 part of the letter midway down it says
21 D-THC-marijuana metabolite 50\15-positive.  Do
22 you see that there?
23     A.   Yes.
24     Q.   Is it your understanding that



MATTHEW REYNOLDS
REYNOLDS V WILLERT

August 26, 2021
217–220

Page 217

1 that indicates that those drug screen results
2 indicates that those drug screen results
3 indicated that you tested positive for
4 D-THC-marijuana metabolite 50\15?
5       A.    Yes.  I can't tell you what all
6 that means, but yes.
7       Q.    I will stop that share here.
8 What happened then after you got the drug screen
9 results?
10       A.    So you mean the call with the
11 medical review officer?
12       Q.    Yes.
13       A.    When I heard results from him?
14       Q.    Yes.
15       A.    I was at work.  So I finished the
16 day at work.  But inside my world was starting
17 to crumble.  It was bad.
18       Q.    At that time when you heard about
19 the results, did you tell Mr. Willert,
20 Mr. Bonsky or anyone else at Willert that you
21 were a medical marijuana patient?
22       A.    No.  Not at that time.
23       Q.    It's my understanding that you
24 were eventually terminated from your employment

Page 218

1 at Willert; is that correct?
2       A.    Yes.
3       Q.    On what day were you terminated?
4       A.    November 5.
5       Q.    How did you find out that you
6 were being terminated?
7       A.    Phone call.
8       Q.    Who was the phone call with?
9       A.    Ed Kennet and Jack Bonsky.
10       Q.    Who is Ed Kennet?
11       A.    He was another salaried
12 individual.  I think he was like the accounting
13 guy slash IT guy, plant controller.
14       Q.    What did they tell you during
15 that call?
16       A.    Jack did the talking.  Ed was
17 just there as a witness.  Typically on
18 termination you have a witness.  So Jack said,
19 hey, Matt, this is not going to be a pleasant
20 call.  And then he read contents of a
21 termination letter which I later received from
22 them.
23       Q.    Did he say anything else to you
24 other than reading the termination letter to

Page 219

1 you?
2       A.    Yeah.  I told him I didn't
3 understand why that was happening because I had
4 a card, a patient card.  I was a medical
5 marijuana patient.  And he kind of shifted
6 gears.  He was like, oh, you have a medical
7 card.  I said yeah.  Oh, okay.  Well, hang
8 tight.  Take the day off and I will get back to
9 you.
10       So for a short period of time I
11 thought maybe things would be all right.  Then I
12 got voice mail from him because my phone died.
13 And I missed the call.  But I got a voice mail
14 saying, yes, indeed you are terminated.
15       Q.    Before Mr. Bonsky read that
16 termination letter to you, did you ever tell
17 Mr. Bonsky that you were a medical marijuana
18 patient?
19       A.    No.
20       Q.    Before Mr. Bonsky read the
21 termination letter to you, did you ever tell
22 Mr. Willert that were a medical marijuana
23 patient?
24       A.    No.

Page 220

1       Q.    Before the termination letter was
2 read to you, did anyone from Willert know that
3 you were a medical marijuana patient?
4       A.    No.
5       Q.    After the termination letter was
6 read to you, did you offer to show Mr. Bonsky
7 your medical marijuana license?
8       A.    I told him I had one.  But I
9 guess I didn't specifically spell it out to show
10 him because I was not there in person.
11       Q.    Did you ever offer or agree to
12 show anyone from Willert your medical marijuana
13 license?
14       A.    I would have agreed to had they
15 asked.  But, no, I didn't offer to show it to
16 anybody there.
17       Q.    On October 28, 2020 at the time
18 you took the drug careen, did you have any
19 intention at that time of stopping using medical
20 marijuana -- strike that.
21       At the time of your October 28,
22 2020 drug screen did you intend to stop using
23 medical marijuana?
24       A.    Yes.



