IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| MATTHEW REYNOLDS,<br>Plaintiff; )<br>)<br>vs. )<br>)<br>WILLERT MFG. CO., LLC,<br>Defendant. ) | CIVIL ACTION<br><br>No.: 5:21-cv-01208<br><br>**ORAL ARGUMENT REQUESTED** |

**APPENDIX AND EXHIBITS**

| | |
|---|---|
| Exhibit 1 | Complaint |
| Exhibit 2 | Requests for Admission |
| Exhibit 3 | Affidavit of Matthew Reynolds |
| Exhibit 4 | Department of Health Correspondence |
| Exhibit 5 | Patient Identification Card |
| Exhibit 6 | Offer Letter |
| Exhibit 7 | *Reserved* |
| Exhibit 8 | Termination Letter |
| Exhibit 9 | Drug Screen Results Letter |
| Exhibit 10 | Toxicology Expert Report |
| Exhibit 11[1] | Engineering Expert Report |
| **Exhibit 12** | **Jack Bonsky Deposition** |
| **Exhibit 13** | **Tammy Gillette Deposition** |

---

[1] Exhibits 1 - 11 are located on ECF 27-2.

Exhibit 12

JACK BONSKY

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF PENNSYLVANIA

- - -

MATTHEW REYNOLDS,          :     NO.: 5:21-cv-01208
                           :
        Plaintiff,         :
                           :
     v.                    :
                           :
WILLERT MFG. CO., LLC,     :
                           :
        Defendant.         :

- - -

Wednesday, September 1, 2021

- - -

Oral deposition of JACK BONSKY, held via ZOOM VIDEOCONFERENCE, commencing at 1:12 p.m., on the above date, before Masheka C. Pettiford, a Professional Shorthand Reporter and Notary Public in and for the Commonwealth of Pennsylvania.

- - -

BISNOW & JOSEPH COURT REPORTING
1518 Walnut Street - Suite 704
Philadelphia, Pennsylvania 19102
215-567-1701
Bisnowandjoseph@verizon.net

JACK BONSKY

Page 2

1     **A P P E A R A N C E S:**

2

3          LAW OFFICE OF STEVEN T. AUERBACH
           BY:  STEVEN T. AUERBACH, ESQ.
4          822 Montgomery Ave, Suite 210
           Narberth, PA 19072
5          215-964-4410
           Auerbach.steven@gmail.com
6          Counsel for Plaintiff

7

8          KAUFMAN, DOLOWICH & VOLUCK, LLP
           BY:  EILEEN FICARO, ESQ.
9          930 Harvest Drive, Suite 420
           Blue Bell, PA 19422
10         215-461-1100
           Eficaro@kdvlaw.com
11         Counsel for Defendant

12

13

14

15

16

17

18

19

20

21

22

23

24

JACK BONSKY

Page 3

```
1                     -  -  -
                    I N D E X
2                     -  -  -

3
     Testimony of:  JACK BONSKY
4
     By Mr. Auerbach . . . . . . . . . .6
5
     By Ms. Ficaro. . . . . . . . . . .87
6

7

8                     -  -  -
                  E X H I B I T S
9                     -  -  -

10   EXHIBIT                              PAGE
       NO.        DESCRIPTION            NO.
11

12

13          (No exhibits were marked.)

14

15

16

17

18

19

20

21

22

23

24
```

JACK BONSKY

Page 4

1                    DEPOSITION SUPPORT INDEX

2

3        DIRECTION TO WITNESS NOT TO ANSWER:

4        Page Line                  Page    Line

5         22  15-18             46    1-3

6         34  12-14

7         34  20-22

8         45  7-12

9         45  17-18

10       REQUEST FOR PRODUCTION OF DOCUMENTS:

11       Page Line

12        (None)

13

14       STIPULATIONS:

15       Page Line

16        5    2-11

17

18       QUESTION MARKED:

19       Page Line

20        22  13-14

21        45  23-24

22

23

24

JACK BONSKY

Page 5

1                          -  -  -

2                  MR. AUERBACH:  There are four

3      stipulations.  Number one, the witness will have

4      the opportunity to read the deposition, number

5      two, the witness will have the opportunity to

6      make any corrections on an errata sheet, three,

7      the witness will sign the deposition correct or

8      not, verifying its accuracy, four, all

9      objections except to the form of the question

10     are reserved and are not waived by not objecting

11     during this deposition.

12                  Our reporter, would you swear in

13     the witness.

14                          -  -  -

15                  JACK BONSKY, after having been

16     duly sworn, was examined and testified as

17     follows:

18                          -  -  -

19                       EXAMINATION

20                          -  -  -

21     BY MR. AUERBACH:

22          Q.      Mr. Bonsky, good morning again.

23          A.      Hello.

24          Q.      My name is Steve Auerbach.  I

JACK BONSKY

1    represent Matthew Reynolds in a lawsuit that he

2    filed against Willert.  We are here today to

3    take your deposition in connection with this

4    lawsuit.

5                    Do you understand?

6         **A.**        **Yes.**

7         Q.        You are here today as a fact

8    witness and not as a defendant.  Today is going

9    to be a question-and-answer session designed to

10   obtain information that you may or may not know.

11   We only care about that of what it is that you

12   actually know about Mr. Reynolds' allegations,

13   and we don't want you to guess.  If you feel

14   like you can approximate or estimate an answer

15   such as a date or number, feel free to do so,

16   but if it's going to be a complete guess or

17   speculation, just let me know and we can move

18   on.

19                    Mr. Bonsky, do you understand the

20   difference between an educated guess and

21   complete speculation?

22        **A.**        **Yes.**

23        Q.        Do you understand that even

24   though we are not in front of a judge and jury

JACK BONSKY

Page 7

1    at the moment this proceeding needs to be

2    treated just as if we were?

3           **A.        Yes.**

4           Q.        At times I mumble and ask clunky

5    questions.  Unless you tell me otherwise, I will

6    assume that you understood all of my questions.

7                     Do you understand that it's your

8    responsibility to tell me you don't understand

9    anything I say?

10          **A.        Yes.**

11          Q.        And if that happens, just let me

12   know, and I'll do my best to restate it.

13          **A.        Okay.**

14          Q.        I'll also assume that you've

15   heard all of my questions in their entirety.  If

16   we have any internet or phone issues, please let

17   me know so that the most recent question and

18   response will be read back.  At times, people

19   who take the depositions, they act like

20   politicians and they can take a thousand words

21   to answer a yes or no question.  I lean in, and

22   I would call that a question dodge.

23                    May I ask your cooperation in not

24   question dodging?

JACK BONSKY

Page 8

1          **A.**          **Yes.**

2          Q.          And should that ever happen for

3   whatever reason, I'm just going to remind you of

4   that agreement.

5                      Mr. Bonsky, is there any reason

6   you wouldn't be able to give your best testimony

7   today?

8          **A.**          **No.**

9          Q.          And you and I are in different

10  locations.

11                     May I ask where you are now?

12         **A.**          **I'm in Douglassville, in the**

13  **plant.**

14         Q.          You're at Willert?

15         **A.**          **Yes.**

16         Q.          Is there anyone else in the room

17  with you?

18         **A.**          **No.**

19         Q.          Is there anyone else within

20  earshot of you?

21         **A.**          **No.**

22         Q.          And are you in the chemistry lab

23  or are you in your office?

24         **A.**          **This is my office.**

JACK BONSKY

Page 9

1          Q.          And may I ask what documents are

2    in front of you?

3          **A.          Work.  Just work documents.**

4          Q.          Anything relating to this

5    litigation?

6          **A.          No.**

7          Q.          Anything with Matthew Reynolds

8    name on it?

9          **A.          No.**

10         Q.          Mr. Bonsky, have you ever been

11   deposed before?

12         **A.          Yes.**

13         Q.          In connection with what?

14         **A.          Lawsuit that I brought.**

15         Q.          And how many times were you

16   deposed in that matter?

17         **A.          Once.**

18         Q.          And how long ago was that?

19         **A.          I was 18 or 19.  I'm 56 now.**

20         Q.          Wonderful.  In broad strokes,

21   what was the nature of that action?

22         **A.          Medical malpractice.**

23         Q.          Is that the only time in which

24   you remember being deposed?

JACK BONSKY

Page 10

1          **A.          Yes.**

2          Q.          Whatever happened with that

3     medical malpractice action?

4          **A.          We settled out of court.**

5          Q.          Have you ever served in the

6     military?

7          **A.          No.**

8          Q.          Have you ever been arrested?

9          **A.          No.**

10          Q.          Have you ever been charged with a

11     crime?

12          **A.          No.**

13          Q.          Okay.  And to make sure today

14     goes smoothly, I'm going to give you some

15     additional ground rules.  You're doing great so

16     far, but it's important that we don't speak over

17     each other.  Please let me finish stating the

18     question before you answer it.  Unless there's a

19     question dodge, I'll allow you to finish your

20     question before I pose another one.  Even though

21     I like -- I'll likely know what you meant if you

22     shrugged your shoulders or nodded your head

23     after I've asked the question, I ask that you

24     use actual words to answer these questions.  If

JACK BONSKY

Page 11

1    a response calls for a yes, please answer with a

2    yes and not with an uh-huh.

3                    Do you agree to that?

4         **A.        Yes.**

5         Q.        Also for the benefit of the court

6    reporter, may I ask you to keep your voice up.

7         **A.        Please restate that.**

8         Q.        Sure.  For the benefit of the

9    court reporter, can I ask you to keep your voice

10   up.

11        **A.        Keep my what now?**

12        Q.        Voice up.

13        **A.        Oh, yes.  Okay.  I'll do that.**

14        Q.        Okay.  Great.  And we discussed

15   this off the record, but if you need to take a

16   break at any point, let me know.  If you need to

17   get up, stretch your legs, get a cup of coffee,

18   use the restroom, that's fine.  We can do that.

19   We'll finish the current line of questioning

20   then take a break.  I would also ask that during

21   the break you not speak with Eileen at any

22   point.

23                    Do you agree to that?

24        **A.        I agree.**

JACK BONSKY

Page 12

1           **MS. FICARO:  I just object to**

2  **that there.  I don't believe that we are -- I**

3  **think that should be limited to about the**

4  **subject matter of the deposition.**

5  **BY MR. AUERBACH:**

6           Q.        Mr. Bonsky, do you agree to not

7  text -- do you have Eileen's cell phone number?

8           **A.        I think I do.**

9           Q.        I'm not asking for what the

10 number is.  I'm just asking if you have it.  May

11 I -- don't tell me anything that was discussed

12 between you and Eileen, but how have you been

13 communicating?  Through phone, e-mail?

14          **A.        Both.**

15          Q.        Okay.  And I'm going to ask that

16 during this litigation your questions not be --

17 your responses not be prompted by Eileen.

18                   Do you understand that?

19          **A.        Yes.**

20          Q.        And that to the extent you need

21 to speak with Eileen, please let me know.

22                   Now, from time to time, Eileen

23 will object to some of my questions, as she just

24 did.  And if she does, please let her place the

JACK BONSKY

Page 13

1    objection on the record.  You'll then go ahead

2    and answer the question after we resolve the

3    objection.  And, again, please don't interpret

4    any of my questions as me asking for information

5    that was shared between you and your attorney.

6    That's protected by attorney/client privilege,

7    so I'm not going to be seeking that information.

8                   Have you had the opportunity to

9    speak with Eileen prior to today's deposition?

10            **A.       Yes.**

11            Q.       Do you need any more time to

12   speak with her before we begin?

13            **A.       No.**

14            Q.       Putting aside counsel for a

15   second, have you spoken with anyone else about

16   today's deposition?

17            **A.       Yes.**

18            Q.       With whom have you spoken?

19            **A.       I've let my staff know that I was**

20   **going to be in a deposition this afternoon so**

21   **they would leave me alone.**

22            Q.       And that would include who?

23            **A.       Dave Furno, Joe Woods, Debbie**

24   **Kulp, Cliff Heller and Rick Hansen.**

JACK BONSKY

Page 14

1          Q.          Did you say that this was a

2    deposition with Matthew Reynolds or you just

3    used the word deposition?

4          **A.          Used the word deposition.**

5          Q.          And these people that you

6    identified, what did you tell them about today's

7    deposition?

8          **A.          Nothing specific.  I'm just being**

9    **deposed.**

10          Q.          And approximately how long would

11    you say -- did you say that you spent talking to

12    these people?

13          **A.          The meeting was about an hour.**

14    **The conversation regarding this was minutes,**

15    **tops.**

16          Q.          And that happened today?

17          **A.          Yes.**

18          Q.          And you said it took minutes

19    tops.

20                      Did you discuss the substance of

21    Mr. Reynolds' allegations or --

22          **A.          No.**

23          Q.          -- the substance of the lawsuit

24    at all?

JACK BONSKY

Page 15

```
 1          A.        No.

 2          Q.        Have these people that you

 3   identified ever shared their feelings about

 4   Mr. Reynolds or his allegations?

 5                    MS. FICARO:  Objection.  You can

 6   answer it if you are able to.

 7                    THE WITNESS:  They have expressed

 8   their feelings about Mr. Reynolds.  Nobody has

 9   expressed anything with respect to this

10   litigation.

11   BY MR. AUERBACH:

12          Q.        When you say they expressed their

13   feelings about Mr. Reynolds, who are you

14   referring to?

15          A.        Many people.

16          Q.        Okay.  Who is the first one who

17   comes to mind?

18          A.        His subordinate, John Kulp.

19          Q.        John -- would you spell the last

20   name.

21          A.        K-U-L-P.

22          Q.        And what did Mr. Kulp share with

23   you about Mr. Reynolds?

24          A.        I asked Mr. Kulp and another
```

JACK BONSKY

Page 16

1   gentleman, Randy Trout, T-R-O-U-T, what they

2   thought about Mr. Reynolds' performance while he

3   was working with them.

4           Q.      Was Mr. Trout also a subordinate

5   of Mr. Reynolds?

6           A.      Yes.

7           Q.      And what were their job titles?

8           A.      Maintenance mechanic, both of

9   them.

10          Q.      Are both of these individuals are

11  still employed with Willert?

12          A.      Yes.

13          Q.      Were they -- did they start

14  working for Willert before you started working

15  there?

16          A.      Yes.

17          Q.      And what did they tell you about

18  Mr. Reynolds' performance?

19          A.      They weren't pleased with his

20  performance.  Their -- the major complaint was

21  -- he said they never knew where he was, and he

22  would work different hours.  He'd come in late,

23  and he just never communicated with his team and

24  they didn't like that.

JACK BONSKY

Page 17

```
 1            Q.        When did you have this
 2   conversation with Mr. Kulp and Mr. Trout?
 3            A.        While Matt was working here.  I
 4   don't recall the date.
 5            Q.        So between October and November
 6   2020?
 7            A.        Yes.
 8                      MS. FICARO:  Objection to form,
 9   just in terms of the dates.
10   BY MR. AUERBACH:
11            Q.        Did you have more than one
12   conversation with Mr. Kulp and Mr. Trout about
13   Mr. Reynolds' performance?
14            A.        No.
15            Q.        Other than Mr. Kulp and
16   Mr. Trout, who else did you discuss about
17   Mr. Reynolds?
18            A.        One would be Joe Woods.
19            Q.        And who was Joe Woods?
20            A.        Production manager.
21            Q.        Is Mr. Woods still employed with
22   Willert?
23            A.        Yes.
24            Q.        And what was shared with you
```

JACK BONSKY

Page 18

1    about Mr. Reynolds by Mr. Woods?

2         A.        Specifics I don't recall, but

3    it's just the normal course of business for the

4    production manager, the plant manager to bring

5    up the name of the maintenance manager.  I'm

6    sure we did.

7         Q.        And this would have only been

8    when Mr. Reynolds was working for Willert?

9         A.        And I notified Joe of the

10   termination maybe afterward.

11        Q.        What did you tell Joe about the

12   termination?

13        A.        Just that Matt was terminated.

14        Q.        Did he share his feelings about

15   Matt's termination?

16        A.        I don't remember.

17        Q.        Since Mr. Reynolds was

18   terminated, have you had any other conversations

19   with Mr. Woods about Mr. Reynolds?

20        A.        Yes.

21        Q.        What other conversations?

22        A.        We talked about the visit that

23   Matt had to the plant with counsel.  Joe hosted

24   the visit.  I suggested he do it, then I let Joe

JACK BONSKY

Page 19

1    **know what was going on, then counsel prepped**

2    **him.**

3          Q.          Other than Mr. Kulp, Trout and

4    Woods, have you discussed Mr. Reynolds with

5    anyone else?

6          A.          **Yes.**

7          Q.          Who?

8          A.          **Bryan Willert.**

9          Q.          Mr. Willert is the owner of

10   Willert?

11         A.          **I believe so.**

12         Q.          Approximately how many

13   conversations did you have with Mr. Willert

14   about Mr. Reynolds?

15         A.          **Oh, many.  Dozens.**

16         Q.          Okay.  When was the most recent?

17         A.          **About Mr. Reynolds, I don't**

18   **remember.**

19         Q.          Was it after he was terminated?

20         A.          **Oh, yeah.  We talked about it**

21   **after the termination, yes.**

22         Q.          Other than Mr. Kulp, Trout, Woods

23   and Willert, have you discussed Mr. Reynolds

24   with anyone else?

JACK BONSKY

Page 20

1          **A.**        **Yes.**

2          Q.          Who?

3          **A.**        **Tammy Gillette.**

4          Q.          Ms. Gillette is the HR rep?

5          **A.**        **Yes.**

6          Q.          And she's still employed with

7  Willert?

8          **A.**        **Yes.**

9          Q.          When was the most recent

10  conversation with Ms. Gillette about Mr.

11  Reynolds?

12          **A.**        **Many, many weeks.  Maybe several**

13  **months back.**

14          Q.          Any other individuals we haven't

15  discussed yet?

16          **A.**        **Yes.**

17          Q.          Who?

18          **A.**        **Dave Furno.**

19          Q.          What?

20          **A.**        **Dave Furno, F-U-R-N-O.**

21          Q.          Who is Mr. Furno?

22          **A.**        **He is our quality and safety**

23  **manager.**

24          Q.          And what did you discuss with

Page 21

1    Mr. Furno?

2              **A.        Many, many things.  Mr. Furno was**

3    **the coordinator of the drug test.  We talked**

4    **about that.**

5              Q.        Anything else you discussed with

6    Mr. Furno about Mr. Reynolds?

7              **A.        Just the day-to-day conversation**

8    **that would happen.  We all worked together.  I**

9    **can't think of a specific anything.**

10             Q.        Did Mr. Furno have any opinion of

11   that or share with you his opinion about

12   Mr. Reynolds or his allegations?

13             **A.        He didn't share anything with me.**

14             Q.        Any other individuals we haven't

15   listed?

16             **A.        Yes.**

17             Q.        Who?

18             **A.        Ed Kennet.**

19             Q.        Ed Kennet or Kenneth?

20             **A.        Kennet.  I apologize.**

21   **K-E-N-N-E-T.**

22             Q.        Who is Mr. Kennet?

23             **A.        He is our controller.**

24             Q.        And what was the nature of the

JACK BONSKY

Page 22

1    conversation with Mr. Kennet about Mr. Reynolds?

2         **A.**      **He was the witness for the**

3    **termination, which --**

4         Q.      Anyone else?

5         **A.**      **Nobody comes to mind, but there's**

6    **dozens and dozens of people here I've probably**

7    **talked to in some way, shape or form.**

8         Q.      And, again, I don't want to know

9    anything that may have been said between you and

10   Eileen, but did you speak with Eileen in

11   anticipation of today's deposition?

12        **A.**      **Yes.**

13        Q.      *For approximately how long did

14   you guys speak?

15             **MS. FICARO:  Objection.  I would**

16   **just instruct him not to answer that question or**

17   **anything regarding the contents of our**

18   **conversation.**

19             **MR. AUERBACH:  Well, I'm not**

20   **asking the contents.  I'm asking how long he**

21   **spoke.**

22             **MS. FICARO:  I think arguably**

23   **that's crossing the line here.**

24             **MR. AUERBACH:  So I can ask about**

JACK BONSKY

Page 23

1    an insertion of privilege.  I can't ask any

2    privileged information.  I can ask how long he

3    spoke with you.

4                    MS. FICARO:  I think anything

5    regarding, you know, our meeting or discussion

6    is off limits.

7                    MR. AUERBACH:  Court reporter,

8    would you mark this for me.

9    BY MR. AUERBACH:

10        Q.        Mr. Bonsky, have you done

11   anything else to prepare for today's deposition?

12        A.        Yes.

13        Q.        What did you do?

14        A.        Deep personal thought while I'm

15   all by myself just to get ready.

16        Q.        Did you review any documents?

17        A.        No.

18        Q.        Moving on to background.

19                  What is your understanding of

20   Mr. Reynolds' claims?

21        A.        I believe he feels that we

22   discriminated against him because he is a

23   medical marijuana user.

24        Q.        Mr. Bonsky, where do you reside?

JACK BONSKY

Page 24

| | | |
|---|---|---|
| 1 | A. | **Wyomissing, Pennsylvania.** |
| 2 | Q. | And do you live with anyone? |
| 3 | A. | **Yes.** |
| 4 | Q. | With whom do you live? |
| 5 | A. | **My wife.** |
| 6 | Q. | How long have you been married? |
| 7 | A. | **About four years.** |
| 8 | Q. | Is this your first marriage? |
| 9 | A. | **No.** |

10      Q.      What number marriage is this for
11  you?

12              A.      **This is my second marriage.**

13      Q.      Your wife, is it her first
14  marriage or is it a second marriage as well?

15              A.      **It is her second marriage.**

16      Q.      Do you have any children?

17              A.      **Yes.**

18      Q.      How many and what are their ages?

19              A.      **I have three children that are**
20  **28 -- let me take that back.  26, 24, 22.**

21      Q.      Do you use social media?

22              A.      **Yes.**

23      Q.      What social media do you use?

24              A.      **LinkedIn.**

JACK BONSKY

Page 25

1          Q.          May I assume that your name on

2     the LinkedIn is Jack Bonsky?

3          **A.          Name on it -- it's either Jack**

4     **Bonsky or Jack R. Bonsky.  I don't recall.**

5          Q.          Do you use Facebook?

6          **A.          No.**

7          Q.          Smart man.  Other than LinkedIn,

8     any other?

9          **A.          No.  None.**

10          Q.          In broad strokes, what does

11    Willert do?

12          **A.          We make products that go in your**

13    **home, consumer packaged goods.  So disposable**

14    **things, things to clean your home with.  Other**

15    **plants do things like mothballs and fly swatters**

16    **and traps to catch insects.  Here we do liquid**

17    **fill.  And our products here are liquid fill**

18    **products, either under our name or somebody**

19    **else's.  We're a third-party manufacturer.  And**

20    **we also do air conditioners -- excuse me -- air**

21    **fresheners for ourselves and for another**

22    **customers.**

23          Q.          What is liquid fill?

24          **A.          Liquid fill?**

JACK BONSKY

Page 26

1          Q.        Yes.

2          **A.        You take a bottle, you fill it**

3  **with liquid, you cap it somehow, you put a label**

4  **on it and you put it in a cart.  Like, I guess I**

5  **missed the fact -- the first thing you do is you**

6  **blend the chemicals together.**

7          Q.        And does Willert blend these

8  chemicals before it puts it in the container?

9          **A.        Yes.**

10         Q.        And you have a house brand of

11  some of these products?

12         **A.        What do you mean house brand?**

13         Q.        Meaning -- you said that you or I

14  believe I heard you say if -- I don't want to

15  misquote you -- that you do liquid fill for

16  other people's products -- other companies'

17  products and then do you also make -- does

18  Willert make their own products to sell directly

19  to consumers.

20         **A.        Yes.**

21         Q.        And --

22         **A.        Let me back up.  Not directly to**

23  **consumers.  Directly to customers that end up on**

24  **the shelf.  That's where consumers get involved.**

JACK BONSKY

Page 27

1          Q.          What types of products are

2     involved in the liquid fill?

3          A.          Our biggest runner is a product

4     called Ty D Bol, which is a toilet cleaner.

5                      MS. FICARO:  Just -- Jack, are

6     you finished your response there?

7                      THE WITNESS:  Yes.

8                      MS. FICARO:  I just want to

9     insert just a statement here, that to the extent

10    that he is testifying to any accommodations of

11    chemicals or anything else that would be

12    considered proprietary and confidential

13    information, that we would request that those

14    portions of the transcript are marked

15    confidential.

16                     MR. AUERBACH:  That's agreeable.

17    CONFIDENTIAL PORTION HELD UNDER SEPARATE COVER

18                               *

19                          *

20                          *

21                          *

22                          *

23                          *

24                          *

JACK BONSKY

Page 28

1                              *

2                              *

3                              *

4                              *

5                              *

6                              *

7                              *

8                              *

9                              *

10                             *

11                             *

12                             *

13          Q.       Willert has a facility in

14   Douglassville, Pennsylvania; does it now?

15          **A.       Yes.**

16          Q.       And that's where you work?

17          **A.       Yes.**

18          Q.       How big of a facility is this?

19          **A.       It's about 87,000 square feet.**

20   **Excuse me.   86,000 square feet.**

21          Q.       And of the 86,000 square feet,

22   how many square -- all 86,000 square feet are in

23   active use; is that correct?

24          **A.       Yes.**

JACK BONSKY

Page 29

1           Q.        So approximately how many square

2     feet is Willert actually using of this 86,000

3     square foot facility?

4           **A.        All of it.**

5           Q.        What is your job title with

6     Willert?

7           **A.        Plant manager.**

8           Q.        And what are your duties?

9           **A.        Virtually every person at the**

10    **facility reports to me, so I'm responsible for**

11    **-- I'll give you the functions that report in to**

12    **me: production, got maintenance, got**

13    **shipping/receiving, human resources, supply**

14    **chain, which is scheduling and buying things,**

15    **material handlers all work indirectly through**

16    **me, all the operators in the plant work**

17    **indirectly through me.  The blenders work,**

18    **again, indirectly for me.**

19          Q.        So you oversee the people?

20          **A.        Yes.**

21          Q.        Do you have any other duties?

22          **A.        Yes.**

23          Q.        What are they?

24          **A.        I do project work that doesn't**

JACK BONSKY

Page 30

1    directly involve managing people.

2              Q.      What's project work mean?

3              A.      **Manufacturing engineering.**

4              Q.      Can you give some examples?

5              A.      **Yeah.  I'm currently in the**

6    **process of purchasing a case taper, a machine to**

7    **take a box together.  Specify it, get the**

8    **prices, get it ordered, get it in here, get it**

9    **installed.**

10             Q.      So project manager work is if

11   there's a -- if there's a need for the plant, so

12   purchasing large equipment?

13             A.      **Yes.**

14             Q.      Anything else?

15             A.      **Yes.**

16             Q.      What else do you do?

17             A.      **I have considerable customer**

18   **contact.**

19             Q.      What does that mean?

20             A.      **Well, everything from pre -- from**

21   **helpings us prepare quotations for jobs to**

22   **helping clarifying specifications with our**

23   **customers, providing the customer technical**

24   **advice and running sample runs here of first,**

JACK BONSKY

Page 31

1    second, third-type runs when the customer comes

2    in.

3            Q.      You became the plant manager in

4    October 2020; is that correct?

5            A.      **Yes, that's correct.**

6            Q.      And who do you report to?

7            A.      **Bryan Willert.**

8            Q.      Do you report to anyone else?

9            A.      **No.**

10           Q.      And your current maintenance

11   manager reports to you?

12           A.      **Yes.**

13           Q.      What is this person's name?

14           A.      **Rick Hansen, H-A-N-S-E-N.**

15           Q.      H-A-N-S-E-N?

16           A.      **Correct.**

17           Q.      When did Mr. Hansen become the

18   maintenance manager?

19           A.      **December 20th or so.  Just before**

20   **the Christmas break.**

21           Q.      Does Mr. Hansen report to anyone

22   else other than you?

23           A.      **No.**

24           Q.      And do you have the authority to

JACK BONSKY

Page 32

1    discipline Mr. Hansen?

2              **A.**        **Yes.**

3              Q.        What authority do you have?

4              **A.**        **To discipline, to coach and**

5    **counsel and have those difficult discussions**

6    **that end up in a file.**

7              Q.        Do you have the ability to put

8    someone on a performance improvement plan?

9              **A.**        **Yes, but I would always do that**

10   **in -- with HR to help out, and I would certainly**

11   **-- if it's somebody directly reporting to me,**

12   **I'd let my boss know what's going on.**

13             Q.        Do you have the ability to fire

14   anyone?

15             **A.**        **Not on my own.**

16             Q.        Who has that authority?

17             **A.**        **Well, it depends on where --**

18   **nobody fires -- no one person can fire anybody**

19   **in the organization.  Like, for example -- well,**

20   **for example, if it's a person that's one step**

21   **below me, my direct reports, I can -- I can have**

22   **a recommendation for termination.  I would**

23   **always run that through our HR person, make sure**

24   **it makes sense to do it, and then I'd run it by**

JACK BONSKY

Page 33

1    my boss, Bryan Willert, to arrive -- to see if

2    he agrees.

3            Q.        And since November 2020, have you

4    had to fire anyone?

5            A.        Yes.

6            Q.        Who have you had to fire?

7            A.        There's been several --

8                      MR. FICARO:  Hold on a moment,

9    Jack.  I just want to object here to offering

10   any testimony regarding, you know, personal and

11   confidential information regarding nonparties to

12   this action.

13                     If you can ask your questions

14   without asking their names, Steven, you know, I

15   will permit Jack to answer that question as so

16   long as it doesn't reveal personal identifying

17   information regarding any individuals other than

18   Mr. Reynolds.

19                     MR. AUERBACH:  Well, I'm going to

20   ask their name.  I'm not going to ask their

21   Social Security number, their bank information,

22   but I have to have some way of identifying who

23   these people are, the reasons for it.  It's

24   plainly discoverable.  Whether or not it's

JACK BONSKY

Page 34

1    admissible in evidence, that's a whole separate

2    issue.

3                    MS. FICARO:  It, frankly, would

4    have no relevance to this case, unless it was

5    somehow -- it was a termination for the same

6    reasons that, you know, Mr. Reynolds is claiming

7    that he was terminated here.

8    BY MR. AUERBACH:

9         Q.        Mr. Bonsky, who have you

10   terminated?

11                   MS. FICARO:  Same objection.  And

12   again, Jack, I would just advise you not to

13   offer their names.

14   BY MR. AUERBACH:

15        Q.        Mr. Bonsky, I'm going to ask for

16   you to give their names.  And if Eileen is going

17   to insist on this, I'm going to ask for us to

18   adjourn while I get the judge on the phone.

19                   MS. FICARO:  I'm going to advise

20   you not to answer in terms of these individuals'

21   names.

22                   MR. AUERBACH:  All right.  How do

23   you want to handle this?  Do you want -- I think

24   we got to call chambers here.

JACK BONSKY

Page 35

```
 1                    Let's go off the record.
 2                          -  -  -
 3                    (Whereupon, an off-the-record
 4                    discussion occurred.)
 5                          -  -  -
 6      CONFIDENTIAL PORTION HELD UNDER SEPARATE COVER
 7                                *
 8                                *
 9                                *
10                                *
11                                *
12                                *
13                                *
14                                *
15                    MS. FICARO:  I think this is an
16      end run around that here in terms of getting
17      these individuals' names.
18                         MR. AUERBACH:  That's fine.
19                         MR. FICARO:  There must be other
20      ways for you to ask these questions that would
21      not reveal these individuals' names and their
22      identities and any employment action taken
23      against them here, something that would be
24      considered confidential and proprietary
```

JACK BONSKY

Page 36

1    information regarding nonparties to this action.

2                         MR. AUERBACH:  So you have an

3    issue with CR?

4                         MS. FICARO:  Yes.

5                         MR. AUERBACH:  Okay.  Do you have

6    any other suggestions?

7                         MS. FICARO:  Well, I think it

8    depends on what you're looking for, Steve, but

9    --

10                        MR. AUERBACH:  I want to know who

11   was fired and for what.

12                        MS. FICARO:  A better way to ask

13   that would be -- well, I'm not going to advise

14   you as to how to ask your question here.  I'm

15   just simply going to assert the objection with

16   regard to anything pertaining to the identities

17   of other individuals who were terminated.

