**IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| MATTHEW REYNOLDS | : |
| | : |
| Plaintiff, | : Civil Action No. 5:21-cv-01208-JFL |
| | : |
| v. | : |
| | : |
| WILLERT MFG. CO., LLC | : |
| | : |
| Defendant. | : |

**DEFENDANT WILLERT MANUFACTURING COMPANY, LLC'S RESPONSE IN OPPOSITION TO PLAINTIFF'S COUNTER-STATEMENT OF FACTS IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

Defendant Willert Manufacturing Company, LLC responds to Plaintiff's Counter-Statement of Facts in Opposition to Defendant's Motion for Summary Judgment as follows:

1. Denied. Plaintiff misstates and offers an incomplete excerpt of the deposition testimony of Jack Bonsky, Willert's Douglassville Plant Manager. Mr. Bonsky testified at his deposition as follows:

> Q. In broad strokes, what does Willert do?
>
> A. We make products that go in your home, consumer packaged goods. So disposable things, things to clean your home with. Other plants do things like mothballs and fly swatters and traps to catch insects. Here we do liquid fill. And our products here are liquid fill products, either under our name or somebody else's. We're a third-party manufacturer. And we also do air conditioners – excuse me – air fresheners for ourselves and for another customers.
>
> Q. What is liquid fill?
>
> A. Liquid fill?
>
> Q. Yes.
>
> A. You take a bottle, you fill it with liquid, you cap it somehow, you put a label on it and you put it in a cart. Like, I guess I missed the fact – the first thing you do is you blend the chemicals together.

1

> Q.   And does Willert blend these chemicals before it puts it in the container?
>
> A.   Yes.

See Ex. E[1] at 25:10 – 26:9.  By way of further response, Plaintiff understood that Willert was making products such as Ty-D-Bowl and that making those products involved the mixing of chemicals.  See Ex. C at 154:8 - 155:3-15.

2.   Denied.  Plaintiff misstates and offers an incomplete excerpt of his own testimony referenced in this paragraph.  Plaintiff testified at his deposition as follows:

> Q.   What did Mr. Willert explain to you about the processes, the general processes of the plant?
>
> A.   Well, I understood that they were making two or three products there at the time.  But that they were going to be rapidly expanding, adding new equipment, bringing in new lines.  So that all sounded pretty exciting.
>
> Q.   What products were they making there at the plan at the time you interviewed there?
>
> A.   Ty-D-Bowl.  Which is a upside down bottle you can put in the back of a commode to make blue water.  Some air refreshers and like a gel air freshener.  It comes in short container.  Then a spray bottle air freshener or cleaner.  But something that comes in a Windex-style bottle with a trigger on it.  Those are the main lines.
>
> Q.   In order to make those products did it involve the mixing of chemicals?
>
> A.   Yes.  They had mix tanks there.
>
> Q.   What types of chemicals were being mixed there at the plant when you interviewed there and when you began to work there?
>
> A.   I don't know.  I know some of those products are 99 percent water.  Just FYI when you are paying $7 for a thing of cleaner it's a lot of water.  I don't

---

[1]   All exhibit references refer to the exhibits attached to Willert's Statement of Undisputed Material Facts in support of its Motion for Summary Judgment filed in this action, unless otherwise indicated.  All new exhibits referenced herein are designated consecutively from the exhibits designated in Willert's Statement of Undisputed Material Facts.

> > know what the actual chemicals were. Some fragrances and maybe surfactants or something.

See Ex. C, Pl's Dep. at 154:8 – 155:15.

Mr. Bonsky further testified at his deposition as follows:

> Q. What chemicals do you have at your plant?
>
> A. We have dozens and dozens, if not hundreds and hundreds of chemicals. Wide variety. Everything from water – well, shouldn't say water. In terms of what they are, we have things that are, like, soaps, we have things that are acids, we have things that are caustics, we have fragrances, we have colorants. Some of – most of what we have is liquid and some is powder, some is palettes.

See Ex. E at 81:5-15.

3. Admitted.

4. Denied as stated. Tammy Gillette, Willert's Head of Human Resources, testified at her deposition in this matter that she is aware that all three states in which Willert has facilities located in the United States have medical marijuana acts. See Ex. F, Gillette Dep. at 38:1-20.

