# EXHIBIT "E"

JACK BONSKY

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

- - -

MATTHEW REYNOLDS,   : NO.: 5:21-cv-01208
   :
  Plaintiff,   :
   :
  v.   :
   :
WILLERT MFG. CO., LLC,  :
   :
  Defendant.   :

- - -

Wednesday, September 1, 2021

- - -

Oral deposition of JACK BONSKY, held
via ZOOM VIDEOCONFERENCE, commencing at 1:12
p.m., on the above date, before Masheka C.
Pettiford, a Professional Shorthand Reporter and
Notary Public in and for the Commonwealth of
Pennsylvania.

BISNOW & JOSEPH COURT REPORTING
1518 Walnut Street - Suite 704
Philadelphia, Pennsylvania 19102
215-567-1701
Bisnowandjoseph@verizon.net

Page 2

1  **APPEARANCES:**
2
3  LAW OFFICE OF STEVEN T. AUERBACH
  BY:  STEVEN T. AUERBACH, ESQ.
4  822 Montgomery Ave, Suite 210
  Narberth, PA 19072
5  215-964-4410
  Auerbach.steven@gmail.com
6  Counsel for Plaintiff
7
8  KAUFMAN, DOLOWICH & VOLUCK, LLP
  BY:  EILEEN FICARO, ESQ.
9  930 Harvest Drive, Suite 420
  Blue Bell, PA 19422
10  215-461-1100
  Eficaro@kdvlaw.com
11  Counsel for Defendant
12
13
14
15
16
17
18
19
20
21
22
23
24

Page 3

1      - - -
     I N D E X
2      - - -
3
  Testimony of: JACK BONSKY
4
  By Mr. Auerbach . . . . . . . . . .6
5
  By Ms. Ficaro. . . . . . . . . .87
6
7
8      - - -
    E X H I B I T S
9      - - -
10  EXHIBIT      PAGE
  NO.   DESCRIPTION   NO.
11
12
13    (No exhibits were marked.)
14
15
16
17
18
19
20
21
22
23
24

Page 4

1     DEPOSITION SUPPORT INDEX
2
3  **DIRECTION TO WITNESS NOT TO ANSWER:**
4  **Page Line   Page  Line**
5  22  15-18   46  1-3
6  34  12-14
7  34  20-22
8  45  7-12
9  45  17-18
10  **REQUEST FOR PRODUCTION OF DOCUMENTS:**
11  **Page Line**
12  (None)
13
14  **STIPULATIONS:**
15  **Page Line**
16  5  2-11
17
18  **QUESTION MARKED:**
19  **Page Line**
20  22  13-14
21  45  23-24
22
23
24

BISNOW & JOSEPH
COURT REPORTING

JACK BONSKY

**Page 5**

1                    - - -
2          MR. AUERBACH:  There are four
3    stipulations.  Number one, the witness will have
4    the opportunity to read the deposition, number
5    two, the witness will have the opportunity to
6    make any corrections on an errata sheet, three,
7    the witness will sign the deposition correct or
8    not, verifying its accuracy, four, all
9    objections except to the form of the question
10   are reserved and are not waived by not objecting
11   during this deposition.
12          Our reporter, would you swear in
13   the witness.
14                    - - -
15          JACK BONSKY, after having been
16   duly sworn, was examined and testified as
17   follows:
18                    - - -
19          EXAMINATION
20                    - - -
21   BY MR. AUERBACH:
22       Q.    Mr. Bonsky, good morning again.
23       A.    Hello.
24       Q.    My name is Steve Auerbach.  I

**Page 6**

1    represent Matthew Reynolds in a lawsuit that he
2    filed against Willert.  We are here today to
3    take your deposition in connection with this
4    lawsuit.
5          Do you understand?
6       A.    Yes.
7       Q.    You are here today as a fact
8    witness and not as a defendant.  Today is going
9    to be a question-and-answer session designed to
10   obtain information that you may or may not know.
11   We only care about that of what it is that you
12   actually know about Mr. Reynolds' allegations,
13   and we don't want you to guess.  If you feel
14   like you can approximate or estimate an answer
15   such as a date or number, feel free to do so,
16   but if it's going to be a complete guess or
17   speculation, just let me know and we can move
18   on.
19          Mr. Bonsky, do you understand the
20   difference between an educated guess and
21   complete speculation?
22       A.    Yes.
23       Q.    Do you understand that even
24   though we are not in front of a judge and jury

**Page 7**

1    at the moment this proceeding needs to be
2    treated just as if we were?
3       A.    Yes.
4       Q.    At times I mumble and ask clunky
5    questions.  Unless you tell me otherwise, I will
6    assume that you understood all of my questions.
7          Do you understand that it's your
8    responsibility to tell me you don't understand
9    anything I say?
10      A.    Yes.
11      Q.    And if that happens, just let me
12   know, and I'll do my best to restate it.
13      A.    Okay.
14      Q.    I'll also assume that you've
15   heard all of my questions in their entirety.  If
16   we have any internet or phone issues, please let
17   me know so that the most recent question and
18   response will be read back.  At times, people
19   who take the depositions, they act like
20   politicians and they can take a thousand words
21   to answer a yes or no question.  I lean in, and
22   I would call that a question dodge.
23          May I ask your cooperation in not
24   question dodging?

**Page 8**

1       A.    Yes.
2       Q.    And should that ever happen for
3    whatever reason, I'm just going to remind you of
4    that agreement.
5          Mr. Bonsky, is there any reason
6    you wouldn't be able to give your best testimony
7    today?
8       A.    No.
9       Q.    And you and I are in different
10   locations.
11          May I ask where you are now?
12      A.    I'm in Douglassville, in the
13   plant.
14      Q.    You're at Willert?
15      A.    Yes.
16      Q.    Is there anyone else in the room
17   with you?
18      A.    No.
19      Q.    Is there anyone else within
20   earshot of you?
21      A.    No.
22      Q.    And are you in the chemistry lab
23   or are you in your office?
24      A.    This is my office.

2 (Pages 5 to 8)

JACK BONSKY

---

**Page 9**

```
 1      Q.     And may I ask what documents are
 2  in front of you?
 3      A.     Work.  Just work documents.
 4      Q.     Anything relating to this
 5  litigation?
 6      A.     No.
 7      Q.     Anything with Matthew Reynolds
 8  name on it?
 9      A.     No.
10      Q.     Mr. Bonsky, have you ever been
11  deposed before?
12      A.     Yes.
13      Q.     In connection with what?
14      A.     Lawsuit that I brought.
15      Q.     And how many times were you
16  deposed in that matter?
17      A.     Once.
18      Q.     And how long ago was that?
19      A.     I was 18 or 19.  I'm 56 now.
20      Q.     Wonderful.  In broad strokes,
21  what was the nature of that action?
22      A.     Medical malpractice.
23      Q.     Is that the only time in which
24  you remember being deposed?
```

**Page 10**

```
 1      A.     Yes.
 2      Q.     Whatever happened with that
 3  medical malpractice action?
 4      A.     We settled out of court.
 5      Q.     Have you ever served in the
 6  military?
 7      A.     No.
 8      Q.     Have you ever been arrested?
 9      A.     No.
10      Q.     Have you ever been charged with a
11  crime?
12      A.     No.
13      Q.     Okay.  And to make sure today
14  goes smoothly, I'm going to give you some
15  additional ground rules.  You're doing great so
16  far, but it's important that we don't speak over
17  each other.  Please let me finish stating the
18  question before you answer it.  Unless there's a
19  question dodge, I'll allow you to finish your
20  question before I pose another one.  Even though
21  I like -- I'll likely know what you meant if you
22  shrugged your shoulders or nodded your head
23  after I've asked the question, I ask that you
24  use actual words to answer these questions.  If
```

**Page 11**

```
 1  a response calls for a yes, please answer with a
 2  yes and not with an uh-huh.
 3             Do you agree to that?
 4      A.     Yes.
 5      Q.     Also for the benefit of the court
 6  reporter, may I ask you to keep your voice up.
 7      A.     Please restate that.
 8      Q.     Sure.  For the benefit of the
 9  court reporter, can I ask you to keep your voice
10  up.
11      A.     Keep my what now?
12      Q.     Voice up.
13      A.     Oh, yes.  Okay.  I'll do that.
14      Q.     Okay.  Great.  And we discussed
15  this off the record, but if you need to take a
16  break at any point, let me know.  If you need to
17  get up, stretch your legs, get a cup of coffee,
18  use the restroom, that's fine.  We can do that.
19  We'll finish the current line of questioning
20  then take a break.  I would also ask that during
21  the break you not speak with Eileen at any
22  point.
23             Do you agree to that?
24      A.     I agree.
```

**Page 12**

```
 1             MS. FICARO:  I just object to
 2  that there.  I don't believe that we are -- I
 3  think that should be limited to about the
 4  subject matter of the deposition.
 5  BY MR. AUERBACH:
 6      Q.     Mr. Bonsky, do you agree to not
 7  text -- do you have Eileen's cell phone number?
 8      A.     I think I do.
 9      Q.     I'm not asking for what the
10  number is.  I'm just asking if you have it.  May
11  I -- don't tell me anything that was discussed
12  between you and Eileen, but how have you been
13  communicating?  Through phone, e-mail?
14      A.     Both.
15      Q.     Okay.  And I'm going to ask that
16  during this litigation your questions not be --
17  your responses not be prompted by Eileen.
18             Do you understand that?
19      A.     Yes.
20      Q.     And that to the extent you need
21  to speak with Eileen, please let me know.
22             Now, from time to time, Eileen
23  will object to some of my questions, as she just
24  did.  And if she does, please let her place the
```

3  (Pages 9 to 12)

JACK BONSKY

Page 13

```
 1   objection on the record.  You'll then go ahead
 2   and answer the question after we resolve the
 3   objection.  And, again, please don't interpret
 4   any of my questions as me asking for information
 5   that was shared between you and your attorney.
 6   That's protected by attorney/client privilege,
 7   so I'm not going to be seeking that information.
 8              Have you had the opportunity to
 9   speak with Eileen prior to today's deposition?
10      A.    Yes.
11      Q.    Do you need any more time to
12   speak with her before we begin?
13      A.    No.
14      Q.    Putting aside counsel for a
15   second, have you spoken with anyone else about
16   today's deposition?
17      A.    Yes.
18      Q.    With whom have you spoken?
19      A.    I've let my staff know that I was
20   going to be in a deposition this afternoon so
21   they would leave me alone.
22      Q.    And that would include who?
23      A.    Dave Furno, Joe Woods, Debbie
24   Kulp, Cliff Heller and Rick Hansen.
```

Page 14

```
 1      Q.    Did you say that this was a
 2   deposition with Matthew Reynolds or you just
 3   used the word deposition?
 4      A.    Used the word deposition.
 5      Q.    And these people that you
 6   identified, what did you tell them about today's
 7   deposition?
 8      A.    Nothing specific.  I'm just being
 9   deposed.
10      Q.    And approximately how long would
11   you say -- did you say that you spent talking to
12   these people?
13      A.    The meeting was about an hour.
14   The conversation regarding this was minutes,
15   tops.
16      Q.    And that happened today?
17      A.    Yes.
18      Q.    And you said it took minutes
19   tops.
20              Did you discuss the substance of
21   Mr. Reynolds' allegations or --
22      A.    No.
23      Q.    -- the substance of the lawsuit
24   at all?
```

Page 15

```
 1      A.    No.
 2      Q.    Have these people that you
 3   identified ever shared their feelings about
 4   Mr. Reynolds or his allegations?
 5              MS. FICARO:  Objection.  You can
 6   answer it if you are able to.
 7              THE WITNESS:  They have expressed
 8   their feelings about Mr. Reynolds.  Nobody has
 9   expressed anything with respect to this
10   litigation.
11   BY MR. AUERBACH:
12      Q.    When you say they expressed their
13   feelings about Mr. Reynolds, who are you
14   referring to?
15      A.    Many people.
16      Q.    Okay.  Who is the first one who
17   comes to mind?
18      A.    His subordinate, John Kulp.
19      Q.    John -- would you spell the last
20   name.
21      A.    K-U-L-P.
22      Q.    And what did Mr. Kulp share with
23   you about Mr. Reynolds?
24      A.    I asked Mr. Kulp and another
```

Page 16

```
 1   gentleman, Randy Trout, T-R-O-U-T, what they
 2   thought about Mr. Reynolds' performance while he
 3   was working with them.
 4      Q.    Was Mr. Trout also a subordinate
 5   of Mr. Reynolds?
 6      A.    Yes.
 7      Q.    And what were their job titles?
 8      A.    Maintenance mechanic, both of
 9   them.
10      Q.    Are both of these individuals are
11   still employed with Willert?
12      A.    Yes.
13      Q.    Were they -- did they start
14   working for Willert before you started working
15   there?
16      A.    Yes.
17      Q.    And what did they tell you about
18   Mr. Reynolds' performance?
19      A.    They weren't pleased with his
20   performance.  Their -- the major complaint was
21   -- he said they never knew where he was, and he
22   would work different hours.  He'd come in late,
23   and he just never communicated with his team and
24   they didn't like that.
```

BISNOW & JOSEPH
COURT REPORTING

JACK BONSKY

Page 17

1    Q.    When did you have this
2  conversation with Mr. Kulp and Mr. Trout?
3    A.    While Matt was working here.  I
4  don't recall the date.
5    Q.    So between October and November
6  2020?
7    A.    Yes.
8        MS. FICARO:  Objection to form,
9  just in terms of the dates.
10 BY MR. AUERBACH:
11   Q.    Did you have more than one
12 conversation with Mr. Kulp and Mr. Trout about
13 Mr. Reynolds' performance?
14   A.    No.
15   Q.    Other than Mr. Kulp and
16 Mr. Trout, who else did you discuss about
17 Mr. Reynolds?
18   A.    One would be Joe Woods.
19   Q.    And who was Joe Woods?
20   A.    Production manager.
21   Q.    Is Mr. Woods still employed with
22 Willert?
23   A.    Yes.
24   Q.    And what was shared with you

Page 18

1  about Mr. Reynolds by Mr. Woods?
2    A.    Specifics I don't recall, but
3  it's just the normal course of business for the
4  production manager, the plant manager to bring
5  up the name of the maintenance manager.  I'm
6  sure we did.
7    Q.    And this would have only been
8  when Mr. Reynolds was working for Willert?
9    A.    And I notified Joe of the
10 termination maybe afterward.
11   Q.    What did you tell Joe about the
12 termination?
13   A.    Just that Matt was terminated.
14   Q.    Did he share his feelings about
15 Matt's termination?
16   A.    I don't remember.
17   Q.    Since Mr. Reynolds was
18 terminated, have you had any other conversations
19 with Mr. Woods about Mr. Reynolds?
20   A.    Yes.
21   Q.    What other conversations?
22   A.    We talked about the visit that
23 Matt had to the plant with counsel.  Joe hosted
24 the visit.  I suggested he do it, then I let Joe

Page 19

1  know what was going on, then counsel prepped
2  him.
3    Q.    Other than Mr. Kulp, Trout and
4  Woods, have you discussed Mr. Reynolds with
5  anyone else?
6    A.    Yes.
7    Q.    Who?
8    A.    Bryan Willert.
9    Q.    Mr. Willert is the owner of
10 Willert?
11   A.    I believe so.
12   Q.    Approximately how many
13 conversations did you have with Mr. Willert
14 about Mr. Reynolds?
15   A.    Oh, many.  Dozens.
16   Q.    Okay.  When was the most recent?
17   A.    About Mr. Reynolds, I don't
18 remember.
19   Q.    Was it after he was terminated?
20   A.    Oh, yeah.  We talked about it
21 after the termination, yes.
22   Q.    Other than Mr. Kulp, Trout, Woods
23 and Willert, have you discussed Mr. Reynolds
24 with anyone else?

