# EXHIBIT "F"

TAMMY GILLETTE

### Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

- - -

MATTHEW REYNOLDS,     :   NO.: 5:21-cv-01208

     Plaintiff,     :

               :

     v.         :

               :

WILLERT MFG. CO., LLC,    :

     Defendant.     :

- - -

Friday, September 3, 2021

- - -

Oral deposition of TAMMY GILLETTE,
held via ZOOM VIDEOCONFERENCE, commencing at
11:04 a.m., on the above date, before Masheka
C. Pettiford, a Professional Shorthand Reporter and
Notary Public in and for the Commonwealth of
Pennsylvania.

- - -

BISNOW & JOSEPH COURT REPORTING
1518 Walnut Street - Suite 704
Philadelphia, Pennsylvania 19102
215-567-1701
Bisnowandjoseph@verizon.net

### Page 2

```
 1   APPEARANCES:
 2
 3        LAW OFFICE OF STEVEN T. AUERBACH
          BY:  STEVEN T. AUERBACH, ESQ.
 4        822 Montgomery Ave, Suite 210
          Narberth, PA 19072
 5        215-964-4410
          Auerbach.steven@gmail.com
 6        Counsel for Plaintiff
 7
 8        KAUFMAN, DOLOWICH & VOLUCK, LLP
          BY:  EILEEN FICARO, ESQ.
 9        930 Harvest Drive, Suite 420
          Blue Bell, PA 19422
10        215-461-1100
          Eficaro@kdvlaw.com
11        Counsel for Defendant
12
13
14
15
16
17
18
19
20
21
22
23
24
```

### Page 3

```
 1              - - -
              I N D E X
 2              - - -
 3
     Testimony of:  TAMMY GILLETTE
 4
     By Mr. Auerbach. . . . . . . . . .5
 5
 6
 7              - - -
           E X H I B I T S
 8              - - -
 9   EXHIBIT                    PAGE
     NO.       DESCRIPTION      NO.
10
11
12        (No exhibits were marked.)
13
14
15
16
17
18
19
20
21
22
23
24
```

### Page 4

```
 1         DEPOSITION SUPPORT INDEX
 2
 3   DIRECTION TO WITNESS NOT TO ANSWER:
 4   Page Line
 5     (None)
 6
 7   REQUEST FOR PRODUCTION OF DOCUMENTS:
 8   Page Line
 9     (None)
10
11   STIPULATIONS:
12   Page Line
13     5  2-11
14
15   QUESTION MARKED:
16   Page Line
17     (None)
18
19
20
21
22
23
24
```

1 (Pages 1 to 4)

TAMMY GILLETTE

## Page 5

2     MR. AUERBACH: There are four
3 stipulations. One, the witness will have the
4 opportunity to read the deposition, two, the
5 witness will have the opportunity to make any
6 corrections on an errata sheet, three, the
7 witness will sign the deposition, correct or
8 not, verifying its accuracy, four, all
9 objections, except to the form, are reserved,
10 and even if they are not made during this
11 deposition are not waived.
12     Eileen, is that your
13 understanding?
14     MS. FICARO: Yes.
15     MR. AUERBACH: Would you swear in
16 the witness please.
17     - - -
18     TAMMY GILLETTE, after having been
19 duly sworn, was examined and testified as
20 follows:
21     - - -
22     EXAMINATION
23     - - -
24 BY MR. AUERBACH:

## Page 6

1     Q.    Ms. Gillette, good morning.
2 Again, my name is Steve Auerbach. I represent
3 Matthew Reynolds in a lawsuit that he filed
4 against Willert. We are here today to take your
5 deposition in connection with this lawsuit.
6     Do you understand that you have
7 an obligation to tell the truth today?
8     A.    Yes.
9     Q.    Do you also understand that you
10 have an obligation to understand all questions
11 asked of me and that if you don't understand an
12 -- if you don't understand the question, you
13 have an obligation to tell me you don't
14 understand it?
15     MS. FICARO: Objection to form.
16     THE WITNESS: Yes.
17 BY MR. AUERBACH:
18     Q.    Do you agree to tell me that if
19 for whatever reason you don't understand the
20 question, that you will tell me I don't
21 understand the question?
22     A.    Yes.
23     Q.    Okay. Now I saw you before --
24 you said yes, I saw you shake your head in the

## Page 7

1 affirmative. This is being written down, so I'm
2 going to ask you to verbalize all answers with
3 either a yes, no or other explanation but no
4 uh-uhs. Even though I see you, I know what you
5 mean. This is for the benefit of the record.
6     A.    Correct. Yes.
7     Q.    Have you ever been deposed
8 before?
9     A.    Never.
10     Q.    There's a first time for
11 everything. All right.
12     What's your position?
13     A.    I'm the human resource manager.
14     Q.    How long have you had this
15 position?
16     A.    Almost six years.
17     Q.    And do you have any degrees or
18 certifications that assist you in this position?
19     A.    No, I do not.
20     Q.    Did you attend college?
21     A.    Yes, I did.
22     Q.    Did you obtain any degrees?
23     A.    I have a bachelor's degree, yes.
24     Q.    What is your bachelor's degree

## Page 8

1 in?
2     A.    Leadership and management.
3     Q.    From where?
4     A.    National Louis University.
5     Q.    And other than your bachelor's
6 degree, do you have any other degrees?
7     A.    No, I do not.
8     Q.    Do you have any certifications?
9     A.    Yes.
10     Q.    What are those certifications in?
11     A.    That was my hesitation, because I
12 knew you were going to ask me what they were. I
13 don't remember exactly the title of all of them, I
14 but I've gone to different HR courses through
15 the years and received different HR
16 certifications for those courses. I just don't
17 remember all the names of them. I apologize.
18     Q.    That's fine. And the instruction
19 that I'm about to give you applies to this
20 question and all other questions.
21     If you remember -- because that's
22 how memory works -- if you remember at any point
23 later on today, just let me know and we can come
24 back to that.

TAMMY GILLETTE

Page 9

1    A.    Okay.
2    Q.    Okay.  When was your -- so do you
3  recall the institutes or the organizations that
4  gave you this HR training?
5    A.    Several of them have been threw
6  SHRM, which is an HR organization.
7    Q.    Could you spell that?
8    A.    Sure.  It's just SHRM.  It stands
9  for Society of Human Resource Management.
10    Q.    And what was your most recent
11  training or certification with SHRM?
12    A.    My most recent one was on the
13  changes with medical care because of COVID.  It
14  had something to do with insurance -- medical --
15  something along those lines and how COVID plays
16  a factor in it because we are -- we just went
17  through the -- all the conversations to renew
18  our insurance plan.
19    Q.    What other trainings and
20  certifications did you receive for SHRM, and I'm
21  asking for topics?
22    A.    Right.  So I periodically will
23  get just general -- go to their general HR
24  courses that they have updates on HR.  I'm sure

Page 10

1  you're well aware of the fact that laws and
2  everything else continues to change, and so
3  periodically they just have courses on different
4  updates.  Like, this one was on the medical
5  insurance because of COVID, so they would have
6  updates such as that.  So there's been a lot of
7  stuff based on COVID in the last year that has
8  been the majority of what I've attended.
9  Anything related to COVID in the last year has
10  been my focus because that has created so many
11  things.
12    Q.    Have you had any other focuses in
13  terms of education and development?
14    A.    Yes.  So there is -- Armstrong
15  Teasdale is a law office that is here in St.
16  Louis, and we are actually a client of theirs
17  and they have annual employment labor seminars
18  every year, and I attend those every year.  And
19  then every so often there will be other ones
20  that pop up, so there is a group that's based in
21  St. Louis that is -- it's AAIM, and I apologize.
22  I don't remember what the letters stand for.  I
23  know one of the A's is association, but they
24  have different webinars as well.  Typically,

Page 11

1  those will be -- oh, my gosh.  There's a wide
2  variety of those, so it could have to do with
3  unions, it could have to do with HR in general
4  and there's been some recently on recruiting so
5  those will be rather short, usually 45 minutes
6  to an hour but I've attended several of those in
7  the last year.  And those have been primarily
8  the ones that I've attended in the last year.
9  So between SHRM, AAIM and then Armstrong
10  Teasdale in the last year, those have been my
11  focus.
12    Q.    Who pays for your attendance?
13  Does Willert pay or do you pay?
14    A.    Because we are a client, there
15  has been no cost.
16    Q.    That's for Armstrong Teasdale;
17  right?
18    A.    So for Armstrong Teasdale and for
19  AAIM, there's -- we use both of them, and so any
20  of those webinars that I've attended have been
21  at no cost to us.  The SHRM ones -- I've been a
22  member of SHRM for many years, and so it's just,
23  again -- although I don't think that there would
24  have been a cost even if I weren't a member

Page 12

1  because SHRM does have a lot of webinars and
2  seminars that are free, so --
3    Q.    Do you recall taking any webinars
4  or seminars on medical marijuana?
5    A.    Not specifically medical
6  marijuana, no.
7    Q.    Do you recall taking any webinars
8  or seminars on marijuana in general?
9    A.    There has not been any seminar or
10  webinar that I have taken part of that that was
11  the only focus, but when they're providing
12  updates on here's what's going on in the
13  country, there has been a time information was
14  presented so it wasn't the only subject, but it
15  was one of several.
16    Q.    And what information do you
17  recall being presented on medical marijuana?
18    A.    I do recall that they talk about
19  the states that are implementing new medical
20  marijuana laws and the implication of what those
21  mean and that it appears as though as a country
22  we are moving towards more and more states
23  having the legislation of that.  To give you any
24  more specifics it would be purely a guess.

3 (Pages 9 to 12)

TAMMY GILLETTE

Page 13

1    Q.    You said you've been a member of
2  SHRM for years.
3          Approximately how many years?
4    A.    I have been a member of SHRM off
5  and on since, I believe, maybe around 2005.
6    Q.    So about 16 years?
7    A.    Off and on, yes.
8    Q.    Is that how long you've been
9  working in HR?
10   A.    I've been in HR -- well, I should
11 say doing HR functions for almost 30 years, yes.
12   Q.    And help me understand.
13         What's the difference between
14 being in HR and doing HR functions? What do you
15 mean by that?
16   A.    So I initially -- I look at my
17 inaugural role in HR is when I ran a parenting
18 program, and I started running that program back
19 in the early 1990s. So even though I did not
20 have an HR title, I was responsible for hiring
21 people and putting together information about
22 what all of the employees were going to do. I
23 wrote the grants, I set up a variety of things.
24 My boss was the regional -- in the -- regional

Page 14

1  superintendent of schools. And so between the
2  two of us, we get that -- we put everything
3  together, and I ran the program so I certainly
4  did not have an HR title, but because I was
5  responsible for the program and all of the
6  people who worked in it, there were a lot of HR
7  duties. Does that make sense?
8    Q.    Yes. And what are your duties at
9  Willert as an HR manager?
10   A.    I typically tell people that if
11 it involves an employee in any way, shape or
12 form it involves me. So the life cycle of an
13 employee from the recruiting, interviewing,
14 hiring, to the discipline, termination, so
15 everything that's involved in between.
16 Enrolling of insurance, workers' comp, leave of
17 absence, general things that come up on a
18 regular basis, and I guess the best way to say
19 it is other duties as assigned, such as COVID.
20   Q.    That's a lot?
21   A.    Yeah.
22   Q.    How many -- plus or minus. I
23 don't need an exact number. If you do, I'll be
24 impressed.

Page 15

1          How many employees does Willert
2  have?
3    A.    Approximately 250.
4    Q.    Does that include the Shanghai
5  operation or is that just state-side.
6    A.    Just state-side, because I don't
7  have any responsibilities for the Shanghai
8  location.
9    Q.    Who's responsible at Willert for
10 making sure that it's compliant with all
11 antidiscrimination laws?
12         MS. FICARO: Objection to form.
13 You can answer.
14         THE WITNESS: I'm sorry.
15         MR. AUERBACH: Our court
16 reporter, could you please read that back.
17              - - -
18         (Whereupon, the pertinent portion
19         of the record was read.)
20              - - -
21         MS. FICARO: I objected to the
22 form but said you can answer.
23         THE WITNESS: Okay. I'm sorry.
24 I knew Eileen said something. Quite honestly, I

Page 16

1  think there are several people who are involved
2  in that process. I think that because I am over
3  HR that a lot of people would say that it is my
4  responsibility, but as I make sure that a lot of
5  people know, we're all in this together. And I
6  can coach, I can counsel. I do my part. I
7  encourage all those sorts of things, but we all
8  have to work together to make sure that every
9  employee is treated with respect.
10   Q.    Does the buck stop with you in
11 terms of compliance with all antidiscrimination
12 laws?
13         MS. FICARO: Objection to form.
14 You can answer.
15         THE WITNESS: Yes.
16 BY MR. AUERBACH:
17   Q.    What kind of training does
18 Willert give its plant managers to make sure all
19 antidiscrimination laws are followed?
20   A.    Honestly, each person at Willert
21 is able to take their own training. They don't
22 have to go through me. I know that there is
23 training that folks have taken, that folks do
24 take. Outside training, in most instances, is

4 (Pages 13 to 16)

TAMMY GILLETTE

Page 17

1  not something that we are requiring. We do
2  provide the general internal training. And as
3  I'm involved with various conversations with
4  people, I make sure that that's part of so many
5  conversations that I have with people. So kind
6  of an ongoing issue. Not something that's
7  handled at one -- oh, here today I'm going to
8  talk about this, then never again.
9       Q.    What did you mean by the word
10 general internal training?
11      A.    Because the general aspect is
12 that it's not just for one person. The internal
13 aspect is that they're not going outside. So,
14 for instance, I mentioned aspects of training
15 through SHRM for myself. So internal training
16 versus external training, general meaning, it's
17 going to be done with everybody and specifically
18 to what they're dealing with. So our plant
19 manager is going to be getting information from
20 a lot more points than what a supervisor who is
21 only over five people.
22      Q.    Do you know whether or not
23 Willert gave Jack Bonsky antidiscrimination
24 training?