MATTHEW REYNOLDS
REYNOLDS V WILLERT

August 26, 2021
221–224

Page 221

1    Q.    When did you plan to stop using
2 medical marijuana?
3    A.    Pretty much immediately.  It was
4 kind of a triage to get me through unemployment.
5    Q.    Did you tell anyone at Willert
6 that you were not going use medical marijuana
7 anymore?
8    A.    Via voice mail, yes.
9    Q.    At the time that you took that
10 drug screen on October 28, 2020, had you
11 discussed or consulted with a doctor about
12 stopping use of medical marijuana?
13    A.    No.
14    Q.    At the time that you took that
15 drug screen on October 28, 2020 did you still
16 have anxiety?
17    A.    Yes.
18    Q.    Has anyone since October 28, 2020
19 told you that your anxiety is cured or done?
20 Can you hear us?
21         Have you told anyone since
22 October 28, 2020 that your ankle -- had any
23 doctor since October 28, 2020 told you that your
24 anxiety is cured or finished?

Page 222

1    A.    No.  Improved, yes.  I have
2 gotten feedback it improved but not ever cured.
3    Q.    After you were terminated from
4 Willert, did you undergo any mental health
5 treatment programs other than treatment that you
6 already testified to?
7    A.    Yes.
8    Q.    What program did you undergo?
9    A.    Sought therapy at Sheppard Pratt
10 down in Baltimore.
11    Q.    In order to do that did you have
12 to stay overnight there?
13    A.    No.
14    Q.    What did that program entail?
15    A.    Three months of therapy.
16    Q.    What type of therapy did you
17 undergo?
18    A.    I don't know the name for it.
19 But counseling, I guess.
20    Q.    How did you come to participate
21 in that program at Sheppard Pratt?
22    A.    I found it online.
23    Q.    Is there a reason why you were
24 looking online for a program at that time?

Page 223

1    A.    Looking for help.  I was in a bad
2 way.  Just looking for help.
3    Q.    Were you eventually discharged
4 from that program?
5    A.    Yes.  I completed the last
6 session here a week or two ago.
7    Q.    At the time of your discharge
8 were you told that you did not need to return to
9 any additional therapy?
10    A.    Correct.  Yes.
11    Q.    Did you continue to participate
12 in that program even after you began your new
13 job at Georgia Pacific?
14    A.    Yes.
15    Q.    Why?
16    A.    Once I start something I will
17 finish it.  There was a couple sessions left.
18 And I already scheduled it so I finished them.
19    Q.    After you left Willert did you
20 try to find new employment?
21    A.    Yes.
22    Q.    What did you do to find new
23 employment?
24    A.    Answered phones when recruiters

Page 224

1 called me.  And I applied for a couple jobs but
2 it was mostly talking to a recruiter.
3    Q.    How many recruiters did you speak
4 to?
5    A.    Three or four.
6    Q.    Did you speak to any of the
7 recruiters who helped you get any of your
8 previous jobs?
9    A.    Yes.  I did.
10    Q.    Did you communicate with those
11 recruiters in writing at all?
12    A.    Most likely.
13    Q.    When you communicated with them
14 in writing was that done via email?
15    A.    Email and text.
16    Q.    Do you have copies of any of your
17 text messages that you exchanged with
18 recruiters?
19    A.    I have not looked.  It depends on
20 retention policy on my phone.  I don't know.
21    Q.    I would ask if you do to take
22 steps now to preserve those text messages.  Do
23 you have copies of any items you exchanged with
24 recruiters?



MATTHEW REYNOLDS
REYNOLDS V WILLERT

August 26, 2021
225–228

Page 225

1    A.    Likely.
2    Q.    I will ask you provide a copy of
3 those emails to your attorney as we will be
4 requesting those.
5    MR. AUERBACH:  Send a letter.
6 BY MS. FICARO
7    Q.    How many jobs did you say you
8 applied for after you left Willert?
9    A.    I don't know.  At least four for
10 sure.  I don't want to overstate it.  But I
11 don't want to understate it either.
12    Q.    When you applied for those jobs
13 did you submit applications?
14    A.    For some of them.  But not all of
15 them.
16    Q.    When you submitted the
17 applications did you submit hard copies of
18 applications or did you submit them
19 electronically?
20    A.    All electronic, if I remember.
21    Q.    Do you have any records or
22 documentation of any of those applications that
23 you submitted electronically?
24    A.    It's unlikely.  It's unlikely.