18                        MR. AUERBACH:  Okay.  So what

19   would make you feel more comfortable?  So

20   there's more than one person, and we're going to

21   be referring to different people so how are we

22   going to keep them together?

23                        MS. FICARO:  Steve, that's up to

24   you in terms of how to do it, so long as it does

JACK BONSKY

Page 37

1    not reveal the identities of these individuals.

2                        MR. AUERBACH:  Well, revealing

3    them in deposition is a lot different than using

4    them as an exhibit.

5                        MS. FICARO:  Not necessarily,

6    Steve.

7                        MR. AUERBACH:  It's a completely

8    different standard, honestly.

9    CONFIDENTIAL PORTION HELD UNDER SEPARATE COVER

10                                    *

11                                    *

12                                    *

13                                    *

14                                    *

15                                    *

16                                    *

17                                    *

18                                    *

19                                    *

20                                    *

21                                    *

22                                    *

23                                    *

24                                    *

JACK BONSKY

Page 38

1                              *

2                              *

3                              *

4                              *

5                              *

6                              *

7                              *

8                              *

9                              *

10                             *

11                             *

12                             *

13                             *

14                             *

15                             *

16                             *

17                             *

18                             *

19                             *

20                             *

21                             *

22                             *

23                             *

24                             *

JACK BONSKY

Page 39

1                              *

2                              *

3                            . *

4                              *

5                              *

6                              *

7                              *

8                              *

9                              *

10                             *

11                             *

12                             *

13                             *

14                             *

15                             *

16                             *

17                             *

18                             *

19                             *

20                             *

21                             *

22                             *

23                             *

24                             *

JACK BONSKY

Page 40

1                              *

2                              *

3                    MS. FICARO:  Same objection with

4      regard to initials.  And, again, just to be

5      clear, I would instruct him not to provide the

6      initials either, but I'll permit him to answer

7      as I did the similar -- the questions you asked

8      about the last individual.

9      BY MR. AUERBACH:

10          Q.      Okay.  We're going to call this

11     person Doe 3 -- or Doe 1.

12                  Is this a man or a woman?

13          A.      A woman.

14          Q.      And why was Doe 1 fired?

15          A.      Poor attendance.

16          Q.      Did this person work for you or

17     for one of your subordinates?

18          A.      One of my subordinates.

19          Q.      Which subordinate?

20          A.      Joe Woods.

21          Q.      And did you or Mr. Woods give

22     this individual any kind of warning that their

23     job was in jeopardy because of attendance?

24          A.      Yes.

JACK BONSKY

Page 41

1           Q.        How many times?

2           **A.        I don't know.**

3           Q.        Was this in writing or was this

4   just in person?

5           **A.        In writing.**

6           Q.        And did this termination happen

7   before or after CR's termination?

8           **A.        After.**

9           Q.        Why was Doe 1 given a written

10  warning but CR was not?

11          **A.        When Doe 1 was terminated, that**

12  **was under -- well, let's back up a second.   I**

13  **don't know that CR -- if CR got a warning or**

14  **not.   I believe that's what I stated -- that's**

15  **what I meant to state.   I don't know.   I know**

16  **that Doe 1 did have warning or warnings,**

17  **according to our attendance policy.**

18          Q.        All right.   The next person we're

19  going to talk about is Doe 2.

20          **A.        Okay.**

21          Q.        Why was Doe 2 fired?

22          **A.        Performance.**

23          Q.        What was this person's job?

24          **A.        Machine operator.**

JACK BONSKY

Page 42

| | | |
|---|---|---|
| 1 | Q. | When was Doe 2 fired? |
| 2 | **A.** | **Probably six weeks ago.** |
| 3 | Q. | What was your involvement with |

Doe 2's termination?

5          **A.**      **I was -- I was told that we would**

6    **proceed with termination unless I objected.**

7          Q.      So someone else made the call and

8    you were just asked to sign off on it?

9          **A.**      **That's correct.**

10         Q.      What type of performance issues

11   was Doe 2 having?

12         **A.**      **Doe 2 was -- in the five days**

13   **that he worked for us -- wasn't getting along**

14   **with his teammates.**

15         Q.      What does that mean?

16         **A.**      **He was argumentive.**

17         Q.      We discussed CR, Doe 1, Doe 2.

18                  Is there another person?

19         **A.**      **Yes.**

20         Q.      We'll call this person Doe 3.

21                  And why was Doe 3 fired?

22         **A.**      **Gross misconduct.**

23         Q.      What was Doe 3's job title?

24         **A.**      **Blender.**

JACK BONSKY

Page 43

1          Q.          How long ago was Doe 3 fired?

2          **A.          About two weeks ago.**

3          Q.          And what was the gross misconduct

4     that was the subject of termination?

5          **A.          He threatened employees.**

6          Q.          How so?

7          **A.          He said he was going to call**

8     **people to come in and beat up somebody.**

9          Q.          And obviously he wasn't warned

10    before he was fired.

11                      You heard about that and you

12    fired him?

13         **A.          You are correct.**

14         Q.          Is there a Doe 4 or have we

15    discussed everyone?

16         **A.          We've discussed everybody.**

17         Q.          So other than -- other than CR,

18    Matthew Reynolds, Doe 1, 2 and 3, these are the

19    only individuals at Willert that you had

20    anything to do with their termination?

21         **A.          Correct.**

22         Q.          Have you ever reprimanded

23    Mr. Hansen?

24         **A.          No.**

JACK BONSKY

Page 44

1          Q.          Have you ever disciplined him?

2          **A.          No.**

3          Q.          Have you ever coached him?

4          **A.          Yes.**

5          Q.          On what?

6          **A.          Prioritization.**

7          Q.          What does that mean?

8          **A.          Making sure he's working on what**

9    **is urgent to the company that he didn't**

10   **necessarily realize.**

11         Q.          When did this coaching session

12   happen?

13         **A.          The one I'm thinking about was in**

14   **January.**

15         Q.          Other than this January 2021 --

16   January 2021; correct?

17         **A.          Yes, this year.**

18         Q.          Other than that instance, did you

19   have any other opportunity or occasion to coach

20   him?

21         **A.          We have daily conversation, but**

22   **that -- what I talked to you about before, I**

23   **would call that coaching.**

24         Q.          And fair to say he's never been

Page 45

1    put on a performance improvement plan?

2            **A.        That's correct.**

3            Q.        His salary -- Mr. Hansen's salary

4    is $85,000; is it not?

5                    **MS. FICARO:  Objection.  Just**

6    **instruct him not to answer that question, to**

7    **provide information regarding Mr. Hansen's**

8    **salary information, as that's confidential**

9    **information pertaining to, you know, a nonparty**

10   **to this action.**

11   **BY MR. AUERBACH:**

12           Q.        Do you know if he makes more --

13   is his salary greater or less than

14   Mr. Reynolds'?

15                   **MS. FICARO:  Same objection and**

16   **instruction.**

17                   **MR. AUERBACH:  It goes to**

18   **damages.**

19                   **MS. FICARO:  It does not.**

20   **BY MR. AUERBACH:**

21           Q.        *Was he eligible to earn a

22   $15,000 bonus?

23                   **MS. FICARO:  Same objection with**

24   **regard -- instruction with regard to**

JACK BONSKY

Page 46

1    Mr. Hansen's earnings.

2                    MR. AUERBACH:  Okay.  Court

3    reporter, would you mark this?  Let's just

4    handle all these at the same time.  And when I

5    say mark this, I mean where there's been

6    instruction not to answer with page and line.

7    And if you can, in any way, mark it now because

8    we're going to call the court --

9                    MS. FICARO:  Steve, in order to

10   avoid a discovery dispute, I welcome any

11   rationale as to how that bears relevance on this

12   case and why it's not confidential.

13                    MR. AUERBACH:  So, first off, you

14   haven't asserted any kind of privilege, and

15   that's not a basis to tell him not to answer --

16   to instruct the witness not to answer.  The

17   other way you can instruct the witness not to

18   answer is by an insertion of privilege, for

19   which you have none.  The second is this goes to

20   damages.  I'd like to know if he earned a

21   $15,000 bonus that Mr. Reynolds was going to get

22   and why or why not and the extenuating

23   circumstances.  And you know the judge is going

24   to make him answer this, and the judge is going

JACK BONSKY

Page 47

1   to be pissed off at you for making us have to

2   call.  And he's going to be asking what's the

3   basis --

4                MS. FICARO:  I disagree with

5   that, Steve, but setting that aside, if your

6   questions are specifically about the bonus, I'll

7   permit him to answer questions about the bonus.

8                MR. AUERBACH:  Okay.

9   CONFIDENTIAL PORTION HELD UNDER SEPARATE COVER

10                                *

11                                *

12                                *

13                                *

14                                *

15                                *

16                                *

17                                *

18                                *

19                                *

20                                *

21                                *

22                                *

23                                *

24                                *

JACK BONSKY

Page 48

1                                    *

2                                    *

3                                    *

4                                    *

5                                    *

6             Q.      What are Mr. Hansen's duties?

7             A.      **He's the maintenance manager.**

8    **He's in charge of the facility, the equipment.**

9    **He has the mechanics reporting in to him.  He**

10   **purchases supplies.**

11            Q.      How many other facilities does

12   Willert have?

13            A.      **Three others.**

14            Q.      Where are they?

15            A.      **There's one in West Virginia,**

16   **there's also St. Louis, Missouri, and we have**

17   **operations in Shanghai, China.**

18            Q.      Mr. Bonsky, what's your highest

19   level of education?

20            A.      **Master's degree.**

21            Q.      In what?

22            A.      **Business administration.**

23            Q.      When did you get your degree?

24            A.      **1989.**

JACK BONSKY

Page 49

1          Q.          From where?

2          **A.          Kent State University.**

3          Q.          Do you have any certificates or

4    trainings?

5          **A.          Yes.**

6          Q.          In what?

7          **A.          I've been trained to be a Six**

8    **Sigma leader, Six Sigma yellow belt.  I achieved**

9    **quality -- certified quality engineer status,**

10   **I've been trained in the DuPont safety training**

11   **observation program to have respect for**

12   **workplace training, I was -- I went through a**

13   **thing with Saint-Gobain called the management**

14   **development institute, which was four weekly**

15   **sessions -- I think it was four or three.  I'm**

16   **not sure.  It was weekly sessions at the**

17   **University of New Hampshire where they sent**

18   **their -- the better people they wanted to make**

19   **even better.**

20         Q.          This respect for workplace

21   training, what is that?

22         **A.          The takeaways were very**

23   **interesting, quite frankly.  When it comes to**

24   **respect for workplace, the best way I can do is**

JACK BONSKY

Page 50

1   just explain.  Like, if -- let's suppose I swear

2   around you and you don't like swearing, right.

3   In my mind I didn't do anything wrong, but in

4   your mind it's offensive.  So being

5   disrespectful is in the eyes of the person who's

6   being -- who feels disrespect.  So it teaches

7   you that if there is a situation, like if I --

8   if you feel that I've done something

9   disrespectful to you, it encourages the two

10  people to work it out amongst themselves, if

11  they can, not to go up the chain of command, but

12  to try to work things out at the lowest level

13  and just understand that what's offensive to one

14  is not necessarily the same as what's offensive

15  to somebody else.  Sexual harassment is a part

16  of respect for the workplace, too.  That's a big

17  one.

18          Q.      Have you ever had any EEO

19  training?

20                  MS. FICARO:  I'm sorry.  Excuse

21  me.  EEO, did you say?

22                  MR. AUERBACH:  Yes.  Equal

23  Employment Opportunity training.

24                  THE WITNESS:  No.

JACK BONSKY

Page 51

1    **BY MR. AUERBACH:**

2              Q.        Any sexual harassment training?

3              **A.        As part of the respect for**

4    **workplace.   That's part of that.**

5              Q.        Any workplace discrimination or

6    retaliation training?

7              **A.        No.**

8              Q.        What about any employment

9    harassment training?

10             **A.        What do you mean by that, please?**

11             Q.        Any training on hostile work

12   environments?

13             **A.        Yes.**

14             Q.        Where was this training?

15             **A.        This was with Saint-Gobain again.**

16             Q.        And did you attend that training

17   before you started working for Willert?

18             **A.        Yes.**

19             Q.        Has Willert ever given you any

20   harassment training?

21             **A.        No.**

22             Q.        Has Willert given you any Equal

23   Employment Opportunity training?

24             **A.        No.**

JACK BONSKY

Page 52

1      Q.      Have they given you any classes

2  on any of those topics?

3      A.      No.

4      Q.      Before you started working for

5  Willert, were you ever the plant manager of any

6  other company?

7      A.      Yes.

8      Q.      Where?

9      A.      Been plant manager several times.

10  Most recently in Wales.  I lived in the UK, ran

11  a plant there that was owned by Spectrum Brands

12  when I got oversees, and then we were purchased

13  by Energizer before I left.  I ran a plant for

14  Spectrum Brands in Ohio, before that I ran a

15  plant for -- I was plant manager for a company

16  called Beckett Air prior to that.

17      Q.      Do you have any previous human

18  resources experience?

19      A.      Yeah.  I -- I had -- human

20  resources has reported to me on several

21  occasions.

22      Q.      In Willert, does human resources

23  report to you or someone else?

24      A.      The plant human resources person

JACK BONSKY

Page 53

1    reports to me.

2         Q.        Who is the plant human resources

3    manager?

4         A.        That's Deborah Kulp.

5         Q.        Is she related to John Kulp?

6         A.        No.

7         Q.        Have you discussed Mr. Reynolds

8    or his allegations with Debra Kulp?

9         A.        Yes.

10        Q.        What did you discuss?

11        A.        She was involved in our

12   preparations.

13        Q.        Preparations for what?

14        A.        For the deposition.

15        Q.        What does that mean, she was

16   involved in the preparations for this

17   deposition?

18        A.        She knew what was going -- it was

19   going on, and she answered some questions that I

20   had specifically involving the case.

21        Q.        What questions did you have?

22        A.        I wanted to --

23                  MS. FICARO:  To the extent that

24   any of these were conversations that we had, I

Page 54

1    would just instruct you not to disclose that,

2    but to the extent that they are not, you know,

3    please answer the question if you can.

4    BY MR. AUERBACH:

5         Q.       And Mr. Bonsky, I want to be

6    clear what I'm asking.  I'm not asking for

7    anything that you told the lawyer, but if

8    there's anything that you told Ms. Kulp, that's

9    what I'm asking you about.

10        A.       I asked her for his -- for Matt's

11   training records.

12        Q.       Why did you ask for Matt's

13   training records?

14        A.       To see what he was trained in.

15        Q.       When did you ask for Matt's

16   training records?

17        A.       When we answered the -- I believe

18   it was eight questions that counsel sent to us

19   that involved training.

20        Q.       And did Deborah Kulp give you

21   Matt's training records?

22        A.       Not physically, but she let me

23   know what he had done.

24        Q.       And training can mean any number

JACK BONSKY

Page 55

1    of things.

2                        What do you mean by Matt's

3    training records?

4           A.        **Well, we have very many formal**

5    **trainings that we do.  Like, it's, I believe, 79**

6    **of them.**

7           Q.        You're talking about -- so you

8    were asking about Matt's training records that

9    are Willert's records?

10          A.        **Yes.**

11          Q.        Are these OSHA trainings, safety

12   trainings?  What are these trainings?

13          A.        **They are.  There's other**

14   **trainings as well.**

15          Q.        And what is your understanding --

16   having had this conversation, what is your

17   understanding of Matt's training with Willert?

18          A.        **I don't understand the question.**

19          Q.        What type of training did Willert

20   give Matt?

21          A.        **I inquired about the eight**

22   **questions that were posed, and that's what I**

23   **reviewed.**

24          Q.        Do you know what training

JACK BONSKY

Page 56

1    Mr. Reynolds received from Willert?

2           A.        The -- one of the OSHA trainings

3    he did get.  It was question two, and I can't

4    recall the verbiage of that question.

5           Q.        When did you receive that

6    question?

7                     MS. FICARO:  I just want to

8    object on the basis of privilege.  To the extent

9    that you're referring to questions from me to

10   you, Jack, I would just instruct you not to

11   answer those, that they would be privileged.  To

12   the extent that you're referring to something

13   non-privileged, you're permitted to answer the

14   question if you can.

15                    Steve, do you want to re-ask the

16   question with that same instruction and

17   objection?

18   BY MR. AUERBACH:

19          Q.        What else did you discuss with

20   Mr. Kulp about Mr. Reynolds?

21          A.        That's Mrs. Kulp, by the way.

22          Q.        Mrs. Kulp.

23          A.        Okay.

24          Q.        But not Mrs. to John Kulp?

JACK BONSKY

Page 57

1        **A.        That is correct.  I have nothing**
2    **I can add.**
3            Q.        Did Mrs. Deborah Kulp -- was she
4    involved, in any way, in the decision to
5    terminate Mr. Reynolds?
6            **A.        No.**
7            Q.        When did she start working at
8    Willert?
9            **A.        Maybe the end of November, 1st of**
10   **December.  It was after Mr. Reynolds' employment**
11   **ended.**
12                    **MR. AUERBACH:  This is a good**
13   **place to take a break.**
14                        -   -   -
15       **(Whereupon, a brief recess was taken.)**
16                        -   -   -
17   **BY MR. AUERBACH:**
18           Q.        Mr. Bonsky, did you have any
19   conversations with Eileen during our break?
20           **A.        No.**
21           Q.        Since you started working with
22   Willert, have any of your employees been hurt on
23   the job?
24           **A.        No.  I take that back.  No OSHA**

JACK BONSKY

1    recordable injuries.  We have had a handful of

2    first aid situations though.

3              Q.       Any workers' comp claims?

4              A.       **There's an existing one, but**

5    **nothing new.**

6              Q.       What does that mean, an existing

7    one?  Did that predate your employment or --

8              A.       **It predated my employment.**

9              Q.       And the individual who has the

10   claim, what position did he hold?

11             A.       **He's the plastics supervisor.**

12             Q.       To your knowledge, did Mr. Hansen

13   have any first aid issues?

14             A.       **I don't recall any.**

15             Q.       What's your understanding of the

16   plastics supervisor's claim?  How did it happen

17   and the injuries?

18                      **MS. FICARO:  To the extent that**

19   **this pertains to, you know, an ongoing claim**

20   **there, I object to this line of questioning.**

21   **BY MR. AUERBACH:**

22             Q.       In this calendar year, have there

23   been any production man hours lost because of

24   work injuries?

JACK BONSKY

Page 59

1          **A.**      **No.**

2          Q.      When did you first learn that

3  Pennsylvania had legalized marijuana for medical

4  purposes?

5          **A.**      **I don't know.**

6          Q.      You are aware that it's legal for

7  medical purposes; are you not?

8          **A.**      **Yes.**

9          Q.      And do you think it's a good idea

10  for people with cancer or AIDS to have access to

11  additional medication?

12                  **MS. FICARO:  Objection.  You can**

13  **answer it if you are able to answer it.**

14                  **THE WITNESS:  The answer is yes.**

15  **BY MR. AUERBACH:**

16          Q.      What is your understanding of the

17  phrase medical marijuana patient employment

18  discrimination?  And I'm not looking for a legal

19  definition.  I'm asking you for your

20  understanding of what the term means.

21                  **MS. FICARO:  Objection to form.**

22  **You can answer if you are able to, Jack.**

23                  **THE WITNESS:  I don't know about**

24  **it.**

JACK BONSKY

Page 60

1   BY MR. AUERBACH:

2            Q.      What's your understanding of the

3   term?

4                    MS. FICARO:  Same objection.  You

5   can answer if you are able, Jack.

6                    MR. AUERBACH:  One second.  I

7   need to make a record of this.

8                    Eileen, I'm going to ask you not

9   to use the words if you're able.  You can say --

10  obviously, you can object on any legitimate

11  grounds.  You can then -- it's then appropriate

12  to direct the deponent to answer, but the words

13  if you are able may be misconstrued as coaching.

14  I'm going to ask you to not use the words if you

15  are able.

16                   MS. FICARO:  There is nothing

17  wrong or objectionable with me saying if you're

18  able and following that with instructing the

19  witness to answer.  So I disagree with the

20  position that you're taking, but nonetheless,

21  the substance of my direction to the witness,

22  which is to answer the question despite my

23  objection, remains the same.

24  BY MR. AUERBACH:

JACK BONSKY

Page 61

1          Q.          Have you ever been involved, in

2     any capacity, in formulating or crafting any

3     antidiscrimination policies at Willert?

4          **A.          No.**

5          Q.          Have you ever been involved, in

6     any capacity, in administering training on

7     antidiscrimination policies at Willert?

8          **A.          No.**

9          Q.          Does Willert have any policies to

10    make sure that medical marijuana patients are

11    not denied equal employment opportunities?

12                    **MS. FICARO:   Objection.   You can**

13    **answer.**

14                    **THE WITNESS:   Not that I'm aware**

15    **of.**

16    **BY MR. AUERBACH:**

17         Q.          We had briefly touched on this,

18    but Mr. Reynolds worked for Willert as a

19    maintenance manager.

20                    What are a maintenance manager's

21    duties?

22         **A.          The maintenance manager is in**

23    **charge of the facility.   That's everything from**

24    **the air conditioning to the roof.   I take that**

JACK BONSKY

Page 62

1    back.  We rent.  The roof is somebody else's

2    responsibility.  But taking care of the office

3    plumbing and all that kind of stuff, responsible

4    for the machines, of maintaining them, repairing

5    them, leading the installation of new equipment,

6    ordering things that are required for the plant

7    to maintain it, making sure we have critical

8    spare parts.

9              Q.      When you say maintaining and

10   repairing machines, you're referring to

11   overseeing his subordinates repair them?

12             A.      That and he -- he would -- would

13   work on machines himself, as well, either with

14   his subordinates or alone.

15             Q.      What machines would he work on?

16             A.      What I remember -- I remember --

17   I can't recall specifically, but he used to

18   carry a little -- like a fanny pack kind of

19   thing, but not really -- I think it was on his

20   belt, but he used to carry tools with him and

21   gloves, and I know he got his hands dirty.  I

22   just can't recall exactly what he's worked on.

23             Q.      Did you ever see him working on

24   machines?

JACK BONSKY

Page 63

1          **A.          I probably did.  I can't think of**
2     **a specific instance.**
3          Q.          This position doesn't have
4     anything to do with confined spaces; does it?
5          **A.          Only to the -- only to the degree**
6     **that this position has to understand that we do**
7     **not -- we, Willert, do not go into confined**
8     **spaces.**
9          Q.          So he would not have been
10    expected to go into a confined space?
11         **A.          That's correct.**
12         Q.          Would he have been expected to
13    work at heights?
14         **A.          Yes.**
15         Q.          What does that mean?
16         **A.          I can give you an example.**
17                      **Like, we have a scissor lift that**
18    **goes, I don't know, 25 feet in the air and there**
19    **can be -- I mean, the current maintenance**
20    **manager goes up and, you know, mount wood of --**
21    **I don't know if he did, but that would be his**
22    **responsibility.  Sometimes you have to fix**
23    **things that are way up.**
24         Q.          And you're referring specifically

JACK BONSKY

Page 64

1   to that lift?

2          **A.**          **That's what I am, yes.**

3          Q.          And is the lift -- when one goes

4   up on the lift, is it an enclosed --

5          **A.**          **No.**

6          Q.          Are there any fall barriers to

7   prevent a fall?

8          **A.**          **Yeah.   There are rails around it.**

9          Q.          How high are the rails?

10          **A.**          **About 36 inches, guessing.**

11          Q.          You never saw Matt on that lift;

12   did you?

13          **A.**          **No, I did not.**

14          Q.          How often does the current

15   maintenance manager go off -- go up on that

16   lift?

17          **A.**          **Probably at least once a week.   I**

18   **don't pay attention.   It's not that big a deal**

19   **to me.   I see him regularly using it.**

20          Q.          Is there a harness that one wears

21   when one goes on this?

22          **A.**          **No.**

23          Q.          Do you know the name of the lift?

24          **A.**          **No.**

JACK BONSKY

Page 65

1          Q.        Is it a cherry picker?

2          A.        No.  So a cherry picker has an

3     articulating arm generally.  This one just goes

4     straight up and straight down, and then it moves

5     with wheels on the -- tires on the ground.

6          Q.        Does one need a license to

7     operate this machine?

8          A.        No.

9          Q.        Have you ever been on it?

10         A.        No.

11         Q.        Any reason why?

12         A.        No.

13         Q.        How's it powered?

14         A.        Battery powered.  Rechargeable.

15         Q.        Other than this lift, any other

16    heights the maintenance manager is involved in?

17         A.        Ladders.

18         Q.        Anything else?

19         A.        Nothing else comes to mind.

20         Q.        And this position has nothing to

21    do with public utilities like gas, water,

22    sewage; does it?

23         A.        I don't understand that question.

24         Q.        I know it's clunky.

JACK BONSKY

Page 66

1          Does the maintenance manager have

2     anything to do with operating sewage?

3          A.     Yes.

4          Q.     What?

5          A.     Well, all of the -- the drains

6     are his responsibility, to keep them clear and,

7     you know, not leaking.

8          Q.     How long did Mr. Reynolds work

9     for Willert?

10         A.     I count either 14 or 17 days he

11    was actually here and working for me.  I don't

12    recall the number because he had some days he

13    missed.

14         Q.     The days I have of his employment

15    are October 16, 2020 through November 5, 2020.

16              Is that your understanding?

17         A.     That sounds correct.

18         Q.     And you were his supervisor

19    during that time?

20         A.     Yes.

21         Q.     Did you consider Mr. Reynolds to

22    be your friend?

23         A.     No.

24         Q.     Did you socialize with him

JACK BONSKY

Page 67

1    outside of work?

2           A.          He occasionally would send me

3    text messages, and I -- I was not especially

4    responsive.

5           Q.          What sorts of messages would he

6    send you?

7           A.          He sent one that was a lead on a

8    music store because he knows I play guitar, and

9    he sent one at Thanksgiving.  I frankly just did

10   not understand.  It was -- I don't know.

11          Q.          Did you ever put him on a

12   performance improvement plan?

13          A.          No.

14          Q.          Did you ever write him up?

15          A.          No.

16          Q.          Did you ever give him an oral

17   warning?

18          A.          Yes.

19          Q.          For what?

20          A.          I told him he had to let his

21   people know where he is because that was their

22   complaint.

23          Q.          Was that the only oral warning

24   you ever gave him?

JACK BONSKY

1          **A.          That's all I remember.**

2          Q.          Do you recall when that warning

3   occurred?

4          **A.          No.**

5          Q.          Was anyone else around when you

6   gave him that warning?

7          **A.          No.**

8          Q.          Do you recall his response to

9   that warning?

10         **A.          I don't remember.**

11         Q.          Did you give him any kind of

12  coaching?

13         **A.          Beyond that, nothing.   Excuse me.**

14  **Nothing that I characterize as coaching.   We had**

15  **daily conversations of course.**

16         Q.          Did you ever give him any

17  coachings on his performance?

18         **A.          No.**

19         Q.          Did you ever let him know that

20  his job was in jeopardy?

21         **A.          No.**

22         Q.          Have you ever had any

23  conversations with him about what you might have

24  perceived to be performance deficiencies other

1    than the instance you had just discussed?

2            **A.          Please restate that.  I got lost.**

3    **My apologies.**

4            Q.          Other than the instance in which

5    you told him you got to let your people know

6    where you are, did you ever have any other

7    conversations with him that might have been

8    perceived as a performance deficiency?

9            **A.          Yes.**

10           Q.          What was that?

11           **A.          He -- we do a -- he came onto the**

12   **shop floor -- this is during COVID and masking**

13   **-- and he was on the shop floor with a leather**

14   **mask, which I don't care about, but it had nose**

15   **holes in it so it wouldn't -- with the nose**

16   **holes it wasn't doing what face masks were**

17   **supposed to do, so I asked him to put on a**

18   **proper one.  First thing he says, well -- well,**

19   **they don't work anyway, because they aren't N95**

20   **masks then -- you know, 30 seconds later he**

21   **says, well, I'll change it.**

22           Q.          But you didn't write him up for

23   that?

24           **A.          No.  That was in a public**

JACK BONSKY

Page 70

1    setting.  I mean, certain things you got to take

2    care of, like masks during COVID.

3              Q.        Overall, how would you describe

4    his abilities as a maintenance manager?

5              A.        Below average.

6              Q.        On what basis do you say that?

7              A.        I guess I can give you an

8    example.  I was with Bryan Willert on our line

9    13, and there's a discussion about something

10   electrical.  I don't recall exactly what it was,

11   but Bryan and I later talked, and it's like Matt

12   doesn't really seem to understand.  It's

13   something he should have understood.  Again, I

14   don't even recall what the electrical thing was

15   and, of course, his attendance wasn't good.

16             Q.        Did you ever warn him about his

17   attendance?

18             A.        No.

19             Q.        Did you ever write him up for his

20   attendance?

21             A.        No.

22             Q.        Did you ever coach him about his

23   attendance?

24             A.        Let me back up here.  Attendance

JACK BONSKY

Page 71

1    in terms of showing up -- I did coach him about

2    showing up for work and letting people know when

3    he's there, if you call that attendance, but

4    beyond that, no.

5              Q.      Is that what -- what you meant

6    when you said attendance?  Is that what you

7    meant about the complaint?

8              A.      No.

9              Q.      That's separate?

10             A.      That's separate.  He would come

11   in late, and he missed entire days.

12             Q.      On what days did he come in late?

13             A.      I don't have that at my

14   fingertips.  I've provided -- I have it, but not

15   at my fingertips.

16             Q.      How many days did he come in

17   late?

18             A.      I don't remember.

19             Q.      How do you know he came in late?

20             A.      I can remember at least one time.

21   There were others.  I tabulated this at one

22   point.  I remember tabulating it.

23             Q.      When you tabulated it, was it

24   before or after being terminated?

JACK BONSKY

Page 72

```
1          A.       I don't remember.

2          Q.       And what did you do with those

3   tabulations?

4          A.       I can't speak to that.

5          Q.       Did you give them to your

6   attorney?

7                   THE WITNESS:  Am I allowed to

8   answer that?

9                   MS. FICARO:  As long as you don't

10  disclose any conversations or discussions that

11  were had --

12                  THE WITNESS:  Okay.

13                  MS. FICARO:  -- with any

14  attorneys, myself or prior counsel then, yes,

15  you can answer the question.

16                  THE WITNESS:  Yes, I did provide

17  it to counsel.

18  BY MR. AUERBACH:

19         Q.       What information did you use to

20  generate those tabulations?

21         A.       I -- well, for one, I flat out

22  just remembered because it was a very short

23  period of time when he worked here, and I have

24  -- I had, at the time, some text -- I know I had
```

JACK BONSKY

Page 73

1    a text message on one Monday that he came in

2    late.   I think he said something to the effect

3    of decided to have breakfast at whatever time.

4    So it was very fresh at the time.  He hadn't

5    worked here long.

6              Q.        Did you ever share, with

7    Mr. Reynolds, these tabulations?

8              A.        No.

9              Q.        When was his shift supposed to

10   start?

11             A.        He didn't -- the maintenance

12   manager does not work shift work, but I expect a

13   person to be here at a reasonable time, meaning

14   8 o'clock or before, in the morning, and stay in

15   through the afternoon or you can switch it a

16   little bit.  If you want to do a 7:00 to 4:00,

17   that's fine.  At the time we were working two

18   shifts.  The first shift started at 5:30 and

19   ended at 2:30.  So there's some leeway, but I

20   would expect a maintenance manager to have

21   contact with both shifts.

22             Q.        Is there anything in writing that

23   says when a maintenance manager is supposed to

24   start his shift?

JACK BONSKY

Page 74

1          **A.**        **No.**

2          Q.        Did you ever have any

3   conversations with him as to what time you

4   expected him to be there?

5          **A.**        **Yes.   When I talk -- yes.**

6          Q.        How many?

7          **A.**        **One.**

8          Q.        What did you tell him?

9          **A.**        **That was incorporated with the**

10  **information of you got to tell your guys where**

11  **you are.**

12         Q.        And what was his response?

13         **A.**        **I don't remember.**

14         Q.        After you had that conversation

15  with him, were there any other latenesses?

16         **A.**        **I don't remember.**

17         Q.        Did you conduct any performance

18  reviews for him?