5. Denied. Ms. Gillette testified that, to her knowledge, Willert does not employ any medical marijuana patients. See Ex. F at 29:4-12.

6. Admitted.

7. Admitted in part and denied in part. The allegation set forth in Paragraph 7 is denied to the extent that it offers an incomplete explanation of what Willert does. Willert incorporates by reference its responses to Paragraphs 1 and 2 of this Response.

8. Denied. At Willert's Douglassville facility (the "Douglassville Facility"), Willert manufactures several household products. See Ex. G, Bryan Willert Decl. at ¶ 3. The manufacture of some of those products involves the use of "Specific Specially Denatured Alcohol/Rum Conditions." Id. at ¶ 4. Willert is required to have an "Industrial Alcohol User Permit" issued by

the United States Department of the Treasury Alcohol and Tobacco Tax and Trade Bureau for the "Specific Specially Denatured Alcohol/Rum Conditions." Id. at ¶ 5. "Specific Specially Denatured Alcohol/Rum Conditions" was present at the Douglassville Facility and used during the time that Plaintiff worked for Willert. Id. at ¶ 6. Willert had an "Industrial Alcohol User Permit" for the "Specific Specially Denatured Alcohol/Rum Conditions" during the time that Plaintiff worked for Willert. Id. at ¶ 7.

9. Admitted.

10. Admitted.

11. Admitted.

12. Admitted in part and denied in part. It is undisputed only that Ms. Gillette is Willert's Human Resource Manager. The statement that the "buck stops" with Ms. Gillette is a not a statement of fact, but rather is a legal conclusion and not a statement of undisputed fact to which a response is required.

13. Admitted in part and denied in part. It is admitted only that Ms. Gillette testified that Willert has maintenance a pre-hire, zero-tolerance drug policy at her deposition in this case. The allegation in this paragraph is denied to the extent that it misstates or mischaracterizes Willert's written policy, which is a document that speaks for itself.

14. Admitted in part and denied in part. It is admitted only that Willert did not update its written drug policy from the time that it acquired the Douglassville facility until the time that Plaintiff worked there. By way of further response, Willert did not acquire the Douglassville Facility until 2019. See Ex. F at 43:5 – 44:18. Ms. Gillette testified as follows:

> Q. But this drug policy hasn't changed since Pennsylvania legalized medical marijuana?
>
> A. Correct.

> Q. Any reason?
>
> A. Well, we did not acquire Pennsylvania – we didn't have them in 2016.
>
> Q. You acquired Pennsylvania in 2019?
>
> A. '19, yes.
>
> Q. Any reason why it didn't update its policy since 2019?
>
> A. Updating the policy was – unfortunately, that was my major goal for last year, and then COVID happened. So last year after acquiring Pennsylvania is when it would have initially been modified and have been put in place. And once COVID happened and ---
>
> Once COVID happened everything changed for me, and I had three states with employees living in an additional, I believe, five states and my focus had to change on learning everything that I could about what the CDC was requiring, what each state was requiring, and in some instances, the county was requiring, making sure that we put practices in place to physically keep our employees safe from being exposed to the pandemic at work because all of our facilities stayed open.
>
> So update the rules and deadlines took a very distance second place to making sure that I kept my employees safe and protected them from potentially getting a lethal virus.

See Ex. F at 43:5 – 44:18.

15. Admitted.

16. Admitted. Willert incorporates by reference its response to Paragraph 14 of Plaintiff's Counter-Statement of Undisputed Material Facts as though fully set forth at length herein.

17. Denied. Ms. Gillette testified at her deposition in this matter as follows:

> Q. Does Willert have any policies to ensure equal employment opportunities for medical marijuana patients?

> A. We have a general Equal Employment Opportunity clause that does not specifically state that it applies solely to medical marijuana, but it's EEO for all.
>
> Q. And does your – I understand that doesn't state the word medical marijuana patient, but does your antidiscrimination policy apply to medical marijuana patients?
>
> A. Yes.
>
> Q. Did it apply to medical marijuana patients in November of 2020?
>
> A. Those that we knew of.

See Ex. F at 48:8-22.