Page 20

1    A.    Yes.
2    Q.    Who?
3    A.    Tammy Gillette.
4    Q.    Ms. Gillette is the HR rep?
5    A.    Yes.
6    Q.    And she's still employed with
7  Willert?
8    A.    Yes.
9    Q.    When was the most recent
10 conversation with Ms. Gillette about Mr.
11 Reynolds?
12   A.    Many, many weeks.  Maybe several
13 months back.
14   Q.    Any other individuals we haven't
15 discussed yet?
16   A.    Yes.
17   Q.    Who?
18   A.    Dave Furno.
19   Q.    What?
20   A.    Dave Furno, F-U-R-N-O.
21   Q.    Who is Mr. Furno?
22   A.    He is our quality and safety
23 manager.
24   Q.    And what did you discuss with

JACK BONSKY

Page 21

1  Mr. Furno?
2      A.      Many, many things. Mr. Furno was
3  the coordinator of the drug test. We talked
4  about that.
5      Q.      Anything else you discussed with
6  Mr. Furno about Mr. Reynolds?
7      A.      Just the day-to-day conversation
8  that would happen. We all worked together. I
9  can't think of a specific anything.
10     Q.      Did Mr. Furno have any opinion of
11 that or share with you his opinion about
12 Mr. Reynolds or his allegations?
13     A.      He didn't share anything with me.
14     Q.      Any other individuals we haven't
15 listed?
16     A.      Yes.
17     Q.      Who?
18     A.      Ed Kennet.
19     Q.      Ed Kennet or Kenneth?
20     A.      Kennet. I apologize.
21 K-E-N-N-E-T.
22     Q.      Who is Mr. Kennet?
23     A.      He is our controller.
24     Q.      And what was the nature of the

Page 22

1  conversation with Mr. Kennet about Mr. Reynolds?
2      A.      He was the witness for the
3  termination, which --
4      Q.      Anyone else?
5      A.      Nobody comes to mind, but there's
6  dozens and dozens of people here I've probably
7  talked to in some way, shape or form.
8      Q.      And, again, I don't want to know
9  anything that may have been said between you and
10 Eileen, but did you speak with Eileen in
11 anticipation of today's deposition?
12     A.      Yes.
13     Q.      *For approximately how long did
14 you guys speak?
15             MS. FICARO: Objection. I would
16 just instruct him not to answer that question or
17 anything regarding the contents of our
18 conversation.
19             MR. AUERBACH: Well, I'm not
20 asking the contents. I'm asking how long he
21 spoke.
22             MS. FICARO: I think arguably
23 that's crossing the line here.
24             MR. AUERBACH: So I can ask about

Page 23

1  an insertion of privilege. I can't ask any
2  privileged information. I can ask how long he
3  spoke with you.
4              MS. FICARO: I think anything
5  regarding, you know, our meeting or discussion
6  is off limits.
7              MR. AUERBACH: Court reporter,
8  would you mark this for me.
9  BY MR. AUERBACH:
10     Q.      Mr. Bonsky, have you done
11 anything else to prepare for today's deposition?
12     A.      Yes.
13     Q.      What did you do?
14     A.      Deep personal thought while I'm
15 all by myself just to get ready.
16     Q.      Did you review any documents?
17     A.      No.
18     Q.      Moving on to background.
19             What is your understanding of
20 Mr. Reynolds' claims?
21     A.      I believe he feels that we
22 discriminated against him because he is a
23 medical marijuana user.
24     Q.      Mr. Bonsky, where do you reside?

Page 24

1      A.      Wyomissing, Pennsylvania.
2      Q.      And do you live with anyone?
3      A.      Yes.
4      Q.      With whom do you live?
5      A.      My wife.
6      Q.      How long have you been married?
7      A.      About four years.
8      Q.      Is this your first marriage?
9      A.      No.
10     Q.      What number marriage is this for
11 you?
12     A.      This is my second marriage.
13     Q.      Your wife, is it her first
14 marriage or is it a second marriage as well?
15     A.      It is her second marriage.
16     Q.      Do you have any children?
17     A.      Yes.
18     Q.      How many and what are their ages?
19     A.      I have three children that are
20 28 -- let me take that back. 26, 24, 22.
21     Q.      Do you use social media?
22     A.      Yes.
23     Q.      What social media do you use?
24     A.      LinkedIn.

6 (Pages 21 to 24)

JACK BONSKY

**Page 25**

1   Q.   May I assume that your name on
2  the LinkedIn is Jack Bonsky?
3   **A.   Name on it -- it's either Jack**
4  **Bonsky or Jack R. Bonsky.  I don't recall.**
5   Q.   Do you use Facebook?
6   **A.   No.**
7   Q.   Smart man.  Other than LinkedIn,
8  any other?
9   **A.   No.  None.**
10   Q.   In broad strokes, what does
11  Willert do?
12   **A.   We make products that go in your**
13  **home, consumer packaged goods.  So disposable**
14  **things, things to clean your home with.  Other**
15  **plants do things like mothballs and fly swatters**
16  **and traps to catch insects.  Here we do liquid**
17  **fill.  And our products here are liquid fill**
18  **products, either under our name or somebody**
19  **else's.  We're a third-party manufacturer.  And**
20  **we also do air conditioners -- excuse me -- air**
21  **fresheners for ourselves and for another**
22  **customers.**
23   Q.   What is liquid fill?
24   **A.   Liquid fill?**

**Page 26**

1   Q.   Yes.
2   **A.   You take a bottle, you fill it**
3  **with liquid, you cap it somehow, you put a label**
4  **on it and you put it in a cart.  Like, I guess I**
5  **missed the fact -- the first thing you do is you**
6  **blend the chemicals together.**
7   Q.   And does Willert blend these
8  chemicals before it puts it in the container?
9   **A.   Yes.**
10   Q.   And you have a house brand of
11  some of these products?
12   **A.   What do you mean house brand?**
13   Q.   Meaning -- you said that you or I
14  believe I heard you say if -- I don't want to
15  misquote you -- that you do liquid fill for
16  other people's products -- other companies'
17  products and then do you also make -- does
18  Willert make their own products to sell directly
19  to consumers.
20   **A.   Yes.**
21   Q.   And --
22   **A.   Let me back up.  Not directly to**
23  **consumers.  Directly to customers that end up on**
24  **the shelf.  That's where consumers get involved.**

**Page 27**

1   Q.   What types of products are
2  involved in the liquid fill?
3   **A.   Our biggest runner is a product**
4  **called Ty D Bol, which is a toilet cleaner.**
5   MS. FICARO:  Just -- Jack, are
6  you finished your response there?
7   THE WITNESS:  Yes.
8   MS. FICARO:  I just want to
9  insert just a statement here, that to the extent
10  that he is testifying to any accommodations of
11  chemicals or anything else that would be
12  considered proprietary and confidential
13  information, that we would request that those
14  portions of the transcript are marked
15  confidential.
16   MR. AUERBACH:  That's agreeable.
17  CONFIDENTIAL PORTION HELD UNDER SEPARATE COVER
18   *
19   *
20   *
21   *
22   *
23   *
24   *

**Page 28**

1   *
2   *
3   *
4   *
5   *
6   *
7   *
8   *
9   *
10   *
11   *
12   *
13   Q.   Willert has a facility in
14  Douglassville, Pennsylvania; does it now?
15   **A.   Yes.**
16   Q.   And that's where you work?
17   **A.   Yes.**
18   Q.   How big of a facility is this?
19   **A.   It's about 87,000 square feet.**
20  **Excuse me.  86,000 square feet.**
21   Q.   And of the 86,000 square feet,
22  how many square -- all 86,000 square feet are in
23  active use; is that correct?
24   **A.   Yes.**

7 (Pages 25 to 28)

JACK BONSKY

Page 29

1     Q.   So approximately how many square
2 feet is Willert actually using of this 86,000
3 square foot facility?
4     A.   **All of it.**
5     Q.   What is your job title with
6 Willert?
7     A.   **Plant manager.**
8     Q.   And what are your duties?
9     A.   **Virtually every person at the**
10 **facility reports to me, so I'm responsible for**
11 **-- I'll give you the functions that report in to**
12 **me: production, got maintenance, got**
13 **shipping/receiving, human resources, supply**
14 **chain, which is scheduling and buying things,**
15 **material handlers all work indirectly through**
16 **me, all the operators in the plant work**
17 **indirectly through me. The blenders work,**
18 **again, indirectly for me.**
19     Q.   So you oversee the people?
20     A.   **Yes.**
21     Q.   Do you have any other duties?
22     A.   **Yes.**
23     Q.   What are they?
24     A.   **I do project work that doesn't**

Page 30

1 **directly involve managing people.**
2     Q.   What's project work mean?
3     A.   **Manufacturing engineering.**
4     Q.   Can you give some examples?
5     A.   **Yeah. I'm currently in the**
6 **process of purchasing a case taper, a machine to**
7 **take a box together. Specify it, get the**
8 **prices, get it ordered, get it in here, get it**
9 **installed.**
10     Q.   So project manager work is if
11 there's a -- if there's a need for the plant, so
12 purchasing large equipment?
13     A.   **Yes.**
14     Q.   Anything else?
15     A.   **Yes.**
16     Q.   What else do you do?
17     A.   **I have considerable customer**
18 **contact.**
19     Q.   What does that mean?
20     A.   **Well, everything from pre -- from**
21 **helpings us prepare quotations for jobs to**
22 **helping clarifying specifications with our**
23 **customers, providing the customer technical**
24 **advice and running sample runs here of first,**

Page 31

1 **second, third-type runs when the customer comes**
2 **in.**
3     Q.   You became the plant manager in
4 October 2020; is that correct?
5     A.   **Yes, that's correct.**
6     Q.   And who do you report to?
7     A.   **Bryan Willert.**
8     Q.   Do you report to anyone else?
9     A.   **No.**
10     Q.   And your current maintenance
11 manager reports to you?
12     A.   **Yes.**
13     Q.   What is this person's name?
14     A.   **Rick Hansen, H-A-N-S-E-N.**
15     Q.   H-A-N-S-E-N?
16     A.   **Correct.**
17     Q.   When did Mr. Hansen become the
18 maintenance manager?
19     A.   **December 20th or so. Just before**
20 **the Christmas break.**
21     Q.   Does Mr. Hansen report to anyone
22 else other than you?
23     A.   **No.**
24     Q.   And do you have the authority to

Page 32

1 discipline Mr. Hansen?
2     A.   **Yes.**
3     Q.   What authority do you have?
4     A.   **To discipline, to coach and**
5 **counsel and have those difficult discussions**
6 **that end up in a file.**
7     Q.   Do you have the ability to put
8 someone on a performance improvement plan?
9     A.   **Yes, but I would always do that**
10 **in -- with HR to help out, and I would certainly**
11 **-- if it's somebody directly reporting to me,**
12 **I'd let my boss know what's going on.**
13     Q.   Do you have the ability to fire
14 anyone?
15     A.   **Not on my own.**
16     Q.   Who has that authority?
17     A.   **Well, it depends on where --**
18 **nobody fires -- no one person can fire anybody**
19 **in the organization. Like, for example -- well,**
20 **for example, if it's a person that's one step**
21 **below me, my direct reports, I can -- I can have**
22 **a recommendation for termination. I would**
23 **always run that through our HR person, make sure**
24 **it makes sense to do it, and then I'd run it by**

BISNOW & JOSEPH
COURT REPORTING

JACK BONSKY

Page 33

1  my boss, Bryan Willert, to arrive -- to see if
2  he agrees.
3         Q.     And since November 2020, have you
4  had to fire anyone?
5         A.     Yes.
6         Q.     Who have you had to fire?
7         A.     There's been several --
8                MR. FICARO:  Hold on a moment,
9  Jack.  I just want to object here to offering
10  any testimony regarding, you know, personal and
11  confidential information regarding nonparties to
12  this action.
13                If you can ask your questions
14  without asking their names, Steven, you know, I
15  will permit Jack to answer that question as so
16  long as it doesn't reveal personal identifying
17  information regarding any individuals other than
18  Mr. Reynolds.
19                MR. AUERBACH:  Well, I'm going to
20  ask their name.  I'm not going to ask their
21  Social Security number, their bank information,
22  but I have to have some way of identifying who
23  these people are, the reasons for it.  It's
24  plainly discoverable.  Whether or not it's

Page 34

1  admissible in evidence, that's a whole separate
2  issue.
3                MS. FICARO:  It, frankly, would
4  have no relevance to this case, unless it was
5  somehow -- it was a termination for the same
6  reasons that, you know, Mr. Reynolds is claiming
7  that he was terminated here.
8  BY MR. AUERBACH:
9         Q.     Mr. Bonsky, who have you
10  terminated?
11                MS. FICARO:  Same objection.  And
12  again, Jack, I would just advise you not to
13  offer their names.
14  BY MR. AUERBACH:
15         Q.     Mr. Bonsky, I'm going to ask for
16  you to give their names.  And if Eileen is going
17  to insist on this, I'm going to ask for us to
18  adjourn while I get the judge on the phone.
19                MS. FICARO:  I'm going to advise
20  you not to answer in terms of these individuals'
21  names.
22                MR. AUERBACH:  All right.  How do
23  you want to handle this?  Do you want -- I think
24  we got to call chambers here.

Page 35

1                Let's go off the record.
2                - - -
3                (Whereupon, an off-the-record
4                discussion occurred.)
5                - - -
6  CONFIDENTIAL PORTION HELD UNDER SEPARATE COVER
7                *
8                *
9                *
10                *
11                *
12                *
13                *
14                *
15                MS. FICARO:  I think this is an
16  end run around that here in terms of getting
17  these individuals' names.
18                MR. AUERBACH:  That's fine.
19                MR. FICARO:  There must be other
20  ways for you to ask these questions that would
21  not reveal these individuals' names and their
22  identities and any employment action taken
23  against them here, something that would be
24  considered confidential and proprietary

Page 36

1  information regarding nonparties to this action.
2                MR. AUERBACH:  So you have an
3  issue with CR?
4                MS. FICARO:  Yes.
5                MR. AUERBACH:  Okay.  Do you have
6  any other suggestions?
7                MS. FICARO:  Well, I think it
8  depends on what you're looking for, Steve, but
9  --
10                MR. AUERBACH:  I want to know who
11  was fired and for what.
12                MS. FICARO:  A better way to ask
13  that would be -- well, I'm not going to advise
14  you as to how to ask your question here.  I'm
15  just simply going to assert the objection with
16  regard to anything pertaining to the identities
17  of other individuals who were terminated.
18                MR. AUERBACH:  Okay.  So what
19  would make you feel more comfortable?  So
20  there's more than one person, and we're going to
21  be referring to different people so how are we
22  going to keep them together?
23                MS. FICARO:  Steve, that's up to
24  you in terms of how to do it, so long as it does

9 (Pages 33 to 36)

JACK BONSKY

Page 37

1  not reveal the identities of these individuals.
2        MR. AUERBACH:  Well, revealing
3  them in deposition is a lot different than using
4  them as an exhibit.
5        MS. FICARO:  Not necessarily,
6  Steve.
7        MR. AUERBACH:  It's a completely
8  different standard, honestly.
9  CONFIDENTIAL PORTION HELD UNDER SEPARATE COVER
10              *
11              *
12              *
13              *
14              *
15              *
16              *
17              *
18              *
19              *
20              *
21              *
22              *
23              *
24              *

Page 38

1              *
2              *
3              *
4              *
5              *
6              *
7              *
8              *
9              *
10             *
11             *
12             *
13             *
14             *
15             *
16             *
17             *
18             *
19             *
20             *
21             *
22             *
23             *
24             *

Page 39

1              *
2              *
3              *
4              *
5              *
6              *
7              *
8              *
9              *
10             *
11             *
12             *
13             *
14             *
15             *
16             *
17             *
18             *
19             *
20             *
21             *
22             *
23             *
24             *

Page 40

1              *
2              *
3        MS. FICARO:  Same objection with
4  regard to initials.  And, again, just to be
5  clear, I would instruct him not to provide the
6  initials either, but I'll permit him to answer
7  as I did the similar -- the questions you asked
8  about the last individual.
9  BY MR. AUERBACH:
10       Q.     Okay.  We're going to call this
11  person Doe 3 -- or Doe 1.
12              Is this a man or a woman?
13       A.     A woman.
14       Q.     And why was Doe 1 fired?
15       A.     Poor attendance.
16       Q.     Did this person work for you or
17  for one of your subordinates?
18       A.     One of my subordinates.
19       Q.     Which subordinate?
20       A.     Joe Woods.
21       Q.     And did you or Mr. Woods give
22  this individual any kind of warning that their
23  job was in jeopardy because of attendance?
24       A.     Yes.