Page 18

1       A.    I do not.
2       Q.    Did he receive antidiscrimination
3  training by Willert?
4       A.    I do not know.
5       Q.    In the six years that you've been
6  with Willert, have you made Jack Bonsky attend
7  antidiscrimination training?
8            MS. FICARO: Objection to form.
9  You can answer.
10           THE WITNESS: Externally, no.
11 Internally through conversations that I have had
12 with him, that is the only thing that I know of,
13 so --
14 BY MR. AUERBACH:
15      Q.    What type of conversations have
16 you had with Jack Bonsky about
17 antidiscrimination matters?
18      A.    As I mentioned earlier, when
19 anybody is calling me from Pennsylvania and
20 asking a question about item X, here's what we
21 have going on, I always will handle it from the
22 point of view of -- all right. So let me make
23 sure I know the entire situation so I ask a lot
24 of questions, get as much detail as what I

Page 19

1  possibly can and then what's been done, you
2  know, what's been said, what's the history,
3  those sorts of things, and then it becomes a
4  matter of, all right, so legally we need to be
5  aware of this and we need to take these steps
6  and what is anybody else saying and what has
7  happened to anybody else. So it's very
8  important that we have consistency. I think one
9  of the issues that comes into play when you're
10 talking about discrimination is when -- if
11 you've got Tom, Dick and Harry and you treat
12 Tom, Dick and Harry all differently, that's when
13 you come into problems. And so it's important
14 to learn what's going on with everyone else,
15 making sure and providing that education of,
16 okay, so the laws say this, we have to do this,
17 have we done this, and in being consistent, we
18 need to do this. If it's never happened before,
19 okay, do we need to put a policy in place, is it
20 that important that it requires a policy, is it
21 just going to be a general practice because
22 consistency is key.
23      Q.    I want to be fair in this
24 question. That's -- that is my intent, and I --

Page 20

1  this is what I heard you say. And if I'm
2  completely off base, I ask that you correct me.
3            What I'm hearing you say -- and
4  I'm just trying to understand -- is these
5  conversations that you're talking about, they're
6  after-the-fact conversations.
7            Is that what you're talking
8  about; someone's coming to you with an issue?
9  You are not talking about prophylactic,
10 preventative care?
11           MS. FICARO: Objection to form.
12 You can answer if you can.
13           THE WITNESS: There are -- I
14 would say it happens both ways, and some of that
15 depends upon what the situation is because I
16 guarantee you even though I've been doing HR
17 stuff for a long time, I haven't heard it all,
18 and I can't provide instruction on something
19 that I've never dealt with. So I will give
20 advice and give information in as much advance
21 notice as what I can, but for those instances
22 that seem to -- life provides, yeah, it has to
23 be after the fact because -- I mean, for
24 instance, with COVID and everything that has

BISNOW & JOSEPH
COURT REPORTING

TAMMY GILLETTE

## Page 21

1  happened and all the things that have continued
2  to change and evolve, anything that we started
3  to put in place back in February has changed
4  many times because we didn't know how it was
5  going to evolve and we didn't know what was
6  going to happen.  So when I am able to provide
7  information ahead of time, yes, that is done
8  but, unfortunately, you can't plan for
9  everything.
10  BY MR. AUERBACH:
11      Q.      And when you say give information
12  -- and I appreciate no one could have
13  anticipated COVID.  And you had to roll with the
14  punches and give information after the fact.  I
15  appreciate that.
16          But when you use the words before
17  the fact, perhaps you didn't use those words --
18  and maybe I'm misremembering -- that's -- do you
19  mean by that general guidance in terms of
20  situations that a manager will face?
21      A.      Are you talking about the
22  conversations that happened after the fact?  Is
23  that what --
24      Q.      No.  Before.  Do you recall any

## Page 22

1  conversations with Jack Bonsky about any
2  antidiscrimination matters, general guidance
3  that you gave before an issue arose?
4      A.      No, but I do know that Bryan
5  Willert and Brian Warner were having numerous
6  conversations with him.  They were more involved
7  with him early on than I was.  I cannot speak to
8  what those conversations were.
9      Q.      Who is Brian Warner?
10      A.      He's our CFO.
11      Q.      And Bryan Willert, is he the
12  owner?
13      A.      He is one of the owners.
14      Q.      Who are the other owners?
15      A.      Bill Willert.
16      Q.      Bill Willert?
17      A.      Yes.  His legal name is William,
18  but he goes by Bill.
19      Q.      Other than Bryan and Bill
20  Willert, any other owners that you are aware of?
21      A.      Just their spouses are minor
22  owners.
23      Q.      So this is a family business?
24      A.      Yes.

## Page 23

1      Q.      What kind of supervision does
2  Willert give over its plant managers to make
3  sure that no discrimination takes place on its
4  premises?
5      A.      I would be speaking out of turn
6  to answer that fairly, because I don't know.
7  I'm not privy to all of their conversations, so
8  I'm not going to put words in their mouth.
9      Q.      What steps do you take to make
10  sure that your plant managers don't discriminate
11  against its employees?
12      A.      So with the plant manager in
13  Kenova and St. Louis, they were in place before
14  I arrived, and so it was introducing myself and
15  I've made trips down to Kenova to make sure that
16  that plant manager and I established a
17  relationship.  Obviously, I'm here in St. Louis,
18  so I have a relationship with the plant manager
19  here and we just have regular conversations.
20  Yeah, without a doubt several e-mails of here's
21  the situation, please call me.  And a lot of
22  times they're very brief e-mails, and it will
23  just say please call me ASAP.
24      Q.      What -- I'll be more specific.

## Page 24

1          What steps do you take or have
2  you taken to make sure that Jack Bonsky doesn't
3  discriminate against his employees?
4          MS. FICARO:  Objection to form.
5          THE WITNESS:  So with Jack,
6  initially, when he was hired, it was -- there
7  were way more conversations in probably the
8  first month that he was there, might be three
9  weeks that Bryan and Brian were having with
10  Jack.  And once Jack had been there for a few
11  weeks I had a verbal introduction through Ed
12  Kennet, and at that point, then, we -- we've had
13  conversations periodically on a variety of
14  topics and sometimes it'll be here's what's
15  going on, sometimes it'll be, hey, I just want
16  to keep in touch, so just periodic.  I have not
17  yet met him.  The only ones who are flying out
18  there are Bryan and Brian.  So once we're past
19  the COVID hump and we're actually traveling,
20  then I will be out to Pennsylvania again.  I've
21  not been to Pennsylvania or Kenova since all of
22  this, so I look forward to actually meeting him
23  at some point.
24  BY MR. AUERBACH:

6 (Pages 21 to 24)

TAMMY GILLETTE

Page 25

1    Q.    So fair statement that you've
2  only had informal conversations with him?
3         MS. FICARO:  Objection to form.
4         THE WITNESS:  Correct.
5  BY MR. AUERBACH:
6    Q.    Have you ever reviewed any of his
7  plant practices and procedures to make sure that
8  he doesn't discriminate against his employees?
9    A.    I've never seen anything in
10  writing.
11    Q.    But have you had -- during your
12  informal conversations, have you ever discussed
13  his policies and procedures to make sure that he
14  doesn't discriminate against his employees?
15         MS. FICARO:  Objection to form.
16         THE WITNESS:  Yes.
17  BY MR. AUERBACH:
18    Q.    When have you had those
19  conversations?
20    A.    I honestly couldn't give you
21  dates.  I couldn't even give you time lines, but
22  as things have happened in the plant or if
23  changes are coming, then we will have those
24  conversations.

Page 26

1    Q.    And what kind of conversations
2  have you had with Jack Bonsky about the changes
3  that were coming?
4    A.    So, as an example, when it was
5  known that there was going to be a lot of hiring
6  that was going to need to be done at the
7  facility, then we started having conversations
8  about, so, what's going on.  And, honestly,
9  Debbie was also involved in those conversations.
10  She is HR out in Pennsylvania, and it's
11  important that all three of us are on the same
12  page.  So we would just talk about so what are
13  we doing, they give me their ideas, and quite
14  honestly, they had some great ideas.  They'd run
15  them past.  Here's what we're going to do, what
16  are you guys doing in St. Louis, how does this
17  compare because we just need to make sure that
18  we're not doing two completely different things.
19  Even though it's the same company, we need to be
20  consistent.
21    Q.    What do you mean by that?  What
22  was your concern in terms of doing two different
23  things?
24    A.    It's not a concern.  It's really

Page 27

1  when you talk about being proactive versus
2  reactive.  If I wait until they've done all the
3  hiring and then say, oh, that's not how we do it
4  in St. Louis, then shame on me.  So it's --
5  talking to them about here's what's gone on in
6  St. Louis, here's how we've done things, is that
7  something that can work or will work in
8  Pennsylvania, what is your situation there, how
9  quickly are you hiring, you know.  It's just
10  making sure that we're all aligned.
11    Q.    In line (sic) in terms of what?
12    A.    Aligned.
13    Q.    Aligned, yes.  In terms of what?
14    A.    In terms of practices.  So if I
15  am hiring -- well, I -- here in St. Louis we
16  have a very diverse workforce and we look for
17  that.  So one of the things that was discussed
18  was what are -- what avenues are there in the
19  Douglassville area so that you can be hiring a
20  diverse workforce.  That is something that the
21  Willert's want.  That's what we put in the
22  practice here.  So here are the places here in
23  St. Louis that I use, do you have any place like
24  that in Douglassville.  And that makes sure that

Page 28

1  both areas are looking to hire a diverse
2  workforce.
3    Q.    And did the Douglassville
4  location end up hiring a diverse workforce?
5    A.    We -- yeah, definitely.  It's not
6  as diverse as what St. Louis is because we have
7  -- yeah.  In this -- I mean, we're in St. Louis.
8  You draw from what you've got and -- yeah, we
9  have quite a bit more diversity here than what
10  they do in Douglassville.  If they were located
11  actually in Philadelphia, then I'm sure that
12  there would be even more of a diverse workforce,
13  but yes.
14    Q.    Diversity means different things
15  to different people.
16         You would agree that that
17  includes race?
18    A.    Oh, yeah.
19    Q.    Does your -- does your term of
20  diversity in workforce also include gender?
21    A.    Yeah.
22    Q.    Does it include handicapped
23  people?
24    A.    Yes.

BISNOW & JOSEPH
COURT REPORTING

TAMMY GILLETTE

Page 29

1   Q.   Does it include medical marijuana
2   patients?
3        A.   Yes.
4        Q.   Does Willert presently -- to your
5   knowledge, does Willert presently employ any
6   medical marijuana patients?
7        A.   Not that has been brought to my
8   attention, no.
9        Q.   So to your knowledge,
10  Mr. Reynolds was the only medical marijuana
11  patient?
12       A.   Yes.
13       Q.   In the six years you have been
14  with the company, have you been involved, in any
15  capacity, in formulating or crafting any
16  antidiscrimination policies?
17       A.   No.
18       Q.   Has anyone else at Willert, in
19  the six years you've been with the company, been
20  involved with formulating or crafting
21  discrimination policies?
22       A.   No.
23       Q.   In the six years you've been with
24  Willert, are you aware of any policy --

Page 30

1   antidiscrimination policies that change
2   throughout the year?
3        A.   In the last year I've been
4   working on a wide variety of policies, so they
5   have not come to -- they have not been
6   finalized, but I'm working on them.
7        Q.   What types of policies are you
8   working on creating?
9        A.   Well, the overall view of this is
10  to create a brand new rules and guidelines book.
11  We'll have one for each of the locations, and
12  then we have to have one that is specific to
13  unions.  And it's looking at all of the policies
14  that are currently in there as well as ones that
15  are missing, that weren't even considered when
16  the last one was put together.  So, for
17  instance, we're manufacturing and no one thought
18  to have a work-from-home policy until the last
19  year happened.
20       Q.   Understood.  Are you updating any
21  of your policies on medical marijuana?
22       A.   That will be part of the new
23  substance abuse policy that we are working on.
24       Q.   What do you anticipate the new

Page 31

1   policy to be?
2        A.   I'm sorry?
3        Q.   What do you anticipate the new
4   policy will be on medical marijuana?
5        A.   Each of the states have different
6   conditions, which is why we will not have just
7   one rules and guidelines book.  To include one
8   medical marijuana policy with all of the
9   different conditions would be stupid on my part.
10  So Kenova, West Virginia, doesn't have that.
11  Well, yet.  Not in the sense that Pennsylvania
12  does.  So Pennsylvania is very different than
13  the others, so I'm starting out with the crux of
14  the substance abuse policy as what it is now and
15  then looking at the state and what are the
16  conditions.  I'm also looking at what's coming
17  down the pike to see if there is anything that
18  is changing.  So Missouri, for instance, has
19  been -- there's been a lot of talk about what
20  we're going to do and so -- yeah.  What do I
21  include, what do I anticipate.  The final draft
22  of any of the policies are going to be reviewed
23  by our lawyers to make sure that I've not missed
24  anything in terms of the state laws.  So I know

Page 32

1   that does not give you specifics, which is
2   probably what you want, but I do not want to
3   speak to something that has not been finalized
4   and put out there for all of the employees yet.
5   That would be speaking out of turn.
6        Q.   I understand.  I certainly don't
7   want you to speak out of turn.  In fact, I only
8   want you to speak in turn, in terms of things
9   you know about.
10            Have you ever been involved in
11  any capacity in administering training on
12  antidiscrimination policies at Willert?
13            MS. FICARO:  Objection on form.
14            THE WITNESS:  Do I answer?
15            MS. FICARO:  Yes, you can answer.
16            THE WITNESS:  Okay.  Every time
17  that I hire someone there is a discussion on
18  what we firmly believe here at Willert and what
19  I know that the Willerts expect of all of the
20  employees.  Bill Willert started many, many
21  years ago bringing in a workforce that was not
22  all going to look the same, and it's important
23  to the Willerts to make sure that everyone is
24  treated with respect.  And I have a very

8 (Pages 29 to 32)

TAMMY GILLETTE

Page 33

1  in-depth conversation with all of the new hires,
2  and periodically with employees, about respect
3  and what that means in the workplace.  And I
4  know that you specifically asked me about
5  discrimination, but my viewpoint and how I put
6  it to everybody is that when there is respect,
7  you don't have those other issues.  I cannot
8  treat you with respect and discriminate you at
9  the same time, I cannot treat you with respect
10  and be using profanity or harass you or any of
11  those other things, and I go into those details.
12  And I know that is the expectation of the
13  Willerts, and so I make sure that everybody,
14  regardless of their position here, understands
15  the expectations are to treat others with that
16  respect and, therefore, create an environment
17  that's going to be free from all of those things
18  that none of us wants, including discrimination.
19  BY MR. AUERBACH:
20      Q.    And have you been -- I understand
21  your position on respect.
22            Have you been involved in any
23  kind of training at Willert on wrongful
24  termination?

Page 34

1      A.    How I have provided the training
2  to the supervisors, I don't call it wrongful
3  termination.  What I talk to the supervisors
4  about is being a good supervisor and what is
5  involved in being a good supervisor.  So, for
6  instance, a good supervisor -- and back -- I
7  just was having this discussion earlier this
8  morning.  A good supervisor is keeping notes
9  about the good and the bad of employees and
10  having conversations, having coaching sessions,
11  however you want to phrase it about, hey, great
12  job, I know you've been struggling with this,
13  that was -- that was great, and I really
14  appreciate it.  But on the flip side, hey, your
15  attendance is not where it needs to be, here's
16  our expectations.  You don't wait until you're
17  at your boiling point to then have a discussion
18  about the issues and terminating somebody.  A
19  wrongful termination only happens when you've
20  been waiting for three years and you never said
21  anything to the employee and then all of a
22  sudden after three years of the employee doing
23  this then you terminate.  So why would I -- why
24  would I focus on wrongful termination when

Page 35

1  everything that I'm here for is to make sure
2  that things are done right.
3      Q.    Are you involved, in any
4  capacity, in making sure that Jack Bonsky
5  follows the law?
6      A.    Yes.
7      Q.    What is your involvement in
8  making sure that Jack Bonsky follows the law?
9      A.    Again, the items that I have just
10  talked about in terms of the respect, and how to
11  treat the employees, about the documentation,
12  things along those lines.  We've had those
13  conversations, but when I hear anything -- and
14  this is not just with Jack.  This could be with
15  anybody who is in a supervisor capacity at any
16  of the locations -- if I hear something of an
17  issue I have an obligation to make sure that
18  that is addressed.  There are a variety of ways
19  that it can be addressed, depending upon the
20  situation with Mr. Bonsky because he is in
21  Douglassville and partly because I've not met
22  him yet.  I have a conversation then with Bryan
23  Willert and make him aware of anything that I
24  might have heard, good or bad.  Hey, Bryan, just

Page 36

1  want you to be aware of this.  And if it is
2  something that needs correcting, then my next
3  question to Bryan is, is this something you want
4  me to handle or would you like to handle it, and
5  we go from there.
6      Q.    Ms. Gillette, I'm going to ask
7  you a yes or no question.  And if there's a need
8  for elaboration, we'll handle it afterwards.
9            Prior to October 2020, did you
10  ever discuss with Mr. Jack Bonsky about the
11  Pennsylvania Medical Marijuana Act?
12        MS. FICARO:  Objection to form.
13        THE WITNESS:  No.
14  BY MR. AUERBACH:
15      Q.    Prior to October 2020, did you
16  ever discuss with Mr. Jack Bonsky about medical
17  marijuana patient discrimination?
18        MS. FICARO:  Objection to form.
19  You can answer.
20        THE WITNESS:  Sorry for the
21  delay.  No.
22  BY MR. AUERBACH:
23      Q.    Prior to October 2020, did
24  Mr. Jack Bonsky receive any training about