Page 226

1    Q.    Did you use any online platform
2 such as Indeed to apply for jobs?
3    A.    Yes.
4    Q.    Do you still have a active Indeed
5 account?
6    A.    I have the account.  I think I
7 suspended the profile so I would stop getting
8 calls from recruiters.
9    Q.    Did you use any other online
10 platforms other than Indeed to apply for jobs
11 after you left Willert.
12    A.    I have a Career Builder account
13 as well.
14    Q.    Did you use your Career Builder
15 account to apply for jobs after you were
16 terminated from Willert?
17    A.    I don't remember if I found any
18 that I applied to or not.  I don't recall.
19    Q.    Did you have any interviews with
20 any potential employers other than Georgia
21 Pacific between the time of your termination
22 from Willert and when you began working for
23 Georgia Pacific?
24    A.    Yes.

Page 227

1    Q.    How many interviews did you have?
2    A.    I remember three.
3    Q.    Which companies did you have
4 interviews?
5    A.    Johnson & Johnson, LCBC, Kunzler.
6    Q.    Were you offered jobs at any of
7 those companies?
8    A.    No.
9    Q.    Do you know why you were not
10 offered jobs at any of those companies?
11    A.    No.
12    Q.    Did you receive any job offers
13 from the time you were terminated from Willert
14 until the time you began working for Georgia
15 Pacific?
16    A.    No.
17    Q.    Do you have a Facebook account?
18    A.    No.
19    Q.    Do you have a Twitter handle?
20    A.    No.
21    Q.    Do you engage in any type of
22 social media?
23    A.    No.
24    Q.    Do you have a Linkedin account?

Page 228

1    A.    Oh, yeah.  I guess, yes.
2    Q.    Under what name is your Linkedin
3 account listed?
4    A.    Matthew Reynolds.  I'm not sure
5 what the link is.  Everyone gets a specific
6 link.  I don't know what the forward slash is.
7 But I am Matthew Reynolds.
8    Q.    Did you ever post any comments
9 about this lawsuit or the allegations involved
10 in this lawsuit on Linkedin?
11    A.    No.
12    Q.    During the time that you worked
13 at Willert how many people did you supervise?
14    A.    Three, I believe.
15    Q.    Did those three people constitute
16 other than you the entire maintenance team
17 there?
18    A.    Yes.
19    Q.    Did you coach those three people
20 on your maintenance team similar to how you
21 testified earlier that you coached other
22 employees at your prior jobs?
23    A.    One employee for sure and there
24 was a teaching opportunity.



MATTHEW REYNOLDS
REYNOLDS V WILLERT

August 26, 2021
229–232

Page 229

1    Q.   What did you do to coach that
2 employee?
3    A.   We looked at a line diagram
4 together.  And I explained to him -- it was an
5 electrical print.  And I was explaining on the
6 print like how an SCR works, which takes up AC
7 wave form and turns into a DC wave form.  So he
8 had not learned much about electricity before or
9 electronic controls.  So I was sharing with him
10 what I knew about what we were looking at on
11 that piece of paper.
12    Q.   During the time that you worked
13 at Willert did you ever have to oversee any of
14 the individuals you supervised perform repairs
15 on any of the machinery?
16    A.   Yes.
17    Q.   When you did that what
18 specifically did you do in order to oversee them
19 and their work?
20    A.   Just make myself available.  I
21 don't like to hide in the office.  So just being
22 in proximity or going back and forth between job
23 sites, checking in with them, seeing if they
24 need anything, anything I can do to coordinate