19         **A.**        **No.**

20         Q.        Any reason?

21         **A.**        **I didn't feel that he had been**

22  **here long enough for me to have a meaningful**

23  **review with him.**

24         Q.        Honesty and integrity are two

JACK BONSKY

Page 75

1   important characteristics for individuals who

2   work for Willert; is that correct?

3          **A.**      **Yes.**

4          Q.      How important would you say those

5   characteristics are?

6          **A.**      **Very important.**

7          Q.      If you feel like you can't

8   answer, just let me know, but on a scale of 1 to

9   10, how important are honesty and integrity for

10  Willert employees?

11              **MS. FICARO:  Object to form.**

12              **THE WITNESS:  I don't remember.**

13  BY MR. AUERBACH:

14         Q.      Do you have any reason to doubt

15  Mr. Reynolds' honesty or integrity?

16         **A.**      **No.**

17         Q.      Can you recall any occasion which

18  you believe that Mr. Reynolds potentially told a

19  lie?

20         **A.**      **No.**

21         Q.      Did you ever see Mr. Reynolds use

22  marijuana at work?

23         **A.**      **No.**

24         Q.      Did you ever see Mr. Reynolds

JACK BONSKY

Page 76

1    appear intoxicated at work?

2         **A.**        **No.**

3         Q.        I'm going to ask you a series of

4    questions about Mr. Reynolds' allegations.

5                   When did you first learn that

6    Mr. Reynolds had failed his drug test?

7         **A.**        **Probably two to three days prior**

8    **to his termination.**

9         Q.        And how were you made aware?

10        **A.**        **The report came from Dave Furno.**

11   **He coordinated the drug test.**

12        Q.        When you say a report, was this a

13   written report or oral report or both?

14        **A.**        **Written.**

15        Q.        How did you receive this written

16   report?  Was it handed to you, e-mail?

17        **A.**        **Handed to me.**

18        Q.        Mr. Furno handed it to you or

19   someone else did?

20        **A.**        **Yeah, Mr. Furno.**

21        Q.        Would it be -- what did Mr. Furno

22   tell you when he handed you this report?

23        **A.**        **Matt failed his drug test.**

24        Q.        The report that he handed to you,

JACK BONSKY

Page 77

1   was that the results of the drug test or

2   something else?

3          **A.**        **Results.**

4          Q.        Do you recall if it was more than

5   one page?

6          **A.**        **It was one page.**

7          Q.        Other than that one page, the

8   drug results, did you see any other paperwork

9   that indicated that he had failed his drug test?

10         **A.**        **No.**

11         Q.        When Mr. Furno told you that Matt

12  had failed his drug test, what did you then do?

13         **A.**        **I don't recall -- I do.  Yeah.  I**

14  **-- that's when I reached out to Tammy for her**

15  **guidance, Tammy Gillette, the HR person handling**

16  **this.**

17         Q.        What did you -- what did you tell

18  Ms. Gillette?

19         **A.**        **I just factually said here's the**

20  **drug test.**

21         Q.        Did you send her a copy of the

22  results?

23         **A.**        **I'm sure I did.**

24         Q.        Do you recall what Ms. Gillette

JACK BONSKY

Page 78

1    told you in response to you telling her that

2    Mr. Reynolds failed the test?

3            **A.         Specific conversation, no, but we**

4    **talked about needing to terminate Mr. Reynolds,**

5    **which I then got with my boss, Bryan Willert,**

6    **because, again, nobody fires anyone alone and**

7    **explained it to him and made the recommendation**

8    **for termination and then we had some**

9    **conversation about not that big a loss anyway**

10   **because he wasn't performing great.**

11           Q.          Now, you had mentioned with

12   respect to Doe 3 -- that's the gross misconduct

13   individual, that you more or less just signed

14   off on the termination, that someone else made

15   the call.

16                       Who made the call or the

17   recommendation to fire Mr. Reynolds?

18                       **MS. FICARO:  Objection to form.**

19   **You can answer.**

20                       **THE WITNESS:  I'm sorry, Eileen?**

21                       **MS. FICARO:  I just said**

22   **objection to form.  You can answer.**

23                       **THE WITNESS:  Okay.  Bryan**

24   **Willert was the person that authorized the**

Page 79

1    termination.

2    BY MR. AUERBACH:

3          Q.        Did anyone recommend the

4    termination to Bryan Willert or did he come up

5    with it on his own idea?

6          A.        I recommended it to him.

7          Q.        Was this on the day that you

8    became aware that he had failed the drug test?

9          A.        Not sure if it was that day.  It

10    was very shortly after.

11          Q.        How was the termination

12    communicated to Mr. Reynolds?

13          A.        It was the set -- he had missed

14    two days of work in a row, so we did it by

15    telephone.  I made the call from my desk with Ed

16    Kennet at my side, was the witness to it, and I

17    read the termination letter that Tammy had

18    prepared word for word, top to bottom, and then

19    at that point Matt sounded like he was crying,

20    and he goes, but I have a card, and it's not

21    even -- I don't even smoke pot.  It's -- I get

22    CBD from a place in Oregon, he said, for his

23    anxiety.  So I said fuck it.  Let me make a

24    call.  So I called Tammy about it and -- just to

JACK BONSKY

Page 80

1   verify what her thoughts were, and she was like

2   it doesn't make a difference.  So I called Matt

3   back, and it went to voice mail, and I said, you

4   know, you are terminated, and I let him know

5   we'd send the stuff to his house.

6           Q.        When Mr. Reynolds told you that

7   he had a card, what did that mean to you?

8           A.        It was a medical marijuana card,

9   was my understanding.  The first I heard, you

10  know, from him that he had one.

11          Q.        Did you ask him why he had a

12  card?

13          A.        No.  He volunteered it was for

14  anxiety though.

15          Q.        Why did you call Ms. Gillette

16  after he told you that he had a card?

17          A.        Just to make sure that having the

18  card could somehow change something.

19          Q.        Why would it change something?

20          A.        I don't know.  I never been in a

21  situation like this.  Unfamiliar situations

22  involving human resource things you talk to a

23  human resources specialist to make sure you're

24  doing the right thing is important.

JACK BONSKY

1        Q.      How long was the conversation

2  with Tammy when you told her that Mr. Reynolds

3  had the card?

4        **A.**      **Just several minutes.**

5        Q.      What chemicals do you have at

6  your plant?

7        **A.**      **We have dozens and dozens, if not**

8  **hundreds and hundreds of chemicals.  Wide**

9  **variety.  Everything from water -- well,**

10  **shouldn't say water.  In terms of what they are,**

11  **we have things that are, like, soaps, we have**

12  **things that are acids, we have things that are**

13  **caustics, we have fragrances, we have colorants.**

14  **Some of -- most of what we have is liquid and**

15  **some is powder, some is palettes.**

16        Q.      Who handles the ordering of the

17  chemicals?

18        **A.**      **There's two people that order the**

19  **chemicals.  One is the -- some of them the**

20  **supply chain manager orders, and we have a**

21  **gentleman that title is purchasing, but he**

22  **doesn't do very much of that.  He orders some of**

23  **our things.**

24        Q.      I'm sorry.  You cut out.

JACK BONSKY

Page 82

1          A.          Yeah.   We have two people.   One

2     is a supply chain manager, the other is a person

3     whose title is purchasing, but as a practical

4     matter, he does very little of it.

5          Q.          Do you oversee this process, at

6     all?

7          A.          Yes.

8          Q.          What's your involvement in the

9     procurement of these chemicals?

10         A.          The two gentlemen I'm talking

11    about that are direct reports to me, so they're

12    accountable to me.

13         Q.          Do any of these chemicals require

14    licenses or permits?

15         A.          We register with the state for

16    some of our chemicals.   Not sure if you call

17    that license approval.

18         Q.          What state agency?

19         A.          I don't know.

20         Q.          Is it the Department of

21    Environment?

22         A.          It could be the DEP.   I don't

23    know.

24         Q.          What chemicals have to be

JACK BONSKY

Page 83

1    registered with the state?

2            **A.        I frankly don't know the criteria**

3    **for that.**

4            Q.        Other than registering some of

5    these chemicals with the state, do you have to

6    have any other permits or licenses?

7            **A.        Boiler permit to run a boiler.**

8            Q.        But specifically for these

9    chemicals, do you need any licenses or permits

10   for these chemicals?

11           **A.        No.**

12           Q.        If Mr. Reynolds hadn't failed his

13   drug test, would he have been fired on November

14   5th?

15           **A.        No.**

16           Q.        Why do you say that?

17           **A.        I guess there's several ways you**

18   **get terminated, and he didn't reach any of the**

19   **thresholds for termination.  He had only been**

20   **here a few weeks.**

21           Q.        So fair to say that's the reason

22   he was fired?

23                      **MS. FICARO:  Objection.**

24                      **THE WITNESS:  What's the reason**

JACK BONSKY

Page 84

1    -- I didn't -- we fired him --

2    BY MR. AUERBACH:

3            Q.      Is it fair to say he was fired

4    because of the drug test?

5                    MS. FICARO:  Objection.

6                    THE WITNESS:  Yes.

7    BY MR. AUERBACH:

8            Q.      Mr. Bonsky, I'm just reviewing my

9    notes.

10                   Do you believe he should have

11   been fired for this?

12                   MS. FICARO:  Objection.  You can

13   answer.

14                   THE WITNESS:  Please say it

15   again.  I thought I heard a double negative in

16   there.  Maybe I got confused.

17   BY MR. AUERBACH:

18           Q.      Do you believe that Mr. Reynolds

19   should have been fired for this?

20                   MS. FICARO:  Objection.

21                   THE WITNESS:  Yes.

22   BY MR. AUERBACH:

23           Q.      Why do you say that?

24           A.      It was a violation of -- it was a

JACK BONSKY

Page 85

1    **company policy that you had to pass a drug test.**

2    **It was a violation.**

3            Q.        The company policy on passing the

4    drug test, does it differentiate between

5    employees' medical marijuana usage or

6    recreational usage?

7            **A.        I don't know.**

8            Q.        Is it Willert's policy that it

9    can fire medical marijuana patients for their

10   off-duty use of medical marijuana?

11           **A.        I'm not aware of a policy like**

12   **that.**

13           Q.        Are you aware of any policy that

14   a medical marijuana patient wouldn't be fired

15   for their off-duty use of medical marijuana?

16           **A.        No.**

17                   **MS. FICARO:  Objection to form.**

18   **You can answer.**

19                   **THE WITNESS:  I'm not aware of**

20   **that.  I don't know all the policies necessarily**

21   **either.**

22   **BY MR. AUERBACH:**

23           Q.        Mr. Hansen is not licensed to

24   operate or control chemicals; is he?

JACK BONSKY

Page 86

1          A.          He is not licensed, yes, that's

2   correct.

3          Q.          And your maintenance managers are

4   not required to be licensed to operate or

5   control high-voltage electricity?

6          A.          That's correct.

7          Q.          And your maintenance managers are

8   not required to possess electrical journeyman

9   certificates?

10          A.          That's correct.

11          Q.          Does Willert provide arc flash or

12   electrical safety courses to its maintenance

13   managers?

14          A.          No.

15                     MR. AUERBACH:  That's all I have

16   for you.

17                     Eileen, do you have anything?

18                     MS. FICARO:  I do.

19                        -   -   -

20                     EXAMINATION

21                        -   -   -

22   BY MS. FICARO:

23          Q.          I just have one question,

24   Mr. Bonsky.

JACK BONSKY

```
                                                      Page 87
 1                    Did the performance issues that
 2    you mentioned and testified to here today that
 3    Mr. Reynolds had while working there, did they
 4    factor into your recommendation that he be
 5    terminated as well?
 6          A.         I included that in the
 7    information with Bryan Willert, that his
 8    performance was poor.
 9                    MS. FICARO:  That's all I have.
10    Thank you.
11                    MR. AUERBACH:  Mr. Bonsky, thank
12    you so much.
13                 *   *   *   *   *
14              (Whereupon, at 3:21 p.m., the
15              deposition of JACK BONSKY
16                 was concluded.)
17                 *   *   *   *   *
18
19
20
21
22
23
24
```

JACK BONSKY

Page 88

```
1     C E R T I F I C A T E

2

      COMMONWEALTH OF PENNSYLVANIA:
3
      COUNTY OF PHILADELPHIA:
4

5        I, Masheka Pettiford, a Notary Public within
      and for the County and State aforesaid, do
6     hereby certify that the foregoing deposition of
      JACK BONSKY, was taken before me, pursuant to
7     notice, at the time and place indicated; that
      said deponent was by me duly sworn to tell the
8     truth, the whole truth, and nothing but the
      truth; that the testimony of said deponent was
9     correctly recorded in machine shorthand by me
      and thereafter transcribed under my supervision
10    with computer-aided transcription; that the
      deposition is a true record of the testimony
11    given by the witness; and that I am neither of
      counsel nor kin to any party in said action, nor
12    interested in the outcome thereof.

13

         WITNESS my hand and official of this 7th day
14    of September, 2021.

15

16

17    _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _
      MASHEKA C. PETTIFORD
18    Notary Public

19

20

21

22

23

24
```

JACK BONSKY

Page 89

1                    INSTRUCTIONS TO WITNESS

2                         Please read your deposition

3     over carefully and make any necessary

4     corrections.  You should state the reason in the

5     appropriate space on the errata sheet for any

6     corrections that are made.

7                         After doing so, please sign the

8     errata sheet and date it.

9                         You are signing same subject to

10    the changes you have noted on the errata sheet,

11    which will be attached to your deposition.

12                        It is imperative that you

13    return the original errata sheet to the deposing

14    attorney within thirty (30) days of receipt of

15    the deposition transcript by you.  If you fail

16    to do so, the deposition transcript may be

17    deemed to be accurate and may be used in court.

18

19

20

21

22

23

24

JACK BONSKY

Page 90

1                    - - - - - - -

2                    E R R A T A

3                    - - - - - - -

4    PAGE        LINE      CHANGE

5    _ _ _ _    _ _ _    _ _ _ _ _ _ _ _ _ _ _ _

6    Reason for Change:_____

7    _ _ _ _    _ _ _    _ _ _ _ _ _ _ _ _ _ _ _

8    Reason for Change:_____

9    _ _ _ _    _ _ _    _ _ _ _ _ _ _ _ _ _ _ _

10   Reason for Change:_____

11   _ _ _     _ _ _    _ _ _ _ _ _ _ _ _ _ _ _

12   Reason for Change:_____

13   _ _ _ _    _ _ _    _ _ _ _ _ _ _ _ _ _ _ _

14   Reason for Change:_____

15   _ _ _ _    _ _ _    _ _ _ _ _ _ _ _ _ _ _ _

16   Reason for Change:_____

17   _ _ _ _    _ _ _    _ _ _ _ _ _ _ _ _ _ _ _

18   Reason for Change:_____

19   _ _ _ _    _ _ _    _ _ _ _ _ _ _ _ _ _ _ _

20   Reason for Change:_____

21   _ _ _ _    _ _ _    _ _ _ _ _ _ _ _ _ _ _ _

22   Reason for Change:_____

23   _ _ _ _    _ _ _    _ _ _ _ _ _ _ _ _ _ _ _

24

JACK BONSKY

Page 91

1                    ACKNOWLEDGMENT OF DEPONENT

2          I, _ _ _ _ _ _ _ _ _ _ _ _ , do hereby

3     certify that I have read the foregoing pages,_ _

4     _ _ _ _ and that the same is a correct

5     transcription of the answers given by me to the

6     questions therein propounded, except for the

7     corrections or changes in form or substance, if

8     any, noted in the attached Errata Sheet.

9     _____      _____

10    DATE                  SIGNATURE

11

12    Subscribed and sworn to before me this

13    _ _ _ _ _ day of  _ _ _ _ _ _ _ _ _ ,

14    202 _ _ .

15    My commission expires: _ _ _ _ _ _ _ _

16

17    --------------------

18    Notary Public

19

20

21

22

23

24

JACK BONSKY

**A**

abilities 70:4
ability 32:7,13
able 8:6 15:6
    59:13,22 60:5
    60:9,13,15,18
access 59:10
accommodati...
    27:10
accountable
    82:12
accuracy 5:8
accurate 89:17
achieved 49:8
acids 81:12
ACKNOWLE...
    91:1
act 7:19
action 9:21 10:3
    33:12 35:22
    36:1 45:10
    88:11
active 28:23
actual 10:24
add 57:2
additional 10:15
    59:11
adjourn 34:18
administering
    61:6
administration
    48:22
admissible 34:1
advice 30:24
advise 34:12,19
    36:13
aforesaid 88:5
afternoon 13:20
    73:15
afterward 18:10
agency 82:18
ages 24:18
ago 9:18 42:2
    43:1,2
agree 11:3,23,24

12:6
agreeable 27:16
agreement 8:4
agrees 33:2
ahead 13:1
aid 58:2,13
AIDS 59:10
air 25:20,20
    52:16 61:24
    63:18
allegations 6:12
    14:21 15:4
    21:12 53:8
    76:4
allow 10:19
allowed 72:7
answer 4:3 6:14
    7:21 10:18,24
    11:1 13:2 15:6
    22:16 33:15
    34:20 40:6
    45:6 46:6,15
    46:16,18,24
    47:7 54:3
    56:11,13 59:13
    59:13,14,22
    60:5,12,19,22
    61:13 72:8,15
    75:8 78:19,22
    84:13 85:18
answered 53:19
    54:17
answers 91:5
anticipation
    22:11
antidiscrimin...
    61:3,7
anxiety 79:23
    80:14
anybody 32:18
anyway 69:19
    78:9
apologies 69:3
apologize 21:20
appear 76:1
appropriate

60:11 89:5
approval 82:17
approximate
    6:14
approximately
    14:10 19:12
    22:13 29:1
arc 86:11
arguably 22:22
argumentive
    42:16
arm 65:3
arrested 10:8
arrive 33:1
articulating
    65:3
aside 13:14 47:5
asked 10:23
    15:24 40:7
    42:8 54:10
    69:17
asking 12:9,10
    13:4 22:20,20
    33:14 47:2
    54:6,6,9 55:8
    59:19
assert 36:15
asserted 46:14
assume 7:6,14
    25:1
attached 89:11
    91:8
attend 51:16
attendance
    40:15,23 41:17
    70:15,17,20,23
    70:24 71:3,6
attention 64:18
attorney 13:5
    72:6 89:14
attorney/client
    13:6
attorneys 72:14
Auerbach 2:3,3
    3:4 5:2,21,24
    12:5 15:11

17:10 22:19,24
    23:7,9 27:16
    33:19 34:8,14
    34:22 35:18
    36:2,5,10,18
    37:2,7 40:9
    45:11,17,20
    46:2,13 47:8
    50:22 51:1
    54:4 56:18
    57:12,17 58:21
    59:15 60:1,6
    60:24 61:16
    72:18 75:13
    79:2 84:2,7,17
    84:22 85:22
    86:15 87:11
Auerbach.stev...
    2:5
authority 31:24
    32:3,16
authorized
    78:24
Ave 2:4
average 70:5
avoid 46:10
aware 59:6
    61:14 76:9
    79:8 85:11,13
    85:19

**B**

B 3:8
back 7:18 20:13
    24:20 26:22
    41:12 57:24
    62:1 70:24
    80:3
background
    23:18
bank 33:21
barriers 64:6
basis 46:15 47:3
    56:8 70:6
Battery 65:14
bears 46:11

beat 43:8
Beckett 52:16
believe 12:2
    19:11 23:21
    26:14 41:14
    54:17 55:5
    75:18 84:10,18
Bell 2:9
belt 49:8 62:20
benefit 11:5,8
best 7:12 8:6
    49:24
better 36:12
    49:18,19
beyond 68:13
    71:4
big 28:18 50:16
    64:18 78:9
biggest 27:3
BISNOW 1:20
Bisnowandjos...
    1:22
bit 73:16
blend 26:6,7
Blender 42:24
blenders 29:17
Blue 2:9
boiler 83:7,7
Bol 27:4
Bonsky 1:12 3:3
    5:15,22 6:19
    8:5 9:10 12:6
    23:10,24 25:2
    25:4,4 34:9,15
    48:18 54:5
    57:18 84:8
    86:24 87:11,15
    88:6
bonus 45:22
    46:21 47:6,7
boss 32:12 33:1
    78:5
bottle 26:2
bottom 79:18
box 30:7
brand 26:10,12

**Brands** 52:11,14
**break** 11:16,20
  11:21 31:20
  57:13,19
**breakfast** 73:3
**brief** 57:15
**briefly** 61:17
**bring** 18:4
**broad** 9:20
  25:10
**brought** 9:14
**Bryan** 19:8 31:7
  33:1 70:8,11
  78:5,23 79:4
  87:7
**business** 18:3
  48:22
**buying** 29:14

**C**

**C** 1:14 2:1 88:1
  88:1,17
**calendar** 58:22
**call** 7:22 34:24
  40:10 42:7,20
  43:7 44:23
  46:8 47:2 71:3
  78:15,16 79:15
  79:24 80:15
  82:16
**called** 27:4
  49:13 52:16
  79:24 80:2
**calls** 11:1
**cancer** 59:10
**cap** 26:3
**capacity** 61:2,6
**card** 79:20 80:7
  80:8,12,16,18
  81:3
**care** 6:11 62:2
  69:14 70:2
**carefully** 89:3
**carry** 62:18,20
**cart** 26:4
**case** 30:6 34:4

46:12 53:20
**catch** 25:16
**caustics** 81:13
**CBD** 79:22
**cell** 12:7
**certain** 70:1
**certainly** 32:10
**certificates** 49:3
  86:9
**certified** 49:9
**certify** 88:6 91:3
**chain** 29:14
  50:11 81:20
  82:2
**chambers** 34:24
**change** 69:21
  80:18,19 90:4
  90:6,8,10,12
  90:14,16,18,20
  90:22
**changes** 89:10
  91:7
**characteristics**
  75:1,5
**characterize**
  68:14
**charge** 48:8
  61:23
**charged** 10:10
**chemicals** 26:6,8
  27:11 81:5,8
  81:17,19 82:9
  82:13,16,24
  83:5,9,10
  85:24
**chemistry** 8:22
**cherry** 65:1,2
**children** 24:16
  24:19
**China** 48:17
**Christmas**
  31:20
**circumstances**
  46:23
**claim** 58:10,16
  58:19

**claiming** 34:6
**claims** 23:20
  58:3
**clarifying** 30:22
**classes** 52:1
**clean** 25:14
**cleaner** 27:4
**clear** 40:5 54:6
  66:6
**Cliff** 13:24
**clunky** 7:4 65:24
**coach** 32:4
  44:19 70:22
  71:1
**coached** 44:3
**coaching** 44:11
  44:23 60:13
  68:12,14
**coachings** 68:17
**coffee** 11:17
**colorants** 81:13
**come** 16:22 43:8
  71:10,12,16
  79:4
**comes** 15:17
  22:5 31:1
  49:23 65:19
**comfortable**
  36:19
**command** 50:11
**commencing**
  1:13
**commission**
  91:15
**Commonwealth**
  1:16 88:2
**communicated**
  16:23 79:12
**communicating**
  12:13
**comp** 58:3
**companies'**
  26:16
**company** 44:9
  52:6,15 85:1,3
**complaint** 16:20

67:22 71:7
**complete** 6:16
  6:21
**completely** 37:7
**computer-aided**
  88:10
**concluded** 87:16
**conditioners**
  25:20
**conditioning**
  61:24
**conduct** 74:17
**confidential**
  27:12,15,17
  33:11 35:6,24
  37:9 45:8
  46:12 47:9
**confined** 63:4,7
  63:10
**confused** 84:16
**connection** 6:3
  9:13
**consider** 66:21
**considerable**
  30:17
**considered**
  27:12 35:24
**consumer** 25:13
**consumers**
  26:19,23,24
**contact** 30:18
  73:21
**container** 26:8
**contents** 22:17
  22:20
**control** 85:24
  86:5
**controller** 21:23
**conversation**
  14:14 17:2,12
  20:10 21:7
  22:1,18 44:21
  55:16 74:14
  78:3,9 81:1
**conversations**
  18:18,21 19:13

53:24 57:19
  68:15,23 69:7
  72:10 74:3
**cooperation**
  7:23
**coordinated**
  76:11
**coordinator**
  21:3
**copy** 77:21
**correct** 5:7
  28:23 31:4,5
  31:16 42:9
  43:13,21 44:16
  45:2 57:1
  63:11 66:17
  75:2 86:2,6,10
  91:4
**corrections** 5:6
  89:4,6 91:7
**correctly** 88:9
**counsel** 2:6,11
  13:14 18:23
  19:1 32:5
  54:18 72:14,17
  88:11
**count** 66:10
**County** 88:3,5
**course** 18:3
  68:15 70:15
**courses** 86:12
**court** 1:1,20
  10:4 11:5,9
  23:7 46:2,8
  89:17
**COVER** 27:17
  35:6 37:9 47:9
**COVID** 69:12
  70:2
**CR** 36:3 41:10
  41:13,13 42:17
  43:17
**CR's** 41:7
**crafting** 61:2
**crime** 10:11
**criteria** 83:2

JACK BONSKY

Page 94

critical 62:7
crossing 22:23
crying 79:19
cup 11:17
current 11:19
  31:10 63:19
  64:14
currently 30:5
customer 30:17
  30:23 31:1
customers 25:22
  26:23 30:23
cut 81:24

**D**

D 3:1 27:4
daily 44:21
  68:15
damages 45:18
  46:20
date 1:14 6:15
  17:4 89:8
  91:10
dates 17:9
Dave 13:23
  20:18,20 76:10
day 79:7,9 88:13
  91:13
day-to-day 21:7
days 42:12
  66:10,12,14
  71:11,12,16
  76:7 79:14
  89:14
deal 64:18
Debbie 13:23
Deborah 53:4
  54:20 57:3
Debra 53:8
December 31:19
  57:10
decided 73:3
decision 57:4
deemed 89:17
Deep 23:14
defendant 1:8

2:11 6:8
deficiencies
  68:24
deficiency 69:8
definition 59:19
degree 48:20,23
  63:5
denied 61:11
DEP 82:22
Department
  82:20
depends 32:17
  36:8
deponent 60:12
  88:7,8 91:1
deposed 9:11,16
  9:24 14:9
deposing 89:13
deposition 1:12
  4:1 5:4,7,11
  6:3 12:4 13:9
  13:16,20 14:2
  14:3,4,7 22:11
  23:11 37:3
  53:14,17 87:15
  88:6,10 89:2
  89:11,15,16
depositions 7:19
describe 70:3
DESCRIPTI...
  3:10
designed 6:9
desk 79:15
despite 60:22
development
  49:14
difference 6:20
  80:2
different 8:9
  16:22 36:21
  37:3,8
differentiate
  85:4
difficult 32:5
direct 32:21
  60:12 82:11

direction 4:3
  60:21
directly 26:18
  26:22,23 30:1
  32:11
dirty 62:21
disagree 47:4
  60:19
discipline 32:1,4
disciplined 44:1
disclose 54:1
  72:10
discoverable
  33:24
discovery 46:10
discriminated
  23:22
discrimination
  51:5 59:18
discuss 14:20
  17:16 20:24
  53:10 56:19
discussed 11:14
  12:11 19:4,23
  20:15 21:5
  42:17 43:15,16
  53:7 69:1
discussion 23:5
  35:4 70:9
discussions 32:5
  72:10
disposable
  25:13
dispute 46:10
disrespect 50:6
disrespectful
  50:5,9
DISTRICT 1:1
  1:2
documents 4:10
  9:1,3 23:16
dodge 7:22
  10:19
dodging 7:24
Doe 40:11,11,14
  41:9,11,16,19

41:21 42:1,4
  42:11,12,17,17
  42:20,21,23
  43:1,14,18
  78:12
doing 10:15
  69:16 80:24
  89:7
DOLOWICH
  2:8
double 84:15
doubt 75:14
Douglassville
  8:12 28:14
dozens 19:15
  22:6,6 81:7,7
drains 66:5
Drive 2:9
drug 21:3 76:6
  76:11,23 77:1
  77:8,9,12,20
  79:8 83:13
  84:4 85:1,4
duly 5:16 88:7
DuPont 49:10
duties 29:8,21
  48:6 61:21

**E**

E 2:1,1 3:1,8
  88:1,1 90:2
e-mail 12:13
  76:16
earn 45:21
earned 46:20
earnings 46:1
earshot 8:20
EASTERN 1:2
Ed 21:18,19
  79:15
educated 6:20
education 48:19
EEO 50:18,21
effect 73:2
Eficaro@kdvl...
  2:10

eight 54:18
  55:21
Eileen 2:8 11:21
  12:12,17,21,22
  13:9 22:10,10
  34:16 57:19
  60:8 78:20
  86:17
Eileen's 12:7
either 25:3,18
  40:6 62:13
  66:10 85:21
electrical 70:10
  70:14 86:8,12
electricity 86:5
eligible 45:21
else's 25:19 62:1
employed 16:11
  17:21 20:6
employees 43:5
  57:22 75:10
employees' 85:5
employment
  35:22 50:23
  51:8,23 57:10
  58:7,8 59:17
  61:11 66:14
enclosed 64:4
encourages 50:9
ended 57:11
  73:19
Energizer 52:13
engineer 49:9
engineering
  30:3
entire 71:11
entirety 7:15
Environment
  82:21
environments
  51:12
equal 50:22
  51:22 61:11
equipment
  30:12 48:8
  62:5

**errata** 5:6 89:5
  89:8,10,13
  91:8
**especially** 67:3
**ESQ** 2:3,8
**estimate** 6:14
**everybody**
  43:16
**evidence** 34:1
**exactly** 62:22
  70:10
**EXAMINATI...**
  5:19 86:20
**examined** 5:16
**example** 32:19
  32:20 63:16
  70:8
**examples** 30:4
**excuse** 25:20
  28:20 50:20
  68:13
**exhibit** 3:10
  37:4
**exhibits** 3:13
**existing** 58:4,6
**expect** 73:12,20
**expected** 63:10
  63:12 74:4
**experience**
  52:18
**expires** 91:15
**explain** 50:1
**explained** 78:7
**expressed** 15:7,9
  15:12
**extent** 12:20
  27:9 53:23
  54:2 56:8,12
  58:18
**extenuating**
  46:22
**eyes** 50:5

**F**
**F** 88:1
**F-U-R-N-O**

20:20
**face** 69:16
**Facebook** 25:5
**facilities** 48:11
**facility** 28:13,18
  29:3,10 48:8
  61:23
**fact** 6:7 26:5
**factor** 87:4
**factually** 77:19
**fail** 89:15
**failed** 76:6,23
  77:9,12 78:2
  79:8 83:12
**fair** 44:24 83:21
  84:3
**fall** 64:6,7
**fanny** 62:18
**far** 10:16
**feel** 6:13,15
  36:19 50:8
  74:21 75:7
**feelings** 15:3,8
  15:13 18:14
**feels** 23:21 50:6
**feet** 28:19,20,21
  28:22 29:2
  63:18
**Ficaro** 2:8 3:5
  12:1 15:5 17:8
  22:15,22 23:4
  27:5,8 33:8
  34:3,11,19
  35:15,19 36:4
  36:7,12,23
  37:5 40:3 45:5
  45:15,19,23
  46:9 47:4
  50:20 53:23
  56:7 58:18
  59:12,21 60:4
  60:16 61:12
  72:9,13 75:11
  78:18,21 83:23
  84:5,12,20
  85:17 86:18,22

87:9
**file** 32:6
**filed** 6:2
**fill** 25:17,17,23
  25:24 26:2,15
  27:2
**fine** 11:18 35:18
  73:17
**fingertips** 71:14
  71:15
**finish** 10:17,19
  11:19
**finished** 27:6
**fire** 32:13,18
  33:4,6 78:17
  85:9
**fired** 36:11
  40:14 41:21
  42:1,21 43:1
  43:10,12 83:13
  83:22 84:1,3
  84:11,19 85:14
**fires** 32:18 78:6
**first** 15:16 24:8
  24:13 26:5
  30:24 46:13
  58:2,13 59:2
  69:18 73:18
  76:5 80:9
**five** 42:12
**fix** 63:22
**flash** 86:11
**flat** 72:21
**floor** 69:12,13
**fly** 25:15
**following** 60:18
**follows** 5:17
**foot** 29:3
**foregoing** 88:6
  91:3
**form** 5:9 17:8
  22:7 59:21
  75:11 78:18,22
  85:17 91:7
**formal** 55:4
**formulating**