18. Denied. See Ex. F at 23:9 – 29:3. Ms. Gillette testified at her deposition that she had regular discussions with Mr. Bonsky to ensure that Mr. Bonsky did not discrimination against his employees. Id. Ms. Gillette further explained that Willert wanted to hire a diverse workforce and that her definition of diversity included medical marijuana patients. Id.

19. Denied. Willert incorporates by reference its response to Paragraph 18 of Plaintiff's Counter-Statement of Undisputed Material Facts as though fully set forth at length herein.

20. Denied. Willert incorporates by reference its response to Paragraph 18 of Plaintiff's Counter-Statement of Undisputed Material Facts as though fully set forth at length herein.

21. Admitted.

22. Denied. Willert incorporates by reference its response to Paragraph 18 of Plaintiff's Counter-Statement of Undisputed Material Facts as though fully set forth at length herein.

23. Admitted in part and denied in part. It is admitted only that Plaintiff alleges that he was a medical marijuana patient at all times relevant to this action.

24. Denied. See Pl.'s Mot. for Partial Summ. J. at Ex. 2.

25. This allegation refers to a document, the terms of which speak for itself. Willert denies all mischaracterizations or misstatements of the document.

26. Denied. Willert currently lacks knowledge or information sufficient to admit or deny this allegation, which is therefore denied.

27. Denied. See Pl.'s Mot. for Partial Summ. J. at Ex. 2.

28. Admitted in part and denied in part. It is admitted only that on October 15, 2020, Willert offered Plaintiff the position of Maintenance Manager. See Ex. B, Offer Letter. It is denied that Willert described the position as "overtime-exempt" in the October 15, 2020 offer letter (the "Offer Letter") it sent to Plaintiff. See id.

29. Admitted in part and denied in part. It is admitted only that Plaintiff held the role of Maintenance Manager at Willert from October 16, 2020 through November 15, 2020. It is denied that Willert described the position as "over-time exempt Maintenance Manager." See Ex. B.

30. Admitted in part and denied in part. It is admitted only that Plaintiff was not placed on a performance improvement plan during the approximately two-week period of time he worked for Willert. It is denied that Willert "is without evidence that, during this period, it gave Plaintiff negative performance reviews or evaluations, reprimands, or coachings to remediate performance deficiencies." Plaintiff's supervisor at Willert, Mr. Bonsky, testified at his deposition in this matter about his coaching of Plaintiff and discussion with Plaintiff regarding Plaintiff's performance deficiencies." See Ex. E at 15:2 – 17:7 and 67:16 – 74:23. Mr. Bonsky explained that Plaintiff's subordinates were not pleased with his job performance. See Ex. A at 16:17-24. Their major complaint was that they never knew where Plaintiff was. See id. Plaintiff would work late and would work different hours. See id. Plaintiff "just never communicated with his team and they

7

didn't like that." Id.  As a result, Mr. Bonsky provided Plaintiff an oral warning that "he had to let his people know where he is because that was their complaint." Id. at 67:16-22.  Mr. Bonsky also coached Plaintiff about the fact that he arrived at work late and missed entire days of work in the two weeks that he worked for Willert.  See id. at 70:3 – 74:16.   Mr. Bonsky further testified to discussing the following incident with Plaintiff:

> Q. Other than the instance in which you told him you got to let your people know where you are, did you ever have any other conversations with him that might have been perceived as a performance deficiency?
>
> A. Yes.
>
> Q. What was that?
>
> A. He – we do a – he came onto the shop floor – this is during COVID and masking – and he was on the shop floor with a leather mask, which I don't care about, but it had nose holes in it so it wouldn't – with the nose holes it wasn't doing what face masks were supposed to do, so I asked him to put on a proper one.  First thing he says, well – well, they don't work anyway, because they aren't N95 masks then – you know, 30 second later he says, well, I'll change it.

See Ex. E at 69:4-21.

Mr. Bonsky described Plaintiff's ability as a maintenance manager as "below average." See Ex. E at 70:3-15.  He testified as follows:

> Q. Overall, how would you describe his abilities as a maintenance manager?
>
> A. Below average.
>
> Q. On what basis do you say that?
>
> A. I guess I can give you an example.  I was with Bryan Willert on our line 13, and there's a discussion about something electrical.  I don't recall exactly what it was, but Bryan and I later talked, and it's like Matt doesn't really seem to understand.  It's something he should have understood.  Again, I don't even recall what the electrical thing was and, of course, his attendance wasn't good.