10 (Pages 37 to 40)

JACK BONSKY

Page 41

1  Q.  How many times?
2  A.  **I don't know.**
3  Q.  Was this in writing or was this
4  just in person?
5  A.  **In writing.**
6  Q.  And did this termination happen
7  before or after CR's termination?
8  A.  **After.**
9  Q.  Why was Doe 1 given a written
10 warning but CR was not?
11 A.  **When Doe 1 was terminated, that**
12 **was under -- well, let's back up a second. I**
13 **don't know that CR -- if CR got a warning or**
14 **not. I believe that's what I stated -- that's**
15 **what I meant to state. I don't know. I know**
16 **that Doe 1 did have warning or warnings,**
17 **according to our attendance policy.**
18 Q.  All right. The next person we're
19 going to talk about is Doe 2.
20 A.  **Okay.**
21 Q.  Why was Doe 2 fired?
22 A.  **Performance.**
23 Q.  What was this person's job?
24 A.  **Machine operator.**

Page 42

1  Q.  When was Doe 2 fired?
2  A.  **Probably six weeks ago.**
3  Q.  What was your involvement with
4  Doe 2's termination?
5  A.  **I was -- I was told that we would**
6  **proceed with termination unless I objected.**
7  Q.  So someone else made the call and
8  you were just asked to sign off on it?
9  A.  **That's correct.**
10 Q.  What type of performance issues
11 was Doe 2 having?
12 A.  **Doe 2 was -- in the five days**
13 **that he worked for us -- wasn't getting along**
14 **with his teammates.**
15 Q.  What does that mean?
16 A.  **He was argumentative.**
17 Q.  We discussed CR, Doe 1, Doe 2.
18 Is there another person?
19 A.  **Yes.**
20 Q.  We'll call this person Doe 3.
21 And why was Doe 3 fired?
22 A.  **Gross misconduct.**
23 Q.  What was Doe 3's job title?
24 A.  **Blender.**

Page 43

1  Q.  How long ago was Doe 3 fired?
2  A.  **About two weeks ago.**
3  Q.  And what was the gross misconduct
4  that was the subject of termination?
5  A.  **He threatened employees.**
6  Q.  How so?
7  A.  **He said he was going to call**
8  **people to come in and beat up somebody.**
9  Q.  And obviously he wasn't warned
10 before he was fired.
11    You heard about that and you
12 fired him?
13 A.  **You are correct.**
14 Q.  Is there a Doe 4 or have we
15 discussed everyone?
16 A.  **We've discussed everybody.**
17 Q.  So other than -- other than CR,
18 Matthew Reynolds, Doe 1, 2 and 3, these are the
19 only individuals at Willert that you had
20 anything to do with their termination?
21 A.  **Correct.**
22 Q.  Have you ever reprimanded
23 Mr. Hansen?
24 A.  **No.**

Page 44

1  Q.  Have you ever disciplined him?
2  A.  **No.**
3  Q.  Have you ever coached him?
4  A.  **Yes.**
5  Q.  On what?
6  A.  **Prioritization.**
7  Q.  What does that mean?
8  A.  **Making sure he's working on what**
9  **is urgent to the company that he didn't**
10 **necessarily realize.**
11 Q.  When did this coaching session
12 happen?
13 A.  **The one I'm thinking about was in**
14 **January.**
15 Q.  Other than this January 2021 --
16 January 2021; correct?
17 A.  **Yes, this year.**
18 Q.  Other than that instance, did you
19 have any other opportunity or occasion to coach
20 him?
21 A.  **We have daily conversation, but**
22 **that -- what I talked to you about before, I**
23 **would call that coaching.**
24 Q.  And fair to say he's never been

BISNOW & JOSEPH
COURT REPORTING

JACK BONSKY

Page 45

1  put on a performance improvement plan?
2      A.     That's correct.
3      Q.     His salary -- Mr. Hansen's salary
4  is $85,000; is it not?
5          MS. FICARO:  Objection.  Just
6  instruct him not to answer that question, to
7  provide information regarding Mr. Hansen's
8  salary information, as that's confidential
9  information pertaining to, you know, a nonparty
10  to this action.
11  BY MR. AUERBACH:
12      Q.     Do you know if he makes more --
13  is his salary greater or less than
14  Mr. Reynolds'?
15          MS. FICARO:  Same objection and
16  instruction.
17          MR. AUERBACH:  It goes to
18  damages.
19          MS. FICARO:  It does not.
20  BY MR. AUERBACH:
21      Q.     *Was he eligible to earn a
22  $15,000 bonus?
23          MS. FICARO:  Same objection with
24  regard -- instruction with regard to

Page 46

1  Mr. Hansen's earnings.
2          MR. AUERBACH:  Okay.  Court
3  reporter, would you mark this?  Let's just
4  handle all these at the same time.  And when I
5  say mark this, I mean where there's been
6  instruction not to answer with page and line.
7  And if you can, in any way, mark it now because
8  we're going to call the court --
9          MS. FICARO:  Steve, in order to
10  avoid a discovery dispute, I welcome any
11  rationale as to how that bears relevance on this
12  case and why it's not confidential.
13          MR. AUERBACH:  So, first off, you
14  haven't asserted any kind of privilege, and
15  that's not a basis to tell him not to answer --
16  to instruct the witness not to answer.  The
17  other way you can instruct the witness not to
18  answer is by an insertion of privilege, for
19  which you have none.  The second is this goes to
20  damages.  I'd like to know if he earned a
21  $15,000 bonus that Mr. Reynolds was going to get
22  and why or why not and the extenuating
23  circumstances.  And you know the judge is going
24  to make him answer this, and the judge is going

Page 47

1  to be pissed off at you for making us have to
2  call.  And he's going to be asking what's the
3  basis --
4          MS. FICARO:  I disagree with
5  that, Steve, but setting that aside, if your
6  questions are specifically about the bonus, I'll
7  permit him to answer questions about the bonus.
8          MR. AUERBACH:  Okay.
9  CONFIDENTIAL PORTION HELD UNDER SEPARATE COVER
10                      *
11                      *
12                      *
13                      *
14                      *
15                      *
16                      *
17                      *
18                      *
19                      *
20                      *
21                      *
22                      *
23                      *
24                      *

Page 48

1                      *
2                      *
3                      *
4                      *
5                      *
6      Q.     What are Mr. Hansen's duties?
7      A.     He's the maintenance manager.
8  He's in charge of the facility, the equipment.
9  He has the mechanics reporting in to him.  He
10  purchases supplies.
11      Q.     How many other facilities does
12  Willert have?
13      A.     Three others.
14      Q.     Where are they?
15      A.     There's one in West Virginia,
16  there's also St. Louis, Missouri, and we have
17  operations in Shanghai, China.
18      Q.     Mr. Bonsky, what's your highest
19  level of education?
20      A.     Master's degree.
21      Q.     In what?
22      A.     Business administration.
23      Q.     When did you get your degree?
24      A.     1989.

12 (Pages 45 to 48)

JACK BONSKY

Page 49

1  Q.   From where?
2  A.   Kent State University.
3  Q.   Do you have any certificates or
4  trainings?
5  A.   Yes.
6  Q.   In what?
7  A.   I've been trained to be a Six
8  Sigma leader, Six Sigma yellow belt.  I achieved
9  quality -- certified quality engineer status,
10 I've been trained in the DuPont safety training
11 observation program to have respect for
12 workplace training, I was -- I went through a
13 thing with Saint-Gobain called the management
14 development institute, which was four weekly
15 sessions -- I think it was four or three.  I'm
16 not sure.  It was weekly sessions at the
17 University of New Hampshire where they sent
18 their -- the better people they wanted to make
19 even better.
20 Q.   This respect for workplace
21 training, what is that?
22 A.   The takeaways were very
23 interesting, quite frankly.  When it comes to
24 respect for workplace, the best way I can do is

Page 50

1  just explain.  Like, if -- let's suppose I swear
2  around you and you don't like swearing, right.
3  In my mind I didn't do anything wrong, but in
4  your mind it's offensive.  So being
5  disrespectful is in the eyes of the person who's
6  being -- who feels disrespect.  So it teaches
7  you that if there is a situation, like if I --
8  if you feel that I've done something
9  disrespectful to you, it encourages the two
10 people to work it out amongst themselves, if
11 they can, not to go up the chain of command, but
12 to try to work things out at the lowest level
13 and just understand that what's offensive to one
14 is not necessarily the same as what's offensive
15 to somebody else.  Sexual harassment is a part
16 of respect for the workplace, too.  That's a big
17 one.
18 Q.   Have you ever had any EEO
19 training?
20 MS. FICARO:  I'm sorry.  Excuse
21 me.  EEO, did you say?
22 MR. AUERBACH:  Yes.  Equal
23 Employment Opportunity training.
24 THE WITNESS:  No.

Page 51

1  BY MR. AUERBACH:
2  Q.   Any sexual harassment training?
3  A.   As part of the respect for
4  workplace.  That's part of that.
5  Q.   Any workplace discrimination or
6  retaliation training?
7  A.   No.
8  Q.   What about any employment
9  harassment training?
10 A.   What do you mean by that, please?
11 Q.   Any training on hostile work
12 environments?
13 A.   Yes.
14 Q.   Where was this training?
15 A.   This was with Saint-Gobain again.
16 Q.   And did you attend that training
17 before you started working for Willert?
18 A.   Yes.
19 Q.   Has Willert ever given you any
20 harassment training?
21 A.   No.
22 Q.   Has Willert given you any Equal
23 Employment Opportunity training?
24 A.   No.

Page 52

1  Q.   Have they given you any classes
2  on any of those topics?
3  A.   No.
4  Q.   Before you started working for
5  Willert, were you ever the plant manager of any
6  other company?
7  A.   Yes.
8  Q.   Where?
9  A.   Been plant manager several times.
10 Most recently in Wales.  I lived in the UK, ran
11 a plant there that was owned by Spectrum Brands
12 when I got oversees, and then we were purchased
13 by Energizer before I left.  I ran a plant for
14 Spectrum Brands in Ohio, before that I ran a
15 plant for -- I was plant manager for a company
16 called Beckett Air prior to that.
17 Q.   Do you have any previous human
18 resources experience?
19 A.   Yeah.  I -- I had -- human
20 resources has reported to me on several
21 occasions.
22 Q.   In Willert, does human resources
23 report to you or someone else?
24 A.   The plant human resources person

13 (Pages 49 to 52)

JACK BONSKY

**Page 53**

1  reports to me.
2      Q.      Who is the plant human resources
3  manager?
4      A.      **That's Deborah Kulp.**
5      Q.      Is she related to John Kulp?
6      A.      **No.**
7      Q.      Have you discussed Mr. Reynolds
8  or his allegations with Debra Kulp?
9      A.      **Yes.**
10     Q.      What did you discuss?
11     A.      **She was involved in our**
12 **preparations.**
13     Q.      Preparations for what?
14     A.      **For the deposition.**
15     Q.      What does that mean, she was
16 involved in the preparations for this
17 deposition?
18     A.      **She knew what was going -- it was**
19 **going on, and she answered some questions that I**
20 **had specifically involving the case.**
21     Q.      What questions did you have?
22     A.      **I wanted to --**
23         MS. FICARO: To the extent that
24 any of these were conversations that we had, I

**Page 54**

1  would just instruct you not to disclose that,
2  but to the extent that they are not, you know,
3  please answer the question if you can.
4  BY MR. AUERBACH:
5      Q.      And Mr. Bonsky, I want to be
6  clear what I'm asking.  I'm not asking for
7  anything that you told the lawyer, but if
8  there's anything that you told Ms. Kulp, that's
9  what I'm asking you about.
10     A.      I asked her for his -- for Matt's
11 training records.
12     Q.      Why did you ask for Matt's
13 training records?
14     A.      To see what he was trained in.
15     Q.      When did you ask for Matt's
16 training records?
17     A.      When we answered the -- I believe
18 it was eight questions that counsel sent to us
19 that involved training.
20     Q.      And did Deborah Kulp give you
21 Matt's training records?
22     A.      Not physically, but she let me
23 know what he had done.
24     Q.      And training can mean any number

**Page 55**

1  of things.
2          What do you mean by Matt's
3  training records?
4      A.      **Well, we have very many formal**
5  **trainings that we do.  Like, it's, I believe, 79**
6  **of them.**
7      Q.      You're talking about -- so you
8  were asking about Matt's training records that
9  are Willert's records?
10     A.      **Yes.**
11     Q.      Are these OSHA trainings, safety
12 trainings?  What are these trainings?
13     A.      **They are.  There's other**
14 **trainings as well.**
15     Q.      And what is your understanding --
16 having had this conversation, what is your
17 understanding of Matt's training with Willert?
18     A.      **I don't understand the question.**
19     Q.      What type of training did Willert
20 give Matt?
21     A.      **I inquired about the eight**
22 **questions that were posed, and that's what I**
23 **reviewed.**
24     Q.      Do you know what training

**Page 56**

1  Mr. Reynolds received from Willert?
2      A.      **The -- one of the OSHA trainings**
3  he did get.  It was question two, and I can't
4  recall the verbiage of that question.
5      Q.      When did you receive that
6  question?
7          MS. FICARO:  I just want to
8  object on the basis of privilege.  To the extent
9  that you're referring to questions from me to
10 you, Jack, I would just instruct you not to
11 answer those, that they would be privileged.  To
12 the extent that you're referring to something
13 non-privileged, you're permitted to answer the
14 question if you can.
15         Steve, do you want to re-ask the
16 question with that same instruction and
17 objection?
18 BY MR. AUERBACH:
19     Q.      What else did you discuss with
20 Mr. Kulp about Mr. Reynolds?
21     A.      That's Mrs. Kulp, by the way.
22     Q.      Mrs. Kulp.
23     A.      Okay.
24     Q.      But not Mrs. to John Kulp?

JACK BONSKY

Page 57

1    A.    That is correct. I have nothing
2 I can add.
3    Q.    Did Mrs. Deborah Kulp -- was she
4 involved, in any way, in the decision to
5 terminate Mr. Reynolds?
6    A.    No.
7    Q.    When did she start working at
8 Willert?
9    A.    Maybe the end of November, 1st of
10 December. It was after Mr. Reynolds' employment
11 ended.
12    MR. AUERBACH: This is a good
13 place to take a break.
14        - - -
15    (Whereupon, a brief recess was taken.)
16        - - -
17 BY MR. AUERBACH:
18    Q.    Mr. Bonsky, did you have any
19 conversations with Eileen during our break?
20    A.    No.
21    Q.    Since you started working with
22 Willert, have any of your employees been hurt on
23 the job?
24    A.    No. I take that back. No OSHA

Page 58

1 recordable injuries. We have had a handful of
2 first aid situations though.
3    Q.    Any workers' comp claims?
4    A.    There's an existing one, but
5 nothing new.
6    Q.    What does that mean, an existing
7 one? Did that predate your employment or --
8    A.    It predated my employment.
9    Q.    And the individual who has the
10 claim, what position did he hold?
11    A.    He's the plastics supervisor.
12    Q.    To your knowledge, did Mr. Hansen
13 have any first aid issues?
14    A.    I don't recall any.
15    Q.    What's your understanding of the
16 plastics supervisor's claim? How did it happen
17 and the injuries?
18    MS. FICARO: To the extent that
19 this pertains to, you know, an ongoing claim
20 there, I object to this line of questioning.
21 BY MR. AUERBACH:
22    Q.    In this calendar year, have there
23 been any production man hours lost because of
24 work injuries?

Page 59

1    A.    No.
2    Q.    When did you first learn that
3 Pennsylvania had legalized marijuana for medical
4 purposes?
5    A.    I don't know.
6    Q.    You are aware that it's legal for
7 medical purposes; are you not?
8    A.    Yes.
9    Q.    And do you think it's a good idea
10 for people with cancer or AIDS to have access to
11 additional medication?
12    MS. FICARO: Objection. You can
13 answer it if you are able to answer it.
14    THE WITNESS: The answer is yes.
15 BY MR. AUERBACH:
16    Q.    What is your understanding of the
17 phrase medical marijuana patient employment
18 discrimination? And I'm not looking for a legal
19 definition. I'm asking you for your
20 understanding of what the term means.
21    MS. FICARO: Objection to form.
22 You can answer if you are able to, Jack.
23    THE WITNESS: I don't know about
24 it.