9 (Pages 33 to 36)

TAMMY GILLETTE

Page 37

1  medical marijuana patient discrimination?
2      **A.    I don't know.**
3      Q.    Prior to October of 2020, did you
4  give Mr. Jack Bonsky any training on medical
5  marijuana discrimination?
6          **MS. FICARO:  Objection to form.**
7          **THE WITNESS:  No.**
8  **BY MR. AUERBACH:**
9      Q.    I'm aware of three Willert
10 plants: one in Pennsylvania, one in West
11 Virginia one in Missouri.
12         Did I miss any?
13     **A.    No, other than Shanghai.**
14     Q.    And you had said that St. Louis
15 is your base?
16     **A.    Yes, headquarters.**
17     Q.    That's where you live, obviously?
18     **A.    I don't live in St. Louis, but I**
19 **work here.**
20     Q.    But you live in Missouri?
21     **A.    I live in Illinois.**
22     Q.    How far of a commute do you have?
23     **A.    All depends on the bridge**
24 **traffic, but it's typically 35 to 40 minutes.**

Page 38

1      Q.    When we're done, I'm going to
2  have to look at a map just so I can get
3  oriented.
4          And because you work in Missouri
5  and for a company that has a base in Missouri or
6  headquarters in Missouri, you are aware Missouri
7  has a Medical Marijuana Patient Act?
8      **A.    Yes.**
9      Q.    And you are aware that West
10 Virginia is a state that also has a Medical
11 Marijuana Act?
12     **A.    Yes.**
13     Q.    And you're aware, obviously, that
14 Pennsylvania has a Medical Marijuana Patient
15 Act?
16     **A.    Yes.**
17     Q.    So you're aware that 100 percent
18 of your US operations have states with Medical
19 Marijuana Acts?
20     **A.    Yes.**
21     Q.    And as of right now, your company
22 doesn't have any policies or procedures to
23 protect medical marijuana patients?
24     **A.    Correct.**

Page 39

1      Q.    If someone -- if one of your
2  plant branch managers were to call you and say I
3  have a patient -- and this happens today -- I
4  have a patient -- I have an employee who just
5  showed me a medical marijuana patient card,
6  what's your next step?
7          **MS. FICARO:  Objection to form.**
8          **THE WITNESS:  Can I answer?**
9          **MS. FICARO:  Yes, answer.  If you**
10 **can, answer.**
11         **THE WITNESS:  My first question**
12 **would be why did he or she show you the card,**
13 **because it doesn't seem like somebody would just**
14 **walk up to you and say, oh, hi.  Look what I**
15 **have, so, yeah.  In my experience, anytime that**
16 **somebody is coming up and volunteering something**
17 **that's unique, there's got to be a reason for it**
18 **so I'd say what happened, fill me in and then**
19 **what would happen next would determine what I**
20 **would do.  What he -- he would say would**
21 **determine what I would do.**
22 **BY MR. AUERBACH:**
23     Q.    And what are the range of
24 outcomes that you would do based on that

Page 40

1  information?
2      **A.    For sure I would get down to the**
3  **nitty-gritty of -- I mean, did this person get**
4  **hurt, is that why they're telling you, you know,**
5  **that they just cut their finger off and they're**
6  **like oh, well, maybe you should know I have a**
7  **medical marijuana license.  You know, so if it's**
8  **something bad, well, let's get through the**
9  **injury, make sure that everything is taken care**
10 **of, make sure that this person gets the medical**
11 **care and medical treatment, okay, do we have all**
12 **the paperwork filled out, everything else.**
13 **Because you have to deal with the crisis first.**
14 **Once we have dealt with the initial crisis and**
15 **everything that goes along with the workplace**
16 **injury -- and I'm just using that because that's**
17 **the example that I started out with -- then I**
18 **start looking at, okay.  So this person has a**
19 **medical marijuana license, we're going to have**
20 **to see if this -- in this situation this has any**
21 **implication with the workers' comp insurance.**
22 **It might.  And then we start having**
23 **conversations about what are the implications**
24 **for the facility as a whole, what do we need to**

BISNOW & JOSEPH
COURT REPORTING

TAMMY GILLETTE

Page 41

1  be putting in place, what procedures, what
2  practices, what policies.  And so there's a huge
3  trickle-down effect as to what started it and
4  where we end up being.
5      Q.     Can you envision a scenario that
6  does not result in a termination for a Willert
7  employee who is a medical marijuana patient?
8      A.     Yes.
9      Q.     What would be an example of that?
10     A.     Well, I'll use the example that
11 -- I'll just continue with the example.  So this
12 person's finger got cut off.  So at that point
13 we know that they're a medical marijuana user.
14 In our investigation, we find out that, I don't
15 know, it got cut off because -- can't even think
16 of how it would get cut off -- but it was of no
17 fault of their own kind, it was kind of one of
18 those freak accidents that do happen and we do
19 get a copy of the medical marijuana license.  At
20 that point, the license had nothing to do with
21 the incident, their performance as an employee
22 has been good up to that point and that would be
23 a key factor.
24         So if they've been a great

Page 42

1  employee it's not, you know, day one on the job,
2  so to speak, we have a history, then I think
3  that at that point in time we would definitely
4  keep them as an employee, but that would also
5  factor in to any policy or procedures that would
6  be put in place as a result of that incident.
7      Q.     Willert has a zero tolerance drug
8  policy; does it not?
9      A.     For pre-hire, yes.
10     Q.     Do you recall approximately when
11 this policy was created?
12     A.     It was before I was here.
13     Q.     Has it been updated in any
14 meaningful sense since you have been there?
15     A.     I am working on it now.  Again,
16 as discussed earlier, taking a look at the
17 different laws, I'm updating all the policy.
18 This is just part of it, yes.
19     Q.     Ms. Gillette, were I to represent
20 to you that Pennsylvania legalized medical
21 marijuana in 2016, would you have any reason to
22 doubt or dispute that assertion?
23     A.     Honestly, I know that the law in
24 Pennsylvania has gone through a few revisions,

Page 43

1  and I don't know the years that they happened so
2  that would be my question, was the 2016 part.
3  So in terms of the doubt, it was just -- I know
4  that it's happened.  I don't know what year.
5      Q.     But this drug policy hasn't
6  changed since Pennsylvania legalized medical
7  marijuana?
8      A.     Correct.
9      Q.     Any reason?
10     A.     Well, we did not acquire
11 Pennsylvania -- we didn't have them in 2016.
12     Q.     You acquired Pennsylvania in
13 2019?
14     A.     '19, yes.
15     Q.     Any reason why it didn't update
16 its policy since 2019?
17     A.     Updating the policy was --
18 unfortunately, that was my major goal for last
19 year, and then COVID happened.  So last year
20 after acquiring Pennsylvania is when it would
21 have initially been modified and have been put
22 in place.  And once COVID happened and --
23         - - -
24         (Whereupon, an off-the-record

Page 44

1          discussion occurred.)
2          - - -
3          THE WITNESS:  Once COVID happened
4  everything changed for me, and I had three
5  states with employees living in an additional, I
6  believe, five states and my focus had to change
7  on learning everything that I could about what
8  the CDC was requiring, what each state was
9  requiring, and in some instances, the county was
10 requiring, making sure that we put practices in
11 place to physically keep our employees safe from
12 being exposed to the pandemic at work because
13 all of our facilities stayed open.
14         So updating the rules and
15 deadlines took a very distant second place to
16 making sure I kept my employees safe and
17 protected them from potentially getting a lethal
18 virus.
19 BY MR. AUERBACH:
20     Q.     Ms. Gillette, I -- I do
21 understand that.
22         So just to summarize what I heard
23 you say is, it had been on the docket to update
24 these drug policies, but when COVID hit, COVID

11 (Pages 41 to 44)

TAMMY GILLETTE

Page 45

1  had to be the priority?
2      A.     Correct.
3          MS. FICARO: Objection to form.
4  BY MR. AUERBACH:
5      Q.     When did you start the process of
6  working on updating Willert's drug policies?
7      A.     I actually started having
8  conversations in -- there we go -- there's some
9  training that I had started going to in 2019,
10 was on handbook and information that needs to be
11 in handbook. So I started attending seminars
12 and webinars and looking up information and
13 started actually working on that in late 2019.
14 We have access to something that's called Think
15 HR, and so the -- it's the database that has the
16 policy -- has, like, a handbook. You can modify
17 it, you change it, you update it so that it --
18 it's not a generic handbook. So I actually
19 started that in 2019 and was working through
20 some of what they actually had in their part,
21 then I was going to be adding things that were
22 specific to states and specific to Willert.
23     Q.     My question was specific to
24 medical marijuana.

Page 46

1          When -- on approximately what
2  date did you begin the process of updating
3  Willert's drug policies?
4      A.     Honestly, I don't have a date and
5  I don't know if that's even something that I had
6  done much progress on. I really have to look at
7  what I had gotten. As I said, it's kind of like
8  you can buy to do or you can -- you know, if you
9  want to write a blog, you can look up that
10 information, it can help you out and you fill in
11 the missing pieces, you update, you put in your
12 titles and that sort of thing, and that's kind
13 of what Think HR has for their handbook. So I
14 started at the beginning of that handbook and
15 was working my way through while I was attending
16 the webinars and the seminars and looking up
17 that information, and I -- I don't know --
18 honestly, I don't know if the substance abuse
19 and medical marijuana had been modified at that
20 point. I just don't know.
21     Q.     In 2019, did you know that
22 Willert needed to update Pennsylvania's medical
23 marijuana drug policies?
24         MS. FICARO: Objection to form.

Page 47

1          THE WITNESS: I'm okay to answer
2  this?
3          MS. FICARO: Yes.
4          THE WITNESS: I knew in 2019 that
5  all locations' policies needed to be updated,
6  not just Pennsylvania.
7  BY MR. AUERBACH:
8      Q.     Did you have any conversations
9  with anyone at Willert that the drug policies
10 needed to be updated?
11     A.     Again, I knew that every policy
12 -- I did not specifically say that there's one
13 policy and only one policy that has to be
14 updated. My conversation was I need to update
15 the handbook and every policy that we have in
16 the company.
17         MR. AUERBACH: Okay. I did
18 promise you a bathroom break, so let's take that
19 now so we can do that. I have 12:14. Can we be
20 back at 12:19?
21         - - -
22     (Whereupon, a brief recess was taken.)
23         - - -
24 BY MR. AUERBACH:

Page 48

1      Q.     Ms. Gillette, did you have any
2  conversations about Mr. Reynolds' allegations
3  during our break?
4      A.     No, I did not.
5      Q.     Okay.
6      A.     The only ones I talked to were
7  our construction guys.
8      Q.     Does Willert have any policies to
9  ensure equal employment opportunities for
10 medical marijuana patients?
11     A.     We have a general Equal
12 Employment Opportunity clause that does not
13 specifically state that it applies solely to
14 medical marijuana, but it's EEO for all.
15     Q.     And does your -- I understand
16 that doesn't state the word medical marijuana
17 patient, but does your antidiscrimination policy
18 apply to medical marijuana patients?
19     A.     Yes.
20     Q.     Did it apply to patients --
21 medical marijuana patients in November of 2020?
22     A.     Those that we knew of.
23     Q.     Again, you are not a lawyer. I'm
24 not asking you for a legal definition. I'm

BISNOW & JOSEPH
COURT REPORTING

TAMMY GILLETTE

Page 49

1  asking you for your understanding of the term.
2         What does the term medical
3  marijuana patient discrimination mean to you.
4         MS. FICARO:  Objection to form.
5  You can answer.
6         THE WITNESS:  So, obviously, the
7  medical marijuana patient is someone who has a
8  legal right to a legal prescription from a
9  doctor to be able to use it for whatever the
10  medical purpose is, and discrimination would be
11  if you look at somebody, and based solely and
12  only on that factor, you make a decision about
13  them.
14  BY MR. AUERBACH:
15      Q.     You've never met Mr. Reynolds;
16  have you?
17      A.     That is correct.
18      Q.     Have you ever spoken to him on
19  the phone?
20      A.     No, I have not.
21      Q.     So you've never seen him under
22  the influence of any drugs?
23      A.     I have never seen him period.
24      Q.     And you are not aware of any

Page 50

1  complaints that he was high on the job?
2      A.     That he was high on the job; is
3  that what you said?
4      Q.     Yes.  Intoxicated.  Under the
5  influence of marijuana on the job.
6      A.     I had never heard that.
7      Q.     When did you become aware that
8  Mr. Reynolds had failed his drug test?
9      A.     I don't know what the date was,
10  but I believe it was the same date of the
11  termination.
12      Q.     How did you become aware that
13  Mr. Reynolds had failed his drug test?
14      A.     I received a phone call from
15  Mr. Bonsky.
16      Q.     And what did Mr. Bonsky tell you?
17      A.     That Mr. Reynolds had tested
18  positive for marijuana, and then I believe his
19  next question was what do we do now.
20      Q.     How did you answer that question?
21      A.     Well, I hadn't seen any
22  documentation, and so I asked him to send it to
23  me.  So while we were on the phone, he then
24  forwarded the information to me so that I could

Page 51

1  review it.  So bit of a pause so that I could
2  take a look at it, kind of had a discussion
3  about -- you know, I asked if Matt had said
4  anything to him, because Matt would have heard
5  something before we did.  So I asked if Matt had
6  said anything, and he said that Matt had not
7  been to work the day before or that day and so
8  he had not -- Matt had not said anything.  So I
9  mentioned about what our practice is of a
10  positive result being termination or anything
11  that was considered the pre-hire so, you know,
12  just -- we wouldn't have hired him, and I said
13  but let me talk to Bryan Willert.  And the
14  reason I said that is because it has been
15  practice almost from the time that I got here,
16  that anytime that we're doing a termination that
17  Bryan wants to know before it happens.  So
18  that's just standard practice.  The only time
19  that we don't have to let him know -- actually,
20  no.  There's no time.  We have to let him know,
21  regardless of the reason.  If he's on vacation,
22  we still have to get ahold of him.  So I needed
23  to discuss it with Bryan and said that we would
24  talk after I was able to talk with Bryan.