Page 230

1 to help get the job done quicker.
2    Q.   Would this involve you talking to
3 them or going near them while they were actually
4 performing work on the machinery?
5    A.   Yes.  Correction.  There were
6 four employees.  I just remember the fourth guy.
7    Q.   Off the record.
8        (Discussion held off the record.)
9 BY MS. FICARO
10    Q.   Mr. Reynolds, you previously
11 testified to an incident which a sibling of
12 yours was committed to a mental health
13 institute.  When did that occur?
14    A.   February 2020.
15    Q.   Did you receive unemployment
16 benefits after you left Willert?
17    A.   Yes.
18    Q.   For how long did you receive
19 unemployment benefits?
20    A.   Up until I got the job at Georgia
21 Pacific.
22    Q.   Was there any period of time from
23 the time that you terminated from Willert until
24 you began working at Georgia Pacific that you

Page 231

1 were not receiving unemployment benefits?
2    A.   Yes.
3    Q.   How long and when?
4    A.   Whenever the feds and state got
5 it messed up.  There was couple of -- I think
6 one was in January or February.
7    Q.   How long a period of time did
8 that last?
9    A.   I think four weeks.
10    Q.   Were you ultimately then provided
11 those benefits that you were not paid during
12 that time?
13    A.   I don't remember.  I don't think
14 I got it all back.
15    Q.   In this case there has been a
16 claim that sustained damages that consist of
17 back pay, of pay that you would have earned had
18 you continued to work at Willert from the time
19 that you were terminated until the time that you
20 began working at Georgia Pacific.  Are there any
21 other economic damages that you believe that you
22 sustained as a result of the conduct that you
23 allege on the part of Willert?
24    A.   Maxed out my credit card, cashed

Page 232

1 out some retirement early which will have tax
2 implications and long-term capital returns will
3 impact my savings.  I have a number of bills in
4 collections still trying to get caught up with.
5    Q.   Are there any other economic
6 damages that you are arguing you sustained in
7 this action?
8    A.   I don't think so.
9    Q.   What noneconomic damages do you
10 allege you sustained as a result of the conduct
11 you attribute to Willert?
12    A.   Hard to quantify the emotional
13 physical effects on me, my wife and the kids.
14 My son has not said it but I can clearly tell I
15 lost the respect of my older son.  My wife and I
16 both gained about 20 pounds after this thing
17 blew up.  I was not myself.  And I messed up
18 relationships with some of the most important
19 people in my life because I was so scattered.
20        And I was seeing doctors after
21 doctor there for a while.  I was trying to
22 figure out what was wrong with me.  I thought I
23 had like -- I ended up getting blood work done
24 too.  Blood tests were showing that something



MATTHEW REYNOLDS
REYNOLDS V WILLERT

August 26, 2021
233—236

Page 233

1 was up but it ended up an endocrinologist said I
2 think you are okay physically.  Talked to me
3 about panic attacks, like how a panic attack
4 feels like?  You are dying.  It was -- I don't
5 know how you quantify all that stuff.  But there
6 is messes that -- I don't know how I will
7 restore the relationship with my son.  It's
8 really if I get one syllable a day out of him it
9 is good.  He doesn't even say hi to me.
10      Q.     How was the relationship with
11 your son before you were terminated from
12 Willert?
13      A.     We at least go out in the garage
14 and work out together, talk about his job.  It
15 was good.  He really is a good kid, a great
16 young man.  I give him advice about things and
17 he would listened to me.  And we would play
18 video games together.  I would try to show
19 interest in whatever he is into to relate.  It
20 was good.
21      Q.     Is there anyone else whose
22 relationship you believe with whom your
23 relationship has been affected since you were
24 terminated from Willert?