61:2
**four** 5:2,8 24:7
  49:14,15
**fragrances**
  81:13
**frankly** 34:3
  49:23 67:9
  83:2
**free** 6:15
**fresh** 73:4
**fresheners**
  25:21
**friend** 66:22
**front** 6:24 9:2
**fuck** 79:23
**functions** 29:11
**Furno** 13:23
  20:18,20,21
  21:1,2,6,10
  76:10,18,20,21
  77:11

**G**
**gas** 65:21
**generally** 65:3
**generate** 72:20
**gentleman** 16:1
  81:21
**gentlemen** 82:10
**getting** 35:16
  42:13
**Gillette** 20:3,4
  20:10 77:15,18
  77:24 80:15
**give** 8:6 10:14
  29:11 30:4
  34:16 40:21
  54:20 55:20
  63:16 67:16
  68:11,16 70:7
  72:5
**given** 41:9 51:19
  51:22 52:1
  88:11 91:5
**gloves** 62:21
**go** 13:1 25:12

35:1 50:11
  63:7,10 64:15
  64:15
**goes** 10:14 45:17
  46:19 63:18,20
  64:3,21 65:3
  79:20
**going** 6:8,16 8:3
  10:14 12:15
  13:7,20 19:1
  32:12 33:19,20
  34:15,16,17,19
  36:13,15,20,22
  40:10 41:19
  43:7 46:8,21
  46:23,24 47:2
  53:18,19 60:8
  60:14 76:3
**good** 5:22 57:12
  59:9 70:15
**goods** 25:13
**great** 10:15
  11:14 78:10
**greater** 45:13
**gross** 42:22 43:3
  78:12
**ground** 10:15
  65:5
**grounds** 60:11
**guess** 6:13,16,20
  26:4 70:7
  83:17
**guessing** 64:10
**guidance** 77:15
**guitar** 67:8
**guys** 22:14
  74:10

**H**
**H** 3:8
**H-A-N-S-E-N**
  31:14,15
**Hampshire**
  49:17
**hand** 88:13
**handed** 76:16,17

JACK BONSKY

76:18,22,24
**handful** 58:1
**handle** 34:23
  46:4
**handlers** 29:15
**handles** 81:16
**handling** 77:15
**hands** 62:21
**Hansen** 13:24
  31:14,17,21
  32:1 43:23
  58:12 85:23
**Hansen's** 45:3,7
  46:1 48:6
**happen** 8:2 21:8
  41:6 44:12
  58:16
**happened** 10:2
  14:16
**happens** 7:11
**harassment**
  50:15 51:2,9
  51:20
**harness** 64:20
**Harvest** 2:9
**head** 10:22
**heard** 7:15
  26:14 43:11
  80:9 84:15
**heights** 63:13
  65:16
**held** 1:12 27:17
  35:6 37:9 47:9
**Heller** 13:24
**Hello** 5:23
**help** 32:10
**helping** 30:22
**helpings** 30:21
**high** 64:9
**high-voltage**
  86:5
**highest** 48:18
**hold** 33:8 58:10
**holes** 69:15,16
**home** 25:13,14
**honestly** 37:8

**honesty** 74:24
  75:9,15
**hosted** 18:23
**hostile** 51:11
**hour** 14:13
**hours** 16:22
  58:23
**house** 26:10,12
  80:5
**How's** 65:13
**HR** 20:4 32:10
  32:23 77:15
**human** 29:13
  52:17,19,22,24
  53:2 80:22,23
**hundreds** 81:8,8
**hurt** 57:22

**I**

**idea** 59:9 79:5
**identified** 14:6
  15:3
**identifying**
  33:16,22
**identities** 35:22
  36:16 37:1
**imperative**
  89:12
**important** 10:16
  75:1,4,6,9
  80:24
**improvement**
  32:8 45:1
  67:12
**inches** 64:10
**include** 13:22
**included** 87:6
**incorporated**
  74:9
**INDEX** 4:1
**indicated** 77:9
  88:7
**indirectly** 29:15
  29:17,18
**individual** 40:8
  40:22 58:9

78:13
**individuals**
  16:10 20:14
  21:14 33:17
  36:17 37:1
  43:19 75:1
**individuals'**
  34:20 35:17,21
**information**
  6:10 13:4,7
  23:2 27:13
  33:11,17,21
  36:1 45:7,8,9
  72:19 74:10
  87:7
**initials** 40:4,6
**injuries** 58:1,17
  58:24
**inquired** 55:21
**insects** 25:16
**insert** 27:9
**insertion** 23:1
  46:18
**insist** 34:17
**installation** 62:5
**installed** 30:9
**instance** 44:18
  63:2 69:1,4
**institute** 49:14
**instruct** 22:16
  40:5 45:6
  46:16,17 54:1
  56:10
**instructing**
  60:18
**instruction**
  45:16,24 46:6
  56:16
**INSTRUCTI...**
  89:1
**integrity** 74:24
  75:9,15
**interested** 88:12
**interesting**
  49:23
**internet** 7:16

**interpret** 13:3
**intoxicated** 76:1
**involve** 30:1
**involved** 26:24
  27:2 53:11,16
  54:19 57:4
  61:1,5 65:16
**involvement**
  42:3 82:8
**involving** 53:20
  80:22
**issue** 34:2 36:3
**issues** 7:16
  42:10 58:13
  87:1

**J**

**Jack** 1:12 3:3
  5:15 25:2,3,4
  27:5 33:9,15
  34:12 56:10
  59:22 60:5
  87:15 88:6
**January** 44:14
  44:15,16
**jeopardy** 40:23
  68:20
**job** 16:7 29:5
  40:23 41:23
  42:23 57:23
  68:20
**jobs** 30:21
**Joe** 13:23 17:18
  17:19 18:9,11
  18:23,24 40:20
**John** 15:18,19
  53:5 56:24
**JOSEPH** 1:20
**journeyman**
  86:8
**judge** 6:24 34:18
  46:23,24
**jury** 6:24

**K**

**K-E-N-N-E-T**

21:21
**K-U-L-P** 15:21
**KAUFMAN** 2:8
**keep** 11:6,9,11
  36:22 66:6
**Kennet** 21:18,19
  21:20,22 22:1
  79:16
**Kenneth** 21:19
**Kent** 49:2
**kin** 88:11
**kind** 40:22
  46:14 62:3,18
  68:11
**knew** 16:21
  53:18
**know** 6:10,12,17
  7:12,17 10:21
  11:16 12:21
  13:19 19:1
  22:8 23:5
  32:12 33:10,14
  34:6 36:10
  41:2,13,15,15
  45:9,12 46:20
  46:23 54:2,23
  55:24 58:19
  59:5,23 62:21
  63:18,20,21
  64:23 65:24
  66:7 67:10,21
  68:19 69:5,20
  71:2,19 72:24
  75:8 80:4,4,10
  80:20 82:19,23
  83:2 85:7,20
**knowledge**
  58:12
**knows** 67:8
**Kulp** 13:24
  15:18,22,24
  17:2,12,15
  19:3,22 53:4,5
  53:8 54:8,20
  56:20,21,22,24
  57:3

**L**

lab 8:22
label 26:3
Ladders 65:17
large 30:12
late 16:22 71:11
   71:12,17,19
   73:2
latenesses 74:15
LAW 2:3
lawsuit 6:1,4
   9:14 14:23
lawyer 54:7
lead 67:7
leader 49:8
leading 62:5
leaking 66:7
lean 7:21
learn 59:2 76:5
leather 69:13
leave 13:21
leeway 73:19
left 52:13
legal 59:6,18
legalized 59:3
legitimate 60:10
legs 11:17
let's 35:1 41:12
   46:3 50:1
letter 79:17
letting 71:2
level 48:19
   50:12
license 65:6
   82:17
licensed 85:23
   86:1,4
licenses 82:14
   83:6,9
lie 75:19
lift 63:17 64:1,3
   64:4,11,16,23
   65:15
limited 12:3
limits 23:6

line 4:4,4,11,15
   4:19 11:19
   22:23 46:6
   58:20 70:8
   90:4
LinkedIn 24:24
   25:2,7
liquid 25:16,17
   25:23,24 26:3
   26:15 27:2
   81:14
listed 21:15
litigation 9:5
   12:16 15:10
little 62:18
   73:16 82:4
live 24:2,4
lived 52:10
LLC 1:7
LLP 2:8
locations 8:10
long 9:18 14:10
   22:13,20 23:2
   24:6 33:16
   36:24 43:1
   66:8 72:9 73:5
   74:22 81:1
looking 36:8
   59:18
loss 78:9
lost 58:23 69:2
lot 37:3
Louis 48:16
lowest 50:12

**M**

machine 30:6
   41:24 65:7
   88:9
machines 62:4
   62:10,13,15,24
mail 80:3
maintain 62:7
maintaining
   62:4,9
maintenance

16:8 18:5
   29:12 31:10,18
   48:7 61:19,20
   61:22 63:19
   64:15 65:16
   66:1 70:4
   73:11,20,23
   86:3,7,12
major 16:20
making 44:8
   47:1 62:7
malpractice
   9:22 10:3
man 25:7 40:12
   58:23
management
   49:13
manager 17:20
   18:4,4,5 20:23
   29:7 30:10
   31:3,11,18
   48:7 52:5,9,15
   53:3 61:19,22
   63:20 64:15
   65:16 66:1
   70:4 73:12,20
   73:23 81:20
   82:2
manager's
   61:20
managers 86:3,7
   86:13
managing 30:1
manufacturer
   25:19
**Manufacturing**
   30:3
marijuana
   23:23 59:3,17
   61:10 75:22
   80:8 85:5,9,10
   85:14,15
mark 23:8 46:3
   46:5,7
marked 3:13
   4:18 27:14

marriage 24:8
   24:10,12,14,14
   24:15
married 24:6
Masheka 1:14
   88:5,17
mask 69:14
masking 69:12
masks 69:16,20
   70:2
Master's 48:20
material 29:15
Matt 17:3 18:13
   18:23 55:20
   64:11 70:11
   76:23 77:11
   79:19 80:2
Matt's 18:15
   54:10,12,15,21
   55:2,8,17
matter 9:16 12:4
   82:4
Matthew 1:4 6:1
   9:7 14:2 43:18
mean 26:12 30:2
   30:19 42:15
   44:7 46:5
   51:10 53:15
   54:24 55:2
   58:6 63:15,19
   70:1 80:7
meaning 26:13
   73:13
meaningful
   74:22
means 59:20
meant 10:21
   41:15 71:5,7
mechanic 16:8
mechanics 48:9
media 24:21,23
medical 9:22
   10:3 23:23
   59:3,7,17
   61:10 80:8
   85:5,9,10,14

85:15
medication
   59:11
meeting 14:13
   23:5
mentioned
   78:11 87:2
message 73:1
messages 67:3,5
MFG 1:7
military 10:6
mind 15:17 22:5
   50:3,4 65:19
minutes 14:14
   14:18 81:4
misconduct
   42:22 43:3
   78:12
misconstrued
   60:13
misquote 26:15
missed 26:5
   66:13 71:11
   79:13
Missouri 48:16
moment 7:1
   33:8
Monday 73:1
Montgomery
   2:4
months 20:13
morning 5:22
   73:14
mothballs 25:15
mount 63:20
move 6:17
moves 65:4
Moving 23:18
mumble 7:4
music 67:8

**N**

N 2:1 3:1
N95 69:19
name 5:24 9:8
   15:20 18:5

JACK BONSKY

25:1,3,18
31:13 33:20
64:23
**names** 33:14
34:13,16,21
35:17,21
**Narberth** 2:4
**nature** 9:21
21:24
**necessarily** 37:5
44:10 50:14
85:20
**necessary** 89:3
**need** 11:15,16
12:20 13:11
30:11 60:7
65:6 83:9
**needing** 78:4
**needs** 7:1
**negative** 84:15
**neither** 88:11
**never** 16:21,23
44:24 64:11
80:20
**new** 49:17 58:5
62:5
**nodded** 10:22
**non-privileged**
56:13
**nonparties**
33:11 36:1
**nonparty** 45:9
**normal** 18:3
**nose** 69:14,15
**Notary** 1:16
88:5,18 91:18
**noted** 89:10 91:8
**notes** 84:9
**notice** 88:7
**notified** 18:9
**November** 17:5
33:3 57:9
66:15 83:13
**number** 5:3,4
6:15 12:7,10
24:10 33:21

54:24 66:12

**O**

**o'clock** 73:14
**object** 12:1,23
33:9 56:8
58:20 60:10
75:11
**objected** 42:6
**objecting** 5:10
**objection** 13:1,3
15:5 17:8
22:15 34:11
36:15 40:3
45:5,15,23
56:17 59:12,21
60:4,23 61:12
78:18,22 83:23
84:5,12,20
85:17
**objectionable**
60:17
**objections** 5:9
**observation**
49:11
**obtain** 6:10
**obviously** 43:9
60:10
**occasion** 44:19
75:17
**occasionally**
67:2
**occasions** 52:21
**occurred** 35:4
68:3
**October** 17:5
31:4 66:15
**off-duty** 85:10
85:15
**off-the-record**
35:3
**offensive** 50:4
50:13,14
**offer** 34:13
**offering** 33:9
**office** 2:3 8:23

8:24 62:2
**official** 88:13
**Oh** 11:13 19:15
19:20
**Ohio** 52:14
**Okay** 7:13 10:13
11:13,14 12:15
15:16 19:16
36:5,18 40:10
41:20 46:2
47:8 56:23
72:12 78:23
**once** 9:17 64:17
**ongoing** 58:19
**operate** 65:7
85:24 86:4
**operating** 66:2
**operations**
48:17
**operator** 41:24
**operators** 29:16
**opinion** 21:10
21:11
**opportunities**
61:11
**opportunity** 5:4
5:5 13:8 44:19
50:23 51:23
**oral** 1:12 67:16
67:23 76:13
**order** 46:9 81:18
**ordered** 30:8
**ordering** 62:6
81:16
**orders** 81:20,22
**Oregon** 79:22
**organization**
32:19
**original** 89:13
**OSHA** 55:11
56:2 57:24
**outcome** 88:12
**outside** 67:1
**Overall** 70:3
**oversee** 29:19
82:5

**overseeing**
62:11
**oversees** 52:12
**owned** 52:11
**owner** 19:9

**P**

**P** 2:1,1
**p.m** 1:14 87:14
**PA** 2:4,9
**pack** 62:18
**packaged** 25:13
**page** 3:10 4:4,4
4:11,15,19
46:6 77:5,6,7
90:4
**pages** 91:3
**palettes** 81:15
**paperwork** 77:8
**part** 50:15 51:3
51:4
**parts** 62:8
**party** 88:11
**pass** 85:1
**passing** 85:3
**patient** 59:17
85:14
**patients** 61:10
85:9
**pay** 64:18
**Pennsylvania**
1:2,17,21 24:1
28:14 59:3
88:2
**people** 7:18 14:5
14:12 15:2,15
22:6 29:19
30:1 33:23
36:21 43:8
49:18 50:10
59:10 67:21
69:5 71:2
81:18 82:1
**people's** 26:16
**perceived** 68:24
69:8

**performance**
16:2,18,20
17:13 32:8
41:22 42:10
45:1 67:12
68:17,24 69:8
74:17 87:1,8
**performing**
78:10
**period** 72:23
**permit** 33:15
40:6 47:7 83:7
**permits** 82:14
83:6,9
**permitted** 56:13
**person** 29:9
32:18,20,23
36:20 40:11,16
41:4,18 42:18
42:20 50:5
52:24 73:13
77:15 78:24
82:2
**person's** 31:13
41:23
**personal** 23:14
33:10,16
**pertaining**
36:16 45:9
**pertains** 58:19
**Pettiford** 1:15
88:5,17
**Philadelphia**
1:21 88:3
**phone** 7:16 12:7
12:13 34:18
**phrase** 59:17
**physically** 54:22
**picker** 65:1,2
**pissed** 47:1
**place** 12:24
57:13 79:22
88:7
**plainly** 33:24
**Plaintiff** 1:5 2:6
**plan** 32:8 45:1

JACK BONSKY

67:12
**plant** 8:13 18:4
　18:23 29:7,16
　30:11 31:3
　52:5,9,11,13
　52:15,15,24
　53:2 62:6 81:6
**plants** 25:15
**plastics** 58:11,16
**play** 67:8
**please** 7:16
　10:17 11:1,7
　12:21,24 13:3
　51:10 54:3
　69:2 84:14
　89:2,7
**pleased** 16:19
**plumbing** 62:3
**point** 11:16,22
　71:22 79:19
**policies** 61:3,7,9
　85:20
**policy** 41:17
　85:1,3,8,11,13
**politicians** 7:20
**poor** 40:15 87:8
**PORTION**
　27:17 35:6
　37:9 47:9
**portions** 27:14
**pose** 10:20
**posed** 55:22
**position** 58:10
　60:20 63:3,6
　65:20
**possess** 86:8
**pot** 79:21
**potentially**
　75:18
**powder** 81:15
**powered** 65:13
　65:14
**practical** 82:3
**pre** 30:20
**predate** 58:7
**predated** 58:8

preparations
　53:12,13,16
**prepare** 23:11
　30:21
**prepared** 79:18
**prepped** 19:1
**prevent** 64:7
**previous** 52:17
**prices** 30:8
**prior** 13:9 52:16
　72:14 76:7
**Prioritization**
　44:6
**privilege** 13:6
　23:1 46:14,18
　56:8
**privileged** 23:2
　56:11
**probably** 22:6
　42:2 63:1
　64:17 76:7
**proceed** 42:6
**proceeding** 7:1
**process** 30:6
　82:5
**procurement**
　82:9
**product** 27:3
**production** 4:10
　17:20 18:4
　29:12 58:23
**products** 25:12
　25:17,18 26:11
　26:16,17,18
　27:1
**Professional**
　1:15
**program** 49:11
**project** 29:24
　30:2,10
**prompted** 12:17
**proper** 69:18
**propounded**
　91:6
**proprietary**
　27:12 35:24

**protected** 13:6
**provide** 40:5
　45:7 72:16
　86:11
**provided** 71:14
**providing** 30:23
**public** 1:16
　65:21 69:24
　88:5,18 91:18
**purchased**
　52:12
**purchases** 48:10
**purchasing** 30:6
　30:12 81:21
　82:3
**purposes** 59:4,7
**pursuant** 88:6
**put** 26:3,4 32:7
　45:1 67:11
　69:17
**puts** 26:8
**Putting** 13:14

**Q**
**quality** 20:22
　49:9,9
**question** 4:18
　5:9 7:17,21,22
　7:24 10:18,19
　10:20,23 13:2
　22:16 33:15
　36:14 45:6
　54:3 55:18
　56:3,4,6,14,16
　60:22 65:23
　72:15 86:23
**question-and-...**
　6:9
**questioning**
　11:19 58:20
**questions** 7:5,6
　7:15 10:24
　12:16,23 13:4
　33:13 35:20
　40:7 47:6,7
　53:19,21 54:18

55:22 56:9
　76:4 91:6
**quite** 49:23
**quotations**
　30:21

**R**
**R** 2:1 25:4 88:1
　90:2,2
**rails** 64:8,9
**ran** 52:10,13,14
**Randy** 16:1
**rationale** 46:11
**re-ask** 56:15
**reach** 83:18
**reached** 77:14
**read** 5:4 7:18
　79:17 89:2
　91:3
**ready** 23:15
**realize** 44:10
**really** 62:19
　70:12
**reason** 8:3,5
　65:11 74:20
　75:14 83:21,24
　89:4 90:6,8,10
　90:12,14,16,18
　90:20,22
**reasonable**
　73:13
**reasons** 33:23
　34:6
**recall** 17:4 18:2
　25:4 56:4
　58:14 62:17,22
　66:12 68:2,8
　70:10,14 75:17
　77:4,13,24
**receipt** 89:14
**receive** 56:5
　76:15
**received** 56:1
**recess** 57:15
**Rechargeable**
　65:14

**recommend**
　79:3
**recommendat...**
　32:22 78:7,17
　87:4
**recommended**
　79:6
**record** 11:15
　13:1 35:1 60:7
　88:10
**recordable** 58:1
**recorded** 88:9
**records** 54:11
　54:13,16,21
　55:3,8,9
**recreational**
　85:6
**referring** 15:14
　36:21 56:9,12
　62:10 63:24
**regard** 36:16
　40:4 45:24,24
**regarding** 14:14
　22:17 23:5
　33:10,11,17
　36:1 45:7
**register** 82:15
**registered** 83:1
**registering** 83:4
**regularly** 64:19
**related** 53:5
**relating** 9:4
**relevance** 34:4
　46:11
**remains** 60:23
**remember** 9:24
　18:16 19:18
　62:16,16 68:1
　68:10 71:18,20
　71:22 72:1
　74:13,16 75:12
**remembered**
　72:22
**remind** 8:3
**rent** 62:1
**rep** 20:4

JACK BONSKY

repair 62:11
repairing 62:4
  62:10
report 29:11
  31:6,8,21
  52:23 76:10,12
  76:13,13,16,22
  76:24
reported 52:20
reporter 1:15
  5:12 11:6,9
  23:7 46:3
reporting 1:20
  32:11 48:9
reports 29:10
  31:11 32:21
  53:1 82:11
represent 6:1
reprimanded
  43:22
request 4:10
  27:13
require 82:13
required 62:6
  86:4,8
reserved 5:10
reside 23:24
resolve 13:2
resource 80:22
resources 29:13
  52:18,20,22,24
  53:2 80:23
respect 15:9
  49:11,20,24
  50:16 51:3
  78:12
response 7:18
  11:1 27:6 68:8
  74:12 78:1
responses 12:17
responsibility
  7:8 62:2 63:22
  66:6
responsible
  29:10 62:3
responsive 67:4

restate 7:12 11:7
  69:2
restroom 11:18
results 77:1,3,8
  77:22
retaliation 51:6
return 89:13
reveal 33:16
  35:21 37:1
revealing 37:2
review 23:16
  74:23
reviewed 55:23
reviewing 84:8
reviews 74:18
Reynolds 1:4
  6:1 9:7 14:2
  15:4,8,13,23
  16:5 17:17
  18:1,8,17,19
  19:4,14,17,23
  20:11 21:6,12
  22:1 33:18
  34:6 43:18
  46:21 53:7
  56:1,20 57:5
  61:18 66:8,21
  73:7 75:18,21
  75:24 76:6
  78:2,4,17
  79:12 80:6
  81:2 83:12
  84:18 87:3
Reynolds' 6:12
  14:21 16:2,18
  17:13 23:20
  45:14 57:10
  75:15 76:4
Rick 13:24
  31:14
right 34:22
  41:18 50:2
  80:24
roof 61:24 62:1
room 8:16
row 79:14

rules 10:15
run 32:23,24
  35:16 83:7
runner 27:3
running 30:24
runs 30:24 31:1

_____

S

S 2:1 3:8
safety 20:22
  49:10 55:11
  86:12
Saint-Gobain
  49:13 51:15
salary 45:3,3,8
  45:13
sample 30:24
saw 64:11
saying 60:17
says 69:18,21
  73:23
scale 75:8
scheduling
  29:14
scissor 63:17
second 13:15
  24:12,14,15
  31:1 41:12
  46:19 60:6
seconds 69:20
Security 33:21
see 33:1 54:14
  62:23 64:19
  75:21,24 77:8
seeking 13:7
sell 26:18
send 67:2,6
  77:21 80:5
sense 32:24
sent 49:17 54:18
  67:7,9
separate 27:17
  34:1 35:6 37:9
  47:9 71:9,10
September 1:10
  88:14

series 76:3
served 10:5
session 6:9
  44:11
sessions 49:15
  49:16
set 79:13
setting 47:5 70:1
settled 10:4
sewage 65:22
  66:2
sexual 50:15
  51:2
Shanghai 48:17
shape 22:7
share 15:22
  18:14 21:11,13
  73:6
shared 13:5 15:3
  17:24
sheet 5:6 89:5,8
  89:10,13 91:8
shelf 26:24
shift 73:9,12,18
  73:24
shifts 73:18,21
shipping/recei...
  29:13
shop 69:12,13
short 72:22
shorthand 1:15
  88:9
shortly 79:10
shoulders 10:22
showing 71:1,2
shrugged 10:22
side 79:16
Sigma 49:8,8
sign 5:7 42:8
  89:7
SIGNATURE
  91:10
signed 78:13
signing 89:9
similar 40:7
simply 36:15

situation 50:7
  80:21
situations 58:2
  80:21
six 42:2 49:7,8
Smart 25:7
smoke 79:21
smoothly 10:14
soaps 81:11
social 24:21,23
  33:21
socialize 66:24
somebody 25:18
  32:11 43:8
  50:15 62:1
sorry 50:20
  78:20 81:24
sorts 67:5
sounded 79:19
sounds 66:17
space 63:10 89:5
spaces 63:4,8
spare 62:8
speak 10:16
  11:21 12:21
  13:9,12 22:10
  22:14 72:4
specialist 80:23
specific 14:8
  21:9 63:2 78:3
specifically 47:6
  53:20 62:17
  63:24 83:8
specifications
  30:22
Specifics 18:2
Specify 30:7
Spectrum 52:11
  52:14
speculation 6:17
  6:21
spell 15:19
spent 14:11
spoke 22:21
  23:3
spoken 13:15,18

JACK BONSKY

square 28:19,20 28:21,22,22 29:1,3
St 48:16
staff 13:19
standard 37:8
start 16:13 57:7 73:10,24
started 16:14 51:17 52:4 57:21 73:18
state 41:15 49:2 82:15,18 83:1 83:5 88:5 89:4
stated 41:14
statement 27:9
STATES 1:1
stating 10:17
status 49:9
stay 73:14
step 32:20
Steve 5:24 36:8 36:23 37:6 46:9 47:5 56:15
Steven 2:3,3 33:14
stipulations 4:14 5:3
store 67:8
straight 65:4,4
Street 1:20
stretch 11:17
strokes 9:20 25:10
stuff 62:3 80:5
subject 12:4 43:4 89:9
subordinate 15:18 16:4 40:19
subordinates 40:17,18 62:11 62:14
Subscribed 91:12

substance 14:20 14:23 60:21 91:7
suggested 18:24
suggestions 36:6
Suite 1:20 2:4,9
supervision 88:9
supervisor 58:11 66:18
supervisor's 58:16
supplies 48:10
supply 29:13 81:20 82:2
SUPPORT 4:1
suppose 50:1
supposed 69:17 73:9,23
sure 10:13 11:8 18:6 32:23 44:8 49:16 61:10 62:7 77:23 79:9 80:17,23 82:16
swatters 25:15
swear 5:12 50:1
swearing 50:2
switch 73:15
sworn 5:16 88:7 91:12

_____ T _____
T 2:3,3 3:8 88:1 88:1 90:2
T-R-O-U-T 16:1
tabulated 71:21 71:23
tabulating 71:22
tabulations 72:3 72:20 73:7
take 6:3 7:19,20 11:15,20 24:20 26:2 30:7 57:13,24 61:24 70:1
takeaways

49:22
taken 35:22 57:15 88:6
talk 41:19 74:5 80:22
talked 18:22 19:20 21:3 22:7 44:22
talking 14:11 55:7 82:10
Tammy 20:3 77:14,15 79:17 79:24 81:2
taper 30:6
teaches 50:6
team 16:23
teammates 42:14
technical 30:23
telephone 79:15
tell 7:5,8 12:11 14:6 16:17 18:11 46:15 74:8,10 76:22 77:17 88:7
telling 78:1
term 59:20 60:3
terminate 57:5 78:4
terminated 18:13,18 19:19 34:7,10 36:17 41:11 71:24 80:4 83:18 87:5
termination 18:10,12,15 19:21 22:3 32:22 34:5 41:6,7 42:4,6 43:4,20 76:8 78:8,14 79:1,4 79:11,17 83:19
terms 17:9 34:20 35:16

36:24 71:1 81:10
test 21:3 76:6,11 76:23 77:1,9 77:12,20 78:2 79:8 83:13 84:4 85:1,4
testified 5:16 87:2
testifying 27:10
testimony 3:3 8:6 33:10 88:8 88:10
text 12:7 67:3 72:24 73:1
thank 87:10,11
Thanksgiving 67:9
thereof 88:12
thing 26:5 49:13 62:19 69:18 70:14 80:24
things 21:2 25:14,14,15 29:14 50:12 55:1 62:6 63:23 70:1 80:22 81:11,12 81:12,23
think 12:3,8 21:9 22:22 23:4 34:23 35:15 36:7 49:15 59:9 62:19 63:1 73:2
thinking 44:13
third-party 25:19
third-type 31:1
thirty 89:14
thought 16:2 23:14 84:15
thoughts 80:1
thousand 7:20
threatened 43:5

three 5:6 24:19 48:13 49:15 76:7
thresholds 83:19
time 9:23 12:22 12:22 13:11 46:4 66:19 71:20 72:23,24 73:3,4,13,17 74:3 88:7
times 7:4,18 9:15 41:1 52:9
tires 65:5
title 29:5 42:23 81:21 82:3
titles 16:7
today 6:2,7,8 8:7 10:13 14:16 87:2
today's 13:9,16 14:6 22:11 23:11
toilet 27:4
told 42:5 54:7,8 67:20 69:5 75:18 77:11 78:1 80:6,16 81:2
tools 62:20
top 79:18
topics 52:2
tops 14:15,19
touched 61:17
trained 49:7,10 54:14
training 49:10 49:12,21 50:19 50:23 51:2,6,9 51:11,14,16,20 51:23 54:11,13 54:16,19,21,24 55:3,8,17,19 55:24 61:6
trainings 49:4 55:5,11,12,12

| | | | | |
|---|---|---|---|---|
| 55:14 56:2 | **usage** 85:5,6 | **wasn't** 42:13 | 66:9 70:8 75:2 | **working** 16:3,14 |
| **transcribed** | **use** 10:24 11:18 | 43:9 69:16 | 75:10 78:5,24 | 16:14 17:3 |
| 88:9 | 24:21,23 25:5 | 70:15 78:10 | 79:4 86:11 | 18:8 44:8 |
| **transcript** 27:14 | 28:23 60:9,14 | **water** 65:21 | 87:7 | 51:17 52:4 |
| 89:15,16 | 72:19 75:21 | 81:9,10 | **Willert's** 55:9 | 57:7,21 62:23 |
| **transcription** | 85:10,15 | **way** 22:7 33:22 | 85:8 | 66:11 73:17 |
| 88:10 91:5 | **user** 23:23 | 36:12 46:7,17 | **witness** 4:3 5:3,5 | 87:3 |
| **traps** 25:16 | **utilities** 65:21 | 49:24 56:21 | 5:7,13 6:8 15:7 | **workplace** |
| **treated** 7:2 | _____ | 57:4 63:23 | 22:2 27:7 | 49:12,20,24 |
| **Trout** 16:1,4 | **V** | **ways** 35:20 | 46:16,17 50:24 | 50:16 51:4,5 |
| 17:2,12,16 | **v** 1:6 | 83:17 | 59:14,23 60:19 | **wouldn't** 8:6 |
| 19:3,22 | **variety** 81:9 | **We'll** 11:19 | 60:21 61:14 | 69:15 85:14 |
| **true** 88:10 | **verbiage** 56:4 | 42:20 | 72:7,12,16 | **write** 67:14 |
| **truth** 88:8,8,8 | **verify** 80:1 | **we're** 25:19 | 75:12 78:20,23 | 69:22 70:19 |
| **try** 50:12 | **verifying** 5:8 | 36:20 40:10 | 79:16 83:24 | **writing** 41:3,5 |
| **two** 5:5 43:2 | **VIDEOCONF...** | 41:18 46:8 | 84:6,14,21 | 73:22 |
| 50:9 56:3 | 1:13 | **We've** 43:16 | 85:19 88:11,13 | **written** 41:9 |
| 73:17 74:24 | **violation** 84:24 | **wears** 64:20 | 89:1 | 76:13,14,15 |
| 76:7 79:14 | 85:2 | **Wednesday** | **woman** 40:12,13 | **wrong** 50:3 |
| 81:18 82:1,10 | **Virginia** 48:15 | 1:10 | **Wonderful** 9:20 | 60:17 |
| **Ty** 27:4 | **Virtually** 29:9 | **week** 64:17 | **wood** 63:20 | **Wyomissing** |
| **type** 42:10 55:19 | **visit** 18:22,24 | **weekly** 49:14,16 | **Woods** 13:23 | 24:1 |
| **types** 27:1 | **voice** 11:6,9,12 | **weeks** 20:12 | 17:18,19,21 | _____ |
| _____ | 80:3 | 42:2 43:2 | 18:1,19 19:4 | **X** |
| **U** | **VOLUCK** 2:8 | 83:20 | 19:22 40:20,21 | **X** 3:1,8 |
| **uh-huh** 11:2 | **volunteered** | **welcome** 46:10 | **word** 14:3,4 | _____ |
| **UK** 52:10 | 80:13 | **went** 49:12 80:3 | 79:18,18 | **Y** |
| **understand** 6:5 | _____ | **weren't** 16:19 | **words** 7:20 | **yeah** 19:20 30:5 |
| 6:19,23 7:7,8 | **W** | **West** 48:15 | 10:24 60:9,12 | 52:19 64:8 |
| 12:18 50:13 | **waived** 5:10 | **wheels** 65:5 | 60:14 | 76:20 77:13 |
| 55:18 63:6 | **Wales** 52:10 | **Wide** 81:8 | **work** 9:3,3 | 82:1 |
| 65:23 67:10 | **Walnut** 1:20 | **wife** 24:5,13 | 16:22 28:16 | **year** 44:17 58:22 |
| 70:12 | **want** 6:13 22:8 | **Willert** 1:7 6:2 | 29:15,16,17,24 | **years** 24:7 |
| **understanding** | 26:14 27:8 | 8:14 16:11,14 | 30:2,10 40:16 | **yellow** 49:8 |
| 23:19 55:15,17 | 33:9 34:23,23 | 17:22 18:8 | 50:10,12 51:11 | _____ |
| 58:15 59:16,20 | 36:10 54:5 | 19:8,9,10,13 | 58:24 62:13,15 | **Z** |
| 60:2 66:16 | 56:7,15 73:16 | 19:23 20:7 | 63:13 66:8 | **ZOOM** 1:13 |
| 80:9 | **wanted** 49:18 | 25:11 26:7,18 | 67:1 69:19 | _____ |
| **understood** 7:6 | 53:22 | 28:13 29:2,6 | 71:2 73:12,12 | **0** |
| 70:13 | **warn** 70:16 | 31:7 33:1 | 75:2,22 76:1 | _____ |
| **Unfamiliar** | **warned** 43:9 | 43:19 48:12 | 79:14 | **1** |
| 80:21 | **warning** 40:22 | 51:17,19,22 | **worked** 21:8 | **1** 1:10 40:11,14 |
| **UNITED** 1:1 | 41:10,13,16 | 52:5,22 55:17 | 42:13 61:18 | 41:9,11,16 |
| **University** 49:2 | 67:17,23 68:2 | 55:19 56:1 | 62:22 72:23 | 42:17 43:18 |
| 49:17 | 68:6,9 | 57:8,22 61:3,7 | 73:5 | 75:8 |
| **urgent** 44:9 | **warnings** 41:16 | 61:9,18 63:7 | **workers'** 58:3 | **1-3** 4:5 |