See Ex. E at 70:3-15.

31. Denied. During the two weeks that he worked at Willert, Plaintiff used medical marijuana approximately twice per week. See Ex. B at 215:21-24. He used medical marijuana if there was a particularly crazy day at work. See id. at 216:1-4. He also used medical marijuana on occasions when he experienced "existential anxiety," some of which he experienced during the two weeks he worked at Willert. See id. at 216:9-17. On each occasion that he used medical marijuana, Plaintiff used "approximately one to five milligrams of THC with a ratio of 10 to 15 milligrams of CBD." See id. at 138:18 – 139:1. Although Plaintiff testified that he typically used medical marijuana in the evening, around 5:00 p.m. or 6:00 p.m., Plaintiff does not know how long the medical marijuana he used stayed in his system after he used it. See id. at 140:3-6 and 140:7-15. Further, Plaintiff could not state when he last used medical marijuana before he took the pre-employment drug screen. See id. at 144:1-14. Finally, when Plaintiff used medical marijuana, he used it in the form of tinctures or extracts and testified that it did not emit a scent. See id. at 141:16-18.

32. Admitted.

33. Denied. Plaintiff's drug screen was originally scheduled for October 27, 2020. See Ex. B at 144:15 – 148:23. However, Plaintiff missed the October 27, 2020 appointment because he "was having so much fun" at work. See id. As a result, Plaintiff ultimately underwent the drug screen on October 28, 2020. See id. at 144:15-19.

34. Admitted in part and denied in part. It is admitted only that Plaintiff testified at his deposition as follows:

> Q. Did you tell the person who performed your drug screen that you were a medical marijuana patient?
>
> A. Yes. I got out my card. Said, hey, this is probably going to show up. Do you guys need to know this?

> Q. What did that person say to you when you told her that?
>
> A. She said, oh, no, no problem. Just if you have any questions I will give you a call. Okay?
>
> Q. Did you know whether it was noted anywhere by the person who collected it whether or not you were a medical marijuana patient?
>
> A. I don't know.
>
> Q. Do you know if the person who performed that collection ever told anyone from Willert that you were a medical marijuana patient?
>
> A. I don't know.

See Ex. C at 212:13 – 213:8.

35. Denied. Willert incorporates by reference its response to Paragraph 34 of Plaintiff's Counter-Statement of Undisputed Material Facts as though fully set forth at length herein.

36. Admitted in part and denied in part. It is admitted only that the drugs Plaintiff was tested for included "D-THC-Marijuana Metabolite 50/15." See Ex. D, Drug Screen Results Letter. It is denied that this means that Plaintiff did not have a blood content of more than 10 nanograms of active THC per milliliter of blood in serum on October 28, 2020, or at any relevant time. Indeed, Plaintiff admitted at his deposition that he does not know how long medical marijuana stayed in his system after he used it. See Ex. C at 140:3-15.

37. Denied. Plaintiff testified at his deposition in this matter as follows:

> Q. The document that we just looked at it says that you learned about the drug test results on November 3, 2020. How did you learn about those results?
>
> A. The medical review officer called me.
>
> Q. What did the medical review officer tell you when he called you?
>
> A. He indicated that I tested positive for THC and was looking for my comments on that.
>
> Q. What did he ask you?

> A. I don't remember his specific question. But he was looking for my feedback about it.
>
> Q. Did he explain what he meant when he said he was looking for your feedback or why he wanted your feedback?
>
> A. I don't remember.
>
> Q. What did you tell him during that call?
>
> A. I told him that I was a medical marijuana patient and I had a card for that. And that that was the reason for the results on the test.
>
> . . .
>
> Q. When you told him you were a medical marijuana patient, what did the medical review officer say?
>
> A. To paraphrase. But it was essentially we don't really care. We go by the federal law. We will report a fail.
>
> Q. Did he explain anything further about what he meant by that?
>
> A. Not that I remember. And I certainly – I don't want to say protested. But I can't think of another word. I said I thought I had protection of privacy with this. I have – I'm a patient. And he was not budging.

See Ex. C at 209:5 – 211:8.