Page 60

1 BY MR. AUERBACH:
2    Q.    What's your understanding of the
3 term?
4    MS. FICARO: Same objection. You
5 can answer if you are able, Jack.
6    MR. AUERBACH: One second. I
7 need to make a record of this.
8    Eileen, I'm going to ask you not
9 to use the words if you're able. You can say --
10 obviously, you can object on any legitimate
11 grounds. You can then -- it's then appropriate
12 to direct the deponent to answer, but the words
13 if you are able may be misconstrued as coaching.
14 I'm going to ask you to not use the words if you
15 are able.
16    MS. FICARO: There is nothing
17 wrong or objectionable with me saying if you're
18 able and following that with instructing the
19 witness to answer. So I disagree with the
20 position that you're taking, but nonetheless,
21 the substance of my direction to the witness,
22 which is to answer the question despite my
23 objection, remains the same.
24 BY MR. AUERBACH:

BISNOW & JOSEPH
COURT REPORTING

JACK BONSKY

Page 61

1    Q.    Have you ever been involved, in
2  any capacity, in formulating or crafting any
3  antidiscrimination policies at Willert?
4    A.    No.
5    Q.    Have you ever been involved, in
6  any capacity, in administering training on
7  antidiscrimination policies at Willert?
8    A.    No.
9    Q.    Does Willert have any policies to
10  make sure that medical marijuana patients are
11  not denied equal employment opportunities?
12        MS. FICARO:  Objection.  You can
13  answer.
14        THE WITNESS:  Not that I'm aware
15  of.
16  BY MR. AUERBACH:
17    Q.    We had briefly touched on this,
18  but Mr. Reynolds worked for Willert as a
19  maintenance manager.
20        What are a maintenance manager's
21  duties?
22    A.    The maintenance manager is in
23  charge of the facility.  That's everything from
24  the air conditioning to the roof.  I take that

Page 62

1  back.  We rent.  The roof is somebody else's
2  responsibility.  But taking care of the office
3  plumbing and all that kind of stuff, responsible
4  for the machines, of maintaining them, repairing
5  them, leading the installation of new equipment,
6  ordering things that are required for the plant
7  to maintain it, making sure we have critical
8  spare parts.
9    Q.    When you say maintaining and
10  repairing machines, you're referring to
11  overseeing his subordinates repair them?
12    A.    That and he -- he would -- would
13  work on machines himself, as well, either with
14  his subordinates or alone.
15    Q.    What machines would he work on?
16    A.    What I remember -- I remember --
17  I can't recall specifically, but he used to
18  carry a little -- like a fanny pack kind of
19  thing, but not really -- I think it was on his
20  belt, but he used to carry tools with him and
21  gloves, and I know he got his hands dirty.  I
22  just can't recall exactly what he's worked on.
23    Q.    Did you ever see him working on
24  machines?

Page 63

1    A.    I probably did.  I can't think of
2  a specific instance.
3    Q.    This position doesn't have
4  anything to do with confined spaces; does it?
5    A.    Only to the -- only to the degree
6  that this position has to understand that we do
7  not -- we, Willert, do not go into confined
8  spaces.
9    Q.    So he would not have been
10  expected to go into a confined space?
11    A.    That's correct.
12    Q.    Would he have been expected to
13  work at heights?
14    A.    Yes.
15    Q.    What does that mean?
16    A.    I can give you an example.
17        Like, we have a scissor lift that
18  goes, I don't know, 25 feet in the air and there
19  can be -- I mean, the current maintenance
20  manager goes up and, you know, mount wood of --
21  I don't know if he did, but that would be his
22  responsibility.  Sometimes you have to fix
23  things that are way up.
24    Q.    And you're referring specifically

Page 64

1  to that lift?
2    A.    That's what I am, yes.
3    Q.    And is the lift -- when one goes
4  up on the lift, is it an enclosed --
5    A.    No.
6    Q.    Are there any fall barriers to
7  prevent a fall?
8    A.    Yeah.  There are rails around it.
9    Q.    How high are the rails?
10    A.    About 36 inches, guessing.
11    Q.    You never saw Matt on that lift;
12  did you?
13    A.    No, I did not.
14    Q.    How often does the current
15  maintenance manager go off -- go up on that
16  lift?
17    A.    Probably at least once a week.  I
18  don't pay attention.  It's not that big a deal
19  to me.  I see him regularly using it.
20    Q.    Is there a harness that one wears
21  when one goes on this?
22    A.    No.
23    Q.    Do you know the name of the lift?
24    A.    No.

16  (Pages 61 to 64)

JACK BONSKY

**Page 65**

1    Q.    Is it a cherry picker?
2    A.    No.  So a cherry picker has an
3  articulating arm generally.  This one just goes
4  straight up and straight down, and then it moves
5  with wheels on the -- tires on the ground.
6    Q.    Does one need a license to
7  operate this machine?
8    A.    No.
9    Q.    Have you ever been on it?
10    A.    No.
11    Q.    Any reason why?
12    A.    No.
13    Q.    How's it powered?
14    A.    Battery powered.  Rechargeable.
15    Q.    Other than this lift, any other
16  heights the maintenance manager is involved in?
17    A.    Ladders.
18    Q.    Anything else?
19    A.    Nothing else comes to mind.
20    Q.    And this position has nothing to
21  do with public utilities like gas, water,
22  sewage; does it?
23    A.    I don't understand that question.
24    Q.    I know it's clunky.

**Page 66**

1         Does the maintenance manager have
2  anything to do with operating sewage?
3    A.    Yes.
4    Q.    What?
5    A.    Well, all of the -- the drains
6  are his responsibility, to keep them clear and,
7  you know, not leaking.
8    Q.    How long did Mr. Reynolds work
9  for Willert?
10    A.    I count either 14 or 17 days he
11  was actually here and working for me.  I don't
12  recall the number because he had some days he
13  missed.
14    Q.    The days I have of his employment
15  are October 16, 2020 through November 5, 2020.
16         Is that your understanding?
17    A.    That sounds correct.
18    Q.    And you were his supervisor
19  during that time?
20    A.    Yes.
21    Q.    Did you consider Mr. Reynolds to
22  be your friend?
23    A.    No.
24    Q.    Did you socialize with him

**Page 67**

1  outside of work?
2    A.    He occasionally would send me
3  text messages, and I -- I was not especially
4  responsive.
5    Q.    What sorts of messages would he
6  send you?
7    A.    He sent one that was a lead on a
8  music store because he knows I play guitar, and
9  he sent one at Thanksgiving.  I frankly just did
10  not understand.  It was -- I don't know.
11    Q.    Did you ever put him on a
12  performance improvement plan?
13    A.    No.
14    Q.    Did you ever write him up?
15    A.    No.
16    Q.    Did you ever give him an oral
17  warning?
18    A.    Yes.
19    Q.    For what?
20    A.    I told him he had to let his
21  people know where he is because that was their
22  complaint.
23    Q.    Was that the only oral warning
24  you ever gave him?

**Page 68**

1    A.    That's all I remember.
2    Q.    Do you recall when that warning
3  occurred?
4    A.    No.
5    Q.    Was anyone else around when you
6  gave him that warning?
7    A.    No.
8    Q.    Do you recall his response to
9  that warning?
10    A.    I don't remember.
11    Q.    Did you give him any kind of
12  coaching?
13    A.    Beyond that, nothing.  Excuse me.
14  Nothing that I characterize as coaching.  We had
15  daily conversations of course.
16    Q.    Did you ever give him any
17  coachings on his performance?
18    A.    No.
19    Q.    Did you ever let him know that
20  his job was in jeopardy?
21    A.    No.
22    Q.    Have you ever had any
23  conversations with him about what you might have
24  perceived to be performance deficiencies other

17 (Pages 65 to 68)

JACK BONSKY

Page 69

1  than the instance you had just discussed?
2      A.      Please restate that.  I got lost.
3  My apologies.
4      Q.      Other than the instance in which
5  you told him you got to let your people know
6  where you are, did you ever have any other
7  conversations with him that might have been
8  perceived as a performance deficiency?
9      A.      Yes.
10     Q.      What was that?
11     A.      He -- we do a -- he came onto the
12 shop floor -- this is during COVID and masking
13 -- and he was on the shop floor with a leather
14 mask, which I don't care about, but it had nose
15 holes in it so it wouldn't -- with the nose
16 holes it wasn't doing what face masks were
17 supposed to do, so I asked him to put on a
18 proper one.  First thing he says, well -- well,
19 they don't work anyway, because they aren't N95
20 masks then -- you know, 30 seconds later he
21 says, well, I'll change it.
22     Q.      But you didn't write him up for
23 that?
24     A.      No.  That was in a public

Page 70

1  setting.  I mean, certain things you got to take
2  care of, like masks during COVID.
3      Q.      Overall, how would you describe
4  his abilities as a maintenance manager?
5      A.      Below average.
6      Q.      On what basis do you say that?
7      A.      I guess I can give you an
8  example.  I was with Bryan Willert on our line
9  13, and there's a discussion about something
10 electrical.  I don't recall exactly what it was,
11 but Bryan and I later talked, and it's like Matt
12 doesn't really seem to understand.  It's
13 something he should have understood.  Again, I
14 don't even recall what the electrical thing was
15 and, of course, his attendance wasn't good.
16     Q.      Did you ever warn him about his
17 attendance?
18     A.      No.
19     Q.      Did you ever write him up for his
20 attendance?
21     A.      No.
22     Q.      Did you ever coach him about his
23 attendance?
24     A.      Let me back up here.  Attendance

Page 71

1  in terms of showing up -- I did coach him about
2  showing up for work and letting people know when
3  he's there, if you call that attendance, but
4  beyond that, no.
5      Q.      Is that what -- what you meant
6  when you said attendance?  Is that what you
7  meant about the complaint?
8      A.      No.
9      Q.      That's separate?
10     A.      That's separate.  He would come
11 in late, and he missed entire days.
12     Q.      On what days did he come in late?
13     A.      I don't have that at my
14 fingertips.  I've provided -- I have it, but not
15 at my fingertips.
16     Q.      How many days did he come in
17 late?
18     A.      I don't remember.
19     Q.      How do you know he came in late?
20     A.      I can remember at least one time.
21 There were others.  I tabulated this at one
22 point.  I remember tabulating it.
23     Q.      When you tabulated it, was it
24 before or after being terminated?

Page 72

1      A.      I don't remember.
2      Q.      And what did you do with those
3  tabulations?
4      A.      I can't speak to that.
5      Q.      Did you give them to your
6  attorney?
7          THE WITNESS:  Am I allowed to
8  answer that?
9          MS. FICARO:  As long as you don't
10 disclose any conversations or discussions that
11 were had --
12         THE WITNESS:  Okay.
13         MS. FICARO:  -- with any
14 attorneys, myself or prior counsel then, yes,
15 you can answer the question.
16         THE WITNESS:  Yes, I did provide
17 it to counsel.
18 BY MR. AUERBACH:
19     Q.      What information did you use to
20 generate those tabulations?
21     A.      I -- well, for one, I flat out
22 just remembered because it was a very short
23 period of time when he worked here, and I have
24 -- I had, at the time, some text -- I know I had

BISNOW & JOSEPH
COURT REPORTING

JACK BONSKY

## Page 73

1 a text message on one Monday that he came in
2 late. I think he said something to the effect
3 of decided to have breakfast at whatever time.
4 So it was very fresh at the time. He hadn't
5 worked here long.
6 Q. Did you ever share, with
7 Mr. Reynolds, these tabulations?
8 A. No.
9 Q. When was his shift supposed to
10 start?
11 A. He didn't -- the maintenance
12 manager does not work shift work, but I expect a
13 person to be here at a reasonable time, meaning
14 8 o'clock or before, in the morning, and stay in
15 through the afternoon or you can switch it a
16 little bit. If you want to do a 7:00 to 4:00,
17 that's fine. At the time we were working two
18 shifts. The first shift started at 5:30 and
19 ended at 2:30. So there's some leeway, but I
20 would expect a maintenance manager to have
21 contact with both shifts.
22 Q. Is there anything in writing that
23 says when a maintenance manager is supposed to
24 start his shift?

## Page 74

1 A. No.
2 Q. Did you ever have any
3 conversations with him as to what time you
4 expected him to be there?
5 A. Yes. When I talk -- yes.
6 Q. How many?
7 A. One.
8 Q. What did you tell him?
9 A. That was incorporated with the
10 information of you got to tell your guys where
11 you are.
12 Q. And what was his response?
13 A. I don't remember.
14 Q. After you had that conversation
15 with him, were there any other latenesses?
16 A. I don't remember.
17 Q. Did you conduct any performance
18 reviews for him?
19 A. No.
20 Q. Any reason?
21 A. I didn't feel that he had been
22 here long enough for me to have a meaningful
23 review with him.
24 Q. Honesty and integrity are two

## Page 75

1 important characteristics for individuals who
2 work for Willert; is that correct?
3 A. Yes.
4 Q. How important would you say those
5 characteristics are?
6 A. Very important.
7 Q. If you feel like you can't
8 answer, just let me know, but on a scale of 1 to
9 10, how important are honesty and integrity for
10 Willert employees?
11 MS. FICARO: Object to form.
12 THE WITNESS: I don't remember.
13 BY MR. AUERBACH:
14 Q. Do you have any reason to doubt
15 Mr. Reynolds' honesty or integrity?
16 A. No.
17 Q. Can you recall any occasion which
18 you believe that Mr. Reynolds potentially told a
19 lie?
20 A. No.
21 Q. Did you ever see Mr. Reynolds use
22 marijuana at work?
23 A. No.
24 Q. Did you ever see Mr. Reynolds

## Page 76

1 appear intoxicated at work?
2 A. No.
3 Q. I'm going to ask you a series of
4 questions about Mr. Reynolds' allegations.
5 When did you first learn that
6 Mr. Reynolds had failed his drug test?
7 A. Probably two to three days prior
8 to his termination.
9 Q. And how were you made aware?
10 A. The report came from Dave Furno.
11 He coordinated the drug test.
12 Q. When you say a report, was this a
13 written report or oral report or both?
14 A. Written.
15 Q. How did you receive this written
16 report? Was it handed to you, e-mail?
17 A. Handed to me.
18 Q. Mr. Furno handed it to you or
19 someone else did?
20 A. Yeah, Mr. Furno.
21 Q. Would it be -- what did Mr. Furno
22 tell you when he handed you this report?
23 A. Matt failed his drug test.
24 Q. The report that he handed to you,

19 (Pages 73 to 76)

JACK BONSKY

Page 77

1   was that the results of the drug test or
2   something else?
3        A.   Results.
4        Q.   Do you recall if it was more than
5   one page?
6        A.   It was one page.
7        Q.   Other than that one page, the
8   drug results, did you see any other paperwork
9   that indicated that he had failed his drug test?
10       A.   No.
11       Q.   When Mr. Furno told you that Matt
12  had failed his drug test, what did you then do?
13       A.   I don't recall -- I do. Yeah. I
14  -- that's when I reached out to Tammy for her
15  guidance, Tammy Gillette, the HR person handling
16  this.
17       Q.   What did you -- what did you tell
18  Ms. Gillette?
19       A.   I just factually said here's the
20  drug test.
21       Q.   Did you send her a copy of the
22  results?
23       A.   I'm sure I did.
24       Q.   Do you recall what Ms. Gillette

Page 78

1   told you in response to you telling her that
2   Mr. Reynolds failed the test?
3        A.   Specific conversation, no, but we
4   talked about needing to terminate Mr. Reynolds,
5   which I then got with my boss, Bryan Willert,
6   because, again, nobody fires anyone alone and
7   explained it to him and made the recommendation
8   for termination and then we had some
9   conversation about not that big a loss anyway
10  because he wasn't performing great.
11       Q.   Now, you had mentioned with
12  respect to Doe 3 -- that's the gross misconduct
13  individual, that you more or less just signed
14  off on the termination, that someone else made
15  the call.
16            Who made the call or the
17  recommendation to fire Mr. Reynolds?
18            MS. FICARO:  Objection to form.
19  You can answer.
20            THE WITNESS:  I'm sorry, Eileen?
21            MS. FICARO:  I just said
22  objection to form.  You can answer.
23            THE WITNESS:  Okay.  Bryan
24  Willert was the person that authorized the

Page 79

1   termination.
2   BY MR. AUERBACH:
3        Q.   Did anyone recommend the
4   termination to Bryan Willert or did he come up
5   with it on his own idea?
6        A.   I recommended it to him.
7        Q.   Was this on the day that you
8   became aware that he had failed the drug test?
9        A.   Not sure if it was that day.  It
10  was very shortly after.
11       Q.   How was the termination
12  communicated to Mr. Reynolds?
13       A.   It was the set -- he had missed
14  two days of work in a row, so we did it by
15  telephone.  I made the call from my desk with Ed
16  Kennet at my side, was the witness to it, and I
17  read the termination letter that Tammy had
18  prepared word for word, top to bottom, and then
19  at that point Matt sounded like he was crying,
20  and he goes, but I have a card, and it's not
21  even -- I don't even smoke pot.  It's -- I get
22  CBD from a place in Oregon, he said, for his
23  anxiety.  So I said fuck it.  Let me make a
24  call.  So I called Tammy about it and -- just to

Page 80

1   verify what her thoughts were, and she was like
2   it doesn't make a difference.  So I called Matt
3   back, and it went to voice mail, and I said, you
4   know, you are terminated, and I let him know
5   we'd send the stuff to his house.
6        Q.   When Mr. Reynolds told you that
7   he had a card, what did that mean to you?
8        A.   It was a medical marijuana card,
9   was my understanding.  The first I heard, you
10  know, from him that he had one.
11       Q.   Did you ask him why he had a
12  card?
13       A.   No.  He volunteered it was for
14  anxiety though.
15       Q.   Why did you call Ms. Gillette
16  after he told you that he had a card?
17       A.   Just to make sure that having the
18  card could somehow change something.
19       Q.   Why would it change something?
20       A.   I don't know.  I never been in a
21  situation like this.  Unfamiliar situations
22  involving human resource things you talk to a
23  human resources specialist to make sure you're
24  doing the right thing is important.