Page 52

1      Q.     You did speak with Bryan?
2      A.     Yes.
3      Q.     And what did you tell Bryan?
4      A.     I told him what Jack had told me.
5  I actually printed out the result and took it
6  into Bryan.  Again, that would have been kind of
7  a normal thing.  And, you know, at that point in
8  time it just -- anytime that something --
9  regardless of what it is, if it's something that
10  we don't want to happen, then Bryan and I are
11  both kind of like, uh, why, kind of thing.  And
12  so, you know, I mentioned about what our policy
13  is and, again, it kind of came up of, well, why
14  was this not done ahead of time and -- you know,
15  an oversight, and so I, you know, made him aware
16  of that and, you know, reminded him, hey, this
17  is -- we would not have hired him if we'd known
18  about a positive test.  And he said it -- at
19  that point he said that -- he goes, well, we
20  need to follow practice.  You know, Matt had
21  only been with us, I think at that point, two
22  weeks, somewhere around there.  He said that
23  there had been some other issues as well.  And
24  so because of everything and the fact that he is

13 (Pages 49 to 52)

TAMMY GILLETTE

Page 53

1  a new hire, that we would go ahead and terminate
2  him.
3        Q.     Did you or Bryan, at that point,
4  inquire as to why Mr. Reynolds had failed the
5  drug test?
6        A.     I never do.  It's -- there's a
7  standard practice for drug testing, and I don't
8  inquire why somebody fails.  That's already been
9  done.
10       Q.     What is that standard practice
11 for drug testing?
12       A.     So when someone takes a drug
13 test -- if I were to go take a drug test, when I
14 get there, they're going to ask me if there's
15 any type of prescription that I'm on.  So, for
16 instance, I'm on thyroid medication, so I would
17 indicate, hey, I take thyroid medication, here's
18 my dosage and, you know, I would do that even if
19 it's, you know, something that's over the
20 counter, cranberries, for instance, vitamin D,
21 those sorts of things.  They ask you what it is
22 that you're taking and if you have a
23 prescription.  And then you provide your sample
24 and that's pretty much it for the drug test at

Page 54

1  that point in time.  We always ask for a split
2  specimen to be done, which means they split it
3  in half, they test half of it and hold onto the
4  other half.  So if somebody comes up positive,
5  then the split specimen, because this is just
6  going to be a rapid, so kind of dip test, so to
7  speak, if it comes up positive for anything,
8  then it is sent off for further evaluation.
9  Depending upon the agencies, some agencies will
10 send the notice to the company stating that it
11 has been sent out for further testing because
12 that explains why you don't have the initial
13 results.  Not all companies do that.  When it
14 goes out for further testing, it's not just
15 another dip test, but there is further -- I
16 don't know what all is involved, but I know that
17 there's more testing if they're involved in the
18 process.
19        In addition to just the testing
20 of the specimen, itself, the medical review
21 officer actually will have a conversation with
22 that person.  And -- so in my instance, they
23 would say, you know, you identified that you
24 take thyroid medication.  You know, do you take

Page 55

1  anything else, you came up positive for
2  marijuana so, you know, we're looking for any
3  reason why you might have this positive result.
4  And that could be any type of medication.  They
5  would ask me what I had eaten recently because
6  sometimes that can produce -- that can impact
7  the test.  So the medical review officer's
8  actually looking for any reason to validate why
9  the result would be positive, and you'd have
10 that conversation if there was something that I
11 had a prescription for.  So let's just say that
12 I had dental work and been given a prescription
13 and that's why I turned up positive for
14 something.  They would want to have a copy of
15 that prescription to prove that it's actually my
16 prescription and not someone else's and to prove
17 that it's current so the prescription, you know,
18 for whatever it is I'm taking is not
19 three-years-old.  Once they would receive any
20 validation, then my experience has been at that
21 point in time if there's a reason why this
22 person tested positive, then the company at that
23 point in time receives a negative result.  If
24 there is no validation as to why it is legally

Page 56

1  okay, then the company receives the positive
2  results, but that is after all of that has
3  happened with the medical review officer.  And
4  so the final results don't come specifically
5  from the agency who did it but the final results
6  come from the medical review officer.
7        Q.     And you are not -- you, yourself,
8  are not a medical review officer?
9        A.     No.  Oh, God.  No.
10       Q.     And you are not a toxicologist?
11       A.     Oh, correct.
12       Q.     And you do not work for Pottstown
13 Hospital?
14       A.     No.
15       Q.     So fair to say you don't know --
16 you don't have any firsthand knowledge of how
17 Pottstown Hospital handles their drug test?
18       MS. FICARO:  Objection to form.
19       THE WITNESS:  Am I okay to
20 answer?
21       MS. FICARO:  You can answer.
22       THE WITNESS:  Okay.  I don't
23 specifically know how Pottstown handles it, but
24 I know from all the places that I have worked,

14 (Pages 53 to 56)

TAMMY GILLETTE

Page 57

1  using different places for testing, the testing
2  procedures are the same.
3  BY MR. AUERBACH:
4      Q.    And in your experience, when
5  someone is given a drug test which includes a
6  battery for methamphetamine, if that person is
7  on a stimulant ADD medication, will they test
8  positive or not for methamphetamine?
9      A.    I don't know.  I don't know how
10  any specific drug is going to show up in a drug
11  test.  I'm not a doctor.
12      Q.    In your experience, if someone
13  has a prescription for some kind of
14  methamphetamine drug and shows the medical
15  review officer the valid prescription, will
16  their drug results indicate a positive or a
17  negative?
18      MS. FICARO:  Objection to the
19  form.  You can answer.
20      THE WITNESS:  To my knowledge, if
21  there is a legal reason for them to be taking
22  any medication that is current, we would receive
23  a negative.
24  BY MR. AUERBACH:

Page 58

1      Q.    And that would be for an FDA
2  approved federally licensed medication?
3      MS. FICARO:  Objection to form.
4  You can answer.
5      THE WITNESS:  I guess.  I say it
6  that way because -- you know, let's say for
7  instance -- I don't know -- if I drank -- and I
8  don't know if this happened or not.  We'll be
9  clear about that.  But if I'm drinking lots of
10  sports drinks that's not FDA approved and I
11  don't know if it shows up in your blood, but if
12  it did, you know, I -- yeah, I don't know how to
13  answer that then, so --
14  BY MR. AUERBACH:
15      Q.    What is -- what is your knowledge
16  of Pottstown Hospital's procedures when an
17  individual presents a medical marijuana card?
18      A.    I don't have that knowledge.
19      Q.    So you don't know whether or not
20  an individual who submits to a test who is a
21  medical marijuana patient presents the card if
22  the results would come back positive or
23  negative?
24      A.    That has -- any testing needs to

Page 59

1  be authorized by somebody local.  And prior to
2  the acquisition, they had somebody who is
3  already established as the contact with
4  Pottstown, and so they had -- they had those
5  procedures on hand.
6      Q.    Would that have been Dave Furno?
7      A.    Furno, yes.
8      Q.    When you look at a drug test, are
9  you able to determine whether or not an
10  individual is a medical marijuana patient?
11      A.    No.  I should never know that
12  from the drug results that I'm given.  The only
13  reason I would know that is if that person who
14  took the drug test told me.
15      Q.    Okay.  Now, you were told that
16  Mr. Reynolds was a medical marijuana patient;
17  were you not?
18      A.    After he was terminated.
19      Q.    Who told you this?
20      A.    When Mr. Reynolds was terminated,
21  he informed Mr. Bonsky.
22      Q.    How do you know he told
23  Mr. Bonsky?
24      A.    Because after the conversation

Page 60

1  that the two of them had, Mr. Bonsky called me
2  up and said here is what Mr. Reynolds told me.
3  He told me he is a medical marijuana user.
4      Q.    And what did you do with that
5  information?
6      A.    I asked if he knew that ahead of
7  time or if anybody knew that ahead of time, and
8  he said no, no one was told.
9      Q.    But you were told right then and
10  there?
11      A.    After he was terminated, yes.
12      Q.    Was there anything stopping you
13  from revoking the termination?
14      A.    No, because that was not --
15  that's what brought everything to a head, but
16  that was not the only item of consideration that
17  led to the termination.
18      Q.    What other items led to the
19  termination?
20      A.    Well, from my understanding --
21  actually, what I knew was there had been some
22  attendance issues with Mr. Reynolds, either
23  arriving late or not arriving at all, taking
24  items home with him that he was not supposed to

15 (Pages 57 to 60)

TAMMY GILLETTE

Page 61

1  take with him and there was an item that -- I
2  don't know the specific circumstances -- but he
3  either took something home or had something that
4  was going to be needed at the plant and he
5  didn't drop it off until after the shift was
6  over and, you know, he said he wouldn't be
7  there.  He acknowledged that he had whatever it
8  was that was needed and said he would drop it
9  off sometime and it wasn't dropped off until
10  later.  Those are the issues that I was made
11  aware of.  I know that Mr. Bonsky and
12  Mr. Willert actually had other conversations
13  about other issues that I don't -- I don't know
14  the specifics of those and so I'm not going to
15  speak to those.
16     Q.     And obviously you don't have
17  firsthand knowledge of Mr. Reynolds' attendance
18  issues or him taking anything home; you've only
19  just been told this by other people?
20     A.     I've seen e-mails that
21  Mr. Reynolds sent.
22     Q.     And did you become aware of these
23  attendance issues before you found out that he
24  had failed his drug test?

Page 62

1     A.     I honestly don't remember what
2  the order was.  I don't recall.
3     Q.     You drafted Mr. Reynolds'
4  termination letter; did you not?
5     A.     Yes, I did.
6     Q.     Any reason why it didn't include
7  the attendance issues or the taking items home
8  with him in your letter?
9     A.     Our practice at Willert is that
10  all employees -- I don't care what your position
11  is -- but all employees are brought in, I guess
12  you could say, on a probation.  I don't know if
13  it's ever worded that way with somebody other
14  than in our union contract, but attendance --
15  what it says -- and I don't even know how many
16  times I have said this -- but attendance is the
17  biggest reason why people are not kept as a new
18  hire.  When you are having attendance issues
19  within your first month, those are red -- that's
20  a huge red flag.  And I did not have every
21  instance of exactly what time he arrived.  I
22  mean, he didn't clock in, so I couldn't tell you
23  what time he got there or what time he left, any
24  of those things.  I did know that there were

Page 63

1  attendance issues.  When we're terminating
2  somebody as a new hire, typically I do not
3  include all the reasons in the termination
4  letter, but we state that we are terminating
5  them effective today, which is September 3rd,
6  then here's what's going to happen.  So the fact
7  that we only stated the drug test, he already
8  knew the results of the drug test.  It was -- it
9  was a positive result.  And so to list the other
10  reason, in our opinion, wasn't necessary.
11     Q.     Had he not failed the drug test,
12  would you have fired him November 5, 2020?
13     A.     I don't know.  The reason that I
14  say that is because you put in there -- in your
15  question November 5th, and I know that there
16  were issues.  Would a termination have happened
17  on November 5th, would it have happened November
18  6th, the next week -- I'm not sure, but I do
19  know that because of the issues, it would have
20  led to termination.
21     Q.     But you would agree with me that
22  before he became aware that he failed the drug
23  test you were not planning on firing him?
24     A.     I know the word termination had

Page 64

1  not been mentioned, but typically the first
2  conversation that I have about a new employee
3  who has issues that first conversation is not,
4  well, are we terminating.  That's never the
5  first conversation.
6     Q.     Did anyone at Willert ask to see
7  Mr. Reynolds' marijuana card?
8     A.     I don't know.
9     Q.     Did you tell Mr. Bonsky to ask
10  for it?
11     A.     I asked him if Matt had ever
12  shown anyone.  So this was the day of the --
13  sorry about that -- after Jack's conversation
14  with Mr. Reynolds of the termination when the
15  medical marijuana was mentioned.  Again, I asked
16  Jack if he ever told anybody, if anybody had
17  ever seen it, if there was any knowledge, and
18  nothing.  Nothing had ever happened up until
19  that point.
20     Q.     Was there anything stopping you
21  from asking Mr. Bonsky to get a copy of it?
22     A.     At that point, because -- the
23  short answer is no, and that's because the --
24     Q.     Would it --

16 (Pages 61 to 64)

TAMMY GILLETTE

Page 65

1      MS. FICARO:  Excuse me, Steve.
2   She's not finished her answer.
3   BY MR. AUERBACH:
4      Q.    Please.  You can answer.
5      A.    Because the positive result was
6   not the only reason for the termination, showing
7   us the medical marijuana license would not have
8   changed his being terminated.
9      Q.    What were his attendance issues?
10     A.    He would be arriving late or not
11  at all or even just I might be there, which --
12  you know, if someone is, let's just say, having
13  some car issues and you're like, hey, I'm going
14  to be late, I'm not sure, I'm waiting for the
15  tow truck, I'll be in after that, that's -- you
16  know, I totally get that.  But then he was also
17  not -- so he wasn't at the facility, but he also
18  was not responding to any e-mails or phone calls
19  and he's got people who are waiting for
20  direction or waiting for answers, and they're
21  not being given the information that they need.
22  So if you're, in my example, waiting on a tow
23  truck, what's to stop you from responding to a
24  call or responding to an e-mail.

Page 66

1      Q.    On how many occasions was
2   Mr. Reynolds late?
3      A.    I can think of twice.  I'm not
4   sure if there were others.
5      Q.    Are you aware that Mr. Bonsky
6   didn't give Mr. Reynolds a set schedule?
7      MS. FICARO:  Objection to form.
8   You can answer.
9      THE WITNESS:  Mr. Reynolds was a
10  salaried individual, such as myself, and so I'll
11  speak to my schedule, because his would be
12  similar.  No one tells me what time he has to be in
13  the office at a certain point in time, but I
14  know what is going on.  I know if there's
15  something -- okay.  Well, I have orientation and
16  they're going to be there at 7:00 and so I need
17  to make sure that I'm there by 7:00 so that --
18  or before then, actually, so that I can be there
19  when they arrive.  Mr. Reynolds' responsibility
20  was to the men who reported to him.  And if he
21  is not going to be there when he's needed, then
22  he needs to make sure that he is accessible.  So
23  he may not have been told, oh, you have to be
24  here at 6:47, but Mr. Reynolds would have known

Page 67

1   what was going on.  Or if this is a Wednesday --
2   today's Thursday, so wait a minute.  Yesterday I
3   know they were having problems with this, so I
4   need to make sure that I'm there at whatever
5   time so that if those problems start happening I
6   can address them.  He's the maintenance manager,
7   so it's his responsibility to know what he needs
8   to be there for.  So, yes, he would set his own
9   schedule, but to just willy-nilly kind of show
10  up whenever and not respond and take no
11  responsibility for the people who are waiting
12  for information -- if I did that, I know people
13  would have a problem with that.
14  BY MR. AUERBACH:
15     Q.    Mr. Reynolds was overtime exempt;
16  was he not?
17     A.    Yes, he was.
18     Q.    You say that very quickly.
19        What makes you say that?
20     A.    I'm the one who put his offer
21  letter together.
22     Q.    And on what basis did you say he
23  was exempt from overtime?
24     A.    Because he had people reporting

Page 68

1   to him, he had decisions that had to be made
2   about are we going to make changes, do we need
3   to order parts, how much do we need to spend, so
4   we had a budget that he was responsible for.
5   Yes, he's going to be speaking with Mr. Bonsky
6   and with Bryan Willert about these items as
7   well, but ultimately his responsibility is to
8   go to them and say, all right.  Here's what
9   changes we need to make.  And because of all the
10  responsibilities that he had, he is overtime
11  exempt.
12     Q.    That's because he's a manager?
13     A.    He's a manager with a lot of
14  responsibility, yes.
15     Q.    So his job was not to turn a
16  wrench; he was just to manage the people who
17  turn a wrench?
18     MS. FICARO:  Objection to form.
19  You can answer.
20     THE WITNESS:  I will put him in a
21  similar position to somebody that we have here
22  in St. Louis now.  Although Mr. Reynolds would
23  have had even more responsibility than what the
24  gentleman here in St. Louis does, he is

17  (Pages 65 to 68)

TAMMY GILLETTE

**Page 69**

1  directing our maintenance guys. Hey, I need
2  this, I need that, but he is also right there
3  with our maintenance guys and he is assisting
4  because there are many times -- to be able to
5  know what needs to be done. Do we need to just
6  change out the screw or do we need to order 10
7  different parts in order to make the change.
8  You know what, our plant here, Para, is a
9  chemical that we use, Paradichlorobenzene is the
10  official name, and there are some issues when
11  you have heat and humidity. So it is this
12  gentleman's responsibility when we start having
13  some issues to say here's the changes that we
14  need to make in order to work around those
15  issues. And many times you're going to do that
16  because you're actually in there doing this and
17  Mr. Reynolds would have had this same
18  responsibility. He would have been in close
19  proximity, he would have been right there on the
20  equipment with the maintenance guy looking to
21  see what works, trying to figure things out.
22  And the only way that he's going to be able to
23  talk to a manufacturer or whoever it is about
24  parts is if he knows how everything is running,

**Page 70**

1  and the best way to do that is to get in there
2  and use your hands on that piece of equipment.
3  So he may not have been working on the equipment
4  -- or wait a minute. His responsibility did not
5  include working on the equipment as much as the
6  men who reported to him, but that would have
7  been critical to his success on that job.
8  BY MR. AUERBACH:
9  Q.     Ms. Gillette, I'm not even going
10  to attempt to pronounce that chemical, but do
11  you have any firsthand knowledge as to whether
12  or not that chemical is at Douglassville?
13  A.     I do not believe that it is.
14  That does not mean that Mr. Reynolds does not
15  need to know the equipment, because Para is not
16  the only chemical that is used here. And the
17  gentleman I spoke to here doesn't have to know
18  just the lines that used Para. He has to know
19  every line that we've got here. Mr. Reynolds
20  would have had the same responsibility.
21  Q.     All right. You had said that you
22  were the one who put Mr. Reynolds' offer letter
23  together.
24  A.     Yes.