Page 234

1      A.     It really made things
2 uncomfortable with my mom, my dad, and my sister
3 and brother-in-law.  I lied to all them for
4 months.  I didn't want to ruin Christmas.  Hey,
5 guys.  I got fired.  I just sat on it.  I kept
6 it all in.  And I had to put on the hat.  Gosh.
7 Sorry.  Sorry.
8            I just had to put on a happy face
9 and just make up stories about work, how things
10 were going.  And I would just take stories from
11 those first three weeks and expound on them like
12 I knew what was going on.  I didn't want my
13 loved ones to have to deal with the pain that I
14 was dealing with.  Like, you know, in a hard
15 time you need your loved ones to be there for
16 you.  And they know now.  But it made things --
17 on one hand they kind of understand but on the
18 other hand I was lying to their face.  It was
19 like, Matt, come on.  There is a trust thing.
20 You know?
21      Q.     So they are upset with you that
22 you lied to them about losing your job?
23      A.     Yeah.  It's made things awkward.
24      Q.     After you were laid off from

Page 235

1 Grosfillex did you tell your parents and your
2 sister and brother-in-law you were laid off from
3 there?
4      A.     Yes.  Because it was COVID
5 related.  They restructures the company.  Part
6 of the world of pandemic.  Yeah.
7      Q.     Were your parents and sister and
8 brother-in-law aware you were a medical
9 marijuana patient before you were terminated
10 from Willert?
11      A.     No.  Absolutely not.  Still
12 don't.
13      Q.     So you have not shared with them
14 you are a medical marijuana patient?
15      A.     No.  I really like to keep my
16 medical stuff private.  But here we are.
17      Q.     Is there anything in your life
18 that you believe you can't do now that you could
19 do before your termination from Willert?
20      A.     I am back to work.  For a while I
21 didn't know I can do that.  I have not been able
22 to do any of the things that I enjoy.  I have
23 always been a project guy.  I build guitars or I
24 build gas bikes or I am always doing something.

Page 236

1 I have a whole garage of tools and woodwork
2 supplies.  But I have not been able to do
3 anything out there.
4            My bedroom looks like I was test
5 driving the horder lifestyle for months.  It
6 still does.  I have not been able to clean up,
7 basic housekeeping.  Like pay pills.  Like I
8 stopped paying bills for while.  I didn't
9 realize I stopped.  My anxiety -- I stopped.
10 And I'm getting better at that.  I am getting
11 better.  You got to pay bills.
12      Q.     Why did you stop paying bills?
13      A.     It was not a conscious decision.
14 I just -- I just like went into la-la land in my
15 head.  I didn't know that I was not taking care
16 of things.
17      Q.     Did you tell your wife that you
18 were not paying the bills?
19      A.     At some point.  And I was paying
20 the core ones.  I made the mortgage payment.
21 Then when I get the shutoff note from the
22 internet, oh, I guess I should pay that.  You
23 get the phone call.  Like it was like I had to
24 be prompted to do each thing.  The electric



MATTHEW REYNOLDS
REYNOLDS V WILLERT

August 26, 2021
237–240

Page 237

1 company only lets you go so long and then they
2 call you. Like, oh, yeah, sure. I will pay
3 that. Sorry.
4      Q.     When did you stop paying the
5 bills?
6      A.     November, December. I stopped
7 paying the health insurance. We got kicked off
8 the Obamacare plan because I stopped paying the
9 friggin health insurance premium.
10      Q.     And the reason why you did that
11 is just because in your words you were off in
12 la-la land at that point?
13      A.     Yes. I just couldn't handle
14 realty. Yeah. I was lost.
15      Q.     I will share my screen with you
16 one more second. I will jump back for a moment
17 during the time you were at Willert. And I
18 marked a series of photographs as exhibits. I
19 will go through them just to show you the Bates.
20      But if you can see up at the top
21 right-hand corner of this screen -- and actually
22 let me rotate the view so you are seeing them
23 the right way. It will be the bottom. The
24 bottom of the screen then, the right-hand corner