JACK BONSKY

**1:12** 1:13
**10** 75:9
**12-14** 4:6
**13** 70:9
**13-14** 4:20
**14** 66:10
**15-18** 4:5
**15,000** 45:22
  46:21
**1518** 1:20
**16** 66:15
**17** 66:10
**17-18** 4:9
**18** 9:19
**19** 9:19
**19072** 2:4
**19102** 1:21
**19422** 2:9
**1989** 48:24
**1st** 57:9

---
**2**

**2** 41:19,21 42:1
  42:11,12,17
  43:18
**2's** 42:4
**2-11** 4:16
**2:30** 73:19
**20-22** 4:7
**202** 91:14
**2020** 17:6 31:4
  33:3 66:15,15
**2021** 1:10 44:15
  44:16 88:14
**20th** 31:19
**210** 2:4
**215-461-1100**
  2:10
**215-567-1701**
  1:21
**215-964-4410**
  2:5
**22** 4:5,20 24:20
**23-24** 4:21
**24** 24:20
**25** 63:18

**26** 24:20
**28** 24:20

---
**3**

**3** 40:11 42:20,21
  43:1,18 78:12
**3's** 42:23
**3:21** 87:14
**30** 69:20 89:14
**34** 4:6,7
**36** 64:10

---
**4**

**4** 43:14
**4:00** 73:16
**420** 2:9
**45** 4:8,9,21
**46** 4:5

---
**5**

**5** 4:16 66:15
**5:21-cv-01208**
  1:4
**5:30** 73:18
**56** 9:19
**5th** 83:14

---
**6**

**6** 3:4

---
**7**

**7-12** 4:8
**7:00** 73:16
**704** 1:20
**79** 55:5
**7th** 88:13

---
**8**

**8** 73:14
**822** 2:4
**85,000** 45:4
**86,000** 28:20,21
  28:22 29:2
**87** 3:5
**87,000** 28:19

---
**9**

**930** 2:9

Exhibit 13

TAMMY GILLETTE

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF PENNSYLVANIA

- - -

MATTHEW REYNOLDS,                :     NO.: 5:21-cv-01208
                                 :
        Plaintiff,               :
                                 :
        v.                       :
                                 :
WILLERT MFG. CO., LLC,           :
                                 :
        Defendant.               :

- - -

Friday, September 3, 2021
- - -

Oral deposition of TAMMY GILLETTE,

held via ZOOM VIDEOCONFERENCE, commencing at

11:04 a.m., on the above date, before Masheka C.

Pettiford, a Professional Shorthand Reporter and

Notary Public in and for the Commonwealth of

Pennsylvania.

- - -

BISNOW & JOSEPH COURT REPORTING
1518 Walnut Street - Suite 704
Philadelphia, Pennsylvania 19102
215-567-1701
Bisnowandjoseph@verizon.net

TAMMY GILLETTE

1    **A P P E A R A N C E S:**

2

3         LAW OFFICE OF STEVEN T. AUERBACH
          BY:  STEVEN T. AUERBACH, ESQ.
4         822 Montgomery Ave, Suite 210
          Narberth, PA 19072
5         215-964-4410
          Auerbach.steven@gmail.com
6         Counsel for Plaintiff

7

8         KAUFMAN, DOLOWICH & VOLUCK, LLP
          BY:  EILEEN FICARO, ESQ.
9         930 Harvest Drive, Suite 420
          Blue Bell, PA 19422
10        215-461-1100
          Eficaro@kdvlaw.com
11        Counsel for Defendant

12

13

14

15

16

17

18

19

20

21

22

23

24

TAMMY GILLETTE

1                          -   -   -
                        I N D E X
2                          -   -   -

3

    Testimony of:  TAMMY GILLETTE
4
    By Mr. Auerbach. . . . . . . . . .5
5

6

7                          -   -   -
                    E X H I B I T S
8                          -   -   -

9   EXHIBIT                                  PAGE
       NO.            DESCRIPTION             NO.
10

11

12              (No exhibits were marked.)

13

14

15

16

17

18

19

20

21

22

23

24

TAMMY GILLETTE

```
 1                  DEPOSITION SUPPORT INDEX

 2

 3          DIRECTION TO WITNESS NOT TO ANSWER:

 4          Page Line

 5            (None)

 6

 7          REQUEST FOR PRODUCTION OF DOCUMENTS:

 8          Page Line

 9            (None)

10

11          STIPULATIONS:

12          Page Line

13            5     2-11

14

15          QUESTION MARKED:

16          Page Line

17            (None)

18

19

20

21

22

23

24
```

TAMMY GILLETTE

Page 5

1                        -  -  -

2                        MR. AUERBACH:  There are four

3    stipulations.  One, the witness will have the

4    opportunity to read the deposition, two, the

5    witness will have the opportunity to make any

6    corrections on an errata sheet, three, the

7    witness will sign the deposition, correct or

8    not, verifying its accuracy, four, all

9    objections, except to the form, are reserved,

10   and even if they are not made during this

11   deposition are not waived.

12                        Eileen, is that your

13   understanding?

14                        MS. FICARO:  Yes.

15                        MR. AUERBACH:  Would you swear in

16   the witness please.

17                        -  -  -

18                        TAMMY GILLETTE, after having been

19   duly sworn, was examined and testified as

20   follows:

21                        -  -  -

22                        EXAMINATION

23                        -  -  -

24   BY MR. AUERBACH:

TAMMY GILLETTE

Page 6

1          Q.          Ms. Gillette, good morning.

2     Again, my name is Steve Auerbach.  I represent

3     Matthew Reynolds in a lawsuit that he filed

4     against Willert.  We are here today to take your

5     deposition in connection with this lawsuit.

6                    Do you understand that you have

7     an obligation to tell the truth today?

8          **A.          Yes.**

9          Q.          Do you also understand that you

10    have an obligation to understand all questions

11    asked of me and that if you don't understand an

12    -- if you don't understand the question, you

13    have an obligation to tell me you don't

14    understand it?

15                    **MS. FICARO:  Objection to form.**

16                    **THE WITNESS:  Yes.**

17    **BY MR. AUERBACH:**

18          Q.          Do you agree to tell me that if

19    for whatever reason you don't understand the

20    question, that you will tell me I don't

21    understand the question?

22          **A.          Yes.**

23          Q.          Okay.  Now I saw you before --

24    you said yes, I saw you shake your head in the

TAMMY GILLETTE

1    affirmative.  This is being written down, so I'm

2    going to ask you to verbalize all answers with

3    either a yes, no or other explanation but no

4    uh-uhs.  Even though I see you, I know what you

5    mean.  This is for the benefit of the record.

6              **A.        Correct.  Yes.**

7              Q.        Have you ever been deposed

8    before?

9              **A.        Never.**

10             Q.        There's a first time for

11   everything.  All right.

12                       What's your position?

13             **A.        I'm the human resource manager.**

14             Q.        How long have you had this

15   position?

16             **A.        Almost six years.**

17             Q.        And do you have any degrees or

18   certifications that assist you in this position?

19             **A.        No, I do not.**

20             Q.        Did you attend college?

21             **A.        Yes, I did.**

22             Q.        Did you obtain any degrees?

23             **A.        I have a bachelor's degree, yes.**

24             Q.        What is your bachelor's degree

TAMMY GILLETTE

Page 8

1    in?

2              A.         **Leadership and management.**

3              Q.         From where?

4              A.         **National Louis University.**

5              Q.         And other than your bachelor's

6    degree, do you have any other degrees?

7              A.         **No, I do not.**

8              Q.         Do you have any certifications?

9              A.         **Yes.**

10             Q.         What are those certifications in?

11             A.         **That was my hesitation, because I**

12   **knew you were going to ask me what they were.  I**

13   **don't remember exactly the title of all of them,**

14   **but I've gone to different HR courses through**

15   **the years and received different HR**

16   **certifications for those courses.  I just don't**

17   **remember all the names of them.  I apologize.**

18             Q.         That's fine.  And the instruction

19   that I'm about to give you applies to this

20   question and all other questions.

21                        If you remember -- because that's

22   how memory works -- if you remember at any point

23   later on today, just let me know and we can come

24   back to that.

TAMMY GILLETTE

Page 9

1          **A.          Okay.**

2          Q.          Okay.  When was your -- so do you

3  recall the institutes or the organizations that

4  gave you this HR training?

5          **A.          Several of them have been threw**

6  **SHRM, which is an HR organization.**

7          Q.          Could you spell that?

8          **A.          Sure.  It's just SHRM.  It stands**

9  **for Society of Human Resource Management.**

10          Q.          And what was your most recent

11  training or certification with SHRM?

12          **A.          My most recent one was on the**

13  **changes with medical care because of COVID.  It**

14  **had something to do with insurance -- medical --**

15  **something along those lines and how COVID plays**

16  **a factor in it because we are -- we just went**

17  **through the -- all the conversations to renew**

18  **our insurance plan.**

19          Q.          What other trainings and

20  certifications did you receive for SHRM, and I'm

21  asking for topics?

22          **A.          Right.  So I periodically will**

23  **get just general -- go to their general HR**

24  **courses that they have updates on HR.  I'm sure**

TAMMY GILLETTE

Page 10

1   you're well aware of the fact that laws and

2   everything else continues to change, and so

3   periodically they just have courses on different

4   updates.  Like, this one was on the medical

5   insurance because of COVID, so they would have

6   updates such as that.  So there's been a lot of

7   stuff based on COVID in the last year that has

8   been the majority of what I've attended.

9   Anything related to COVID in the last year has

10  been my focus because that has created so many

11  things.

12          Q.      Have you had any other focuses in

13  terms of education and development?

14          A.      Yes.  So there is -- Armstrong

15  Teasdale is a law office that is here in St.

16  Louis, and we are actually a client of theirs

17  and they have annual employment labor seminars

18  every year, and I attend those every year.  And

19  then every so often there will be other ones

20  that pop up, so there is a group that's based in

21  St. Louis that is -- it's AAIM, and I apologize.

22  I don't remember what the letters stand for.  I

23  know one of the A's is association, but they

24  have different webinars as well.  Typically,

TAMMY GILLETTE

Page 11

1    those will be -- oh, my gosh.  There's a wide

2    variety of those, so it could have to do with

3    unions, it could have to do with HR in general

4    and there's been some recently on recruiting so

5    those will be rather short, usually 45 minutes

6    to an hour but I've attended several of those in

7    the last year.  And those have been primarily

8    the ones that I've attended in the last year.

9    So between SHRM, AAIM and then Armstrong

10   Teasdale in the last year, those have been my

11   focus.

12          Q.      Who pays for your attendance?

13   Does Willert pay or do you pay?

14          A.      Because we are a client, there

15   has been no cost.

16          Q.      That's for Armstrong Teasdale;

17   right?

18          A.      So for Armstrong Teasdale and for

19   AAIM, there's -- we use both of them, and so any

20   of those webinars that I've attended have been

21   at no cost to us.  The SHRM ones -- I've been a

22   member of SHRM for many years, and so it's just,

23   again -- although I don't think that there would

24   have been a cost even if I weren't a member

TAMMY GILLETTE

Page 12

1    because SHRM does have a lot of webinars and

2    seminars that are free, so --

3            Q.        Do you recall taking any webinars

4    or seminars on medical marijuana?

5            A.        **Not specifically medical**

6    **marijuana, no.**

7            Q.        Do you recall taking any webinars

8    or seminars on marijuana in general?

9            A.        **There has not been any seminar or**

10   **webinar that I have taken part of that that was**

11   **the only focus, but when they're providing**

12   **updates on here's what's going on in the**

13   **country, there has been a time information was**

14   **presented so it wasn't the only subject, but it**

15   **was one of several.**

16           Q.        And what information do you

17   recall being presented on medical marijuana?

18           A.        **I do recall that they talk about**

19   **the states that are implementing new medical**

20   **marijuana laws and the implication of what those**

21   **mean and that it appears as though as a country**

22   **we are moving towards more and more states**

23   **having the legislation of that.  To give you any**

24   **more specifics it would be purely a guess.**

TAMMY GILLETTE

Page 13

1          Q.          You said you've been a member of

2     SHRM for years.

3                      Approximately how many years?

4          **A.          I have been a member of SHRM off**

5     **and on since, I believe, maybe around 2005.**

6          Q.          So about 16 years?

7          **A.          Off and on, yes.**

8          Q.          Is that how long you've been

9     working in HR?

10         **A.          I've been in HR -- well, I should**

11    **say doing HR functions for almost 30 years, yes.**

12         Q.          And help me understand.

13                     What's the difference between

14    being in HR and doing HR functions?  What do you

15    mean by that?

16         **A.          So I initially -- I look at my**

17    **inaugural role in HR is when I ran a parenting**

18    **program, and I started running that program back**

19    **in the early 1990s.  So even though I did not**

20    **have an HR title, I was responsible for hiring**

21    **people and putting together information about**

22    **what all of the employees were going to do.  I**

23    **wrote the grants, I set up a variety of things.**

24    **My boss was the regional -- in the -- regional**

TAMMY GILLETTE

Page 14

1    superintendent of schools.  And so between the

2    two of us, we get that -- we put everything

3    together, and I ran the program so I certainly

4    did not have an HR title, but because I was

5    responsible for the program and all of the

6    people who worked in it, there were a lot of HR

7    duties.  Does that make sense?

8         Q.        Yes.  And what are your duties at

9    Willert as an HR manager?

10        A.        I typically tell people that if

11   it involves an employee in any way, shape or

12   form it involves me.  So the life cycle of an

13   employee from the recruiting, interviewing,

14   hiring, to the discipline, termination, so

15   everything that's involved in between.

16   Enrolling of insurance, workers' comp, leave of

17   absence, general things that come up on a

18   regular basis, and I guess the best way to say

19   it is other duties as assigned, such as COVID.

20        Q.        That's a lot?

21        A.        Yeah.

22        Q.        How many -- plus or minus.  I

23   don't need an exact number.  If you do, I'll be

24   impressed.

TAMMY GILLETTE

Page 15

1                        How many employees does Willert

2    have?

3            **A.**        **Approximately 250.**

4            Q.        Does that include the Shanghai

5    operation or is that just state-side.

6            **A.**        **Just state-side, because I don't**

7    **have any responsibilities for the Shanghai**

8    **location.**

9            Q.        Who's responsible at Willert for

10   making sure that it's compliant with all

11   antidiscrimination laws?

12                   **MS. FICARO:  Objection to form.**

13   **You can answer.**

14                   **THE WITNESS:  I'm sorry.**

15                   **MR. AUERBACH:  Our court**

16   **reporter, could you please read that back.**

17                        -  -  -

18                   **(Whereupon, the pertinent portion**

19        **of the record was read.)**

20                        -  -  -

21                   **MS. FICARO:  I objected to the**

22   **form but said you can answer.**

23                   **THE WITNESS:  Okay.  I'm sorry.**

24   **I knew Eileen said something.  Quite honestly, I**

TAMMY GILLETTE

Page 16

1    think there are several people who are involved

2    in that process.  I think that because I am over

3    HR that a lot of people would say that it is my

4    responsibility, but as I make sure that a lot of

5    people know, we're all in this together.  And I

6    can coach, I can counsel.  I do my part.  I

7    encourage all those sorts of things, but we all

8    have to work together to make sure that every

9    employee is treated with respect.

10           Q.      Does the buck stop with you in

11   terms of compliance with all antidiscrimination

12   laws?

13                   MS. FICARO:  Objection to form.

14   You can answer.

15                   THE WITNESS:  Yes.

16   BY MR. AUERBACH:

17           Q.      What kind of training does

18   Willert give its plant managers to make sure all

19   antidiscrimination laws are followed?

20           A.      Honestly, each person at Willert

21   is able to take their own training.  They don't

22   have to go through me.  I know that there is

23   training that folks have taken, that folks do

24   take.  Outside training, in most instances, is

TAMMY GILLETTE

Page 17

1    not something that we are requiring.  We do

2    provide the general internal training.  And as

3    I'm involved with various conversations with

4    people, I make sure that that's part of so many

5    conversations that I have with people.  So kind

6    of an ongoing issue.  Not something that's

7    handled at one -- oh, here today I'm going to

8    talk about this, then never again.

9            Q.      What did you mean by the word

10   general internal training?

11           A.      Because the general aspect is

12   that it's not just for one person.  The internal

13   aspect is that they're not going outside.  So,

14   for instance, I mentioned aspects of training

15   through SHRM for myself.  So internal training

16   versus external training, general meaning, it's

17   going to be done with everybody and specifically

18   to what they're dealing with.  So our plant

19   manager is going to be getting information from

20   a lot more points than what a supervisor who is

21   only over five people.

22           Q.      Do you know whether or not

23   Willert gave Jack Bonsky antidiscrimination

24   training?

TAMMY GILLETTE

Page 18

1          **A.        I do not.**

2              Q.        Did he receive antidiscrimination

3    training by Willert?

4          **A.        I do not know.**

5              Q.        In the six years that you've been

6    with Willert, have you made Jack Bonsky attend

7    antidiscrimination training?

8                   **MS. FICARO:  Objection to form.**

9    **You can answer.**

10                   **THE WITNESS:  Externally, no.**

11   **Internally through conversations that I have had**

12   **with him, that is the only thing that I know of,**

13   **so --**

14   **BY MR. AUERBACH:**

15             Q.        What type of conversations have

16   you had with Jack Bonsky about

17   antidiscrimination matters?

18                   **A.        As I mentioned earlier, when**

19   **anybody is calling me from Pennsylvania and**

20   **asking a question about item X, here's what we**

21   **have going on, I always will handle it from the**

22   **point of view of -- all right.  So let me make**

23   **sure I know the entire situation so I ask a lot**

24   **of questions, get as much detail as what I**

TAMMY GILLETTE

Page 19

1    possibly can and then what's been done, you

2    know, what's been said, what's the history,

3    those sorts of things, and then it becomes a

4    matter of, all right, so legally we need to be

5    aware of this and we need to take these steps

6    and what is anybody else saying and what has

7    happened to anybody else.  So it's very

8    important that we have consistency.  I think one

9    of the issues that comes into play when you're

10   talking about discrimination is when -- if

11   you've got Tom, Dick and Harry and you treat

12   Tom, Dick and Harry all differently, that's when

13   you come into problems.  And so it's important

14   to learn what's going on with everyone else,

15   making sure and providing that education of,

16   okay, so the laws say this, we have to do this,

17   have we done this, and in being consistent, we

18   need to do this.  If it's never happened before,

19   okay, do we need to put a policy in place, is it

20   that important that it requires a policy, is it

21   just going to be a general practice because

22   consistency is key.

23        Q.     I want to be fair in this

24   question.  That's -- that is my intent, and I --

TAMMY GILLETTE

Page 20

1    this is what I heard you say.  And if I'm

2    completely off base, I ask that you correct me.

3                     What I'm hearing you say -- and

4    I'm just trying to understand -- is these

5    conversations that you're talking about, they're

6    after-the-fact conversations.

7                     Is that what you're talking

8    about; someone's coming to you with an issue?

9    You are not talking about prophylactic,

10   preventative care?

11                    **MS. FICARO:  Objection to form.**

12   **You can answer if you can.**

13                    **THE WITNESS:  There are -- I**

14   **would say it happens both ways, and some of that**

15   **depends upon what the situation is because I**

16   **guarantee you even though I've been doing HR**

17   **stuff for a long time, I haven't heard it all,**

18   **and I can't provide instruction on something**

19   **that I've never dealt with.  So I will give**

20   **advice and give information in as much advance**

21   **notice as what I can, but for those instances**

22   **that seem to -- life provides, yeah, it has to**

23   **be after the fact because -- I mean, for**

24   **instance, with COVID and everything that has**

TAMMY GILLETTE

Page 21

1    happened and all the things that have continued

2    to change and evolve, anything that we started

3    to put in place back in February has changed

4    many times because we didn't know how it was

5    going to evolve and we didn't know what was

6    going to happen.  So when I am able to provide

7    information ahead of time, yes, that is done

8    but, unfortunately, you can't plan for

9    everything.

10   BY MR. AUERBACH:

11          Q.        And when you say give information

12   -- and I appreciate no one could have

13   anticipated COVID.  And you had to roll with the

14   punches and give information after the fact.  I

15   appreciate that.

16                    But when you use the words before

17   the fact, perhaps you didn't use those words --

18   and maybe I'm misremembering -- that's -- do you

19   mean by that general guidance in terms of

20   situations that a manager will face?

21          A.        Are you talking about the

22   conversations that happened after the fact?  Is

23   that what --

24          Q.        No.  Before.  Do you recall any

TAMMY GILLETTE

Page 22

1    conversations with Jack Bonsky about any

2    antidiscrimination matters, general guidance

3    that you gave before an issue arose?

4            **A.        No, but I do know that Bryan**

5    **Willert and Brian Warner were having numerous**

6    **conversations with him.  They were more involved**

7    **with him early on than I was.  I cannot speak to**

8    **what those conversations were.**

9            Q.        Who is Brian Warner?

10           **A.        He's our CFO.**

11           Q.        And Bryan Willert, is he the

12   owner?

13           **A.        He is one of the owners.**

14           Q.        Who are the other owners?

15           **A.        Bill Willert.**

16           Q.        Bill Willert?

17           **A.        Yes.  His legal name is William,**

18   **but he goes by Bill.**

19           Q.        Other than Bryan and Bill

20   Willert, any other owners that you are aware of?

21           **A.        Just their spouses are minor**

22   **owners.**

23           Q.        So this is a family business?

24           **A.        Yes.**

TAMMY GILLETTE

Page 23

1           Q.          What kind of supervision does

2     Willert give over its plant managers to make

3     sure that no discrimination takes place on its

4     premises?

5           **A.          I would be speaking out of turn**

6     **to answer that fairly, because I don't know.**

7     **I'm not privy to all of their conversations, so**

8     **I'm not going to put words in their mouth.**

9           Q.          What steps do you take to make

10    sure that your plant managers don't discriminate

11    against its employees?

12          **A.          So with the plant manager in**

13    **Kenova and St. Louis, they were in place before**

14    **I arrived, and so it was introducing myself and**

15    **I've made trips down to Kenova to make sure that**

16    **that plant manager and I established a**

17    **relationship.  Obviously, I'm here in St. Louis,**

18    **so I have a relationship with the plant manager**

19    **here and we just have regular conversations.**

20    **Yeah, without a doubt several e-mails of here's**

21    **the situation, please call me.  And a lot of**

22    **times they're very brief e-mails, and it will**

23    **just say please call me ASAP.**

24          Q.          What -- I'll be more specific.

TAMMY GILLETTE

Page 24

1                     What steps do you take or have

2     you taken to make sure that Jack Bonsky doesn't

3     discriminate against his employees?

4                     MS. FICARO:  Objection to form.

5                     THE WITNESS:  So with Jack,

6     initially, when he was hired, it was -- there

7     were way more conversations in probably the

8     first month that he was there, might be three

9     weeks that Bryan and Brian were having with

10    Jack.  And once Jack had been there for a few

11    weeks I had a verbal introduction through Ed

12    Kennet, and at that point, then, we -- we've had

13    conversations periodically on a variety of

14    topics and sometimes it'll be here's what's

15    going on, sometimes it'll be, hey, I just want

16    to keep in touch, so just periodic.  I have not

17    yet met him.  The only ones who are flying out

18    there are Bryan and Brian.  So once we're past

19    the COVID hump and we're actually traveling,

20    then I will be out to Pennsylvania again.  I've

21    not been to Pennsylvania or Kenova since all of

22    this, so I look forward to actually meeting him

23    at some point.

24    BY MR. AUERBACH:

TAMMY GILLETTE

Page 25

1          Q.      So fair statement that you've

2  only had informal conversations with him?

3                **MS. FICARO:  Objection to form.**

4                **THE WITNESS:  Correct.**

5  BY MR. AUERBACH:

6          Q.      Have you ever reviewed any of his

7  plant practices and procedures to make sure that

8  he doesn't discriminate against his employees?

9          **A.**      **I've never seen anything in**

10  **writing.**

11         Q.      But have you had -- during your

12  informal conversations, have you ever discussed

13  his policies and procedures to make sure that he

14  doesn't discriminate against his employees?

15                **MS. FICARO:  Objection to form.**

16                **THE WITNESS:  Yes.**

17  BY MR. AUERBACH:

18         Q.      When have you had those

19  conversations?

20         **A.**      **I honestly couldn't give you**

21  **dates.  I couldn't even give you time lines, but**

22  **as things have happened in the plant or if**

23  **changes are coming, then we will have those**

24  **conversations.**

TAMMY GILLETTE

Page 26

1          Q.        And what kind of conversations

2     have you had with Jack Bonsky about the changes

3     that were coming?

4          A.        So, as an example, when it was

5     known that there was going to be a lot of hiring

6     that was going to need to be done at the

7     facility, then we started having conversations

8     about, so, what's going on.  And, honestly,

9     Debbie was also involved in those conversations.

10    She is HR out in Pennsylvania, and it's

11    important that all three of us are on the same

12    page.  So we would just talk about so what are

13    we doing, they give me their ideas, and quite

14    honestly, they had some great ideas.  They'd run

15    them past.  Here's what we're going to do, what

16    are you guys doing in St. Louis, how does this

17    compare because we just need to make sure that

18    we're not doing two completely different things.

19    Even though it's the same company, we need to be

20    consistent.

21         Q.        What do you mean by that?  What

22    was your concern in terms of doing two different

23    things?

24         A.        It's not a concern.  It's really

TAMMY GILLETTE

Page 27

1    when you talk about being proactive versus

2    reactive.  If I wait until they've done all the

3    hiring and then say, oh, that's not how we do it

4    in St. Louis, then shame on me.  So it's --

5    talking to them about here's what's gone on in

6    St. Louis, here's how we've done things, is that

7    something that can work or will work in

8    Pennsylvania, what is your situation there, how

9    quickly are you hiring, you know.  It's just

10   making sure that we're all aligned.

11            Q.       In line (sic) in terms of what?

12            A.       Aligned.

13            Q.       Aligned, yes.  In terms of what?

14            A.       In terms of practices.  So if I

15   am hiring -- well, I -- here in St. Louis we

16   have a very diverse workforce and we look for

17   that.  So one of the things that was discussed

18   was what are -- what avenues are there in the

19   Douglassville area so that you can be hiring a

20   diverse workforce.  That is something that the

21   Willert's want.  That's what we put in the

22   practice here.  So here are the places here in

23   St. Louis that I use, do you have any place like

24   that in Douglassville.  And that makes sure that

TAMMY GILLETTE

Page 28

1    both areas are looking to hire a diverse

2    workforce.

3           Q.        And did the Douglassville

4    location end up hiring a diverse workforce?

5           A.        We -- yeah, definitely.  It's not

6    as diverse as what St. Louis is because we have

7    -- yeah.  In this -- I mean, we're in St. Louis.

8    You draw from what you've got and -- yeah, we

9    have quite a bit more diversity here than what

10   they do in Douglassville.  If they were located

11   actually in Philadelphia, then I'm sure that

12   there would be even more of a diverse workforce,

13   but yes.

14          Q.        Diversity means different things

15   to different people.

16                    You would agree that that

17   includes race?

18          A.        Oh, yeah.

19          Q.        Does your -- does your term of

20   diversity in workforce also include gender?

21          A.        Yeah.

22          Q.        Does it include handicapped

23   people?

24          A.        Yes.

TAMMY GILLETTE

Page 29

1          Q.          Does it include medical marijuana

2    patients?

3          **A.**          **Yes.**

4          Q.          Does Willert presently -- to your

5    knowledge, does Willert presently employ any

6    medical marijuana patients?

7          **A.**          **Not that has been brought to my**

8    **attention, no.**

9          Q.          So to your knowledge,

10   Mr. Reynolds was the only medical marijuana

11   patient?

12         **A.**          **Yes.**

13         Q.          In the six years you have been

14   with the company, have you been involved, in any

15   capacity, in formulating or crafting any

16   antidiscrimination policies?

17         **A.**          **No.**

18         Q.          Has anyone else at Willert, in

19   the six years you've been with the company, been

20   involved with formulating or crafting

21   discrimination policies?

22         **A.**          **No.**

23         Q.          In the six years you've been with

24   Willert, are you aware of any policy --

TAMMY GILLETTE

Page 30

1    antidiscrimination policies that change

2    throughout the year?

3            A.        In the last year I've been

4    working on a wide variety of policies, so they

5    have not come to -- they have not been

6    finalized, but I'm working on them.

7            Q.        What types of policies are you

8    working on creating?

9            A.        Well, the overall view of this is

10   to create a brand new rules and guidelines book.

11   We'll have one for each of the locations, and

12   then we have to have one that is specific to

13   unions.  And it's looking at all of the policies

14   that are currently in there as well as ones that

15   are missing, that weren't even considered when

16   the last one was put together.  So, for

17   instance, we're manufacturing and no one thought

18   to have a work-from-home policy until the last

19   year happened.

20           Q.        Understood.  Are you updating any

21   of your policies on medical marijuana?

22           A.        That will be part of the new

23   substance abuse policy that we are working on.

24           Q.        What do you anticipate the new

TAMMY GILLETTE

Page 31

1   policy to be?

2           **A.**         **I'm sorry?**

3           Q.         What do you anticipate the new

4   policy will be on medical marijuana?