Plaintiff further testified:

> Q. On the form here it identifies a gentleman Joseph Albert, DO. Do you recognize that name?
>
> A. I don't recognize it just because I am bad with names. But I wouldn't disagree either.
>
> Q. Disagree meaning that that was the medical review officer who contacted you?
>
> A. It is likely the right name.
>
> Q. Do you know if Dr. Albert told anyone from Willert that you had communicated to him that you are a medical marijuana patient?

    A.  I can't say with certainty that he did.  I don't believe he did.

See Ex. C at 213:9-22.

  38.  Admitted.  By way of further response, Willert incorporates by reference its response to Paragraph 37 of Plaintiff's Counter-Statement of Undisputed Material Facts as though fully set forth at length herein.

  39.  Admitted.  By way of further response, Ms. Gillette testified in pertinent part that "[t]o my knowledge, if there is a legal reason for them to be taking any medication that is current, we would receive a negative."  See Ex. F at 57:12-23.

  40.  Denied as stated.  Plaintiff appears to be referring to the Drug Screen Results Letter, which is a document that speaks for itself.  Willert denies any misstatements of the document.  Willert admits that the Drug Screen Results Letter does not indicate that Plaintiff informed either the person who performed his drug screen or the Medical Review Officer that he was a medical marijuana user.  See Ex. D.

  41.  Admitted in part and denied in part.  It is admitted only that the results of the Drug Screen were relayed to Willert on or after November 3, 2020.  It is denied that the Drug Screen is the "sole source of knowledge that Plaintiff had any amount of THC in his system."  After Willert communicated to Plaintiff that he was terminated, Plaintiff told Mr. Bonsky that he was a medical marijuana patient.  See Ex. C at 218:14 – 219:14.

  42.  Denied.  Any characterization of the decision to terminate Plaintiff was "an initial determination to terminate" is denied.  Ms. Gillette further testified at her deposition that she did not inquire as to why Plaintiff had failed the drug test because that had already been done.  See Ex. F at 53:3 – 56:14.

43.     Denied.  Mr. Bonsky did not inform Plaintiff that "he was being fired because of the presence of marijuana in his system."  Rather, Mr. Bonsky read a copy of Plaintiff's termination letter to Plaintiff.  See Ex. E at 79:11 – 80:5.

44.     Admitted in part and denied in part.  It is admitted only that Plaintiff first told Mr. Bonsky that he was a medical marijuana user after Mr. Bonsky read the termination letter to him. See Ex. E at 79:11 – 80:24.  It is denied that Plaintiff "asked Mr. Bonsky to reconsider this decision because he was a medical marijuana patient."  See id.

45.     Denied as stated.  It is admitted only that Mr. Bonsky testified at his deposition as follows:

> Q.   When Mr. Reynolds told you that he had a card, what did that mean to you?
>
> A.   It was a medical marijuana card, was my understanding.  The first I heard, you know, from him that he had one.
>
> Q.   Did you ask him why he had a card?
>
> A.   No.  He volunteered it was for anxiety though.
>
> Q.   Why did you call Ms. Gillette after he told you that he had a card?
>
> A.   Just to make sure that having the card could somehow change something.
>
> Q.   Why would it change something?
>
> A.   I don't know.  I never been in a situation like this.  Unfamiliar situations involving human resource things you talk to a human resources specialist to make sure that you're doing the right thing is important.

See Ex. E at 80:6-24.

46.     Admitted in part and denied in part.  It is admitted only that Mr. Bonsky testified at his deposition in this matter that Ms. Gillette commented to him that "it doesn't make a difference." See Ex. E at 79:11 – 80:5.  By way of further response, Ms. Gillette testified during her deposition as follows:

13

> Q. Okay. Now, you were told that Mr. Reynolds was a medical marijuana patient; were you not?
>
> A. After he was terminated.
>
> Q. Who told you this?
>
> A. When Mr. Reynolds was terminated, he informed Mr. Bonsky.
>
> Q. How do you know he told Mr. Bonsky?
>
> A. Because after the conversation that the two of them had, Mr. Bonsky called me up and said here is what Mr. Reynolds told me. He told me he is a medical marijuana user.
>
> Q. And what did you do with that information?
>
> A. I asked if he knew that ahead of time, and he said no, no one was told.
>
> Q. But you were told right then and there?
>
> A. After he was terminated, yes.