BISNOW & JOSEPH
COURT REPORTING

JACK BONSKY

Page 81

1      Q.    How long was the conversation
2  with Tammy when you told her that Mr. Reynolds
3  had the card?
4      A.    Just several minutes.
5      Q.    What chemicals do you have at
6  your plant?
7      A.    We have dozens and dozens, if not
8  hundreds and hundreds of chemicals.  Wide
9  variety.  Everything from water -- well,
10  shouldn't say water.  In terms of what they are,
11  we have things that are, like, soaps, we have
12  things that are acids, we have things that are
13  caustics, we have fragrances, we have colorants.
14  Some of -- most of what we have is liquid and
15  some is powder, some is palettes.
16      Q.    Who handles the ordering of the
17  chemicals?
18      A.    There's two people that order the
19  chemicals.  One is the -- some of them the
20  supply chain manager orders, and we have a
21  gentleman that title is purchasing, but he
22  doesn't do very much of that.  He orders some of
23  our things.
24      Q.    I'm sorry.  You cut out.

Page 82

1      A.    Yeah.  We have two people.  One
2  is a supply chain manager, the other is a person
3  whose title is purchasing, but as a practical
4  matter, he does very little of it.
5      Q.    Do you oversee this process, at
6  all?
7      A.    Yes.
8      Q.    What's your involvement in the
9  procurement of these chemicals?
10      A.    The two gentlemen I'm talking
11  about that are direct reports to me, so they're
12  accountable to me.
13      Q.    Do any of these chemicals require
14  licenses or permits?
15      A.    We register with the state for
16  some of our chemicals.  Not sure if you call
17  that license approval.
18      Q.    What state agency?
19      A.    I don't know.
20      Q.    Is it the Department of
21  Environment?
22      A.    It could be the DEP.  I don't
23  know.
24      Q.    What chemicals have to be

Page 83

1  registered with the state?
2      A.    I frankly don't know the criteria
3  for that.
4      Q.    Other than registering some of
5  these chemicals with the state, do you have to
6  have any other permits or licenses?
7      A.    Boiler permit to run a boiler.
8      Q.    But specifically for these
9  chemicals, do you need any licenses or permits
10  for these chemicals?
11      A.    No.
12      Q.    If Mr. Reynolds hadn't failed his
13  drug test, would he have been fired on November
14  5th?
15      A.    No.
16      Q.    Why do you say that?
17      A.    I guess there's several ways you
18  get terminated, and he didn't reach any of the
19  thresholds for termination.  He had only been
20  here a few weeks.
21      Q.    So fair to say that's the reason
22  he was fired?
23            MS. FICARO:  Objection.
24            THE WITNESS:  What's the reason

Page 84

1  -- I didn't -- we fired him --
2  BY MR. AUERBACH:
3      Q.    Is it fair to say he was fired
4  because of the drug test?
5            MS. FICARO:  Objection.
6            THE WITNESS:  Yes.
7  BY MR. AUERBACH:
8      Q.    Mr. Bonsky, I'm just reviewing my
9  notes.
10            Do you believe he should have
11  been fired for this?
12            MS. FICARO:  Objection.  You can
13  answer.
14            THE WITNESS:  Please say it
15  again.  I thought I heard a double negative in
16  there.  Maybe I got confused.
17  BY MR. AUERBACH:
18      Q.    Do you believe that Mr. Reynolds
19  should have been fired for this?
20            MS. FICARO:  Objection.
21            THE WITNESS:  Yes.
22  BY MR. AUERBACH:
23      Q.    Why do you say that?
24      A.    It was a violation of -- it was a

                           21 (Pages 81 to 84)

JACK BONSKY

## Page 85

1  company policy that you had to pass a drug test.
2  It was a violation.
3      Q.      The company policy on passing the
4  drug test, does it differentiate between
5  employees' medical marijuana usage or
6  recreational usage?
7      A.      I don't know.
8      Q.      Is it Willert's policy that it
9  can fire medical marijuana patients for their
10  off-duty use of medical marijuana?
11     A.      I'm not aware of a policy like
12  that.
13     Q.      Are you aware of any policy that
14  a medical marijuana patient wouldn't be fired
15  for their off-duty use of medical marijuana?
16     A.      No.
17         MS. FICARO:  Objection to form.
18  You can answer.
19         THE WITNESS:  I'm not aware of
20  that.  I don't know all the policies necessarily
21  either.
22  BY MR. AUERBACH:
23     Q.      Mr. Hansen is not licensed to
24  operate or control chemicals; is he?

## Page 86

1      A.      He is not licensed, yes, that's
2  correct.
3      Q.      And your maintenance managers are
4  not required to be licensed to operate or
5  control high-voltage electricity?
6      A.      That's correct.
7      Q.      And your maintenance managers are
8  not required to possess electrical journeyman
9  certificates?
10     A.      That's correct.
11     Q.      Does Willert provide arc flash or
12  electrical safety courses to its maintenance
13  managers?
14     A.      No.
15         MR. AUERBACH:  That's all I have
16  for you.
17         Eileen, do you have anything?
18         MS. FICARO:  I do.
19           - - -
20         EXAMINATION
21           - - -
22  BY MS. FICARO:
23     Q.      I just have one question,
24  Mr. Bonsky.

## Page 87

1      Did the performance issues that
2  you mentioned and testified to here today that
3  Mr. Reynolds had while working there, did they
4  factor into your recommendation that he be
5  terminated as well?
6      A.      I included that in the
7  information with Bryan Willert, that his
8  performance was poor.
9         MS. FICARO:  That's all I have.
10  Thank you.
11         MR. AUERBACH:  Mr. Bonsky, thank
12  you so much.
13           * * * * *
14         (Whereupon, at 3:21 p.m., the
15         deposition of JACK BONSKY
16         was concluded.)
17           * * * * *

## Page 88

1  C E R T I F I C A T E
2
   COMMONWEALTH OF PENNSYLVANIA:
3
   COUNTY OF PHILADELPHIA:
4
5      I, Masheka Pettiford, a Notary Public within
   and for the County and State aforesaid, do
6  hereby certify that the foregoing deposition of
   JACK BONSKY, was taken before me, pursuant to
7  notice, at the time and place indicated; that
   said deponent was by me duly sworn to tell the
8  truth, the whole truth, and nothing but the
   truth; that the testimony of said deponent was
9  correctly recorded in machine shorthand by me
   and thereafter transcribed under my supervision
10 with computer-aided transcription; that the
   deposition is a true record of the testimony
11 given by the witness; and that I am neither of
   counsel nor kin to any party in said action, nor
12 interested in the outcome thereof.
13
14     WITNESS my hand and official of this 7th day
   of September, 2021.
15
16
17
   _____
18  MASHEKA C. PETTIFORD
   Notary Public
19
20
21
22
23
24

BISNOW & JOSEPH
COURT REPORTING

JACK BONSKY

Page 89

```
 1        INSTRUCTIONS TO WITNESS
 2        Please read your deposition
 3  over carefully and make any necessary
 4  corrections.  You should state the reason in the
 5  appropriate space on the errata sheet for any
 6  corrections that are made.
 7        After doing so, please sign the
 8  errata sheet and date it.
 9        You are signing same subject to
10  the changes you have noted on the errata sheet,
11  which will be attached to your deposition.
12        It is imperative that you
13  return the original errata sheet to the deposing
14  attorney within thirty (30) days of receipt of
15  the deposition transcript by you.  If you fail
16  to do so, the deposition transcript may be
17  deemed to be accurate and may be used in court.
18
19
20
21
22
23
24
```

Page 90

```
 1      - - - - - - - -
 2        E R R A T A
 3      - - - - - - - -
 4  PAGE    LINE    CHANGE
 5  ____ ___ _____
 6  Reason for Change:_____
 7  ____ ___ _____
 8  Reason for Change:_____
 9  ____ ___ _____
10  Reason for Change:_____
11  ____ ___ _____
12  Reason for Change:_____
13  ____ ___ _____
14  Reason for Change:_____
15  ____ ___ _____
16  Reason for Change:_____
17  ____ ___ _____
18  Reason for Change:_____
19  ____ ___ _____
20  Reason for Change:_____
21  ____ ___ _____
22  Reason for Change:_____
23  ____ ___ _____
24
```

Page 91

```
 1      ACKNOWLEDGMENT OF DEPONENT
 2        I, _____, do hereby
 3  certify that I have read the foregoing pages,__
 4  _____ and that the same is a correct
 5  transcription of the answers given by me to the
 6  questions therein propounded, except for the
 7  corrections or changes in form or substance, if
 8  any, noted in the attached Errata Sheet.
 9  _____     _____
10  DATE            SIGNATURE
11
12  Subscribed and sworn to before me this
13  _____ day of _____,
14  202___.
15  My commission expires: _____
16
17  --------------------
18  Notary Public
19
20
21
22
23
24
```

23  (Pages 89 to 91)

BISNOW & JOSEPH
COURT REPORTING

JACK BONSKY

**A**

abilities 70:4
ability 32:7,13
able 8:6 15:6
  59:13,22 60:5
  60:9,13,15,18
access 59:10
accommodati...
  27:10
accountable
  82:12
accuracy 5:8
accurate 89:17
achieved 49:8
acids 81:12
ACKNOWLE...
  91:1
act 7:19
action 9:21 10:3
  33:12 35:22
  36:1 45:10
  88:11
active 28:23
actual 10:24
add 57:2
additional 10:15
  59:11
adjourn 34:18
administering
  61:6
administration
  48:22
admissible 34:1
advice 30:24
advise 34:12,19
  36:13
aforesaid 88:5
afternoon 13:20
  73:15
afterward 18:10
agency 82:18
ages 24:18
ago 9:18 42:2
  43:1,2
agree 11:3,23,24

12:6
agreeable 27:16
agreement 8:4
agrees 33:2
ahead 13:1
aid 58:2,13
AIDS 59:10
air 25:20,20
  52:16 61:24
  63:18
allegations 6:12
  14:21 15:4
  21:12 53:8
  76:4
allow 10:19
allowed 72:7
answer 4:3 6:14
  7:21 10:18,24
  11:1 13:2 15:6
  22:16 33:15
  34:20 40:6
  45:6 46:6,15
  46:16,18,24
  47:7 54:3
  56:11,13 59:13
  59:13,14,22
  60:5,12,19,22
  61:13 72:8,15
  75:8 78:19,22
  84:13 85:18
answered 53:19
  54:17
answers 91:5
anticipation
  22:11
antidiscrimin...
  61:3,7
anxiety 79:23
  80:14
anybody 32:18
anyway 69:19
  78:9
apologies 69:3
apologize 21:20
appear 76:1
appropriate

60:11 89:5
approval 82:17
approximate
  6:14
approximately
  14:10 19:12
  22:13 29:1
arc 86:11
arguably 22:22
argumentive
  42:16
arm 65:3
arrested 10:8
arrive 33:1
articulating
  65:3
aside 28:18 47:5
asked 10:23
  15:24 40:7
  42:8 54:10
  69:17
asking 12:9,10
  13:4 22:20,20
  33:14 47:2
  54:6,6,9 55:8
  59:19
assert 36:15
asserted 46:14
assume 7:6,14
  25:1
attached 89:11
  91:8
attend 51:16
attendance
  40:15,23 41:17
  70:15,17,20,23
  70:24 71:3,6
attention 64:18
attorney 13:5
  72:6 89:14
attorney/client
  13:6
attorneys 72:14
Auerbach 2:3,3
  3:4 5:2,21,24
  12:5 15:11

17:10 22:19,24
  23:7,9 27:16
  33:19 34:8,14
  34:22 35:18
  36:2,5,10,18
  37:2,7 40:9
  45:11,17,20
  46:2,13 47:8
  50:22 51:1
  54:4 56:18
  57:12,17 58:21
  59:15 60:1,6
  60:24 61:16
  72:18 75:13
  79:2 84:2,7,17
  84:22 85:22
  86:15 87:11
Auerbach.stev...
  2:5
authority 31:24
  32:3,16
authorized
  78:24
Ave 2:4
average 70:5
avoid 46:10
aware 59:6
  61:14 76:9
  79:8 85:11,13
  85:19

**B**

B 3:8
back 7:18 20:13
  24:20 26:22
  41:12 57:24
  62:1 70:24
  80:3
background
  23:18
bank 33:21
barriers 64:6
basis 46:15 47:3
  56:8 70:6
Battery 65:14
bears 46:11

beat 43:8
Beckett 52:16
believe 12:2
  19:11 23:21
  26:14 41:14
  54:17 55:5
  75:18 84:10,18
Bell 2:9
belt 49:8 62:20
benefit 11:5,8
best 7:12 8:6
  49:24
better 36:12
  49:18,19
beyond 68:13
  71:4
big 28:18 50:16
  64:18 78:9
biggest 27:3
BISNOW 1:20
Bisnowandjos...
  1:22
bit 73:16
blend 26:6,7
Blender 42:24
blenders 29:17
Blue 2:9
boiler 83:7,7
Bol 27:4
Bonsky 1:12 3:3
  5:15,22 6:19
  8:5 9:10 12:6
  23:10,24 25:2
  25:4,4 34:9,15
  48:18 54:5
  57:18 84:8
  86:24 87:11,15
  88:6
bonus 45:22
  46:21 47:6,7
boss 32:12 33:1
  78:5
bottle 26:2
bottom 79:18
box 30:7
brand 26:10,12