**Page 71**

1  Q.     Was it your understanding that
2  Mr. Reynolds had a base salary of $85,000 a
3  year?
4  A.     It's been a long time since I put
5  that offer letter together, but if that's what
6  you're telling me was in the letter, then I'll
7  say yes.
8  Q.     And he had a potential bonus of
9  $15,000 a year as well?
10  A.     Potential, yes.
11  Q.     And he had other benefits as
12  well, like a 401K?
13  A.     As does everyone.
14  Q.     Okay. What other benefits would
15  he have had?
16  A.     Well, to go back to the one that
17  you've already mentioned -- what we say for
18  anybody who is offered a bonus is that it is
19  only after the successful completion of -- and
20  then it will say -- sometimes it says a certain
21  length of time, but it always talks about
22  successful completion. So it's not -- bonuses
23  are never guaranteed, without a doubt you're
24  going to get it. The 401K, you mentioned that.

**Page 72**

1  There are two criteria in order to be eligible
2  to participate. You have to have worked 480
3  hours. And once you've worked that, you are
4  able to contribute at the beginning of the next
5  quarter. So if Mr. Reynolds started in October,
6  he may not have been eligible until April. Just
7  depends on what the timing would have been, and
8  that would have been April the following year.
9  But it's not a required, and it's not anything
10  that automatically happened. So whether or not
11  Mr. Reynolds would have participated or
12  contributed was entirely up to him, and we did
13  not have any paperwork yet on that. We have
14  medical and vision benefits which go into effect
15  after 60 calendar days. I believe Mr. Reynolds
16  started in October, which means that his
17  insurance would have gone into effect sometime
18  in December. Usually ends up being almost two
19  months to the day. There is short-term
20  disability that goes into effect after
21  completing six months of employment, but that's
22  only if you're out for your own medical reason,
23  and that's it. Long-term disability would not
24  have gone into effect as of yet either. And the

18 (Pages 69 to 72)

TAMMY GILLETTE

Page 73

1  company-paid life insurance goes into effect --
2  his actually would have gone into effect on
3  January 1st, because you have to be eligible for
4  the medical insurance, then it goes into effect
5  the first of the month after.  He was also
6  granted vacation.  I believe that he was given
7  four weeks vacation, which is outside of the
8  norm.  Normal is to start somebody out with two
9  or three weeks.  Those are the -- oh, we of
10 course have holidays.  I don't know if you
11 consider that necessarily benefits, but we've
12 got 10 paid holidays, so --
13          MR. AUERBACH:  That is everything
14 I have for you.
15          * * * * *
16          (Whereupon, at 1:03 p.m., the
17 deposition of TAMMY GILLETTE
18 was concluded.)
19          * * * * *
20
21
22
23
24

Page 74

1  C E R T I F I C A T E
2
   COMMONWEALTH OF PENNSYLVANIA:
3
   COUNTY OF PHILADELPHIA:
4
5     I, Masheka Pettiford, a Notary Public within
   and for the County and State aforesaid, do
6  hereby certify that the foregoing deposition of
   TAMMY GILLETTE, was taken before me, pursuant to
7  notice, at the time and place indicated; that
   said deponent was by me duly sworn to tell the
8  truth, the whole truth, and nothing but the
   truth; that the testimony of said deponent was
9  correctly recorded in machine shorthand by me
   and thereafter transcribed under my supervision
10 with computer-aided transcription; that the
   deposition is a true record of the testimony
11 given by the witness; and that I am neither of
   counsel nor kin to any party in said action, nor
12 interested in the outcome thereof.
13
      WITNESS my hand and official of this 7th day
14 of September, 2021.
15
16
17
   _____
   MASHEKA C. PETTIFORD
18 Notary Public
19
20
21
22
23
24          INSTRUCTIONS TO WITNESS

Page 75

1          Please read your deposition
2  over carefully and make any necessary
3  corrections.  You should state the reason in the
4  appropriate space on the errata sheet for any
5  corrections that are made.
6          After doing so, please sign the
7  errata sheet and date it.
8          You are signing same subject to
9  the changes you have noted on the errata sheet,
10 which will be attached to your deposition.
11         It is imperative that you
12 return the original errata sheet to the deposing
13 attorney within thirty (30) days of receipt of
14 the deposition transcript by you.  If you fail
15 to do so, the deposition transcript may be
16 deemed to be accurate and may be used in court.
17
18
19
20
21
22
23
24

Page 76

1  - - - - - - - -
2          E R R A T A
3  - - - - - - - -
4  PAGE   LINE   CHANGE
5  ____  ___  _____
6  Reason for Change:_____
7  ____  ___  _____
8  Reason for Change:_____
9  ____  ___  _____
10 Reason for Change:_____
11 ____  ___  _____
12 Reason for Change:_____
13 ____  ___  _____
14 Reason for Change:_____
15 ____  ___  _____
16 Reason for Change:_____
17 ____  ___  _____
18 Reason for Change:_____
19 ____  ___  _____
20 Reason for Change:_____
21 ____  ___  _____
22 Reason for Change:_____
23 ____  ___  _____
24

TAMMY GILLETTE

Page 77

```
 1        ACKNOWLEDGMENT OF DEPONENT
 2        I, _ _ _ _ _ _ _ _ _ _ _ _ , do hereby
 3  certify that I have read the foregoing pages,_ _
 4  _ _ _ _ and that the same is a correct
 5  transcription of the answers given by me to the
 6  questions therein propounded, except for the
 7  corrections or changes in form or substance, if
 8  any, noted in the attached Errata Sheet.
 9  _____     _____
10  DATE               SIGNATURE
11
12  Subscribed and sworn to before me this
13  _ _ _ _ _ day of _ _ _ _ _ _ _ _ _ ,
14  202 _ _ .
15  My commission expires: _ _ _ _ _ _ _ _
16
17  --------------------
18  Notary Public
19
20
21
22
23
24
```

BISNOW & JOSEPH
COURT REPORTING

TAMMY GILLETTE

| A | | | | |
|---|---|---|---|---|
| **A's** 10:23 | **agency** 56:5 | **apply** 48:18,20 | 63:1 65:9 | **base** 20:2 37:15 |
| **a.m** 1:14 | **ago** 32:21 | **appreciate** | **attended** 10:8 | 38:5 71:2 |
| **AAIM** 10:21 | **agree** 6:18 28:16 | 21:12,15 34:14 | 11:6,8,20 | **based** 10:7,20 |
| 11:9,19 | 63:21 | **appropriate** | **attending** 45:11 | 39:24 49:11 |
| **able** 16:21 21:6 | **ahead** 21:7 | 75:4 | 46:15 | **basis** 14:18 |
| 49:9 51:24 | 52:14 53:1 | **approved** 58:2 | **attention** 29:8 | 67:22 |
| 59:9 69:4,22 | 60:6,7 | 58:10 | **attorney** 75:13 | **bathroom** 47:18 |
| 72:4 | **ahold** 51:22 | **approximately** | **Auerbach** 2:3,3 | **battery** 57:6 |
| **absence** 14:17 | **aligned** 27:10,12 | 13:3 15:3 | 3:4 5:2,15,24 | **beginning** 46:14 |
| **abuse** 30:23 | 27:13 | 42:10 46:1 | 6:2,17 15:15 | 72:4 |
| 31:14 46:18 | **allegations** 48:2 | **April** 72:6,8 | 16:16 18:14 | **believe** 13:5 |
| **access** 45:14 | **annual** 10:17 | **area** 27:19 | 21:10 24:24 | 32:18 44:6 |
| **accessible** 66:22 | **answer** 4:3 | **areas** 28:1 | 25:5,17 33:19 | 50:10,18 70:13 |
| **accidents** 41:18 | 15:13,22 16:14 | **Armstrong** | 36:14,22 37:8 | 72:15 73:6 |
| **accuracy** 5:8 | 18:9 20:12 | 10:14 11:9,16 | 39:22 44:19 | **Bell** 2:9 |
| **accurate** 75:16 | 23:6 32:14,15 | 11:18 | 45:4 47:7,17 | **benefit** 7:5 |
| **acknowledged** | 36:19 39:8,9 | **arose** 22:3 | 47:24 49:14 | **benefits** 71:11 |
| 61:7 | 39:10 47:1 | **arrive** 66:19 | 57:3,24 58:14 | 71:14 72:14 |
| **ACKNOWLE...** | 49:5 50:20 | **arrived** 23:14 | 65:3 67:14 | 73:11 |
| 77:1 | 56:20,21 57:19 | 62:21 | 70:8 73:13 | **best** 14:18 70:1 |
| **acquire** 43:10 | 58:4,13 64:23 | **arriving** 60:23 | **Auerbach.stev...** | **biggest** 62:17 |
| **acquired** 43:12 | 65:2,4 66:8 | 60:23 65:10 | 2:5 | **Bill** 22:15,16,18 |
| **acquiring** 43:20 | 68:19 | **ASAP** 23:23 | **authorized** 59:1 | 22:19 32:20 |
| **acquisition** 59:2 | **answers** 7:2 | **asked** 6:11 33:4 | **automatically** | **BISNOW** 1:20 |
| **Act** 36:11 38:7 | 65:20 77:5 | 50:22 51:3,5 | 72:10 | **Bisnowandjos...** |
| 38:11,15 | **anticipate** 30:24 | 60:6 64:11,15 | **Ave** 2:4 | 1:22 |
| **action** 74:11 | 31:3,21 | **asking** 9:21 | **avenues** 27:18 | **bit** 28:9 51:1 |
| **Acts** 38:19 | **anticipated** | 18:20 48:24 | **aware** 10:1 19:5 | **blog** 46:9 |
| **ADD** 57:7 | 21:13 | 49:1 64:21 | 22:20 29:24 | **blood** 58:11 |
| **adding** 45:21 | **antidiscrimin...** | **aspect** 17:11,13 | 35:23 36:1 | **Blue** 2:9 |
| **addition** 54:19 | 15:11 16:11,19 | **aspects** 17:14 | 37:9 38:6,9,13 | **boiling** 34:17 |
| **additional** 44:5 | 17:23 18:2,7 | **assertion** 42:22 | 38:17 49:24 | **Bonsky** 17:23 |
| **address** 67:6 | 18:17 22:2 | **assigned** 14:19 | 50:7,12 52:15 | 18:6,16 22:1 |
| **addressed** 35:18 | 29:16 30:1 | **assist** 7:18 | 61:11,22 63:22 | 24:2 26:2 35:4 |
| 35:19 | 32:12 48:17 | **assisting** 69:3 | 66:5 | 35:8,20 36:10 |
| **administering** | **anybody** 18:19 | **association** | | 36:16,24 37:4 |
| 32:11 | 19:6,7 35:15 | 10:23 | B | 50:15,16 59:21 |
| **advance** 20:20 | 60:7 64:16,16 | **attached** 75:10 | | 59:23 60:1 |
| **advice** 20:20 | 71:18 | 77:8 | **B** 3:7 | 61:11 64:9,21 |
| **affirmative** 7:1 | **anytime** 39:15 | **attempt** 70:10 | **bachelor's** 7:23 | 66:5 68:5 |
| **aforesaid** 74:5 | 51:16 52:8 | **attend** 7:20 | 7:24 8:5 | **bonus** 71:8,18 |
| **after-the-fact** | **apologize** 8:17 | 10:18 18:6 | **back** 8:24 13:18 | **bonuses** 71:22 |
| 20:6 | 10:21 | **attendance** | 15:16 21:3 | **book** 30:10 31:7 |
| **agencies** 54:9,9 | **appears** 12:21 | 11:12 34:15 | 34:6 47:20 | **boss** 13:24 |
| | **applies** 8:19 | 60:22 61:17,23 | 58:22 71:16 | **branch** 39:2 |
| | 48:13 | 62:7,14,16,18 | **bad** 34:9 35:24 | **brand** 30:10 |
| | | | 40:8 | |

TAMMY GILLETTE

**break** 47:18
48:3
**Brian** 22:5,9
24:9,18
**bridge** 37:23
**brief** 23:22
47:22
**bringing** 32:21
**brought** 29:7
60:15 62:11
**Bryan** 22:4,11
22:19 24:9,18
35:22,24 36:3
51:13,17,23,24
52:1,3,6,10
53:3 68:6
**buck** 16:10
**budget** 68:4
**business** 22:23
**buy** 46:8

**C**

**C** 1:14 2:1 74:1
74:1,17
**calendar** 72:15
**call** 23:21,23
34:2 39:2
50:14 65:24
**called** 45:14
60:1
**calling** 18:19
**calls** 65:18
**capacity** 29:15
32:11 35:4,15
**car** 65:13
**card** 39:5,12
58:17,21 64:7
**care** 9:13 20:10
40:9,11 62:10
**carefully** 75:2
**CDC** 44:8
**certain** 66:13
71:20
**certainly** 14:3
32:6
**certification**

9:11
**certifications**
7:18 8:8,10,16
9:20
**certify** 74:6 77:3
**CFO** 22:10
**change** 10:2
21:2 30:1 44:6
45:17 69:6,7
76:4,6,8,10,12
76:14,16,18,20
76:22
**changed** 21:3
43:6 44:4 65:8
**changes** 9:13
25:23 26:2
68:2,9 69:13
75:9 77:7
**changing** 31:18
**chemical** 69:9
70:10,12,16
**circumstances**
61:2
**clause** 48:12
**clear** 58:9
**client** 10:16
11:14
**clock** 62:22
**close** 69:18
**coach** 16:6
**coaching** 34:10
**college** 7:20
**come** 8:23 14:17
19:13 30:5
56:4,6 58:22
**comes** 19:9 54:4
54:7
**coming** 20:8
25:23 26:3
31:16 39:16
**commencing**
1:13
**commission**
77:15
**Commonwealth**
1:16 74:2

**commute** 37:22
**comp** 14:16
40:21
**companies**
54:13
**company** 26:19
29:14,19 38:5
38:21 47:16
54:10 55:22
56:1
**company-paid**
73:1
**compare** 26:17
**complaints** 50:1
**completely** 20:2
26:18
**completing**
72:21
**completion**
71:19,22
**compliance**
16:11
**compliant** 15:10
**computer-aided**
74:10
**concern** 26:22
26:24
**concluded** 73:18
**conditions** 31:6
31:9,16
**connection** 6:5
**consider** 73:11
**consideration**
60:16
**considered**
30:15 51:11
**consistency** 19:8
19:22
**consistent** 19:17
26:20
**construction**
48:7
**contact** 59:3
**continue** 41:11
**continued** 21:1
**continues** 10:2