Page 238

1 again, we have Bates labels. And it begins with
2 Bates Willert 0085. And it goes down
3 continuously through Willert 00104. Do you see
4 that there?
5      A.     Yes.
6      Q.     Take a look at the first picture.
7 Is this equipment that you recognized that was
8 located at Willert during your time there?
9      A.     I am not contesting it's there.
10 I can't recall where that stuff is at.
11      Q.     Do you see looking at the two
12 boxes there that have orange stickers on them
13 that say 480 volts, are those electrical panels?
14      A.     Yes. They are safety disconnect
15 switches.
16      Q.     Does the 480-volts suggest the
17 voltage associated with that?
18      A.     Yes.
19      (Exhibit 9 was marked for
20      identification.)
21 BY MS. FICARO
22      Q.     How about the next picture,
23 looking at Willert 0086. And I will ask this
24 whole set of photographs be marked as Exhibit 9.

Page 239

1 Do you recognize that?
2      A.     Yes.
3      Q.     What is that?
4      A.     That's one of the control panels.
5 I think that was outside of what they called the
6 mix room by the fillers.
7      Q.     What housed -- what was located
8 at the mix room?
9      A.     They had some tanks in there,
10 some mix tanks. They are like badge tanks that
11 make up a smaller batches for the fillers.
12      Q.     Did that mix room -- is that
13 where mixing of chemicals occurred there at
14 Willert?
15      A.     Yes. That was one of the
16 locations.
17      Q.     How about this next picture here,
18 Willert 087. Do you recognize that?
19      A.     Trying to place it just based on
20 the surroundings there. I know what it is.
21      Q.     What is it?
22      A.     That's the control panel in the
23 distribution cabinet. So that would have either
24 relays, motor control starters, PLC stuff. You

Page 240

1 can see all the conduit at the top. So it's
2 eight or ten pieces of equipment being
3 controlled out of that thing. And the knobs and
4 selector switches would be on bypass or on off
5 switches. The operator would use them. The red
6 knob on the left is the emergency stop. If
7 anything goes wrong anyone can walk up and slap
8 that.
9      Q.     Did your role as maintenance
10 manager at Willert involve overseeing the
11 maintenance and repair of this cabinet we are
12 looking at in this photograph?
13      A.     This certainly could have. I
14 don't remember like anything specifically of
15 that one while I was there. But it is part of
16 the equipment of the building. So it fell under
17 my responsibility.
18      Q.     How about this next picture which
19 is marked Willert 088, what is that we are
20 looking at there?
21      A.     Honor Guard? Production area --
22 I can only guess that might be controlling
23 exhaust fans. But I'm not sure on that.
24      Q.     Did your role as maintenance



MATTHEW REYNOLDS
REYNOLDS V WILLERT

August 26, 2021
241–244

Page 241

1 manager involve overseeing and supervising the
2 maintenance and repair of this cabinet we are
3 looking at in Willert 0088?
4     A.    Yes.
5     Q.    We are now looking at Willert
6 0089.  The Bates on this document actually --
7 let me rotate the photograph.  If you look at
8 that document what we are looking at there?
9     A.    I think that is a lighting panel.
10 So that would control -- those are breakers, a
11 breaker panel, that controls lighting throughout
12 the plant.  Those are on the right there is --
13 there is a start and stop stations.  I'm not
14 sure what they controlled.
15     Q.    And the 480-volt sticker there,
16 does that indicate there are 480 volts of
17 electricity associated with that?
18     A.    Yes.  The supply going into that
19 would be a 480 supply.
20     Q.    Did your role as a maintenance
21 supervisor at Willert involve overseeing and
22 supervising maintenance and repair of this
23 cabinet that we see in Willert 0089?
24     A.    Yes.