5           **A.**         **Each of the states have different**

6   **conditions, which is why we will not have just**

7   **one rules and guidelines book.  To include one**

8   **medical marijuana policy with all of the**

9   **different conditions would be stupid on my part.**

10  **So Kenova, West Virginia, doesn't have that.**

11  **Well, yet.  Not in the sense that Pennsylvania**

12  **does.  So Pennsylvania is very different than**

13  **the others, so I'm starting out with the crux of**

14  **the substance abuse policy as what it is now and**

15  **then looking at the state and what are the**

16  **conditions.  I'm also looking at what's coming**

17  **down the pike to see if there is anything that**

18  **is changing.  So Missouri, for instance, has**

19  **been -- there's been a lot of talk about what**

20  **we're going to do and so -- yeah.  What do I**

21  **include, what do I anticipate.  The final draft**

22  **of any of the policies are going to be reviewed**

23  **by our lawyers to make sure that I've not missed**

24  **anything in terms of the state laws.  So I know**

TAMMY GILLETTE

Page 32

1    that does not give you specifics, which is

2    probably what you want, but I do not want to

3    speak to something that has not been finalized

4    and put out there for all of the employees yet.

5    That would be speaking out of turn.

6                Q.        I understand.  I certainly don't

7    want you to speak out of turn.  In fact, I only

8    want you to speak in turn, in terms of things

9    you know about.

10                        Have you ever been involved in

11   any capacity in administering training on

12   antidiscrimination policies at Willert?

13                        MS. FICARO:  Objection on form.

14                        THE WITNESS:  Do I answer?

15                        MS. FICARO:  Yes, you can answer.

16                        THE WITNESS:  Okay.  Every time

17   that I hire someone there is a discussion on

18   what we firmly believe here at Willert and what

19   I know that the Willerts expect of all of the

20   employees.  Bill Willert started many, many

21   years ago bringing in a workforce that was not

22   all going to look the same, and it's important

23   to the Willerts to make sure that everyone is

24   treated with respect.  And I have a very

TAMMY GILLETTE

Page 33

1    in-depth conversation with all of the new hires,

2    and periodically with employees, about respect

3    and what that means in the workplace.  And I

4    know that you specifically asked me about

5    discrimination, but my viewpoint and how I put

6    it to everybody is that when there is respect,

7    you don't have those other issues.  I cannot

8    treat you with respect and discriminate you at

9    the same time, I cannot treat you with respect

10   and be using profanity or harass you or any of

11   those other things, and I go into those details.

12   And I know that is the expectation of the

13   Willerts, and so I make sure that everybody,

14   regardless of their position here, understands

15   the expectations are to treat others with that

16   respect and, therefore, create an environment

17   that's going to be free from all of those things

18   that none of us wants, including discrimination.

19   BY MR. AUERBACH:

20        Q.      And have you been -- I understand

21   your position on respect.

22                Have you been involved in any

23   kind of training at Willert on wrongful

24   termination?

TAMMY GILLETTE

1          **A.**          How I have provided the training

2     to the supervisors, I don't call it wrongful

3     termination.  What I talk to the supervisors

4     about is being a good supervisor and what is

5     involved in being a good supervisor.  So, for

6     instance, a good supervisor -- and back -- I

7     just was having this discussion earlier this

8     morning.  A good supervisor is keeping notes

9     about the good and the bad of employees and

10    having conversations, having coaching sessions,

11    however you want to phrase it about, hey, great

12    job, I know you've been struggling with this,

13    that was -- that was great, and I really

14    appreciate it.  But on the flip side, hey, your

15    attendance is not where it needs to be, here's

16    our expectations.  You don't wait until you're

17    at your boiling point to then have a discussion

18    about the issues and terminating somebody.  A

19    wrongful termination only happens when you've

20    been waiting for three years and you never said

21    anything to the employee and then all of a

22    sudden after three years of the employee doing

23    this then you terminate.  So why would I -- why

24    would I focus on wrongful termination when

TAMMY GILLETTE

Page 35

1   everything that I'm here for is to make sure

2   that things are done right.

3          Q.         Are you involved, in any

4   capacity, in making sure that Jack Bonsky

5   follows the law?

6          **A.          Yes.**

7          Q.         What is your involvement in

8   making sure that Jack Bonsky follows the law?

9          **A.          Again, the items that I have just**

10  **talked about in terms of the respect, and how to**

11  **treat the employees, about the documentation,**

12  **things along those lines.  We've had those**

13  **conversations, but when I hear anything -- and**

14  **this is not just with Jack.  This could be with**

15  **anybody who is in a supervisor capacity at any**

16  **of the locations -- if I hear something of an**

17  **issue I have an obligation to make sure that**

18  **that is addressed.  There are a variety of ways**

19  **that it can be addressed, depending upon the**

20  **situation with Mr. Bonsky because he is in**

21  **Douglassville and partly because I've not met**

22  **him yet.  I have a conversation then with Bryan**

23  **Willert and make him aware of anything that I**

24  **might have heard, good or bad.  Hey, Bryan, just**

TAMMY GILLETTE

Page 36

1    want you to be aware of this.  And if it is

2    something that needs correcting, then my next

3    question to Bryan is, is this something you want

4    me to handle or would you like to handle it, and

5    we go from there.

6                Q.      Ms. Gillette, I'm going to ask

7    you a yes or no question.  And if there's a need

8    for elaboration, we'll handle it afterwards.

9                Prior to October 2020, did you

10   ever discuss with Mr. Jack Bonsky about the

11   Pennsylvania Medical Marijuana Act?

12               MS. FICARO:  Objection to form.

13               THE WITNESS:  No.

14   BY MR. AUERBACH:

15               Q.      Prior to October 2020, did you

16   ever discuss with Mr. Jack Bonsky about medical

17   marijuana patient discrimination?

18               MS. FICARO:  Objection to form.

19   You can answer.

20               THE WITNESS:  Sorry for the

21   delay.  No.

22   BY MR. AUERBACH:

23               Q.      Prior to October 2020, did

24   Mr. Jack Bonsky receive any training about

TAMMY GILLETTE

Page 37

1    medical marijuana patient discrimination?

2            A.        I don't know.

3            Q.        Prior to October of 2020, did you

4    give Mr. Jack Bonsky any training on medical

5    marijuana discrimination?

6                      MS. FICARO:  Objection to form.

7                      THE WITNESS:  No.

8    BY MR. AUERBACH:

9            Q.        I'm aware of three Willert

10   plants: one in Pennsylvania, one in West

11   Virginia one in Missouri.

12                     Did I miss any?

13           A.        No, other than Shanghai.

14           Q.        And you had said that St. Louis

15   is your base?

16           A.        Yes, headquarters.

17           Q.        That's where you live, obviously?

18           A.        I don't live in St. Louis, but I

19   work here.

20           Q.        But you live in Missouri?

21           A.        I live in Illinois.

22           Q.        How far of a commute do you have?

23           A.        All depends on the bridge

24   traffic, but it's typically 35 to 40 minutes.

TAMMY GILLETTE

Page 38

1        Q.        When we're done, I'm going to

2    have to look at a map just so I can get

3    oriented.

4                  And because you work in Missouri

5    and for a company that has a base in Missouri or

6    headquarters in Missouri, you are aware Missouri

7    has a Medical Marijuana Patient Act?

8        **A.        Yes.**

9        Q.        And you are aware that West

10   Virginia is a state that also has a Medical

11   Marijuana Act?

12       **A.        Yes.**

13       Q.        And you're aware, obviously, that

14   Pennsylvania has a Medical Marijuana Patient

15   Act?

16       **A.        Yes.**

17       Q.        So you're aware that 100 percent

18   of your US operations have states with Medical

19   Marijuana Acts?

20       **A.        Yes.**

21       Q.        And as of right now, your company

22   doesn't have any policies or procedures to

23   protect medical marijuana patients?

24       **A.        Correct.**

TAMMY GILLETTE

Page 39

1          Q.        If someone -- if one of your

2     plant branch managers were to call you and say I

3     have a patient -- and this happens today -- I

4     have a patient -- I have an employee who just

5     showed me a medical marijuana patient card,

6     what's your next step?

7                         MS. FICARO:  Objection to form.

8                         THE WITNESS:  Can I answer?

9                         MS. FICARO:  Yes, answer.  If you

10    can, answer.

11                        THE WITNESS:  My first question

12    would be why did he or she show you the card,

13    because it doesn't seem like somebody would just

14    walk up to you and say, oh, hi.  Look what I

15    have, so, yeah.  In my experience, anytime that

16    somebody is coming up and volunteering something

17    that's unique, there's got to be a reason for it

18    so I'd say what happened, fill me in and then

19    what would happen next would determine what I

20    would do.  What he -- he would say would

21    determine what I would do.

22    BY MR. AUERBACH:

23          Q.        And what are the range of

24    outcomes that you would do based on that

TAMMY GILLETTE

Page 40

1   information?

2          A.        For sure I would get down to the

3   nitty-gritty of -- I mean, did this person get

4   hurt, is that why they're telling you, you know,

5   that they just cut their finger off and they're

6   like oh, well, maybe you should know I have a

7   medical marijuana license.  You know, so if it's

8   something bad, well, let's get through the

9   injury, make sure that everything is taken care

10  of, make sure that this person gets the medical

11  care and medical treatment, okay, do we have all

12  the paperwork filled out, everything else.

13  Because you have to deal with the crisis first.

14  Once we have dealt with the initial crisis and

15  everything that goes along with the workplace

16  injury -- and I'm just using that because that's

17  the example that I started out with -- then I

18  start looking at, okay.  So this person has a

19  medical marijuana license, we're going to have

20  to see if this -- in this situation this has any

21  implication with the workers' comp insurance.

22  It might.  And then we start having

23  conversations about what are the implications

24  for the facility as a whole, what do we need to

TAMMY GILLETTE

Page 41

1  be putting in place, what procedures, what

2  practices, what policies.  And so there's a huge

3  trickle-down effect as to what started it and

4  where we end up being.

5       Q.       Can you envision a scenario that

6  does not result in a termination for a Willert

7  employee who is a medical marijuana patient?

8       A.       Yes.

9       Q.       What would be an example of that?

10      A.       Well, I'll use the example that

11  -- I'll just continue with the example.  So this

12  person's finger got cut off.  So at that point

13  we know that they're a medical marijuana user.

14  In our investigation, we find out that, I don't

15  know, it got cut off because -- can't even think

16  of how it would get cut off -- but it was of no

17  fault of their own kind, it was kind of one of

18  those freak accidents that do happen and we do

19  get a copy of the medical marijuana license.  At

20  that point, the license had nothing to do with

21  the incident, their performance as an employee

22  has been good up to that point and that would be

23  a key factor.

24                    So if they've been a great

TAMMY GILLETTE

Page 42

1   employee it's not, you know, day one on the job,

2   so to speak, we have a history, then I think

3   that at that point in time we would definitely

4   keep them as an employee, but that would also

5   factor in to any policy or procedures that would

6   be put in place as a result of that incident.

7          Q.        Willert has a zero tolerance drug

8   policy; does it not?

9          A.        For pre-hire, yes.

10          Q.        Do you recall approximately when

11   this policy was created?

12          A.        It was before I was here.

13          Q.        Has it been updated in any

14   meaningful sense since you have been there?

15          A.        I am working on it now.  Again,

16   as discussed earlier, taking a look at the

17   different laws, I'm updating all the policy.

18   This is just part of it, yes.

19          Q.        Ms. Gillette, were I to represent

20   to you that Pennsylvania legalized medical

21   marijuana in 2016, would you have any reason to

22   doubt or dispute that assertion?

23          A.        Honestly, I know that the law in

24   Pennsylvania has gone through a few revisions,

TAMMY GILLETTE

Page 43

1    and I don't know the years that they happened so

2    that would be my question, was the 2016 part.

3    So in terms of the doubt, it was just -- I know

4    that it's happened.  I don't know what year.

5            Q.        But this drug policy hasn't

6    changed since Pennsylvania legalized medical

7    marijuana?

8            A.        Correct.

9            Q.        Any reason?

10           A.        Well, we did not acquire

11   Pennsylvania -- we didn't have them in 2016.

12           Q.        You acquired Pennsylvania in

13   2019?

14           A.        '19, yes.

15           Q.        Any reason why it didn't update

16   its policy since 2019?

17           A.        Updating the policy was --

18   unfortunately, that was my major goal for last

19   year, and then COVID happened.  So last year

20   after acquiring Pennsylvania is when it would

21   have initially been modified and have been put

22   in place.  And once COVID happened and --

23                        -   -   -

24                    (Whereupon, an off-the-record

TAMMY GILLETTE

Page 44

1                    discussion occurred.)

2                       -   -   -

3                    THE WITNESS:  Once COVID happened

4    everything changed for me, and I had three

5    states with employees living in an additional, I

6    believe, five states and my focus had to change

7    on learning everything that I could about what

8    the CDC was requiring, what each state was

9    requiring, and in some instances, the county was

10   requiring, making sure that we put practices in

11   place to physically keep our employees safe from

12   being exposed to the pandemic at work because

13   all of our facilities stayed open.

14                    So updating the rules and

15   deadlines took a very distant second place to

16   making sure I kept my employees safe and

17   protected them from potentially getting a lethal

18   virus.

19   BY MR. AUERBACH:

20           Q.       Ms. Gillette, I -- I do

21   understand that.

22                    So just to summarize what I heard

23   you say is, it had been on the docket to update

24   these drug policies, but when COVID hit, COVID

TAMMY GILLETTE

Page 45

1    had to be the priority?

2              A.        Correct.

3                        MS. FICARO:  Objection to form.

4    BY MR. AUERBACH:

5              Q.        When did you start the process of

6    working on updating Willert's drug policies?

7              A.        I actually started having

8    conversations in -- there we go -- there's some

9    training that I had started going to in 2019,

10   was on handbook and information that needs to be

11   in handbook.  So I started attending seminars

12   and webinars and looking up information and

13   started actually working on that in late 2019.

14   We have access to something that's called Think

15   HR, and so the -- it's the database that has the

16   policy -- has, like, a handbook.  You can modify

17   it, you change it, you update it so that it --

18   it's not a generic handbook.  So I actually

19   started that in 2019 and was working through

20   some of what they actually had in their part,

21   then I was going to be adding things that were

22   specific to states and specific to Willert.

23             Q.        My question was specific to

24   medical marijuana.

TAMMY GILLETTE

Page 46

1          When -- on approximately what

2   date did you begin the process of updating

3   Willert's drug policies?

4          **A.          Honestly, I don't have a date and**

5   **I don't know if that's even something that I had**

6   **done much progress on.  I really have to look at**

7   **what I had gotten.  As I said, it's kind of like**

8   **you can buy to do or you can -- you know, if you**

9   **want to write a blog, you can look up that**

10  **information, it can help you out and you fill in**

11  **the missing pieces, you update, you put in your**

12  **titles and that sort of thing, and that's kind**

13  **of what Think HR has for their handbook.  So I**

14  **started at the beginning of that handbook and**

15  **was working my way through while I was attending**

16  **the webinars and the seminars and looking up**

17  **that information, and I -- I don't know --**

18  **honestly, I don't know if the substance abuse**

19  **and medical marijuana had been modified at that**

20  **point.  I just don't know.**

21          Q.          In 2019, did you know that

22  Willert needed to update Pennsylvania's medical

23  marijuana drug policies?

24          **MS. FICARO:  Objection to form.**

TAMMY GILLETTE

Page 47

1          THE WITNESS:  I'm okay to answer

2  this?

3          MS. FICARO:  Yes.

4          THE WITNESS:  I knew in 2019 that

5  all locations' policies needed to be updated,

6  not just Pennsylvania.

7  BY MR. AUERBACH:

8      Q.      Did you have any conversations

9  with anyone at Willert that the drug policies

10  needed to be updated?

11      A.      Again, I knew that every policy

12  -- I did not specifically say that there's one

13  policy and only one policy that has to be

14  updated.  My conversation was I need to update

15  the handbook and every policy that we have in

16  the company.

17          MR. AUERBACH:  Okay.  I did

18  promise you a bathroom break, so let's take that

19  now so we can do that.  I have 12:14.  Can we be

20  back at 12:19?

21              -  -  -

22      (Whereupon, a brief recess was taken.)

23              -  -  -

24  BY MR. AUERBACH:

TAMMY GILLETTE

Page 48

1          Q.        Ms. Gillette, did you have any

2     conversations about Mr. Reynolds' allegations

3     during our break?

4          **A.        No, I did not.**

5          Q.        Okay.

6          **A.        The only ones I talked to were**

7     **our construction guys.**

8          Q.        Does Willert have any policies to

9     ensure equal employment opportunities for

10    medical marijuana patients?

11         **A.        We have a general Equal**

12    **Employment Opportunity clause that does not**

13    **specifically state that it applies solely to**

14    **medical marijuana, but it's EEO for all.**

15         Q.        And does your -- I understand

16    that doesn't state the word medical marijuana

17    patient, but does your antidiscrimination policy

18    apply to medical marijuana patients?

19         **A.        Yes.**

20         Q.        Did it apply to patients --

21    medical marijuana patients in November of 2020?

22         **A.        Those that we knew of.**

23         Q.        Again, you are not a lawyer.  I'm

24    not asking you for a legal definition.  I'm

TAMMY GILLETTE

Page 49

1    asking you for your understanding of the term.

2                        What does the term medical

3    marijuana patient discrimination mean to you.

4                        **MS. FICARO:  Objection to form.**

5    **You can answer.**

6                        **THE WITNESS:  So, obviously, the**

7    **medical marijuana patient is someone who has a**

8    **legal right to a legal prescription from a**

9    **doctor to be able to use it for whatever the**

10   **medical purpose is, and discrimination would be**

11   **if you look at somebody, and based solely and**

12   **only on that factor, you make a decision about**

13   **them.**

14   **BY MR. AUERBACH:**

15         Q.       You've never met Mr. Reynolds;

16   have you?

17         **A.       That is correct.**

18         Q.       Have you ever spoken to him on

19   the phone?

20         **A.       No, I have not.**

21         Q.       So you've never seen him under

22   the influence of any drugs?

23         **A.       I have never seen him period.**

24         Q.       And you are not aware of any

TAMMY GILLETTE

Page 50

1    complaints that he was high on the job?

2           **A.        That he was high on the job; is**

3    **that what you said?**

4           Q.       Yes.   Intoxicated.   Under the

5    influence of marijuana on the job.

6           **A.        I had never heard that.**

7           Q.       When did you become aware that

8    Mr. Reynolds had failed his drug test?

9           **A.        I don't know what the date was,**

10   **but I believe it was the same date of the**

11   **termination.**

12          Q.       How did you become aware that

13   Mr. Reynolds had failed his drug test?

14          **A.        I received a phone call from**

15   **Mr. Bonsky.**

16          Q.       And what did Mr. Bonsky tell you?

17          **A.        That Mr. Reynolds had tested**

18   **positive for marijuana, and then I believe his**

19   **next question was what do we do now.**

20          Q.       How did you answer that question?

21          **A.        Well, I hadn't seen any**

22   **documentation, and so I asked him to send it to**

23   **me.   So while we were on the phone, he then**

24   **forwarded the information to me so that I could**

TAMMY GILLETTE

Page 51

1   review it.  So bit of a pause so that I could

2   take a look at it, kind of had a discussion

3   about -- you know, I asked if Matt had said

4   anything to him, because Matt would have heard

5   something before we did.  So I asked if Matt had

6   said anything, and he said that Matt had not

7   been to work the day before or that day and so

8   he had not -- Matt had not said anything.  So I

9   mentioned about what our practice is of a

10  positive result being termination or actually

11  that was considered the pre-hire so, you know,

12  just -- we wouldn't have hired him, and I said

13  but let me talk to Bryan Willert.  And the

14  reason I said that is because it has been

15  practice almost from the time that I got here,

16  that anytime that we're doing a termination that

17  Bryan wants to know before it happens.  So

18  that's just standard practice.  The only time

19  that we don't have to let him know -- actually,

20  no.  There's no time.  We have to let him know,

21  regardless of the reason.  If he's on vacation,

22  we still have to get ahold of him.  So I needed

23  to discuss it with Bryan and said that we would

24  talk after I was able to talk with Bryan.

TAMMY GILLETTE

Page 52

1          Q.          You did speak with Bryan?

2          **A.**          **Yes.**

3          Q.          And what did you tell Bryan?

4          **A.**          **I told him what Jack had told me.**
**I actually printed out the result and took it**
**into Bryan.  Again, that would have been kind of**
**a normal thing.  And, you know, at that point in**
**time it just -- anytime that something --**
**regardless of what it is, if it's something that**
**we don't want to happen, then Bryan and I are**
**both kind of like, uh, why, kind of thing.  And**
**so, you know, I mentioned about what our policy**
**is and, again, it kind of came up of, well, why**
**was this not done ahead of time and -- you know,**
**an oversight, and so I, you know, made him aware**
**of that and, you know, reminded him, hey, this**
**is -- we would not have hired him if we'd known**
**about a positive test.  And he said it -- at**
**that point he said that -- he goes, well, we**
**need to follow practice.  You know, Matt had**
**only been with us, I think at that point, two**
**weeks, somewhere around there.  He said that**
**there had been some other issues as well.  And**
**so because of everything and the fact that he is**

TAMMY GILLETTE

Page 53

1    a new hire, that we would go ahead and terminate

2    him.

3         Q.        Did you or Bryan, at that point,

4    inquire as to why Mr. Reynolds had failed the

5    drug test?

6         A.        I never do.  It's -- there's a

7    standard practice for drug testing, and I don't

8    inquire why somebody fails.  That's already been

9    done.

10         Q.        What is that standard practice

11    for drug testing?

12         A.        So when someone takes a drug

13    test -- if I were to go take a drug test, when I

14    get there, they're going to ask me if there's

15    any type of prescription that I'm on.  So, for

16    instance, I'm on thyroid medication, so I would

17    indicate, hey, I take thyroid medication, here's

18    my dosage and, you know, I would do that even if

19    it's, you know, something that's over the

20    counter, cranberries, for instance, vitamin D,

21    those sorts of things.  They ask you what it is

22    that you're taking and if you have a

23    prescription.  And then you provide your sample

24    and that's pretty much it for the drug test at

TAMMY GILLETTE

Page 54

1    that point in time.  We always ask for a split

2    specimen to be done, which means they split it

3    in half, they test half of it and hold onto the

4    other half.  So if somebody comes up positive,

5    then the split specimen, because this is just

6    going to be a rapid, so kind of dip test, so to

7    speak, if it comes up positive for anything,

8    then it is sent off for further evaluation.

9    Depending upon the agencies, some agencies will

10   send the notice to the company stating that it

11   has been sent out for further testing because

12   that explains why you don't have the initial

13   results.  Not all companies do that.  When it

14   goes out for further testing, it's not just

15   another dip test, but there is further -- I

16   don't know what all is involved, but I know that

17   there's more testing if they're involved in the

18   process.

19                   In addition to just the testing

20   of the specimen, itself, the medical review

21   officer actually will have a conversation with

22   that person.  And -- so in my instance, they

23   would say, you know, you identified that you

24   take thyroid medication.  You know, do you take

TAMMY GILLETTE

Page 55

1    anything else, you came up positive for

2    marijuana so, you know, we're looking for any

3    reason why you might have this positive result.

4    And that could be any type of medication.  They

5    would ask me what I had eaten recently because

6    sometimes that can produce -- that can impact

7    the test.  So the medical review officer's

8    actually looking for any reason to validate why

9    the result would be positive, and you'd have

10   that conversation if there was something that I

11   had a prescription for.  So let's just say that

12   I had dental work and been given a prescription

13   and that's why I turned up positive for

14   something.  They would want to have a copy of

15   that prescription to prove that it's actually my

16   prescription and not someone else's and to prove

17   that it's current so the prescription, you know,

18   for whatever it is I'm taking is not

19   three-years-old.  Once they would receive any

20   validation, then my experience has been at that

21   point in time if there's a reason why this

22   person tested positive, then the company at that

23   point in time receives a negative result.  If

24   there is no validation as to why it is legally

TAMMY GILLETTE

Page 56

1    okay, then the company receives the positive

2    results, but that is after all of that has

3    happened with the medical review officer.  And

4    so the final results don't come specifically

5    from the agency who did it but the final results

6    come from the medical review officer.

7              Q.      And you are not -- you, yourself,

8    are not a medical review officer?

9              A.      No.  Oh, God.  No.

10             Q.      And you are not a toxicologist?

11             A.      Oh, correct.

12             Q.      And you do not work for Pottstown

13   Hospital?

14             A.      No.

15             Q.      So fair to say you don't know --

16   you don't have any firsthand knowledge of how

17   Pottstown Hospital handles their drug test?

18                     MS. FICARO:  Objection to form.

19                     THE WITNESS:  Am I okay to

20   answer?

21                     MS. FICARO:  You can answer.

22                     THE WITNESS:  Okay.  I don't

23   specifically know how Pottstown handles it, but

24   I know from all the places that I have worked,

TAMMY GILLETTE

Page 57

1    using different places for testing, the testing

2    procedures are the same.

3    BY MR. AUERBACH:

4           Q.        And in your experience, when

5    someone is given a drug test which includes a

6    battery for methamphetamine, if that person is

7    on a stimulant ADD medication, will they test

8    positive or not for methamphetamine?

9           A.        I don't know.  I don't know how

10   any specific drug is going to show up in a drug

11   test.  I'm not a doctor.

12          Q.        In your experience, if someone

13   has a prescription for some kind of

14   methamphetamine drug and shows the medical

15   review officer the valid prescription, will

16   their drug results indicate a positive or a

17   negative?

18                    MS. FICARO:  Objection to the

19   form.  You can answer.

20                    THE WITNESS:  To my knowledge, if

21   there is a legal reason for them to be taking

22   any medication that is current, we would receive

23   a negative.

24   BY MR. AUERBACH:

TAMMY GILLETTE

Page 58

1              Q.       And that would be for an FDA

2    approved federally licensed medication?

3                      **MS. FICARO:  Objection to form.**

4    **You can answer.**

5                      **THE WITNESS:  I guess.  I say it**

6    **that way because -- you know, let's say for**

7    **instance -- I don't know -- if I drank -- and I**

8    **don't know if this happened or not.  We'll be**

9    **clear about that.  But if I'm drinking lots of**

10   **sports drinks that's not FDA approved and I**

11   **don't know if it shows up in your blood, but if**

12   **it did, you know, I -- yeah, I don't know how to**

13   **answer that then, so --**

14   **BY MR. AUERBACH:**

15             Q.       What is -- what is your knowledge

16   of Pottstown Hospital's procedures when an

17   individual presents a medical marijuana card?

18             **A.       I don't have that knowledge.**

19             Q.       So you don't know whether or not

20   an individual who submits to a test who is a

21   medical marijuana patient presents the card if

22   the results would come back positive or

23   negative?

24             **A.       That has -- any testing needs to**

1  be authorized by somebody local.  And prior to

2  the acquisition, they had somebody who is

3  already established as the contact with

4  Pottstown, and so they had -- they had those

5  procedures on hand.

6          Q.      Would that have been Dave Furno?

7          A.      Furno, yes.

8          Q.      When you look at a drug test, are

9  you able to determine whether or not an

10  individual is a medical marijuana patient?

11          A.      No.  I should never know that

12  from the drug results that I'm given.  The only

13  reason I would know that is if that person who

14  took the drug test told me.

15          Q.      Okay.  Now, you were told that

16  Mr. Reynolds was a medical marijuana patient;

17  were you not?

18          A.      After he was terminated.

19          Q.      Who told you this?

20          A.      When Mr. Reynolds was terminated,

21  he informed Mr. Bonsky.

22          Q.      How do you know he told

23  Mr. Bonsky?

24          A.      Because after the conversation

TAMMY GILLETTE

Page 60

1      that the two of them had, Mr. Bonsky called me

2      up and said here is what Mr. Reynolds told me.

3      He told me he is a medical marijuana user.

4              Q.        And what did you do with that

5      information?

6              A.        I asked if he knew that ahead of

7      time or if anybody knew that ahead of time, and

8      he said no, no one was told.

9              Q.        But you were told right then and

10     there?

11             A.        After he was terminated, yes.

12             Q.        Was there anything stopping you

13     from revoking the termination?

14             A.        No, because that was not --

15     that's what brought everything to a head, but

16     that was not the only item of consideration that

17     led to the termination.

18             Q.        What other items led to the

19     termination?

20             A.        Well, from my understanding --

21     actually, what I knew was there had been some

22     attendance issues with Mr. Reynolds, either

23     arriving late or not arriving at all, taking

24     items home with him that he was not supposed to

TAMMY GILLETTE

Page 61

1    take with him and there was an item that -- I

2    don't know the specific circumstances -- but he

3    either took something home or had something that

4    was going to be needed at the plant and he

5    didn't drop it off until after the shift was

6    over and, you know, he said he wouldn't be

7    there.  He acknowledged that he had whatever it

8    was that was needed and said he would drop it

9    off sometime and it wasn't dropped off until

10   later.  Those are the issues that I was made

11   aware of.  I know that Mr. Bonsky and

12   Mr. Willert actually had other conversations

13   about other issues that I don't -- I don't know

14   the specifics of those and so I'm not going to

15   speak to those.

16          Q.      And obviously you don't have

17   firsthand knowledge of Mr. Reynolds' attendance

18   issues or him taking anything home; you've only

19   just been told this by other people?

20          A.      I've seen e-mails that

21   Mr. Reynolds sent.

22          Q.      And did you become aware of these

23   attendance issues before you found out that he

24   had failed his drug test?

TAMMY GILLETTE

Page 62

1      **A.**        **I honestly don't remember what**
2   **the order was.  I don't recall.**
3          Q.        You drafted Mr. Reynolds'
4   termination letter; did you not?
5      **A.**        **Yes, I did.**
6          Q.        Any reason why it didn't include
7   the attendance issues or the taking items home
8   with him in your letter?
9      **A.**        **Our practice at Willert is that**
10  **all employees -- I don't care what your position**
11  **is -- but all employees are brought in, I guess**
12  **you could say, on a probation.  I don't know if**
13  **it's ever worded that way with somebody other**
14  **than in our union contract, but attendance --**
15  **what it says -- and I don't even know how many**
16  **times I have said this -- but attendance is the**
17  **biggest reason why people are not kept as a new**
18  **hire.  When you are having attendance issues**
19  **within your first month, those are red -- that's**
20  **a huge red flag.  And I did not have every**
21  **instance of exactly what time he arrived.  I**
22  **mean, he didn't clock in, so I couldn't tell you**
23  **what time he got there or what time he left, any**
24  **of those things.  I did know that there were**

TAMMY GILLETTE

Page 63

1   attendance issues.  When we're terminating

2   somebody as a new hire, typically I do not

3   include all the reasons in the termination

4   letter, but we state that we are terminating

5   them effective today, which is September 3rd,

6   then here's what's going to happen.  So the fact

7   that we only stated the drug test, he already

8   knew the results of the drug test.  It was -- it

9   was a positive result.  And so to list the other

10  reason, in our opinion, wasn't necessary.

11          Q.       Had he not failed the drug test,

12  would you have fired him November 5, 2020?

13          A.       I don't know.  The reason that I

14  say that is because you put in there -- in your

15  question November 5th, and I know that there

16  were issues.  Would a termination have happened

17  on November 5th, would it have happened November

18  6th, the next week -- I'm not sure, but I do

19  know that because of the issues, it would have

20  led to termination.

21          Q.       But you would agree with me that

22  before he became aware that he failed the drug

23  test you were not planning on firing him?

24          A.       I know the word termination had

TAMMY GILLETTE

Page 64

1    not been mentioned, but typically the first

2    conversation that I have about a new employee

3    who has issues that first conversation is not,

4    well, are we terminating.  That's never the

5    first conversation.

6              Q.       Did anyone at Willert ask to see

7    Mr. Reynolds' marijuana card?

8              A.       I don't know.

9              Q.       Did you tell Mr. Bonsky to ask

10   for it?

11             A.       I asked him if Matt had ever

12   shown anyone.  So this was the day of the --

13   sorry about that -- after Jack's conversation

14   with Mr. Reynolds of the termination when the

15   medical marijuana was mentioned.  Again, I asked

16   Jack if he ever told anybody, if anybody had

17   ever seen it, if there was any knowledge, and

18   nothing.  Nothing had ever happened up until

19   that point.