See Ex. F at 59:15 – 60:10.

    47.    Denied. The decision to terminate Plaintiff was made before Plaintiff ever told anyone from Willert that he was a medical marijuana patient. See Ex. F at 59:15 – 60:10.

    48.    Denied. Ms. Gillette testified at her deposition as follows:

> Q. Was there anything stopping you from revoking the termination?
>
> A. No, because that was not – that's what brought everything to a head, but that was not the only item of consideration that led to the termination.
>
> Q. What other items led to the termination?
>
> A. Well, from my understanding – actually, what I knew was there had been some attendance issues with Mr. Reynolds, either arriving late or not arriving at all, taking items home with him that he was not supposed to take with him and there was an item that – I don't know the specific circumstances – but he either took something home or had something that was going to be needed at the plant and he didn't drop it off until after the shift was over and, you know, he said he wouldn't be there. He acknowledged that he had whatever it was that was needed and said he

14

>would drop it off sometime and it wasn't dropped off until later. Those are the issues that I was made aware of. I know that Mr. Bonsky and Mr. Willert actually had other conversations about other issues that I don't – I don't know the specifics of those and so I'm not going to speak to those.

See Ex. F at 60:12 – 61:15.

Ms. Gillette further testified that ". . . attendance is the biggest reason why people are not kept as a new hire. When you are having attendance issues within your first month, those are red -- that's a huge red flag. . . ." See Ex. F at 62:6 – 63:10.

49. Denied. Plaintiff did not tell anyone from Willert that he was a medical marijuana user until after Willert terminated him and no one from Willert knew that Plaintiff was a medical marijuana user. See Ex. C at 219:15-24 and 220:1-4. Further, Plaintiff's performance issues factored into the decision to terminate him. See Ex. E at 86:23 – 87:8; Ex. F at 60:12 – 63:20. Indeed, Ms. Gillette testified at her deposition as follows:

>Q. Had he not failed the drug test, would you have fired him November 5, 2020?
>
>A. I don't know. The reason that I say that is because you put in there – your question November 5th, and I know that there were issues. Would a termination have happened on November 5th, would it have happened November 6th, the next week – I'm not sure, but I do know that because of the issues, it would have led to termination.

See Ex. F at 63:11-20.

50. The Termination Letter is a document, the terms of which speak for itself. Willert denies all mischaracterizations or misstatements of the Termination Letter. By way of further response, Mr. Bonsky coached and/or discussed with Plaintiff his performance issues related to lack of communication with his team, his attendance issues, and the fact that he wore an inappropriate face mask to work. See Ex. E at 67:16-22, 69:4-21, and 70:3 – 74:16. By way of further response, Ms. Gillette testified at her deposition as follows:

> Q. You drafted Mr. Reynolds' termination letter, did you not?
>
> A. Yes, I did.
>
> Q. Any reason why it didn't include the attendance issues or the taking items home with him in your letter?
>
> A. Our practice at Willert is that all employees – I don't care what your position is – but all employees are brought in, I guess you could say, on a probation. I don't know if it's ever worded that way with somebody other than in our union contract, but attendance – what it says – and I don't even know how many times I have said this – but attendance is the biggest reason why people are not kept as a new hire. When you are having attendance issues within your first month, those are red – that's a huge red flag. And I did not have every instance of exactly what time he arrived. I mean, he didn't clock in, so I couldn't tell you what time he got there or what time he left, any of those things. I did know that there were attendance issues. When we're terminating someone as a new hire, typically I do not include all the reason in the termination letter, but we state that we are terminating them effect today, which is September 3rd, then here's what's going to happen. So the fact that we only stated the drug test, he already knew the results of the drug test. It was – it was a positive result. And so to list the other reason, in our opinion, wasn't necessary.

See Ex. F at 62:6 – 63:10.

51. Denied. Willert incorporates by reference its Statement of Undisputed Material Facts in support of its Motion for Summary Judgment.

Respectfully submitted this 4th day of October, 2021,

**KAUFMAN DOLOWICH & VOLUCK, LLP**

By:   */s/ Eileen Monaghan Ficaro*
Gregory S. Hyman, Esquire
Eileen Monaghan Ficaro, Esquire
*Attorneys for Defendant,*
*Willert Manufacturing Company, LLC*