JACK BONSKY

Page 93

| | | | | |
|---|---|---|---|---|
| **Brands** 52:11,14 | 46:12 53:20 | **claiming** 34:6 | 67:22 71:7 | 53:24 57:19 |
| **break** 11:16,20 | **catch** 25:16 | **claims** 23:20 | **complete** 6:16 | 68:15,23 69:7 |
| 11:21 31:20 | **caustics** 81:13 | 58:3 | 6:21 | 72:10 74:3 |
| 57:13,19 | **CBD** 79:22 | **clarifying** 30:22 | **completely** 37:7 | **cooperation** |
| **breakfast** 73:3 | **cell** 12:7 | **classes** 52:1 | **computer-aided** | 7:23 |
| **brief** 57:15 | **certain** 70:1 | **clean** 25:14 | 88:10 | **coordinated** |
| **briefly** 61:17 | **certainly** 32:10 | **cleaner** 27:4 | **concluded** 87:16 | 76:11 |
| **bring** 18:4 | **certificates** 49:3 | **clear** 40:5 54:6 | **conditioners** | **coordinator** |
| **broad** 9:20 | 86:9 | 66:6 | 25:20 | 21:3 |
| 25:10 | **certified** 49:9 | **Cliff** 13:24 | **conditioning** | **copy** 77:21 |
| **brought** 9:14 | **certify** 88:6 91:3 | **clunky** 7:4 65:24 | 61:24 | **correct** 5:7 |
| **Bryan** 19:8 31:7 | **chain** 29:14 | **coach** 32:4 | **conduct** 74:17 | 28:23 31:4,5 |
| 33:1 70:8,11 | 50:11 81:20 | 44:19 70:22 | **confidential** | 31:16 42:9 |
| 78:5,23 79:4 | 82:2 | 71:1 | 27:12,15,17 | 43:13,21 44:16 |
| 87:7 | **chambers** 34:24 | **coached** 44:3 | 33:11 35:6,24 | 45:2 57:1 |
| **business** 18:3 | **change** 69:21 | **coaching** 44:11 | 37:9 45:8 | 63:11 66:17 |
| 48:22 | 80:18,19 90:4 | 44:23 60:13 | 46:12 47:9 | 75:2 86:2,6,10 |
| **buying** 29:14 | 90:6,8,10,12 | 68:12,14 | **confined** 63:4,7 | 91:4 |
| | 90:14,16,18,20 | **coachings** 68:17 | 63:10 | **corrections** 5:6 |
| **C** | 90:22 | **coffee** 11:17 | **confused** 84:16 | 89:4,6 91:7 |
| **C** 1:14 2:1 88:1 | **changes** 89:10 | **colorants** 81:13 | **connection** 6:3 | **correctly** 88:9 |
| 88:1,17 | 91:7 | **come** 16:22 43:8 | 9:13 | **counsel** 2:6,11 |
| **calendar** 58:22 | **characteristics** | 71:10,12,16 | **consider** 66:21 | 13:14 18:23 |
| **call** 7:22 34:24 | 75:1,5 | 79:4 | **considerable** | 19:1 32:5 |
| 40:10 42:7,20 | **characterize** | **comes** 15:17 | 30:17 | 54:18 72:14,17 |
| 43:7 44:23 | 68:14 | 22:5 31:1 | **considered** | 88:11 |
| 46:8 47:2 71:3 | **charge** 48:8 | 49:23 65:19 | 27:12 35:24 | **count** 66:10 |
| 78:15,16 79:15 | 61:23 | **comfortable** | **consumer** 25:13 | **County** 88:3,5 |
| 79:24 80:15 | **charged** 10:10 | 36:19 | **consumers** | **course** 18:3 |
| 82:16 | **chemicals** 26:6,8 | **command** 50:11 | 26:19,23,24 | 68:15 70:15 |
| **called** 27:4 | 27:11 81:5,8 | **commencing** | **contact** 30:18 | **courses** 86:12 |
| 49:13 52:16 | 81:17,19 82:9 | 1:13 | 73:21 | **court** 1:1,20 |
| 79:24 80:2 | 82:13,16,24 | **commission** | **container** 26:8 | 10:4 11:5,9 |
| **calls** 11:1 | 83:5,9,10 | 91:15 | **contents** 22:17 | 23:7 46:2,8 |
| **cancer** 59:10 | 85:24 | **Commonwealth** | 22:20 | 89:17 |
| **cap** 26:3 | **chemistry** 8:22 | 1:16 88:2 | **control** 85:24 | **COVER** 27:17 |
| **capacity** 61:2,6 | **cherry** 65:1,2 | **communicated** | 86:5 | 35:6 37:9 47:9 |
| **card** 79:20 80:7 | **children** 24:16 | 16:23 79:12 | **controller** 21:23 | **COVID** 69:12 |
| 80:8,12,16,18 | 24:19 | **communicating** | **conversation** | 70:2 |
| 81:3 | **China** 48:17 | 12:13 | 14:14 17:2,12 | **CR** 36:3 41:10 |
| **care** 6:11 62:2 | **Christmas** | **comp** 58:3 | 20:10 21:7 | 41:13,13 42:17 |
| 69:14 70:2 | 31:20 | **companies'** | 22:1,18 44:21 | 43:17 |
| **carefully** 89:3 | **circumstances** | 26:16 | 55:16 74:14 | **CR's** 41:7 |
| **carry** 62:18,20 | 46:23 | **company** 44:9 | 78:3,9 81:1 | **crafting** 61:2 |
| **cart** 26:4 | **claim** 58:10,16 | 52:6,15 85:1,3 | **conversations** | **crime** 10:11 |
| **case** 30:6 34:4 | 58:19 | **complaint** 16:20 | 18:18,21 19:13 | **criteria** 83:2 |

JACK BONSKY

**critical** 62:7
**crossing** 22:23
**crying** 79:19
**cup** 11:17
**current** 11:19
   31:10 63:19
   64:14
**currently** 30:5
**customer** 30:17
   30:23 31:1
**customers** 25:22
   26:23 30:23
**cut** 81:24

**D**

**D** 3:1 27:4
**daily** 44:21
   68:15
**damages** 45:18
   46:20
**date** 1:14 6:15
   17:4 89:8
   91:10
**dates** 17:9
**Dave** 13:23
   20:18,20 76:10
**day** 79:7,9 88:13
   91:13
**day-to-day** 21:7
**days** 42:12
   66:10,12,14
   71:11,12,16
   76:7 79:14
   89:14
**deal** 64:18
**Debbie** 13:23
**Deborah** 53:4
   54:20 57:3
**Debra** 53:8
**December** 31:19
   57:10
**decided** 73:3
**decision** 57:4
**deemed** 89:17
**Deep** 23:14
**defendant** 1:8

2:11 6:8
**deficiencies**
   68:24
**deficiency** 69:8
**definition** 59:19
**degree** 48:20,23
   63:5
**denied** 61:11
**DEP** 82:22
**Department**
   82:20
**depends** 32:17
   36:8
**deponent** 60:12
   88:7,8 91:1
**deposed** 9:11,16
   9:24 14:9
**deposing** 89:13
**deposition** 1:12
   4:1 5:4,7,11
   6:3 12:4 13:9
   13:16,20 14:2
   14:3,4,7 22:11
   23:11 37:3
   53:14,17 87:15
   88:6,10 89:2
   89:11,15,16
**depositions** 7:19
**describe** 70:3
**DESCRIPTI...**
   3:10
**designed** 6:9
**desk** 79:15
**despite** 60:22
**development**
   49:14
**difference** 6:20
   80:2
**different** 8:9
   16:22 36:21
   37:3,8
**differentiate**
   85:4
**difficult** 32:5
**direct** 32:21
   60:12 82:11

**direction** 4:3
   60:21
**directly** 26:18
   26:22,23 30:1
   32:11
**dirty** 62:21
**disagree** 47:4
   60:19
**discipline** 32:1,4
**disciplined** 44:1
**disclose** 54:1
   72:10
**discoverable**
   33:24
**discovery** 46:10
**discriminated**
   23:22
**discrimination**
   51:5 59:18
**discuss** 14:20
   17:16 20:24
   53:10 56:19
**discussed** 11:14
   12:11 19:4,23
   20:15 21:5
   42:17 43:15,16
   53:7 69:1
**discussion** 23:5
   35:4 70:9
**discussions** 32:5
   72:10
**disposable**
   25:13
**dispute** 46:10
**disrespect** 50:6
**disrespectful**
   50:5,9
**DISTRICT** 1:1
   1:2
**documents** 4:10
   9:1,3 23:16
**dodge** 7:22
   10:19
**dodging** 7:24
**Doe** 40:11,11,14
   41:9,11,16,19

41:21 42:1,4
   42:11,12,17,17
   42:20,21,23
   43:1,14,18
   78:12
**doing** 10:15
   69:16 80:24
   89:7
**DOLOWICH**
   2:8
**double** 84:15
**doubt** 75:14
**Douglassville**
   8:12 28:14
**dozens** 19:15
   22:6,6 81:7,7
**drains** 66:5
**Drive** 2:9
**drug** 21:3 76:6
   76:11,23 77:1
   77:8,9,12,20
   79:8 83:13
   84:4 85:1,4
**duly** 5:16 88:7
**DuPont** 49:10
**duties** 29:8,21
   48:6 61:21

**E**

**E** 2:1,1 3:1,8
   88:1,1 90:2
**e-mail** 12:3
   76:16
**earn** 45:21
**earned** 46:20
**earnings** 46:1
**earshot** 8:20
**EASTERN** 1:2
**Ed** 21:18,19
   79:15
**educated** 6:20
**education** 48:19
**EEO** 50:18,21
**effect** 73:2
**Eficaro@kdvl...**
   2:10

**eight** 54:18
   55:21
**Eileen** 2:8 11:21
   12:12,17,21,22
   13:9 22:10,10
   34:16 57:19
   60:8 78:20
   86:17
**Eileen's** 12:7
**either** 25:3,18
   40:6 62:13
   66:10 85:21
**electrical** 70:10
   70:14 86:8,12
**electricity** 86:5
**eligible** 45:21
**else's** 25:19 62:1
**employed** 16:11
   17:21 20:6
**employees** 43:5
   57:22 75:10
**employees'** 85:5
**employment**
   35:22 50:23
   51:8,23 57:10
   58:7,8 59:17
   61:11 66:14
**enclosed** 64:4
**encourages** 50:9
**ended** 57:11
**Energizer** 52:13
**engineer** 49:9
**engineering**
   30:3
**entire** 71:11
**entirety** 7:15
**Environment**
   82:21
**environments**
   51:12
**equal** 50:22
   51:22 61:11
**equipment**
   30:12 48:8
   62:5

JACK BONSKY

Page 95

errata 5:6 89:5
  89:8,10,13
  91:8
especially 67:3
ESQ 2:3,8
estimate 6:14
everybody
  43:16
evidence 34:1
exactly 62:22
  70:10
EXAMINATI...
  5:19 86:20
examined 5:16
example 32:19
  32:20 63:16
  70:8
examples 30:4
excuse 25:20
  28:20 50:20
  68:13
exhibit 3:10
  37:4
exhibits 3:13
existing 58:4,6
expect 73:12,20
expected 63:10
  63:12 74:4
experience
  52:18
expires 91:15
explain 50:1
explained 78:7
expressed 15:7,9
  15:12
extent 12:20
  27:9 53:23
  54:2 56:8,12
  58:18
extenuating
  46:22
eyes 50:5

**F**

F 88:1
F-U-R-N-O

20:20
face 69:16
Facebook 25:5
facilities 48:11
facility 28:13,18
  29:3,10 48:8
  61:23
fact 6:7 26:5
factor 87:4
factually 77:19
fail 89:15
failed 76:6,23
  77:9,12 78:2
  79:8 83:12
fair 44:24 83:21
  84:3
fall 64:6,7
fanny 62:18
far 10:16
feel 6:13,15
  36:19 50:8
  74:21 75:7
feelings 15:3,8
  15:13 18:14
feels 23:21 50:6
feet 28:19,20,21
  28:22 29:2
  63:18
Ficaro 2:8 3:5
  12:1 15:5 17:8
  22:15,22 23:4
  27:5,8 33:8
  34:3,11,19
  35:15,19 36:4
  36:7,12,23
  37:5 40:3 45:5
  45:15,19,23
  46:9 47:4
  50:20 53:23
  56:7 58:18
  59:12,21 60:4
  60:16 61:12
  72:9,13 75:11
  78:18,21 83:23
  84:5,12,20
  85:17 86:18,22

87:9
file 32:6
filed 6:2
fill 25:17,17,23
  25:24 26:2,15
  27:2
fine 11:18 35:18
  73:17
fingertips 71:14
  71:15
finish 10:17,19
  11:19
finished 27:6
fire 32:13,18
  33:4,6 78:17
  85:9
fired 36:11
  40:14 41:21
  42:1,21 43:1
  43:10,12 83:13
  83:22 84:1,3
  84:11,19 85:14
fires 32:18 78:6
first 15:16 24:8
  24:13 26:5
  30:24 46:13
  58:2,13 59:2
  69:18 73:18
  76:5 80:9
five 42:12
fix 63:22
flash 86:11
flat 72:21
floor 69:12,13
fly 25:15
following 60:18
follows 5:17
foot 29:3
foregoing 88:6
  91:3
form 5:9 17:8
  22:7 59:21
  75:11 78:18,22
  85:17 91:7
formal 55:4
formulating

61:2
four 5:2,8 24:7
  49:14,15
fragrances
  81:13
frankly 34:3
  49:23 67:9
  83:2
free 6:15
fresh 73:4
fresheners
  25:21
friend 66:22
front 6:24 9:2
fuck 79:23
functions 29:11
Furno 13:23
  20:18,20,21
  21:1,2,6,10
  76:10,18,20,21
  77:11

**G**

gas 65:21
generally 65:3
generate 72:20
gentleman 16:1
  81:21
gentlemen 82:10
getting 35:16
  42:13
Gillette 20:3,4
  20:10 77:15,18
  77:24 80:15
give 8:6 10:14
  29:11 30:4
  34:16 40:21
  54:20 55:20
  63:16 67:16
  68:11,16 70:7
  72:5
given 41:9 51:19
  51:22 52:1
  88:11 91:5
gloves 62:21
go 13:1 25:12

35:1 50:11
  63:7,10 64:15
  64:15
goes 10:14 45:17
  46:19 63:18,20
  64:3,21 65:3
  79:20
going 6:8,16 8:3
  10:14 12:15
  13:7,20 19:1
  32:12 33:19,20
  34:15,16,17,19
  36:13,15,20,22
  40:10 41:19
  43:7 46:8,21
  46:23,24 47:2
  53:18,19 60:8
  60:14 76:3
good 5:22 57:12
  59:9 70:15
goods 25:13
great 10:15
  11:14 78:10
greater 45:13
gross 42:22 43:3
  78:12
ground 10:15
  65:5
grounds 60:11
guess 6:13,16,20
  26:4 70:7
  83:17
guessing 64:10
guidance 77:15
guitar 67:8
guys 22:14
  74:10

**H**

H 3:8
H-A-N-S-E-N
  31:14,15
Hampshire
  49:17
hand 88:13
handed 76:16,17

JACK BONSKY

76:18,22,24
**handful** 58:1
**handle** 34:23
  46:4
**handlers** 29:15
**handles** 81:16
**handling** 77:15
**hands** 62:21
**Hansen** 13:24
  31:14,17,21
  32:1 43:23
  58:12 85:23
**Hansen's** 45:3,7
  46:1 48:6
**happen** 8:2 21:8
  41:6 44:12
  58:16
**happened** 10:2
  14:16
**happens** 7:11
**harassment**
  50:15 51:2,9
  51:20
**harness** 64:20
**Harvest** 2:9
**head** 10:22
**heard** 7:15
  26:14 43:11
  80:9 84:15
**heights** 63:13
  65:16
**held** 1:12 27:17
  35:6 37:9 47:9
**Heller** 13:24
**Hello** 5:23
**help** 32:10
**helping** 30:22
**helpings** 30:21
**high** 64:9
**high-voltage**
  86:5
**highest** 48:18
**hold** 33:8 58:10
**holes** 69:15,16
**home** 25:13,14
**honestly** 37:8

**honesty** 74:24
  75:9,15
**hosted** 18:23
**hostile** 51:11
**hour** 14:13
**hours** 16:22
  58:23
**house** 26:10,12
  80:5
**How's** 65:13
**HR** 20:4 32:10
  32:23 77:15
**human** 29:13
  52:17,19,22,24
  53:2 80:22,23
**hundreds** 81:8,8
**hurt** 57:22

**I**

**idea** 59:9 79:5
**identified** 14:6
  15:3
**identifying**
  33:16,22
**identities** 35:22
  36:16 37:1
**imperative**
  89:12
**important** 10:16
  75:1,4,6,9
  80:24
**improvement**
  32:8 45:1
  67:12
**inches** 64:10
**include** 13:22
**included** 87:6
**incorporated**
  74:9
**INDEX** 4:1
**indicated** 77:9
  88:7
**indirectly** 29:15
  29:17,18
**individual** 40:8
  40:22 58:9

78:13
**individuals**
  16:10 20:14
  21:14 33:17
  36:17 37:1
  43:19 75:1
**individuals'**
  34:20 35:17,21
**information**
  6:10 13:4,7
  23:2 27:13
  33:11,17,21
  36:1 45:7,8,9
  72:19 74:10
  87:7
**initials** 40:4,6
**injuries** 58:1,17
  58:24
**inquired** 55:21
**insects** 25:16
**insert** 27:9
**insertion** 23:1
  46:18
**insist** 34:17
**installation** 62:5
**installed** 30:9
**instance** 44:18
  63:2 69:1,4
**institute** 49:14
**instruct** 22:16
  40:5 45:6
  46:16,17 54:1
  56:10
**instructing**
  60:18
**instruction**
  45:16,24 46:6
  56:16
**INSTRUCTI...**
  89:1
**integrity** 74:24
  75:9,15
**interested** 88:12
**interesting**
  49:23
**internet** 7:16