**contract** 62:14
**contribute** 72:4
**contributed**
72:12
**conversation**
33:1 35:22
47:14 54:21
55:10 59:24
64:2,3,5,13
**conversations**
9:17 17:3,5
18:11,15 20:5
20:6 21:22
22:1,6,8 23:7
23:19 24:7,13
25:2,12,19,24
26:1,7,9 34:10
35:13 40:23
45:8 47:8 48:2
61:12
**copy** 41:19
55:14 64:21
**correct** 5:7 7:6
20:2 25:4
38:24 43:8
45:2 49:17
56:11 77:4
**correcting** 36:2
**corrections** 5:6
75:3,5 77:7
**correctly** 74:9
**cost** 11:15,21,24
**counsel** 2:6,11
16:6 74:11
**counter** 53:20
**country** 12:13
12:21
**county** 44:9 74:3
74:5
**course** 73:10
**courses** 8:14,16
9:24 10:3
**court** 1:1,20
15:15 75:16
**COVID** 9:13,15
10:5,7,9 14:19

20:24 21:13
24:19 43:19,22
44:3,24,24
**crafting** 29:15
29:20
**cranberries**
53:20
**create** 30:10
33:16
**created** 10:10
42:11
**creating** 30:8
**crisis** 40:13,14
**criteria** 72:1
**critical** 70:7
**crux** 31:13
**current** 55:17
57:22
**currently** 30:14
**cut** 40:5 41:12
41:15,16
**cycle** 14:12

**D**

**D** 3:1 53:20
**database** 45:15
**date** 1:14 46:2,4
50:9,10 75:7
77:10
**dates** 25:21
**Dave** 59:6
**day** 42:1 51:7,7
64:12 72:19
74:13 77:13
**days** 72:15
75:13
**deadlines** 44:15
**deal** 40:13
**dealing** 17:18
**dealt** 20:19
40:14
**Debbie** 26:9
**December** 72:18
**decision** 49:12
**decisions** 68:1
**deemed** 75:16

TAMMY GILLETTE

**Defendant** 1:8
2:11
**definitely** 28:5
42:3
**definition** 48:24
**degree** 7:23,24
8:6
**degrees** 7:17,22
8:6
**delay** 36:21
**dental** 55:12
**depending**
35:19 54:9
**depends** 20:15
37:23 72:7
**deponent** 74:7,8
77:1
**deposed** 7:7
**deposing** 75:12
**deposition** 1:12
4:1 5:4,7,11
6:5 73:17 74:6
74:10 75:1,10
75:14,15
**DESCRIPTI...**
3:9
**detail** 18:24
**details** 33:11
**determine** 39:19
39:21 59:9
**development**
10:13
**Dick** 19:11,12
**difference** 13:13
**different** 8:14
8:15 10:3,24
26:18,22 28:14
28:15 31:5,9
31:12 42:17
57:1 69:7
**differently**
19:12
**dip** 54:6,15
**directing** 69:1
**direction** 4:3
65:20

**disability** 72:20
72:23
**discipline** 14:14
**discriminate**
23:10 24:3
25:8,14 33:8
**discrimination**
19:10 23:3
29:21 33:5,18
36:17 37:1,5
49:3,10
**discuss** 36:10,16
51:23
**discussed** 25:12
27:17 42:16
**discussion** 32:17
34:7,17 44:1
51:2
**dispute** 42:22
**distant** 44:15
**DISTRICT** 1:1
1:2
**diverse** 27:16,20
28:1,4,6,12
**diversity** 28:9
28:14,20
**docket** 44:23
**doctor** 49:9
57:11
**documentation**
35:11 50:22
**DOCUMENTS**
4:7
**doing** 13:11,14
20:16 26:13,16
26:18,22 34:22
51:16 69:16
75:6
**DOLOWICH**
2:8
**dosage** 53:18
**doubt** 23:20
42:22 43:3
71:23
**Douglassville**
27:19,24 28:3

28:10 35:21
70:12
**draft** 31:21
**drafted** 62:3
**drank** 58:7
**draw** 28:8
**drinking** 58:9
**drinks** 58:10
**Drive** 2:9
**drop** 61:5,8
**dropped** 61:9
**drug** 42:7 43:5
44:24 45:6
46:3,23 47:9
50:8,13 53:5,7
53:11,12,13,24
56:17 57:5,10
57:10,14,16
59:8,12,14
61:24 63:7,8
63:11,22
**drugs** 49:22
**duly** 5:19 74:7
**duties** 14:7,8,19

### E

**E** 2:1,1 3:1,7
74:1,1 76:2
**e-mail** 65:24
**e-mails** 23:20,22
61:20 65:18
**earlier** 18:18
34:7 42:16
**early** 13:19 22:7
**EASTERN** 1:2
**eaten** 55:5
**Ed** 24:11
**education** 10:13
19:15
**EEO** 48:14
**effect** 41:3 72:14
72:17,20,24
73:1,2,4
**effective** 63:5
**Eficaro@kdvl...**
2:10

**Eileen** 2:8 5:12
15:24
**either** 7:3 60:22
61:3 72:24
**elaboration** 36:8
**eligible** 72:1,6
73:3
**else's** 55:16
**employ** 29:5
**employee** 14:11
14:13 16:9
34:21,22 39:4
41:7,21 42:1,4
64:2
**employees** 13:22
15:1 23:11
24:3 25:8,14
32:4,20 33:2
34:9 35:11
44:5,11,16
62:10,11
**employment**
10:17 48:9,12
72:21
**encourage** 16:7
**ends** 72:18
**Enrolling** 14:16
**ensure** 48:9
**entire** 18:23
**entirely** 72:12
**environment**
33:16
**envision** 41:5
**equal** 48:9,11
**equipment**
69:20 70:2,3,5
70:15
**errata** 5:6 75:4
75:7,9,12 77:8
**ESQ** 2:3,8
**established**
23:16 59:3
**evaluation** 54:8
**everybody**
17:17 33:6,13
**evolve** 21:2,5

**exact** 14:23
**exactly** 8:13
62:21
**EXAMINATI...**
5:22
**examined** 5:19
**example** 26:4
40:17 41:9,10
41:11 65:22
**Excuse** 65:1
**exempt** 67:15,23
68:11
**EXHIBIT** 3:9
**exhibits** 3:12
**expect** 32:19
**expectation**
33:12
**expectations**
33:15 34:16
**experience**
39:15 55:20
57:4,12
**expires** 77:15
**explains** 54:12
**explanation** 7:3
**exposed** 44:12
**external** 17:16
**Externally**
18:10

### F

**F** 74:1
**face** 21:20
**facilities** 44:13
**facility** 26:7
40:24 65:17
**fact** 10:1 20:23
21:14,17,22
32:7 52:24
63:6
**factor** 9:16
41:23 42:5
49:12
**fail** 75:14
**failed** 50:8,13
53:4 61:24

TAMMY GILLETTE

63:11,22
**fails** 53:8
**fair** 19:23 25:1
  56:15
**fairly** 23:6
**family** 22:23
**far** 37:22
**fault** 41:17
**FDA** 58:1,10
**February** 21:3
**federally** 58:2
**FICARO** 2:8
  5:14 6:15
  15:12,21 16:13
  18:8 20:11
  24:4 25:3,15
  32:13,15 36:12
  36:18 37:6
  39:7,9 45:3
  46:24 47:3
  49:4 56:18,21
  57:18 58:3
  65:1 66:7
  68:18
**figure** 69:21
**filed** 6:3
**fill** 39:18 46:10
**filled** 40:12
**final** 31:21 56:4
  56:5
**finalized** 30:6
  32:3
**find** 41:14
**fine** 8:18
**finger** 40:5
  41:12
**finished** 65:2
**fired** 63:12
**firing** 63:23
**firmly** 32:18
**first** 7:10 24:8
  39:11 40:13
  62:19 64:1,3,5
  73:5
**firsthand** 56:16
  61:17 70:11

**five** 17:21 44:6
**flag** 62:20
**flip** 34:14
**flying** 24:17
**focus** 10:10
  11:11 12:11
  34:24 44:6
**focuses** 10:12
**folks** 16:23,23
**follow** 52:20
**followed** 16:19
**following** 72:8
**follows** 5:20
  35:5,8
**foregoing** 74:6
  77:3
**form** 5:9 6:15
  14:12 15:12,22
  16:13 18:8
  20:11 24:4
  25:3,15 32:13
  36:12,18 37:6
  39:7 45:3
  46:24 49:4
  56:18 57:19
  58:3 66:7
  68:18 77:7
**formulating**
  29:15,20
**forward** 24:22
**forwarded**
  50:24
**found** 61:23
**four** 5:2,8 73:7
**freak** 41:18
**free** 12:2 33:17
**Friday** 1:10
**functions** 13:11
  13:14
**Furno** 59:6,7
**further** 54:8,11
  54:14,15

___
**G**
**gender** 28:20
**general** 9:23,23

11:3 12:8
  14:17 17:2,10
  17:11,16 19:21
  21:19 22:2
  48:11
**generic** 45:18
**gentleman**
  68:24 70:17
**gentleman's**
  69:12
**getting** 17:19
  44:17
**Gillette** 1:12 3:3
  5:18 6:1 36:6
  42:19 44:20
  48:1 70:9
  73:17 74:6
**give** 8:19 12:23
  16:18 20:19,20
  21:11,14 23:2
  25:20,21 26:13
  32:1 37:4 66:6
**given** 55:12 57:5
  59:12 65:21
  73:6 74:11
  77:5
**go** 9:23 16:22
  33:11 36:5
  45:8 53:1,13
  68:8 71:16
  72:14
**goal** 43:18
**God** 56:9
**goes** 22:18 40:15
  52:19 54:14
  72:20 73:1,4
**going** 7:2 8:12
  12:12 13:22
  17:7,13,17,19
  18:21 19:14,21
  21:5,6 23:8
  24:15 26:5,6,8
  26:15 31:20,22
  32:22 33:17
  36:6 38:1
  40:19 45:9,21

53:14 54:6
  57:10 61:4,14
  63:6 65:13
  66:14,16,21
  67:1 68:2,5
  69:15,22 70:9
  71:24
**good** 6:1 34:4,5
  34:6,8,9 35:24
  41:22
**gosh** 11:1
**gotten** 46:7
**granted** 73:6
**grants** 13:23
**great** 26:14
  34:11,13 41:24
**group** 10:20
**guarantee** 20:16
**guaranteed**
  71:23
**guess** 12:24
  14:18 58:5
  62:11
**guidance** 21:19
  22:2
**guidelines** 30:10
  31:7
**guy** 69:20
**guys** 26:16 48:7
  69:1,3

___
**H**
**H** 3:7
**half** 54:3,3,4
**hand** 59:5 74:13
**handbook** 45:10
  45:11,16,18
  46:13,14 47:15
**handicapped**
  28:22
**handle** 18:21
  36:4,4,8
**handled** 17:7
**handles** 56:17
  56:23
**hands** 70:2

**happen** 21:6
  39:19 41:18
  52:10 63:6
**happened** 19:7
  19:18 21:1,22
  25:22 30:19
  39:18 43:1,4
  43:19,22 44:3
  56:3 58:8
  63:16,17 64:18
  72:10
**happening** 67:5
**happens** 20:14
  34:19 39:3
  51:17
**harass** 33:10
**Harry** 19:11,12
**Harvest** 2:9
**head** 6:24 60:15
**headquarters**
  37:16 38:6
**hear** 35:13,16
**heard** 20:1,17
  35:24 44:22
  50:6 51:4
**hearing** 20:3
**heat** 69:11
**held** 1:13
**help** 13:12 46:10
**hesitation** 8:11
**hey** 24:15 34:11
  34:14 35:24
  52:16 53:17
  65:13 69:1
**hi** 39:14
**high** 50:1,2
**hire** 28:1 32:17
  53:1 62:18
  63:2
**hired** 24:6 51:12
  52:17
**hires** 33:1
**hiring** 13:20
  14:14 26:5
  27:3,9,15,19
  28:4

TAMMY GILLETTE

**history** 19:2
42:2
**hit** 44:24
**hold** 54:3
**holidays** 73:10
73:12
**home** 60:24 61:3
61:18 62:7
**honestly** 15:24
16:20 25:20
26:8,14 42:23
46:4,18 62:1
**Hospital** 56:13
56:17
**Hospital's** 58:16
**hour** 11:6
**hours** 72:3
**HR** 8:14,15 9:4
9:6,23,24 11:3
13:9,10,11,14
13:14,17,20
14:4,6,9 16:3
20:16 26:10
45:15 46:13
**huge** 41:2 62:20
**human** 7:13 9:9
**humidity** 69:11
**hump** 24:19
**hurt** 40:4

**I**
**ideas** 26:13,14
**identified** 54:23
**Illinois** 37:21
**impact** 55:6
**imperative**
75:11
**implementing**
12:19
**implication**
12:20 40:21
**implications**
40:23
**important** 19:8
19:13,20 26:11
32:22

**impressed** 14:24
**in-depth** 33:1
**inaugural** 13:17
**incident** 41:21
42:6
**include** 15:4
28:20,22 29:1
31:7,21 62:6
63:3 70:5
**includes** 28:17
57:5
**including** 33:18
**INDEX** 4:1
**indicate** 53:17
57:16
**indicated** 74:7
**individual** 58:17
58:20 59:10
66:10
**influence** 49:22
50:5
**informal** 25:2
25:12
**information**
12:13,16 13:21
17:19 20:20
21:7,11,14
40:1 45:10,12
46:10,17 50:24
60:5 65:21
67:12
**informed** 59:21
**initial** 40:14
54:12
**initially** 13:16
24:6 43:21
**injury** 40:9,16
**inquire** 53:4,8
**instance** 17:14
20:24 30:17
31:18 34:6
53:16,20 54:22
58:7 62:21
**instances** 16:24
20:21 44:9
**institutes** 9:3

**instruction** 8:18
20:18
**INSTRUCTI...**
74:24
**insurance** 9:14
9:18 10:5
14:16 40:21
72:17 73:1,4
**intent** 19:24
**interested** 74:12
**internal** 17:2,10
17:12,15
**Internally** 18:11
**interviewing**
14:13
**Intoxicated** 50:4
**introducing**
23:14
**introduction**
24:11
**investigation**
41:14
**involved** 14:15
16:1 17:3 22:6
26:9 29:14,20
32:10 33:22
34:5 35:3
54:16,17
**involvement**
35:7
**involves** 14:11
14:12
**issue** 17:6 20:8
22:3 35:17
**issues** 19:9 33:7
34:18 52:23
60:22 61:10,13
61:18,23 62:7
62:18 63:1,16
63:19 64:3
65:9,13 69:10
69:13,15
**it'll** 24:14,15
**item** 18:20 60:16
61:1
**items** 35:9 60:18

60:24 62:7
68:6

**J**
**Jack** 17:23 18:6
18:16 22:1
24:2,5,10,10
26:2 35:4,8,14
36:10,16,24
37:4 52:4
64:16
**Jack's** 64:13
**January** 73:3
**job** 34:12 42:1
50:1,2,5 68:15
70:7
**JOSEPH** 1:20

**K**
**KAUFMAN** 2:8
**keep** 24:16 42:4
44:11
**keeping** 34:8
**Kennet** 24:12
**Kenova** 23:13
23:15 24:21
31:10
**kept** 44:16 62:17
**key** 19:22 41:23
**kin** 74:11
**kind** 16:17 17:5
23:1 26:1
33:23 41:17,17
46:7,12 51:2
52:6,11,11,13
54:6 57:13
67:9
**knew** 8:12 15:24
47:4,11 48:22
60:6,7,21 63:8
**know** 7:4 8:23
10:23 16:5,22
17:22 18:4,12
18:23 19:2
21:4,5 22:4
23:6 27:9