Page 242

1     Q.    Take a look now at Willert 0090.
2 What are we looking at there?
3     A.    I believe that's a fork truck
4 battery charger.
5     Q.    Would your work as maintenance
6 manager at Willert involve overseeing and
7 supervising maintenance and repair of that in
8 this photograph?
9     A.    In the sense of coordinating
10 outside contracting, yes.
11     Q.    The 480-volt sticker, does that
12 indicate the electricity associated with that
13 battery?
14     A.    Yes.
15     Q.    Looking at Willert 0091.  And
16 what am I looking at in that picture?
17     A.    The transformer.  You see the
18 480, 208, 120 at the top.  That takes a 480-volt
19 input voltage.  And then it steps down.  There
20 is tabs in there that different supply voltages
21 can be ran from that source.
22     Q.    Did your role as maintenance
23 manager at Willert involve overseeing and
24 supervising maintenance and repair of this shown

Page 243

1 in this photograph here?
2     A.    Yes.
3         MS. FICARO:  Steve, also as an
4     aside, these documents I am showing you
5     have been marked confidential.  I will just
6     ask that this portion of the transcript
7     with regard to the photographs be marked as
8     confidential as well.
9 BY MS. FICARO
10     Q.    Take look at Willert 092.  What
11 am I looking at in that picture?
12     A.    That is a control cabinet.  I
13 don't know what equipment that's running.  But
14 that is similar to other control cabinet that we
15 saw earlier.  Multiple pieces of equipment would
16 be run out of that.
17     Q.    The stickers on there say 480
18 volts.  Does that mean there is 480 volts of
19 electricity associated with this cabinet here?
20     A.    Yes.
21     Q.    As maintenance manager at Willert
22 did your job responsibilities include overseeing
23 and supervising the maintenance and repair of
24 this cabinet in Willert 0092?

Page 244

1     A.    Yes.
2         MR. AUERBACH:  Can you read back
3     the question?
4         (The reporter read back the
5     record as requested.)
6 BY MS. FICARO
7     Q.    Take a look at Willert 094.  What
8 is this that we are looking in this photograph?
9     A.    I think that is the panel in the
10 mix tank room.  It used to be the Kiwi plant
11 when it made shoe polish.  That is a left over
12 label.  Anyway I think that this is in this mix
13 tank room where the big tanks were.  So that 480
14 runs various pieces of equipment.
15     Q.    And there are 480-volt stickers
16 on there.  Does that mean there are 480 volts of
17 electricity associated with that?
18     A.    Yes.
19     Q.    As maintenance manager at Willert
20 did your job responsibilities include overseeing
21 and supervising the maintenance and repair of
22 this cabinet in Willert 93?
23     A.    Yes.
24     Q.    How about Willert 094, I will



MATTHEW REYNOLDS
REYNOLDS V WILLERT

August 26, 2021
245–248

Page 245

1 rotate that photograph.  What is that we are
2 looking at in Willert 0094?
3      A.     Another control panel.  The thing
4 on side there is a lunchbox -- is a safety
5 disconnect.
6      Q.     And there is 480 volts of
7 electricity associated with that?
8      A.     Yes.
9      Q.     Did your job responsibilities as
10 the maintenance manager at Willert involve
11 overseeing and supervising maintenance and
12 repair of this machinery in here in Willert 094?
13      A.     Yes.
14      Q.     Willert 0095, what is that?
15      A.     Good question.  Looks like a
16 refrigerator.  But it's not.  That might be the
17 welder in the maintenance shop.  But I can't
18 tell.
19      Q.     How about Willert 0096, what is
20 in that photograph?
21      A.     I think that is another fork
22 truck battery charger.
23      Q.     Is 480 volts of electricity
24 associated with that?

Page 246

1      A.     Yes.
2      Q.     Did your job responsibilities as
3 maintenance manager involve overseeing
4 maintenance and repair of this charger in
5 Willert 0096?
6      A.     Yes.
7      Q.     Willert 0097, I will rotate that
8 picture.  What is that in that picture?
9      A.     I think that's the main switch
10 gear, the main on/off switch for the whole
11 plant.
12      Q.     Are you able to tell how many
13 volts of electricity are associated with that?
14      A.     I am just looking at the picture
15 there I don't see any identification.
16      Q.     Did your job responsibilities as
17 maintenance manager include overseeing and
18 supervising maintenance and repair of what we
19 see in Willert 097?
20      A.     Yes.
21      Q.     Looking at Willert 099.  What is
22 that in Willert 099?
23      A.     That's a breaker panel.
24      Q.     And there are different places