20             Q.       Was there anything stopping you

21   from asking Mr. Bonsky to get a copy of it?

22             A.       At that point, because -- the

23   short answer is no, and that's because the --

24             Q.       Would it --

TAMMY GILLETTE

Page 65

1          MS. FICARO:  Excuse me, Steve.

2   She's not finished her answer.

3   BY MR. AUERBACH:

4          Q.       Please.  You can answer.

5          A.       Because the positive result was

6   not the only reason for the termination, showing

7   us the medical marijuana license would not have

8   changed his being terminated.

9          Q.       What were his attendance issues?

10          A.       He would be arriving late or not

11   at all or even just I might be there, which --

12   you know, if someone is, let's just say, having

13   some car issues and you're like, hey, I'm going

14   to be late, I'm not sure, I'm waiting for the

15   tow truck, I'll be in after that, that's -- you

16   know, I totally get that.  But then he was also

17   not -- so he wasn't at the facility, but he also

18   was not responding to any e-mails or phone calls

19   and he's got people who are waiting for

20   direction or waiting for answers, and they're

21   not being given the information that they need.

22   So if you're, in my example, waiting on a tow

23   truck, what's to stop you from responding to a

24   call or responding to an e-mail.

TAMMY GILLETTE

Page 66

1            Q.        On how many occasions was

2   Mr. Reynolds late?

3            A.        I can think of twice.  I'm not

4   sure if there were others.

5            Q.        Are you aware that Mr. Bonsky

6   didn't give Mr. Reynolds a set schedule?

7                      MS. FICARO:  Objection to form.

8   You can answer.

9                      THE WITNESS:  Mr. Reynolds was a

10  salaried individual, such as myself, and so I'll

11  speak to my schedule, because his would be

12  similar.  No one tells me that I have to be in

13  the office at a certain point in time, but I

14  know what is going on.  I know if there's

15  something -- okay.  Well, I have orientation and

16  they're going to be there at 7:00 and so I need

17  to make sure that I'm there by 7:00 so that --

18  or before then, actually, so that I can be there

19  when they arrive.  Mr. Reynolds' responsibility

20  was to the men who reported to him.  And if he

21  is not going to be there when he's needed, then

22  he needs to make sure that he is accessible.  So

23  he may not have been told, oh, you have to be

24  here at 6:47, but Mr. Reynolds would have known

TAMMY GILLETTE

Page 67

1    what was going on.  Or if this is a Wednesday --

2    today's Thursday, so wait a minute.  Yesterday I

3    know they were having problems with this, so I

4    need to make sure that I'm there at whatever

5    time so that if those problems start happening I

6    can address them.  He's the maintenance manager,

7    so it's his responsibility to know what he needs

8    to be there for.  So, yes, he would set his own

9    schedule, but to just willy-nilly kind of show

10   up whenever and not respond and take no

11   responsibility for the people who are waiting

12   for information -- if I did that, I know people

13   would have a problem with that.

14   BY MR. AUERBACH:

15           Q.        Mr. Reynolds was overtime exempt;

16   was he not?

17           A.        Yes, he was.

18           Q.        You say that very quickly.

19                     What makes you say that?

20           A.        I'm the one who put his offer

21   letter together.

22           Q.        And on what basis did you say he

23   was exempt from overtime?

24           A.        Because he had people reporting

TAMMY GILLETTE

Page 68

1    to him, he had decisions that had to be made

2    about are we going to make changes, do we need

3    to order parts, how much do we need to spend, so

4    we had a budget that he was responsible for.

5    Yes, he's going to be speaking with Mr. Bonsky

6    and with Bryan Willert about these items as

7    well, but ultimately it's his responsibility to

8    go to them and say, all right.  Here's what

9    changes we need to make.  And because of all the

10   responsibilities that he had, he is overtime

11   exempt.

12         Q.      That's because he's a manager?

13         A.      He's a manager with a lot of

14   responsibility, yes.

15         Q.      So his job was not to turn a

16   wrench; he was just to manage the people who

17   turn a wrench?

18              MS. FICARO:  Objection to form.

19   You can answer.

20              THE WITNESS:  I will put him in a

21   similar position to somebody that we have here

22   in St. Louis now.  Although Mr. Reynolds would

23   have had even more responsibility than what the

24   gentleman here in St. Louis does, he is

TAMMY GILLETTE

Page 69

1    directing our maintenance guys.  Hey, I need

2    this, I need that, but he is also right there

3    with our maintenance guys and he is assisting

4    because there are many times -- to be able to

5    know what needs to be done.  Do we need to just

6    change out the screw or do we need to order 10

7    different parts in order to make the change.

8    You know what, our plant here, Para, is a

9    chemical that we use, Paradichlorobenzene is the

10   official name, and there are some issues when

11   you have heat and humidity.  So it is this

12   gentleman's responsibility when we start having

13   some issues to say here's the changes that we

14   need to make in order to work around those

15   issues.  And many times you're going to do that

16   because you're actually in there doing this and

17   Mr. Reynolds would have had this same

18   responsibility.  He would have been in close

19   proximity, he would have been right there on the

20   equipment with the maintenance guy looking to

21   see what works, trying to figure things out.

22   And the only way that he's going to be able to

23   talk to a manufacturer or whoever it is about

24   parts is if he knows how everything is running,

Page 70

1    and the best way to do that is to get in there

2    and use your hands on that piece of equipment.

3    So he may not have been working on the equipment

4    -- or wait a minute.  His responsibility did not

5    include working on the equipment as much as the

6    men who reported to him, but that would have

7    been critical to his success on that job.

8    BY MR. AUERBACH:

9         Q.      Ms. Gillette, I'm not even going

10   to attempt to pronounce that chemical, but do

11   you have any firsthand knowledge as to whether

12   or not that chemical is at Douglassville?

13        A.      I do not believe that it is.

14   That does not mean that Mr. Reynolds does not

15   need to know the equipment, because Para is not

16   the only chemical that is used here.  And the

17   gentleman I spoke to here doesn't have to know

18   just the lines that used Para.  He has to know

19   every line that we've got here.  Mr. Reynolds

20   would have had the same responsibility.

21        Q.      All right.  You had said that you

22   were the one who put Mr. Reynolds' offer letter

23   together.

24        A.      Yes.

TAMMY GILLETTE

Page 71

1          Q.          Was it your understanding that

2     Mr. Reynolds had a base salary of $85,000 a

3     year?

4          **A.          It's been a long time since I put**

5     **that offer letter together, but if that's what**

6     **you're telling me was in the letter, then I'll**

7     **say yes.**

8          Q.          And he had a potential bonus of

9     $15,000 a year as well?

10         **A.          Potential, yes.**

11         Q.          And he had other benefits as

12    well, like a 401K?

13         **A.          As does everyone.**

14         Q.          Okay.  What other benefits would

15    he have had?

16         **A.          Well, to go back to the one that**

17    **you've already mentioned -- what we say for**

18    **anybody who is offered a bonus is that it is**

19    **only after the successful completion of -- and**

20    **then it will say -- sometimes it says a certain**

21    **length of time, but it always talks about**

22    **successful completion.  So it's not -- bonuses**

23    **are never guaranteed, without a doubt you're**

24    **going to get it.  The 401K, you mentioned that.**

TAMMY GILLETTE

Page 72

1    There are two criteria in order to be eligible

2    to participate.  You have to have worked 480

3    hours.  And once you've worked that, you are

4    able to contribute at the beginning of the next

5    quarter.  So if Mr. Reynolds started in October,

6    he may not have been eligible until April.  Just

7    depends on what the timing would have been, and

8    that would have been April the following year.

9    But it's not a required, and it's not anything

10   that automatically happened.  So whether or not

11   Mr. Reynolds would have participated or

12   contributed was entirely up to him, and we did

13   not have any paperwork yet on that.  We have

14   medical and vision benefits which go into effect

15   after 60 calendar days.  I believe Mr. Reynolds

16   started in October, which means that his

17   insurance would have gone into effect sometime

18   in December.  Usually ends up being almost two

19   months to the day.  There is short-term

20   disability that goes into effect after

21   completing six months of employment, but that's

22   only if you're out for your own medical reason,

23   and that's it.  Long-term disability would not

24   have gone into effect as of yet either.  And the

TAMMY GILLETTE

Page 73

1    company-paid life insurance goes into effect --

2    his actually would have gone into effect on

3    January 1st, because you have to be eligible for

4    the medical insurance, then it goes into effect

5    the first of the month after.  He was also

6    granted vacation.  I believe that he was given

7    four weeks vacation, which is outside of the

8    norm.  Normal is to start somebody out with two

9    or three weeks.  Those are the -- oh, we of

10   course have holidays.  I don't know if you

11   consider that necessarily benefits, but we've

12   got 10 paid holidays, so --

13                  MR. AUERBACH:  That is everything

14   I have for you.

15                  *   *   *   *   *

16             (Whereupon, at 1:03 p.m., the

17             deposition of TAMMY GILLETTE

18                was concluded.)

19                  *   *   *   *   *

20

21

22

23

24

TAMMY GILLETTE

Page 74

1      C E R T I F I C A T E

2

       COMMONWEALTH OF PENNSYLVANIA:
3
       COUNTY OF PHILADELPHIA:
4

5          I, Masheka Pettiford, a Notary Public within
       and for the County and State aforesaid, do
6      hereby certify that the foregoing deposition of
       TAMMY GILLETTE, was taken before me, pursuant to
7      notice, at the time and place indicated; that
       said deponent was by me duly sworn to tell the
8      truth, the whole truth, and nothing but the
       truth; that the testimony of said deponent was
9      correctly recorded in machine shorthand by me
       and thereafter transcribed under my supervision
10     with computer-aided transcription; that the
       deposition is a true record of the testimony
11     given by the witness; and that I am neither of
       counsel nor kin to any party in said action, nor
12     interested in the outcome thereof.

13

           WITNESS my hand and official of this 7th day
14     of September, 2021.

15

16

17     _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _
       MASHEKA C. PETTIFORD
18     Notary Public

19

20

21

22

23

24                     INSTRUCTIONS TO WITNESS

TAMMY GILLETTE

Page 75

1          Please read your deposition

2     over carefully and make any necessary

3     corrections.  You should state the reason in the

4     appropriate space on the errata sheet for any

5     corrections that are made.

6               After doing so, please sign the

7     errata sheet and date it.

8               You are signing same subject to

9     the changes you have noted on the errata sheet,

10    which will be attached to your deposition.

11              It is imperative that you

12    return the original errata sheet to the deposing

13    attorney within thirty (30) days of receipt of

14    the deposition transcript by you.  If you fail

15    to do so, the deposition transcript may be

16    deemed to be accurate and may be used in court.

17

18

19

20

21

22

23

24

TAMMY GILLETTE

Page 76

1                    - - - - - - - -

2              E R R A T A

3                    - - - - - - - -

4   PAGE        LINE      CHANGE

5   _ _ _ _    _ _ _    _ _ _ _ _ _ _ _ _ _ _ _

6   Reason for Change:_____

7   _ _ _ _    _ _ _    _ _ _ _ _ _ _ _ _ _ _ _

8   Reason for Change:_____

9   _ _ _ _    _ _ _    _ _ _ _ _ _ _ _ _ _ _ _

10  Reason for Change:_____

11  _ _ _    _ _ _    _ _ _ _ _ _ _ _ _ _ _ _

12  Reason for Change:_____

13  _ _ _ _    _ _ _    _ _ _ _ _ _ _ _ _ _ _ _

14  Reason for Change:_____

15  _ _ _ _    _ _ _    _ _ _ _ _ _ _ _ _ _ _ _

16  Reason for Change:_____

17  _ _ _ _    _ _ _    _ _ _ _ _ _ _ _ _ _ _ _

18  Reason for Change:_____

19  _ _ _ _    _ _ _    _ _ _ _ _ _ _ _ _ _ _ _

20  Reason for Change:_____

21  _ _ _ _    _ _ _    _ _ _ _ _ _ _ _ _ _ _ _

22  Reason for Change:_____

23  _ _ _ _    _ _ _    _ _ _ _ _ _ _ _ _ _ _ _

24

BISNOW & JOSEPH
COURT REPORTING

TAMMY GILLETTE

Page 77

1              ACKNOWLEDGMENT OF DEPONENT

2          I, _ _ _ _ _ _ _ _ _ _ _ _ , do hereby

3    certify that I have read the foregoing pages,_ _

4    _ _ _ _ and that the same is a correct

5    transcription of the answers given by me to the

6    questions therein propounded, except for the

7    corrections or changes in form or substance, if

8    any, noted in the attached Errata Sheet.

9    _____        _____

10   DATE                   SIGNATURE

11

12   Subscribed and sworn to before me this

13   _ _ _ _ _ day of  _ _ _ _ _ _ _ _ _  ,

14   202 _ _ .

15   My commission expires: _ _ _ _ _ _ _ _

16

17   --------------------

18   Notary Public

19

20

21

22

23

24

TAMMY GILLETTE

**A**

A's 10:23
a.m 1:14
AAIM 10:21
   11:9,19
able 16:21 21:6
   49:9 51:24
   59:9 69:4,22
   72:4
absence 14:17
abuse 30:23
   31:14 46:18
access 45:14
accessible 66:22
accidents 41:18
accuracy 5:8
accurate 75:16
acknowledged
   61:7
ACKNOWLE...
   77:1
acquire 43:10
acquired 43:12
acquiring 43:20
acquisition 59:2
Act 36:11 38:7
   38:11,15
action 74:11
Acts 38:19
ADD 57:7
adding 45:21
addition 54:19
additional 44:5
address 67:6
addressed 35:18
   35:19
administering
   32:11
advance 20:20
advice 20:20
affirmative 7:1
aforesaid 74:5
after-the-fact
   20:6
agencies 54:9,9

agency 56:5
ago 32:21
agree 6:18 28:16
   63:21
ahead 21:7
   52:14 53:1
   60:6,7
ahold 51:22
aligned 27:10,12
   27:13
allegations 48:2
annual 10:17
answer 4:3
   15:13,22 16:14
   18:9 20:12
   23:6 32:14,15
   36:19 39:8,9
   39:10 47:1
   49:5 50:20
   56:20,21 57:19
   58:4,13 64:23
   65:2,4 66:8
   68:19
answers 7:2
   65:20 77:5
anticipate 30:24
   31:3,21
anticipated
   21:13
antidiscrimin...
   15:11 16:11,19
   17:23 18:2,7
   18:17 22:2
   29:16 30:1
   32:12 48:17
anybody 18:19
   19:6,7 35:15
   60:7 64:16,16
   71:18
anytime 39:15
   51:16 52:8
apologize 8:17
   10:21
appears 12:21
applies 8:19
   48:13

apply 48:18,20
appreciate
   21:12,15 34:14
appropriate
   75:4
approved 58:2
   58:10
approximately
   13:3 15:3
   42:10 46:1
April 72:6,8
area 27:19
areas 28:1
Armstrong
   10:14 11:9,16
   11:18
arose 22:3
arrive 66:19
arrived 23:14
   62:21
arriving 60:23
   60:23 65:10
ASAP 23:23
asked 6:11 33:4
   50:22 51:3,5
   60:6 64:11,15
asking 9:21
   18:20 48:24
   49:1 64:21
aspect 17:11,13
aspects 17:14
assertion 42:22
assigned 14:19
assist 7:18
assisting 69:3
association
   10:23
attached 75:10
   77:8
attempt 70:10
attend 7:20
   10:18 18:6
attendance
   11:12 34:15
   60:22 61:17,23
   62:7,14,16,18

63:1 65:9
attended 10:8
   11:6,8,20
attending 45:11
   46:15
attention 29:8
attorney 75:13
Auerbach 2:3,3
   3:4 5:2,15,24
   6:2,17 15:15
   16:16 18:14
   21:10 24:24
   25:5,17 33:19
   36:14,22 37:8
   39:22 44:19
   45:4 47:7,17
   47:24 49:14
   57:3,24 58:14
   65:3 67:14
   70:8 73:13
Auerbach.stev...
   2:5
authorized 59:1
automatically
   72:10
Ave 2:4
avenues 27:18
aware 10:1 19:5
   22:20 29:24
   35:23 36:1
   37:9 38:6,9,13
   38:17 49:24
   50:7,12 52:15
   61:11,22 63:22
   66:5

**B**

B 3:7
bachelor's 7:23
   7:24 8:5
back 8:24 13:18
   15:16 21:3
   34:6 47:20
   58:22 71:16
bad 34:9 35:24
   40:8

base 20:2 37:15
   38:5 71:2
based 10:7,20
   39:24 49:11
basis 14:18
   67:22
bathroom 47:18
battery 57:6
beginning 46:14
   72:4
believe 13:5
   32:18 44:6
   50:10,18 70:13
   72:15 73:6
Bell 2:9
benefit 7:5
benefits 71:11
   71:14 72:14
   73:11
best 14:18 70:1
biggest 62:17
Bill 22:15,16,18
   22:19 32:20
BISNOW 1:20
Bisnowandjos...
   1:22
bit 28:9 51:1
blog 46:9
blood 58:11
Blue 2:9
boiling 34:17
Bonsky 17:23
   18:6,16 22:1
   24:2 26:2 35:4
   35:8,20 36:10
   36:16,24 37:4
   50:15,16 59:21
   59:23 60:1
   61:11 64:9,21
   66:5 68:5
bonus 71:8,18
bonuses 71:22
book 30:10 31:7
boss 13:24
branch 39:2
brand 30:10

TAMMY GILLETTE

break 47:18
48:3
Brian 22:5,9
24:9,18
bridge 37:23
brief 23:22
47:22
bringing 32:21
brought 29:7
60:15 62:11
Bryan 22:4,11
22:19 24:9,18
35:22,24 36:3
51:13,17,23,24
52:1,3,6,10
53:3 68:6
buck 16:10
budget 68:4
business 22:23
buy 46:8

**C**

C 1:14 2:1 74:1
74:1,17
calendar 72:15
call 23:21,23
34:2 39:2
50:14 65:24
called 45:14
60:1
calling 18:19
calls 65:18
capacity 29:15
32:11 35:4,15
car 65:13
card 39:5,12
58:17,21 64:7
care 9:13 20:10
40:9,11 62:10
carefully 75:2
CDC 44:8
certain 66:13
71:20
certainly 14:3
32:6
certification

9:11
certifications
7:18 8:8,10,16
9:20
certify 74:6 77:3
CFO 22:10
change 10:2
21:2 30:1 44:6
45:17 69:6,7
76:4,6,8,10,12
76:14,16,18,20
76:22
changed 21:3
43:6 44:4 65:8
changes 9:13
25:23 26:2
68:2,9 69:13
75:9 77:7
changing 31:18
chemical 69:9
70:10,12,16
circumstances
61:2
clause 48:12
clear 58:9
client 10:16
11:14
clock 62:22
close 69:18
coach 16:6
coaching 34:10
college 7:20
come 8:23 14:17
19:13 30:5
56:4,6 58:22
comes 19:9 54:4
54:7
coming 20:8
25:23 26:3
31:16 39:16
commencing
1:13
commission
77:15
Commonwealth
1:16 74:2

commute 37:22
comp 14:16
40:21
companies
54:13
company 26:19
29:14,19 38:5
38:21 47:16
54:10 55:22
56:1
company-paid
73:1
compare 26:17
complaints 50:1
completely 20:2
26:18
completing
72:21
completion
71:19,22
compliance
16:11
compliant 15:10
computer-aided
74:10
concern 26:22
26:24
concluded 73:18
conditions 31:6
31:9,16
connection 6:5
consider 73:11
consideration
60:16
considered
30:15 51:11
consistency 19:8
19:22
consistent 19:17
26:20
construction
48:7
contact 59:3
continue 41:11
continued 21:1
continues 10:2

contract 62:14
contribute 72:4
contributed
72:12
conversation
33:1 35:22
47:14 54:21
55:10 59:24
64:2,3,5,13
conversations
9:17 17:3,5
18:11,15 20:5
20:6 21:22
22:1,6,8 23:7
23:19 24:7,13
25:2,12,19,24
26:1,7,9 34:10
35:13 40:23
45:8 47:8 48:2
61:12
copy 41:19
55:14 64:21
correct 5:7 7:6
20:2 25:4
38:24 43:8
45:2 49:17
56:11 77:4
correcting 36:2
corrections 5:6
75:3,5 77:7
correctly 74:9
cost 11:15,21,24
counsel 2:6,11
16:6 74:11
counter 53:20
country 12:13
12:21
county 44:9 74:3
74:5
course 73:10
courses 8:14,16
9:24 10:3
court 1:1,20
15:15 75:16
COVID 9:13,15
10:5,7,9 14:19

20:24 21:13
24:19 43:19,22
44:3,24,24
crafting 29:15
29:20
cranberries
53:20
create 30:10
33:16
created 10:10
42:11
creating 30:8
crisis 40:13,14
criteria 72:1
critical 70:7
crux 31:13
current 55:17
57:22
currently 30:14
cut 40:5 41:12
41:15,16
cycle 14:12

**D**

D 3:1 53:20
database 45:15
date 1:14 46:2,4
50:9,10 75:7
77:10
dates 25:21
Dave 59:6
day 42:1 51:7,7
64:12 72:19
74:13 77:13
days 72:15
75:13
deadlines 44:15
deal 40:13
dealing 17:18
dealt 20:19
40:14
Debbie 26:9
December 72:18
decision 49:12
decisions 68:1
deemed 75:16

TAMMY GILLETTE

**Defendant** 1:8
2:11
**definitely** 28:5
42:3
**definition** 48:24
**degree** 7:23,24
8:6
**degrees** 7:17,22
8:6
**delay** 36:21
**dental** 55:12
**depending**
35:19 54:9
**depends** 20:15
37:23 72:7
**deponent** 74:7,8
77:1
**deposed** 7:7
**deposing** 75:12
**deposition** 1:12
4:1 5:4,7,11
6:5 73:17 74:6
74:10 75:1,10
75:14,15
**DESCRIPTI...**
3:9
**detail** 18:24
**details** 33:11
**determine** 39:19
39:21 59:9
**development**
10:13
**Dick** 19:11,12
**difference** 13:13
**different** 8:14
8:15 10:3,24
26:18,22 28:14
28:15 31:5,9
31:12 42:17
57:1 69:7
**differently**
19:12
**dip** 54:6,15
**directing** 69:1
**direction** 4:3
65:20

**disability** 72:20
72:23
**discipline** 14:14
**discriminate**
23:10 24:3
25:8,14 33:8
**discrimination**
19:10 23:3
29:21 33:5,18
36:17 37:1,5
49:3,10
**discuss** 36:10,16
51:23
**discussed** 25:12
27:17 42:16
**discussion** 32:17
34:7,17 44:1
51:2
**dispute** 42:22
**distant** 44:15
**DISTRICT** 1:1
1:2
**diverse** 27:16,20
28:1,4,6,12
**diversity** 28:9
28:14,20
**docket** 44:23
**doctor** 49:9
57:11
**documentation**
35:11 50:22
**DOCUMENTS**
4:7
**doing** 13:11,14
20:16 26:13,16
26:18,22 34:22
51:16 69:16
75:6
**DOLOWICH**
2:8
**dosage** 53:18
**doubt** 23:20
42:22 43:3
71:23
**Douglassville**
27:19,24 28:3

28:10 35:21
70:12
**draft** 31:21
**drafted** 62:3
**drank** 58:7
**draw** 28:8
**drinking** 58:9
**drinks** 58:10
**Drive** 2:9
**drop** 61:5,8
**dropped** 61:9
**drug** 42:7 43:5
44:24 45:6
46:3,23 47:9
50:8,13 53:5,7
53:11,12,13,24
56:17 57:5,10
57:10,14,16
59:8,12,14
61:24 63:7,8
63:11,22
**drugs** 49:22
**duly** 5:19 74:7
**duties** 14:7,8,19

---
                E
---
**E** 2:1,1 3:1,7
74:1,1 76:2
**e-mail** 65:24
**e-mails** 23:20,22
61:20 65:18
**earlier** 18:18
34:7 42:16
**early** 13:19 22:7
**EASTERN** 1:2
**eaten** 55:5
**Ed** 24:11
**education** 10:13
19:15
**EEO** 48:14
**effect** 41:3 72:14
72:17,20,24
73:1,2,4
**effective** 63:5
**Eficaro@kdvl...**
2:10

**Eileen** 2:8 5:12
15:24
**either** 7:3 60:22
61:3 72:24
**elaboration** 36:8
**eligible** 72:1,6
73:3
**else's** 55:16
**employ** 29:5
**employee** 14:11
14:13 16:9
34:21,22 39:4
41:7,21 42:1,4
64:2
**employees** 13:22
15:1 23:11
24:3 25:8,14
32:4,20 33:2
34:9 35:11
44:5,11,16
62:10,11
**employment**
10:17 48:9,12
72:21
**encourage** 16:7
**ends** 72:18
**Enrolling** 14:16
**ensure** 48:9
**entire** 18:23
**entirely** 72:12
**environment**
33:16
**envision** 41:5
**equal** 48:9,11
**equipment**
69:20 70:2,3,5
70:15
**errata** 5:6 75:4
75:7,9,12 77:8
**ESQ** 2:3,8
**established**
23:16 59:3
**evaluation** 54:8
**everybody**
17:17 33:6,13
**evolve** 21:2,5

**exact** 14:23
**exactly** 8:13
62:21
**EXAMINATI...**
5:22
**examined** 5:19
**example** 26:4
40:17 41:9,10
41:11 65:22
**Excuse** 65:1
**exempt** 67:15,23
68:11
**EXHIBIT** 3:9
**exhibits** 3:12
**expect** 32:19
**expectation**
33:12
**expectations**
33:15 34:16
**experience**
39:15 55:20
57:4,12
**expires** 77:15
**explains** 54:12
**explanation** 7:3
**exposed** 44:12
**external** 17:16
**Externally**
18:10

---
                F
---
**F** 74:1
**face** 21:20
**facilities** 44:13
**facility** 26:7
40:24 65:17
**fact** 10:1 20:23
21:14,17,22
32:7 52:24
63:6
**factor** 9:16
41:23 42:5
49:12
**fail** 75:14
**failed** 50:8,13
53:4 61:24

TAMMY GILLETTE

63:11,22
**fails** 53:8
**fair** 19:23 25:1
  56:15
**fairly** 23:6
**family** 22:23
**far** 37:22
**fault** 41:17
**FDA** 58:1,10
**February** 21:3
**federally** 58:2
**FICARO** 2:8
  5:14 6:15
  15:12,21 16:13
  18:8 20:11
  24:4 25:3,15
  32:13,15 36:12
  36:18 37:6
  39:7,9 45:3
  46:24 47:3
  49:4 56:18,21
  57:18 58:3
  65:1 66:7
  68:18
**figure** 69:21
**filed** 6:3
**fill** 39:18 46:10
**filled** 40:12
**final** 31:21 56:4
  56:5
**finalized** 30:6
  32:3
**find** 41:14
**fine** 8:18
**finger** 40:5
  41:12
**finished** 65:2
**fired** 63:12
**firing** 63:23
**firmly** 32:18
**first** 7:10 24:8
  39:11 40:13
  62:19 64:1,3,5
  73:5
**firsthand** 56:16
  61:17 70:11

**five** 17:21 44:6
**flag** 62:20
**flip** 34:14
**flying** 24:17
**focus** 10:10
  11:11 12:11
  34:24 44:6
**focuses** 10:12
**folks** 16:23,23
**follow** 52:20
**followed** 16:19
**following** 72:8
**follows** 5:20
  35:5,8
**foregoing** 74:6
  77:3
**form** 5:9 6:15
  14:12 15:12,22
  16:13 18:8
  20:11 24:4
  25:3,15 32:13
  36:12,18 37:6
  39:7 45:3
  46:24 49:4
  56:18 57:19
  58:3 66:7
  68:18 77:7
**formulating**
  29:15,20
**forward** 24:22
**forwarded**
  50:24
**found** 61:23
**four** 5:2,8 73:7
**freak** 41:18
**free** 12:2 33:17
**Friday** 1:10
**functions** 13:11
  13:14
**Furno** 59:6,7
**further** 54:8,11
  54:14,15

———————
**G**
———————
**gender** 28:20
**general** 9:23,23

11:3 12:8
  14:17 17:2,10
  17:11,16 19:21
  21:19 22:2
  48:11
**generic** 45:18
**gentleman**
  68:24 70:17
**gentleman's**
  69:12
**getting** 17:19
  44:17
**Gillette** 1:12 3:3
  5:18 6:1 36:6
  42:19 44:20
  48:1 70:9
  73:17 74:6
**give** 8:19 12:23
  16:18 20:19,20
  21:11,14 23:2
  25:20,21 26:13
  32:1 37:4 66:6
**given** 55:12 57:5
  59:12 65:21
  73:6 74:11
  77:5
**go** 9:23 16:22
  33:11 36:5
  45:8 53:1,13
  68:8 71:16
  72:14
**goal** 43:18
**God** 56:9
**goes** 22:18 40:15
  52:19 54:14
  72:20 73:1,4
**going** 7:2 8:12
  12:12 13:22
  17:7,13,17,19
  18:21 19:14,21
  21:5,6 23:8
  24:15 26:5,6,8
  26:15 31:20,22
  32:22 33:17
  36:6 38:1
  40:19 45:9,21

53:14 54:6
  57:10 61:4,14
  63:6 65:13
  66:14,16,21
  67:1 68:2,5
  69:15,22 70:9
  71:24
**good** 6:1 34:4,5
  34:6,8,9 35:24
  41:22
**gosh** 11:1
**gotten** 46:7
**granted** 73:6
**grants** 13:23
**great** 26:14
  34:11,13 41:24
**group** 10:20
**guarantee** 20:16
**guaranteed**
  71:23
**guess** 12:24
  14:18 58:5
  62:11
**guidance** 21:19
  22:2
**guidelines** 30:10
  31:7
**guy** 69:20
**guys** 26:16 48:7
  69:1,3

———————
**H**
———————
**H** 3:7
**half** 54:3,3,4
**hand** 59:5 74:13
**handbook** 45:10
  45:11,16,18
  46:13,14 47:15
**handicapped**
  28:22
**handle** 18:21
  36:4,4,8
**handled** 17:7
**handles** 56:17
  56:23
**hands** 70:2

**happen** 21:6
  39:19 41:18
  52:10 63:6
**happened** 19:7
  19:18 21:1,22
  25:22 30:19
  39:18 43:1,4
  43:19,22 44:3
  56:3 58:8
  63:16,17 64:18
  72:10
**happening** 67:5
**happens** 20:14
  34:19 39:3
  51:17
**harass** 33:10
**Harry** 19:11,12
**Harvest** 2:9
**head** 6:24 60:15
**headquarters**
  37:16 38:6
**hear** 35:13,16
**heard** 20:1,17
  35:24 44:22
  50:6 51:4
**hearing** 20:3
**heat** 69:11
**held** 1:13
**help** 13:12 46:10
**hesitation** 8:11
**hey** 24:15 34:11
  34:14 35:24
  52:16 53:17
  65:13 69:1
**hi** 39:14
**high** 50:1,2
**hire** 28:1 32:17
  53:1 62:18
  63:2
**hired** 24:6 51:12
  52:17
**hires** 33:1
**hiring** 13:20
  14:14 26:5
  27:3,9,15,19
  28:4

TAMMY GILLETTE

history 19:2
   42:2
hit 44:24
hold 54:3
holidays 73:10
   73:12
home 60:24 61:3
   61:18 62:7
honestly 15:24
   16:20 25:20
   26:8,14 42:23
   46:4,18 62:1
Hospital 56:13
   56:17
Hospital's 58:16
hour 11:6
hours 72:3
HR 8:14,15 9:4
   9:6,23,24 11:3
   13:9,10,11,14
   13:14,17,20
   14:4,6,9 16:3
   20:16 26:10
   45:15 46:13
huge 41:2 62:20
human 7:13 9:9
humidity 69:11
hump 24:19
hurt 40:4