**interpret** 13:3
**intoxicated** 76:1
**involve** 30:1
**involved** 26:24
  27:2 53:11,16
  54:19 57:4
  61:1,5 65:16
**involvement**
  42:3 82:8
**involving** 53:20
  80:22
**issue** 34:2 36:3
**issues** 7:16
  42:10 58:13
  87:1

**J**

**Jack** 1:12 3:3
  5:15 25:2,3,4
  27:5 33:9,15
  34:12 56:10
  59:22 60:5
  87:15 88:6
**January** 44:14
  44:15,16
**jeopardy** 40:23
  68:20
**job** 16:7 29:5
  40:23 41:23
  42:23 57:23
  68:20
**jobs** 30:21
**Joe** 13:23 17:18
  17:19 18:9,11
  18:23,24 40:20
**John** 15:18,19
  53:5 56:24
**JOSEPH** 1:20
**journeyman**
  86:8
**judge** 6:24 34:18
  46:23,24
**jury** 6:24

**K**

**K-E-N-N-E-T**

21:21
**K-U-L-P** 15:21
**KAUFMAN** 2:8
**keep** 11:6,9,11
  36:22 66:6
**Kennet** 21:18,19
  21:20,22 22:1
  79:16
**Kenneth** 21:19
**Kent** 49:2
**kin** 88:11
**kind** 40:22
  46:14 62:3,18
  68:11
**knew** 16:21
  53:18
**know** 6:10,12,17
  7:12,17 10:21
  11:16 12:21
  13:19 19:1
  22:8 23:5
  32:12 33:10,14
  34:6 36:10
  41:2,13,15,15
  45:9,12 46:20
  46:23 54:2,23
  55:24 58:19
  59:5,23 62:21
  63:18,20,21
  64:23 65:24
  66:7 67:10,21
  68:19 69:5,20
  71:2,19 72:24
  75:8 80:4,4,10
  80:20 82:19,23
  83:2 85:7,20
**knowledge**
  58:12
**knows** 67:8
**Kulp** 13:24
  15:18,22,24
  17:2,12,15
  19:3,22 53:4,5
  53:8 54:8,20
  56:20,21,22,24
  57:3

JACK BONSKY

| **L** | | | |
|---|---|---|---|

**L**

lab 8:22
label 26:3
Ladders 65:17
large 30:12
late 16:22 71:11
71:12,17,19
73:2
latenesses 74:15
LAW 2:3
lawsuit 6:1,4
9:14 14:23
lawyer 54:7
lead 67:7
leader 49:8
leading 62:5
leaking 66:7
lean 7:21
learn 59:2 76:5
leather 69:13
leave 13:21
leeway 73:19
left 52:13
legal 59:6,18
legalized 59:3
legitimate 60:10
legs 11:17
let's 35:1 41:12
46:3 50:1
letter 79:17
letting 71:2
level 48:19
50:12
license 65:6
82:17
licensed 85:23
86:1,4
licenses 82:14
83:6,9
lie 75:19
lift 63:17 64:1,3
64:4,11,16,23
65:15
limited 12:3
limits 23:6

line 4:4,4,11,15
4:19 11:19
22:23 46:6
58:20 70:8
90:4
LinkedIn 24:24
25:2,7
liquid 25:16,17
25:23,24 26:3
26:15 27:2
81:14
listed 21:15
litigation 9:5
12:16 15:10
little 62:18
73:16 82:4
live 24:2,4
lived 52:10
LLC 1:7
LLP 2:8
locations 8:10
long 9:18 14:10
22:13,20 23:2
24:6 33:16
36:24 43:1
66:8 72:9 73:5
74:22 81:1
looking 36:8
59:18
loss 78:9
lost 58:23 69:2
lot 37:3
Louis 48:16
lowest 50:12

| **M** | | | |
|---|---|---|---|

**M**

machine 30:6
41:24 65:7
88:9
machines 62:4
62:10,13,15,24
mail 80:3
maintain 62:7
maintaining
62:4,9
maintenance

16:8 18:5
29:12 31:10,18
48:7 61:19,20
61:22 63:19
64:15 65:16
66:1 70:4
73:11,20,23
86:3,7,12
major 16:20
making 44:8
47:1 62:7
malpractice
9:22 10:3
man 25:7 40:12
58:23
management
49:13
manager 17:20
18:4,4,5 20:23
29:7 30:10
31:3,11,18
48:7 52:5,9,15
53:3 61:19,22
63:20 64:15
65:16 66:1
70:4 73:12,20
73:23 81:20
82:2
manager's
61:20
managers 86:3,7
86:13
managing 30:1
manufacturer
25:19
Manufacturing
30:3
marijuana
23:23 59:3,17
61:10 75:22
80:8 85:5,9,10
85:14,15
mark 23:8 46:3
46:5,7
marked 3:13
4:18 27:14

marriage 24:8
24:10,12,14,14
24:15
married 24:6
Masheka 1:14
88:5,17
mask 69:14
masking 69:12
masks 69:16,20
70:2
Master's 48:20
material 29:15
Matt 17:3 18:13
18:23 55:20
64:11 70:11
76:23 77:11
79:19 80:2
Matt's 18:15
54:10,12,15,21
55:2,8,17
matter 9:16 12:4
82:4
Matthew 1:4 6:1
9:7 14:2 43:18
mean 26:12 30:2
30:19 42:15
44:7 46:5
51:10 53:15
54:24 55:2
58:6 63:15,19
70:1 80:7
meaning 26:13
73:13
meaningful
74:22
means 59:20
meant 10:21
41:15 71:5,7
mechanic 16:8
mechanics 48:9
media 24:21,23
medical 9:22
10:3 23:23
59:3,7,17
61:10 80:8
85:5,9,10,14

85:15
medication
59:11
meeting 14:13
23:5
mentioned
78:11 87:2
message 73:1
messages 67:3,5
MFG 1:7
military 10:6
mind 15:17 22:5
50:3,4 65:19
minutes 14:14
14:18 81:4
misconduct
42:22 43:3
78:12
misconstrued
60:13
misquote 26:15
missed 26:5
66:13 71:11
79:13
Missouri 48:16
moment 7:1
33:8
Monday 73:1
Montgomery
2:4
months 20:13
morning 5:22
73:14
mothballs 25:15
mount 63:20
move 6:17
moves 65:4
Moving 23:18
mumble 7:4
music 67:8

| **N** | | | |
|---|---|---|---|

**N**

N 2:1 3:1
N95 69:19
name 5:24 9:8
15:20 18:5

JACK BONSKY

25:1,3,18
31:13 33:20
64:23
**names** 33:14
34:13,16,21
35:17,21
**Narberth** 2:4
**nature** 9:21
21:24
**necessarily** 37:5
44:10 50:14
85:20
**necessary** 89:3
**need** 11:15,16
12:20 13:11
30:11 60:7
65:6 83:9
**needing** 78:4
**needs** 7:1
**negative** 84:15
**neither** 88:11
**never** 16:21,23
44:24 64:11
80:20
**new** 49:17 58:5
62:5
**nodded** 10:22
**non-privileged**
56:13
**nonparties**
33:11 36:1
**nonparty** 45:9
**normal** 18:3
**nose** 69:14,15
**Notary** 1:16
88:5,18 91:18
**noted** 89:10 91:8
**notes** 84:9
**notice** 88:7
**notified** 18:9
**November** 17:5
33:3 57:9
66:15 83:13
**number** 5:3,4
6:15 12:7,10
24:10 33:21

54:24 66:12

**O**

**o'clock** 73:14
**object** 12:1,23
33:9 56:8
58:20 60:10
75:11
**objected** 42:6
**objecting** 5:10
**objection** 13:1,3
15:5 17:8
22:15 34:11
36:15 40:3
45:5,15,23
56:17 59:12,21
60:4,23 61:12
78:18,22 83:23
84:5,12,20
85:17
**objectionable**
60:17
**objections** 5:9
**observation**
49:11
**obtain** 6:10
**obviously** 43:9
60:10
**occasion** 44:19
75:17
**occasionally**
67:2
**occasions** 52:21
**occurred** 35:4
68:3
**October** 17:5
31:4 66:15
**off-duty** 85:10
85:15
**off-the-record**
35:3
**offensive** 50:4
50:13,14
**offer** 34:13
**offering** 33:9
**office** 2:3 8:23

8:24 62:2
**official** 88:13
**Oh** 11:13 19:15
19:20
**Ohio** 52:14
**Okay** 7:13 10:13
11:13,14 12:15
15:16 19:16
36:5,18 40:10
41:20 46:2
47:8 56:23
72:12 78:23
**once** 9:17 64:17
**ongoing** 58:19
**operate** 65:7
85:24 86:4
**operating** 66:2
**operations**
48:17
**operator** 41:24
**operators** 29:16
**opinion** 21:10
21:11
**opportunities**
61:11
**opportunity** 5:4
5:5 13:8 44:19
50:23 51:23
**oral** 1:12 67:16
67:23 76:13
**order** 46:9 81:18
**ordered** 30:8
**ordering** 62:6
81:16
**orders** 81:20,22
**Oregon** 79:22
**organization**
32:19
**original** 89:13
**OSHA** 55:11
56:2 57:24
**outcome** 88:12
**outside** 67:1
**Overall** 70:3
**oversee** 29:19
82:5

**overseeing**
62:11
**oversees** 52:12
**owned** 52:11
**owner** 19:9

**P**

**P** 2:1,1
**p.m** 1:14 87:14
**PA** 2:4,9
**pack** 62:18
**packaged** 25:13
**page** 3:10 4:4,4
4:11,15,19
46:6 77:5,6,7
90:4
**pages** 91:3
**palettes** 81:15
**paperwork** 77:8
**part** 50:15 51:3
51:4
**parts** 62:8
**party** 88:11
**pass** 85:1
**passing** 85:3
**patient** 59:17
85:14
**patients** 61:10
85:9
**pay** 64:18
**Pennsylvania**
1:2,17,21 24:1
28:14 59:3
88:2
**people** 7:18 14:5
14:12 15:2,15
22:6 29:19
30:1 33:23
36:21 43:8
49:18 50:10
59:10 67:21
69:5 71:2
81:18 82:1
**people's** 26:16
**perceived** 68:24
69:8

**performance**
16:2,18,20
17:13 32:8
41:22 42:10
45:1 67:12
68:17,24 69:8
74:17 87:1,8
**performing**
78:10
**period** 72:23
**permit** 33:15
40:6 47:7 83:7
**permits** 82:14
83:6,9
**permitted** 56:13
**person** 29:9
32:18,20,23
36:20 40:11,16
41:4,18 42:18
42:20 50:5
52:24 73:13
77:15 78:24
82:2
**person's** 31:13
41:23
**personal** 23:14
33:10,16
**pertaining**
36:16 45:9
**pertains** 58:19
**Pettiford** 1:15
88:5,17
**Philadelphia**
1:21 88:3
**phone** 7:16 12:7
12:13 34:18
**phrase** 59:17
**physically** 54:22
**picker** 65:1,2
**pissed** 47:1
**place** 12:24
57:13 79:22
88:7
**plainly** 33:24
**Plaintiff** 1:5 2:6
**plan** 32:8 45:1

BISNOW & JOSEPH
COURT REPORTING

JACK BONSKY

67:12
**plant** 8:13 18:4
18:23 29:7,16
30:11 31:3
52:5,9,11,13
52:15,15,24
53:2 62:6 81:6
**plants** 25:15
**plastics** 58:11,16
**play** 67:8
**please** 7:16
10:17 11:1,7
12:21,24 13:3
51:10 54:3
69:2 84:14
89:2,7
**pleased** 16:19
**plumbing** 62:3
**point** 11:16,22
71:22 79:19
**policies** 61:3,7,9
85:20
**policy** 41:17
85:1,3,8,11,13
**politicians** 7:20
**poor** 40:15 87:8
**PORTION**
27:17 35:6
37:9 47:9
**portions** 27:14
**pose** 10:20
**posed** 55:22
**position** 58:10
60:20 63:3,6
65:20
**possess** 86:8
**pot** 79:21
**potentially**
75:18
**powder** 81:15
**powered** 65:13
65:14
**practical** 82:3
**pre** 30:20
**predate** 58:7
**predated** 58:8

**preparations**
53:12,13,16
**prepare** 23:11
30:21
**prepared** 79:18
**prepped** 19:1
**prevent** 64:7
**previous** 52:17
**prices** 30:8
**prior** 13:9 52:16
72:14 76:7
**Prioritization**
44:6
**privilege** 13:6
23:1 46:14,18
56:8
**privileged** 23:2
56:11
**probably** 22:6
42:2 63:1
64:17 76:7
**proceed** 42:6
**proceeding** 7:1
**process** 30:6
82:5
**procurement**
82:9
**product** 27:3
**production** 4:10
17:20 18:4
29:12 58:23
**products** 25:12
25:17,18 26:11
26:16,17,18
27:1
**Professional**
1:15
**program** 49:11
**project** 29:24
30:2,10
**prompted** 12:17
**proper** 69:18
**propounded**
91:6
**proprietary**
27:12 35:24

**protected** 13:6
**provide** 40:5
45:7 72:16
86:11
**provided** 71:14
**providing** 30:23
**public** 1:16
65:21 69:24
88:5,18 91:18
**purchased**
52:12
**purchases** 48:10
**purchasing** 30:6
30:12 81:21
82:3
**purposes** 59:4,7
**pursuant** 88:6
**put** 26:3,4 32:7
45:1 67:11
69:17
**puts** 26:8
**Putting** 13:14

**Q**

**quality** 20:22
49:9,9
**question** 4:18
5:9 7:17,21,22
7:24 10:18,19
10:20,23 13:2
22:16 33:15
36:14 45:6
54:3 55:18
56:3,4,6,14,16
60:22 65:23
72:15 86:23
**question-and-...**
6:9
**questioning**
11:19 58:20
**questions** 7:5,6
7:15 10:24
12:16,23 13:4
33:13 35:20
40:7 47:6,7
53:19,21 54:18

55:22 56:9
76:4 91:6
**quite** 49:23
**quotations**
30:21

**R**

**R** 2:1 25:4 88:1
90:2,2
**rails** 64:8,9
**ran** 52:10,13,14
**Randy** 16:1
**rationale** 46:11
**re-ask** 56:15
**reach** 83:18
**reached** 77:14
**read** 5:4 7:18
79:17 89:2
91:3
**ready** 23:15
**realize** 44:10
**really** 62:19
70:12
**reason** 8:3,5
65:11 74:20
75:14 83:21,24
89:4 90:6,8,10
90:12,14,16,18
90:20,22
**reasonable**
73:13
**reasons** 33:23
34:6
**recall** 17:4 18:2
25:4 56:4
58:14 62:17,22
66:12 68:2,8
70:10,14 75:17
77:4,13,24
**receipt** 89:14
**receive** 56:5
76:15
**received** 56:1
**recess** 57:15
**Rechargeable**
65:14