31:24 32:9,19
33:4,12 34:12
37:2 40:4,6,7
41:13,15 42:1
42:23 43:1,3,4
46:5,8,17,18
46:20,21 50:9
51:3,11,17,19
51:20 52:7,12
52:14,15,16,20
53:18,19 54:16
54:16,23,24
55:2,17 56:15
56:23,24 57:9
57:9 58:6,7,8
58:11,12,12,19
59:11,13,22
61:2,6,11,13
62:12,15,24
63:13,15,19,24
64:8 65:12,16
66:14,14 67:3
67:7,12 69:5,8
70:15,17,18
73:10
**knowledge** 29:5
29:9 56:16
57:20 58:15,18
61:17 64:17
70:11
**known** 26:5
52:17 66:24
**knows** 69:24

**L**
**labor** 10:17
**late** 45:13 60:23
65:10,14 66:2
**law** 2:3 10:15
35:5,8 42:23
**laws** 10:1 12:20
15:11 16:12,19
19:16 31:24
42:17
**lawsuit** 6:3,5
**lawyer** 48:23

TAMMY GILLETTE

**lawyers** 31:23
**Leadership** 8:2
**learn** 19:14
**learning** 44:7
**leave** 14:16
**led** 60:17,18
  63:20
**left** 62:23
**legal** 22:17
  48:24 49:8,8
  57:21
**legalized** 42:20
  43:6
**legally** 19:4
  55:24
**legislation** 12:23
**length** 71:21
**let's** 40:8 47:18
  55:11 58:6
  65:12
**lethal** 44:17
**letter** 62:4,8
  63:4 67:21
  70:22 71:5,6
**letters** 10:22
**license** 40:7,19
  41:19,20 65:7
**licensed** 58:2
**life** 14:12 20:22
  73:1
**line** 4:4,8,12,16
  27:11 70:19
  76:4
**lines** 9:15 25:21
  35:12 70:18
**list** 63:9
**live** 37:17,18,20
  37:21
**living** 44:5
**LLC** 1:7
**LLP** 2:8
**local** 59:1
**located** 28:10
**location** 15:8
  28:4
**locations** 30:11

35:16
**locations'** 47:5
**long** 7:14 13:8
  20:17 71:4
**Long-term**
  72:23
**look** 13:16 24:22
  27:16 32:22
  38:2 39:14
  42:16 46:6,9
  49:11 51:2
  59:8
**looking** 28:1
  30:13 31:15,16
  40:18 45:12
  46:16 55:2,8
  69:20
**lot** 10:6 12:1
  14:6,20 16:3,4
  17:20 18:23
  23:21 26:5
  31:19 68:13
**lots** 58:9
**Louis** 8:4 10:16
  10:21 23:13,17
  26:16 27:4,6
  27:15,23 28:6
  28:7 37:14,18
  68:22,24

**M**
**machine** 74:9
**maintenance**
  67:6 69:1,3,20
**major** 43:18
**majority** 10:8
**making** 15:10
  19:15 27:10
  35:4,8 44:10
  44:16
**manage** 68:16
**management**
  8:2 9:9
**manager** 7:13
  14:9 17:19
  21:20 23:12,16

23:18 67:6
  68:12,13
**managers** 16:18
  23:2,10 39:2
**manufacturer**
  69:23
**manufacturing**
  30:17
**map** 38:2
**marijuana** 12:4
  12:6,8,17,20
  29:1,6,10
  30:21 31:4,8
  36:11,17 37:1
  37:5 38:7,11
  38:14,19,23
  39:5 40:7,19
  41:7,13,19
  42:21 43:7
  45:24 46:19,23
  48:10,14,16,18
  48:21 49:3,7
  50:5,18 55:2
  58:17,21 59:10
  59:16 60:3
  64:7,15 65:7
**marked** 3:12
  4:15
**Masheka** 1:14
  74:5,17
**Matt** 51:3,4,5,6
  51:8 52:20
  64:11
**matter** 19:4
**matters** 18:17
  22:2
**Matthew** 1:4 6:3
**mean** 7:5 12:21
  13:15 17:9
  20:23 21:19
  26:21 28:7
  40:3 49:3
  62:22 70:14
**meaning** 17:16
**meaningful**
  42:14

**means** 28:14
  33:3 54:2
  72:16
**medical** 9:13,14
  10:4 12:4,5,17
  12:19 29:1,6
  29:10 30:21
  31:4,8 36:11
  36:16 37:1,4
  38:7,10,14,18
  38:23 39:5
  40:7,10,11,19
  41:7,13,19
  42:20 43:6
  45:24 46:19,22
  48:10,14,16,18
  48:21 49:2,7
  49:10 54:20
  55:7 56:3,6,8
  57:14 58:17,21
  59:10,16 60:3
  64:15 65:7
  72:14,22 73:4
**medication**
  53:16,17 54:24
  55:4 57:7,22
  58:2
**meeting** 24:22
**member** 11:22
  11:24 13:1,4
**memory** 8:22
**men** 66:20 70:6
**mentioned**
  17:14 18:18
  51:9 52:12
  64:1,15 71:17
  71:24
**met** 24:17 35:21
  49:15
**methampheta...**
  57:6,8,14
**MFG** 1:7
**minor** 22:21
**minus** 14:22
**minute** 67:2
  70:4

**minutes** 11:5
  37:24
**misremember...**
  21:18
**missed** 31:23
**missing** 30:15
  46:11
**Missouri** 31:18
  37:11,20 38:4
  38:5,6,6
**modified** 43:21
  46:19
**modify** 45:16
**Montgomery**
  2:4
**month** 24:8
  62:19 73:5
**months** 72:19,21
**morning** 6:1
  34:8
**mouth** 23:8
**moving** 12:22

**N**
**N** 2:1 3:1
**name** 6:2 22:17
  69:10
**names** 8:17
**Narberth** 2:4
**National** 8:4
**necessarily**
  73:11
**necessary** 63:10
  75:2
**need** 14:23 19:4
  19:5,18,19
  26:6,17,19
  36:7 40:24
  47:14 52:20
  65:21 66:16
  67:4 68:2,3,9
  69:1,2,5,6,14
  70:15
**needed** 46:22
  47:5,10 51:22
  61:4,8 66:21

TAMMY GILLETTE

needs 34:15 36:2
45:10 58:24
66:22 67:7
69:5
negative 55:23
57:17,23 58:23
neither 74:11
never 7:9 17:8
19:18 20:19
25:9 34:20
49:15,21,23
50:6 53:6
59:11 64:4
71:23
new 12:19 30:10
30:22,24 31:3
33:1 53:1
62:17 63:2
64:2
nitty-gritty 40:3
norm 73:8
normal 52:7
73:8
Notary 1:16
74:5,18 77:18
noted 75:9 77:8
notes 34:8
notice 20:21
54:10 74:7
November
48:21 63:12,15
63:17,17
number 14:23
numerous 22:5

**O**

objected 15:21
Objection 6:15
15:12 16:13
18:8 20:11
24:4 25:3,15
32:13 36:12,18
37:6 39:7 45:3
46:24 49:4
56:18 57:18
58:3 66:7

68:18
objections 5:9
obligation 6:7
6:10,13 35:17
obtain 7:22
obviously 23:17
37:17 38:13
49:6 61:16
occasions 66:1
occurred 44:1
October 36:9,15
36:23 37:3
72:5,16
off-the-record
43:24
offer 67:20
70:22 71:5
offered 71:18
office 2:3 10:15
66:13
officer 54:21
56:3,6,8 57:15
officer's 55:7
official 69:10
74:13
oh 11:1 17:7
27:3 28:18
39:14 40:6
56:9,11 66:23
73:9
okay 6:23 9:1,2
15:23 19:16,19
32:16 40:11,18
47:1,17 48:5
56:1,19,22
59:15 66:15
71:14
once 24:10,18
40:14 43:22
44:3 55:19
72:3
ones 10:19 11:8
11:21 24:17
30:14 48:6
ongoing 17:6
open 44:13

operation 15:5
operations
38:18
opinion 63:10
opportunities
48:9
opportunity 5:4
5:5 48:12
Oral 1:12
order 62:2 68:3
69:6,7,14 72:1
organization 9:6
organizations
9:3
orientation
66:15
oriented 38:3
original 75:12
outcome 74:12
outcomes 39:24
outside 16:24
17:13 73:7
overall 30:9
oversight 52:15
overtime 67:15
67:23 68:10
owner 22:12
owners 22:13,14
22:20,22

**P**

P 2:1,1
p.m 73:16
PA 2:4,9
page 3:9 4:4,8
4:12,16 26:12
76:4
pages 77:3
paid 73:12
pandemic 44:12
paperwork
40:12 72:13
Para 69:8 70:15
70:18
Paradichloro...
69:9

parenting 13:17
part 12:10 16:6
17:4 30:22
31:9 42:18
43:2 45:20
participate 72:2
participated
72:11
partly 35:21
parts 68:3 69:7
69:24
party 74:11
patient 29:11
36:17 37:1
38:7,14 39:3,4
39:5 41:7
48:17 49:3,7
58:21 59:10,16
patients 29:2,6
38:23 48:10,18
48:20,21
pause 51:1
pay 11:13,13
pays 11:12
Pennsylvania
1:2,17,21
18:19 24:20,21
26:10 27:8
31:11,12 36:11
37:10 38:14
42:20,24 43:6
43:11,12,20
47:6 74:2
Pennsylvania's
46:22
people 13:21
14:6,10 16:1,3
16:5 17:4,5,21
28:15,23 61:19
62:17 65:19
67:11,12,24
68:16
percent 38:17
performance
41:21
period 49:23

periodic 24:16
periodically
9:22 10:3
24:13 33:2
person 16:20
17:12 40:3,10
40:18 54:22
55:22 57:6
59:13
person's 41:12
pertinent 15:18
Pettiford 1:15
74:5,17
Philadelphia
1:21 28:11
74:3
phone 49:19
50:14,23 65:18
phrase 34:11
physically 44:11
piece 70:2
pieces 46:11
pike 31:17
place 19:19 21:3
23:3,13 27:23
41:1 42:6
43:22 44:11,15
74:7
places 27:22
56:24 57:1
Plaintiff 1:5 2:6
plan 9:18 21:8
planning 63:23
plant 16:18
17:18 23:2,10
23:12,16,18
25:7,22 39:2
61:4 69:8
plants 37:10
play 19:9
plays 9:15
please 5:16
15:16 23:21,23
65:4 75:1,6
plus 14:22
point 8:22 18:22

TAMMY GILLETTE

24:12,23 34:17
41:12,20,22
42:3 46:20
52:7,19,21
53:3 54:1
55:21,23 64:19
64:22 66:13
**points** 17:20
**policies** 25:13
29:16,21 30:1
30:4,7,13,21
31:22 32:12
38:22 41:2
44:24 45:6
46:3,23 47:5,9
48:8
**policy** 19:19,20
29:24 30:18,23
31:1,4,8,14
42:5,8,11,17
43:5,16,17
45:16 47:11,13
47:13,15 48:17
52:12
**pop** 10:20
**portion** 15:18
**position** 7:12,15
7:18 33:14,21
62:10 68:21
**positive** 50:18
51:10 52:18
54:4,7 55:1,3,9
55:13,22 56:1
57:8,16 58:22
63:9 65:5
**possibly** 19:1
**potential** 71:8
71:10
**potentially**
44:17
**Pottstown** 56:12
56:17,23 58:16
59:4
**practice** 19:21
27:22 51:9,15
51:18 52:20

53:7,10 62:9
**practices** 25:7
27:14 41:2
44:10
**pre-hire** 42:9
51:11
**premises** 23:4
**prescription**
49:8 53:15,23
55:11,12,15,16
55:17 57:13,15
**presented** 12:14
12:17
**presently** 29:4,5
**presents** 58:17
58:21
**pretty** 53:24
**preventative**
20:10
**primarily** 11:7
**printed** 52:5
**prior** 36:9,15,23
37:3 59:1
**priority** 45:1
**privy** 23:7
**proactive** 27:1
**probably** 24:7
32:2
**probation** 62:12
**problem** 67:13
**problems** 19:13
67:3,5
**procedures** 25:7
25:13 38:22
41:1 42:5 57:2
58:16 59:5
**process** 16:2
45:5 46:2
54:18
**produce** 55:6
**PRODUCTION**
4:7
**profanity** 33:10
**Professional**
1:15
**program** 13:18

13:18 14:3,5
**progress** 46:6
**promise** 47:18
**pronounce**
70:10
**prophylactic**
20:9
**propounded**
77:6
**protect** 38:23
**protected** 44:17
**prove** 55:15,16
**provide** 17:2
20:18 21:6
53:23
**provided** 34:1
**provides** 20:22
**providing** 12:11
19:15
**proximity** 69:19
**Public** 1:16 74:5
74:18 77:18
**punches** 21:14
**purely** 12:24
**purpose** 49:10
**pursuant** 74:6
**put** 14:2 19:19
21:3 23:8
27:21 30:16
32:4 33:5 42:6
43:21 44:10
46:11 63:14
67:20 68:20
70:22 71:4
**putting** 13:21
41:1

**Q**

**quarter** 72:5
**question** 4:15
6:12,20,21
8:20 18:20
19:24 36:3,7
39:11 43:2
45:23 50:19,20
63:15

**questions** 6:10
8:20 18:24
77:6
**quickly** 27:9
67:18
**quite** 15:24
26:13 28:9

**R**

**R** 2:1 74:1 76:2
76:2
**race** 28:17
**ran** 13:17 14:3
**range** 39:23
**rapid** 54:6
**reactive** 27:2
**read** 5:4 15:16
15:19 75:1
77:3
**really** 26:24
34:13 46:6
**reason** 6:19
39:17 42:21
43:9,15 51:14
51:21 55:3,8
55:21 57:21
59:13 62:6,17
63:10,13 65:6
72:22 75:3
76:6,8,10,12
76:14,16,18,20
76:22
**reasons** 63:3
**recall** 9:3 12:3,7
12:17,18 21:24
42:10 62:2
**receipt** 75:13
**receive** 9:20
18:2 36:24
55:19 57:22
**received** 8:15
50:14
**receives** 55:23
56:1
**recess** 47:22
**record** 7:5 15:19

74:10
**recorded** 74:9
**recruiting** 11:4
14:13
**red** 62:19,20
**regardless** 33:14
51:21 52:9
**regional** 13:24
13:24
**regular** 14:18
23:19
**related** 10:9
**relationship**
23:17,18
**remember** 8:13
8:17,21,22
10:22 62:1
**reminded** 52:16
**renew** 9:17
**reported** 66:20
70:6
**reporter** 1:15
15:16
**reporting** 1:20
67:24
**represent** 6:2
42:19
**REQUEST** 4:7
**required** 72:9
**requires** 19:20
**requiring** 17:1
44:8,9,10
**reserved** 5:9
**resource** 7:13
9:9
**respect** 16:9
32:24 33:2,6,8
33:9,16,21
35:10
**respond** 67:10
**responding**
65:18,23,24
**responsibilities**
15:7 68:10
**responsibility**
16:4 66:19