Page 247

1 where I see 480, 480, 480V, 480V.  Does that
2 designate the electricity voltage associated
3 with that breaker panel?
4      A.     Yes.
5      Q.     Did your job as a maintenance
6 manager at Willert involve overseeing and
7 supervising maintenance and repair of this
8 breaker?
9      A.     Yes.
10      Q.     In Willert 0099?
11      A.     Yes.
12      Q.     Looking at Willert 0101 what is
13 that that we see in that picture?
14      A.     I can only read off the label
15 there, a closed switch.  That's a -- I think
16 that is one of the main circuit breakers for the
17 plastic room.
18      Q.     On the switch does it indicate
19 there is 600 volts of electricity associated
20 with that?
21      A.     I think that's the rating.  Like
22 the upper end of the rating.  But below that it
23 says 3 phase 480.  I think the actual operating
24 voltage is 480.  But it is rated for 600.

Page 248

1      Q.     Did your role as maintenance
2 manager at Willert involve overseeing and
3 supervising maintenance and repair of this
4 switch depicted in Willert 01101?
5      A.     Yes.
6      Q.     Looking at Willert 0104.  What is
7 it that we are looking at in that picture?
8      A.     (inaudible) the scribbling on
9 that is a metameter transformer.  But I have to
10 go with that.  I don't recognize it otherwise.
11      Q.     Do you recognize having ever seen
12 it Willert?
13      A.     I can't remember that one
14 specifically.  I don't know where that's at.
15      Q.     I will scroll up and then just
16 ask with regard to Willert 0103 what are we
17 looking at in that picture?
18      A.     That's control cabinet.
19      Q.     There are stickers on here for
20 480 volts.  Does that mean there is 480 volts of
21 electricity associated with that control panel?
22      A.     Yes.
23      Q.     Does your job as maintenance
24 manager at Willert involve overseeing and



MATTHEW REYNOLDS
REYNOLDS V WILLERT

August 26, 2021
249—251

Page 249

1 supervising maintenance and repair of this
2 control panel?
3       A.    Yes.
4       Q.    I am sorry?
5       A.    Yes.
6       Q.    Let me ask the question again so
7 the record is clear.  Did your role as
8 maintenance manager at Willert involve
9 overseeing and supervising maintenance and
10 repair of the cabinet depicted in Willert 01103?
11      A.    Yes.
12      Q.    I will stop that share.  Off the
13 record one moment.
14            (Discussion held off the record.)
15 BY MS. FICARO
16      Q.    We asked earlier with regard to
17 other jobs and I just don't recall whether I
18 asked with regard to Willert.  With regard to
19 lock out, tag out procedures at Willert, as
20 maintenance manager was it your responsibility
21 to ensure that those individuals on your
22 maintenance team whom you were supervising
23 properly employed lock out, tag out procedures
24 when necessary?

Page 250

1       A.    Yes.  Definitely.
2             MS. FICARO:  Those are all the
3 questions that I have for you.
4             (Witness excused.)
5             (Deposition concluded at 5:03
6 p.m.)
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

Page 251

1
2              C E R T I F I C A T I O N
3
4
5           I, JARED CAREY, Court Reporter,
6 certify that the foregoing is a true and
7 accurate transcript of the foregoing deposition,
8 that the witness was first sworn by me at the
9 time, place and on the date herein before set
10 forth.
11           I further certify that I am neither
12 attorney nor counsel for, not related to nor
13 employed by any of the parties to the action in
14 which this deposition was taken; further, that I
15 am not a relative or employee of any attorney or
16 counsel employed in this case, nor am I
17 financially interested in this action.
18
19
20
21
Jared Carey
22 Court Reporter
and Notary Public
23 Date: August 31, 2021
24