                I
ideas 26:13,14
identified 54:23
Illinois 37:21
impact 55:6
imperative
   75:11
implementing
   12:19
implication
   12:20 40:21
implications
   40:23
important 19:8
   19:13,20 26:11
   32:22

impressed 14:24
in-depth 33:1
inaugural 13:17
incident 41:21
   42:6
include 15:4
   28:20,22 29:1
   31:7,21 62:6
   63:3 70:5
includes 28:17
   57:5
including 33:18
INDEX 4:1
indicate 53:17
   57:16
indicated 74:7
individual 58:17
   58:20 59:10
   66:10
influence 49:22
   50:5
informal 25:2
   25:12
information
   12:13,16 13:21
   17:19 20:20
   21:7,11,14
   40:1 45:10,12
   46:10,17 50:24
   60:5 65:21
   67:12
informed 59:21
initial 40:14
   54:12
initially 13:16
   24:6 43:21
injury 40:9,16
inquire 53:4,8
instance 17:14
   20:24 30:17
   31:18 34:6
   53:16,20 54:22
   58:7 62:21
instances 16:24
   20:21 44:9
institutes 9:3

instruction 8:18
   20:18
INSTRUCTI...
   74:24
insurance 9:14
   9:18 10:5
   14:16 40:21
   72:17 73:1,4
intent 19:24
interested 74:12
internal 17:2,10
   17:12,15
Internally 18:11
interviewing
   14:13
Intoxicated 50:4
introducing
   23:14
introduction
   24:11
investigation
   41:14
involved 14:15
   16:1 17:3 22:6
   26:9 29:14,20
   32:10 33:22
   34:5 35:3
   54:16,17
involvement
   35:7
involves 14:11
   14:12
issue 17:6 20:8
   22:3 35:17
issues 19:9 33:7
   34:18 52:23
   60:22 61:10,13
   61:18,23 62:7
   62:18 63:1,16
   63:19 64:3
   65:9,13 69:10
   69:13,15
it'll 24:14,15
item 18:20 60:16
   61:1
items 35:9 60:18

60:24 62:7
   68:6
─────────
                J
Jack 17:23 18:6
   18:16 22:1
   24:2,5,10,10
   26:2 35:4,8,14
   36:10,16,24
   37:4 52:4
   64:16
Jack's 64:13
January 73:3
job 34:12 42:1
   50:1,2,5 68:15
   70:7
JOSEPH 1:20
─────────
                K
KAUFMAN 2:8
keep 24:16 42:4
   44:11
keeping 34:8
Kennet 24:12
Kenova 23:13
   23:15 24:21
   31:10
kept 44:16 62:17
key 19:22 41:23
kin 74:11
kind 16:17 17:5
   23:1 26:1
   33:23 41:17,17
   46:7,12 51:2
   52:6,11,11,13
   54:6 57:13
   67:9
knew 8:12 15:24
   47:4,11 48:22
   60:6,7,21 63:8
know 7:4 8:23
   10:23 16:5,22
   17:22 18:4,12
   18:23 19:2
   21:4,5 22:4
   23:6 27:9

31:24 32:9,19
   33:4,12 34:12
   37:2 40:4,6,7
   41:13,15 42:1
   42:23 43:1,3,4
   46:5,8,17,18
   46:20,21 50:9
   51:3,11,17,19
   51:20 52:7,12
   52:14,15,16,20
   53:18,19 54:16
   54:16,23,24
   55:2,17 56:15
   56:23,24 57:9
   57:9 58:6,7,8
   58:11,12,12,19
   59:11,13,22
   61:2,6,11,13
   62:12,15,24
   63:13,15,19,24
   64:8 65:12,16
   66:14,14 67:3
   67:7,12 69:5,8
   70:15,17,18
   73:10
knowledge 29:5
   29:9 56:16
   57:20 58:15,18
   61:17 64:17
   70:11
known 26:5
   52:17 66:24
knows 69:24
─────────
                L
labor 10:17
late 45:13 60:23
   65:10,14 66:2
law 2:3 10:15
   35:5,8 42:23
laws 10:1 12:20
   15:11 16:12,19
   19:16 31:24
   42:17
lawsuit 6:3,5
lawyer 48:23

TAMMY GILLETTE

lawyers 31:23
Leadership 8:2
learn 19:14
learning 44:7
leave 14:16
led 60:17,18
  63:20
left 62:23
legal 22:17
  48:24 49:8,8
  57:21
legalized 42:20
  43:6
legally 19:4
  55:24
legislation 12:23
length 71:21
let's 40:8 47:18
  55:11 58:6
  65:12
lethal 44:17
letter 62:4,8
  63:4 67:21
  70:22 71:5,6
letters 10:22
license 40:7,19
  41:19,20 65:7
licensed 58:2
life 14:12 20:22
  73:1
line 4:4,8,12,16
  27:11 70:19
  76:4
lines 9:15 25:21
  35:12 70:18
list 63:9
live 37:17,18,20
  37:21
living 44:5
LLC 1:7
LLP 2:8
local 59:1
located 28:10
location 15:8
  28:4
locations 30:11

35:16
locations' 47:5
long 7:14 13:8
  20:17 71:4
Long-term
  72:23
look 13:16 24:22
  27:16 32:22
  38:2 39:14
  42:16 46:6,9
  49:11 51:2
  59:8
looking 28:1
  30:13 31:15,16
  40:18 45:12
  46:16 55:2,8
  69:20
lot 10:6 12:1
  14:6,20 16:3,4
  17:20 18:23
  23:21 26:5
  31:19 68:13
lots 58:9
Louis 8:4 10:16
  10:21 23:13,17
  26:16 27:4,6
  27:15,23 28:6
  28:7 37:14,18
  68:22,24

_____ M _____
machine 74:9
maintenance
  67:6 69:1,3,20
major 43:18
majority 10:8
making 15:10
  19:15 27:10
  35:4,8 44:10
  44:16
manage 68:16
management
  8:2 9:9
manager 7:13
  14:9 17:19
  21:20 23:12,16

23:18 67:6
  68:12,13
managers 16:18
  23:2,10 39:2
manufacturer
  69:23
manufacturing
  30:17
map 38:2
marijuana 12:4
  12:6,8,17,20
  29:1,6,10
  30:21 31:4,8
  36:11,17 37:1
  37:5 38:7,11
  38:14,19,23
  39:5 40:7,19
  41:7,13,19
  42:21 43:7
  45:24 46:19,23
  48:10,14,16,18
  48:21 49:3,7
  50:5,18 55:2
  58:17,21 59:10
  59:16 60:3
  64:7,15 65:7
marked 3:12
  4:15
Masheka 1:14
  74:5,17
Matt 51:3,4,5,6
  51:8 52:20
  64:11
matter 19:4
matters 18:17
  22:2
Matthew 1:4 6:3
mean 7:5 12:21
  13:15 17:9
  20:23 21:19
  26:21 28:7
  40:3 49:3
  62:22 70:14
meaning 17:16
meaningful
  42:14

means 28:14
  33:3 54:2
  72:16
medical 9:13,14
  10:4 12:4,5,17
  12:19 29:1,6
  29:10 30:21
  31:4,8 36:11
  36:16 37:1,4
  38:7,10,14,18
  38:23 39:5
  40:7,10,11,19
  41:7,13,19
  42:20 43:6
  45:24 46:19,22
  48:10,14,16,18
  48:21 49:2,7
  49:10 54:20
  55:7 56:3,6,8
  57:14 58:17,21
  59:10,16 60:3
  64:15 65:7
  72:14,22 73:4
medication
  53:16,17 54:24
  55:4 57:7,22
  58:2
meeting 24:22
member 11:22
  11:24 13:1,4
memory 8:22
men 66:20 70:6
mentioned
  17:14 18:18
  51:9 52:12
  64:1,15 71:17
  71:24
met 24:17 35:21
  49:15
methampheta...
  57:6,8,14
MFG 1:7
minor 22:21
minus 14:22
minute 67:2
  70:4

minutes 11:5
  37:24
misremember...
  21:18
missed 31:23
missing 30:15
  46:11
Missouri 31:18
  37:11,20 38:4
  38:5,6,6
modified 43:21
  46:19
modify 45:16
Montgomery
  2:4
month 24:8
  62:19 73:5
months 72:19,21
morning 6:1
  34:8
mouth 23:8
moving 12:22

_____ N _____
N 2:1 3:1
name 6:2 22:17
  69:10
names 8:17
Narberth 2:4
National 8:4
necessarily
  73:11
necessary 63:10
  75:2
need 14:23 19:4
  19:5,18,19
  26:6,17,19
  36:7 40:24
  47:14 52:20
  65:21 66:16
  67:4 68:2,3,9
  69:1,2,5,6,14
  70:15
needed 46:22
  47:5,10 51:22
  61:4,8 66:21

TAMMY GILLETTE

needs 34:15 36:2
45:10 58:24
66:22 67:7
69:5
negative 55:23
57:17,23 58:23
neither 74:11
never 7:9 17:8
19:18 20:19
25:9 34:20
49:15,21,23
50:6 53:6
59:11 64:4
71:23
new 12:19 30:10
30:22,24 31:3
33:1 53:1
62:17 63:2
64:2
nitty-gritty 40:3
norm 73:8
normal 52:7
73:8
Notary 1:16
74:5,18 77:18
noted 75:9 77:8
notes 34:8
notice 20:21
54:10 74:7
November
48:21 63:12,15
63:17,17
number 14:23
numerous 22:5

**O**

objected 15:21
Objection 6:15
15:12 16:13
18:8 20:11
24:4 25:3,15
32:13 36:12,18
37:6 39:7 45:3
46:24 49:4
56:18 57:18
58:3 66:7

68:18
objections 5:9
obligation 6:7
6:10,13 35:17
obtain 7:22
obviously 23:17
37:17 38:13
49:6 61:16
occasions 66:1
occurred 44:1
October 36:9,15
36:23 37:3
72:5,16
off-the-record
43:24
offer 67:20
70:22 71:5
offered 71:18
office 2:3 10:15
66:13
officer 54:21
56:3,6,8 57:15
officer's 55:7
official 69:10
74:13
oh 11:1 17:7
27:3 28:18
39:14 40:6
56:9,11 66:23
73:9
okay 6:23 9:1,2
15:23 19:16,19
32:16 40:11,18
47:1,17 48:5
56:1,19,22
59:15 66:15
71:14
once 24:10,18
40:14 43:22
44:3 55:19
72:3
ones 10:19 11:8
11:21 24:17
30:14 48:6
ongoing 17:6
open 44:13

operation 15:5
operations
38:18
opinion 63:10
opportunities
48:9
opportunity 5:4
5:5 48:12
Oral 1:12
order 62:2 68:3
69:6,7,14 72:1
organization 9:6
organizations
9:3
orientation
66:15
oriented 38:3
original 75:12
outcome 74:12
outcomes 39:24
outside 16:24
17:13 73:7
overall 30:9
oversight 52:15
overtime 67:15
67:23 68:10
owner 22:12
owners 22:13,14
22:20,22

**P**

P 2:1,1
p.m 73:16
PA 2:4,9
page 3:9 4:4,8
4:12,16 26:12
76:4
pages 77:3
paid 73:12
pandemic 44:12
paperwork
40:12 72:13
Para 69:8 70:15
70:18
Paradichloro...
69:9

parenting 13:17
part 12:10 16:6
17:4 30:22
31:9 42:18
43:2 45:20
participate 72:2
participated
72:11
partly 35:21
parts 68:3 69:7
69:24
party 74:11
patient 29:11
36:17 37:1
38:7,14 39:3,4
39:5 41:7
48:17 49:3,7
58:21 59:10,16
patients 29:2,6
38:23 48:10,18
48:20,21
pause 51:1
pay 11:13,13
pays 11:12
Pennsylvania
1:2,17,21
18:19 24:20,21
26:10 27:8
31:11,12 36:11
37:10 38:14
42:20,24 43:6
43:11,12,20
47:6 74:2
Pennsylvania's
46:22
people 13:21
14:6,10 16:1,3
16:5 17:4,5,21
28:15,23 61:19
62:17 65:19
67:11,12,24
68:16
percent 38:17
performance
41:21
period 49:23

periodic 24:16
periodically
9:22 10:3
24:13 33:2
person 16:20
17:12 40:3,10
40:18 54:22
55:22 57:6
59:13
person's 41:12
pertinent 15:18
Pettiford 1:15
74:5,17
Philadelphia
1:21 28:11
74:3
phone 49:19
50:14,23 65:18
phrase 34:11
physically 44:11
piece 70:2
pieces 46:11
pike 31:17
place 19:19 21:3
23:3,13 27:23
41:1 42:6
43:22 44:11,15
74:7
places 27:22
56:24 57:1
Plaintiff 1:5 2:6
plan 9:18 21:8
planning 63:23
plant 16:18
17:18 23:2,10
23:12,16,18
25:7,22 39:2
61:4 69:8
plants 37:10
play 19:9
plays 9:15
please 5:16
15:16 23:21,23
65:4 75:1,6
plus 14:22
point 8:22 18:22

24:12,23 34:17
41:12,20,22
42:3 46:20
52:7,19,21
53:3 54:1
55:21,23 64:19
64:22 66:13
points 17:20
policies 25:13
29:16,21 30:1
30:4,7,13,21
31:22 32:12
38:22 41:2
44:24 45:6
46:3,23 47:5,9
48:8
policy 19:19,20
29:24 30:18,23
31:1,4,8,14
42:5,8,11,17
43:5,16,17
45:16 47:11,13
47:13,15 48:17
52:12
pop 10:20
portion 15:18
position 7:12,15
7:18 33:14,21
62:10 68:21
positive 50:18
51:10 52:18
54:4,7 55:1,3,9
55:13,22 56:1
57:8,16 58:22
63:9 65:5
possibly 19:1
potential 71:8
71:10
potentially
44:17
Pottstown 56:12
56:17,23 58:16
59:4
practice 19:21
27:22 51:9,15
51:18 52:20

53:7,10 62:9
practices 25:7
27:14 41:2
44:10
pre-hire 42:9
51:11
premises 23:4
prescription
49:8 53:15,23
55:11,12,15,16
55:17 57:13,15
presented 12:14
12:17
presently 29:4,5
presents 58:17
58:21
pretty 53:24
preventative
20:10
primarily 11:7
printed 52:5
prior 36:9,15,23
37:3 59:1
priority 45:1
privy 23:7
proactive 27:1
probably 24:7
32:2
probation 62:12
problem 67:13
problems 19:13
67:3,5
procedures 25:7
25:13 38:22
41:1 42:5 57:2
58:16 59:5
process 16:2
45:5 46:2
54:18
produce 55:6
PRODUCTION
4:7
profanity 33:10
Professional
1:15
program 13:18

13:18 14:3,5
progress 46:6
promise 47:18
pronounce
70:10
prophylactic
20:9
propounded
77:6
protect 38:23
protected 44:17
prove 55:15,16
provide 17:2
20:18 21:6
53:23
provided 34:1
provides 20:22
providing 12:11
19:15
proximity 69:19
Public 1:16 74:5
74:18 77:18
punches 21:14
purely 12:24
purpose 49:10
pursuant 74:6
put 14:2 19:19
21:3 23:8
27:21 30:16
32:4 33:5 42:6
43:21 44:10
46:11 63:14
67:20 68:20
70:22 71:4
putting 13:21
41:1

Q

quarter 72:5
question 4:15
6:12,20,21
8:20 18:20
19:24 36:3,7
39:11 43:2
45:23 50:19,20
63:15

questions 6:10
8:20 18:24
77:6
quickly 27:9
67:18
quite 15:24
26:13 28:9

R

R 2:1 74:1 76:2
76:2
race 28:17
ran 13:17 14:3
range 39:23
rapid 54:6
reactive 27:2
read 5:4 15:16
15:19 75:1
77:3
really 26:24
34:13 46:6
reason 6:19
39:17 42:21
43:9,15 51:14
51:21 55:3,8
55:21 57:21
59:13 62:6,17
63:10,13 65:6
72:22 75:3
76:6,8,10,12
76:14,16,18,20
76:22
reasons 63:3
recall 9:3 12:3,7
12:17,18 21:24
42:10 62:2
receipt 75:13
receive 9:20
18:2 36:24
55:19 57:22
received 8:15
50:14
receives 55:23
56:1
recess 47:22
record 7:5 15:19

74:10
recorded 74:9
recruiting 11:4
14:13
red 62:19,20
regardless 33:14
51:21 52:9
regional 13:24
13:24
regular 14:18
23:19
related 10:9
relationship
23:17,18
remember 8:13
8:17,21,22
10:22 62:1
reminded 52:16
renew 9:17
reported 66:20
70:6
reporter 1:15
15:16
reporting 1:20
67:24
represent 6:2
42:19
REQUEST 4:7
required 72:9
requires 19:20
requiring 17:1
44:8,9,10
reserved 5:9
resource 7:13
9:9
respect 16:9
32:24 33:2,6,8
33:9,16,21
35:10
respond 67:10
responding
65:18,23,24
responsibilities
15:7 68:10
responsibility
16:4 66:19

67:7,11 68:7
68:14,23 69:12
69:18 70:4,20
**responsible**
13:20 14:5
15:9 68:4
**result** 41:6 42:6
51:10 52:5
55:3,9,23 63:9
65:5
**results** 54:13
56:2,4,5 57:16
58:22 59:12
63:8
**return** 75:12
**review** 51:1
54:20 55:7
56:3,6,8 57:15
**reviewed** 25:6
31:22
**revisions** 42:24
**revoking** 60:13
**Reynolds** 1:4
6:3 29:10
49:15 50:8,13
50:17 53:4
59:16,20 60:2
60:22 61:21
64:14 66:2,6,9
66:24 67:15
68:22 69:17
70:14,19 71:2
72:5,11,15
**Reynolds'** 48:2
61:17 62:3
64:7 66:19
70:22
**right** 7:11 9:22
11:17 18:22
19:4 35:2
38:21 49:8
60:9 68:8 69:2
69:19 70:21
**role** 13:17
**roll** 21:13
**rules** 30:10 31:7

44:14
**run** 26:14
**running** 13:18
69:24

---
**S**

**S** 2:1 3:7
**safe** 44:11,16
**salaried** 66:10
**salary** 71:2
**sample** 53:23
**saw** 6:23,24
**saying** 19:6
**says** 62:15 71:20
**scenario** 41:5
**schedule** 66:6,11
67:9
**schools** 14:1
**screw** 69:6
**second** 44:15
**see** 7:4 31:17
40:20 64:6
69:21
**seen** 25:9 49:21
49:23 50:21
61:20 64:17
**seminar** 12:9
**seminars** 10:17
12:2,4,8 45:11
46:16
**send** 50:22
54:10
**sense** 14:7 31:11
42:14
**sent** 54:8,11
61:21
**September** 1:10
63:5 74:14
**sessions** 34:10
**set** 13:23 66:6
67:8
**shake** 6:24
**shame** 27:4
**Shanghai** 15:4,7
37:13
**shape** 14:11

**sheet** 5:6 75:4,7
75:9,12 77:8
**shift** 61:5
**short** 11:5 64:23
**short-term**
72:19
**shorthand** 1:15
74:9
**show** 39:12
57:10 67:9
**showed** 39:5
**showing** 65:6
**shown** 64:12
**shows** 57:14
58:11
**SHRM** 9:6,8,11
9:20 11:9,21
11:22 12:1
13:2,4 17:15
**sic** 27:11
**side** 34:14
**sign** 5:7 75:6
**SIGNATURE**
77:10
**signing** 75:8
**similar** 66:12
68:21
**situation** 18:23
20:15 23:21
27:8 35:20
40:20
**situations** 21:20
**six** 7:16 18:5
29:13,19,23
72:21
**Society** 9:9
**solely** 48:13
49:11
**somebody** 34:18
39:13,16 49:11
53:8 54:4 59:1
59:2 62:13
63:2 68:21
73:8
**someone's** 20:8
**sorry** 15:14,23

31:2 36:20
64:13
**sort** 46:12
**sorts** 16:7 19:3
53:21
**space** 75:4
**speak** 22:7 32:3
32:7,8 42:2
52:1 54:7
61:15 66:11
**speaking** 23:5
32:5 68:5
**specific** 23:24
30:12 45:22,22
45:23 57:10
61:2
**specifically** 12:5
17:17 33:4
47:12 48:13
56:4,23
**specifics** 12:24
32:1 61:14
**specimen** 54:2,5
54:20
**spell** 9:7
**spend** 68:3
**split** 54:1,2,5
**spoke** 70:17
**spoken** 49:18
**sports** 58:10
**spouses** 22:21
**St** 10:15,21
23:13,17 26:16
27:4,6,15,23
28:6,7 37:14
37:18 68:22,24
**stand** 10:22
**standard** 51:18
53:7,10
**stands** 9:8
**start** 40:18,22
45:5 67:5
69:12 73:8
**started** 13:18
21:2 26:7
32:20 40:17

41:3 45:7,9,11
45:13,19 46:14
72:5,16
**starting** 31:13
**state** 31:15,24
38:10 44:8
48:13,16 63:4
74:5 75:3
**state-side** 15:5,6
**stated** 63:7
**statement** 25:1
**states** 1:1 12:19
12:22 31:5
38:18 44:5,6
45:22
**stating** 54:10
**stayed** 44:13
**step** 39:6
**steps** 19:5 23:9
24:1
**Steve** 6:2 65:1
**STEVEN** 2:3,3
**stimulant** 57:7
**stipulations**
4:11 5:3
**stop** 16:10 65:23
**stopping** 60:12
64:20
**Street** 1:20
**struggling** 34:12
**stuff** 10:7 20:17
**stupid** 31:9
**subject** 12:14
75:8
**submits** 58:20
**Subscribed**
77:12
**substance** 30:23
31:14 46:18
77:7
**success** 70:7
**successful** 71:19
71:22
**sudden** 34:22
**Suite** 1:20 2:4,9
**summarize**

TAMMY GILLETTE

44:22
**superintendent** 14:1
**supervision** 23:1 74:9
**supervisor** 17:20 34:4,5,6 34:8 35:15
**supervisors** 34:2 34:3
**SUPPORT** 4:1
**supposed** 60:24
**sure** 9:8,24 15:10 16:4,8 16:18 17:4 18:23 19:15 23:3,10,15 24:2 25:7,13 26:17 27:10,24 28:11 31:23 32:23 33:13 35:1,4,8,17 40:2,9,10 44:10,16 63:18 65:14 66:4,17 66:22 67:4
**swear** 5:15
**sworn** 5:19 74:7 77:12

**T**
**T** 2:3,3 3:7 74:1 74:1 76:2
**take** 6:4 16:21 16:24 19:5 23:9 24:1 47:18 51:2 53:13,17 54:24 54:24 61:1 67:10
**taken** 12:10 16:23 24:2 40:9 47:22 74:6
**takes** 23:3 53:12
**talk** 12:18 17:8

26:12 27:1 31:19 34:3 51:13,24,24 69:23
**talked** 35:10 48:6
**talking** 19:10 20:5,7,9 21:21 27:5
**talks** 71:21
**TAMMY** 1:12 3:3 5:18 73:17 74:6
**Teasdale** 10:15 11:10,16,18
**tell** 6:7,13,18,20 14:10 50:16 52:3 62:22 64:9 74:7
**telling** 40:4 71:6
**tells** 66:12
**term** 28:19 49:1 49:2
**terminate** 34:23 53:1
**terminated** 59:18,20 60:11 65:8
**terminating** 34:18 63:1,4 64:4
**termination** 14:14 33:24 34:3,19,24 41:6 50:11 51:10,16 60:13 60:17,19 62:4 63:3,16,20,24 64:14 65:6
**terms** 10:13 16:11 21:19 26:22 27:11,13 27:14 31:24 32:8 35:10 43:3
**test** 50:8,13

52:18 53:5,13 53:13,24 54:3 54:6,15 55:7 56:17 57:5,7 57:11 58:20 59:8,14 61:24 63:7,8,11,23
**tested** 50:17 55:22
**testified** 5:19
**testimony** 3:3 74:8,10
**testing** 53:7,11 54:11,14,17,19 57:1,1 58:24
**theirs** 10:16
**thereof** 74:12
**They'd** 26:14
**thing** 18:12 46:12 52:7,11
**things** 10:11 13:23 14:17 16:7 19:3 21:1 25:22 26:18,23 27:6,17 28:14 32:8 33:11,17 35:2,12 45:21 53:21 62:24 69:21
**think** 11:23 16:1 16:2 19:8 41:15 42:2 45:14 46:13 52:21 66:3
**thirty** 75:13
**thought** 30:17
**three** 5:6 24:8 26:11 34:20,22 37:9 44:4 73:9
**three-years-old** 55:19
**threw** 9:5
**Thursday** 67:2
**thyroid** 53:16,17 54:24
**time** 7:10 12:13

20:17 21:7 25:21 32:16 33:9 42:3 51:15,18,20 52:8,14 54:1 55:21,23 60:7 60:7 62:21,23 62:23 66:13 67:5 71:4,21 74:7
**times** 21:4 23:22 62:16 69:4,15
**timing** 72:7
**title** 8:13 13:20 14:4
**titles** 46:12
**today** 6:4,7 8:23 17:7 39:3 63:5
**today's** 67:2
**told** 52:4,4 59:14,15,19,22 60:2,3,8,9 61:19 64:16 66:23
**tolerance** 42:7
**Tom** 19:11,12
**topics** 9:21 24:14
**totally** 65:16
**touch** 24:16
**tow** 65:15,22
**toxicologist** 56:10
**traffic** 37:24
**training** 9:4,11 16:17,21,23,24 17:2,10,14,15 17:16,24 18:3 18:7 32:11 33:23 34:1 36:24 37:4 45:9
**trainings** 9:19
**transcribed** 74:9
**transcript** 75:14

75:15
**transcription** 74:10 77:5
**traveling** 24:19
**treat** 19:11 33:8 33:9,15 35:11
**treated** 16:9 32:24
**treatment** 40:11
**trickle-down** 41:3
**trips** 23:15
**truck** 65:15,23
**true** 74:10
**truth** 6:7 74:8,8 74:8
**trying** 20:4 69:21
**turn** 23:5 32:5,7 32:8 68:15,17
**turned** 55:13
**twice** 66:3
**two** 5:4 14:2 26:18,22 52:21 60:1 72:1,18 73:8
**type** 18:15 53:15 55:4
**types** 30:7
**typically** 10:24 14:10 37:24 63:2 64:1

**U**
**uh** 52:11
**uh-uhs** 7:4
**ultimately** 68:7
**understand** 6:6 6:9,10,11,12 6:14,19,21 13:12 20:4 32:6 33:20 44:21 48:15
**understanding** 5:13 49:1 60:20 71:1

BISNOW & JOSEPH
COURT REPORTING

33:14
**Understood**
30:20
**unfortunately**
21:8 43:18
**union** 62:14
**unions** 11:3
30:13
**unique** 39:17
**UNITED** 1:1
**University** 8:4
**update** 43:15
44:23 45:17
46:11,22 47:14
**updated** 42:13
47:5,10,14
**updates** 9:24
10:4,6 12:12
**updating** 30:20
42:17 43:17
44:14 45:6
46:2
**use** 11:19 21:16
21:17 27:23
41:10 49:9
69:9 70:2
**user** 41:13 60:3
**usually** 11:5
72:18

**V**
**v** 1:6
**vacation** 51:21
73:6,7
**valid** 57:15
**validate** 55:8
**validation** 55:20
55:24
**variety** 11:2
13:23 24:13
30:4 35:18
**various** 17:3
**verbal** 24:11
**verbalize** 7:2
**verifying** 5:8
**versus** 17:16

27:1
**VIDEOCONF...**
1:13
**view** 18:22 30:9
**viewpoint** 33:5
**Virginia** 31:10
37:11 38:10
**virus** 44:18
**vision** 72:14
**vitamin** 53:20
**VOLUCK** 2:8
**volunteering**
39:16

**W**
**wait** 27:2 34:16
67:2 70:4
**waiting** 34:20
65:14,19,20,22
67:11
**waived** 5:11
**walk** 39:14
**Walnut** 1:20
**want** 19:23
24:15 27:21
32:2,2,7,8
34:11 36:1,3
46:9 52:10
55:14
**wants** 33:18
51:17
**Warner** 22:5,9
**wasn't** 12:14
61:9 63:10
65:17
**way** 14:11,18
24:7 46:15
58:6 62:13
69:22 70:1
**ways** 20:14
35:18
**we'll** 30:11 36:8
58:8
**we're** 16:5 24:18
24:19 26:15,18
27:10 28:7

30:17 31:20
38:1 40:19
51:16 55:2
63:1
**we've** 24:12 27:6
35:12 70:19
73:11
**webinar** 12:10
**webinars** 10:24
11:20 12:1,3,7
45:12 46:16
**Wednesday**
67:1
**week** 63:18
**weeks** 24:9,11
52:22 73:7,9
**went** 9:16
**weren't** 11:24
30:15
**West** 31:10
37:10 38:9
**wide** 11:1 30:4
**Willert** 1:7 6:4
11:13 14:9
15:1,9 16:18
16:20 17:23
18:3,6 22:5,11
22:15,16,20
23:2 29:4,5,18
29:24 32:12,18
32:20 33:23
35:23 37:9
41:6 42:7
45:22 46:22
47:9 48:8
51:13 61:12
62:9 64:6 68:6
**Willert's** 27:21
45:6 46:3
**Willerts** 32:19
32:23 33:13
**William** 22:17
**willy-nilly** 67:9
**witness** 4:3 5:3,5
5:7,16 6:16
15:14,23 16:15

18:10 20:13
24:5 25:4,16
32:14,16 36:13
36:20 37:7
39:8,11 44:3
47:1,4 49:6
56:19,22 57:20
58:5 66:9
68:20 74:11,13
74:24
**word** 17:9 48:16
63:24
**worded** 62:13
**words** 21:16,17
23:8
**work** 16:8 27:7
27:7 37:19
38:4 44:12
51:7 55:12
56:12 69:14
**work-from-ho...**
30:18
**worked** 14:6
56:24 72:2,3
**workers'** 14:16
40:21
**workforce** 27:16
27:20 28:2,4
28:12,20 32:21
**working** 13:9
30:4,6,8,23
42:15 45:6,13
45:19 46:15
70:3,5
**workplace** 33:3
40:15
**works** 8:22
69:21
**wouldn't** 51:12
61:6
**wrench** 68:16,17
**write** 46:9
**writing** 25:10
**written** 7:1
**wrongful** 33:23
34:2,19,24

**wrote** 13:23

**X**
**X** 3:1,7 18:20

**Y**
**yeah** 14:21
20:22 23:20
28:5,7,8,18,21
31:20 39:15
58:12
**year** 10:7,9,18
10:18 11:7,8
11:10 30:2,3
30:19 43:4,19
43:19 71:3,9
72:8
**years** 7:16 8:15
11:22 13:2,3,6
13:11 18:5
29:13,19,23
32:21 34:20,22
43:1
**Yesterday** 67:2

**Z**
**zero** 42:7
**ZOOM** 1:13

**0**

**1**
**1:03** 73:16
**10** 69:6 73:12
**100** 38:17
**11:04** 1:14
**12:14** 47:19
**12:19** 47:20
**15,000** 71:9
**1518** 1:20
**16** 13:6
**19** 43:14
**19072** 2:4
**19102** 1:21
**19422** 2:9
**1990s** 13:19

TAMMY GILLETTE

| 2 | 7 |
|---|---|
| **2-11** 4:13 | **7:00** 66:16,17 |
| **2005** 13:5 | **704** 1:20 |
| **2016** 42:21 43:2 | **7th** 74:13 |
| 43:11 | |
| **2019** 43:13,16 | 8 |
| 45:9,13,19 | **822** 2:4 |
| 46:21 47:4 | **85,000** 71:2 |
| **202** 77:14 | |
| **2020** 36:9,15,23 | 9 |
| 37:3 48:21 | **930** 2:9 |
| 63:12 | |
| **2021** 1:10 74:14 | |
| **210** 2:4 | |
| **215-461-1100** | |
| 2:10 | |
| **215-567-1701** | |
| 1:21 | |
| **215-964-4410** | |
| 2:5 | |
| **250** 15:3 | |

| 3 |
|---|
| **3** 1:10 |
| **30** 13:11 75:13 |
| **35** 37:24 |
| **3rd** 63:5 |

| 4 |
|---|
| **40** 37:24 |
| **401K** 71:12,24 |
| **420** 2:9 |
| **45** 11:5 |
| **480** 72:2 |

| 5 |
|---|
| **5** 3:4 4:13 63:12 |
| **5:21-cv-01208** |
| 1:4 |
| **5th** 63:15,17 |

| 6 |
|---|
| **6:47** 66:24 |
| **60** 72:15 |
| **6th** 63:18 |