**recommend**
79:3
**recommendat...**
32:22 78:7,17
87:4
**recommended**
79:6
**record** 11:15
13:1 35:1 60:7
88:10
**recordable** 58:1
**recorded** 88:9
**records** 54:11
54:13,16,21
55:3,8,9
**recreational**
85:6
**referring** 15:14
36:21 56:9,12
62:10 63:24
**regard** 36:16
40:4 45:24,24
**regarding** 14:14
22:17 23:5
33:10,11,17
36:1 45:7
**register** 82:15
**registered** 83:1
**registering** 83:4
**regularly** 64:19
**related** 53:5
**relating** 9:4
**relevance** 34:4
46:11
**remains** 60:23
**remember** 9:24
18:16 19:18
62:16,16 68:1
68:10 71:18,20
71:22 72:1
74:13,16 75:12
**remembered**
72:22
**remind** 8:3
**rent** 62:1
**rep** 20:4

| | | | | |
|---|---|---|---|---|
| **repair** 62:11 | **restate** 7:12 11:7 | **rules** 10:15 | **series** 76:3 | **situation** 50:7 |
| **repairing** 62:4 | 69:2 | **run** 32:23,24 | **served** 10:5 | 80:21 |
| 62:10 | **restroom** 11:18 | 35:16 83:7 | **session** 6:9 | **situations** 58:2 |
| **report** 29:11 | **results** 77:1,3,8 | **runner** 27:3 | 44:11 | 80:21 |
| 31:6,8,21 | 77:22 | **running** 30:24 | **sessions** 49:15 | **six** 42:2 49:7,8 |
| 52:23 76:10,12 | **retaliation** 51:6 | **runs** 30:24 31:1 | 49:16 | **Smart** 25:7 |
| 76:13,13,16,22 | **return** 89:13 | | **set** 79:13 | **smoke** 79:21 |
| 76:24 | **reveal** 33:16 | **S** | **setting** 47:5 70:1 | **smoothly** 10:14 |
| **reported** 52:20 | 35:21 37:1 | **S** 2:1 3:8 | **settled** 10:4 | **soaps** 81:11 |
| **reporter** 1:15 | **revealing** 37:2 | **safety** 20:22 | **sewage** 65:22 | **social** 24:21,23 |
| 5:12 11:6,9 | **review** 23:16 | 49:10 55:11 | 66:2 | 33:21 |
| 23:7 46:3 | 74:23 | 86:12 | **sexual** 50:15 | **socialize** 66:24 |
| **reporting** 1:20 | **reviewed** 55:23 | **Saint-Gobain** | 51:2 | **somebody** 25:18 |
| 32:11 48:9 | **reviewing** 84:8 | 49:13 51:15 | **Shanghai** 48:17 | 32:11 43:8 |
| **reports** 29:10 | **reviews** 74:18 | **salary** 45:3,3,8 | **shape** 22:7 | 50:15 62:1 |
| 31:11 32:21 | **Reynolds** 1:4 | 45:13 | **share** 15:22 | **sorry** 50:20 |
| 53:1 82:11 | 6:1 9:7 14:2 | **sample** 30:24 | 18:14 21:11,13 | 78:20 81:24 |
| **represent** 6:1 | 15:4,8,13,23 | **saw** 64:11 | 73:6 | **sorts** 67:5 |
| **reprimanded** | 16:5 17:17 | **saying** 60:17 | **shared** 13:5 15:3 | **sounded** 79:19 |
| 43:22 | 18:1,8,17,19 | **says** 69:18,21 | 17:24 | **sounds** 66:17 |
| **request** 4:10 | 19:4,14,17,23 | 73:23 | **sheet** 5:6 89:5,8 | **space** 63:10 89:5 |
| 27:13 | 20:11 21:6,12 | **scale** 75:8 | 89:10,13 91:8 | **spaces** 63:4,8 |
| **require** 82:13 | 22:1 33:18 | **scheduling** | **shelf** 26:24 | **spare** 62:8 |
| **required** 62:6 | 34:6 43:18 | 29:14 | **shift** 73:9,12,18 | **speak** 10:16 |
| 86:4,8 | 46:21 53:7 | **scissor** 63:17 | 73:24 | 11:21 12:21 |
| **reserved** 5:10 | 56:1,20 57:5 | **second** 13:15 | **shifts** 73:18,21 | 13:9,12 22:10 |
| **reside** 23:24 | 61:18 66:8,21 | 24:12,14,15 | **shipping/recei-** | 22:14 72:4 |
| **resolve** 13:2 | 73:7 75:18,21 | 31:1 41:12 | 29:13 | **specialist** 80:23 |
| **resource** 80:22 | 75:24 76:6 | 46:19 60:6 | **shop** 69:12,13 | **specific** 14:8 |
| **resources** 29:13 | 78:2,4,17 | **seconds** 69:20 | **short** 72:22 | 21:9 63:2 78:3 |
| 52:18,20,22,24 | 79:12 80:6 | **Security** 33:21 | **shorthand** 1:15 | **specifically** 47:6 |
| 53:2 80:23 | 81:2 83:12 | **see** 33:1 54:14 | 88:9 | 53:20 62:17 |
| **respect** 15:9 | 84:18 87:3 | 62:23 64:19 | **shortly** 79:10 | 63:24 83:8 |
| 49:11,20,24 | **Reynolds'** 6:12 | 75:21,24 77:8 | **shoulders** 10:22 | **specifications** |
| 50:16 51:3 | 14:21 16:2,18 | **seeking** 13:7 | **showing** 71:1,2 | 30:22 |
| 78:12 | 17:13 23:20 | **sell** 26:18 | **shrugged** 10:22 | **Specifics** 18:2 |
| **response** 7:18 | 45:14 57:10 | **send** 67:2,6 | **side** 79:16 | **Specify** 30:7 |
| 11:1 27:6 68:8 | 75:15 76:4 | 77:21 80:5 | **Sigma** 49:8,8 | **Spectrum** 52:11 |
| 74:12 78:1 | **Rick** 13:24 | **sense** 32:24 | **sign** 5:7 42:8 | 52:14 |
| **responses** 12:17 | 31:14 | **sent** 49:17 54:18 | 89:7 | **speculation** 6:17 |
| **responsibility** | **right** 34:22 | 67:7,9 | **SIGNATURE** | 6:21 |
| 7:8 62:2 63:22 | 41:18 50:2 | **separate** 27:17 | 91:10 | **spell** 15:19 |
| 66:6 | 80:24 | 34:1 35:6 37:9 | **signed** 78:13 | **spent** 14:11 |
| **responsible** | **roof** 61:24 62:1 | 47:9 71:9,10 | **signing** 89:9 | **spoke** 22:21 |
| 29:10 62:3 | **room** 8:16 | **September** 1:10 | **similar** 40:7 | 23:3 |
| **responsive** 67:4 | **row** 79:14 | 88:14 | **simply** 36:15 | **spoken** 13:15,18 |

JACK BONSKY

square 28:19,20
28:21,22,22
29:1,3
St 48:16
staff 13:19
standard 37:8
start 16:13 57:7
73:10,24
started 16:14
51:17 52:4
57:21 73:18
state 41:15 49:2
82:15,18 83:1
83:5 88:5 89:4
stated 41:14
statement 27:9
STATES 1:1
stating 10:17
status 49:9
stay 73:14
step 32:20
Steve 5:24 36:8
36:23 37:6
46:9 47:5
56:15
Steven 2:3,3
33:14
stipulations
4:14 5:3
store 67:8
straight 65:4,4
Street 1:20
stretch 11:17
strokes 9:20
25:10
stuff 62:3 80:5
subject 12:4
43:4 89:9
subordinate
15:18 16:4
40:19
subordinates
40:17,18 62:11
62:14
Subscribed
91:12

substance 14:20
14:23 60:21
91:7
suggested 18:24
suggestions 36:6
Suite 1:20 2:4,9
supervision 88:9
supervisor
58:11 66:18
supervisor's
58:16
supplies 48:10
supply 29:13
81:20 82:2
SUPPORT 4:1
suppose 50:1
supposed 69:17
73:9,23
sure 10:13 11:8
18:6 32:23
44:8 49:16
61:10 62:7
77:23 79:9
80:17,23 82:16
swatters 25:15
swear 5:12 50:1
swearing 50:2
switch 73:15
sworn 5:16 88:7
91:12

**T**

T 2:3,3 3:8 88:1
88:1 90:2
T-R-O-U-T 16:1
tabulated 71:21
71:23
tabulating 71:22
tabulations 72:3
72:20 73:7
take 6:3 7:19,20
11:15,20 24:20
26:2 30:7
57:13,24 61:24
70:1
takeaways

49:22
taken 35:22
57:15 88:6
talk 41:19 74:5
80:22
talked 18:22
19:20 21:3
22:7 44:22
70:11 78:4
talking 14:11
55:7 82:10
Tammy 20:3
77:14,15 79:17
79:24 81:2
taper 30:6
teaches 50:6
team 16:23
teammates
42:14
technical 30:23
telephone 79:15
tell 7:5,8 12:11
14:6 16:17
18:11 46:15
74:8,10 76:22
77:17 88:7
telling 78:1
term 59:20 60:3
terminate 57:5
78:4
terminated
18:13,18 19:19
34:7,10 36:17
41:11 71:24
80:4 83:18
87:5
termination
18:10,12,15
19:21 22:3
32:22 34:5
41:6,7 42:4,6
43:4,20 76:8
78:8,14 79:1,4
79:11,17 83:19
terms 17:9
34:20 35:16

36:24 71:1
81:10
test 21:3 76:6,11
76:23 77:1,9
77:12,20 78:2
79:8 83:13
84:4 85:1,4
testified 5:16
87:2
testifying 27:10
testimony 3:3
8:6 33:10 88:8
88:10
text 12:7 67:3
72:24 73:1
thank 87:10,11
Thanksgiving
67:9
thereof 88:12
thing 26:5 49:13
62:19 69:18
70:14 80:24
things 21:2
25:14,14,15
29:14 50:12
55:1 62:6
63:23 70:1
80:22 81:11,12
81:12,23
think 12:3,8
21:9 22:22
23:4 34:23
35:15 36:7
49:15 59:9
62:19 63:1
73:2
thinking 44:13
third-party
25:19
third-type 31:1
thirty 89:14
thought 16:2
23:14 84:15
thoughts 80:1
thousand 7:20
threatened 43:5

three 5:6 24:19
48:13 49:15
76:7
thresholds
83:19
time 9:23 12:22
12:22 13:11
46:4 66:19
71:20 72:23,24
73:3,4,13,17
74:3 88:7
times 7:4,18
9:15 41:1 52:9
tires 65:5
title 29:5 42:23
81:21 82:3
titles 16:7
today 6:2,7,8 8:7
10:13 14:16
87:2
today's 13:9,16
14:6 22:11
23:11
toilet 27:4
told 42:5 54:7,8
67:20 69:5
75:18 77:11
78:1 80:6,16
81:2
tools 62:20
top 79:18
topics 52:2
tops 14:15,19
touched 61:17
trained 49:7,10
54:14
training 49:10
49:12,21 50:19
50:23 51:2,6,9
51:11,14,16,20
51:23 54:11,13
54:16,19,21,24
55:3,8,17,19
55:24 61:6
trainings 49:4
55:5,11,12,12

55:14 56:2
**transcribed** 88:9
**transcript** 27:14 89:15,16
**transcription** 88:10 91:5
**traps** 25:16
**treated** 7:2
**Trout** 16:1,4 17:2,12,16 19:3,22
**true** 88:10
**truth** 88:8,8,8
**try** 50:12
**two** 5:5 43:2 50:9 56:3 73:17 74:24 76:7 79:14 81:18 82:1,10
**Ty** 27:4
**type** 42:10 55:19
**types** 27:1

**U**

**uh-huh** 11:2
**UK** 52:10
**understand** 6:5 6:19,23 7:7,8 12:18 50:13 55:18 63:6 65:23 67:10 70:12
**understanding** 23:19 55:15,17 58:15 59:16,20 60:2 66:16 80:9
**understood** 7:6 70:13
**Unfamiliar** 80:21
**UNITED** 1:1
**University** 49:2 49:17
**urgent** 44:9

**usage** 85:5,6
**use** 10:24 11:18 24:21,23 25:5 28:23 60:9,14 72:19 75:21 85:10,15
**user** 23:23
**utilities** 65:21

**V**

**v** 1:6
**variety** 81:9
**verbiage** 56:4
**verify** 80:1
**verifying** 5:8
**VIDEOCONF...** 1:13
**violation** 84:24 85:2
**Virginia** 48:15
**Virtually** 29:9
**visit** 18:22,24
**voice** 11:6,9,12 80:3
**VOLUCK** 2:8
**volunteered** 80:13

**W**

**waived** 5:10
**Wales** 52:10
**Walnut** 1:20
**want** 6:13 22:8 26:14 27:8 33:9 34:23,23 36:10 54:5 56:7,15 73:16
**wanted** 49:18 53:22
**warn** 70:16
**warned** 43:9
**warning** 40:22 41:10,13,16 67:17,23 68:2 68:6,9
**warnings** 41:16

**wasn't** 42:13 43:9 69:16 70:15 78:10
**water** 65:21 81:9,10
**way** 22:7 33:22 36:12 46:7,17 49:24 56:21 57:4 63:23
**ways** 35:20 83:17
**We'll** 11:19 42:20
**we're** 25:19 36:20 40:10 41:18 46:8
**We've** 43:16
**wears** 64:20
**Wednesday** 1:10
**week** 64:17
**weekly** 49:14,16
**weeks** 20:12 42:2 43:2 83:20
**welcome** 46:10
**went** 49:12 80:3
**weren't** 16:19
**West** 48:15
**wheels** 65:5
**Wide** 81:8
**wife** 24:5,13
**Willert** 1:7 6:2 8:14 16:11,14 17:22 18:8 19:8,9,10,13 19:23 20:7 25:11 26:7,18 28:13 29:2,6 31:7 33:1 43:19 48:12 51:17,19,22 52:5,22 55:17 55:19 56:1 57:8,22 61:3,7 61:9,18 63:7

66:9 70:8 75:2 75:10 78:5,24 79:4 86:11 87:7
**Willert's** 55:9 85:8
**witness** 4:3 5:3,5 5:7,13 6:8 15:7 22:2 27:7 46:16,17 50:24 59:14,23 60:19 60:21 61:14 72:7,12,16 75:12 78:20,23 79:16 83:24 84:6,14,21 85:19 88:11,13 89:1
**woman** 40:12,13
**Wonderful** 9:20
**wood** 63:20
**Woods** 13:23 17:18,19,21 18:1,19 19:4 19:22 40:20,21 78:18,18
**word** 14:3,4 79:18,18
**words** 7:20 10:24 60:9,12 60:14
**work** 9:3,3 16:22 28:16 29:15,16,17,24 30:2,10 40:16 50:10,12 51:11 58:24 62:13,15 63:13 66:8 67:1 69:19 71:2 73:12,12 75:2,22 76:1 79:14
**worked** 21:8 42:13 61:18 62:22 72:23 73:5
**workers'** 58:3

**working** 16:3,14 16:14 17:3 18:8 44:8 51:17 52:4 57:7,21 62:23 66:11 73:17 87:3
**workplace** 49:12,20,24 50:16 51:4,5
**wouldn't** 8:6 69:15 85:14
**write** 67:14 69:22 70:19
**writing** 41:3,5 73:22
**written** 41:9 76:13,14,15
**wrong** 50:3 60:17
**Wyomissing** 24:1

**X**

**X** 3:1,8

**Y**

**yeah** 19:20 30:5 52:19 64:8 76:20 77:13 82:1
**year** 44:17 58:22
**years** 24:7
**yellow** 49:8

**Z**

**ZOOM** 1:13

**0**

**1**

**1** 1:10 40:11,14 41:9,11,16 42:17 43:18 75:8
**1-3** 4:5

JACK BONSKY

**1:12** 1:13
**10** 75:9
**12-14** 4:6
**13** 70:9
**13-14** 4:20
**14** 66:10
**15-18** 4:5
**15,000** 45:22
  46:21
**1518** 1:20
**16** 66:15
**17** 66:10
**17-18** 4:9
**18** 9:19
**19** 9:19
**19072** 2:4
**19102** 1:21
**19422** 2:9
**1989** 48:24
**1st** 57:9

**2**

**2** 41:19,21 42:1
  42:11,12,17
  43:18
**2's** 42:4
**2-11** 4:16
**2:30** 73:19
**20-22** 4:7
**202** 91:14
**2020** 17:6 31:4
  33:3 66:15,15
**2021** 1:10 44:15
  44:16 88:14
**20th** 31:19
**210** 2:4
**215-461-1100**
  2:10
**215-567-1701**
  1:21
**215-964-4410**
  2:5
**22** 4:5,20 24:20
**23-24** 4:21
**24** 24:20
**25** 63:18

**26** 24:20
**28** 24:20

**3**

**3** 40:11 42:20,21
  43:1,18 78:12
**3's** 42:23
**3:21** 87:14
**30** 69:20 89:14
**34** 4:6,7
**36** 64:10

**4**

**4** 43:14
**4:00** 73:16
**420** 2:9
**45** 4:8,9,21
**46** 4:5

**5**

**5** 4:16 66:15
**5:21-cv-01208**
  1:4
**5:30** 73:18
**56** 9:19
**5th** 83:14

**6**

**6** 3:4

**7**

**7-12** 4:8
**7:00** 73:16
**704** 1:20
**79** 55:5
**7th** 88:13

**8**

**8** 73:14
**822** 2:4
**85,000** 45:4
**86,000** 28:20,21
  28:22 29:2
**87** 3:5
**87,000** 28:19

**9**

**930** 2:9