TAMMY GILLETTE

67:7,11 68:7
68:14,23 69:12
69:18 70:4,20
**responsible**
13:20 14:5
15:9 68:4
**result** 41:6 42:6
51:10 52:5
55:3,9,23 63:9
65:5
**results** 54:13
56:2,4,5 57:16
58:22 59:12
63:8
**return** 75:12
**review** 51:1
54:20 55:7
56:3,6,8 57:15
**reviewed** 25:6
31:22
**revisions** 42:24
**revoking** 60:13
**Reynolds** 1:4
6:3 29:10
49:15 50:8,13
50:17 53:4
59:16,20 60:2
60:22 61:21
64:14 66:2,6,9
66:24 67:15
68:22 69:17
70:14,19 71:2
72:5,11,15
**Reynolds'** 48:2
61:17 62:3
64:7 66:19
70:22
**right** 7:11 9:22
11:17 18:22
19:4 35:2
38:21 49:8
60:9 68:8 69:2
69:19 70:21
**role** 13:17
**roll** 21:13
**rules** 30:10 31:7

44:14
**run** 26:14
**running** 13:18
69:24

**S**

**S** 2:1 3:7
**safe** 44:11,16
**salaried** 66:10
**salary** 71:2
**sample** 53:23
**saw** 6:23,24
**saying** 19:6
**says** 62:15 71:20
**scenario** 41:5
**schedule** 66:6,11
67:9
**schools** 14:1
**screw** 69:6
**second** 44:15
**see** 7:4 31:17
40:20 64:6
69:21
**seen** 25:9 49:21
49:23 50:21
61:20 64:17
**seminar** 12:9
**seminars** 10:17
12:2,4,8 45:11
46:16
**send** 50:22
54:10
**sense** 14:7 31:11
42:14
**sent** 54:8,11
61:21
**September** 1:10
63:5 74:14
**sessions** 34:10
**set** 13:23 66:6
67:8
**shake** 6:24
**shame** 27:4
**Shanghai** 15:4,7
37:13
**shape** 14:11

**sheet** 5:6 75:4,7
75:9,12 77:8
**shift** 61:5
**short** 11:5 64:23
**short-term**
72:19
**shorthand** 1:15
74:9
**show** 39:12
57:10 67:9
**showed** 39:5
**showing** 65:6
**shown** 64:12
**shows** 57:14
58:11
**SHRM** 9:6,8,11
9:20 11:9,21
11:22 12:1
13:2,4 17:15
**sic** 27:11
**side** 34:14
**sign** 5:7 75:6
**SIGNATURE**
77:10
**signing** 75:8
**similar** 66:12
68:21
**situation** 18:23
20:15 23:21
27:8 35:20
40:20
**situations** 21:20
**six** 7:16 18:5
29:13,19,23
72:21
**Society** 9:9
**solely** 48:13
49:11
**somebody** 34:18
39:13,16 49:11
53:8 54:4 59:1
59:2 62:13
63:2 68:21
73:8
**someone's** 20:8
**sorry** 15:14,23

31:2 36:20
64:13
**sort** 46:12
**sorts** 16:7 19:3
53:21
**space** 75:4
**speak** 22:7 32:3
32:7,8 42:2
52:1 54:7
61:15 66:11
**speaking** 23:5
32:5 68:5
**specific** 23:24
30:12 45:22,22
45:23 57:10
61:2
**specifically** 12:5
17:17 33:4
47:12 48:13
56:4,23
**specifics** 12:24
32:1 61:14
**specimen** 54:2,5
54:20
**spell** 9:7
**spend** 68:3
**split** 54:1,2,5
**spoke** 70:17
**spoken** 49:18
**sports** 58:10
**spouses** 22:21
**St** 10:15,21
23:13,17 26:16
27:4,6,15,23
28:6,7 37:14
37:18 68:22,24
**stand** 10:22
**standard** 51:18
53:7,10
**stands** 9:8
**start** 40:18,22
45:5 67:5
69:12 73:8
**started** 13:18
21:2 26:7
32:20 40:17

41:3 45:7,9,11
45:13,19 46:14
72:5,16
**starting** 31:13
**state** 31:15,24
38:10 44:8
48:13,16 63:4
74:5 75:3
**state-side** 15:5,6
**stated** 63:7
**statement** 25:1
**states** 1:1 12:19
12:22 31:5
38:18 44:5,6
45:22
**stating** 54:10
**stayed** 44:13
**step** 39:6
**steps** 19:5 23:9
24:1
**Steve** 6:2 65:1
**STEVEN** 2:3,3
**stimulant** 57:7
**stipulations**
4:11 5:3
**stop** 16:10 65:23
**stopping** 60:12
64:20
**Street** 1:20
**struggling** 34:12
**stuff** 10:7 20:17
**stupid** 31:9
**subject** 12:14
75:8
**submits** 58:20
**Subscribed**
77:12
**substance** 30:23
31:14 46:18
77:7
**success** 70:7
**successful** 71:19
71:22
**sudden** 34:22
**Suite** 1:20 2:4,9
**summarize**

44:22
**superintendent**
14:1
**supervision** 23:1
74:9
**supervisor**
17:20 34:4,5,6
34:8 35:15
**supervisors** 34:2
34:3
**SUPPORT** 4:1
**supposed** 60:24
**sure** 9:8,24
15:10 16:4,8
16:18 17:4
18:23 19:15
23:3,10,15
24:2 25:7,13
26:17 27:10,24
28:11 31:23
32:23 33:13
35:1,4,8,17
40:2,9,10
44:10,16 63:18
65:14 66:4,17
66:22 67:4
**swear** 5:15
**sworn** 5:19 74:7
77:12

**T**
**T** 2:3,3 3:7 74:1
74:1 76:2
**take** 6:4 16:21
16:24 19:5
23:9 24:1
47:18 51:2
53:13,17 54:24
54:24 61:1
67:10
**taken** 12:10
16:23 24:2
40:9 47:22
74:6
**takes** 23:3 53:12
**talk** 12:18 17:8

26:12 27:1
31:19 34:3
51:13,24,24
69:23
**talked** 35:10
48:6
**talking** 19:10
20:5,7,9 21:21
27:5
**talks** 71:21
**TAMMY** 1:12
3:3 5:18 73:17
74:6
**Teasdale** 10:15
11:10,16,18
**tell** 6:7,13,18,20
14:10 50:16
52:3 62:22
64:9 74:7
**telling** 40:4 71:6
**tells** 66:12
**term** 28:19 49:1
49:2
**terminate** 34:23
53:1
**terminated**
59:18,20 60:11
65:8
**terminating**
34:18 63:1,4
64:4
**termination**
14:14 33:24
34:3,19,24
41:6 50:11
51:10,16 60:13
60:17,19 62:4
63:3,16,20,24
64:14 65:6
**terms** 10:13
16:11 21:19
26:22 27:11,13
27:14 31:24
32:8 35:10
43:3
**test** 50:8,13

52:18 53:5,13
53:13,24 54:3
54:6,15 55:7
56:17 57:5,7
57:11 58:20
59:8,14 61:24
63:7,8,11,23
**tested** 50:17
55:22
**testified** 5:19
**testimony** 3:3
74:8,10
**testing** 53:7,11
54:11,14,17,19
57:1,1 58:24
**theirs** 10:16
**thereof** 74:12
**They'd** 26:14
**thing** 18:12
46:12 52:7,11
**things** 10:11
13:23 14:17
16:7 19:3 21:1
25:22 26:18,23
27:6,17 28:14
32:8 33:11,17
35:2,12 45:21
53:21 62:24
69:21
**think** 11:23 16:1
16:2 19:8
41:15 42:2
45:14 46:13
52:21 66:3
**thirty** 75:13
**thought** 30:17
**three** 5:6 24:8
26:11 34:20,22
37:9 44:4 73:9
**three-years-old**
55:19
**threw** 9:5
**Thursday** 67:2
**thyroid** 53:16,17
54:24
**time** 7:10 12:13

20:17 21:7
25:21 32:16
33:9 42:3
51:15,18,20
52:8,14 54:1
55:21,23 60:7
60:7 62:21,23
62:23 66:13
67:5 71:4,21
74:7
**times** 21:4 23:22
62:16 69:4,15
**timing** 72:7
**title** 8:13 13:20
14:4
**titles** 46:12
**today** 6:4,7 8:23
17:7 39:3 63:5
**today's** 67:2
**told** 52:4,4
59:14,15,19,22
60:2,3,8,9
61:19 64:16
66:23
**tolerance** 42:7
**Tom** 19:11,12
**topics** 9:21
24:14
**totally** 65:16
**touch** 24:16
**tow** 65:15,22
**toxicologist**
56:10
**traffic** 37:24
**training** 9:4,11
16:17,21,23,24
17:2,10,14,15
17:16,24 18:3
18:7 32:11
33:23 34:1
36:24 37:4
45:9
**trainings** 9:19
**transcribed**
74:9
**transcript** 75:14

75:15
**transcription**
74:10 77:5
**traveling** 24:19
**treat** 19:11 33:8
33:9,15 35:11
**treated** 16:9
32:24
**treatment** 40:11
**trickle-down**
41:3
**trips** 23:15
**truck** 65:15,23
**true** 74:10
**truth** 6:7 74:8,8
74:8
**trying** 20:4
69:21
**turn** 23:5 32:5,7
32:8 68:15,17
**turned** 55:13
**twice** 66:3
**two** 5:4 14:2
26:18,22 52:21
60:1 72:1,18
73:8
**type** 18:15 53:15
55:4
**types** 30:7
**typically** 10:24
14:10 37:24
63:2 64:1

**U**
**uh** 52:11
**uh-uhs** 7:4
**ultimately** 68:7
**understand** 6:6
6:9,10,11,12
6:14,19,21
13:12 20:4
32:6 33:20
44:21 48:15
**understanding**
5:13 49:1
60:20 71:1

33:14
**Understood**
30:20
**unfortunately**
21:8 43:18
**union** 62:14
**unions** 11:3
30:13
**unique** 39:17
**UNITED** 1:1
**University** 8:4
**update** 43:15
44:23 45:17
46:11,22 47:14
**updated** 42:13
47:5,10,14
**updates** 9:24
10:4,6 12:12
**updating** 30:20
42:17 43:17
44:14 45:6
46:2
**use** 11:19 21:16
21:17 27:23
41:10 49:9
69:9 70:2
**user** 41:13 60:3
**usually** 11:5
72:18

**V**

**v** 1:6
**vacation** 51:21
73:6,7
**valid** 57:15
**validate** 55:8
**validation** 55:20
55:24
**variety** 11:2
13:23 24:13
30:4 35:18
**various** 17:3
**verbal** 24:11
**verbalize** 7:2
**verifying** 5:8
**versus** 17:16

27:1
**VIDEOCONF...**
1:13
**view** 18:22 30:9
**viewpoint** 33:5
**Virginia** 31:10
37:11 38:10
**virus** 44:18
**vision** 72:14
**vitamin** 53:20
**VOLUCK** 2:8
**volunteering**
39:16

**W**

**wait** 27:2 34:16
67:2 70:4
**waiting** 34:20
65:14,19,20,22
67:11
**waived** 5:11
**walk** 39:14
**Walnut** 1:20
**want** 19:23
24:15 27:21
32:2,2,7,8
34:11 36:1,3
46:9 52:10
55:14
**wants** 33:18
51:17
**Warner** 22:5,9
**wasn't** 12:14
61:9 63:10
65:17
**way** 14:11,18
24:7 46:15
58:6 62:13
69:22 70:1
**ways** 20:14
35:18
**we'll** 30:11 36:8
58:8
**we're** 16:5 24:18
24:19 26:15,18
27:10 28:7

30:17 31:20
38:1 40:19
51:16 55:2
63:1
**we've** 24:12 27:6
35:12 70:19
73:11
**webinar** 12:10
**webinars** 10:24
11:20 12:1,3,7
45:12 46:16
**Wednesday**
67:1
**week** 63:18
**weeks** 24:9,11
52:22 73:7,9
**went** 9:16
**weren't** 11:24
30:15
**West** 31:10
37:10 38:9
**wide** 11:1 30:4
**Willert** 1:7 6:4
11:13 14:9
15:1,9 16:18
16:20 17:23
18:3,6 22:5,11
22:15,16,20
23:2 29:4,5,18
29:24 32:12,18
32:20 33:23
35:23 37:9
41:6 42:7
45:22 46:22
47:9 48:8
51:13 61:12
62:9 64:6 68:6
**Willert's** 27:21
45:6 46:3
**Willerts** 32:19
32:23 33:13
**William** 22:17
**willy-nilly** 67:9
**witness** 4:3 5:3,5
5:7,16 6:16
15:14,23 16:15

18:10 20:13
24:5 25:4,16
32:14,16 36:13
36:20 37:7
39:8,11 44:3
47:1,4 49:6
56:19,22 57:20
58:5 66:9
68:20 74:11,13
74:24
**word** 17:9 48:16
63:24
**worded** 62:13
**words** 21:16,17
23:8
**work** 16:8 27:7
27:7 37:19
38:4 44:12
51:7 55:12
56:12 69:14
**work-from-ho...**
30:18
**worked** 14:6
56:24 72:2,3
**workers'** 14:16
40:21
**workforce** 27:16
27:20 28:2,4
28:12,20 32:21
**working** 13:9
30:4,6,8,23
42:15 45:6,13
45:19 46:15
70:3,5
**workplace** 33:3
40:15
**works** 8:22
69:21
**wouldn't** 51:12
61:6
**wrench** 68:16,17
**write** 46:9
**writing** 25:10
**written** 7:1
**wrongful** 33:23
34:2,19,24

**wrote** 13:23

**X**

**X** 3:1,7 18:20

**Y**

**yeah** 14:21
20:22 23:20
28:5,7,8,18,21
31:20 39:15
58:12
**year** 10:7,9,18
10:18 11:7,8
11:10 30:2,3
30:19 43:4,19
43:19 71:3,9
72:8
**years** 7:16 8:15
11:22 13:2,3,6
13:11 18:5
29:13,19,23
32:21 34:20,22
43:1
**Yesterday** 67:2

**Z**

**zero** 42:7
**ZOOM** 1:13

**0**

**1**

**1:03** 73:16
**10** 69:6 73:12
**100** 38:17
**11:04** 1:14
**12:14** 47:19
**12:19** 47:20
**15,000** 71:9
**1518** 1:20
**16** 13:6
**19** 43:14
**19072** 2:4
**19102** 1:21
**19422** 2:9
**1990s** 13:19

TAMMY GILLETTE

| **2** | **7** | | | |
|---|---|---|---|---|
| **2-11** 4:13 | **7:00** 66:16,17 | | | |
| **2005** 13:5 | **704** 1:20 | | | |
| **2016** 42:21 43:2 | **7th** 74:13 | | | |
| 43:11 | | | | |
| **2019** 43:13,16 | **8** | | | |
| 45:9,13,19 | **822** 2:4 | | | |
| 46:21 47:4 | **85,000** 71:2 | | | |
| **202** 77:14 | | | | |
| **2020** 36:9,15,23 | **9** | | | |
| 37:3 48:21 | **930** 2:9 | | | |
| 63:12 | | | | |
| **2021** 1:10 74:14 | | | | |
| **210** 2:4 | | | | |
| **215-461-1100** | | | | |
| 2:10 | | | | |
| **215-567-1701** | | | | |
| 1:21 | | | | |
| **215-964-4410** | | | | |
| 2:5 | | | | |
| **250** 15:3 | | | | |

**3**

**3** 1:10
**30** 13:11 75:13
**35** 37:24
**3rd** 63:5

**4**

**40** 37:24
**401K** 71:12,24
**420** 2:9
**45** 11:5
**480** 72:2

**5**

**5** 3:4 4:13 63:12
**5:21-cv-01208**
  1:4
**5th** 63:15,17

**6**

**6:47** 66:24
**60** 72:15
**6th** 63:18